# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| COREY E. JOHNSON,<br><br>            *Plaintiff*,<br><br>    v.<br><br>CANINE OFFICER MCCOWAN, WARDEN JEFFREY KISER, CANINE SERGEANT STANLEY, COMMONWEALTH OF VIRGINIA *by and through the Virginia Department of Corrections*, HAROLD W. CLARKE, *in his individual capacity and official capacity as Director of the Virginia Department of Corrections*, WILLIAM BARBETTO, *in his individual capacity and official capacity as Statewide Canine Program Coordinator for the Virginia Department of Corrections*, A. DAVID ROBINSON, *in his individual capacity and official capacity as Chief of Corrections Operations for the Virginia Department of Corrections*, and JOHN DOES 1-4,<br><br>                  *Defendants*. | Civil No. 7:20-cv-00582<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiff Corey E. Johnson is the victim of a gruesome canine attack that occurred inside Virginia's Red Onion State Prison ("Prison"). On May 20, 2020, Defendant Officer McCowan maliciously deployed his canine against Mr. Johnson as he was lying motionless and face down on the ground with his arms extended outward. Defendant McCowan's canine proceeded to maul Mr. Johnson's right wrist and arm, dragging him several feet, while other

Defendants chose to stand by and let Mr. Johnson suffer, deliberately shunning their duties as Officer McCowan's fellow officers or supervisors.

2.     Although the use of canines in a force capacity is widely recognized as an extreme and brutal measure, the official policies, practices, and customs of the Virginia Department of Corrections ("VDOC") continue to allow the use of unmuzzled canines to terrify and attack prisoners in order to ensure their compliance with prison guard orders. These VDOC policies permit, condone, and ratify the acts and omissions of officers like Defendant McCowan, who engage canines to bite or physically restrain prisoners in a malicious, violent, and brutal fashion. The conduct of such officers within VDOC detention facilities constitutes a clear violation of the constitutional rights of prisoners, including Mr. Johnson.

3.     Indeed, as a result of this malicious canine attack, Mr. Johnson was severely injured, suffering deep wounds in his right arm and hand that required a visit to the emergency room and a total of twenty-one stitches. Months later, Mr. Johnson still suffers injuries from the attack. He continues to experience numbness between his thumb and index finger and has nerve damage in his right arm.

4.     Mr. Johnson now brings this action to hold Defendants accountable for violating his rights under the United States Constitution and the laws of the Commonwealth of Virginia and to enjoin and estop the VDOC policies permitting, condoning, and ratifying canine attacks on prisoners.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

6.     This Court has supplemental jurisdiction over Plaintiff's claims under Virginia law pursuant to 28 U.S.C. § 1367.

7.     Venue lies in the Western District of Virginia under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action took place in this District, specifically at the Prison located in Wise County, Virginia.

## PARTIES

8.     Plaintiff Corey E. Johnson is and was at all times relevant to this Complaint a citizen of the Commonwealth of Virginia. He was incarcerated at the Prison and housed in the Prison's A-1 Pod on May 2, 2020. Mr. Johnson's VDOC identification number is 1061522.

9.     Defendant McCowan is a corrections office and Canine Officer of the Patrol Canine Team at the Prison and served in that capacity on May 2, 2020 and at all times relevant to this Complaint. According to VDOC Operating Procedure 435.3, the Patrol Canine Team consists of Canine Officers and their canines, which are trained to assist in maintaining security, custody, and control of prisoner populations. He is sued in his individual capacity.

10.    Defendant Warden Jeffrey Kiser is employed by VDOC as Warden and Facility Unit Head of the Prison and held such position on May 2, 2020 and at all times relevant to this Complaint. As Warden, Defendant Kiser is tasked with supervising daily operational activities at the Prison, ensuring staff compliance with VDOC policies and procedures, training the Prison's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. He also receives all Canine Bite Reports for any incidents in the Prison that result in a canine bite. He is sued in his individual capacity.

3

11.   Defendant Canine Sergeant Stanley is employed by VDOC as the Prison's Institutional Canine Sergeant and served in that capacity on May 2, 2020 and at all times relevant to this Complaint. In his capacity as the Prison's Institutional Canine Sergeant, he provides support to and oversees the Prison's Canine Officers, including the Patrol Canine Team, and is responsible for ensuring that the Canine Officers at the Prison comply with all policies applicable to the use of force and deployment of canines. Under VDOC Operating Procedures, Defendant Stanley receives all Canine Bite Reports for any incidents in the Prison that result in a canine bite and must be notified immediately of such incidents. He is sued in his individual capacity.

12.   Defendant Commonwealth of Virginia, through Defendant Virginia Department of Corrections, operates and maintains correctional facilities within Virginia, including the Prison. Specifically, VDOC provides supervision and control over state correctional facilities and is responsible for issuing regulations, policies, directives, and operating procedures governing the operation of state correctional facilities, including the Prison.

13.   Defendant Director Harold W. Clarke is the Director of VDOC and held such position on May 2, 2020 and at all times relevant to this Complaint. In his capacity as Director, Defendant Clarke serves as the official governing authority for VDOC and is responsible for overseeing all employees of VDOC and reviewing and approving the policies that govern the conduct of VDOC officers, including the policies concerning the use of force and use of canines described herein. At all times relevant to the subject matter of this litigation, Defendant Clarke was acting under color of state law in his capacity as Director of VDOC. He is sued in his individual capacity and his official capacity for injunctive and declaratory relief.

14.   Defendant A. David Robinson is the Chief of Corrections Operations for VDOC and held such position on May 2, 2020 and at all times relevant to this Complaint. In his capacity as

Chief of Corrections Operations, Defendant Robinson leads the VDOC facilities and is responsible for reviewing and approving the policies that govern the conduct of VDOC officers, including the policies concerning the use of force and use of canines described herein. At all times relevant to the subject matter of this litigation, Defendant Robinson was acting under color of state law in his capacity as Chief of Corrections Operations for VDOC. He is sued in his individual capacity and his official capacity for injunctive and declaratory relief.

