**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

COREY E. JOHNSON,

      Plaintiff,

v.                                   Case No.  7:20cv582

(K-9) OFFICER MCCOWAN, *et al.*,

      Defendants.

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Defendants K-9 Officer McCowan, K-9 Officer Baker, C/O S. Dean, and C/O P. Carroll ("Officer Defendants"), by counsel, submit the following in support of their Motion for Summary Judgment.

### PRELIMINARY STATEMENT

      Plaintiff Corey E. Johnson, #1061522, an inmate in the custody of the Virginia Department of Corrections ("VDOC"), who at all relevant times was housed at Red Onion State Prison ("ROSP"), asserts claims under 42 U.S.C. § 1983 and Virginia tort law, arising from the use of force by a Defendant McCowan that occurred on May 2, 2020. Following partial grant of the Defendants' Motion to Dismiss, the following claims in this case remain, as stated in Johnson's Amended Complaint, ECF No. 19:

      Count I:      An Eighth Amendment claim for excessive force against Defendant K-9 Officer McCowan. Am. Compl. ¶¶ 84–89.

      Count II:     An Eighth Amendment claim for deliberate indifference against Defendants K-9 Officer E. Baker, C/O S. Dean, C/O P. Carroll, and an unnamed correctional officer identified in the Amended Complaint as John Doe 4. Am. Compl. ¶¶ 90–99.

Count III:     An Eighth Amendment claim for bystander liability against Defendants Baker, Dean, Carroll, and John Doe 4. Am. Compl. ¶¶ 100–03.

Count IV:      An Eighth Amendment claim for failure to train, supervise, or discipline against Defendants Jeffrey Kiser, K-9 Sergeant J. Stanley, Harold W. Clarke, A. David Robinson, and William J. Barbetto. Am. Compl. ¶¶ 104–21.

Count V:       An Eighth Amendment claim against Defendants Clarke, Robinson, and Barbetto. Am. Compl. ¶¶ 122–32.

Count VI:      Claims under Virginia law for assault, battery, and intentional infliction of emotional distress against Defendant McCowan. Am. Compl. ¶¶ 133–37.

The Officer Defendants move for summary judgment as to all claims asserted against them.[1] With respect to the claims against Officer McCowan, the record evidence shows that Johnson cannot prevail on his claim for excessive force, as Officer McCowan used force only in a good faith effort to restore order. Similarly, the evidence does not support Johnson's state-law claims for assault and battery or for intentional infliction of emotional distress. As to the claims against Defendants Baker, Dean, and Carroll, the record shows that these Defendants did not fail to intervene in the use of force because they did not observe the force used to be excessive and because they did not have the opportunity to intervene. The Officer Defendants therefore submit that summary judgment should be entered in their favor as to all claims asserted against them.

## EVIDENCE

In support of their Motion, Defendants attach and incorporate by reference the following materials from the record:

- Excerpts from the deposition transcript of Defendant McCowan ("McCowan Tr.")

---

[1] Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto separately move for summary judgment as to the claims asserted against them.

- Exhibit 10 to the deposition of Defendant McCowan, Bite Report ("McCowan Bite Report")

- Excerpts from the deposition transcript of Defendant Baker ("Baker Tr.")

- Exhibit 5 to the deposition of Defendant Baker, Bite Report ("Baker Bite Report")

- Exhibit 4 to the deposition of Defendant Jeffrey Kiser, Incident Report ("Incident Report")

- Excerpts from the deposition transcript of Plaintiff Johnson ("Johnson Tr.")

- The affidavit of Defendant S. Dean and Enclosure ("Dean Aff.")

- The affidavit of Defendant P. Carroll

- The affidavit of C. Stanley, Corrections Lieutenant and Institutional Investigator at ROSP, with the following enclosures:

  o Enclosure A: MaxPro video footage dated May 2, 2020 ("Front Video")

  o Enclosure B: MaxPro video footage dated May 2, 2020 ("Center Video")

### Facts Regarding the Parties

1.  Plaintiff Corey E. Johnson, #1061522, is an inmate in the custody of the Virginia Department of Corrections. He has been serving a life sentence since 2005. Johnson was housed in the A-1 pod at ROSP on May 2, 2020. Am. Compl. ¶ 8; Johnson Tr. 8:19–23.

