1            UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF VIRGINIA

3                ROANOKE DIVISION

4    _____

5    COREY E. JOHNSON,

6            Plaintiff,

7        v.                        Civil Action File No.

8    CANINE OFFICER MCCOWAN, WARDEN    7:20-cv-00582

9    JEFFREY KISER, CANINE SERGEANT

10   STANLEY, COMMONWEALTH OF

11   VIRGINIA by and through the

12   Virginia Department of

13   Corrections, HAROLD W. CLARKE,

14   in his individual capacity and

15   official capacity as Director

16   of the Virginia Department of

17   Corrections, WILLIAM BARBETTO,

18   in his individual capacity and

19   official capacity as Statewide

20   Canine Program Coordinator

21   for the Virginia Department

22   of Corrections, A. DAVID

1   ROBINSON, in his individual

2   capacity and official capacity

3   as Chief of Corrections

4   Operations for the Virginia

5   Department of Corrections,

6   and JOHN DOES 1-4,

7          Defendants.

8   ------------------------------

9          VIDEOCONFERENCE DEPOSITION OF

10        CANINE OFFICER BRIAN MCCOWAN

11  DATE:       Wednesday, June 8, 2022

12  TIME:       9:19 a.m.

13  LOCATION:    Remote Proceeding

14            Washington, DC 20005

15  REPORTED BY:  Janel Folsom, Notary Public

16  JOB NO.:     5267183

17

18

19

20

21

22

1    on duty as a patrol canine handler?

2        A   Yes.

3        Q   And were you on duty at Red Onion State

4    Prison?

5        A   Yes.

6        Q   Okay.  Can you, as you sit here today, walk

7    me through everything you remember and recall from how

8    you became aware of Mr. Johnson and through this

9    incident?

10       A   I was unaware of Mr. Johnson up until the

11   point of the incident.

12       Q   Okay.  So what do you recall about May 2nd

13   before you met Mr. Johnson?

14       A   Just a normal working day.

15       Q   Okay.

16       A   Nothing particular that stands out.

17       Q   Okay.  And at some point, you got a call to

18   respond to an event.  Is that correct?

19       A   Yes.

20       Q   Okay.  Starting from when you received the

21   call, can you walk me through as best as you can

22   recall it everything that happened from the moment you

1    were informed that there was an incident that required

2    your response?

3         A    I was monitoring a -- let's see.  May the

4    2nd, 2020, I was monitoring for any movement on Bravo

5    yard.  So I was on the opposite end of where the fight

6    was.  I'm not sure who called the fight.

7              It was either the booth officer or the floor

8    officer, it could have been either one.  They called

9    the fight.  I responded.  Arrived probably within, I

10   would say, 30 seconds of the call within the pod.

11        Q    Okay.  What happened next?

12        A    As I was entering the pod -- let's see.

13   First slider or the second -- I got through the second

14   slider on the inside and witnessed Mr. Johnson and an

15   officer in close proximity with each other, and it

16   appeared as if Johnson was going towards that officer

17   in a threatening manner.

18        Q    Okay.  What else do you recall?

19        A    I then began giving Mr. Johnson warnings --

20   oral orders.  "State canine.  Get on the ground or I

21   will release the dog."  And he received -- not only

22   did he receive those from myself but Canine Officer

1    Baker as well.  Baker was the first to respond to the

2    incident.

3        Q    Okay.  What happened next?

4        A    After I gave the three warnings to Mr.

5    Johnson, he refused to comply with those orders and

6    began to run towards another group of inmates that was

7    on the -- let's see.  Close to the cells.

8            Let's see.  It was in A1, so it would have

9    been the inmates were laying scattered around the --

10   around the -- where the cells are located.  And he was

11   running towards those -- in the -- towards those other

12   individuals.

13           At that point in time, I deployed canine

14   Shadow striking Mr. Johnson on the right upper-wrist

15   area right above the wrist.  Let's see.  I then gave

16   Mr. Johnson several consecutive -- several consecutive

17   orders to stop fighting the dog and to let me see

18   his -- and to show me his left hand.

