IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

_____

COREY E. JOHNSON,

      Plaintiff,

  v.                           Case No.

K9 OFFICER MCCOWAN, ET AL.,      7:20CV00582

      Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF

OFFICER ERIC W. BAKER

DATE:         Monday, June 13, 2022

TIME:         10:25 a.m.

LOCATION:     Remote Proceeding

              Washington, DC 20005

REPORTED BY:  Timothy Guevara, Notary Public

JOB NO.:     5279123

Page 16

A     I mean like I've had hunting dogs and things of that nature, but no jobs working with K9.

Q     Okay.  And so did you have any formal training with dogs outside of your position as a K9 officer?

A     No, I -- it was all my own training with my hunting dogs.

Q     Okay.  Thank you.  Why did you join the Virginia Department of Correction?

A     Good benefits, good retirement and I knew that the job would be around indefinitely.  I mean, because everything else is -- comes and goes and around this area, this is one of the most stable positions and jobs that you can get.

Q     And just for our purposes, I will be referring to Virginia Department of Corrections as VDOC; is that okay?

A     That's fine.

Q     Okay.  And so does the VDOC employ a lot of people in your city?

A     Yes.

Q     Okay.  And what was your first position when

Page 17

joining the VDOC?

    A    Corrections officer.

    Q    And what were your duties and responsibilities as a correctional officer?

    A    I'll try to explain this.  Provide security, make sure that inmates get what they're required to do and make sure that we keep structure and make sure that we keep everyone safe and keep the public safe.

    Q    And when did you first join VDOC?

    A    January 10th of 2017.

    Q    And then did you have any other positions between correctional officer and K9 officer at VDOC?

    A    No.

    Q    Okay.  And then when did you become a K9 officer?

    A    Officially graduated December 20th of 2018.

    Q    Thank you.  And which prisons have you worked at within the VDOC?

    A    Do you mean as far as employed by or have actually traveled to to work?

    Q    Well, first let's answer where -- who were you employed by specifically?

long a officer -- or how long a K9 is engaged on an inmate, you had said as long as the officer deems appropriate; correct?

A    Yeah.  Correct.

Q    And so that is again another factor that is in the sole discretion of the K9 officer; correct?

A    Correct.

Q    Okay.  Thank you.  Did any of the trainings address a K9 officer's intervention on behalf of an inmate?

A    Yes.

Q    And what did that training cover?

A    The training covered if one -- if two inmates are fighting and if possible you can step in, intervene and keep someone from getting -- you know, keep them from having an altercation between the two of them if possible.

Q    And do you have a duty to intervene as a K9 officer?

A    Yes, we prevent -- we protect everyone's well-being.

Q    I'm sorry.  Can you repeat that?

Page 105

A    We -- we protect everyone's well-being.

Q    Okay.  And so if you are witnessing an inmate's well-being being threatened, it is your duty as a K9 officer to intervene and protect that inmate; correct?

A    Yes.  Any excessive force or anything of that nature, yes, we are --

Q    Understood.  And what would you consider excessive force that would require you to intervene on behalf of the inmate --

A    Force more necessary than what it is to control the situation.

Q    Okay.  Did the trainings ever teach you specific intervention practices on behalf of inmates?

A    I mean, not particular scenario by scenario, but different reasons that you would need to step in and intervene.

Q    Can you describe some of those?

A    An inmate being restrained and officers using physical assault on them once they're -- once they are already restrained when they're --

Q    Using physical what?  I'm sorry.

Page 106

A    Physical force.

Q    Physical force.  Okay.

A    Yes.  Using physical force on them once they're already restrained and -- and then -- and anything that would deem as more excessive than what the officers perceive the force needed to solve that situation or de-escalate that event.

Q    Understood.  So you were trained that as a K9 officer, you can intervene on behalf of an inmate in a situation with another officer?

A    That is -- also -- yes, as K9 and as a -- it is more introduced in the basic corrections officer training than anything else.  It is used more and understood more in your basic officer school when you first become a corrections officer.  That is a -- that is when they go over that a whole lot.  So you cover it in both schools, your original basic officer and then your patrol as well.

Q    Understood.  So you were trained to take action to prevent excessive harm to an inmate; correct?

A    If we perceive that it's excessive, yes.

Page 107

Q    And is that again up to your discretion, what is excessive?

A    Yes.  Yes.

Q    And what does excessive harm to an inmate mean to you?

A    Using more force than necessary to get an inmate to -- to cause an inmate to stop resisting or to get an inmate to comply or to get an inmate to stop being assaultive.  Different scenarios are different. Force is used on different levels in different situations.

Q    And so if you saw that an inmate was complying and another officer continued to use force even after the inmate started complying, are you required to intervene?

A    If you feel that it's excessive, yes, you are required to step in and say something or take action of some sort.

Q    Understood.  Were you ever provided scenarios in your training where you would have to intervene as a K9 officer to protect an inmate from a K9?

Page 108

A    Yes.

Q    And can you describe those to me?

A    Yes.  It was -- one that's in my head is one inmate would be trying to assault another inmate, but the second inmate was already being restrained.  So then you stop the first inmate and stop the officers from doing that before you engage or before you stop -- you intervene before any other damage can -- or any other assault or -- or anything like that can happen to the inmates that are already restrained or already been complying.

