**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

COREY E. JOHNSON,

      Plaintiff,

v.                                     Case No.  7:20cv582

(K-9) OFFICER MCCOWAN, *et al.*,

      Defendants.

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Jeffrey Kiser, K-9 Sergeant J. Stanley, Harold W. Clarke, A. David Robinson, and William J. Barbetto ("Supervisory Defendants"), by counsel, submit the following in support of their Motion for Summary Judgment.

### PRELIMINARY STATEMENT

Plaintiff Corey E. Johnson, #1061522, an inmate in the custody of the Virginia Department of Corrections ("VDOC"), who at all relevant times was housed at Red Onion State Prison ("ROSP"), asserts claims under 42 U.S.C. § 1983 and Virginia tort law, arising from the use of force by a VDOC Canine Officer that occurred on May 2, 2020. Following partial grant of the Defendants' Motion to Dismiss, the following claims in this case remain, as stated in Johnson's Amended Complaint, ECF No. 19:

Count I:      An Eighth Amendment claim for excessive force against Defendant K-9 Officer McCowan. Am. Compl. ¶¶ 84–89.

Count II:     An Eighth Amendment claim for deliberate indifference against Defendants K-9 Officer E. Baker, C/O S. Dean, C/O P. Carroll, and an unnamed correctional officer identified in the Amended Complaint as John Doe 4. Am. Compl. ¶¶ 90–99.

Count III:    An Eighth Amendment claim for bystander liability against Defendants Baker, Dean, Carroll, and John Doe 4. Am. Compl. ¶¶ 100–03.

Count IV:     An Eighth Amendment claim for failure to train, supervise, or discipline against Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto. Am. Compl. ¶¶ 104–21.

Count V:      An Eighth Amendment claim against Defendants Clarke, Robinson, and Barbetto. Am. Compl. ¶¶ 122–32.

Count VI:     Claims under Virginia law for assault, battery, and intentional infliction of emotional distress against Defendant McCowan. Am. Compl. ¶¶ 133–37.

Johnson seeks damages, declaratory relief, and an injunction against "VDOC policies that permit, condone, and ratify canine attacks on prisoners." Am. Compl. 32. He asserts his claims against all named individual Defendants in their individual capacities. *Id.* ¶¶ 9–18. He also names Defendants Clarke, Robinson, and Barbetto in their official capacities to the extent he seeks injunctive and declaratory relief. *Id.* ¶¶ 13–15.

The Supervisory Defendants move for summary judgment as to all claims asserted against them and as to Johnson's claim for injunctive relief.[1] They summarize their arguments as follows. First, all claims asserted against them for supervisory liability, including claims for failure to supervise, discipline, train, or promulgate sufficient policies, must be dismissed because the record does not establish widespread misuse of canine force prior to the incident at issue in this case. Further, with respect to the claims regarding training and policy, the record does not show that VDOC's canine training program or its policies regarding the use of canine force were deficient under clearly established law. Finally, as to Johnson's request for an injunction, the record shows that he lacks standing to obtain injunctive relief and that he fails to

---

[1] Defendants McCowan, Baker, Dean, and Carroll separately move for summary judgment as to the claims asserted against them.

meet the elements necessary to obtain a permanent injunction. Accordingly, the Defendants submit that they should be granted qualified immunity and that summary judgment be entered in their favor as to all claims asserted against them.

**EVIDENCE**

In support of their Motion, Defendants attach and incorporate by reference the following materials from the record:

- Excerpts from the deposition transcript of Defendant Kiser ("Kiser Tr.")

- Excerpts from the deposition transcript of Defendant Stanley ("Stanley Tr.")

- Exhibit 1 to the deposition of Defendant Stanley, Canine Operations Organization Chart ("Organization Chart")

- Excerpts from the deposition transcript of Defendant Robinson ("Robinson Tr.")

- Excerpts from the deposition transcript of Defendant Barbetto ("Barbetto Tr.")

- Exhibit 3 to the deposition of Defendant Barbetto, VDOC Operating Procedure 420.1, *Use of Force* ("OP 420.1") (filed separately under seal)

- Excerpts from the deposition transcript of Defendant McCowan ("McCowan Tr.")

- Excerpts from the deposition transcript of Defendant Baker ("Baker Tr.")

- Exhibit 9 to the deposition of Defendant Baker, VDOC Operating Procedure 435.3, *Canines* ("OP 435.3") (filed separately under seal)

- Excerpts from the deposition transcript of VDOC's Rule 30(b)(6) designee, Major Matthew Bernocco ("Bernocco Tr.")

- Exhibit 2 to the Rule 30(b)(6) deposition, Case Law Lesson Plan ("Case Law Lesson Plan") (filed separately under seal)

- Exhibit 3 to the Rule 30(b)(6) deposition, Reasonable Force Lesson Plan ("Reasonable Force Lesson Plan") (filed separately under seal)

- Excerpts from the deposition transcript of Plaintiff Johnson ("Johnson Tr.")

- The affidavit of Defendant McCowan and its enclosures ("McCowan Aff.") (Enclosures B and C filed separately under seal)

- The affidavit of T. Celi, Director of Research for VDOC, and its enclosures ("Celi Aff.")

- Interrogatory Responses and Supplemental Interrogatory Responses of Defendant Clarke ("Clarke Interrog." and "Clarke Suppl. Interrog.")

- Interrogatory Responses and Supplemental Interrogatory Responses of Defendant Robinson ("Robinson Interrog." and "Robinson Suppl. Interrog.")

- Interrogatory Responses and Supplemental Interrogatory Responses of Defendant Barbetto ("Barbetto Interrog." and "Barbetto Suppl. Interrog.")

- Interrogatory Responses of Plaintiff Johnson with referenced Bates stamped documents attached ("Johnson Interrog.") (unredacted copy file under seal)[2]

- The Initial Expert Report of Defendants' Expert Witness Michael W. Kmiecik, II ("Kmiecik Report") (filed separately under seal)

Defendants respectfully request the Court to consider these materials as evidence in support of their Motion. *See* Fed. R. Civ. P. 56(c).

## STATEMENT OF FACTS

1.      Defendants fully adopt and incorporate by reference the Statement of Facts set forth in the Memorandum in Support of Defendants McCowan, Baker, Dean, and Carroll's

---

[2] Medical records and photographs of nonparties are redacted from the copy of the interrogatory attachments filed to the public docket, pursuant to Rule 5.2 of the Federal Rules of Civil Procedure and Local Rule 8. The copy filed under seal includes redactions made when the records were initially produced in discovery.

Motion for Summary Judgment. In addition, Defendants set forth the following undisputed facts pertaining to the claims asserted against them.

### *Facts Regarding the Parties*

2.      Defendant Jeffrey Kiser is a former employee of VDOC. He served as the Warden at ROSP from 2017 until his retirement in December 2020. Am. Compl. ¶ 10; Answer ¶ 10, ECF No. 57; Kiser Tr. 44:6–45:7.

3.      Defendant K-9 Sergeant J. Stanley is a former employee of VDOC. He served as the K-9 Sergeant at ROSP from 2012 until his retirement in April 2021. Am. Compl. ¶ 11; Answer ¶ 11; Stanley Tr. 21:4–22, 37:5–9.

4.      Defendant Harold W. Clarke is the Director of VDOC. He served in that capacity on May 2, 2020. Am. Compl. ¶ 13; Answer ¶ 13.

5.      Defendant A. David Robinson is the Chief of Corrections Operations ("CCO") for VDOC. He has served in that capacity since August 25, 2011. Am. Compl. ¶ 14; Answer ¶ 14; Robinson Tr. 8:24–25.