15.    Defendant William Barbetto is the Virginia Statewide Canine Program Coordinator for VDOC and held such position on May 2, 2020 and at all times relevant to this Complaint. In his capacity as Statewide Canine Program Coordinator, Defendant Barbetto coordinates training and field operations and provides leadership and guidance to the VDOC Canine Program. Defendant Barbetto also holds responsibility for reviewing and approving the policies that govern the conduct of VDOC Canine Officers, including the policies concerning the use of canines as a means of force described herein. Under VDOC Operating Procedures, he receives all Canine Bite Report for any incident in a VDOC facility that result in a bite and must be notified immediately such incidents. At all times relevant to the subject matter of this litigation, Defendant Barbetto was acting under color of state law in his capacity as the Virginia Statewide Canine Program Coordinator. He is sued in his individual capacity and his official capacity for injunctive and declaratory relief.

16.    Defendant John Doe 1 was employed by VDOC as a corrections and Canine Officer at the Prison on May 2, 2020. He is sued in his individual capacity.

17.    Defendant John Doe 2 was employed by VDOC as a corrections officer at the Prison on May 2, 2020. At all times relevant to this Complaint, he staffed the control booth inside the A-1 Pod as a gun officer. He is sued in his individual capacity.

18.    Defendants John Does 3–4 were employed by VDOC as corrections officers at the Prison on May 2, 2020. At all times relevant to this Complaint, they staffed the control booth inside the A-1 Pod as control booth officers. They are sued in their individual capacities.

19.    The "Doe Defendants" in this matter are Prison employees whose identities are not presently known to Mr. Johnson but who were active participants in the denial of Mr. Johnson's Eighth Amendment right to be free from cruel and unusual punishment. The identities of these Defendants will be pursued in discovery, and these Defendants may be added in their individual and official capacities as appropriate.

## FACTUAL ALLEGATIONS

***Virginia's Policy Authorizing Using of Canines to Control Prisoners***

20.    VDOC operates a statewide Canine Program, the structure and function of which is defined by VDOC Operating Procedure 435.3. The very first paragraph of that Operating Procedure provides that one of the primary goals of the VDOC's Canine Program is to allow the use of canines to assist officers "in control of offenders."[1]  That Operating Procedure, signed by Defendant Robinson as Chief of Corrections Operations, further makes clear that the Defendant Barbetto, as Statewide Canine Program Coordinator, maintains responsibility over both the Canine Program Team policies and its individual Canine Officers.

---

[1]  Although VDOC publishes many of its Operating Procedures, it does not publish VDOC Operating Procedures 435.3, 420.1, or 420.2. The copies of those VDOC Operating Procedures that VDOC provided to counsel for Mr. Johnson through Virginia Freedom of Information Act requests contain extensive redactions, including to the portions detailing the specific utilization of the VDOC Canine Teams and general utilization of force. Thus, while it is clear that Operating Procedures 435.3, 420.1, and 420.2 permit the use of canines in the Prison and other VDOC facilities, the precise scope of the authorized use under the policies remain unclear at this stage in the proceedings.

21.     Although the United States Constitution prohibits the use of excessive force against prisoners and VDOC's own policies, including Operating Procedure 420.1, purport to restrict the use of force "only as a last resort," the use of canines to attack prisoners in VDOC facilities is systemic and has led to severe physical and psychological injuries in prisoners.

22.     The use of unmuzzled canines by prison officers as a means of force and intimidation to secure compliance with orders has been widely recognized as an extreme, brutal, and unnecessary tactic. As Kathleen Dennehy, then-Commissioner of the Massachusetts Department of Corrections, succinctly explained: "[t]here are other ways to compel inmates to cuff up than sending in an animal to rip his flesh."[2] Indeed, many corrections experts recognize "the notion that dogs are different; they cannot simply be considered as another way of exercising force over a prisoner; that there is something inherently troubling about the use of a trained attack dog to bite prisoners."[3]

23.     The canines used in these attacks are no ordinary dogs. Canines used by officers to inflict force are bred and trained to bite hard and bite multiple times, inflicting wounds that, according to experts and medical researchers, are more akin to shark attacks than the average dog bite.[4] In many instances, those inflicted with such wounds experience permanent nerve damage and, in some cases, even death.[5] And even when trained, these canines do not always stop biting

---

[2] Human Rights Watch, *Cruel and Degrading: The Use of Dogs for Cell Extractions in U.S. Prisons* (Oct. 9, 2006), https://www.hrw.org/report/2006/10/09/cruel-and-degrading/use-dogs-cell-extractions-us-prisons.

[3] *Id.*

[4] The Marshall Project, *We Spent A Year Investigating Police Dogs. Here Are Six Takeaways* (Oct. 2, 2020), https://www.themarshallproject.org/2020/10/02/we-spent-a-year-investigating-police-dogs-here-are-six-takeaways.

[5] *Id.*

when ordered to do so, increasing the likelihood of prolonged attacks and even greater injury from the manual efforts required to pry the canines away.[6]

24.     Recognizing the real and significant dangers of engaging canines to bite or restrain prisoners, many states have prohibited or severely restricted the use of attack dogs in confinement settings.[7]  In fact, in the wake of Ahu Ghraib and the reports that canines had been used to harass, threaten, and assault detainees, the United States Armed Forces revised their policy on the use of Military Working Dogs to expressly prohibit the use of canines in guarding detainees and military prisoners abroad or as a means of intimidation or coercion in interrogations.[8]

25.     Nevertheless, the Operating Procedures issued by VDOC and approved by Defendants Clarke, Robinson, and Barbetto—in particular Operating Procedure 435.3, 420.1, and 420.2—allow officers to engage canines to bite or physically restrain prisoners in facilities throughout the state. While VDOC Operating Procedures purport to restrict canine deployment and other use of force "only as a last resort," as many commentators have suggested, the legitimacy of such a use in a confinement setting is limited at best.

26.     Operating Procedure 435.3, Operating Procedure 420.1, and Operating Procedure 420.2 do not provide meaningful guidance or restrictions on the use of canines because, among other reasons, the terms "appropriately matched" and "last resort" are vague and subject to

---

[6] *Id.*; *see also* Christy Lopez, *Don't overlook one of the most brutal and unnecessary parts of policing:    Police    dogs*,    Washington    Post    (July    6,    2020), https://www.washingtonpost.com/opinions/2020/07/06/police-dogs-are-problem-that-needs-fixing/.