2.  Defendant K-9 Officer McCowan is a K-9 Officer at ROSP. He joined VDOC in 2014 as a Correctional Officer. He certified as a Patrol Canine Handler in 2017 and worked in that capacity at ROSP on May 2, 2020. Am. Compl. ¶ 9; Answer ¶ 9, ECF No. 41; McCowan Aff. ¶ 3.

3.  Defendant K-9 Officer E. Baker is a K-9 Officer at ROSP. He joined VDOC in January 2017 as a Correctional Officer. He certified as a Patrol Canine Handler in December

2018 and worked in that capacity at ROSP on May 2, 2020. Am. Compl. ¶ 16; Answer ¶ 16; Baker Tr. 16:22–17:16.

4.      Defendant C/O S. Dean is a former Correctional Officer at ROSP. On May 2, 2020, he worked as the gun post officer in the control booth in A-1 pod at ROSP. Am. Compl. ¶ 17; Answer ¶ 17; Dean Aff. ¶¶ 1, 5.

5.      Defendant C/O P. Carroll is a Correctional Officer at ROSP. On May 2, 2020, he worked as the control booth officer in A-1 pod at ROSP. Am. Compl. ¶ 18; Answer ¶ 18; Carroll Aff. ¶¶ 1, 5.

### Facts Regarding the Incident of May 2, 2020

6.      On May 2, 2020, at approximately 6:07 p.m., bottom tier inmates in the A-1 pod at ROSP were released for pod recreation. Approximately 30 to 40 inmates were out on the pod floor. Johnson, inmate Arthur Guy, and several other inmates gathered around the phone bank in the corner of the pod, while still other inmates congregated in other areas of the pod. Officer S. Mullins was working as the lone officer on the floor of the pod. Defendants Dean and Carroll, respectively the gun post officer and the control booth officer, were posted in the control booth on the top tier of the pod. Defendant McCowan and his assigned K-9, Shadow, were monitoring offender movement on Bravo yard. Defendant Baker and his assigned K-9, ET, were monitoring offender movement on A yard. Front Video at 18:07:01–18:09:26;[2] Center Video at 18:09:00–18:09:26; McCowan Tr. 159:3–6; McCowan Bite Report; Baker Tr. 223:8–15; Baker Bite Report; Dean Aff. ¶¶ 6–7, Encl. A; Carroll Aff. ¶¶ 6–7; Incident Report.

7.      Shortly after recreation began, Johnson and Guy started fighting in the area near the phones. Both inmates threw punches and soon dropped to the floor, where they continued to

---

[2] Defendants cite herein to the time stamp on the bottom right of each video.

struggle, with Guy initially on top of Johnson. Other inmates in the vicinity laid on the floor. Front Video at 18:09:26–18:09:33; Center Video at 18:09:26–18:09:33; Dean Aff. ¶ 5, Encl. A; Incident Report.

8.     As Johnson and Guy continued to fight, Officer Dean made an announcement over the radio to call for assistance. He called for Johnson and Guy to get on the ground, and when Johnson and Guy failed to comply, Dean fired one OC round, which landed on the floor in front of the staircase. Center Video at 18:09:33–18:09:35; Dean Aff. ¶ 5, Encl. A; Carroll Aff. ¶ 5; Incident Report.

9.     Officer Mullins then gave verbal commands for Johnson and Guy to stop fighting and lay on the ground to be restrained. When Johnson and Guy failed to comply with these orders, Officer Mullins used one burst of OC spray to compel compliance. After a few seconds passed and Johnson and Guy did not stop fighting, Officer Mullins deployed another burst of OC spray. Both uses of OC spray proved ineffective, and Officer Mullins stepped away to wait for responding staff while Johnson and Guy continued to fight. Also at this time, Officer Dean gave additional orders to stop fighting, and he fired four direct impact rounds at the inmates. These actions also proved ineffective, and Johnson and Guy continued fighting. Front Video at 18:09:35–18:09:56; Center Video at 18:09:35–18:09:56; Dean Aff. ¶ 5, Encl. A; Carroll Aff. ¶ 5; Incident Report.