19           After a few -- after a few -- a few moments

20   to try to get him to comply, I then bent down to see

21   if I could -- he -- he wouldn't -- unfortunately, he

22   never would show me his left hand.  So I bent down to

1   see if I could physically see anything in his left

2   hand.

3           At that point in time, I did not.  I then

4   verbally gave canine Shadow the command to disengage,

5   and he did so.

6       Q    Is there anything else that you recall?

7       A    Let's see.  I then provided additional

8   security in the pod while Mr. Johnson was taken to

9   medical, and all other inmates that were in that pod

10  were frisk search -- frisk searched, and they returned

11  to their housing assignment.

12          Not only -- I'm sorry.  Not only did Mr.

13  Johnson go to medical but so did the individual he was

14  in the altercation with.

15      Q    Okay.  Is there anything else you recall?

16      A    Let's see.  I believe there was a question

17  about me patting the dog in one of his grievances.  I

18  do recollect -- I do recall patting the dog.  And why

19  that was -- it was to reinforce the verbal call off --

20  or I'm sorry.  The verbal disengagement.

21          That's -- as of right now, that's all I

22  recall.  If I can add anything to that I will as you

1   BY MR. JOHNSON:

2      Q   Okay. Officer McCowan, so just before we

3 took a quick break, we were just starting to talk

4 about -- or you had just kind of given us what you

5 recall about the incident on May 2nd with Mr. Johnson.

6 And so I'd like to pick up there and ask you a couple

7 questions and then we'll take a look at the video that

8 we have pulled up, which is Defense Exhibit 9.

9      So I believe you testified earlier that you

10 were the second canine officer to respond to the

11 incident with Mr. Johnson and that Canine Officer

12 Baker was the first canine officer to respond on May

13 2nd to the incident with Mr. Johnson. Is that

14 correct?

15      A   Yes.

16      Q   Okay. When you came into Alpha Pod A1, what

17 was the first thing that you saw?

18      A   Mr. Johnson approaching the officer who had

19 gotten involved --

20      Q   And is that Officer --

21      A   -- in that altercation.

22      Q   In the altercation. Okay. Is that Officer

1    Mullins or is that Officer Baker?

2         A     Mull.

3         Q     Officer Mullins?

4         A     Yes, sir.

5         Q     Okay.  So upon entering the A1 alpha pod,

6    the very first thing that you saw was Mr. Johnson

7    approaching Officer Mullins.  Is that correct?

8         A     That's best recollection.  Yes, sir.

9         Q     Okay.  And I believe you also testified that

10   you know, or you heard, that Officer Baker also gave

11   an order to Mr. Johnson that he had not complied with.

12   Is that correct?

13        A     Both inmates that were involved in that

14   altercation, but Canine Officer Baker gave the same

15   warnings that I did.

16        Q     Understood.  Did you hear Officer Baker give

17   Mr. Johnson the verbal warnings?

18        A     No, sir.  No.  I was not in the pod at that

19   time.

20        Q     So how did you know when you came into the

21   pod that verbal warnings had been given to Mr. Johnson

22   by Officer Baker?

1    the dog."

2         They would have said, "Stop fighting.  Get

3    on the ground.  Stop fighting.  Get on the ground."

4    Something along those lines.

5         Q    Understood.  When you first gave your first

6    warning to Mr. Johnson, can you describe for me where

7    he was in the A1 pod?

8         A    As I was -- I gave my first warning as I was

9    breaching the threshold of the Alpha 1 slider.  As I

10   was looking for where the incident was, I seen what

11   was happening.  Mr. Johnson was approaching that

12   officer.  I then began -- started giving warnings

13   right then as I was coming through that threshold of

14   the door.

15        Q    Okay.  So you were giving him a verbal

16   warning to stop fighting.  You started giving that

17   warning before you crossed the threshold into the pod,

18   and you were giving it as you were crossing the

19   threshold and coming into the pod.  Is that correct?

20        A    I was giving -- I began giving that order as

21   I was crossing the threshold into the pod.

22        Q    Understood.  And had you made visual contact

1    if they were trying to get my attention or not.  I

2    apologize, sir.