Q    Understood.  So I guess my question was more about you see an inmate having a K9 -- a K9 has engaged on the inmate.  Have you -- were you given any scenarios where you had to intervene and help the inmate who had the K9 engaged on him?

A    No because that K9 is that K9 officer's responsibility.  I cannot touch his K9.  I cannot stop his K9 from engaging because you only deal with your personal K9.

Q    So even if you witnessed an inmate being subjected to excessive force by the use of a K9, is it

your testimony that you cannot do anything if it is not your assigned K9?

A    I cannot go over and touch the K9.    I cannot.    I can say something to the K9 officer, but I cannot physically touch the K9.

Q    Understood.    And what would you say to the K9 officer?

A    Depending on the situation, but -- but if I was trying -- if I was attempting to stop it beforehand, I would be -- say don't do that, stop, pull back, hold up, something of that if I was trying to prevent it before he engaged.

Q    And how would you proceed if the K9 officer did not respond to your attempts at intervening?

A    I don't know.    I've not been placed in that situation, so I don't know -- I don't know what I would do.

Q    Okay.    And what would you do if the officer was trying to follow your instructions, but the K9 was not complying?

A    You going to have to clarify.

Q    So you said that you cannot touch another K9

Page 110

officer's K9; correct?

    A    Correct.

    Q    And in that situation where excessive force was being used on a inmate by the means of a K9, the way that you would intervene is by shouting out to the officer or speaking to the officer, telling them pull your dog, lift your dog off, disengage, giving those types of commands to the officer to maybe highlight that that may be -- it's enough; correct?

    A    Correct.

    Q    So what if it's clear to you that the officer is doing everything that you are instructing the officer to do to disengage the K9, but the K9 is not disengaging?  How would you respond in that situation?

    A    In that situation, there's nothing I can do because there's -- it's one K9 and I can't go over there and take his K9 off because then at that point, then I would have two dogs at the same time and I -- that's not a possibility.

    Q    Okay.  So as long as you have your dog, you cannot assist anyone else with their dog?

Page 111

A    True.

Q    Okay.  But it is your duty to intervene in ways that you can, such as you described verbal commands from wherever you are with your K9 to instruct the officer on how to proceed in a situation that you perceive to be excessive force?

A    Yes.

Q    Okay.  And just to be clear, under no circumstance can you physically get involved and help remove the K9 or help disengage the K9?

A    No, I cannot.

Q    Okay.  Is there a reason why?

A    Because I'm assigned my K9 and I have my K9 responsibilities.  I cannot control two dogs -- two K9s at the same time because I would have to do something with my K9 while I was trying to remove someone else's K9 if that was to be the situation, and that's not physically possible.  I -- I only have two arms and I cannot safely control my K9 and remove their K9 as well.

Q    Okay.  Understood.  In terms of your training on intervention, was this covered in the

Page 223

before the incident with Mr. Johnson?

A    It was a normal, everyday, regular workday.

Q    So nothing out of the ordinary that day?

A    No.

Q    Okay.  At some point on May 2nd, you were called to respond to an incident in A1 pod; correct?

A    Correct.

Q    Where were you when you got this call?

A    In front of the building.

Q    In front of which building?

A    Alpha building.

Q    Were you patrolling that area?

A    Yes.

Q    And which area is that exactly?

A    The boulevard.

Q    Okay.  What information did you receive about the incident from the call?

A    That -- that there was a -- a 1018, which is a inmate-on-inmate fight, in Alpha 1 pod.

Q    Were you provided any other information?

A    No.

Q    So all that you knew at this point when you

Page 224

received the call was there was an inmate-on-inmate fight in A1 pod; correct?

A    Yes.

Q    Do you recall who those two inmates were?

A    One was inmate Johnson and one was inmate Guy.

Q    Did you know Mr. Guy before this incident?

A    No.

Q    To the best of your recollection, can you walk me through everything that happened from the moment you were informed about the incident that required your response?

A    I ran down the boulevard to the front door, through the front door, through the vestibule, give my warnings of dog, that way no one else would inadvertently run into me.

THE REPORTER:  My -- my apologies. This is the court reporter.  My apologies for interrupting.  I'm having a little bit of trouble kind of understanding.  I -- I do need to make sure that everything is captured clearly word per word on the record.  You sound a little far, Mr. Baker, and it

Page 225

sounds -- Officer Baker.  My apologies.  And it
sounds --

THE WITNESS:  Sorry.

THE REPORTER:  Okay.  I do have ran
down, stating there was a dog, that's up till there I
kind of caught.

THE WITNESS:  Okay.  I'll start over.
I ran down the boulevard to the front door, I opened
the front door and I gave -- let my presence be known,
dog, that there's a dog in the area, and I proceed
into Alpha 1 pod.

BY MS. QAHOUSH:

Q    And when you say you ran to the door from
the boulevard, how far away from the door were you?

A    Maybe somewhere betweens -- somewhere around
60 or 70 foot I would say.  Maybe a little more, maybe
a little less.  I don't know.  I've never measured the
boulevard, but I was somewheres about -- in about the
middle range of it.

Q    Understood.  And when you said you let it be
known that your presence was there and that you had a
K9 with you, where did you make that statement?

Page 226

A    Soon as I entered the front door.

Q    So the front door of A1 pod?

A    No, the front door of A building.

Q    Of A building.  And who was that statement for?