6.      Defendant William J. Barbetto served as the Statewide Canine Coordinator for VDOC from December 2016 through February 2021. He currently serves in VDOC's Extradition and Fugitive Unit. Am. Compl. ¶ 15; Answer ¶ 15; Barbetto Tr. 8:11–13; Barbetto Suppl. Interrog. 2.

### *General Facts Regarding VDOC's Canine Program*

7.      The use of canines within VDOC is governed by Operating Procedure ("OP") 435.3, *Canines*. According to that OP, the primary purpose of the Canine Program is "to utilize canines as a manpower multiplier, to assist in the detection of narcotics, cell phones, and

tobacco, assist in control of offenders, and assist in apprehension of escaping and absconding offenders." OP 435.3 § I.

8.      The Canine Program is overseen by the Statewide Canine Coordinator, who "coordinates training and field operations and provides leadership and guidance to the DOC Canine Program." The Statewide Canine Coordinator reports to VDOC's Chief of Security Operations. OP 435.3 § III; Organization Chart.

9.      A Canine Team, which consists of a canine and a Canine Officer, is trained and certified in one of four disciplines: patrol, contraband detection, narcotic detection, and man-trailing. With a few exceptions not applicable here, canines and canine handlers may not be certified in more than one of these specialties at any time. OP 435.3 §§ III, VI(F).

10.     Patrol Canine Teams are "trained to assist in maintaining security, custody, and control of the offender population." Patrol Canine Officers are supervised by an Institutional Canine Sergeant, who is in turn supervised by the Statewide Canine Coordinator. OP 435.3 § III; Organization Chart; Stanley Tr. 27:21–28:16.

11.     Currently, Patrol Canine Teams are assigned full-time to Keen Mountain Correctional Center, River North Correctional Center, Red Onion State Prison, Sussex 1 State Prison, Sussex 2 State Prison, and Wallens Ridge State Prison, all of which are high security level institutions. On rare occasions, Patrol Canine Teams may also be assigned to lower level institutions for emergency coverage. Barbetto Interrog. 3–4; Barbetto Suppl. Interrog. 3–4.

12.     Canine Sergeants and Patrol Canine Officers are kept on the payroll of their assigned institution. The warden of the institution has ultimate responsibility for approving an officer to be hired as a Patrol Canine Officer. Officials from VDOC's regional offices or the

statewide canine unit also participate in the hiring process. Kiser Tr. 83:12–84:8, 104:7–22, 216:11–217:22; Stanley Tr. 60:2–4, 118:12–119:13.

13.     Discipline of patrol canine handlers is carried out through "dotted line" supervision by the statewide Canine Program and the Facility Unit Head of the officers' respective institutions. If an incident involving a canine occurred that could potentially lead to disciplinary action, the Warden of the facility would consult with officials in the canine unit to determine whether the officer acted appropriately. Termination of a patrol canine handler is ultimately the warden's decision. Kiser Tr. 84:9–85:15, 210:20–212:14.

14.     Patrol Canines are used as a tool to reduce violent incidents in VDOC's highest security facilities. Defendant Kiser has testified that canines are effective both as a deterrent and, in instances where it is necessary for them to engage, that they are also effective at ending a violent incident while protecting staff safety. He has also testified that canines facilitate mass movement, allowing more out of cell time for inmates housed in high security institutions. Defendant Robinson has testified that in his experience, the introduction of patrol canines at Wallens Ridge State Prison—a facility housing inmates classed at the same security level as ROSP's general population—allowed greater out of cell movement and greatly reduced the number of serious incidents. Kiser Tr. 86:18–97:13, 215:13–216:8; Robinson Tr. 91:6–92:16.

### Facts Regarding VDOC's Policies Governing the Use of Canine Force

15.     OP 420.1, *Use of Force*, governs the use of force by VDOC employees. The policy provides that force may only be used in "instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort and in accordance with appropriate statutory authority." OP 420.1 § I(B).

16.     The policy further provides that staff may use "[o]nly the amount of force that is reasonably necessary to overcome resistance, mitigate an incident, or gain control under the circumstances," and that "[n]on-force methods of control should be used whenever possible and the minimum necessary force should be used to gain control only when non-force methods have failed or are not appropriate." Staff are not permitted to use force "for vindictive or retaliatory purposes," or as punishment. Pursuant to this policy, staff are cautioned that they may be subject to disciplinary action, among other potential consequences, for the use of excessive force. Excessive force is defined under the policy as "[t]hat amount of force that is beyond what is reasonably required to prevent harm or to control a particular situation or that is not justified by the circumstances." OP 420.1 §§ I(B)(2), III(A)(1), III(B)(1)–(2); *see also id.* at 17.

17.     OP 435.3, VDOC's canine policy, includes additional provisions regarding the use of force by patrol canines. Under this policy, the use of a patrol canine to engage an inmate "is regarded as a use of force and will be reviewed in accordance with Operating Procedure 420.1, *Use of Force*." Canines are not permitted to be used as a form of punishment. The policy notes that canines are not regarded as deadly force. Nonetheless, canine handlers are instructed to use their canines only when justified, that they may only use "the amount of force necessary to maintain control," and that "[i]n determining the amount/type of force to be used, the Canine Officer should take into consideration all circumstances known to them." Ultimate responsibility "for determining whether the use of a canine is justified and reasonable" lies with the canine handler. OP 435.3 § V(C)(5), (7)–(9).

18.     Defendants' expert witness Michael W. Kmiecik, II has opined that VDOC's policies regarding patrol canines and patrol canine use of force generally comport with industry standards, including requirements of the American Correctional Association and guidelines of

the Police Executive Research Forum, with the exception that the policies do not expressly mandate the issuance of a warning prior to deployment. Kmiecik Report 55–62.

19.     As the Statewide Canine Coordinator, Defendant Barbetto was the content owner for OP 435.3. In this role, he was responsible for regularly reviewing the policy and updating it as needed. Policy is reviewed on an annual basis and rewritten as necessary every three years. He was not responsible for reviewing or amending OP 420.1, but he was familiar with that policy's requirements. OP 420.1, at 1; OP 435.3, at 1; Barbetto Tr. 94:1–95:22; Barbetto Suppl. Interrog. 2; Robinson Interrog. 1.

20.     In his role as Chief of Corrections Operations, Defendant Robinson is the signatory to OP 420.1 and OP 435.3. As such, he reviews and approves any final revisions to the policies. OP 420.1, at 1; OP 435.3, at 22; Robinson Tr. 26:9–19; Robinson Interrog. 1, 16.

21.     Defendant Clarke, in his role as Director of VDOC, is not a signatory to OP 420.1 or OP 435.3, and as a matter of general practice he does not ordinarily review these policies. Clarke Interrog. 1, 16.

### *Facts Regarding Requirements and Practices for Reporting Canine Bites*

22.     Both the Use of Force and Canine policies impose reporting requirements when a canine use of force occurs. Under OP 420.1, any employee who uses force or observes a use of force is required to submit an Internal Incident Report ("IIR") describing the incident to the Facility Unit Head or designee by the end of the employee's shift. An Incident Report ("IR"), which combines information gathered from the individual IIRs, is then prepared and submitted to the Facility Unit Head or designee. VDOC's Operations and Logistics Unit ("OLU") is also notified of the incident. IRs and IIRs are stored on CORIS, VDOC's electronic case management system. OP 420.1 § II(C)–(D); Kiser Tr. 235:17–237:15; Barbetto Tr. 174:3–175:1.