[7] Human Rights Watch, *Cruel and Degrading: The Use of Dogs for Cell Extractions in U.S. Prisons* (Oct. 9, 2006),  https://www.hrw.org/report/2006/10/09/cruel-and-degrading/use-dogs-cell-extractions-us-prisons.

[8] U.S. DEPT OF THE ARMY, INSTR. 190-12, MILITARY WORKING DOG PROGRAM ch. 7-4.b (Oct. 23, 2019).

individual interpretation. As a result, the use of canines to attack prisoners under the guise of managing behavior in VDOC facilities is systemic. In many cases, including Mr. Johnson's, canines are engaged in excessive, malicious, and wholly egregious manners in violation of the prisoner's constitutional rights. Prisoners in facilities throughout the state have described canine attacks similar to the one experienced by Mr. Johnson. They report that canines are often permitted to bite, drag, or otherwise maul prisoners who are already complying with correctional officer orders. Often, these prisoners are in compromising positions—facedown, arms out—with little ability to reduce the physical damage from the canine's bites. They experience physical injuries, including deep lacerations, disfigurement, and permanent nerve damage, and perhaps worse, severe mental anguish as a result of these attacks.

27. Moreover, VDOC policies and practices allow corrections officers, either expressly or through failure to provide sufficient training and discipline, to deploy canines against prisoners in a manner wholly inconsistent with accepted guidance on patrol canines. On information and belief, VDOC policies and practices permit or fail to prevent Canine Officers from deploying canines before sufficient time is provided for a prisoner to comply with officer orders. VDOC's failure to adhere to the widely recognized standards for canine deployment both facilitates and exacerbates the systemic problem of canine attacks in VDOC facilities.

28. The use of canines to bite or restrain prisoners is unnecessary and excessive. Given the pervasive nature of the use, and abuse, of the tactic in VDOC facilities, VDOC policies must be changed to prohibit the use of canines as a means of, or in any way connected to, attacking, restraining, or physically engaging with prisoners within VDOC facilities. At the very least, VDOC policies and procedures must be revised so that they provide meaningful guidance for Canine

Officers on the appropriate instances in which a canine may be engaged as a means of force and so that they comport with accepted standards for canine deployment.

***Defendant McCowan's Malicious Deployment of His Patrol Dog to Attack Mr. Johnson***

29.   Mr. Johnson, now 51 years old, has been incarcerated at the Prison for the past two years.

30.   On May 2, 2020, at around 6:06 p.m., Mr. Johnson was engaged in a fistfight with another prisoner near the telephone booths in the A-1 Pod. During the altercation, Mr. Johnson and the other prisoner began to wrestle on the ground.

31.   While Mr. Johnson was straddled on top of the other prisoner during the altercation, Defendant John Doe 2 shot Mr. Johnson in his back and arm roughly five times with gas canisters from the A-1 Pod's control booth.

32.   A-1's control booth is located on the second floor of the housing unit, approximately twelve feet above the ground and ten feet away from the scene of the physical altercation and the subsequent dog attack.

33.   After Defendant John Doe 2 fired at least five shots, Mr. Johnson ceased fighting and stood up. The other prisoner remained on the ground; no other prisoners were fighting in the immediate vicinity.

34.   The Patrol Canine Unit, including Defendant John Doe 1, Defendant McCowan, and their canine patrol dogs, were dispatched to the A-1 Pod to respond to the altercation. They arrived at the Pod shortly after the gun officer shot Mr. Johnson and Mr. Johnson had ceased fighting.

35.   Upon information and belief, it is a common procedure for Canine Officers at the Prison to order prisoners to lie on the ground upon entering a Pod.

36.     Anticipating such orders, Mr. Johnson immediately placed himself face down on the ground and extended both arms outward when he saw the Patrol Canine Unit.

37.     At or around the same moment Mr. Johnson first saw the Patrol Canine Unit, Defendant McCowan gave Mr. Johnson a verbal order to "lie face down" on the floor and place his hands on the ground. Having preemptively complied with this order, Mr. Johnson continued to lay prostrate and motionless on the ground.

38.     Defendant McCowan nonetheless released his canine upon Mr. Johnson's prostrate and motionless body and ordered it to attack him.

39.     As a result of Defendant McCowan's command to attack, the canine latched onto Mr. Johnson's right wrist and right arm and began to maul Mr. Johnson.

40.     Despite Mr. Johnson's continued compliance with the order to lie on the ground, Defendant McCowan failed to disengage the canine, allowing it to continue biting Mr. Johnson. Defendant McCowan encouraged the canine to prolong the attack by patting its back and saying "good boy" as it continued to hold onto Mr. Johnson's right arm.

41.     The canine dragged Mr. Johnson by his arm approximately two to three feet across the Pod's floor, leaving three deep lacerations on Mr. Johnson's dominant right hand and down his right arm. Each laceration was approximately one-and-a-half inches long.

42.     The canine's bite also caused heavy bleeding. The surrounding floor of the Pod was covered in Mr. Johnson's blood.

43.     By the time the canine had released Mr. Johnson from its grasp, it had mauled Mr. Johnson's right wrist and right arm for an approximate total of ten to thirteen seconds.

44.     At no point during the attack did Mr. Johnson stand up or make any other movement toward Defendant McCowan or any others. Unlike the uneven, surface-level, or zig-zagging

11

wounds a canine might leave on a person who continues an altercation in defiance of official orders, Mr. Johnson's wounds were deep, clean, and had no jagged patterns because he had remained prostrate on the ground during the attack.

45.    After the canine attack, Defendant McCowan escorted Mr. Johnson to the Prison's medical station for a preliminary examination. During the examination, Defendant McCowan remarked that his dog gave Mr. Johnson "one of the best bites" he had ever seen.

46.    Due to the severity of Mr. Johnson's bite wounds, he was immediately transported to an emergency room at a Norton, Virginia hospital off the Prison's grounds during a deadly pandemic.