10.     Officer Baker was patrolling the boulevard in front of A Building when he received the call announcing an inmate fight and requesting assistance. He and his K-9 ET ran down the boulevard and through the front door of A Building, announcing his and his K-9's presence as he entered the building. He continued through the vestibule and into A-1 pod, again

announcing his presence as he entered the pod. Baker Tr. 223:5–226:3, 233:10–234:21, 273:10–21; Incident Report.

11.     When Officer Baker entered the pod, he observed Johnson and Guy fighting. He gave several consecutive orders for Johnson and Guy to "[s]top fighting or I will release the dog." When the two failed to comply with this direction, Officer Baker directed ET to engage Guy. ET then bit Guy on the right calf. While ET remained engaged on Guy, Officer Baker gave several more consecutive orders for the inmates to stop fighting. Guy complied with these orders and placed his arms and hands out to his sides. Officer Baker then commanded ET to disengage, and ET disengaged as commanded. The engagement lasted approximately ten seconds in total. Front Video at 18:09:56–18:10:13; Center Video at 18:09:56–18:10:13; Baker Tr. 234:6–244:4, 273:7–281:12, 283:11–285:12; Baker Bite Report; Incident Report.

12.     Johnson continued to assault Guy even after Guy had been bitten and began to comply with Officer Baker's orders. Officer Mullins walked over to the altercation and pulled Johnson off of Guy. Johnson got to his feet, stepped toward the center of the pod, and began to turn his body to face in the direction of Officer Mullins, Officer Baker, and Guy. Front Video at 18:10:04–18:10:14; Center Video at 18:10:04–18:10:14; Baker Tr. 243:11–244:7; Baker Bite Report; McCowan Bite Report; Incident Report.

13.     Officer McCowan had been monitoring inmate movement on Bravo yard when he received the call announcing an inmate-on-inmate fight. He and his K-9 Shadow arrived at A-1 pod within about thirty seconds of receiving the call and entered the pod door as Officer Mullins was pulling Johnson off of Guy. Officer McCowan observed Johnson, already in close proximity to Officer Mullins, turn in the direction of Officer Mullins in what Officer McCowan perceived to be a threatening manner, with his fists clenched and his body in a combative posture. Video at

Front Video at 18:10:09–18:10:14; Center Video at 18:10:09–18:10:14; McCowan Tr. 158:20–159:17, 165:16–166:8, 176:3–177:13; McCowan Bite Report; Baker Tr. 248:3–16, 250:11–22, 252:12–254:11; Baker Bite Report; Incident Report.

14.     As he passed through the door into the pod, Officer McCowan began giving verbal orders to Johnson to "get on the ground or I will release the dog." Johnson did not get to the ground. Officer McCowan and Shadow approached Johnson, and Shadow attempted to engage Johnson but did not make contact. Johnson then turned away and began moving toward the far side of the pod. Officer McCowan perceived that Johnson may have been attempting to run towards a group of inmates who were lying on the floor in the direction he was moving. He gave one additional warning and, when Johnson still did not get on the ground, directed Shadow to engage. Shadow bit Johnson above the right wrist, and both Shadow and Johnson went to the ground. Front Video at 18:10:12–18:10:20; Center Video at 18:10:12–18:10:20; McCowan Tr. 159:19–160:15, 170:8–21, 174:18–176:2, 179:5–180:5, 181:2–182:7, 204:15–208:2, 209:1–15; McCowan Bite Report; Baker Tr. 257:4–258:8; Baker Bite Report; Incident Report.

15.     After Johnson went to the ground, Shadow remained engaged on his right wrist. Officer McCowan ordered Johnson to show his left hand, which he had tucked under his chest, to ascertain whether he was holding a weapon. Johnson failed to follow this order, and Officer McCowan attempted to view Johnson's left hand. Although Johnson continued to refuse to show his hand, Officer McCowan ordered Shadow to release out of concern that Johnson's injuries could worsen if the engagement continued. Shadow released from Johnson shortly after McCowan ordered him to release. The engagement lasted approximately twenty-seven seconds in total. Front Video at 18:10:20–18:10:44; Center Video at 18:10:20–18:10:44; McCowan Tr.