3        Q    Understood.  And just to confirm, on the

4    screens in front of you, is it just the Veritext

5    application and the Veritext?  There's no other sorts

6    of documents or anything that you're referencing or

7    looking at from time to time?

8        A    No, sir.

9        Q    Okay.  Thank you.  The virtual environment,

10   it's a little bit hard to tell and then --

11       A    I understand.

12       Q    Yeah.  So thank you, though.  I appreciate

13   that.  And I apologize for having to just verify.

14       A    That's fine.

15       Q    It's a lot easier at times when we're all in

16   the same room and we can all, you know, transparency

17   helps.

18            Okay.  So I believe my understanding of what

19   you've just testified to is that you are called to the

20   Alpha 1 pod to respond to an inmate altercation.  And

21   as you are entering the pod and crossing the threshold

22   into the pod, you see Officer Mullins being approached

1    in a threatening manner by Mr. Johnson.

2         At which point, you give Mr. Johnson a

3    verbal command to lie down on the ground or you'll

4    release your canine.  Is that correct?

5        A    Multiple verbal commands.  Yes.

6        Q    Do you recall how many?

7        A    No, sir.  I would say two to three.  Three

8    would be most -- three yeah.

9        Q    Understood.

10        A    Yeah.  We're going with it.  As I recall,

11    three -- there was three verbal warnings that I gave.

12        Q    Okay.  And what do you recall was Mr.

13    Johnson's response, either physical or verbally, to

14    your warnings?

15        A    There was no response.

16        Q    Can you describe what you mean by that a

17    little bit more?

18        A    There was no response as far as there was

19    no -- he physically nor verbally responded to my

20    orders.

21        Q    Understood.  So from your perspective, your

22    orders were just ignored and Mr. Johnson continued to

1    engage in whatever he was engaging in?

2        A    Yes.

3        Q    Understood.  When you say that you entered

4    the A1 pod and that you observed Mr. Johnson

5    approaching Officer Mullins in a threatening manner,

6    what do you recall about Mr. Johnson that made you

7    believe he was approaching him in a threatening

8    manner?

9        A    Close fisted.

10       Q    Okay.  Anything else?

11       A    Body language was somewhat -- I would say

12   combative or closed in.  It appeared as if that there

13   was a staff assault about to take place at that point

14   in time.

15       Q    Okay.  So I just want to confirm that I

16   understand what you just said.  So you understood that

17   Mr. Johnson had a closed fist and closed-in body

18   language that was suggestive to you based on your

19   training and experience that he was about to engage in

20   a physical altercation with Officer Mullins

21   imminently?

22       A    It -- it appeared that way.  Yes, sir.

1     Q    Understood.  Is there anything else besides

2    the closed fist and the turned-in body language of Mr.

3    Johnson that led you to believe that he posed an

4    imminent physical threat to Officer Mullins?

5     A    He was approaching Officer Mullins.  Other

6    than --

7     Q    And when you --

8     A    And other than that no.

9     Q    Other than that, no.  Thank you for

10    clarifying.  And by "approach," what do you mean?  Do

11    you mean walking --

12     A    Walking -- walking towards or they were

13    fairly close, so he was walking towards.

14     Q    So as you were entering the A1 pod, Mr.

15    Johnson would have been walking toward Officer Mullins

16    as you're entering, and that's when you're yelling

17    your commands.  Is that correct?

18     A    Yeah.  And then --

19     Q    Okay.

20     A    Yes.

21     Q    Oh, please.  If there's something, please go

22    ahead.  I didn't mean to.

1      Q    Okay.  Did you have any information given to

2   you over the radio that Mr. Johnson had used a weapon

3   to attack the other inmate that he was engaged with?

4      A    No.

5      Q    At the time you gave your last command, I

6   understand that you've testified that you believed

7   Officer Mullins was at imminent risk of harm from Mr.

8   Johnson.  Was there any other inmates or officers who

9   you felt were at imminent risk of harm?