A    Anyone that's in the area to let them know that there's a -- you know, a dog there because, I mean, I don't -- I don't want to go through a steel door and on the other side of it be someone standing there that I -- and get bit that I don't have -- have intentions on, you know, biting or needing -- needing to engage them and it would be an accidental bite then.  If I open a door and they run into me, head-on into me, then it would be an accident, you know?

Q    So there is a risk of accidental bite when you do not give this warning?

A    Yes because if someone's running at me and they run into the -- into a dog, a trained patrol dog, the trained patrol -- patrol dog will engage if he runs -- if someone runs into me.

Q    So a patrol dog will engage if somebody runs into him; correct?

Page 233

enter?  Is it at the doorway?  Where specifically?

A    At -- at the doorway cause like I said, it's steel doors.  You can't -- you can't let your presence be known through a steel door and concrete.  I mean, they -- we don't have that kind of ability.  So you open -- as you open the door and you start through, you let your presence be known and that way people will acknowledge that you're there if there's anyone in the area.

Q    Understood.  Okay.  So the last thing we talked about was you said that you entered A1 pod and then can you -- or you entered Alpha building and you made your presence known, then you entered the vestibule; is that correct?

A    That -- that is -- the vestibule is right behind the -- on the opposite side of the front door to the building.

Q    Okay.  And then did you make your presence known when you entered the vestibule?

A    That was -- when I cleared the front door, that was the vestibule.

Q    Understood.  Okay.  And so when -- and then

Page 234

through there, you entered A1 pod; correct?

A    Yes.  Yes.

Q    And then did you make your presence known when you entered A1 pod?

A    Yes.

Q    What else did you say when you entered A1 pod?

A    I looked around and I witnessed the two that we're talking about, inmate Johnson, inmate Guy, being involved in an altercation on the floor.  So then I start giving my verbal warnings for them to stop fighting.

Q    Okay.  So upon entering A1 pod, you first gave -- you first made your presence known?

A    Yes.

Q    What exactly do you say when you make your presence known?

A    When I first start through a door, I'll say, "Dog," that way people know there's a dog in the area cause "dog" is a universal term.  Everyone knows what it is.

Q    And is that all that's required of you to

Page 235

make your presence known?

A     Yes.

Q     Okay.  And you looked around A1 pod?

A     Yes.

Q     And you saw Mr. Guy and Mr. Johnson in an
altercation on the floor; correct?

A     Correct.

Q     How far away were they from where you
entered from into A1 pod?

A     I don't know.  I don't have a -- I didn't
have a tape measure with me.  I don't know -- I ain't
never -- ain't never measured the pods and stuff.  I
couldn't really tell you -- I can't tell you -- like
earlier, you said don't speculate or guess anything
unless I know for sure.  So I couldn't tell you the
distance.

Q     That's okay.  If you do not remember or you
can't -- if you don't know, that's okay.  That answer
is fine.

A     Okay.

Q     Were you the first K9 officer to respond?

A     Yes.

Page 236

Q    Were there any other officers on the scene when you arrived?

A    Yes.

Q    Who was there?

A    Officer Mullins was there.

Q    And who is Officer Mullins?

A    He was a corrections officer that was working that building that night.

Q    And who gave -- who put in the call that you responded to?

A    The -- someone -- I'm not sure the name, but someone that was in the control room above them.  They witnessed it, so then they made the call across the radio.

Q    Understood.  Can you describe Mr. Guy's actions upon entering A1 pod?

A    Guy and Johnson both were throwing fists and tussling back and forth, kicking and struggling each other, both trying to get the upper hand in the fight and one trying to overpower the other one.

Q    And when did you decide to engage your K9?

A    Whenever I give them warnings to stop and

Page 237

they refused.

Q     How many warnings did you give?

A     Several.

Q     Do you remember how many?

A     Not a definite number, no.

Q     I'm sorry.  What was that?

A     I said not a -- not a specific number, no,
but it was several.

Q     Was it more than one?

A     Yes.

Q     More than two?

A     I'm going to -- if I had to put a number on
it, if you're making me put a number on it, I'm going
to say maybe five.

Q     So you gave five warnings before you engaged
your K9 --

A     If you're -- if you're making me put a
definite number on it, then we'll have to go with five
because I don't remember.  I -- I mean, I know
several, but I don't have a specific number, but
somewheres around five, give or take.

Q     Okay.  But it was definitely more than one?

Page 238

A    Yes.

Q    Okay.  Thank you.  And when you gave the command for ET to engage, who did ET engage?

A    Inmate Guy.

Q    And why did ET engage Mr. Guy?

A    Because that was the -- that was who I had -- that is where I had guided him in to engage.

Q    Why did you guide him to Mr. Guy?

A    Because they were both tussling and whenever I'd done it, inmate Guy was -- they was both tangled up and inmate Guy was kicking more than Johnson and so from my perception at that point, I seen Guy as being the aggressor at that point, so I engaged him.

Q    Understood.  So the use of force against Mr. Guy was intentional?

A    Yes.

Q    You specifically wanted ET to engage Mr. Guy; correct?

A    Yes.

Q    And not Mr. Johnson; correct?

A    Correct.

Q    And you testified that's because you viewed

Page 239

Mr. Guy as being the aggressor in that situation; correct?

A    At -- at that particular time, yes.

Q    Okay.  Thank you.  Other than Mr. Guy's kicking, was there anything about his behavior that made you engage your K9 on him specifically?