23.     Additional recordkeeping requirements for canines are imposed under OP 435.3. Any time a canine bite occurs, the Canine Officer or other responsible party must notify the Statewide Canine Coordinator and Institutional Canine Sergeant about the incident. The canine officer must also complete a Bite Report in DINGO, VDOC's electronic record system for canines, and send the report to the Statewide Canine Coordinator, Shift Commander, Administrative Duty Officer, and Facility Unit Head. The Bite Report includes such information as the synopsis of the incident; identifying information for the inmate, canine, and handler; the location and time of the incident; and the location of the bite on the inmate's body. The same information from the Bite Report and the IIR is also entered into a Patrol Canine Utilization Report. The policy also requires that photographs be taken of the bitten subject's injuries, ID card, full body, and any torn clothing. OP 435.3 § X(B)(1)–(2); Bernocco Tr. 287:6–288:21; McCowan Tr. 227:18–228:17.

24.     When a bite incident occurred, Defendant Barbetto would receive an email from the handler including the IIR, Bite Report, Utilization Report, photographs, and medical documentation. Hard copies of these documents would also be placed in the handler's canine folder at his assigned institution, and Barbetto would print a copy. He would then review the documents, along with video of the incident, to determine whether the use of force was appropriate or if there were discrepancies between the report and the video. He would then notify VDOC's Director of Security and Correctional Enforcement of his assessment. On occasion, he would also refer incidents to VDOC's Special Investigation Unit ("SIU") for further investigation. Barbetto Tr. 181:19–182:21, 183:13–184:8, 185:4–13; Barbetto Interrog. 13.

25.     Defendant Stanley would be immediately notified by phone or by radio when a bite incident occurred. He would then receive the Bite Report and accompanying documentation

once the handler completed the report. He would then review the documents and video of the incident, and he would speak with the handler. If there was a discrepancy between the video and the report, he would have referred the matter to SIU for investigation; however, he never found such a discrepancy in the reports he reviewed. Stanley Tr. 160:7–163:19, 190:6–22, 191:19–22, 194:1–9, 197:19–198:15.

26.     Defendant Kiser was notified of all uses of force at ROSP, including canine force. He would receive the IIRs, IR, and Bite Reports for any canine engagement. He would review the Bite Reports and IR for each incident but would not always review every individual IR. He would also often review video of the incident. If he had questions about whether the use of force was proper after reviewing the reports and video, he would request investigation by SIU. Kiser Tr. 140:9–141:12, 145:12–16, 146:4–147:7, 149:15–150:14, 151:13–152:15.

27.     Defendants Clarke and Robinson do not, as a matter of general practice, receive routine canine bite notifications. To the extent they are notified of a canine use of force, they ordinarily do not become personally involved in those incidents. In some instances in which they receive an inquiry demanding response on behalf of VDOC, Clarke or Robinson could ask staff to gather further information about the incident for their review in order to provide a response. In such an instance, Robinson's usual practice is to refer canine bites to SIU for investigation if that referral has not already been made. Clarke Suppl. Interrog. 7–8; Robinson Suppl. Interrog. 7–8.

### Facts Regarding Training and Certification of Patrol Canine Teams

28.     A new Patrol Canine Team must complete a 480-hour Basic Patrol Canine School in order to be certified. The school is taught by certified instructors. Topics covered during the school include obedience, controlled aggression, reasonable force, institutional environment, and patrol canine case law. OP 435.3 §§ IX(B), IX(D)(3); Barbetto Interrog. 8.

29.    The patrol canine training manual includes a lesson plan for patrol canine case law. The objective of the lesson plan is to familiarize canine handlers with legal guidelines and potential sources of liability regarding patrol canines. Handlers take a written test to assess their understanding of the lesson. Bernocco Tr. 113:8–114:14; Case Law Lesson Plan.

30.    The patrol canine case law lesson plan covers multiple topics regarding legal issues involving the use of canine force, including the following:

a.    Issues where canine units have been reduced in size include where there have been issues of improper bites or accidental bites. Case Law Lesson Plan 2; *see also* Barbetto Tr. 110:6–20.

b.    The inmate "controls his own destiny," insofar as the inmate creates the circumstances that potentially lead to the use of force if he chooses not to comply with orders. Case Law Lesson Plan 2, at 2; *see also* Bernocco Tr. 118:11–120:1.

c.    There is an "objective reasonableness" test for the use of force, with the factors for this test being the severity of the offense at issue, whether the inmate poses an immediate threat to the officer or others, and whether the inmate resists restraint. Case Law Lesson Plan 3; *see also* Barbetto Tr. 114:1–116:3.

d.    Officers must evaluate the circumstances at hand and make split second decisions. Case Law Lesson Plan 3; *see also* Barbetto Tr. 116:14–118:7.

e.    A high ratio of bites to apprehensions can indicate a misbehaving dog. Case Law Lesson Plan 3.

f.    Handlers should give multiple loud, clear warnings stating who they are, what they want the inmate to do, and what will happen if the inmate does not comply, and they should ensure the warning was heard. Case Law Lesson Plan 4.

g.      Officers should not continue with an application of force if it is not working, and they should not use the dog multiple times if pain compliance has not worked to that point. Case Law Lesson Plan 4–5.

31.      Handlers train with their assigned canines, including training regarding when and when not to use force. The patrol canine training manual includes a lesson plan for reasonable force. The purpose of this training is to train the handler to have control of the canine, such that the inmate (played by a decoy in the training) is allowed to have the opportunity to surrender before being bitten. The training is conducted in the field with handlers and their assigned canines. Instructors observe the handler's ability to recognize whether the decoy is obeying orders, give warnings, and release the dog once the decoy has complied. Bernocco Tr. 202:9–203:14; Reasonable Force Lesson Plan.

32.      Defendants in their deposition testimony have further described training regarding the use of canine force:

a.      Handlers are trained not to use force if the inmate does not pose a threat and has complied with orders to stop fighting, get on the ground, and show his hands. This training includes simulated inmate fight and staff assault scenarios, in which handlers were to determine whether the decoy, in the role of an inmate, has sufficiently complied with orders such that engagement was unnecessary. Handlers were required to assess the totality of the circumstances and exercise their judgment. McCowan Tr. 57:7–14, 71:9–72:14, 73:20–75:21, 92:3–94:17; Baker Tr. 39:21–40:14, 40:21–41:10, 45:21–46:8, 65:22–66:19, 76:2–18; Stanley Tr. 77:18–78:4, 128:20–129:4, 129:9–14, 141:3–20; Bernocco Tr. 192:15–193:14, 194:20–196:2, 209:25–211:13; Barbetto Tr. 54:1–56:18.

b.       Handlers are instructed to give multiple verbal warnings if time permits prior to deploying their canines. McCowan Tr. 78:11–17, 167:3–4; Baker Tr. 41:3–10, 52:21–53:6; Stanley 185:6–186:3; Bernocco Tr. 123:19–124:4; Barbetto Tr. 45:14–20.

c.       Handlers are trained to order the dog to release a bite once the inmate has complied with orders and no longer poses a threat. A dog that does not release from a bite on verbal command or through the use of an electric or correction collar will not be certified. McCowan Tr. 33:2–16; Baker 91:1–9, 97:8–11; Stanley Tr. 68:13–21, 279:8–13, 298:7–11; Barbetto Tr. 52:17–53:17.

33.       There are continuing training requirements after a Patrol Canine Team is certified and enters into service. The handler and canine must train for sixteen hours per 28-day cycle under the supervision of an instructor. The team must also pass quarterly evaluations and annual recertifications. Annual certifications are conducted by an instructor other than the handler's direct supervisor. During these assessments, handlers are evaluated on the same criteria as they are during training. Specifically, the Canine Team is evaluated in the areas of obedience, obstacle course, building search, and aggression or bite work. Canine Officers also receive annual correctional officer in-service training, which includes topics on excessive force. McCowan Tr. 48:12–19, 126:12–17; Baker Tr. 140:10–13, 144:21–146:17; Stanley Tr. 158:9–14, 179:21–180:5; McCowan Aff. Encls. A–C.