47.    Mr. Johnson received a total of twenty-one stitches for his wounds.

48.    As a result of the dog bite, Mr. Johnson has suffered and continues to suffer from numbness between his right thumb and index finger as well as nerve damage in his right arm.

49.    Defendant McCowan's deployment of his patrol dog on Mr. Johnson on May 2, 2020 violated several VDOC Operating Procedures, including Operating Procedure 420.1 and 420.2, which governs the use of force and measures used to control prisoner behavior in Virginia correctional institutions. Under Operating Procedure 420.1, force, which includes deployment of canines, should be used "only as a last resort." Further, pursuant to Operating Procedure 420.2, measures used to control prisoner behavior "must be appropriately matched to the seriousness of the behaviors they are intended to control," and "must not be applied any longer than necessary to manage the targeted behaviors."

50.    Mr. Johnson's behavior did not in any way necessitate the use of a canine against him, and certainly not for the length of time and in the manner employed. Mr. Johnson already had disengaged from the altercation and was passively lying face down on the ground when the canine

12

was deployed to attack him. Mr. Johnson did not verbally threaten the Canine Officers at any point prior to or during the canine's attack. He had no weapon in his possession.

51.    That Defendant McCowan's use of the canine was excessive and not appropriately matched to Mr. Johnson's behavior is supported by the unsubstantiated and unpersuasive justifications for Defendant McCowan's attack on Mr. Johnson that Prison officials have since crafted.

52.    After allegedly reviewing surveillance footage of the incident, Sergeant Massingil filed a disciplinary charge against Mr. Johnson for violating section V(A)(129) of VDOC Operating Procedure 861.1, claiming Mr. Johnson "approached [Floor Officer] Mullins in a threatening manner" at some time before or during his physical altercation with the other prisoner.

53.    Upon information and belief, this charge was fabricated in order to justify Defendant McCowan's release of his patrol canine to attack Mr. Johnson.

54.    Mr. Johnson did not see—much less approach or threaten—Officer Mullins before or during the incident on May 2. In fact, upon Mr. Johnson's return from the emergency room, at around 2 a.m. the next day, Officer Mullins informed Mr. Johnson that he was nowhere near the scene of the altercation or the dog attack. Officer Mullins also told Mr. Johnson that he "didn't even hear the gun go off," referring to the five shots fired by Defendant John Doe 2 during the altercation.

55.    Later, in the Prison's official response to Mr. Johnson's Level 1 grievance, Defendant Stanley claimed that Defendant McCowan's actions were justified because Mr. Johnson's left hand remained hidden under his chest after Mr. Johnson was told to spread both of his arms out on the ground. Defendant Stanley alleged that Mr. Johnson "refused direct orders," which "added seconds to the canine's engagement."

13

56.   Contrary to Defendant Stanley's assertions, Mr. Johnson complied with Defendant McCowan's orders and placed both hands out on the ground. Mr. Johnson's left hand was not obscured from view, and he did not "refuse[] direct orders."

57.   Mr. Johnson did not approach Officer Mullins in a "threatening manner," nor did he obscure his left hand beneath him during the attack. These two justifications also are inconsistent. Regardless, neither action taken together nor separately would suffice to justify the force that was used against him.

### Bystander Officers' Failure to Intervene in the Dog Attack

58.   The Prison operated the Max-Pro video surveillance system on May 2, 2020.

59.   The A-1 Pod's control booth was equipped with monitors that allowed for real-time surveillance of all prisoner movements inside the Pod through the Max-Pro system.

60.   Upon information and belief, Defendants John Does 2–4 were guarding the control booth during the dog attack on May 2, 2020 and personally witnessed the incident through their clear view of the scene from above and on the monitors.

61.   Another canine officer, Defendant John Doe 1, also reported to the A-1 Pod, along with his canine, to respond to the physical altercation between Mr. Johnson and the other prisoner.

62.   Defendants John Does 1–4 were all aware that Mr. Johnson was exposed to a substantial risk of serious harm from Defendant McCowan's deployment of his patrol canine and failure to disengage his patrol canine as it attacked Mr. Johnson.

63.   Because Defendant John Doe 1 had also reported to the A-1 Pod to respond to the physical altercation between Mr. Johnson and the other prisoner, he was therefore in close enough proximity to intervene and assist Mr. Johnson.

64.     Though Defendant John Doe 1 witnessed the attack at close range, and should have been aware that Defendant McCowan's canine deployment was excessive and not consistent with VDOC policies, he refused to intervene to get Defendant McCowan to control the dog as it continued to bite Mr. Johnson and drag him across the floor.

65.     Defendants John Doe 2 and John Does 3 and 4 had a clear view of the altercation and canine attack, yet similarly refused to intervene to cause Defendant McCowan to control the canine, for example by altering Defendant McCowan that Mr. Johnson was in compliance with his orders and was not a threat.

***Defendants Kiser's and Stanley's Failure to Properly Supervise, Train, and Discipline Defendants McCowan and John Does 1–4***

66.     VDOC Operating Procedure 420.2 establishes guidelines for the control and management of prisoner behavior through behavior management and control techniques. That Operating Procedure mandates that any control measures taken "must be appropriately matched to the seriousness of the behaviors they are intended to control" and that "controls must not be applied any longer than is necessary to manage the targeted behavior."

67.     Under VDOC Operating Procedure 420.1, the use of force, including through the engagement of canines, is limited to instances "of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort." Any force that "is beyond what is reasonably required to prevent harm or to control a particular situation or is not justified by the circumstances" is deemed "excessive force." Force may never be used for "vindictive or retaliatory purposes" and is "never justifiable as punishment."

68.     Pursuant to VDOC Operating Procedure 435.3, which permits canines to be deployed as a means of prisoner control, any incident involving a canine bite must be logged in a Canine Bite Report in the Dog Information Governance & Operation System (DINGO), and any injury

must be photographed and included with the Canine Bite Report. Operating Procedure 435.3 further requires that all Bite Reports be delivered to the Statewide Canine Program Coordinator, Shift Commander, Administrative Duty Officer, and the Facility Unit Head. Additionally, the Operating Procedure mandates that the Statewide Canine Program Coordinator and the Institutional Canine Sergeant be immediately notified whenever a canine bites a prisoner.