160:15–161:5, 182:11–22, 183:14–184:12, 185:10–186:4, 211:2–214:13, 215:15–216:8, 216:20–217:12; McCowan Bite Report; Incident Report.

16.     After Shadow disengaged from Johnson, Officer McCowan and Officer Baker remained to provide further security. Johnson and Guy were restrained by other officers, escorted out of the pod, and taken to the medical unit, where McCowan and Baker took photographs of Johnson and Guy's injures. McCowan Tr. 161:7–14, 240:16–21; McCowan Bite Report; Baker Bite Report; Incident Report.

### *Facts Regarding the Bystander Officers*

17.     Officer Baker's basic correctional officer training and his canine training both instructed that an officer has a duty to intervene if they perceive that another officer is using excessive force against an inmate. As a canine handler, he understood that he could talk to the other handler to stop a use of force if he believed it to be excessive, but he could not touch the other officer's canine or otherwise force it to disengage. The other canine would be the other officer's responsibility, and Officer Baker would have already been responsible for handling his own dog. Baker Tr. 104:8–111:20.

18.     During the incident of May 2, 2020, Officer Baker did not believe Officer McCowan's use of force against Johnson to be excessive. He perceived Johnson's actions prior to Officer McCowan's initial engagement as aggressive. Initially, he had even considered needing to engage ET on Johnson, but he did not do so because he was occupied with securing Guy and because Officer McCowan had arrived in the pod. He did not observe the moment Shadow engaged Johnson, as he also needed to keep watch over Guy and the other inmates in the pod. Once Shadow and Johnson went to the ground, Officer Baker's view was obstructed by the pod tables and he could not hear the engagement, but he assumed that Officer McCowan had the

8

situation under control. He could not tell whether Shadow's engagement on Johnson was overly long because he was unable to tell whether Johnson had complied with orders. Baker Tr. 244:8–246:1, 249:3–250:2, 258:9–264:5, 298:10–302:15.

19.      Officer Dean and Officer Carroll were also trained on the duty to intervene if they observed misconduct, including excessive force. During the incident, both officers were posted in the control booth on the top tier of the pod, and thus could not have left their post to assist with restraining Johnson. Officer Dean was responsible for assisting the floor officers with stopping the fight and then with maintaining control over the 30 to 40 other inmates in the pod. Officer Carroll was responsible for monitoring the door to allow staff to enter the pod. In light of these responsibilities, neither officer could focus long on Officer McCowan's engagement of Johnson. In addition, Officer Carroll testifies that he could not clearly see the incident because of glare from the sun on the control booth window. Both officers testify that they did not observe Officer McCowan using excessive force, and that if they had witnessed an excessive use of force they would have attempted to intervene. Dean Aff. ¶¶ 4–8; Carroll Aff. ¶¶ 4–8.

### Additional Facts Regarding the Plaintiff

20.      Johnson began serving his current sentence in 2005. Beginning in late 2005, he has been housed at Sussex I State Prison, Sussex II State Prison, and ROSP, where he has been housed from March 2018 until the present. Each of those facilities uses patrol canines. Johnson Tr. 8:19–21, 9:16–13:14, 20:21–21:3.

21.      Johnson has testified that he and other inmates know to get out of the way when a fight occurs. He has also testified that Canine Officers direct inmates to get on the ground when they enter a housing unit. Johnson Tr. 24:13–21, 25:6–13.

22.     Prior to the incident of May 2, 2020, Johnson had not been bitten by a VDOC canine, nor has he been bitten by a VDOC canine since that incident. Johnson Tr. 27:20–24.

23.     Johnson has not had any mental health treatment relating to the May 2, 2020 incident. Johnson Tr. 63:9–11.

<u>S</u>TANDARD OF <u>R</u>EVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material, and summary judgment may be entered even if such immaterial facts are in dispute. *Id.* A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this showing has been made, the burden shifts to the nonmoving party to establish the specific material facts that are in dispute. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In considering a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The court does not weigh evidence or determine credibility, but instead only determines whether the record demonstrates a genuine dispute of material fact. *Id.*; *Anderson*, 477 U.S. at 255.