10     A    Yes.  As I was coming through the door, he

11  first approached Officer Mullins in a threatening

12  manner.  I began giving warnings.  He then turned away

13  from Officer Mullins and started running towards

14  another group of inmates that were lying face down

15  near the cells on the -- if we're looking at it from

16  the center view, it would have been on the right-hand

17  side.

18     Q    Okay.  As you sit here today or at the time,

19  did you have an understanding that that group of

20  individuals that you believe Mr. Johnson was running

21  towards, did you believe they were in danger from Mr.

22  Johnson?

1      A    Yes.

2      Q    And why did you believe that?

3      A    He was running towards then with closed

4  fists, closed-in body language, looked as if he was

5  ready to fight again.

6      Q    Understood.  But it could have been that he

7  was running away from the other canine that was

8  attacking the individual who he was in a fight with.

9  Correct?

10              MR. DAVIS:  Objection.  Calls for

11  speculation.

12  BY MR. JOHNSON:

13      Q    You can answer.

14      A    I do not know.

15      Q    Okay.  So after giving your third warning to

16  Mr. Johnson, prior to making a decision to release

17  your canine, did you consider not releasing your

18  canine?

19      A    Yes.  I always consider it.

20      Q    Okay.  And what were the considerations that

21  were going through your mind at that time?

22      A    What was the cost of not using force versus

1    the cost of using force.

2         Q    Okay.  And can you talk me through, like, I

3    know it was on the fly, but the calculus you were

4    making at that time specifically that led you to use

5    force in this instance?

6         A    Other inmates laying on the ground.  Mr.

7    Johnson was standing, running, being combative.  If at

8    that point he decided to assault another inmate that

9    was already laying on the ground, he could very easily

10   crush his skull -- crush the other inmate's skull

11   before I could have ever done anything about it, and

12   that would have been something else I would have had

13   to have answered for.

14        Instead of me explaining why I did

15   something, I would be explaining why I didn't do

16   something.

17        Q    Understood.  So after you made the

18   determination that based on what you were observing in

19   the pod after giving your third verbal warning to Mr.

20   Johnson, you decided to release your canine at that

21   time.  Is that correct?

22        A    Yes.

CONFIDENTIAL

1    Q    Okay.  So once you made the decision to

2    release your canine, what do you recall happened last?

3    A    Canine Shadow struck -- I'm sorry, engaged

4    inmate -- or Mr. Johnson on the right wrist, right

5    above the right wrist -- right above the wrist,

6    stopping said final actions that I was speaking of

7    earlier.

8    Q    Okay.

9    A    Would you like me to continue to go?

10   Q    Yes, please.  Yes.  Please.

11   A    Mr. Johnson -- I worked my way around at the

12   table -- a way around the table 'cause he -- the way

13   that he landed, he was laying very in close proximity

14   to a table, so I had to work my way around that.

15        I then gave him multiple orders to stop

16   fighting the dog and to show me his left hand.  I'm

17   not sure if he never -- I can't say whether he never

18   heard me or just ignored it.  Said show it so I could

19   see his left hand.

20        I then bent down to see if I could visibly

21   see anything in his left hand.  I did not.  I then

22   verbally disengaged canine Shadow.

CONFIDENTIAL

1     Q    Understood.  Okay.  So I'd like to break

2     down before we watch the video a little bit about what

3     you can recall now or just before we watch about the

4     time in which you first deployed Shadow on Mr. Johnson

5     and the time that you call or give Shadow the command

6     to disengage.

7          Do you have a recollection of what happened

8     after what happened or where Shadow first engaged with

9     Mr. Johnson?

10     A    There was only one engagement.

11     Q    Okay.  Can you describe it for me?

12     A    It was on the upper -- I'm sorry, lower

13     right arm upper -- right above the wrist.

14     Q    Okay.  And what do you recall happening

15     after Shadow engaged Mr. Johnson on the lower-right

16     arm?

17     A    Mr. Johnson complied with orders to get on

18     the ground.  I then worked my way around to take the

19     dog off at that point and see that he is hiding his

20     left hand from me.  I then tell him to stop fighting

21     the dog and to show me his left hand multiple times,

22     and he refused to do so.