A    I mean, other than him being involved in an altercation, no.  He was just -- he was more -- he was trying to get more of the upper hand.  From what I seen, he was trying his best to get more of the upper hand more than the other one was.

Q    Did you consider having ET engage Mr. Johnson?

A    Yes, I did.

Q    And what made you choose not to engage Mr. Johnson?

A    Because whenever I went through, Johnson was -- did not -- was not making as much -- did not have as much movement going on.  So from my perception, I assumed that Guy was being the aggressor and usually if you engage on the aggressor, the fight will stop because the -- the other one, the one

Page 240

that's -- that's on the losing end, is obviously going to quit because -- usually going to quit because the one that's -- that is the aggressor has stopped because of the dog engagement.

Q    Did you ever consider not deploying your K9?

A    Yes.

Q    When?

A    Whenever I come in and I started giving warnings and they had -- they had slowed up -- slowed down their movements and as I got closer, then their movements increased.

Q    And so you waited until you gave your several warnings before engaging your K9; correct?

A    Correct.

Q    And during the time that you were giving your warnings, you were considering not deploying your K9; correct?

A    Correct.

Q    Okay.  Did you have any suspicion that Mr. Guy had a weapon on him?

A    No.

Q    Did you ever find a weapon on Mr. Guy?

Page 241

A    No.

Q    Did you have any concerns about Mr. Guy's behavior?

A    Behavior as in what?

Q    In the actions that he was taking during the altercation, was there anything particularly concerning to you?

A    I mean, I was just trying to get him to -- for them to stop -- I was trying to get the altercation to the end and the physical violence to end, so -- but anything other than that, there was nothing out of the -- out of the ordinary.

Q    From your point of view in A1 pod, was the physical altercation limited to Mr. Guy and Mr. Johnson?

A    Yes.

Q    Was anyone else involved in the altercation?

A    Not that I seen.

Q    When engaging ET on Mr. Guy, did you utilize the bite and hold technique?

A    Yes.

Q    Did you give a verbal command to have ET

Page 242

disengage from Mr. Guy?

A    Yes.

Q    When did you do that?

A    Whenever he complied.

Q    Do you remember how long it took for Mr. Guy to comply?

A    No.  It wasn't long, but I don't have a set number.

Q    Right.  That's okay.  Thank you.  And what did it look like when Mr. Guy complied?

A    He -- he could not get -- he could not go face down because at this point Johnson had become the aggressor and was on top punching inmate Guy in the face and he -- and -- but Guy was on his back with his arms out and his palms up and he was not even -- he was not even fighting back Johnson.  Even though Johnson was still assaulting him, he was not fighting back after the K9 engagement.  So then I -- once he complied like that, I gave the command and he disengaged and I took him off.

Q    And how long -- from the moment you gave the verbal command for ET disengage, how long did it take

Page 243

for ET to actually disengage?

A    Maybe -- again, this is speculation, but maybe two seconds maybe.

Q    So is that appropriate in terms of your training and what you know to -- and what you've been trained?

A    Yes.

Q    Okay.  So you had no issues with ET disengaging Mr. Guy?

A    No.  No.

Q    Okay.  Can you describe Mr. Johnson's actions when you entered A1 pod?

A    He was still -- when I went in, they was both tussling again, but one -- both was looking for the upper hand.  Johnson was not moving as much as inmate Guy and so that's why I engaged inmate Guy and inmate Johnson -- once inmate Guy was engaged, inmate Johnson then became the aggressor and started punching inmate Guy in the face at this point.  At that -- at that time once he became the aggressor, I then -- and Guy had complied, I then pulled my -- had my K9 disengage.

Page 244

Q    And after you disengaged Mr. Guy when you -- and you disengaged Mr. Guy because you found him to be complying with your commands; correct?

A    Correct.

Q    And at this point, Mr. Johnson, according to you, you believed was the aggressor now; correct?

A    Correct.

Q    Did you ever consider engaging ET on Mr. Johnson once --

A    Yes.  If he had not stopped assaulting Guy, I was going to -- I was -- had considered engaging on inmate Johnson because Guy, at this point, had completely complied and had stopped all physical movements and had -- had just completely -- for lack of a better term, had surrendered up and was complying with everything and he didn't even defend himself from inmate Johnson hitting him the last several times.

Q    And so why did you not engage ET on Mr. Johnson after ET disengaged from Mr. Guy?

A    Cause at this time, that's when Johnson, inmate Johnson, came off off of inmate Guy because Officer Mullins had grabbed inmate Johnson and was

Page 245

pulling him off of inmate Guy.

Q    And when Officer Mullins pulled Mr. Johnson off of Mr. Guy, why did -- why even then did you decide not to engage ET?

A    Cause then at that point, inmate Johnson was a good distance away from me and -- and I thought that inmate Johnson was -- let me rephrase that.  Inmate Johnson was a good distance away from me and I was not comfortable leaving inmate Guy that had just been in an altercation on the floor not being secured or restrained, and at this time is when I heard Officer McCowan come through the door.  So then I done what I was supposed to do and control one of the inmates that had been involved in the altercation and I was leaving the other one for the -- Officer Mullins and Officer McCowan to restrain.

Q    Understood.  So when Officer Mullins pulled Mr. Johnson off, you felt, based on the distance, that you did not have to immediately engage ET on Mr. Johnson; correct?