34.       During his tenure as Statewide Canine Coordinator, Defendant Barbetto also held the role Canine Training and Development Coordinator, and in this role had oversight of the instructors. He was also responsible for the contents of the training manual, including any revisions or updates. OP 435.3 § IX(A)(1); Bernocco Tr. 84:11–86:16; Barbetto Tr. 75:10–16.

35.     Defendant Stanley's duties as a Canine Sergeant included working as an instructor. He assisted with teaching Officer McCowan's basic school. He was also responsible for the continuing training of Patrol Canine Teams following their initial certification. Stanley Tr. 83:13–16, 213:15–19.

36.     As Warden at ROSP, Defendant Kiser was not responsible for training Canine Officers. Kiser Tr. 224:2–9.

37.     Defendant Robinson reviews and approves the training curriculum for canine handlers, but he is not responsible for making ordinary modifications to the training program. Robinson Tr. 24:17–26:14.

38.     Defendant Clarke is not responsible for reviewing training materials regarding the use of force as a matter of policy and general practice. Clarke Interrog. 17.

### *Facts Regarding Officer McCowan's Training*

39.     Officer McCowan attended and completed his 480-hour Basic Patrol Canine School from August 2017 through November 2017. McCowan Aff. ¶ 3.

40.     In July 2018, Officer McCowan attended and completed the 80-hour Basic Patrol Canine School[3] and certified with K-9 Shadow. McCowan Aff. ¶ 4, Encl. A.

41.     Officer McCowan recertified with K-9 Shadow in January 2019 and again in December 2019. Officer McCowan and Shadow met all recertification requirements, completed an average of more than 16 hours of training per month, and passed all quarterly evaluations prior to the May 2, 2020 incident. McCowan Aff. ¶¶ 5–6, Encls. B–C.

---

[3] If a trainer who has already been certified is assigned to a new dog, the handler and the dog must go through another basic canine school. The school is 80 hours if the dog has already been certified, and 480 hours if the dog has not yet been certified. Stanley Tr. 280:2–9.

42.     Defense expert Michael W. Kmiecik, II has opined that Officer McCowan and Shadow met or exceeded industry standards for training, including guidance from the National Institute of Standards and Technology, Academy Standard Board, American Academy of Forensic Sciences, and the American National Standards Institute. Mr. Kmiecik also opined that Officer McCowan and Shadow met or exceeded industry standards for certification, including guidance from the United States Police Canine Association, the North American Police Work Dog Association, the National Police Canine Association, and the National Narcotic Detector Dog Association. Kmiecik Report 24–34.

### *Facts Regarding Other Bite Incidents*

43.     In his responses to the Defendants' Interrogatories, Plaintiff cites to several other incidents that he contends give rise to his claims that unconstitutional canine bites are widespread throughout VDOC, and in particular incidents involving Defendants McCowan and Baker.[4] Johnson Interrog. 4–5.

The records cited in Plaintiff's responses are included as attachments to the responses and are summarized as follows.

44.     On September 20, 2019, K-9 Officer S. McReynolds responded to a report of an inmate fight at ROSP. Upon arriving in the pod, he saw two inmates fighting. He began to issue orders for the inmates to stop fighting or he would release the dog. As he approached, one of the inmates stopped fighting and laid of the floor. The other inmate began to re-engage the inmate who had complied, and in doing so lunged into Officer McReynolds's assigned canine Butchie. This caused Butchie to engage the inmate on the top and back of his head. Officer McReynolds

---

[4] Although Plaintiff reserved the right to supplement his interrogatory responses, no supplemental responses have been received as of this date.

immediately commanded Butchie to release, and Butchie immediately obeyed the command and disengaged. As he released, Butchie attempted to readjust and made contact with the inmate's pants but caused no injury. The inmate then laid on the floor and ceased all aggression. Officer McReynolds provided additional security while all inmates in the pod were searched and returned to their cells. The inmate who was bitten was then taken to medical for treatment. Defendant Barbetto reported the incident to his supervisors, advising them that an inmate had been bitten in the head and that dogs are not utilized on the head during training. Bates Nos. Johnson 582 007781–7791.

45. On March 22, 2020, two inmates became involved in an altercation at Keen Mountain Correctional Center. One OC round was fired in an attempt to gain compliance, but the inmates did not stop fighting. K-9 staff therefore engaged the inmates. One inmate was engaged on the left side of his face by the dog. The inmates were then restrained, decontaminated, and provided medical treatment. Bates Nos. Johnson 582 004552–4555.

46. Also on March 22, 2020, two inmates were involved in an altercation at River North Correctional Center. OC spray was used to attempt to gain compliance but was ineffective. K-9 staff therefore engaged the inmates. One inmate was engaged by a canine on his right thigh. The inmates were then restrained and taken for decontamination and medical treatment. Bates Nos. Johnson 582 004552–4555.

47. On April 3, 2020, Officer Baker responded to a call of an inmate-on-inmate fight. Upon arriving in the pod, he observed three inmates fighting. He gave multiple consecutive orders for the inmates to stop fighting and get on the ground or he would release the dog. The inmates did not comply, and at that time Baker deployed K-9 ET, engaging one of the inmates on the left hip area. The inmate who was bitten complied with orders to stop fighting and get on the

ground, and Baker directed ET to disengage, which he did immediately. The other two inmates also complied with orders. All inmates involved in the altercation were escorted out of the pod, and the inmate who was bitten was brought to medical for treatment. Bates Nos. Johnson 582 000159–165.

48.     On August 9, 2020, Officer McCowan responded to a call of an inmate-on-inmate fight. Upon arriving to the pod, he observed two inmates in an altercation. He began giving orders for the inmates to stop fighting and get on the ground or he would release the dog. Both inmates refused all orders given. McCowan deployed K-9 Shadow, who engaged one inmate on the right upper arm. He continued to give orders to the inmate to stop fighting and lay face down with arms out and palms up. The inmate failed to comply and instead began to strike Shadow to attempt to forcibly remove the dog from his arm. When the inmate attempted to roll away, Shadow adjusted his bite from the upper right arm to the lower right arm. The inmate then complied with orders to get on the ground and put his hands out. McCowan then gave Shadow the command to disengage and he did so immediately. The inmate was restrained and taken to receive medical treatment. Bates Nos. Johnson 582 000374–380.

49.     On October 27, 2020, Officer Baker responded to a call of an inmate-on-inmate fight. Upon arriving to the pod, he observed two inmates fighting on the top tier. He began giving multiple consecutive orders to the inmates to stop fighting or he would release the dog. The inmates did not comply with orders, and Baker deployed K-9 ET, who engaged one of the inmates on the bottom half of the inmate's shirt. The inmate pulled away from the dog, tearing the bottom of his shirt, then immediately laid on the floor and complied with orders. Responding staff then restrained both inmates and escorted them to medical, while Baker provided additional security in the pod. Bates Nos. Johnson 582 000173–178.