69.   Accordingly, under Operating Procedure 435.3, Defendants McCowan and John Doe 1 were required to submit a Canine Bite Report, including a photograph of Mr. Johnson's injuries, to DINGO and to immediately notify Statewide Canine Program Coordinator Defendant Barbetto and Institutional Canine Sergeant Defendant Stanley of the incident. Defendants McCowan and John Doe 1's Canine Bite Report would then be forwarded to, among others, Defendant Barbetto, Defendant Kiser, and Defendant Stanley.

70.   On information and belief, Defendant McCowan, Defendant John Doe 1, and other Canine Officers at the Prison have frequently engaged in excessive force, assaulting non-threatening prisoners with their attack canines. Assuming Canine Officers at the Prison complied with VDOC policies, Defendants Kiser, Stanley, and Barbetto knew or should have known about each of these incidents.

71.   Pursuant to VDOC's internal rules, including Operating Procedures 010.1, 135.1, and 135.2, Defendant Kiser, as Warden of the Prison, is responsible for supervising the Prison, training the Prison's corrections officers, and disciplining officers who violate VDOC rules.

72.   Under VDOC Operating Procedure 435.3, Defendant Stanley is responsible for supervising the Prison's Canine Officers and receives notification of every incident in which the use of a canine results in a bite.

16

73.   Upon information and belief, Defendant Kiser and Defendant Stanley failed to properly (a) investigate Defendant McCowan's improper deployment of the canine on May 2, 2020; (b) discipline Defendants McCowan and Does 1-4 for their actions or failure to intervene in connection with that incident of brutality; (c) train corrections officers on the proper use of canines and use of force; and (d) verify that the Canine Program canines and/or Canine Officers were sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

74.   By their investigative and administrative inaction, Defendant Kiser and Defendant Stanley have encouraged Defendants McCowan and Does 1-4 and other corrections officers at the Prison to believe that their use of canines, or failure to intervene to prevent the use of canines, to abuse prisoners is permissible and will not be punished.

75.   It was foreseeable that Defendant Kiser's and Defendant Stanley's failure to properly train, supervise, or discipline Defendant McCowan and the other Prison officers would lead to prisoners being bitten and mauled by patrol dogs even when they posed no threat.

### *VDOC Official's Failure to Properly Supervise, Train, and Discipline Defendants McCowan and John Does 1–4*

76.   Under VDOC Operating Procedure 435.3, the Statewide Canine Program Coordinator, Defendant Barbetto, coordinates training and field operations for the Virginia Canine Program. Pursuant to this Operating Procedure, Defendant Barbetto must be notified immediately of and receive a Canine Bite Report in DINGO for any incident that involves in a canine bite.

77.   As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and holds ultimate responsibility for training, supervising, and disciplining VDOC corrections officers.

78.     As the Chief of Corrections Operations for VDOC, Defendant Robinson leads the VDOC facilities and is responsible for training, supervising, and disciplining VDOC corrections officers.

79.     Upon information and belief, Defendant Barbetto, Defendant Clarke, and Defendant Robinson failed to properly (a) investigate Defendant McCowan's improper deployment of his canine on May 2, 2020; (b) discipline Defendants McCowan and Does 1-4 for their actions or failure to intervene in connection with that incident of brutality; (c) train corrections officers on the proper use of canines and use of force; and (d) verify that the state's canines and/or Canine Officers were sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

80.     As a result of their investigative and administrative inaction, Defendant Barbetto, Defendant Clarke, and Defendant Robinson have encouraged Defendants McCowan and Does 1-4 and other corrections officers to believe that their use of canines, or failure to intervene to prevent the use of canines, to abuse prisoners is permissible and will not be punished.

81.     It was foreseeable that Defendant Barbetto's, Defendant Clarke's, and Defendant Robinson's failure to properly train, supervise, or discipline Defendant McCowan and the other Prison officers would lead to prisoners being bitten and mauled by patrol dogs even when they posed no threat.

82.     Because of Defendants' collective actions and omissions, Mr. Johnson has suffered and continues to suffer physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

83.     Defendants' actions were egregious, warranting punitive damages.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 (Eighth Amendment; Excessive Force)
### Against Defendant McCowan

84.    Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

85.    Defendant McCowan violated Mr. Johnson's Eighth Amendment right to be free from "the unnecessary and wanton infliction of pain" by using excessive force against Mr. Johnson. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

86.    Defendant McCowan used more than *de minimis* force against Mr. Johnson when he ordered his canine to attack him. The dog bit Mr. Johnson and dragged him across the floor, creating deep lacerations on his arms and legs and causing him to endure pain and suffering. Mr. Johnson was forced to receive 21 stitches for those injuries and still suffers from nerve damage related to the attack.

87.    Defendant McCowan's actions were not a good-faith effort to maintain order or restore discipline after an altercation, but rather were carried out maliciously and sadistically for the sole purpose of causing harm to Mr. Johnson.

(a)    Defendant McCowan had no need to order his canine to attack. When he released his patrol canine, Mr. Johnson was already in full compliance with Defendant McCowan's orders.

(b)    Defendant McCowan could not have reasonably perceived that Mr. Johnson posed any threat that would have justified the canine attack. Mr. Johnson had already lain prone on the ground before Defendant McCowan released his dog and remained so during

the entire attack. Nor did Mr. Johnson's assailant, or any other prisoner, pose an alternative threat.

(c) Defendant McCowan's use of his canine in an attack capacity would have been a disproportionately forceful response even had there been a purported need for it, which there was not. Defendant McCowan failed to consider any lesser sanction against Mr. Johnson before engaging the canine. Further, Defendant McCowan failed to disengage the canine while Mr. Johnson remained passive after he had voluntarily laid on the ground.

(d) Defendant McCowan made no attempt to temper the severity of his overly forceful response. His dog bit Mr. Johnson in the right arm and hand repeatedly for ten or more seconds, causing deep lacerations. Defendant McCowan did not restrain his dog at any point during this attack—in fact, he encouraged his dog to continue attacking Mr. Johnson by patting the dog's back and calling it a "good boy."