<u>A</u>RGUMENT AND <u>A</u>UTHORITIES

I.      **Officer McCowan did not use excessive force in violation of the Eighth Amendment. (Count I)**

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" against prisoners through the use of excessive force. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In order to state a claim under the Eighth Amendment for excessive force, a plaintiff must satisfy both an objective and subjective component. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Objectively, the use of force must be "sufficiently serious to establish a cause of action." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quoting *Hudson*, 503 U.S. at 9). Thus, a claim for excessive force will not lie for "*de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

As to the subjective component, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). Several factors are considered in making this determination, including, "(1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response." *Williams*, 77 F.3d at 762 (internal quotation marks omitted) (citing *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321). The absence of serious injury is another factor that, although not dispositive, is relevant to this inquiry. *Id.* Ultimately, the court must determine "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321.

Even assuming *arguendo* that McCowan used force that was objectively sufficiently serious, the record shows that his use of force was necessary and proportional under the circumstances. Accordingly, there can be no genuine dispute that McCowan did not use force wantonly or maliciously.

### A.    *Need for the Application of Force*

Officer McCowan determined that the use of force was necessary in the face of Johnson's threatening behavior and repeated failure to comply with orders. Johnson had failed to stop fighting Guy after multiple warnings and attempts by Officer Dean and Officer Mullins to compel compliance through force, even continuing to assault Guy after Guy had been engaged by Officer Baker's dog and surrendered. Baker Tr. 244:5–17. After Officer Mullins pulled Johnson away from Guy, Johnson remained on his feet despite being ordered to get to the ground. Officer McCowan testified that he believed it necessary to engage Shadow in order to protect staff and other inmates from possible assault. McCowan Tr. 179:10–180:5, 181:2–16.

Despite Johnson's allegation to the contrary, he had not "preemptively complied" with orders to get on the ground and was not "prostrate and motionless" at the time Officer McCowan engaged his dog. Am. Compl. ¶¶ 37–38. Rather, the video evidence makes clear that Johnson was on his feet, first turning in the direction of Officer Mullins and then, after Officer McCowan and Shadow approached, moving toward the far side of the pod. Center Video at 18:10:12–18:10:16. Because Johnson's allegation that he was compliant at the time of the initial engagement is plainly refuted by the video, it does not serve to create a genuine dispute of fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

12

judgment."); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (noting that where "the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape").

Once Shadow and engaged Johnson and both went to the ground, Johnson again refused orders when Officer McCowan directed him to remove his left hand from under his chest. McCowan Tr. 182:15–19. McCowan kept Shadow engaged out of concern that if Johnson had a weapon, he could pose a threat to McCowan himself or to others in the pod. McCowan Tr. 214:5–13. McCowan then directed Shadow to release despite Johnson never having complied with this order. McCowan Tr. 160:15–161:5. In light of Johnson's continued failures to comply with orders and the potential threat posed to others in the area, Officer McCowan's use of force was justified under the circumstances.

B.    *Relationship Between the Need and the Amount of Force Used*

McCowan engaged his canine only after other options to gain Johnson's compliance had failed. Prior to Officer McCowan's arrival, Johnson was given multiple verbal orders to stop fighting by Officers Dean, Mullins, and Baker. All of these orders were disregarded. Officer Dean fired one OC round and four direct impact rounds. Dean Aff. ¶ 5. Officer Mullins deployed two bursts of OC spray. Center Video at 18:09:35–18:09:56. Even after Officer Baker engaged his canine on Guy, Johnson continued to assault Guy until he was pulled away from the altercation. Baker Tr. 244:5–17.

Despite knowing from his experience in VDOC facilities of the need to get on the ground during an altercation, Johnson remained on his feet. Johnson Tr. 24:13–21, 25:6–13. At the time Officer McCowan arrived in the pod, Johnson turned toward Officer Mullins in what appeared to be a threatening manner. McCowan Tr. 159:12–17. Johnson then failed to comply with multiple

verbal warnings from Officer McCowan to get on the ground. McCowan Tr. 160:4–12. At this point, every verbal and forceful attempt to compel Johnson to follow orders and get to the ground had been futile. It was therefore reasonable for Officer McCowan to determine that the use of canine was the only effective means to secure Johnson's compliance and end any potential threat.