1     And that's when I physically looked under

2  him to see if I could see a weapon or anything that he

3  could use to harm me or any other individual in the

4  pod.  And then I verbally disengaged Canine Shadow.

5     Q    Understood.  So from your perspective, Mr.

6  Johnson had not complied with your orders until he was

7  on the ground and you were able to look under him to

8  verify that there was no weapon on his person or in

9  his left hand.  Is that correct?

10    A    He never complied completely.  I took it on

11 good faith that there was nothing in his left hand at

12 that point.

13    Q    Okay.  Are you trained that you are able to

14 make subjective determinations about when an inmate is

15 complying with an order for purposes of disengaging

16 use of force?

17    A    I'm sorry.  Can you repeat the question,

18 sir?

19    Q    Sure.

20    A    I don't believe I understand what you're

21 asking.

22    Q    Sure.  In your training, are you permitted

1    pretty wide latitude to make a judgment call as to

2    when or what qualifies as complying with an order that

3    you get?

4        A    Policy sets the standards and then we decide

5    at what point that policy doesn't necessarily work in

6    real life because as policy states -- so to gain

7    compliance, you see that you're supposed to have your

8    legs crossed, both hands out, complying with all

9    orders.

10        I subjectively made the decision to take --

11   to disengage canine Shadow to prevent any further

12   damage to Mr. Johnson even though he would not show me

13   his left hand.  He was not in 100 percent compliance,

14   I disengaged canine Shadow regardless because I did

15   not want to cause any undue damage.

16        Q    Understood.  So to just confirm, in terms of

17   policy, Mr. Johnson never complied with your order.

18   Notwithstanding, you still called off your canine in

19   this particular instance?

20        A    Yes.

21        Q    And the reason that you called off your

22   canine when you did was because you did not want to

1   cause any further injury to Mr. Johnson beyond what

2   had already -- what he had already sustained up to

3   that point?

4       A    Yes.  That is correct, sir.

5       Q    Thank you.  And at the outset of today,

6   which I know seems like a long time ago, we were

7   talking about a concept called bite and hold as part

8   of your training.  Do you recall our conversation

9   around that?

10      A    Yes.

11      Q    Okay.  And do you recall testifying that you

12  were familiar with bite and hold within the

13  correctional canine training application, but you were

14  unaware of bark and hold within the correctional

15  canine setting.  Is that correct?

16      A    I am not aware of the bark and hold.

17      Q    Understood.  And when you released your

18  canine on Mr. Johnson, was the canine in bite and hold

19  mode?

20      A    I don't necessarily think I could call it a

21  mode.

22      Q    Okay.  Would technique be a better -- was

1    taking two steps back at this point.  Is that correct?

2         A    According to the camera, yes.

3         Q    Okay.  And have you --

4         A    I don't personally recall the details.  The

5    things -- these things happen in a mere matter of

6    seconds.

7         Q    Understood.  So at the 1:13 mark, have you

8    given your third warning yet?

9         A    No.

10        Q    Okay.

11        A    I'd finished my second one.

12        Q    Understood.  So now, if we click through to

13   the 1:14 and then pause on 1:14.

14        A    Yes, sir.

15        Q    Okay.  What appears to happen between 1:13

16   and 1:14 is that you continue to come closer to Mr.

17   Johnson.  Mr. Johnson takes another step back in an

18   apparent attempt to sidestep Shadow going to what

19   appears to be engage him on his right side.  Is that

20   correct?

21             MR. DAVIS:  Objection to form.  You can

22   answer.

CONFIDENTIAL

1           THE WITNESS:  Yes.  It does appear that

2   way.  Yes, sir.

3   BY MR. JOHNSON:

4       Q    So as of the 1:14 mark, had you already

5   deployed Shadow and determined that it was proper to

6   use force against Mr. Johnson?

7       A    Between this deployment and the next, I gave

8   another warning giving him another opportunity to

9   comply with orders and to lay on the ground and stop

10  being a threat.  But what was your question, I'm

11  sorry?

12      Q    That's okay.  Understood.  I appreciate your

13  response.  So it looks like between the 1:13 mark and

14  the 1:14 mark after you've given your second verbal

15  warning that you instruct Shadow to engage Mr.