A    They was not -- I could not immediately do that because Officer Mullins was between me and

Page 246

Officer [sic] Johnson.

Q    And how do you instruct your K9 on who to engage?

A    The dogs -- the K9s respond to aggression and so we guide them in to engage who we need them to.

Q    And you testified that it was your intention to have ET engage Mr. Guy; correct?

A    Correct.

Q    And in a situation where there is an altercation between two inmates, is there a possibility that ET will engage the wrong inmate?

A    No.

Q    And why is that not a possibility?

A    Because I am controlling his head per leash control in order to get him to engage where and how I need him to.

Q    And how do you control ET with leash control?

A    I don't know how to put it in words.  It's just a -- it's one of those situations that you learn as you do things as far as like you learn to do that in the basic K9 school of how to control the dog and

Page 249

A    Not exactly, no.

Q    Okay.

A    Not that I seen, but my whole -- you -- you got to keep in mind the whole time that I'm doing this, I have an inmate that was just involved in an altercation too laid in front of me with no -- no restraints on, not handcuffed or anything.  So I've got to provide security over him to make sure that he doesn't get up and the altercation begin again or with someone else.

Q    So let's talk about that a little bit. You're in a -- when you are in a situation where you are the only K9 officer at the scene and you have inmate Guy who you just engaged your K9 in and you now have to act security until inmate Guy is restrained, but then you also have inmate Johnson who is, as you testified, a distance away, what is -- what are your competing duties?  Is your duty to secure inmate Guy or is your duty to watch over Mr. Johnson?

A    If I am the only K9 on the -- on the -- in that area, my job is to get compliance from any -- from anyone involved in the alteration that's

Page 250

not on the ground, which in this case would be Mr. Johnson, but I was not the only K9 there.

Q   So you testified that Officer McCowan entered A1 pod after Officer Mullins pulled Mr. Johnson off of Mr. Guy; correct?

A   It was around the same amount of time.

Q   Okay.  And so you did not feel the need to engage Mr. Johnson because you knew another K9 officer was on the scene; correct?

A   Yes.  Correct.

Q   If there wasn't another K9 officer on the scene, was there anything about Mr. Johnson's actions that would require you to engage your K9?

A   Yes.

Q   And what were those actions?

A   Fists balled, fighting stance and had just moved -- had just blown past -- turned past a -- an officer when the officer was giving him multiple warnings to stop and get on the ground and he jerked away from the officer as well.  So at that point, he's showing that he is not complying with anyone's orders that anyone's giving him.

Page 257

Q    So it was only you, Officer McCowan and Officer Mullins; correct?

A    That I recall, yes.

Q    Okay.  What do you recall Officer McCowan doing when he entered A1 pod?

A    First, he was -- he -- first, he gave his warning letting his presence be known, saying, "Dog," when he came through the -- into the pod was the first thing he done because I could hear it.

Q    And then did he say anything else upon entering A1 pod?

A    Soon as he come through the door, he started giving warnings to Johnson to get on the ground.

Q    And how many warnings did he give to Mr. Johnson?

A    I didn't count them.  I don't know.

Q    Was it more than one?

A    Yes.

Q    Do you recall if it was more than two?

A    If I had to -- if I had to -- I'm not even going to answer that because I don't know.  I didn't count them.  Like I said, I didn't -- I didn't sit

Page 258

there and count them on my fingers and think, well, that was three or four or whatever, but it was -- it was several. It was not just one or two. It was several, but I don't really want to put a number on it.

Q    Okay. So as you recall today, you just know that it was more than one, it was several?

A    Yes, several.

Q    Okay. Did you observe Shadow engage Mr. Johnson?

A    No.

Q    Did you hear Officer McCowan give a command for Shadow to engage?

A    No.

Q    Do you know what happened to Mr. Johnson when Officer McCowan entered the scene?

A    What do you mean what happened --

Q    So you were in A1 pod, your K9, ET, disengaged Mr. Guy, Officer Mullins pulled Mr. Johnson off of Mr. Guy and Officer McCowan entered A1 pod. He gave several warnings to get on the ground and then what happened?

Page 259

A    And then he engaged Johnson.

Q    And how do you know that Shadow was engaged?

A    Because I looked over and seen Shadow on Mr. Guy's arm and -- and him starting to go towards the ground.

Q    What was the last sentence?  Sorry.

A    He was starting to go towards the ground --

Q    Mr. Johnson was?

A    Yes, Mr. Johnson was.

Q    Okay.  So you did not witness Shadow the moment that Shadow engaged Mr. Johnson?

A    No, I was -- when you go into a situation like that and you have more inmates out other than just the two that's fighting, you have to pay attention to all your surroundings and keep everything in visual on all corners, that way you keep, you know -- you look out for yourself, make sure that nobody's going to try to come up and assault you or anyone else and you try to keep your head on a swivel, so to speak, and pay attention to all that you can. But there's things that you will obviously miss if you're looking left and it happens on the right.

Page 260

Q    Understood.  So it's your duty to -- in that situation, it was your duty to be aware of your surroundings in terms of other inmates, Mr. Guy?

A    Yes.

Q    Okay.  So after you saw Shadow engaging Mr. Johnson on his right arm and pulling him down to the ground, did you continue to observe?

A    I was maintaining security over inmate Guy and making sure that no one else in the pod stood up or decided to try to start doing anything else.