50.     On November 10, 2020, Officer Baker responded to a call of an inmate-on-inmate fight. Upon arriving to the vestibule, Baker observed two staff members attempting to restrain an inmate. Baker began to issue orders to the inmate to stop resisting or he would release the dog. The inmate failed to comply with orders. Baker placed K-9 ET on the inmate's right upper leg, where he engaged the outer thigh. Baker continued to give orders to the inmate to stop resisting, and the inmate complied. Baker then directed ET to disengage, which he did immediately. He warned the inmate that staff would approach to restrain him and that the dog would respond if the inmate attempted to resist or assault staff. The inmate complied and restraints were applied without further incident. The inmate was then brought to medical for treatment. Bates Nos. Johnson 582 000166–172, 000213.[5]

51.     On February 11, 2021, Officer McCowan responded to a call of an inmate-on-inmate fight. Upon arriving to the pod, he saw one inmate striking an officer in the face with a closed fist. McCowan began to issue orders to stop fighting or he would release the dog. The inmate did not comply and continued to assault the officer. McCowan deployed K-9 Shadow, engaging the inmate on the upper left leg. McCowan continued to give orders for the inmate to stop assaulting staff and place his hands behind his back. The inmate complied with these commands, and McCowan gave Shadow the command to release, which he did immediately. McCowan then provided additional security while the inmate was escorted to medical. Bates Nos. Johnson 582 000381–388.

---

[5] The inmate who was bitten filed suit against Officer Baker and other staff for claims of excessive force, failure to intervene, and retaliation. This Court granted summary judgment on the merits in favor of the Defendants on all claims. *See Lightfoot v. Bartley*, No. 7:21cv253, 2022 U.S. Dist. LEXIS 166798 (W.D. Va. Sept. 15, 2022). The undersigned has found no active litigation relating to any of the other incidents cited in Plaintiff's interrogatory responses.

52.     On February 20, 2021, Officer McCowan responded to a call of an inmate-on-inmate fight. When he arrived to the pod, he observed two inmates fighting in the shower. McCowan gave orders for the inmates to stop fighting or he would release the dog. The two inmates complied with orders and were restrained and escorted out of the pod. The other inmates in the pod were then frisk searched and returned to their cells. As they were returning to their cells, two other inmates began fighting on the top tier. McCowan immediately responded, and when he arrived to the altercation began giving warnings for the inmates to stop fighting and get on the ground or he would release the dog. Both inmates refused to comply, and McCowan deployed K-9 Shadow on one of the inmates, engaging him on the left lower arm. McCowan continued to issue orders to the inmates to stop fighting and get on the ground. Both inmates complied, and McCowan ordered Shadow to disengage, which he did immediately. McCowan then provided additional security while the inmates were restrained and escorted from the pod. Bates Nos. Johnson 582 000389–395.

### *Facts Regarding Bite Ratios*

53.     Information regarding bite ratios was gathered by VDOC's Director of Research using Internal Incident Reports stored on the CORIS case management system. The ratio compares the number of canine engagements to the total number of times canines responded to an incident. Celi Aff. Encl. B.

54.     For the period of April 2016 through June 2022, the bite ratio for all VDOC facilities 11%. For the same time period, the ratio was 14% at facilities where Patrol Canine Teams are permanently assigned, and 14% at ROSP specifically. Celi Aff. Encl. A.

55.     Defense expert Michael W. Kmiecik, II has opined that a properly trained and supervised canine unit should have a ratio of less 20–30% bites per apprehension. Accordingly,

he found that the bite ratios for ROSP and for VDOC as a whole were below the industry average and that this indicated a properly trained and supervised canine unit. Kmiecik Report 62–64.

I. **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material, and summary judgment may be entered even if such immaterial facts are in dispute. *Id.* A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this showing has been made, the burden shifts to the nonmoving party to establish the specific material facts that are in dispute. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In considering a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The court does not weigh evidence or determine credibility, but instead only determines whether the record demonstrates a genuine dispute of material fact. *Id.*; *Anderson*, 477 U.S. at 255.

II. **Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per

curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Put simply, qualified

immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.*

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts evaluate a claim of qualified immunity under a two-part inquiry. The court must

determine (1) whether the alleged facts show that the defendant's conduct violated a

constitutional right, and (2) whether the right in question was clearly established at the time of

the conduct at issue. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A finding that one of these two

prongs has not been met obviates the need to consider the other; judges therefore have discretion

as to which prong to address first "in light of the circumstances in the particular case at hand."

*Pearson*, 555 U.S. at 236.

With respect to the second prong, "[a] clearly established right is one that is 'sufficiently

clear that every reasonable official would have understood that what he is doing violates that

right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The

court should not "define clearly established law at a high level of generality." *Ashcroft v. al-

Kidd*, 563 U.S. 731, 742 (2011). Rather, "[t]he dispositive question is 'whether the violative

nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-

Kidd*, 563 U.S. at 742).

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.      Defendants are not liable under a theory of supervisory liability.**

Counts IV and V assert claims against the Supervisory Defendants under a theory of

supervisory liability. It is well established that a supervisory government official cannot be held

liable under § 1983 for the actions of his subordinates solely on the basis of *respondeat superior*.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978). Nonetheless, a supervisory official may be liable for his subordinate's acts if the supervisor himself bears personal responsibility for those acts. *Iqbal*, 556 U.S. at 676. "Liability in this context is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

In order to prevail in a claim for supervisory liability, a plaintiff must show,

> (1) that the supervisor had actual or constructive knowledge that [his] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Overall, "[t]he plaintiff . . . assumes a heavy burden of proof in supervisory liability cases," for "[h]e must not only demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Slakan*, 737 F.3d at 372 (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)) (alteration in original). "[H]e cannot satisfy [this] burden of proof by pointing to a single incident or isolated incidents." *Id.*

As a threshold matter, Defendants note that they may not be found liable under a theory of supervisory liability if Johnson did not suffer a constitutional injury. *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) (noting that a claim under § 1983 for supervisory liability

cannot succeed without a predicate constitutional violation). Officer McCowan has separately moved for summary judgment, arguing that his use of force against Johnson was not excessive in violation of the Eighth Amendment. Should the Court grant his Motion, Defendants submit that summary judgment must be entered in their favor as to all derivative claims for supervisory liability.

> **A.** **No Defendant may be found liable for matters in which they were not personally involved in a supervisory capacity.**

Under the standard for supervisory liability, a supervisory defendant may not be found liable purely on the basis of *respondeat superior*, but instead must have had actual or constructive knowledge of subordinate conduct and must have acted or failed to act in their supervisory capacity. In this case, not all of the Supervisory Defendants would have been personally involved in the practices Johnson complains of to a degree necessary to obtain liability. With respect to Johnson's claim for failure to supervise, Defendants Clarke and Robinson have testified that they do not, as a matter of general practice, receive routine canine bite notifications, and as a result the record does not establish that they would have been aware of a prior pattern of canine bites. Clarke Suppl. Interrog. 7–8; Robinson Suppl. Interrog. 7–8. As to the claim for failure to train, the evidence shows that Defendants Clarke and Kiser were not responsible for canine training. Kiser Tr. 224:2–9; Clarke Interrog. 17. And with respect to the claim regarding failure to promulgate adequate policies, Defendant Clarke has stated that he is not a signatory to the Use of Force or Canine Operating Procedures and does not ordinarily review these policies. Clarke Interrog. 1, 16. These Defendants therefore request that summary judgment be entered in their favor with respect to claims for which they lacked personal involvement.

**B.      Defendants are not liable for failure to supervise or failure to discipline. (Count IV)**

Johnson's claims for failure to supervise or discipline fail because he cannot establish a pattern of widespread misconduct by VDOC's Canine Officers. As the Defendants noted in support of their Motion to Dismiss, the Amended Complaint does not identify any other instances of unconstitutional dog bites by VDOC canine handlers. ECF No. 43, at 11–12. Johnson has since identified in his interrogatory responses other bite incidents he contends support his claim of supervisory liability. Johnson Interrog. 4–5. These incidents do not provide a sufficient basis for liability, however, and they therefore do not give rise to a genuine dispute of fact.