88.   Because of Defendant McCowan's excessive use of force, Mr. Johnson has suffered and continues to suffer extreme physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

89.   Defendant McCowan's actions were egregious, warranting punitive damages.

## COUNT II
### 42 U.S.C. § 1983 (Eighth Amendment; Deliberate Indifference)
### Against Defendants John Does 1–4

90.   Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

91.   The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners within their facility and prohibits them from acting with deliberate

20

indifference to prisoners' physical safety and well-being. *See Cox v. Quinn*, 828 F.3d 227, 235–36 (4th Cir. 2016).

92.    Defendants John Does 1–4 violated Mr. Johnson's Eighth Amendment right by failing to protect him from Defendant McCowan's excessive use of force.

93.    Defendant McCowan's use of a canine to attack Mr. Johnson exposed him to an obvious and substantial risk of serious harm as he was lying docilely on the ground.

94.    Defendants John Does 1–4 were aware of the canine attack as it was taking place. Defendant John Doe 1 reported to the A-1 Pod to respond to the altercation between Mr. Johnson and the other prisoner and witnessed the attack at close range. Defendants John Does 2–4, on information and belief, were guarding the control booth during the dog attack and witnessed the incident through their clear view of the scene from the booth and on the monitors inside the booth.

95.    Defendants John Does 1–4 were aware of the substantial risk of harm that Mr. Johnson would suffer from the continued canine attack. They could see that the canine bit deeply into Mr. Johnson's right arm and wrist and dragged him across the floor. They could also see that Mr. Johnson remained passive and was unable to protect himself against such abuse.

96.    Yet Defendant Does consciously disregarded such an obvious and substantial threat to Mr. Johnson's physical safety and well-being by refusing to intervene in any meaningful way to protect him from being mauled by Defendant McCowan's canine.

97.    Instead, Defendant John Doe 1 refused to cause Defendant McCowan to order the canine to release Mr. Johnson as it mauled his hand and arm, even though he was aware that Mr. Johnson clearly posed no threat to the security of the facility while lying on the ground.

98.    Defendants John Does 2–4 similarly refused to intervene to cause Defendant McCowan to control the canine.

99.   Because of the Defendants' inaction, Mr. Johnson has suffered and continues to suffer extreme physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

**COUNT III**
**42 U.S.C. § 1983 (Eighth Amendment; Bystander Liability)**
**Against Defendants John Does 1–4**

100.   Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

101.   As corrections officers, Defendants John Does 1–4 had an affirmative duty to stop Defendant McCowan from abusing Mr. Johnson with his canine, in violation of the latter's Eighth Amendment right. *See Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002).

102.   As alleged above, Defendants John Does 1–4 could all see, either on-screen or in plain sight, Defendant McCowan violate Mr. Johnson's constitutional rights by ordering his patrol dog to attack Mr. Johnson while the latter was lying docilely on the ground. They all had a reasonable opportunity to stop the attack and prevent further harm to Mr. Johnson but breached their duty by choosing not to act.

103.   Because of the Defendants' inaction, Mr. Johnson has suffered and continues to suffer extreme physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

**COUNT IV**
**42 U.S.C. § 1983 (Eighth Amendment; Failure to Train, Supervise, or Discipline)**
**Against Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto**

104.   Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

22

105. Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto have an obligation to ensure that their subordinates act within the confines of the law and, when they have notice of a subordinate's tendency to act unlawfully, to prevent such misconduct. *See Randall*, 302 F.3d at 203.

106. As Warden of the Prison, Defendant Kiser is responsible for properly training the Prison's corrections officers, including Defendant McCowan, on the permissive use of force, including but not limited to the use of canines as a means of force. Defendant Kiser is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and use of canines and ensuring that officers do not use their canines as weapons of excessive force against prisoners in his facility.

107. As the Prison's Canine Sergeant, Defendant Stanley is responsible for using his specialized training and experience in patrol canine field operations to provide support, training, and management to Canine Officers such as Defendant McCowan. Defendant Stanley is further responsible for ensuring Canine Officers in the Prison, including Defendant McCowan, comply with VDOC policies concerning the use of force and the use of canines and ensuring that they do not use their canines as weapons of excessive force against prisoners in his facility.

108. As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and is responsible for ensuring that the Prison's corrections officers, including Defendant McCowan, are properly trained on the permissive use of force, including, but not limited to, the use of canines as a means of force. Defendant Clarke is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use of canines and ensuring that officers do not use their canines as weapons of excessive force against prisoners in his facility, such as in connection to disciplinary action.

109.  As the Chief of Corrections Operations for VDOC, Defendant Robinson leads the VDOC facilities and is responsible for ensuring that the Prison's corrections officers, including Defendant McCowan, are properly trained on the permissive use of force, including, but not limited to, the use of canines as a means of force. Defendant Robinson is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use of canines and ensuring that officers do not use their canines as weapon s of excessive force against prisoners in his facility.

110.  As Statewide Canine Program Coordinator, Defendant Barbetto coordinates training and field operations for the VDOC Canine Program, including Defendant McCowan and other Canine Officers in the Prison. He is responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use of canines and ensuring that Canine Officers do not use their canines as weapons of excessive force against prisoners in his facility, such as in connection to disciplinary action.

111. Upon information and belief, Canine Officers at the Prison have engaged in a pervasive pattern of attacking prisoners with patrol dogs when there is no legitimate penological justification for doing so, in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. The systemic problem of Canine Officers at the Prison using patrol dogs to attack prisoners without a legitimate penological justification existed well before the date of Mr. Johnson's attack and continues to this day.

112. Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto have actual or constructive knowledge of their subordinates' widespread, abusive conduct of using canines to attack prisoners and had such knowledge on or before May 2, 2020. Defendants Kiser's, Stanley's, Clarke's, Robinson's, and Barbetto's response to that knowledge, which on information and belief

24

was to do nothing, was so inadequate as to show deliberate indifference to or tacit approval of such unconstitutional practice.

113.   Defendants Kiser's, Stanley's, Clarke's, Robinson's, and Barbetto's inactions caused Defendant McCowan's unconstitutional deployment of his patrol dog against Mr. Johnson on May 2, 2020.