C.    *The Threat Reasonably Perceived by Officials*

Officer McCowan was aware prior to reaching the pod that an inmate altercation had taken place. On his arrival, McCowan saw Johnson turn toward Officer Mullins in what he perceived to be a threatening manner. McCowan Tr. 159:12–17. He observed that Johnson's fist was clenched and his body was in a combative posture. McCowan Tr. 176:3–14. After giving his warnings and approaching Johnson, Officer McCowan understood Johnson's movement towards the far side of the pod as posing a potential threat toward the inmates who were lying on the ground in that area. McCowan Tr. 181:6–13. In the context of a tense, uncertain situation following a known altercation, and with little time to act, it was reasonable for Officer McCowan to perceive these actions as threatening. *See Whitley*, 475 U.S. at 320 (noting the "appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance").

The potential threat did not end after Shadow engaged Johnson. Despite Officer McCowan's orders for Johnson to show his left hand, Johnson failed to comply. McCowan Tr. 160:15–161:5. McCowan believed that there was a possibility that Johnson had a weapon and that if he released Shadow from the engagement, Johnson could quickly use the weapon against himself or other inmates. McCowan Tr. 214:5–13. Given the circumstances of the situation— Johnson was an inmate housed in a high security facility, had just been in a fight with another

inmate, and was continually refusing to show his hand—it was reasonable for Officer McCowan to take this possibility into consideration and to maintain Shadow's engagement.

### D.     *Efforts to Temper the Severity of a Forceful Response*

Officer McCowan did not use greater force than was necessary to gain Johnson's compliance and control a potential threat to officer and inmate safety. As noted *supra*, numerous attempts by other officers through verbal warnings and use of other means of force were unsuccessful in getting Johnson to comply. McCowan gave multiple verbal warnings prior to Shadow's engagement of Johnson. Officer McCowan later ordered Shadow to disengage from Johnson even though Johnson never complied with McCowan's order to show his left hand. McCowan testified that he did so in order to avoid causing further injury to Johnson. McCowan Tr. 185:10–186:4. Johnson was then promptly removed from the pod to receive medical attention. McCowan Bite Report. These efforts to avoid or limit the use of force make clear that Officer McCowan did not act wantonly or with malicious or sadistic intent.

### E.     *Summary of Subjective Factors*

The record makes clear that Officer McCowan only used force in a good-faith effort to get Johnson to comply with orders and to stop a potential threat. Prior attempts by other officers to gain Johnson's compliance through verbal commands and other uses of force were not successful. Officer McCowan arrived at a tense and uncertain situation, observing Johnson still on his feet and appearing to move threateningly toward another officer. His attempts to gain compliance through verbal warnings also proved unsuccessful, and he then made the decision to use force to ensure the safety of other inmates and staff. Johnson continued to resist orders even after Shadow engaged, giving rise to a reasonable suspicion that he could have hidden a weapon in his left hand. Despite Johnson's continual failure to show his hand, however, McCowan made

the decision to disengage to avoid further injury. The evidence does not show that Officer McCowan acted with subjective malicious intent, and accordingly summary judgment should be granted in his favor on Johnson's Eighth Amendment claim.

## II. Officer McCowan is not liable for assault and battery under Virginia law. (Count VI)

Johnson asserts his claims for assault and battery against Defendant McCowan under Virginia law. Am. Compl. ¶¶ 133–37. "The tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 265 Va. 12, 16, 574 S.E.2d 258, 261 (2003). "The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Id.*

These claims fail because Officer McCowan's use of force was justified under the circumstances. Under Virginia law, "[a] legal justification for the act being complained of will defeat an assault or battery claim." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (citing *Koffman*, 265 Va. at 16, 574 S.E.2d at 261). In particular, "[a] law enforcement officer enjoys 'special protection' from tort liability when he is performing his duties in a lawful manner . . . ." *Bell v. Johnson*, No. 7:09cv214, 2011 U.S. Dist. LEXIS 33888, at *35–36 (W.D. Va. Mar. 30, 2011) (citing *Mercer v. Commonwealth*, 150 Va. 588, 599, 142 S.E. 369, 372 (1928)); *see also Unus*, 565 F.3d at 117 ("Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties."). Consequently, in order for a claim for assault and battery to succeed against a law enforcement official, a plaintiff must prove that the official committed a "'wrongful act'" that "lacked 'justification and excuse.'" *Bell*, 2011 U.S. Dist. LEXIS 33888, at *36–37 (citing *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994)).