16  Johnson.

17           And we see that in 1:13 and 1:14 when Shadow

18  goes to engage Mr. Johnson on the right, and he takes

19  another step back in what appears to be a side-

20  stepping maneuver to avoid being bitten by Shadow.  Is

21  that correct

22      A    Yes, sir.

1      Q    Okay.  And after making the decision to

2  deploy Shadow and use force, you give Mr. Johnson

3  another opportunity to comply with the orders, and you

4  give a third verbal warning to stop or that you will

5  use force again against Mr. Johnson.  Is that right?

6      A   Yes, sir.

7      Q    Okay.  So from the 1:14 mark to just play

8  through 1:15 please.

9               (Video played.)

10     A   I'm there.

11     Q    I believe what we see here is Mr. Johnson

12 continuing to take two more steps back both from

13 Officer Mullins and from yourself.  Is that correct?

14     A   Yes.

15     Q    Okay.  At this point, when Mr. Johnson has

16 taken two steps back and you've given another warning

17 to him to cease engaging, who is in imminent threat of

18 danger at the 1:15 mark?

19     A   Had I not deployed, he could have -- in the

20 direction he was going, those six inmates just above

21 and the two to three that we can see below.

22     Q    Okay.  I believe it would appear to be one

1    inmate to Mr. Johnson's right, although his back to

2    that inmate, about eight or so feet away diagonally to

3    the right from Mr. Johnson.  And then in the bottom-

4    right corner about maybe 25 to 35 feet away, we see

5    other inmates lying on the ground.

6              Are those the inmates you're referring to

7    are in imminent danger from Mr. Johnson at the 1:15

8    mark?

9              MR. DAVIS:  Objection to the form of

10   the question, but Mr. McCowan, you can answer.

11             THE WITNESS:  Yes.

12   BY MR. JOHNSON:

13        Q    And the movements that Mr. Johnson has made

14   up to this point, the 1:15 mark, are these the

15   movements that you were talking about earlier when you

16   were describing Mr. Johnson running toward a group of

17   inmates?  Are the movements that we have seen up

18   through the 1:15 mark those movements?

19        A    As I recall them, yes.

20        Q    Okay.  Are there any other movements up

21   until this point that you recall that we haven't seen

22   on this video that led you to believe that Mr. Johnson

1    was running towards or presenting an imminent risk to

2    other inmates?

3        A    No, sir.

4        Q    And if we could actually -- and I apologize

5    for the bouncing around on the video.  There's not a

6    better way to do this.  If we can start at the 1:13

7    mark and then we're going to play through to the 1:16.

8    Or excuse me, 1:17.

9                    (Video played.)

10       A    1:17.

11       Q    Okay.  Excuse me.  Thank you.  So what we

12   see from the 1:14 to 1:17 mark is Mr. Johnson now

13   having taken another few steps away from both you and

14   Officer Mullins.  Is that correct?

15       A    Yes.

16       Q    We also see from the 1:15 to the 1:17 that

17   your canine, Shadow, appears to be barking at Mr.

18   Johnson, and Mr. Johnson continues to back away from

19   canine Shadow.  Is that correct?  Specifically, from

20   1:15 to 1:16?

21       A    It -- he does not appear to be barking.  It

22   looks as if his mouth is closed.

1    Q    Understood.  Okay.  Thank you.  So at what

2    point between the 1:13 mark and the 1:17 mark did you

3    decide for the second time to deploy Shadow on Mr.

4    Johnson?

5    A    At the one -- between the 1:14 and the 1:15

6    after giving -- after saying -- after giving him my

7    warnings twice.  "State canine.  Get on the ground.

8    I'll release the dog" twice.  He then stepped out of

9    the way of the deployment and at that point in my

10   perception I seen that he was -- was attempting to be

11   a threat to someone else in that immediate area.

12        At that point in time, I did not know who or

13   why.  But at about 1:15, I would say I make that

14   decision.  Well, make that -- I make the decision to

15   use force if the third command was not followed.