Q    So that was the last thing you saw regarding Shadow's engagement of Mr. Johnson?

A    Yes.  I seen Shadow -- once he came off, I seen Shadow, but that was -- that was about all I seen.

Q    So from the moment that Shadow engaged Mr. Johnson and -- or from the moment that you looked over and Shadow was already engaged with Mr. Johnson pulling him to the ground until Shadow disengaged, you did not look over at Mr. Johnson or Officer McCowan?

A    I looked that way, but they was -- there were several tables, pod tables.  You can see them,

Page 261

I'm sure, in the video, that there's several pod tables that's there. They're silver and they are -- they was in my view and I could not see anything. I could see McCowan standing, and I didn't see Johnson standing anymore, so I assumed that he had the situation under control.

Q    Were you patrolling with Officer McCowan that day?

A    Yes.

Q    And do you have a duty -- when two K9 officers arrive at a scene, do you have a duty to be aware of what is happening to the other K9 officer?

A    You look out for them and make sure that they're safe. That's your main -- that's your main thing cause we're all officers, we're all like a family and we all have to look out for each other. So that's -- that's the very first thing we do is make sure that everyone that we work with and stuff is -- is safe and that way we -- and that's why we respond so fast to incidents is because we look out for everyone being safe and, you know, look out for their well-being.

Page 262

Q    Do you know if Mr. Johnson complied with Officer McCowan's commands?

A    As far as I know, yes.

Q    Was that a yes?

A    Once he got on the ground, I'm assuming yes.

Q    Okay.

A    Again, that's speculation cause I don't know.  I -- I could not hear him from my position.

Q    Understood.  Did you hear -- were you able to hear Officer McCowan give a command of disengagement?

A    No, I was not able to hear that.

Q    And do you know how long it was from the time that you saw Shadow engaged in Mr. Johnson's right arm, dragging him to the ground and the time that Shadow was disengaged?  Do you know how much time between the two?

A    I did not see him drag him to the ground.  I see Johnson go to the ground.  I don't know if Johnson moved himself to the ground.  I wouldn't per se say that Shadow drug him to the ground.

Q    Okay.  And that would be actions by Mr.

Page 263

Johnson that were showing that he was complying with Officer McCowans [sic]?

A    Yes.  If he's going towards the ground, that would be complying with orders.

Q    Okay.  And so back to my question on that moment of when Mr. Johnson was going towards the ground in compliance with Officer McCowan's commands and the time that Shadow disengaged, do you know how much time passed between the two?

A    No.

Q    Okay.  And how -- where were you during all of this?

A    I was standing in a close proximity to Guy in order to provide security for him to make sure he did not get back off the ground and to provide security to make sure all the other inmates that was in the pod that was not involved was staying on the ground and not -- not getting involved or not being -- not doing anything they shouldn't be doing either.

Q    Did you feel like you had the situation under control?

Page 264

A    Yes.

Q    Did you feel that Officer McCowan had the situation under control?

A    Yes.  His situation he was dealing with, I felt he had it under control.

Q    Okay.  Thank you, Officer Baker.  I'm going to introduce another exhibit now, so please give me one moment.  I have just introduced Baker Exhibit 4. Officer Baker, did you get that exhibit?

              (Baker Exhibit 4 was marked for

              identification.)

A    It -- it says, "Cannot be previewed." It says, "Download." Do I download?

Q    Yes.  Please let me know when you have that ready.

A    Okay.  Okay.

Q    Okay.  And then is the video playing?

A    Yes.

Q    Can you please go back to the time mark zero and pause the video?

A    Do what now?

Q    Just go all the way to the beginning of the

Page 273

far away from the -- from officer -- from Mr. Johnson

and Mr. Guy; correct?

A    Correct.

Q    And is that -- that's about 15 to 20 feet

away; correct?

A    I don't know.

Q    Okay.  So from here, we see you and ET enter

through the door; correct?

A    Correct.

Q    And is it at this point where you

give -- where you make your presence known?

A    No, I let my presence known as soon as the

door starts to open and I start to come in because if

I wait to this point to get in, I'm already in and

I've already came in and if anybody was that close on

either side of the door, then they could have been in

the wrong spot.

Q    Understood.

A    So I've -- I've already said -- I've already

give my warnings of -- or not warnings, but let my

presence known before this point.

Q    Understood.  Can you go back to mark 55 and

Page 274

then pause the video, please?

(Video played.)

A    Okay.

Q    Is that around the time when you would give your -- you would make your presence known?

A    No.

Q    Can you show a time frame where you would have made your presence known?

A    About 56.  If you pause it in 56, you can see me in the glass of the door and you can see the door start to open.

Q    Okay.  And you would shout your presence through the opening of the door?

A    Yes.

Q    Understood.  Thank you.

A    You're welcome.

Q    So can we play to the one minute and two second mark?

(Video played.)

A    Okay.  I'm there.

Q    And that was one minute and two seconds; correct?

Page 275

A    Correct.

Q    And, Officer Baker, is it correct that you enter the pod and immediately move towards the altercation?

A    Yes.

Q    And at this point, just to be clear, Officer Mullins is still far away from Mr. Johnson; correct?

A    Yes, but he has stepped closer.

Q    Okay.  Would you consider him still far away from the fighting inmates?

A    He's still a good distance, yes.

Q    Okay.  And at this point at the 1:02 mark, all you know is that you were called to respond to an inmate-on-inmate fight in A1 pod; correct?