First, many of the incidents Johnson has identified occurred *after* the May 2, 2020 engagement. *See* Bates Nos. Johnson 582 000374–380 (August 9, 2020); 000173–178 (October 27, 2020); 000166–172, 000213 (November 10, 2020); 000381–388 (February 11, 2020); 000389–395 (February 20, 2021). Whatever the circumstances of these engagements may have been, they cannot, as a matter of law, support a claim for supervisory liability. It is a necessary element of a supervisory liability claim that the supervisor's inaction in the face of subordinate misconduct have a causal relationship to the plaintiff's injury. *Wilkins*, 751 F.3d at 226. Matters that only could have been known to supervisors after the injury had already occurred simply cannot give rise to this causal relationship. *See Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014) (noting that "the 'tacit authorization' theory focuses on information known to a supervisor *before* an incident occurs").

Johnson has identified four canine bites that occurred prior to the incident at issue in this case: (1) a September 20, 2019 incident at ROSP involving K-9 Officer S. McReynolds, Bates Nos. Johnson 582 007781–7791; (2) a March 22, 2020 incident occurring at Keen Mountain

Correctional Center, Bates Nos. Johnson 582 004552–4555; (3) a March 22, 2020 incident occurring at River North Correctional Center, Bates Nos. Johnson 582 004552–4555; and (4) an April 3, 2020 incident involving Officer Baker, Bates Nos. Johnson 000159–165. These incidents also fail to support a supervisory liability claim.

With respect to the April 3, 2020 incident, nothing in the record is suggestive of misconduct by Officer Baker. As described in his reports, he responded with his canine to an announcement of an inmate fight. Bates Nos. 000159, 000162–164. He gave multiple warnings for the inmates to stop fighting and, when the inmates failed to comply, engaged his canine on one inmate's left hip. *Id.* He then disengaged the dog once the inmate complied with orders, and the inmate received medical attention. *Id.* These reports do not suggest that Baker's engagement was unjustified or that he utilized the dog improperly. Johnson has identified no evidence to suggest that these reports are inaccurate, and his supervisors could reasonably rely on them as accurately conveying the circumstances of the incident. *See Jackson v. Brickey*, 771 F. Supp. 2d 593, 603 (W.D. Va. 2011) (noting that supervisory liability does not entail "a heightened affirmative duty to investigate" and granting qualified immunity on ground that "a supervisor is entitled to reasonably defer to a subordinate's description of events"); *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 538 (W.D. Va. 2002) (finding that there was no clearly established duty for a supervisor to investigate the circumstances of an arrest made by his subordinate).

With respect to the two incidents of March 22, 2020, Johnson attributes significance to the fact that two canine engagements occurred in separate facilities on the same day, *see* Johnson Interrog. 5, but it is unclear how this fact, standing alone, is meaningful. Defendants can discern no reason why it would be improper for canines to be used in two instances on the same date if called for under the circumstances. As to the incident occurring at River North Correctional

Center, nothing in the record indicates that the use of the canine was improper. As described in the report, inmates were involved in a physical altercation, OC spray had proven ineffective at getting the inmates to stop fighting, and as a result the canine engaged one inmate on the right thigh to obtain compliance. Bates No. Johnson 582 004553. The report does not suggest that use of the canine was excessive or improper.

The March 22, 2020 incident at Keen Mountain Correctional Center, along with the September 20, 2019 incident at ROSP, could arguably have raised concerns to supervisory staff due to reports that canines had engaged inmates in the head, which, as Defendant Barbetto acknowledged, is not where the dogs are trained to bite. Bates Nos. Johnson 582 004552–4555, 007781–7791. Nonetheless, these incidents as well do not give rise to supervisory liability.

First, the fact that a canine bit an inmate on a part of the body where it is not trained to bite does not by itself show that the canine officer used excessive force in violation of the Eighth Amendment. *See Whitten v. Gunter*, No. 18-6108, 757 F. App'x 235, 236, 237–38 (4th Cir. Dec. 17, 2018) (affirming jury's verdict for defendant canine handler on claim of excessive force in which canine bit an inmate "by the head and then by the back, causing substantial injuries"), *reh'g denied*, 2019 U.S. App. LEXIS 2867 (4th Cir. Jan. 28, 2019), *cert. denied*, 205 L. Ed. 2d 72 (2019). The reports cited in Johnson's interrogatory responses do not indicate that the canine handlers engaged their dogs on the inmates' heads wantonly or maliciously. K-9 Officer McReynolds noted in his report that his canine engaged the inmate on the top of the head after the inmate lunged into the dog, and that Officer McReynolds immediately commanded the dog to release. Bates No. Johnson 582 007788. Thus, supervisors would not have been on notice from these incidents that their subordinates had violated the clearly established rights of inmates against excessive force. *See Shaw*, 13 F.3d at 801 (noting that to overcome a supervisor's claim

of qualified immunity, it must be clearly established that the subordinate's conduct was unconstitutional).

Second, these incidents do not implicate conduct similar to that which he complains of in this case. "A supervisor may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of *comparable conduct* occurring before the incident at issue took place." *Danser*, 772 F.3d at 350 (emphasis added). Here, although Johnson complains that Officer McCowan's engagement of his canine was overlong and that it should not have happened at all, he does not complain that Officer McCowan engaged him on an inappropriate part of the body, nor is there evidence that an engagement on the wrist would be improper. As such, the incidents Johnson highlights in his interrogatory responses would not have put supervisors on notice of the need to prevent the sort of conduct Johnson alleges to have later occurred in this case.

Finally, these are no more than isolated incidents. Neither of these incidents involved Officer McCowan; in fact, Johnson cites no engagements at all by Officer McCowan that occurred before May 2, 2020. Johnson's reliance on these two incidents of canines biting an inmate on an improper part of the body does not demonstrate the sort of widespread misconduct necessary to prevail in a claim for supervisory liability. *See Boone v. Clarke*, No. 1:21cv528, 2022 U.S. Dist. LEXIS 147416, at *6 (E.D. Va. Aug. 17, 2022) (finding that two instances over a period of six months in which prison medical staff were alleged to have improperly disposed of used needles were isolated incidents); *Woodson v. City of Richmond*, 88 F. Supp. 3d 551, 570 (E.D. Va. 2015) ("The failure to investigate two instances of heat related deaths cannot be considered to be persistent and widespread."). These two instances, combined with other incidents Johnson cites which occurred after the fact or which do not implicate any misconduct

whatsoever, do not suffice to show that supervisors were deliberately indifferent to a widespread pattern of constitutional violations.

Aside from the absence of evidence showing widespread misconduct prior, the evidence of the bite ratios in VDOC's Canine Unit further demonstrates that the unit was appropriately supervised. For the time period of April 2016 through June 2022, 14% of canine responses in facilities with permanent patrol canine presence resulted in a bite. Celi Aff. Encl. A. The ratio for that same time period was 14% at ROSP specifically. *Id.* Defense expert Michael W. Kmiecik, II determined that these statistics indicated that the Canine Unit was properly trained and supervised. Kmiecik Report 63.

In the absence of a widespread pattern of unconstitutional canine bites, and in light of the data showing that the Canine Unit as a whole and ROSP Canine Officers do not engage their canines with excessive frequency, Defendants cannot be shown to have failed to adequately supervise or discipline their subordinates. Accordingly, they submit that they are entitled to qualified immunity and summary judgment in their favor.

### C.    Defendants are not liable for failure to train. (Count IV)

Liability under § 1983 for inadequate training of officers exists "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Comm'rs of Bryan Cnty. v. Brown*, 520

U.S. 397, 409 (1997)). For the reasons stated herein, Johnson has failed to prove a pattern of similar widespread misconduct, and for this reason alone his claim for failure to train cannot prevail.