114.   As Warden of the Prison, Defendant Kiser is responsible for properly training the Prison's corrections officers, including Defendants John Does 1–4, on, among other things, (a) the permissive use of force; (b) their obligations to take reasonable measures to guarantee the safety of prisoners within the Prison; (c) their obligation not to act with deliberate indifference to a prisoner's safety and well-being; and (d) their affirmative duty to stop other officers from abusing prisoners in violation of their Eighth Amendment rights. Defendant Kiser is also responsible for supervising and ensuring that VDOC officers comply with their obligations under VDOC policy and the United States Constitution.

115.   As the Prison's Canine Sergeant, Defendant Stanley is responsible for using his specialized training and experience in patrol canine field operations to provide support, training, and management to Canine Officers, including Defendant John Doe 1, on, among other things, (a) the permissive use of force; (b) their obligations to take reasonable measures to guarantee the safety of prisoners within the Prison; (c) their obligation not to act with deliberate indifference to a prisoner's safety and well-being; and (d) their affirmative duty to stop other officers from abusing prisoners in violation of their Eighth Amendment rights. Defendant Stanley is also responsible for supervising VDOC Canine Officers and ensuring that they comply with their obligations under VDOC policy and the United States Constitution.

116.  As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and is responsible for ensuring that the Prison's corrections officers, including Defendants John Does 1–4, are properly trained in, among other things, (a) the permissive use of force; (b) their obligations to take reasonable measures to guarantee the safety of prisoners within the Prison; (c) their obligation not to act with deliberate indifference to a prisoner's safety and well-being; and (d) their affirmative duty to stop other officers from abusing prisoners in violation of their Eighth Amendment rights. Defendant Clarke is also responsible for supervising VDOC officers and ensuring that they comply with their obligations under VDOC policy and the United States Constitution.

117.  As the Chief of Corrections Operations for VDOC, Defendant Robinson leads the VDOC facilities and is responsible for ensuring that the Prison's corrections officers, including Defendant John Doe 1, are properly trained in, among other things, (a) the permissive use of force; (b) their obligations to take reasonable measures to guarantee the safety of prisoners within the Prison; (c) their obligation not to act with deliberate indifference to a prisoner's safety and well-being; and (d) their affirmative duty to stop other officers from abusing prisoners in violation of their Eighth Amendment rights. Defendant Robinson is also responsible for supervising the Prison's corrections officers and ensuring that they comply with their obligations under VDOC policy and the United States Constitution.

118.  As Statewide Canine Program Coordinator, Defendant Barbetto coordinates training and field operations for the VDOC Canine Program. Training includes, among other things, (a) the permissive use of force; (b) Canine Officers' obligations to take reasonable measures to guarantee the safety of prisoners within the Prison; (c) Canine officers' obligation not to act with deliberate indifference to a prisoner's safety and well-being; and (d) Canine officers' affirmative duty to stop

26

other officers from abusing prisoners in violation of their Eighth Amendment rights. He is also responsible for supervising VDOC Canine Officers and ensuring that they comply with their obligations under VDOC policy and the United States Constitution.

119.  Upon information and belief, there is a pervasive pattern at the Prison wherein officers fail to take reasonable measure to guarantee the safety of prisoners or act with deliberate indifference in response to Canine Officers deploying patrol dogs on prisoners when there is no legitimate penological justification for doing so, in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. This pervasive pattern of inaction and deliberate indifference to using canines to attack prisoners without a legitimate penological justification existed well before the date of Mr. Johnson's attack and continues to this day.

120.  Defendants Kiser, Stanley, Barbetto, Clarke, and Robinson have actual or constructive knowledge of their subordinates widespread, abusive conduct of failing to prevent or acting with deliberate indifference toward the use of canines to attack prisoners and had such knowledge on or before May 2, 2020. Defendant Kiser's, Defendant Stanley's, Defendant Barbetto's, Defendant Clarke's, and Defendant Robinson's response to that knowledge, which on information and belief was to do nothing, was so inadequate as to show deliberate indifference to or tacit approval for such unconstitutional practice.

121.  Defendant Kiser's, Defendant Stanley's, Defendant Barbetto's, Defendant Clarke's, and Defendant Robinson's inactions caused Defendants John Does 1–4 to fail to prevent Defendant McCowan's unconstitutional deployment of his patrol dog against Mr. Johnson on May 2, 2020.

**COUNT V**
**42 U.S.C. § 1983 (Eighth Amendment)**
**Against Defendants VDOC, Clarke, Robinson, and Barbetto**

122.  Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

123.  The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners within their facility. *Cox*, 828 F.3d at 235.

124.  Moreover, the Eighth Amendment affords prisoners the right to be free from "the unnecessary and wanton infliction of pain." *Hudson*, 503 U.S. at 5 (quoting *Whitley*, 475 U.S. at 319).

125.  Upon information and belief, Canine Officers at the Prison and in other facilities managed by VDOC have engaged in a pervasive pattern of deploying dogs to attack prisoners when there is no legitimate penological justification for doing so, in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. This systemic problem of Canine Officers at the Prison using patrol dogs on prisoners without a legitimate penological justification existed well before May 2, 2020, when Mr. Johnson was attacked, and continues to this day.

126.  Despite widespread recognition that the use of unmuzzled canines to bite or physically restrain prisoners is extreme, brutal, and "inherently degrading," the widespread and pervasive pattern of canine attacks against prisoners is authorized, permitted, and condoned by the official VDOC Operating Procedures, including Operating Procedure 435.3, which permit officers to engage canines to bite or physically control prisoners in Virginia correctional institutions.

127.  Further, VDOC Operating Procedures, official policies, practices, customs and/or usages fail to adequately: (a) ensure that canines are deployed in a manner consistent with VDOC

Operating Procedure or other widely accepted guidance governing the use of patrol canines; (b) investigate improper deployment of canines; (c) discipline officers for their actions or failures to intervene in connection with incidents of brutality arising from the deployment of canines; (d) ensure corrections officers are properly trained on the use of canines in VDOC facilities; and (e) ensure that canines and/or Canine Officers are sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

128.  Defendant Clarke, in his capacity as Director of VDOC, approves and authorizes these policies.

129.  Defendant Robinson, in his capacity as Chief of Corrections Operations of VDOC, approves and authorizes these policies.