"While an officer's liability for the use of excessive force under § 1983 is not completely co-extensive with the common law tort liability for battery, unreasonable or unnecessary force is the touchstone for both causes of action." *Frye v. Hodges*, 839 F. Supp. 2d 843, 848 (W.D. Va. 2011). "The fact that [a defendant has] evaded liability for excessive force . . . does not insulate [him] from liability under the pending state law claims [for assault and battery], given that a law enforcement officer's conduct need not necessarily be reasonable for him to avoid liability on . . . [an] excessive force claim." *Bell*, 2011 U.S. Dist. LEXIS 33888, at *37. But, to the extent that the excessive force claim fails because the use of force was reasonable, a corresponding claim for assault and battery will "rise or fall" with the excessive force claim. *Johnson v. Dep't of Alcoholic Beverage Control*, No. 3:15cv55, 2016 U.S. Dist. LEXIS 172423, at *22–23 (W.D. Va. Dec. 12, 2016) (collecting cases).

As discussed in Part I, *supra*, Officer McCowan used force in this instance in order to gain Johnson's compliance with commands and to ensure the safety of staff and other inmates. No more force was used than was needed under the circumstances. In light of these facts, Johnson's claims for assault and battery must be dismissed.[3]

## III. Officer McCowan is not liable for intentional infliction of emotional distress under Virginia law. (Count VI)

The record does not support Johnson's claim under Virginia law against Defendant McCowan for intentional infliction of emotional distress. Am. Compl. ¶¶ 133–37. The tort of intentional infliction of emotional distress is "not favored" in the Virginia courts. *Super Valu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335, 343 (2008). In order to prevail on such a claim, a plaintiff must show that "1) the wrongdoer's conduct was intentional or reckless; 2) the

---

[3] In the alternative, Defendants request that the Court decline to exercise jurisdiction over Johnson's state law claims against Officer McCowan should the Court dismiss all federal claims asserted against him. *See* 28 U.S.C. § 1367(c)(3); *Shanaghan v. Cahill*, 58 F.3d 106, 109–10 (4th Cir. 1995).

conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Id.*

The evidence of record does not show that Officer McCowan's conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Russo v. White*, 241 Va. 23, 27, 400 S.E.2d 160, 162 (1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). As argued herein, Officer McCowan justifiably deployed his canine in a good faith effort to gain compliance. Even if Johnson's allegations are accepted on their face, an ordinary claim of excessive force by a law enforcement officer is not so outrageous as to support a claim for intentional infliction of emotional distress. *See Hammond v. Morley*, No. 3:11cv53, 2011 U.S. Dist. LEXIS 73614, at *12 (E.D. Va. July 8, 2011) ("Plaintiff's allegations—that he was assaulted by officers who used excessive force against him and wrongly arrested him—do not constitute the type of outrageous and extreme behavior required to support a claim for intentional infliction of emotional distress under Virginia law.").

Nor does the evidence show that Johnson suffered severe emotional distress as a result of this incident. "[L]iability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 241 Va. at 27, 400 S.E.2d at 163. Here, Johnson does not even allege symptoms of emotional distress except in the vaguest terms. *See* Am. Compl. ¶ 137 (alleging that McCowan's conduct "caused severe emotional distress"). He has also testified that he has not received any mental health treatment pertaining to this incident. Johnson Tr. 63:9–11. Absent any evidence

whatsoever of severe emotional distress resulting from Officer McCowan's use of his canine, Johnson fails to support a claim for intentional infliction of emotional distress.