16   Q    Understood.  And that's what we see in the

17   1:14 and 1:15 even though we can't hear it because the

18   video is you giving the third command.  But then we

19   obviously, you know, but we can see that, you know,

20   the deployment around the 1:15, 1:16 mark is the third

21   deployment of the canine.  Is that correct?

22   A    More between 15, 16, to 17.

1   BY MR. JOHNSON:

2       Q       Of course.  No problem.  It appears by the

3   1:20 mark that Mr. Johnson is completely on the form

4   on his stomach.  Is that correct?

5       A       Yes.  But where you're -- the -- yes.  He is

6   for the most part on the ground by 1:20.

7       Q       Okay.  And Shadow is still engaged on Mr.

8   Johnson's right arm.  Is that correct?

9       A       Yes.

10      Q       Okay.  And at this time, what are you saying

11  to Mr. Johnson?

12      A       From -- let's see.  From the time the

13  engagement starts, which is about 16.  And he stays on

14  his -- he's on his feet completely until about 1:19.

15  And by 1:20, he is on the ground.

16              "Get on the ground.  Get on the ground and

17  stop fighting the dog.  Get on the ground."

18      Q       All right.  Is this when you're looking for

19  a weapon?

20      A       No.

21      Q       Okay.  Did you believe that Mr. Johnson had

22  a weapon at this point in time?

1      A     I was unsure at that point.

2      Q     Okay.  And if we keep watching the video,

3   from 1:20 to about 1:29, Shadow is still engaged on

4   Mr. Johnson.  Is that correct?

5                 (Video played.)

6      A     Yes.

7      Q     Okay.  So then, the engagement with Mr.

8   Johnson, just by looking at the video, appears to

9   start at the 1:16 mark and lasts through the -- it's a

10  little bit hard to tell, but it's at the 1:34 or 1:35

11  mark?  Or is it longer?

12                (Video played.)

13     A     I'm sorry.  Let's see.  1:40 -- let's see.

14  1:41.  Between 1:41 and 1:42.

15     Q     Understood.  So it starts at the 16 and then

16  goes to the 41, 42?

17     A     Yes.

18     Q     Understood.  Okay.  And so now that we have

19  just the parameter, let's go back to the 1:21, 1:22

20  mark when Mr. Johnson is first brought down to the

21  ground.

22              So now that Mr. Johnson is on the ground,

1    and it appears that Shadow has continued to engage

2    him, what imminent threat are you seeing to continue

3    to use the canine on Mr. Johnson at the 1:21 mark?

4         A    Possibility of a weapon.

5         Q    Okay.  But again, you didn't have any reason

6    to believe he had a weapon?

7         A    No.

8         Q    And playing forward from 1:21 up through

9    1:46, is the reason that you continued to use force

10   against Mr. Johnson because you were unsure of whether

11   he had a weapon?

12        A    Yes.

13        Q    Is there any other reason --

14        A    And that he would not show me his left hand.

15   I apologize for interrupting.

16        Q    Oh, no.  I apologize.  So could you repeat

17   your answer?

18        A    Yes.  I was unsure of whether or not -- the

19   possibility of the weapon was there, and I was

20   attempting to get him to show me his left hand so I

21   could make sure that there was no weapon in his left

22   hand that he had tucked under his chest at that point.

1    Q    Okay.  Given from where Mr. Johnson is at

2    the 1:21 mark, even if he had a weapon, what's your

3    understanding of how he could have caused imminent

4    harm from the position he was in?

5    A    If I were to disengage, and he had a weapon,

6    I would be stabbed.  I would -- he'd jump up if the

7    dog was not engaged and he had -- and I took him off

8    while he still had a weapon in his possession, I just

9    put every -- myself, canine, and every other

10   individual in that pod back into danger of being

11   stabbed or any sort of homemade weapon that can be

12   made.  Whether it's a soap in a bar sock -- or a bar

13   of soap in a sock or a homemade knife.

14   Q    Understood.  And is that determination that

15   you just described, were you trained to -- let me

16   start over.  Sorry.  Is your understanding that until

17   you can verify somebody doesn't have a weapon that you

18   should treat them as if they do?  For purposes of use

19   of force?