A    Correct.

Q    There was no other information provided over the call; correct?

A    Correct.

Q    And you testified earlier that you gave several verbal commands to stop fighting; correct?

A    Correct.

Q    Can you identify at which time stamp you

Page 276

were giving each verbal command?

A    No.

Q    Did you give a verbal command when you first entered?

A    Yes.  Between -- I can give you the -- the time stamps between 56 is when I give my -- let my presence be known when I was coming through the pod and as soon as I'd done that and I came in the pod, then I started -- and I seen the altercation, I began giving several verbal commands for them to stop and up until this point of one minute and two seconds.  But I don't know at -- at each second of the video what I was saying at that point.

Q    So it is your testimony that in those six seconds from time stamp 56 to time stamp one minute and two seconds -- so that's six seconds -- you gave several commands to stop fighting, state, "K9.  Get on the ground"?

A    Yes.  Yes.

Q    You said that several times?

A    Yes.

Q    And were you giving those verbal warnings

stating -- state, "K9.  Get on the ground.  Stop fighting," several times as you were rushing towards the altercation?

A    Yes.

Q    Okay.  But you cannot identify each time stamp that you gave the several verbal commands?

A    No.

Q    Okay.  Is that how you were trained to respond to an altercation?

A    What?  What do you mean?

Q    Are you trained to run towards the altercation while you give your commands?

A    Yes.

Q    So you're not trained to enter a room, give your command and then approach the situation?

A    Again, this is a -- one of the perception things.  If you feel that it is necessary and it would be for the best outcome of the situation to rush, yes, you will.  Some situations, you won't rush.  You'll be a little slower.  Each individual situation is different.

Q    But per your training, this was an

Page 278

appropriate way to respond?

A    Yes.

Q    And then just at 1:02, it looks like ET is right about to engage inmate Guy; is that correct?

A    Correct.

Q    And do you know where you gave the command to engage?

A    Somewheres right before I turned -- before I give him the slack on the leash to put him where I want him.

Q    So in the six seconds that you've entered the room, you have made your presence known; correct?

A    Correct.

Q    You have given more than one verbal command to stop fighting, state, "K9.  Get on the ground"; correct?

A    Correct.

Q    And you also gave a verbal command to ET to engage Mr. Guy; correct?

A    Correct.

Q    And that all happened between time frame 56 seconds and one minute and two seconds?

Page 279

A    Correct.

Q    So all that happened within six seconds; correct?

A    Correct.

Q    And is that time frame in accordance with your training?

A    You're going to have to elaborate on that.

Q    So in your training and the scenarios that you experienced, did you respond and complete all your warnings or all your verbal commands and engagement within six seconds?

A    I don't know.

Q    Okay.

A    I -- I -- nobody timed our -- we didn't have a stopwatch timing our engagements, so -- in our training, so I don't know.

Q    Okay.  Can we play to 1:05, please?

A    Did you say 1:05?

Q    Yes.

         (Video Played.)

A    Okay.

Q    And it looks like here that Officer Mullins

Page 280

is reapproaching Mr. Johnson and Mr. Guy; correct?

A    Correct.

Q    Do you know if he deploys another round of chemical agent?

A    I don't know.

Q    And then between 1:02 and 1:05, this is -- or between 1:02 and 1:05, did you give any verbal command to disengage?

A    I'm not sure.  I can't see if Guy is complying at this -- at this moment.  I can't see.

Q    Okay.  So at this point, you're not sure if you gave a verbal command to disengage between 1:02 and 1:05?

A    No -- no.

Q    Okay.  Can we play to the 1:08 mark?

        (Video played.)

A    Okay.

Q    And at this point, do you know whether or not you have given the verbal command to disengage to ET?

A    If I have not, it should be about that time, pretty close to that time.

Page 281

Q    Why do you say that?

A    Because that is when -- that's when he complied when -- because Johnson kept -- kept swinging and -- and inmate -- or Officer Mullins steps up to pull him off because he is -- he's still fighting and he sees the other guy not fighting.  He sees inmate Guy not fighting anymore, so he steps up to assist to get Johnson off of him.

Q    And so your testimony is that one minute -- at one minute and eight seconds, it appears that Mr. Guy is complying with your commands?

A    Approximately, yes.

Q    Okay.  And then if I could turn your attention to the door at the top of the video.  It appears that another officer and K9 are entering the pod at this point; correct?

A    Appears to be, yes.

Q    Is that Officer McCowan?

A    Cannot tell.

Q    Was there any other K9 officer that entered A1 pod after you?

A    No.  Other than McCowan, no.

Page 283

A      Okay.

Q      At this point, is ET still engaged with Mr. Guy?

A      No.  No.

Q      When did ET release?

A      Somewheres -- it's not real clear on the video, but it's somewhere between 1:08 and probably 1:11.

Q      Okay.

A      But it's not real clear exactly what --

Q      One moment, please.  Okay.  And based on the video footage, when did you give the verbal command to disengage?

A      Approximately -- approximately 1:09, 1:10.

Q      And so between -- so your testimony is that Mr. Guy began to comply around time stamp 1:08; correct?

A      Roughly, yes.  I mean, approximately, yes.

Q      And you approximate that you gave your verbal command to disengage at one minute and nine seconds?

A      Yes.

Page 284

Q    And it appears that ET has disengaged by one minute and 12 seconds; correct?