In addition, Johnson cannot show "a direct causal link . . . between a specific deficiency in training and the particular violation alleged." *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 122 (4th Cir. 1990) (citing *Canton*, 489 U.S. at 391). VDOC's canine training program taught handlers all aspects of proper deployment of their canines. Handlers were taught relevant canine case law, including the need to give clear warnings and ensure they were heard, and not to continue an application of force that was not effective in attaining compliance. Bernocco Ex. 2, 4–5. The reasonable force lesson plan instructed handlers to give inmates an opportunity to surrender. Bernocco Ex. 3.

Handlers were trained not to use force against inmates who complied with orders, to assess the totality of the circumstances, and to use appropriate judgment. McCowan Tr. 57:7–14, 71:9–72:14, 73:20–75:21, 92:3–94:17; Baker Tr. 39:21–40:14, 40:21–41:10, 45:21–46:8, 65:22–66:19, 76:2–18; Stanley Tr. 77:18–78:4, 128:20–129:4, 129:9–14, 141:3–20; Bernocco Tr. 192:15–193:14, 194:20–196:2, 209:25–211:13; Barbetto Tr. 54:1–56:18. They were taught to give multiple verbal warnings prior to engagement and understood this to be a requirement. McCowan Tr. 78:11–17, 167:3–4; Baker Tr. 41:3–10, 52:21–53:6; Stanley 185:6–186:3; Bernocco Tr. 123:19–124:4; Barbetto Tr. 45:14–20. And they were trained to release a bite once an inmate had complied with orders and no longer posed a threat. McCowan Tr. 33:2–16; Baker 91:1–9, 97:8–11; Stanley Tr. 68:13–21, 279:8–13, 298:7–11; Barbetto Tr. 52:17–53:17.

Officer McCowan attended a 480-hour initial canine school and then, with K-9 Shadow, an 80-hour school. McCowan Aff. ¶¶ 3–4, Encl. A. After he and Shadow certified, he continued

to complete more than 16 hours per month of maintenance training and passed all of his quarterly evaluations and annual recertifications. McCowan Aff. ¶¶ 5–6, Encls. B–C. The Defendants' expert has testified that McCowan's training and certification record met or exceeded national standards. Kmiecik Report 24–34.

Johnson cannot plausibly contend that this training was inadequate. His allegations that VDOC failed to train canine handlers to give warnings or not to use force on compliant prisoners, *see* ECF No. 55, at 13–14, are plainly refuted by the record. Likewise, the record, including Officer McCowan's individual training record, does not support Johnson's claim that the Defendants failed to ensure that canine officers were trained in accordance with VDOC training requirements and national standards, Am. Compl. ¶¶ 73, 79. Because Johnson fails to identify a pattern of misconduct that would have given notice to officials of the need for additional training, and because VDOC's canine handlers were sufficiently trained on the appropriate use of force, his claim for failure to train must fail on its merits.

Defendants further assert that there is no clearly established law holding that their training program was inadequate. Notwithstanding Johnson's claims to the contrary, the record demonstrates that Defendants did not utterly fail canine handlers in matters such as the appropriate use of force or the provision of warnings. Defendants have found no precedent establishing specific training requirements for the use of force or the use of canines that has not been met here. Rather, according to the testimony of the Defendants' expert, Officer McCowan's training met or exceeded relevant national standards. Because reasonable supervisors would have no reason to believe that VDOC's canine training program was deficient, they are entitled to qualified immunity.

    **D.**    **Defendants are not liable for failing to promulgate or enforce adequate policies. (Count V)**

Count V, labeled simply as "Eighth Amendment," Am. Compl. ¶¶ 122–32, has been interpreted by the Court as alleging that Defendants Clarke, Robinson, and Barbetto "fail[ed] to promulgate or enforce adequate policies regarding the use of canines," and thus asserting an additional claim for supervisory liability. ECF No. 55, at 14. This claim, like Johnson's other supervisory liability claims, fails as an initial matter because his contention that canine officers have engaged in widespread abuses lacks evidentiary support.

Johnson also fails to show that VDOC's policies on the use of canine force are unconstitutional. Both the Use of Force policy and the Canine policy, which are read in conjunction when considering a canine use of force, allow only the force that is reasonable under the circumstances. OP 420.1 §§ III(A)(1), III(B)(1)–(B)(2); OP 435.3 § V(C)(8)(a). Both policies also forbid the use of force, including canine force, as a means of retaliation or punishment. OP 420.1 § I(B)(2); OP 435.3 § V(C)(5). The Use of Force policy requires that staff use non-force options whenever possible and only use the minimum force necessary if non-force options fail or are not appropriate. OP 420.1 § III(A)(1). The Canine policy directs officers to take all circumstances into consideration when using force, and states that the Canine Officer has ultimate responsibility for determining whether the use of force is justified. OP 435.3 § V(9).

Both policies set forth requirements for reporting canine bites through Internal Incident Reports and Bite Reports, which are then forwarded to supervisory personnel for review. OP 420.1 § II (C)–(D); OP 435.3 § X(B)(1)–(2). The Canine policy also provides for basic and continuing training of Canine Officers to be conducted by certified canine instructors. OP 435.3 §§ IX(B), IX(D)(3)–(4).

There is nothing on the face of these policies that authorizes the use of excessive canine force. *See Moody v. City of Newport News*, 93 F. Supp. 3d 516, 531–32 (E.D. Va. 2015) (citing

*Spell v. McDaniel*, 842 F.2d 1380, 1388 (4th Cir. 1987)) (holding that, for claims of express policies of deliberate indifference, "'where there is no official statement respecting specific [employee] conduct, it will be difficult if not impossible to imply an official municipal policy directly authorizing conduct at odds with [§ 1983]'"). The policies comport with the requirements of the Eighth Amendment by limiting the use of force to only that necessary under the circumstances and forbidding the use of force that is malicious or for the purpose of punishment. As such, the policies themselves are constitutional on their face.

Further, no reasonable official would determine that these policies were deficient as a matter of clearly established law. Johnson contends that the policies are insufficient because they entrust too much discretion to canine handlers. Am. Compl. ¶ 26. But the policies themselves do not stand alone. Although the Operating Procedures do not prescribe in precise detail the manner in which canine force should be deployed, canine handlers receive additional instruction on canine force utilization through their training.

Moreover, a policy that grants law enforcement officials discretion in the use of force is not unconstitutional. *See Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009) ("A policy which does not 'affirmatively sanction' unconstitutional action, and which instead relies on the discretion of the municipality's employees, is not an unconstitutional policy."); *Clark v. Baltimore Cnty.*, No. BPG-08-2528, 2009 U.S. Dist. LEXIS 79575, at *16 (D. Md. Sept. 1, 2009) (finding that policy which permitted police officers discretion in the use of force did not permit excessive force on its face and that plaintiff failed to prove that such a policy would inevitably lead to the violation of rights).

Defendants' expert has also testified that the Use of Force and Canine policies comported with national standards, with the only exception that the canine policy does not expressly provide

for the issuance of warnings. Kmiecik Report 55–62. Officers are trained to provide these warnings, however, and it is understood by both canine handlers and their supervisors that providing verbal warnings is a requirement for any canine engagement. McCowan Tr. 78:11–17, 167:3–4; Baker Tr. 41:3–10, 52:21–53:6; Stanley 185:6–186:3; Bernocco Tr. 123:19–124:4; Barbetto Tr. 45:14–20.

In light of these considerations, a reasonable supervisor would not know that the challenged policies violated clearly established law. As such they are entitled to qualified immunity. *See Delph v. Trent*, 86 F. Supp. 2d 572, 576 (E.D. Va. 2000) ("[I]f the official can respond that a reasonable person would not have known the effects of the policy or that the policy violated clearly established laws, then that official is entitled to qualified immunity from suit.").