130.  Defendant Barbetto, in his capacity as Statewide Canine Program Coordinator, holds responsibility for reviewing and approving these policies.

131.  Defendants VDOC, Clarke, Robinson, and Barbetto have actual or constructive knowledge of the widespread, abusive use of canines to attack prisoners and had such knowledge on or before May 2, 2020. Defendant VDOC's, Defendant Clarke's, Defendant Robinson's, and Defendant Barbetto's response to that knowledge—which, on information and belief, was to do nothing and permit these policies to remain in place unchecked—was so inadequate as to show deliberate indifference to or tacit approval of such unconstitutional practice.

132.  As a legal and proximate cause of Defendant VDOC's, Defendant Clarke's, and Defendant Robinson's inactions, continued authorization of the use of canines, and failure to provide any meaningful guidance or standards in official VDOC policies, VDOC, Defendant

Clarke, Defendant Robinson, and Defendant Barbetto violated Mr. Johnson's rights to be free from excessive force secured by the Eighth and Fourteenth Amendments.

**COUNT VI**
**Intentional Torts: Assault, Battery, Intentional Infliction of Emotional Distress**
**Against Defendant McCowan**

133. Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

134. On May 2, 2020, Defendant McCowan committed assault and battery upon Mr. Johnson when he intentionally released his canine patrol dog and ordered it to bite Mr. Johnson repeatedly without consent, excuse, or justification.

135. Defendant McCowan's conduct was intentional and done with the purpose of inflicting pain on Mr. Johnson.

136. Defendant McCowan encouraged and/or intentionally refused to prevent his canine from continuing to attack Mr. Johnson, causing Mr. Johnson to apprehend imminent forceful battery just before Defendant McCowan allowed the canine to forcibly drag Mr. Johnson across the floor by its teeth.

137. Defendant McCowan's outrageous and intolerable conduct in deploying his canine against Mr. Johnson offends the generally accepted standards of decency and morality, and intentionally or recklessly caused severe emotional distress to Mr. Johnson.

**COUNT VII**
**Negligence**
**Against Defendants Kiser, Stanley, and Barbetto**

138. Mr. Johnson incorporates and realleges the foregoing paragraphs as if fully set forth herein.

30

139.   As Warden of the Prison, Defendant Kiser is responsible for properly training the Prison's corrections officers, including Defendants McCowan and John Does 1–4, on the permissive use of force, and for supervising their use of force.

140.   As the Prison's Canine Sergeant, Defendant Stanley is responsible for using his specialized training and experience in patrol canine field operations to provide support for Canine Officers such as Defendants McCowan and John Doe 1. He is tasked with training Canine Officers so that they do not use their canines as weapons of excessive force against prisoners in his facility.

141.   As Statewide Canine Program Coordinator, Defendant Barbetto is responsible for, among other things, coordinating training and field operations for VDOC Canine Program, ensuring that VDOC Canine Officers are in compliance with their obligations under VDOC policy and the United States Constitution, and training Canine Officers so that they do not use their canines as weapons of excessive force against prisoners.

142.   Defendants Kiser, Stanley, and Barbetto are tasked with directing corrections officers, including Defendants McCowan and John Does 1–4, in how to use force against prisoners.

143.   Because it is reasonably foreseeable that using force on prisoners would create a danger of harm to others, Defendants Kiser, Stanley, and Barbetto have a duty to use ordinary care and skill to avoid such harm.

144.   Defendants Kiser, Stanley, and Barbetto failed to use ordinary care and skill in directing their corrections officers to avoid excessive force, resulting in serious and foreseeable harm to Mr. Johnson.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in favor of Mr. Johnson and against all Defendants, and that the Court grant the following:

A.  Enter a declaratory judgment on behalf of Mr. Johnson that Defendants' actions and omissions described herein constituted cruel and unusual punishment in violation of the Eighth Amendment and tortious conduct in violation of Virginia common law;

B.  Enter a judgment on behalf of Mr. Johnson against Defendants for actual damages sufficient to compensate him for the violation of his Eighth Amendment rights and rights under Virginia law;

C.  Permanently enjoin and estop the VDOC policies that permit, condone, and ratify canine attacks on prisoners;

D.  Order Defendants to pay punitive and other exemplary damages based on 42 U.S.C. § 1983 claims;

E.  Order Defendants to pay Mr. Johnson's attorney fees and costs as authorized by 42 U.S.C. § 1988; and

F.  Grant such other equitable relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

January 7, 2020                              Respectfully submitted,


                                             /s/ Ian S. Hoffman
                                             Ian Hoffman (VA Bar # 75002)
                                             John A. Freedman (*pro hac vice* forthcoming)
                                             Shira Anderson (*pro hac vice* forthcoming)
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             601 Massachusetts Ave., N.W.
                                             Washington, D.C.   20001-3743
                                             Tel: 202.942.5000
                                             Fax: 202.942.5999
                                             E-mail: Ian.Hoffman@arnoldporter.com
                                             E-mail: John.Freedman@arnoldporter.com
                                             E-mail: Shira.Anderson@arnoldporter.com


                                             Lauren S. Wulfe (*pro hac vice* forthcoming)
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             777 S. Flower St., 44th Floor
                                             Los Angeles, CA 90017-5844
                                             Tel: 213.243.4000
                                             Fax: 213.243.4199
                                             E-mail: Lauren.Wulfe@arnoldporter.com


                                             Samuel Weiss (*pro hac vice* forthcoming)
                                             Oren Nimni (*pro hac vice* forthcoming)
                                             Kelly Jo Popkin (*pro hac vice* forthcoming)
                                             RIGHTS BEHIND BARS
                                             416 Florida Ave. NW #26152
                                             Washington, D.C. 20001
                                             Tel: 202.455.4399
                                             E-mail: sam@rightsbehindbars.org
                                             E-mail: oren@rightsbehindbars.org
                                             E-mail: kellyjo@rightsbehindbars.org


                                             *Attorneys for Plaintiff*