## IV.  Defendants Baker, Dean, and Carroll are not liable for deliberate indifference or bystander liability. (Counts II–III)

Johnson asserts a claim for deliberate indifference against Baker, Dean, and Carroll in Count III of his Amended Complaint, Am. Compl. ¶¶ 90–99, and a claim for bystander liability against the same Defendants in Count IV, Am. Compl. ¶¶ 100–03. Both claims are analyzed under functionally similar standards. *See Thompson v. Commonwealth*, 878 F.3d 89, 107 n.5 (4th Cir. 2017) (noting that the deliberate indifference standard has "symmetry with the test used to establish bystander liability, which is similar in principle" to the allegations of failure to protect made by the plaintiff); *Bacon v. Wood*, 616 F. App'x 601, 603 (4th Cir. July 1, 2005) (citing bystander liability standard for claim of deliberate indifference). Under the deliberate indifference standard, an officer violates the Eighth Amendment if he "knew of an disregarded the substantial risk of harm" to the plaintiff. *Thompson*, 878 F.3d at 108. Officials are not liable for deliberate indifference "if taking action would endanger their own lives or if harm occurred despite their reasonable efforts to prevent it." *Id.* As to bystander liability, under § 1983, a bystanding officer is liable for the acts of his fellow officers if he "(1) knows that a fellow officer is violating an individual's constitutional rights[]; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002).

As a threshold matter, liability does not lie against these bystanding officers if no excessive force was used. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996). Thus, if the Court grants summary judgment to Officer McCowan on the claim for excessive force, summary judgment must also be granted in favor of Baker, Dean, and Carroll.

In addition, the record shows that Officers Baker, Dean, and Carroll did not fail to intervene or act with deliberate indifference. All three officers have testified that they did not observe Officer McCowan use excessive force against Johnson. Baker, who was occupied with securing Guy, did not see the initial engagement on Johnson by Shadow. Baker Tr. 258:9–11. After Shadow and Johnson went to the ground, Baker's view was obscured by pod tables, and he could not tell if Johnson was complying with McCowan's orders. Baker Tr. 260:21–261:6. Officer Dean and Officer Carroll were also occupied with securing the other inmates and allowing staff to enter the pod. As such, neither officer could focus on McCowan's engagement of Johnson. Dean Aff. ¶ 7; Carroll Aff. ¶ 8. In addition, Officer Carroll's view of the incident was obscured by glare on the control booth window. Carroll Aff. ¶ 8.

Moreover, none of these three officers had a reasonable opportunity to intervene. All of these Defendants were responsible for securing a pod where thirty to forty inmates were present. Baker not only needed to control Guy, but also needed to handle his canine ET. He also testified that he could not touch another Canine Officer's dog. Baker Tr. 109:3–5. Dean and Carroll were stationed in the control booth on the upper tier of the pod, and were therefore not able to leave their post to assist with restraining Johnson. Dean Aff. ¶¶ 6–7; Carroll Aff. ¶¶ 6–7. The engagement itself lasted less than thirty seconds before Officer McCowan directed Shadow to release, further limiting any reasonable opportunity to intervene.

Because the record demonstrates that Officer Baker, Officer Dean, and Officer Carroll were not aware of an excessive use of force against Johnson and had no reasonable chance to intervene, they cannot be found liable under a theory of deliberate indifference or bystander liability. Accordingly, summary judgment should be granted in their favor.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants McCowan, Baker, Dean, and Carroll respectfully request that the Court grant summary judgment in their favor and dismiss all claims asserted against them in this case.

Respectfully submitted,

K-9 OFFICER MCCOWAN, K-9 OFFICER E. BAKER, C/O S. DEAN, and C/O P. CARROLL

By: _____/s/ Timothy E. Davis_____
Timothy E. Davis, AAG, VSB #87448
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 225-4226
(804) 786-4239 (Fax)
Email: tdavis@oag.state.va.us

_____/s/____Richard C. Vorhis_____
Richard C. Vorhis, SAAG, VSB #23170
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 786-4805
(804) 786-4239 (Fax)
E-mail: rvorhis@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of October, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing (NEF) to all counsel of record for the Plaintiff.

                                             /s/ Timothy E. Davis
                                    Timothy E. Davis, AAG, VSB#87448
                                    Office of the Attorney General
                                    Criminal Justice & Public Safety Division
                                    202 North 9th Street
                                    Richmond, Virginia 23219
                                    (804) 225-4226
                                    (804) 786-4239 (Fax)
                                    Email:  tdavis@oag.state.va.us