20   A    Can you repeat the question, please?  I

21   apologize.

22   Q    No problem.

1    A    I don't believe I understood you the first

2  time around.

3    Q    That's not a problem.  Let me try to ask it

4  a clearer way.  Is the justification for the use of

5  force that an inmate may have a knife or a homemade

6  weapon --

7    A    Yeah.

8    Q    Is that -- is that a reasoning that you are

9  trained to react with a use of force to if you don't

10  know that an inmate has a knife or a homemade weapon?

11    A    Not necessarily.  We have to go off of what

12  we know as we are entering a pod where there is an

13  altercation that has happened.  And once we respond,

14  we have to add what we know to what we are seeing.

15    Q    Understood.  So what is it that you saw,

16  knowing that Mr. Johnson had fought another inmate,

17  been in close proximity to Officer Mullins, and been

18  next to the individual who Officer Baker deployed his

19  canine on, what did you see that led you to believe

20  that he would pull out a knife on you as compared to

21  earlier in the altercation?

22    A    That he would not show me his left hand.

1    Q    And that's the same left hand that he had

2    balled up in a fist when you entered the pod.  Is that

3    correct?

4    A    He had both of them balled into a fist.

5    Q    Got it.  And because he kept his left hand

6    balled in a fist, you believed that he was in fact

7    carrying a weapon?

8    A    Attempting to hide one, yes.

9    Q    Understood.  Even though he had not used

10   that weapon in the altercation up to that point.

11   A    I was unaware of whether a weapon had or had

12   not been used in that altercation.

13   Q    Understood.  Okay.  So I believe that you

14   said the altercation lasted through the 1:46 mark.  Is

15   that correct?

16   A    1:42.

17   Q    1:42.  Okay.

18   A    1:42 to 1:43, I believe, was the mark that

19   we were looking at.

20   Q    Okay.  So if maybe we could go to the 1:40

21   mark, could you identify for me between, you know,

22   1:40 and 1:45 where the specific timestamp where you

1    tell or you give the command to Shadow to disengage?

2        A    About 1:00 -- I would say somewhere around

3    1:40 to 1:41 is where I give him the command.  You can

4    see me bent down there giving the command, and I bent

5    down for -- I -- I bent down earlier to see if I

6    could -- this is where I said I could -- if I could

7    see if there was anything in his hand or in his hands

8    that was balled up in a fist under his chest.

9         I bent down, I couldn't see anything, I

10    then -- I would say around 1:40 and 1:41, I give the

11    verbal command to disengage, and 1:43 he disengages

12    upon his own -- he releases on his own.

13        Q    Okay.  In your training with Shadow, do you

14    recall how long it would take Shadow to disengage in

15    your training after you give a command?

16        A    A couple of seconds.

17        Q    Okay.

18        A    Because it's congruent with what I'm seeing

19    here.

20        Q    Understood.  To say that back or just to

21    confirm, Shadow's release time in response to your

22    command, as we have seen on this video, is consistent

1    exhibit are all pictures of Mr. Guy's injuries after

2    the incident with Mr. Johnson.  Is that correct?

3        A    Yes, sir.

4        Q    Okay.  And just to confirm, none of the

5    pictures in Exhibit 14 relate to Mr. Johnson.  Is that

6    correct?

7        A    I'm sorry?  Can you repeat that, sir?

8        Q    Sure.  None of the pictures in Exhibit 14

9    are Mr. Johnson or his clothing.  Is that correct?

10       A    No, sir.

11       Q    Are any of the pictures in Exhibit 14

12   pictures of Mr. Johnson's wounds?

13       A    Yes.  Yes, sir.  I believe the numbers are

14   114, 115, 116, 117, and 118 are all of Mr. Johnson.

15   Numbers 109, 10, 11, 12, 13 are of Mr. Guy.

16       Q    Understood.  Than you.  And you took the

17   pictures of Mr. Guy.  Is that correct?

18       A    Yes, sir.  I did.

19       Q    Do you know who took the pictures of Mr.

20   Johnson?

21       A    Officer Baker.

22       Q    Do you know who the individual in 115 who