A    No, he disengaged before one minute and 12 seconds.

Q    And --

A    But in -- in the video it's clear that you can see him disengage by that time, but I cannot put a time stamp on exactly when he opened his mouth and let go.

Q    So as far as we can see from the video, between the time that you gave the verbal command to disengage and the actual disengagement, it was about three seconds; correct?

A    Roughly.  Maybe.

Q    And is that consistent with your training?

A    Yes.

Q    Okay.  Is that how you would normally expect ET to respond to a disengagement command?

A    Yes.

Q    Okay.  Is that how you would normally expect other K9s trained within VDOC to respond to a disengagement command?

Page 285

A    Yes.

Q    Okay.  And so let's go back to the 1:02 mark and play to 1:12.

(Video played.)

A    Okay.

Q    And it appears that ET was engaged on Mr. Guy from the 1:02 mark to the 1:12 mark; correct?

A    Approximately, yes.

Q    And that would be approximately ten seconds from initial engagement to full disengagement of ET; correct?

A    Correct.

Q    And you testified that you gave the verbal command to disengage because Mr. Guy was complying on the ground; correct?

A    Correct.

Q    So now I want you to go back to 1:10 and play through 1:12.

(Video played.)

A    Okay.

Q    And at this point, it looks like Officer Mullins was successful in separating Mr. Johnson and

Page 298

during training?

A    Yes.

Q    So even when an inmate is complying on the ground and the bite continues for another 26 seconds, is that not considered excessive?

MR. DAVIS:  Objection to form.

THE WITNESS:  What'd you say, Tim?

MR. DAVIS:  Just an objection.  You can answer if you can, sir.

THE WITNESS:  I don't know if he was complying fully or not.  I cannot see his head.  I cannot see his arms.  And I did not recall and I did not see it from my view because I was watching inmate Guy be restrained.  He -- if he was still resisting, Officer McCowan would not have gave the disengagement command to come off until he fully complies.

BY MS. QAHOUSH:

Q    So to clarify, you did not witness this in real time?

A    Witness what?

Q    You did not witness Mr. -- the engagement on Mr. Johnson for 26 seconds?

Page 299

A    I did not watch all of it, no.

Q    Okay.  And based on what you observed and what you did not observe in real time, you could not tell whether or not Mr. Johnson was compliant; correct?

A    No, I could not.

Q    Okay.  And to clarify, during those 28 seconds where Shadow was engaged on Mr. Johnson's right arm, you were observing the other inmate, Mr. Guy, and other inmates in the pod; correct?

A    Correct.

Q    And your testimony is that you did not say anything to Officer McCowan; correct?

A    Correct.

Q    While you were with Mr. Guy, did you perceive a continued threat from Mr. Johnson?

A    At what point?

Q    When Shadow was engaged on Mr. Johnson?

A    I did not, no, because if Shadow is engaged on him, he is no longer a threat to me.  At that point, he becomes more of a threat to Officer McCowan.

Q    And then you testified in the 28 seconds

that Shadow was engaged on Mr. Johnson, you never

heard Officer McCowan give the verbal disengagement

command; correct?

A    Correct because those officers, as you can

see right here in this freeze frame at 1:44, are

telling -- telling inmate Guy to roll over and put his

hands behind his back so he can be restrained.  So

they're giving orders and I'm focused on that.  I'm

not -- I did not hear Officer McCowan give his

order -- his command to disengage.

Q    Understood.  And your testimony is that

based on the length of the -- of Shadow's engagement

on Mr. Johnson, you did not feel the need to intervene

on behalf of Mr. Johnson; correct?

A    Correct.

Q    This did not strike you as excessive force;

correct?

A    Correct.

Q    It did not occur to you that Officer McCowan

did not have a handle on the situation?

MR. DAVIS:  Objection to form.  You can

answer, sir.

Page 301

THE WITNESS:  It didn't -- from what I perceived and what I seen, he had it -- he had the -- he had his -- his part of the situation under control and I had mine.

BY MS. QAHOUSH:

Q    And you testified earlier that if an inmate is complying, you are trained to give the verbal command to disengage immediately; correct?

A    Correct.

Q    And you testified earlier that Mr. Guy was complying when he was laying on the ground; correct?

A    Correct.

Q    And you disengaged ET within ten seconds of engagement; correct?

A    Correct.

Q    And your testimony is that you are not sure if Mr. Johnson was complying; correct?

A    Correct.

Q    Even though Mr. Johnson was laying on the ground; correct?

A    I have seen and heard from other experienced officers that they will go to the ground, but they

Page 302

still will fight the dog, they will still try to pry the dog off of them, they will pull -- they will smack the dog in the face, they will continue to assault the dog and that is not compliant. If they're on the ground and they're smacking the dog in the face or hitting the dog in the head or stabbing the dog, even though they're laying on the ground, that's still not compliant. Because they're on the ground does not mean that they're compliant. They have to do everything that they're supposed to do to fully comply.

Q    And so your testimony today is that an inmate resisting the bite of a K9 is an inmate who is not compliant; correct?

A    Correct.

Q    Okay. And you agree that Shadow engaged on Mr. Johnson's arm for 28 seconds; correct?

A    Approximately, yes.

Q    Okay. All right, Officer Baker. That is all for the video.

A    Okay.

Q    Now I'm going to introduce Baker Exhibit 5.