## II. Johnson is not entitled to injunctive relief.

The record evidence shows that Johnson is not entitled to his requested injunctive relief. First, Defendants reiterate their argument, first made in their Motion to Dismiss, that Johnson lacks standing to obtain an injunction.

Prospective relief "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Under the rule set forth in *Lyons*, a plaintiff's past injury standing alone does not confer standing to seek injunctive relief; instead the plaintiff must show that he faces a threat of injury from the challenged conduct that is "both real and immediate, not conjectural or hypothetical." *Id.* at 102 (internal quotation marks omitted). In that case, the Court considered from the plaintiff, who had been injured by an illegal police

chokehold and requested an injunction against the practice. *Id.* at 97–98. The Court found that the plaintiff failed to show that the potential for future injury was anything more than hypothetical; in order to demonstrate such a likelihood, the plaintiff would have to show both a likelihood that he would be stopped by the police and that, if stopped, he would again be subjected to an illegal chokehold. *Id.* at 105–06. The Court therefore held that the plaintiff lacked standing for injunctive relief. *Id.* at 111.

In ruling on the Defendants' Motion to Dismiss, this Court found Johnson's circumstances largely analogous to *Lyons*, but it determined that there was nonetheless "a narrow window for Johnson to demonstrate standing in spite of *Lyons*." ECF No. 55, at 8–9. The Court determined that Johnson's status as a prisoner distinguished the facts of his case from the double-hypothetical in *Lyons*. It found that because Johnson is incarcerated, the likelihood of him encountering VDOC Canine Officers was almost certain, and due to the likelihood of these encounters there was also a greater likelihood of him being subjected to an unconstitutional dog bite. *Id.* at 9–10. The Court in particular noted that Johnson's allegation that the illegal use of canines was "pervasive" and that dogs routinely bite non-threatening prisoners was sufficient to show likelihood of future injury. *Id.* at 11. Observing that discovery had yet to occur, the Court "invited [the parties] to revisit their standing arguments" after further development of the record. *Id.*

Defendants now submit that the record forecloses Johnson's contention that he is imminently likely to suffer injury from a future unconstitutional dog bite. First, notwithstanding Johnson's claims of widespread and pervasive uses of excessive canine force, the evidence he has advanced in support of this claim is scant and, as Defendants have argued herein, not sufficient to show a pattern of illegal conduct. *See supra* Part I(B). The low bite ratios of 14% for

both VDOC as a whole and ROSP in particular further demonstrate that VDOC's canine handlers do not engage their dogs to an excessive degree. Celi Aff. Encl. A. The record also disproves Johnson's claim that he was compliant at the time he had been bitten, but instead he was bitten after fighting another inmate and refusing to follow orders to get on the ground. Thus, instead of the picture painted in Johnson's pleading—that canines are engaged on inmates at random and with no justifiable reason—the record evidence makes clear that Johnson and other inmates have only been engaged by canines following avoidable instances of their own misconduct.

Most tellingly, aside from the incident at issue in this case, Johnson has never been bitten by a VDOC canine, despite having spent nearly all seventeen years of his sentence in facilities which use patrol dogs. Johnson Tr. 8:19–21, 9:16–13:14, 20:21–21:3, 27:20–24. That this has not occurred on any other occasion, including during the entirety of the time this suit has been pending, makes clear that there is no imminent likelihood that Johnson will be again bitten by a dog, let alone that he would be subjected to unconstitutional force. Defendants therefore contend that Johnson lacks standing to pursue injunctive relief.

Moreover, even if Johnson did have standing, the record further shows that he cannot meet the required elements to obtain a permanent injunction. "The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). "To obtain such an injunction, a plaintiff must show (1) irreparable injury, (2) remedies at law are inadequate to compensate for that injury, (3) the balance of hardships between the plaintiff and defendant warrants a remedy, and (4) an injunction would not disserve the public interest." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotation marks omitted).

As to the first of these elements, Johnson fails to show a real or immediate threat of irreparable injury for the same reasons he fails to demonstrate standing. *Simmons*, 47 F.3d at 1382 (citing *Lyons*, 461 U.S. at 111). With respect to the second element, Johnson can obtain an adequate remedy at law for any injury through monetary damages. *See Lyons*, 461 U.S. at 113 ("If Lyons has suffered an injury barred by the Federal Constitution, he has a remedy for damages under § 1983.").

As to the last two factors, the balance of equities and the public interest weigh against Johnson's request to enjoin the use of canines as a means of force within VDOC. The public's interest is better served by noninterference with prison administration. Courts are typically hesitant to become involved in the affairs of prison administration. *See, e.g., Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (noting that the Prisoner Litigation Reform Act was enacted, in part, to eliminate "unwarranted federal-court interference with the administration of prisons"). As the Fourth Circuit has stated in the context of vacating a preliminary injunction issued by a district court:

> Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their informed discretion have been accorded "wide-ranging deference" by the federal courts. . . . Judicial recognition that courts are ill-equipped to deal with problems of prison administrators ". . . reflects no more than a healthy sense of realism."

*Wetzel v. Edwards,* 635 F.2d 283, 288 (4th Cir. 1980) (quoting *Jones v. N.C. Prisoners' Union,* 433 U.S. 119, 126 (1977); *Procunier v. Martinez,* 416 U.S. 396, 405 (1974)). Second-guessing decisions made by professionals "would place an undue burden on the administration of institutions . . . and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). The decision to permit

the use of patrol canines in VDOC facilities is a matter best left to the professional judgment of prison officials.

Further, an injunction effectively banning the use of patrol dogs within VDOC would be significantly disruptive. Patrol canines are a highly effective tool to reduce violence in high security level institutions. Defendants have testified to their efficacy both as a deterrent and, if engaged, as a means to end violent confrontations while minimizing risks to staff safety. Kiser Tr. 86:18–97:13. Patrol canines facilitate mass movement of high security inmates, allowing for more out of cell time, and greatly reduce the number of serious incidents at the institutions where they are introduced. Kiser Tr. 215:13–216:8; Robinson Tr. 91:6–92:16. VDOC's low bite ratio not only demonstrates that canine handlers are judicious in their use of force, but also that in the overwhelming majority of instances, the presence of a canine is sufficient to end an altercation. Celi Aff. Encl. A. This deterrent effect would be rendered non-credible by the knowledge that the canines could no longer be engaged under the weight of a federal injunction. For these reasons, Johnson's request for injunctive relief should be denied and dismissed.

## CONCLUSION

For the foregoing reasons, Defendants Kiser, Stanley, Clarke, Robinson, and Barbetto respectfully request that the Court grant summary judgment in their favor and dismiss all claims asserted against them in this case.

Respectfully submitted,

JEFFREY KISER, K-9 SERGEANT J. STANLEY, HAROLD W. CLARKE, MAJOR WILLIAM J. BARBETTO, and A. DAVID ROBINSON

By:     ____/s/ Timothy E. Davis_____
        Timothy E. Davis, AAG, VSB #87448
        Office of the Attorney General

Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 225-4226
(804) 786-4239 (Fax)
Email:  tdavis@oag.state.va.us


<u>        /s/        Richard C. Vorhis        </u>
Richard C. Vorhis, SAAG, VSB #23170
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 786-4805
(804) 786-4239 (Fax)
E-mail:  rvorhis@oag.state.va.us


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of October, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing (NEF) to all counsel of record for the Plaintiff.


<u>        /s/ Timothy E. Davis        </u>
Timothy E. Davis, AAG, VSB#87448
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 225-4226
(804) 786-4239 (Fax)
Email:  tdavis@oag.state.va.us