Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF VIRGINIA

3                   ROANOKE DIVISION

4    _____

5    COREY E. JOHNSON,

6            Plaintiff,

7        v.                        Civil Action File No.

8    CANINE OFFICER MCCOWAN, WARDEN   7:20-cv-00582

9    JEFFREY KISER, CANINE SERGEANT

10   STANLEY, COMMONWEALTH OF

11   VIRGINIA by and through the

12   Virginia Department of

13   Corrections, HAROLD W. CLARKE,

14   in his individual capacity and

15   official capacity as Director

16   of the Virginia Department of

17   Corrections, WILLIAM BARBETTO,

18   in his individual capacity and

19   official capacity as Statewide

20   Canine Program Coordinator

21   for the Virginia Department

22   of Corrections, A. DAVID

Page 2

1    ROBINSON, in his individual

2    capacity and official capacity

3    as Chief of Corrections

4    Operations for the Virginia

5    Department of Corrections,

6    and JOHN DOES 1-4,

7          Defendants.

8    _____

9             VIDEOCONFERENCE DEPOSITION OF

10            CANINE OFFICER BRIAN MCCOWAN

11    DATE:         Wednesday, June 8, 2022

12    TIME:         9:19 a.m.

13    LOCATION:     Remote Proceeding

14               Washington, DC 20005

15    REPORTED BY:  Janel Folsom, Notary Public

16    JOB NO.:      5267183

17

18

19

20

21

22

Page 3

```
 1              A P P E A R A N C E S

 2      ON BEHALF OF PLAINTIFF COREY JOHNSON:

 3            ANDREW JOHNSON, ESQUIRE (by videoconference)

 4            LAUREN WULFE, ESQUIRE (by videoconference)

 5            DANIA QAHOUSH, ESQUIRE (by videoconference)

 6            Arnold and Porter

 7            601 Massachusetts Avenue Northwest

 8            Washington, DC 20001

 9            andrew.johnson@arnoldporter.com

10            lauren.wulfe@arnoldporter.com

11            Dania.Qahoush@arnoldporter.com

12

13

14

15

16

17

18

19

20

21

22
```

Page 4

1          A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANTS CANINE OFFICER MCCOWAN, WARDEN

3    JEFFREY KISER, CANINE SERGEANT STANLEY, COMMONWEALTH

4    OF VIRGINIA BY AND THROUGH THE VIRGINIA DEPARTMENT OF

5    CORRECTIONS, HAROLD W. CLARKE, IN HIS INDIVIDUAL

6    CAPACITY AND OFFICIAL CAPACITY AS DIRECTOR OF THE

7    VIRGINIA DEPARTMENT OF CORRECTIONS, WILLIAM BARBETTO,

8    IN HIS INDIVIDUAL CAPACITY AND OFFICIAL CAPACITY AS

9    STATEWIDE CANINE PROGRAM COORDINATOR FOR THE VIRGINIA

10   DEPARTMENT OF CORRECTIONS, A. DAVID ROBINSON, IN HIS

11   INDIVIDUAL CAPACITY AND OFFICIAL CAPACITY AS CHIEF OF

12   CORRECTIONS OPERATIONS FOR THE VIRGINIA DEPARTMENT OF

13   CORRECTIONS:

14        TIMOTHY DAVIS, ESQUIRE (by videoconference)

15        RICHARD VORHIS, ESQUIRE (by videoconference)

16        Virginia Office of the Attorney General

17        202 North 9th Street

18        Richmond, VA 23219

19        tdavis@oag.state.va.us

20        rvorhis@oag.state.va.us

21

22

CONFIDENTIAL

Page 5

1              A P P E A R A N C E S (Cont'd)

2     ALSO PRESENT:

3          Joshua Barr, Intern at Office of Attorney General

4          (by videoconference)

5          Emily Wells, Intern at Office of Attorney General

6          (by videoconference)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                        I N D E X

2    EXAMINATION:                                    PAGE

3        By Mr. Johnson                              10

4

5                      E X H I B I T S

6    NO.              DESCRIPTION                     PAGE

7    Defense:

8    Exhibit 1      Officer Brian McCowan

9                   Training Record                 116

10   Exhibit 2      Performance Evaluation Report   121

11   Exhibit 3      Patrol Canine Training and

12                  Utilization Time Record         129

13   Exhibit 4      Patrol Utilization Summary      136

14   Exhibit 5      Basic Patrol Canine Class

15                  Spring 2018 Participant List    141

16   Exhibit 6      Patrol K-9 2018 Program Summary 143

17   Exhibit 7      Email from Officer Brian McCowan

18                  to Sergeant Stanley,

19                  May 31, 2020                    147

20   Exhibit 8      Email from Sergeant Stanley

21                  to Officer Brian McCowan        154

22

Page 7

1                    E X H I B I T S (Cont'd)

2       NO.                DESCRIPTION                    PAGE

3       Exhibit 9          Video of Incident             162

4       Exhibit 10         Canine Bite Report,

5                          5/2/2020                      226

6       Exhibit 11         Canine Utilization Report,

7                          05/02/2020                    227

8       Exhibit 12         Bite Incident Packet          232

9       Exhibit 13         Video of Incident-Alternate

10                         Angle                         237

11      Exhibit 14         Photos from Incident          238

12

13                     (Exhibits attached.)

14

15         I N F O R M A T I O N   R E Q U E S T E D

16      NO.                DESCRIPTION                    PAGE

17      1                  Bates Numbers of Documents

18                         Reviewed Prior to Deposition   14

19

20

21

22

Page 8

1                    P R O C E E D I N G S

2                    THE REPORTER:  Okay.  Good morning.  My

3      name is Janel Folsom; I am the reporter assigned by

4      Veritext to take the record of this deposition.  We

5      are now on the record at -- let's see -- 9:19 a.m. on

6      Wednesday, June 8, 2022.

7                    This is the deposition of Officer Brian

8      McCowan taken in the matter of Corey Johnson vs.

9      Canine Officer Brian McCowan, et al.  Civil Action No.

10     7:20cv00582.  This is filed with the U.S. District

11     Court for the Western District of Virginia, Roanoke

12     Division.

13                    We are all participating via a Zoom

14     video conference, and I am a notary authorized to take

15     acknowledgements and administer oaths in the

16     Commonwealth of Virginia.  Parties agree that I will

17     swear in the witness remotely outside of his presence.

18                    Additionally, absent an objection on

19     the record before the witness is sworn, all parties

20     and the witness understand and agree that any

21     certified transcript produced from the recording

22     virtually of this proceeding:

CONFIDENTIAL

Page 9

1              - is intended for all uses permitted

2              under applicable procedural and

3              evidentiary rules and laws in the same

4              manner as a deposition recorded by

5              stenographic means; and

6              - shall constitute written stipulation

7              of such.

8              At this time will the attorneys on the

9    call please introduce yourself for the record.  Mr.

10   Johnson, you can go first.

11             MR. JOHNSON:  Good morning.  My name is

12   Andrew Johnson of Arnold and Porter.  Also with me

13   today is Lauren Wulfe of Arnold and Porter and Dania

14   Qahoush of Arnold and Porter on behalf of the

15   plaintiff in this matter.

16             MR. DAVIS:  Good morning.  Timothy

17   Davis with the Office of the Attorney General.  I have

18   with me Richard Vorhis.  We also have two interns,

19   Joshua Barr and Emily Wells on the other line that

20   will be observing today.  All here on behalf of the

21   defendants.

22             THE REPORTER:  Okay.  Perfect.

CONFIDENTIAL

```
                                                    Page 10

 1              Okay, Officer McCowan, if you will just

 2    raise your right hand, I will swear you in.

 3    WHEREUPON,

 4                      BRIAN MCCOWAN,

 5    called as a witness, and having been first duly sworn

 6    to tell the truth, the whole truth, and nothing but

 7    the truth, was examined and testified as follows:

 8                  THE REPORTER:  Okay.  You can begin.

 9                      EXAMINATION

10    BY MR. JOHNSON:

11         Q    Great.  Good morning, Officer McCowan.  How

12    are you today?

13         A    Doing all right.

14         Q    Good.  Could you just for the record state

15    your full name and current title?

16         A    Canine Officer McCowan.

17         Q    Thank you so much.

18         A    Yeah.

19         Q    And have you ever had your deposition taken

20    before?

21         A    No.

22         Q    Okay.  So I'm going to go through a little
```

CONFIDENTIAL

Page 11

```
 1     bit of just background to the deposition, kind of,

 2     processes. It's a little different than our normal

 3     styles of communicating just as humans.

 4            So first, I'm going to ask that as we get

 5     into the examination that first we agree that you will

 6     allow me to finish my question and allow your attorney

 7     to state any objection that he may want to make.  And

 8     then I will, of course, you know, allow you to give

 9     your full answer before I ask another question.

10            Does that sound like an okay arrangement for

11     today?

12        A     Yes, sir.

13        Q     Okay.  Wonderful.  And you understand that

14     the oath that you just took here for this deposition

15     is the same oath that you would take if we were

16     sitting in a federal court of law, and it has the same

17     impact on you sitting here today.  Do you understand

18     that?

19        A     Yes, sir.

20        Q     Okay.  And who else is in the room with you

21     today?

22        A     Just myself.
```

CONFIDENTIAL

Page 12

1          Q     Just yourself?  And since we're in this,

2     kind of, virtual setting, I'm just going to kind of

3     ask you just a couple of just ground questions of

4     what's in the room just because I'm not there.

5                Do you have any screens in front of you?

6          A     I have two.

7          Q     You have two?  And what do you have on those

8     screens?

9          A     Exhibit share and video.

10         Q     Are those the only applications you have

11    open?  The exhibit share and the deposition video?

12         A     Yes.

13         Q     Okay.  Do you have any materials in front of

14    you to help you testify today?

15         A     No, sir.

16         Q     Okay.  Great.  And can we agree, since we're

17    just, you know, remote and not in the same room maybe

18    as we would have been a couple years ago that you

19    won't try to access any materials or access your phone

20    for purposes of testifying here today unless you just

21    kind of notify me before you go to do that?  Is that

22    okay?

CONFIDENTIAL

 1          A     Yes, sir.

 2          Q     Okay.  Great.  So in preparing for today's

 3     deposition, what did you do?

 4          A     Spoke with Tim Davis a couple of times.  No,

 5     I'm sorry.  Just once.

 6          Q     Just once?  Okay.  And --

 7          A     But that was about it --

 8          Q     And for about how long did you speak with

 9     Mr. Davis?

10          A     Hour and a half?

11          Q     Okay.  Did you review any documents as part

12     of your conversation with Mr. Davis?

13          A     Yes.

14          Q     Okay.  Did any of those documents refresh

15     your recollection as to any of the events we may be

16     discussing here today?

17          A     Yes.

18          Q     Okay.

19                MR. JOHNSON:  Tim, I'm going to ask

20     because the witness has said that the documents

21     refreshed his recollection for purposes of testifying

22     today that you, you know, at some point, it doesn't

Page 14

1      have to be right now, just provide us either a list of

2      the Bates stamps of the documents that refreshed his

3      recollection or, you know, if you could zip them over.

4                      But just because he's -- he's testified

5      on the record that it's refreshed his recollection, I

6      believe we're entitled to know what those documents

7      are.

8                      MR. DAVIS:  We can do that.

9                      MR. JOHNSON:  Thank you so much, Tim.

10     BY MR. JOHNSON:

11         Q    And thank you, Officer McCowan.  And

12     Officer, is it okay if I call you Officer McCowan?  Or

13     is there another way you would prefer for me to refer

14     to you today or is Officer McCowan okay?

15         A    That is okay.

16         Q    Okay.  Thanks so much.  Okay.  And before we

17     kind of jump in, is there anything or any reason that

18     you can think of as to why you cannot competently

19     testify here today?

20         A    No, sir.

21         Q    Okay.  Great.  Wonderful.  So now I'm just

22     going to kind of ask you just kind of some background

CONFIDENTIAL

```
 1      questions just to kind of understand just yourself and

 2      your background.  So how old are you?

 3           A    Twenty-seven.

 4           Q    Twenty-seven?  Okay.  And can you describe

 5      for me your educational background up through your

 6      highest level of schooling completed?

 7           A    High school would be the highest.

 8           Q    Okay.  And did you graduate from high

 9      school?

10           A    Yes.

11           Q    Okay.  What year did you graduate?

12           A    2013.

13           Q    Okay.  Prior to your current role as a

14      canine officer, did you ever have a job?

15           A    Yes.

16           Q    What jobs did you have prior to being a

17      canine officer?

18           A    Several through high school.

19           Q    Okay.  Could you please describe the jobs

20      that you had in high school?

21           A    They were fast food mostly.

22           Q    I'm sorry.  I just couldn't quite hear that.
```

1          A     They were fast food mostly, and one call

2     center.

3          Q     And one call center.  Okay.  Did you ever

4     have any experience in handling canines?

5          A     Yes.

6          Q     Okay.  And what was your experience in

7     handling canines?

8          A     Hunting dogs when I was small.  When I was

9     young.

10          Q     Okay.  And did you do any formalized

11     training as part of your hunting with dogs or was that

12     more of, like, a hobby that you would do with family

13     or friends?

14          A     It was a hobby.

15          Q     Okay.  And just to confirm.  After high

16     school, was there any sort of formal education that

17     you went through?  Or high school, just confirming,

18     was the highest level of formal education that you

19     completed?

20          A     Yes.

21          Q     Okay.  Thank you.  What year did you join

22     the Virginia Department of Corrections?

Page 17

1          A     2014.

2          Q     Okay.  And that would be roughly a year

3     after you graduated high school?  Is that correct?

4          A     Yes.

5          Q     Okay.  And for today's purposes, just

6     because we'll use this name a lot, is it okay if I

7     just say "VDOC" and we'll both just kind of know I'm

8     referring to the Virginia Department of Corrections.

9     Is that okay?

10         A     Yes, sir.

11         Q     Okay.  Thank you.  So why did you join VDOC

12    in 2014?

13         A     Lack of employment opportunity at the time.

14         Q     Okay.  Was VDOC or is VDOC a major employer

15    in the city that you live?

16         A     Yes.

17         Q     Okay.  What city do you live in?

18         A     It's not a city.  I live in Wise County.

19         Q     Wise County.  Okay.  Thank you.  And is Wise

20    County where your high school was as well?

21         A     Yes.

22         Q     Okay.  So when you first joined VDOC in

Page 18

1      2014, what role were you hired onto?

2          A    Correctional officer.

3          Q    Okay.  And what's a correctional officer's

4      duties and responsibilities?

5          A    That's been a long time.  Correctional

6      officers, they work the housing units, medical towers,

7      anything there that -- that runs the institution at

8      the officers' level, that's what they do.

9          Q    Okay.  Thank you.  And also, your response

10     just reminded me of something I wanted to cover

11     initially, but we can cover it now.  So I did want to

12     mention, I may ask you questions that, you know, you

13     may just not recall and you may not have an answer to

14     because you don't have a memory, which is totally

15     okay.

16          The law is that, though, I am entitled to

17     your best recollection as you sit here today.  So if

18     you don't remember something, that is okay.

19          A    Yes.

20          Q    I want you tell me that you don't remember.

21     I don't want you to guess or speculate on anything.

22     And, you know, if Mr. Davis instructs you not to

CONFIDENTIAL

1    answer, that's really the only instance where I'm not

2    entitled to an answer is after an explicit instruction

3    by your attorney.

4              Does that make sense?

5         A    Yes, sir.

6         Q    Okay.  Perfect.  Great.  So how long were

7    you a correctional officer, then, at VDOC before you

8    became a canine officer?

9         A    Approximately three years.

10        Q    Okay.  Did you hold any other roles in

11   between becoming a canine officer after you were a

12   correctional officer?

13        A    Yes.

14        Q    What were those roles?

15        A    A field training officer.

16        Q    Okay.  And what years were you a field

17   training officer?

18        A    Twenty -- it was very -- not for a very long

19   time.  It was about six months.  The first six months

20   of 2018, I believe.

21        Q    Okay.  So you were a correctional officer

22   from 2014 to roughly the beginning of 2018 and then

Page 20

1      the first six months, roughly, of 2018, you were a

2      field training officer.  And then after that, about

3      six months into 2018, you became a canine officer?

4          A     Yes, sir.  You're still a correctional

5      officer with -- you just get an FTO certification.

6      You're still a correction -- you never stop being a

7      correctional officer.  I'm a correctional officer

8      today.

9          Q     Understood.  My apologies.  Understood.

10         A     That's fine.

11         Q     Thank you for clarifying.  And as a field

12     training officer, can you explain that role to me a

13     little bit?

14         A     Layman's terms, it -- you train trainees.

15     They come in from the job interview, they go through

16     the Phase 1, Phase 2.  They then go the academy and

17     then a field training officer takes them and runs them

18     through everything that goes on inside the

19     institution.

20         Q     Okay.  And where were you a field

21     corrections officer?

22         A     At Red Onion State Prison.

1       Q    Okay.  And were you also a correctional

2    officer -- well, before you became a field training

3    officer, were you at Red Onion State Prison?

4       A    Yes.

5       Q    Okay.  And when you became specialized in

6    handling canines, were you also at Red Onion for that

7    entire time?

8       A    Yes.

9       Q    Okay.  And have you been at any other

10   facility other than Red Onion while you've been

11   employed at VDOC?

12      A    Yes.

13      Q    Okay.  What facility is that?

14      A    Several.

15      Q    Could you list them?

16      A    Yes.  Let's see.  Sussex I and II, Indian

17   Creek Correctional, Wallens Ridge State Prison, Keen

18   Mountain Correctional Unit, River North Correctional

19   Center.  I think that's it.

20      Q    Okay.  And well, I apologize for this

21   question but do you recall about approximate dates you

22   were at each facility?  I know that's quite a long

Page 22

1       list, but do you roughly recall the dates or the

2       position you held while you were at each of those

3       facilities?

4            A     I know the position, but the dates I do not

5       remember.

6            Q     Okay.

7            A     I was canine at that time.

8            Q     Could you clarify that?  At what time?

9            A     I was canine at the time as I went through

10      those institutions.  The position I held was canine.

11           Q     Got it.  So you were a canine officer at

12      each of these facilities?

13           A     Yes, sir.

14           Q     Got it.  Okay.  And just to clarify, though,

15      the only facility where you have been a correctional

16      officer and a field training officer is Red Onion?

17           A     Yes, sir.

18           Q     Okay.

19           A     May I clarify the last question?

20           Q     Yep.

21           A     We only -- Red Onion is my home base.  Okay?

22      The only time we ever go to other institutions, we're

CONFIDENTIAL

1    just visiting.  Right?

2         Q    And so why would you be visiting another

3    institution?

4         A    Short staffed.  Short -- the short staff

5    mostly is the reason.

6         Q    Okay.  And how often do you in your role as

7    a canine officer get called out to fill in at another

8    facility that's short staffed?

9         A    Since COVID-19, several times a year.

10        Q    Okay.  When you go to a different facility

11   as a canine officer, do you travel with your assigned

12   canine, or do you use a different canine when you're

13   at those facilities?

14        A    You travel with your assigned canine.

15        Q    Okay.  When you became a field training

16   officer for the six months in 2018, was that

17   considered a promotion at the time?

18        A    There is a slight pay raise, but it is not a

19   promotion.

20        Q    Okay.  So when you became a canine training

21   officer in 2018, did you have to go through any sort

22   of training to attain that role?

Page 24

1          A     Yes.

2          Q     Can you describe that training for me?

3          A     It's a 12-week, 480-hour class.

4          Q     I couldn't quite hear the last thing that

5    you said.  I apologize.

6          A     It's a 12-week total of 480-hour class.

7          Q     Okay.  And do you recall that the 12-week,

8    480-hour program how those hours were broken out into

9    the different modules of training that you were going

10   through?

11         A     I can't say that I recall exactly how they

12   did it.  It's been five years ago.

13         Q     Understood.  Do you generally recall the

14   types of things that you were being trained on during

15   those 480 hours of training?

16         A     Yes.

17         Q     Could you describe what you generally recall

18   about the training that you received?

19         A     They trained in on and off-lead obedience.

20   On and off-lead apprehension, controlled aggression,

21   hesitation, policy and procedure review.  That's all

22   that's coming to me at the moment.  I may -- let me

CONFIDENTIAL

1    think about it for just a moment, please.

2         Q    Of course.  Take your time.

3         A    Obstacle course training.  That's all that's

4    coming to me at the moment, sir.

5         Q    Okay.  Thank you.  And when you were going

6    through training, were you assigned a canine at the

7    outset of training?

8         A    Yes.

9         Q    And how were you assigned a canine?

10        A    They -- the instructors pick and place of --

11   with trainees.  They see what canines match what

12   handlers.  Dogs have a personality just like humans

13   do.

14        Q    Understood.  And do you have any

15   understanding of what the supervisors are looking for

16   when they are evaluating a dog's personality to match

17   to a handler?

18        A    No, sir.  I mean, unfortunately, I am not an

19   instructor.

20        Q    Do you have any understanding in your

21   particular situation why your supervisors thought your

22   particular canine was appropriate to be matched with

CONFIDENTIAL

Page 26

1      you?

2           A    No, sir.

3           Q    Okay.  Do you recall the name of the canine

4      that you were assigned in your training course in

5      2018?

6           A    At that point in time, I would say that they

7      give you whatever at that point in time was available

8      to them to give you.  And at that point in time, it

9      was -- Tessa was her name.

10          Q    Understood.

11          A    I believe.

12          Q    Understood.  And is Tessa the canine that

13     you trained with for the entire 12-week, 480-hour

14     training course?

15          A    No.

16          Q    Okay.  What other canines did you train with

17     during your 480-hour, 12-week training course?

18          A    Rojo.

19          Q    Was that Rojo?

20          A    Yes.

21          Q    Okay.  And about how many hours of your

22     training course did you spend training with Tessa?

Page 27

1          A      They were both technically certified dogs at

2      that point in time.  By policy, I would've only have

3      had to have done an 80-hour school with either one of

4      those dogs, but I had not been certified at that time,

5      so I had to do the full 480-hours.  The dog itself did

6      not need the full 480-hours.

7          Q      Understood.  So let me repeat that back

8      just to make sure I understand.  So the dogs

9      themselves were certified, however you had a separate

10     480-hour training component that you needed to

11     complete for your own certification.

12              And that training that you needed to

13     complete at times required you to handle a canine, and

14     the two canines that you handled as part of your

15     completion of the 480 hours was Tessa and Rojo.  Was

16     that correct?

17         A      Yes.

18         Q      Okay.  Of the times of that 480 hours that

19     you were required to use a canine to train, how many

20     of those hours did you use Tessa as opposed to Rojo?

21         A      I'm going to say it's pretty 50/50.

22         Q      Okay.  About half?

CONFIDENTIAL

Page 28

1          A     Yeah.  About half.

2          Q     Okay.  And of that 480 hours, about how many

3     of those hours required you to handle a canine as part

4     of the training as compared to sitting in a class or

5     some other form of the training?

6          A     Very little of the canine school is

7     classroom.  It's all, for the most part, field work.

8          Q     Understood.  And when you say "mostly field

9     work," roughly speaking are we talking 90 percent

10    field, ten percent class or what percentages would you

11    assign to the classroom component versus the field

12    component?

13         A     I would say 90 -- 85/15.

14         Q     Understood.  And that's 85 percent field, 15

15    percent classroom?

16         A     Yes.

17         Q     Okay.  And when you're in the field, where

18    are you trained?

19         A     There's several different locations, sir.

20         Q     Okay.  Could you name them for me?

21         A     At that point in time, we were using an

22    obstacle course behind the Abingdon Regional Jail.

```
 1      But just about every institution that has canine has

 2      an obstacle course.

 3           Q    Okay.  Were there any other locations that

 4      you were trained at other than the jail that you just

 5      mentioned?

 6           A    At that point in time, no.

 7           Q    Okay.  And the 15 percent classroom

 8      component of your training, where did that occur?

 9           A    There is a trailer above the obstacle course

10      that the Virginia State Police also use during their

11      canine schools.

12           Q    Understood.  So that's at that same jail you

13      mentioned a moment ago?

14           A    Yes.

15           Q    Okay.  Thank you.  How many other

16      individuals were in your training program, the 480-

17      hour, 12-week canine training program with you?

18           A    I don't recall.

19           Q    Okay.  Do you have an estimate?  10?  15?

20           A    Five.

21           Q    Understood.  And do you recall?  Did the

22      five other individuals also train with Tessa and Rojo?
```

Page 30

```
 1          A    No, sir.

 2          Q    Okay.  Do you recall, did the other trainees

 3   also train with multiple canines?

 4          A    Some did, some didn't.

 5          Q    Do you recall how many did and how many

 6   didn't?

 7          A    No, sir.

 8          Q    Okay.  Do you recall the maximum number of

 9   canines an individual in your training class trained

10   with?

11          A    Two.

12          Q    Two?  Okay.  All right.  Are you familiar

13   with the concept of bark and hold?

14          A    No, sir.

15          Q    In part of your 12-week, 480-hour training

16   program, did you ever hear the phrase "bark and hold"?

17          A    Can't say that I did.  I -- it's -- I, as I

18   said, it's been a very long time since the -- my

19   first -- my basic canine school.  I honestly couldn't.

20   I do not -- I don't recall perfectly.

21          Q    Understood.  As you sit here today, are you

22   familiar with that phrase?
```

Page 31

```
 1        A     I have heard of it, but I do not under -- I

 2   do not understand the concept.

 3        Q     Understood.  How have you heard of it?

 4        A     Just through passing from older instructors.

 5   Just -- it's been a very long -- I have heard it, but

 6   it's been a very long time ago.

 7        Q     Understood.  Are you familiar with the

 8   concept of bite and hold?

 9        A     Yes.

10        Q     How are you familiar with that concept?

11        A     That is part of the certification that you

12   must get when certifying these canines.  They must

13   bite and hold decoys.

14        Q     Okay.  Can you explain what you were trained

15   on as part of your certification for bite and hold?

16        A     The -- it's the full bite routine.  On and

17   off-lead apprehensions, controlled aggression, passive

18   decoy.  That should be the full routine.

19        Q     Okay.  Was there anything else that you were

20   trained on to handle a canine in a bite and hold

21   command?

22        A     No.  That pretty well covered -- other than,
```

CONFIDENTIAL

Page 32

```
1     I apologize, the verbal disengagement of that bite and

2     hold.

3          Q    Okay.  And can you explain to me the

4     training you received on the verbal disengaging of a

5     bite hold?

6          A    It's the verbal command that you say that

7     the dog understands when he hears that verbal command

8     to release.

9          Q    Okay.  And how --

10         A    From that bite and hold.

11         Q    Understood.  I apologize.  And how are you

12    trained to instruct your canine to release after a

13    bite and hold?

14         A    Can you repeat the question, sir?  I don't

15    believe I --

16         Q    Yep.  What is the specific training that you

17    go to train your dog specifically to react to you when

18    he or she is in a bite and hold and you tell them to

19    release?

20         A    The specific training as far as bite hold, I

21    have -- I am not an instructor.  So as far as -- as

22    far as speculating on how it's trained, I couldn't --
```

Page 33

```
 1      I don't -- I don't know.  I couldn't -- couldn't say.

 2          Q     Okay.  So can you help me understand then

 3      how you become comfortable in your training when you

 4      give a command to your canine, that the canine will

 5      release after a bite and hold?

 6          A     They simulate it during training.

 7          Q     And what --

 8          A     You become comfortable by -- you become

 9      comfortable by doing.

10          Q     Okay.  So then what do you mean by

11      "simulate" during your training?

12          A     So on -- when you're on a bite and hold

13      situation, you do dozens of those during school.  You

14      give the command, the dog releases.  Over time, you'll

15      become comfortable with it and trust that the dog will

16      do it every time that you ask the dog to do so.

17          Q     Okay.  Of the 85 percent of the field work

18      training that you went through, about how many hours

19      of that portion of your training were committed to

20      training on bite and hold and release as we've been

21      discussing that just, you know, recently.

22          A     Like -- unfortunately, I -- I don't want to
```

Page 34

1    speculate.  I'm not -- I'm not an instructor, so I'd

2    rather not guess.

3         Q    Okay.  Do you have a sense?  Was it, you

4    know, 50 percent of that time or was it less than 50?

5         A    I'm -- I -- I apologize, sir.  I don't know.

6         Q    That's okay.  No problem.

7         A    And I'd rather not speculate on it.

8         Q    Understood.  I appreciate that.  Thank you.

9    Are you familiar with a canine named Shadow?

10        A    Yes.

11        Q    And how are you familiar with Shadow?

12        A    He was my assigned canine from 20 -- let's

13   see.  Mid-2018 to just until about four or five months

14   ago.

15        Q    So Shadow was your assigned canine from

16   roughly 2018 through the end of 2021.  Is that

17   correct?

18        A    End of 2022.  I'm sorry.  Now the end of

19   2022, but the -- the first month.  I would say he

20   retired in March of 2022, and I had him up until

21   January of 2022.

22        Q    Understood.  So Shadow is now retired?

CONFIDENTIAL

1          A     He is.

2          Q     Understood.  Prior to Shadow being assigned

3     to you in 2018, did you train with Shadow?

4          A     Nope.

5          Q     Was Shadow the first canine that you were

6     assigned after completing the canine course?

7          A     No.

8          Q     What canine were you assigned when you first

9     completed the course?

10         A     Tessa.

11         Q     And how long were you assigned Tessa?

12         A     From probably -- I would say January of 2018

13     up until June of 2018.

14         Q     Okay.  And were you at Red Onion State

15     Prison the entire time that Tessa was assigned to you?

16         A     Yes.

17         Q     Okay.  And that's other than if you were

18     doing any short-term filling in for short-staffed

19     individuals or short-staffed individuals or short-

20     staffed facilities?  Or was Tessa only at Red Onion?

21         A     Only at Red Onion at that point in time.

22         Q     Okay.  And after Tessa was assigned to you

1       until June of 2018, who was your next canine assigned

2       to you?

3               A       I don't recall, sir.

4               Q       Okay.  Did you have a canine assigned to you

5       in between having Shadow assigned to you and Tessa

6       assigned to you?

7               A       No.

8               Q       Okay.  So Shadow would have been assigned --

9       Shadow was the next canine you were assigned after

10      Tessa.  Is that correct?

11              A       Yes.

12              Q       Okay.  And where did Shadow retire?

13              A       He is currently at Red Onion.

14              Q       Excuse me.  Why did Shadow retire?  Sorry.

15      I misspoke.

16              A       Why did Shadow retire?

17              Q       I apologize.

18              A       Okay.  Health issues.

19              Q       Okay.  Do you know what those health issues

20      were?

21              A       He has several.

22              Q       Okay.  Could you describe them for me?

CONFIDENTIAL

1      A     He constantly gets skin infections.  The

2    reason that he was taken out of service was because he

3    contracted MRSA, I believe.

4      Q     Okay.

5      A     And he retired because of age after that.

6    He's quite old.

7      Q     Okay.  As you sit here today, do you have an

8    understanding of any other medical conditions that

9    caused Shadow to retire?

10     A     No, sir.  It was mostly due to age.

11     Q     Okay.  When Shadow was first assigned to

12   you, what was your relationship with Shadow like?  Did

13   you take to each other quickly or did you have to

14   train together to be able to effectively work

15   together?

16     A     It takes years to build.  It takes -- let's

17   see.  Can you repeat the question, sir?  I apologize.

18     Q     Sure.  No problem.  So you said earlier, I

19   believe, that you trained with Tessa and that Tessa

20   was your first assigned canine.  Is that correct?

21     A     Yes.

22     Q     So after Tessa was unassigned to you and

1    Shadow was assigned to you, what was your experience

2    with Shadow like as compared to Tessa?

3         A    He was -- he was obviously different.  Every

4    dog has a different personality, but we done well

5    together.

6         Q    Okay.  Could you explain to me specifically

7    what you mean by "a different personality"?

8         A    Just Tessa was a female, Shadow was a male.

9    As far as -- well, for instance, Tessa bit me once

10   while working inside the institution.  Shadow never

11   tried, for example.

12        Q    Okay.  Were there any other personality

13   differences between Tessa and Shadow that you recall

14   sitting here today?

15        A    Shadow was much more social.

16        Q    Okay.  And what do you mean by "social"?

17   Social with --

18        A    Social towards human beings.

19        Q    Okay.  And do you know sitting here today

20   what happened to Tessa?

21        A    No.  I'm sorry.  I apologize.  I do not.

22        Q    That's okay.  Do you know if Tessa is

Page 39

```
 1    retired or still on active duty?

 2         A    I do not.  I -- she was quite old then.  I

 3    would say if she has not passed away, she has retired

 4    by now.

 5         Q    Understood.  How old was Shadow when you

 6    were assigned to him?

 7         A    Three.

 8         Q    And how old was Tessa when you started

 9    training with her?

10         A    That I don't recall.

11         Q    Okay.  Do you know if it's common for canine

12    officers to train with a different dog or a different

13    canine than they are assigned in the field?

14         A    Can you repeat the question, sir?  I

15    apologize.  I don't believe I understood that.

16         Q    No problem.  Of course.  So I believe you

17    said that you -- well, let me strike that.  Do you

18    know if it's common, as you sit here today, for

19    officers to train with one canine, complete training,

20    and then be assigned a different canine for their

21    field assignment after the canine training school?

22         A    It's not a -- a usual -- the only thing that
```

CONFIDENTIAL

Page 40

1      I can see that would happen in that instance would be

2      that that particular dog at that point in time did not

3      meet certification, and the officer had to take

4      another canine to be able to certify and work inside.

5          Q    Are you aware of any incidents since your

6      time at VDOC where that's actually happened?

7          A    No, sir.

8          Q    Okay.  Are you familiar as you sit here

9      today, since your time at VDOC, of any canine handler

10     having a different canine for their first field

11     assignment from the canine that they trained with?

12         A    I don't -- I -- I couldn't recall, sir.

13     There's been so many come and go.

14         Q    So I believe that you said that you had

15     Tessa for about six months before Shadow was assigned

16     to you.  Is that correct?

17         A    Yes.

18         Q    And how did it come to be that Shadow was

19     assigned to you after that six-month period over

20     Tessa?

21         A    I don't believe I understand what you're

22     asking me -- of me, sir.

CONFIDENTIAL

Page 41

1      Q    Sorry.  Let me repeat that.  Sure.  Do you

2  recall as you sit here today, why were you assigned a

3  new canine in June of 2018?

4      A    My personality and her personality did not

5  meld well together.  And as I said before, she bit me.

6      Q    Okay.  Was Tessa's biting you the reason

7  that you were assigned a new canine?

8      A    Partly.  In part, yes.

9      Q    Okay.  Do you know as you sit here today how

10  often canine handlers are assigned a new canine?

11      A    No, sir.  It's random.

12      Q    Okay.  Do you know, is there a VDOC policy

13  or practice that requires a regular transfer or

14  reassignment of canines and their handlers?

15      A    I do not.  I don't know, sir.

16      Q    Okay.  Is it your understanding that canine

17  assignments to canine officers are done on a one-time

18  basis and only revisited if there is a reason, such as

19  you were explaining earlier, to have a reassignment

20  completed?

21      A    So you're -- there are no -- they are not

22  assigned -- they are not assigned or reassigned to

Page 42

1    anybody else unless you fail a quarterly certification

2    or you do not necessarily have to -- you do not

3    necessarily have to reassign your canine after failing

4    a two-week certification.  This is just what the

5    policy reads.

6              After failing a two-week certification, you

7    have to -- or, I'm sorry, a quarterly certification.

8    You must then do a two-week remedial with an

9    instructor, as policy reads if you fail a quarterly or

10   annual certification.  And at that point in time, the

11   canine can be reassigned if you are unable to score or

12   recertify that particular canine.

13        Q    Okay.  Are you aware of any incidents where

14   a canine and the handler, since you've been at VDOC,

15   have failed their quarterly or annual certification

16   and had their canine reassigned?

17        A    I can't recall, sir.

18        Q    Have you ever failed an annual

19   certification?

20        A    Yes.

21        Q    When?

22        A    With Tessa.

Page 43

1          Q     What year?

2          A     It was during -- can't speculate on the

3     month, but I know it was 2018.  That was part of the

4     reason why of having Shadow assigned to me.  She bit

5     me, and that next -- I continued working her until the

6     next quarterly.

7                She then failed her quarterly.  I was then

8     assigned Shadow and from then, I done an 80-hour class

9     with Shadow and was certified and had been since until

10    his retirement.

11         Q     Understood.  So maybe let's take a quick

12    step back to just kind of talk back through that a

13    little bit.  So do you recall about the month when

14    Tessa bit you?

15         A     I do not, sir.

16         Q     Okay.  As you sit here today, is it your

17    recollection that Tessa bit you and then the next

18    quarterly certification that arose for Tessa, Tessa

19    failed that certification because she bit you?

20         A     I don't believe there is correlation.  No,

21    sir.

22         Q     Okay.  Do you have an understanding as you

Page 44

```
 1    sit here today why Tessa failed the quarterly

 2    certification?

 3         A    I do not, sir.

 4         Q    Okay.  Do you recall as you sit here today

 5    the circumstances that caused Tessa to bite you?

 6         A    It was random, sir.  No.

 7         Q    Could you explain to me what you mean by "it

 8    was random"?

 9         A    I was -- there was not particularly any

10    reason that she bit me other than that she was

11    particularly handler-aggressive.

12         Q    Understood.  What were your physical

13    surroundings and where were you when Tessa bit you?

14         A    I was inside the institution.

15         Q    Okay.  Is that the Red Onion Institution?

16         A    Yes.

17         Q    Okay.  Where in Red Onion specifically were

18    you when Tessa bit you?

19         A    I was on Alpha and Bravo side of the

20    institution.

21         Q    Okay.  Could you assume I don't know what

22    that means and explain that to me?
```

Page 45

1          A     There is two different sides to the

2      institution as you come through it.  There is an admin

3      building that runs through the middle, A and B, C and

4      D.

5                 A and -- Alpha and Bravo buildings are here

6      and here.  Charlie and Delta are here and here.  And

7      there's an admin building where the kitchen, the chow

8      halls, and all that is -- runs between those two.

9          Q     Okay.  And you were in the Alpha building at

10     the time that Tessa bit you.  Is that correct?

11         A     No, sir.

12         Q     Okay.  Where were you when Tessa bit you?

13         A     I was patrolling -- I'm sorry.  I was

14     monitoring movement on A/B yard.  I was on the yard at

15     that point in time.

16         Q     Okay.  Understood.  And then you were on the

17     yard patrolling, and then Tessa bit you as you

18     described, randomly?

19         A     Yes.

20         Q     Okay.  Understood.  And I believe you said

21     earlier, other than -- well, I believe you testified

22     earlier that you do not believe that Tessa biting you

CONFIDENTIAL

1      is the reason why she failed her quarterly

2      certification.  Is that correct?

3          A    I do not personally believe there is any

4      correlation.  No, sir.

5          Q    Understood.  But you don't have an awareness

6      as to why Tessa failed her quarterly certification

7      following the bite?

8          A    No, sir.

9          Q    Understood.  Okay.  So after Tessa failed

10     her certification, I believe you just said that you

11     were assigned Shadow and that you and Shadow completed

12     80 hours of training.  Is that correct?

13         A    Yes.

14         Q    Okay.  Was that training completed before

15     you were deployed back into Red Onion for, you know,

16     your patrol purposes?

17         A    Yes.

18         Q    Okay.  And can you describe that 80 hours of

19     training for me in as much detail as you can remember

20     sitting here today?

21         A    You must certify on everything everybody --

22     on every aspect of the training that we do -- you do.

Page 47

1    You have to certify within those 80 hours.

2            So a certified handler already knows

3    everything he needs to as far as the basics go, so

4    does the canine itself.  So the only thing the policy

5    requires of us is an 80-hour school to more or less

6    bond with each other and certify on what we need to

7    certify on by policy to be able to utilize those

8    canines in an institution.

9        Q    Understood.  So I'm going to ask you just a

10   couple of questions to help me just kind of understand

11   just similarities and differences between the 80-hour

12   program and the 480-hour training program that we

13   spoke about earlier.

14           So just yeah.  If you could, that's kind of

15   the context for some of these questions.  So when you

16   were testifying earlier about the 480-hour program,

17   you said that Tessa and Rojo were already certified.

18   Is that correct?

19       A    Yes.

20       Q    Okay.  And I believe you just testified just

21   now that Shadow was not certified and that you were

22   going through the certification with Shadow.  Is that

Page 48

1    correct?

2         A    No, sir.

3         Q    Okay.

4         A    Shadow was certified.

5         Q    Okay.  So who certified Shadow, Tessa, and

6    Rojo?

7         A    They were certified by different individuals

8    at different times, sir.

9         Q    Do you know the specific individuals that

10   certified Shadow, Tessa, or Rojo?

11        A    No, sir.

12        Q    Do you know the certification process that

13   Shadow, Tessa, or Rojo or any canine went through in

14   order to be certified?

15        A    Yes, sir.

16        Q    Could you explain that to me?

17        A    Yes, sir.  They have to complete the full

18   bite routine, full obedience routine, full obstacle

19   course routine, and an area building search.

20        Q    Okay.  And when they're undergoing this

21   certification, is it VDOC employees who are conducting

22   this training or is it outside consultants that are

CONFIDENTIAL

Page 49

```
 1       conducting this training?

 2            A      VDOC employees, sir.

 3            Q      Understood.  Is there anybody that is part

 4       of the canine program that is not a VDOC employee?

 5            A      No, sir.

 6            Q      Okay.  So it would have been a VDOC canine

 7       trainer who certified Tessa, or Rojo, and Shadow?

 8            A      Yes, sir.

 9            Q      And am I using the correct title for the

10       individuals who would have done that certification?

11       Are they a canine training officer or what is the

12       title of the people who train and certify canines for

13       your use?

14            A      The instructors at that point in time

15       were -- most of them were sergeants over channels at

16       the institutions.

17            Q      Okay.  And so would the --

18            A      I apologize.  There's somebody at the door.

19            Q      No problem.  We could take a quick break and

20       go off the record if you need to handle it.  That's

21       okay.

22            A      That's okay, sir.  It was -- it's not --
```

CONFIDENTIAL

Page 50

1      it's not important.

2          Q    Understood.  Okay.  Maybe just since we've

3      taken a pause, you know, we can take a break whenever

4      you'd like, just so you know.  So if at any time you

5      need to take a break, let me know.

6               I'm going to try about every hour, you know,

7      unless we're kind of in a back and forth try to be

8      mindful of the time.  But please don't hesitate.  If

9      you need a moment, just ask, and it's more than okay.

10         A    Okay.

11         Q    Okay.  So a moment ago, we were just

12     discussing the individuals who are responsible for

13     certifying canines, and I believe you testified that

14     the individuals who perform those certifications are

15     sergeants within the canine program at VDOC.  Is that

16     correct?

17         A    Most of them.  Yes, sir.

18         Q    Okay.  When you say "most," what do you mean

19     by that?

20         A    At that point in time, policy read that --

21     that you could as a -- it's been so long.  I

22     apologize.  Can you repeat the question for me?

Page 51

1       A    Sure.

2       Q    I'm not sure I completely 100 percent

3    understand what you're trying to ask of me.

4       A    Understood.  I believe that you testified

5    that most of the individuals who train canines are

6    sergeants within VDOC's canine unit.  Is that correct?

7       A    I apologize.  That was a mistake by -- at

8    that time, it was all of the instructors at that point

9    in time were sergeants.

10       Q    Understood.  And am I using the department

11    that they're affiliated with correctly?  They're

12    sergeants within --

13       A    The canine operations.  Yes, sir.

14       Q    Understood.  And is their job solely to

15    train canines to be certified?

16       A    Those and their officers'.

17       Q    Understood.  So is it the same pool of

18    trainers who train both canines and their handlers?

19       A    At that point in time, yes.

20       Q    Okay.  A few times, as I've asked questions

21    about the training, you've testified "at that time."

22    Has the training program changed since you went

CONFIDENTIAL

1       through it that's leading you to say "at that time"?

2              A       Not to the extent -- the training itself has

3       not changed.  The instructors over the years have

4       changed, and people have retired, left for better

5       jobs, whatever the case may be.

6              Q       Understood.  So as you sit here today, is it

7       your understanding that there are other individuals

8       other than sergeants within the canine operations unit

9       that are conducting canine trainings?

10             A       Now?

11             Q       Yes, sir.

12             A       Yes.

13             Q       And can you describe for me who those people

14      are?

15             A       They're still officers, sir.  They just --

16      instead of having a supervisory role, they are those

17      officers who have volunteered to be able to instruct

18      schools or through canine operations have chosen to

19      instruct schools.

20             Q       Understood.  As you sit here today, do you

21      have any understanding of whether or not those

22      officers who volunteer to train have to undergo any

CONFIDENTIAL

Page 53

1    sort of training or specialized schooling in order to

2    be allowed to train canines and/or handlers?

3         A    Yes.  I -- I don't personally know what the

4    actual -- it's one of those things I'd rather not

5    speculate on because I would be guessing at probably

6    about 75 percent of it, sir.  I apologize.

7         Q    That's okay.

8         A    'Cause I -- I have not volunteered to be an

9    instructor.  I -- I do not know.

10        Q    Understood.  But I believe you testified,

11   though, that at the time you went through the canine

12   training school and at the time that you completed the

13   80-hour certification program with Shadow, that the

14   individuals that trained you were sergeants within

15   VDOC.  Is that correct?

16        A    Yes.

17        Q    Understood.  Okay.  So were the programs or

18   modules that were part of the 80-hour program that you

19   went through with Shadow entirely the same as the

20   modules that you went through during the 480-hour

21   program or were there differences?

22        A    They are -- they were the same.

Page 54

1          Q     Okay.  Can you explain to me how they were

2     the same if one takes 480 hours and the other takes

3     80?

4          A     'Cause the 480-hour school, you're coming

5     into a -- the operation blank.  You don't know

6     anything about the trainings for the basic canine

7     school.  You have to have a 480-hour basic canine

8     school to be able to work inside.

9               After you've already completed the 480-hour

10    class, all you must do during the 80-hour class is

11    certify.

12         Q     Understood.

13         A     You already know all the basics from your

14    original 480-hour class.

15         Q     Understood.  So you're a veteran, and you

16    understand the program, and you're going through it

17    and --

18         A     Yeah.

19         Q     Okay.  And so there's efficiencies in the

20    training that are gained as a result of that baseline

21    knowledge?

22         A     Yes, sir.

CONFIDENTIAL

1         Q    Is that what you're testifying?  Okay.

2    Excuse me.  I believe that you testified that part of

3    both the 480-hour program and the 80-hour program is

4    training on patrol canine usage.  Is that correct?

5         A    Yes.

6         Q    Okay.  Are there any other forms or

7    modalities of use of canines that you were trained on?

8         A    As far as?

9         Q    For example -- sorry.  That was probably a

10   poorly worded question.  So were you trained on

11   contraband or narcotics detection for --

12        A    No, sir.

13        Q    Were you trained on any other use of canines

14   in a prison context other than a patrol canine usage?

15        A    No, sir.

16        Q    Okay.  Have you ever received training on

17   any canine usage in a correctional setting other than

18   a patrol canine usage?

19        A    No, sir.

20        Q    Do you have any awareness or understanding

21   as to whether or not the other canine officers within

22   VDOC ever received training on other forms of canine

Page 56

1     usage in a correctional setting, other than patrol

2     canine use?

3          A     No, sir.

4          Q     Understood.  And I believe that you

5     testified that all of your training is provided to

6     you -- sorry.  Let me rephrase.  I apologize.

7               I believe that you testified earlier that

8     all of your training as a canine officer while at VDOC

9     has been provided to you by VDOC.  Is that correct?

10         A     Yes, sir.

11         Q     And you have received no outside canine

12    training, other than what VDOC has provided to you.

13    Is that correct?

14         A     Yes, sir.

15         Q     Okay.  So going back to earlier, I was

16    asking a few questions about just your comfort level

17    around giving a command.  For example, we were talking

18    about earlier release command to a canine.

19              And I wanted to ask you about your training

20    around deploying your canine.  Can you talk to me

21    about or explain to me what specifically you were

22    trained to do when you are in a situation where you

Page 57

```
 1     potentially need to use canine force in a correctional

 2     setting?

 3         A    You're asking as far as the training goes?

 4         Q    Yes, sir.

 5         A    You do -- you would run your training no

 6     different than you would do it in real life.

 7         Q    Okay.  So does that mean that you were

 8     trained on situations where use of force was not

 9     appropriate?

10         A    Yes.

11         Q    Can you explain those situations to me?

12         A    When they become compliant, there is no use

13     of force.  That's it.  It's pretty black and white as

14     far as -- as far as the use of force goes.

15         Q    Okay.  So I believe that you just said that

16     you're trained to use force until an inmate complies

17     with your command.  Is that your understanding?

18         A    As far as policy is written, yes, sir.

19         Q    Okay.  Is there a difference in your

20     understanding of the policy versus the practice?

21         A    No, sir.

22         Q    Okay.  Is there a reason why you said "as
```

Page 58

1    the policy is written" as opposed to that's how you do

2    it?

3         A    Because the -- the way the policy is

4    written, you must follow the policy in order to keep a

5    job.

6         Q    Understood.  So could you break down what

7    you mean by, "until somebody complies"?  So for

8    example, say you are called into a pod, and you've

9    been instructed that two inmates are fighting.  And

10   you show up at the pod, and everybody is lying down.

11   Would you release your canine?

12        A    No, sir.

13        Q    Okay.  So can you help me understand.  What

14   is that you're trained to look for and do when you

15   arrive on scene regarding whether or not the use of

16   force of your canine is proper?

17        A    Aggressive actions.

18        Q    What does that mean?

19        A    Aggressive actions toward other individuals.

20   One individual is showing aggressive actions, close

21   fisted, approaching in a threatening manner.  Anything

22   as far as any kind of aggression -- aggressive action,

Page 59

 1    use of force can be utilized.

 2         Q    Okay.  And I believe you said the way you're

 3    trained is that you are trained to look for a closed

 4    fist to identify whether or not an individual is -- or

 5    whether use of force is appropriate.  Is that correct?

 6         A    No, sir.  A closed fist does not necessarily

 7    give way to aggressive action.  It can be a multitude

 8    of things.

 9         Q    Okay.  so could you explain to me everything

10    that you have been trained to look for to determine

11    whether or not an inmate is exhibiting aggressive

12    behavior?

13         A    Assaultive -- assaultiveness and

14    combativeness. Persistence towards that as far as what

15    orders they give.

16         Q    Okay.  And when you say "assaultiveness,"

17    can you explain to me in just layman's terms what you

18    mean by assaultiveness?

19         A    Assaultiveness, whether or not they have

20    stopped fighting.

21         Q    Okay.  Other than stopping fighting, is

22    there anything that you look for to determine whether

Page 60

1    or not aggressive behavior is being exhibited?

2         A    Running, not complying with orders.  Running

3    towards inmates, staffs, things of that nature.

4         Q    Okay.  What about walking away from an

5    inmate or staff?

6         A    Very possible.  It's not out of the realm of

7    possible.

8         Q    Okay.  And are all the things that you just

9    described to me, is that part of your training that

10   you receive as a canine officer?

11        A    Yes, sir.

12        Q    Okay.  So all of those things that you just

13   described are specific components of your training

14   program that you are trained to look for when you come

15   on scene to identify whether or not an inmate is

16   exhibiting aggressive behavior such that use of force

17   is proper?

18        A    Yes, sir.

19        Q    Okay.  Is the term "assaultive" part of your

20   training?

21        A    I don't -- yes, sir.

22        Q    Okay.  And do you recall how your training

CONFIDENTIAL

1    defines "assaultive"?

2         A    Assaultive being anything that appears to be

3    an aggressive action towards another human being.

4         Q    Okay.  And is that the definition that you

5    recall being provided or is that the definition that

6    you recall as you sit here today?

7         A    It's as I recall as I sit here today.

8         Q    Is that a pretty close approximation to what

9    you were trained at the time?

10        A    Yes, sir.

11        Q    Okay.  And just to confirm, your training,

12   was this part of both the training that you went

13   through in the 480-hour program as well as the 80-hour

14   program with Shadow?

15        A    Yes, sir.

16        Q    Okay.  Do you recall there being any

17   differences in how you were trained on use of force

18   between when you went through the training with Tessa

19   as compared to when you went through the training with

20   Shadow?

21        A    No, sir.

22        Q    Since you became a canine officer, do you

Page 62

1    recall any changes to how you've been trained to

2    utilize canine force as a canine handler?

3        A    No.

4        Q    Okay.  So then it's your testimony here

5    today that the use of force policy as applied to

6    canines has been the same at VDOC ever since you've

7    been a canine officer since 2018.  Is that correct?

8        A    I believe -- I apologize.  I believe that

9    they're -- I'd rather not speculate on it because I

10   don't know what the policy used to be.  I can't

11   remember what the policy used to be.  I do know what

12   it is now.  But for the most part, I don't believe it

13   has changed much.

14       Q    In carrying out your day-to-day duties, do

15   you recall since 2018 ever thinking or having an idea

16   that the way in which you utilized your canine has

17   changed?

18       A    I apologize, sir.  Can you repeat that

19   question?  I don't believe I understood you.

20       Q    Sure.  Since you became a canine officer in

21   2018, do you ever recall thinking that the way in

22   which you use your canine has changed as a result of a

CONFIDENTIAL

1    policy change?

2         A    If the policy changes, then yes, sir.

3         Q    Do you recall policy changing as you sit

4    here today?

5         A    Policy changes frequently as times evolve,

6    what have you.  Policy changes frequently.  As far as

7    use of force goes, not to my knowledge.  No, sir.  It

8    has not changed.

9         Q    Okay.

10                   MR. DAVIS:  Andy, I'd ask that we take

11   a break after this next question if that's good with

12   you?

13                   MR. JOHNSON:  Yeah.  Absolutely.  Maybe

14   just a couple clarifying questions and then we'll take

15   a break if that's okay?

16                   MR. DAVIS:  Okay.  All right.

17                   MR. JOHNSON:  Okay.

18   BY MR. JOHNSON:

19        Q    And Officer McCowan, I did just want to

20   confirm.  When we're talking about policy changes

21   here, we're talking about the operating procedures.

22   Correct?

Page 64

1        A    Yes, sir.

2        Q    Okay.  Understood.

3                  MR. JOHNSON:  Okay, Tim.  Why don't we

4        take, I don't know, 10 or 15 minutes?  Does that sound

5        okay?

6                  MR. DAVIS:  Sure.  So we reconvene at

7        10:45?

8                  MR. JOHNSON:  Yeah.  Does that work for

9        everybody?

10                  THE REPORTER:  Yep.

11                  MR. JOHNSON:  Okay.  Let's go off the

12       record then.

13                  THE REPORTER:  Okay.  We're off record

14       at 10:33 Eastern Daylight Time.

15                  (Off the record.)

16                  THE REPORTER:  Okay.  We're back on the

17       record at 10:46 a.m.  Go ahead.

18       BY MR. JOHNSON:

19       Q    Okay.  So Officer McCowan, when we broke we

20       were talking about your training on use of force as it

21       applied to your canine.  So I was hoping maybe we

22       could kind of go back and start there.

Page 65

1         So do you recall specifically as it was

2    articulated to you what the standard was that you

3    needed to look for for utilizing your canine in a

4    correctional setting?

5         A    As I said before, combativeness,

6    assaultiveness, or the potential for combativeness or

7    assaultiveness.

8         Q    Okay.  And just really quick, Officer

9    McCowan, I meant to ask you.  Did you speak with

10   anyone about your testimony during the break?

11        A    No, sir.

12        Q    Okay.  Thank you.  And as you described the

13   assaultiveness and combativeness, are those concepts

14   that you understand are part of the VDOC use of force

15   policy?

16        A    As far as I know, yes, sir.

17        Q    And you're aware of that because of the

18   training that you received from VDOC.  Is that

19   correct?

20        A    Can you repeat the question, sir?  I

21   apologize.

22        Q    Sure.  You're aware of the fact that

```
 1      assaultiveness and combativeness are part of the

 2      standard of your use of force because of the training

 3      that you received?

 4           A    As I recall, yes sir.

 5           Q    Okay.  Have you ever reviewed the use of

 6      force or canine policy on your own?

 7           A    Yes, sir.

 8           Q    Do you know when or do you recall when you

 9      would have reviewed the use of force policy on your

10      own?

11           A    I do not, sir.

12           Q    Is that something that you -- do you

13      frequently review the use of force policy or is it

14      something that you've done before but you don't

15      routinely do?

16           A    It's something that I do occasionally.  Just

17      on occasion to make sure no --

18           Q    When was --

19           A    I apologize.  Just to make sure there's been

20      no changes.

21           Q    Understood.  No, I apologize.  I didn't mean

22      to jump in there.  When was the last time that you
```

Page 67

1    reviewed it?

2        A    I can't -- I don't recall, sir.

3        Q    Okay.  Did you review it in preparation for

4    your deposition today?

5        A    No, sir.

6        Q    Okay.  Did you review any policies in

7    preparation for your deposition today?

8        A    No, sir.

9        Q    Okay.  So a couple of more questions about

10   the canine training program that you went through.

11   And first, I'll ask you about the 480-hour program and

12   then the 80-hour program.

13           So with respect to the 480-program, how were

14   you evaluated during that training for purposes of

15   understanding whether or not you were, you know,

16   completing the training appropriately?

17       A    I apologize, sir.  I'm not an instructor.

18   As far as that goes, I do not know as to how the

19   evaluation goes -- how the evaluations go.  I

20   apologize.

21       Q    Understood.  Did you ever receive the

22   equivalent of a report card or an assessment that had

CONFIDENTIAL

1    different components that you were being ranked on?

2         A    As I recall, yes sir.

3         Q    Okay.  And those components that you were

4    being on ranked on, what do you recall that those

5    were?

6         A    I do not -- I do not recall, sir, as far as

7    the specifics go.  I knew --

8         Q    Do you --

9         A    I knew that the instructors made an -- I

10   know that the instructors make an evaluation once a

11   week.  If you are meeting their standards, you stay in

12   school.

13        Q    Got it.  So it was a weekly evaluation that

14   your training officers performed to enable you to

15   continue on to the next week of school.  Is that

16   correct?

17        A    Yes.

18        Q    And did you receive those weekly evaluations

19   during your training?

20        A    Yes.

21        Q    Did you read and review those evaluations

22   during your training?

```
 1          A     Yes.  Yes.

 2          Q     Okay.  And as you sit here today, do you

 3    generally recall whether or not use of force was one

 4    of the criteria upon which you were being evaluated?

 5          A     Yes.

 6          Q     Okay.  What other criteria do you recall

 7    that you were being evaluated on?

 8          A     Responsiveness, ability, intelligence.

 9          Q     Any others?

10          A     Not that I recall, sir.

11          Q     Okay.  So I believe then that you've

12    testified that weekly you received an evaluation

13    during training that evaluated you on different

14    components.  Those components were use of force,

15    responsiveness, ability, and intelligence.  Is that

16    correct?

17          A     Yeah.

18          Q     Okay.  Are there any other criteria that you

19    were evaluated on?

20          A     Not that I can recall, sir.

21          Q     Okay.  And so can we walk through each of

22    those criteria as you understand them?  Was the use of
```

CONFIDENTIAL

1    force evaluation, was that an evaluation of your

2    determination as to when use of force was proper or

3    what was that evaluation regarding use of force?

4         A    I don't believe I understand the question,

5    sir.

6         Q    Sure.  Let me break it down.  So was the use

7    of force assessment an assessment of your

8    determination as to whether or not to use canine

9    force?

10        A    Can you repeat it one more time?

11        Q    Sure.

12             MR. JOHNSON:  Madam Court Reporter,

13    could you read that back?

14             THE REPORTER:  I could play it back for

15    you.  Just a moment.

16             MR. JOHNSON:  Thank you so much.

17             THE REPORTER:  Sure.

18             (The reporter played the record as

19             requested.)

20             MR. JOHNSON:  Madam Court Reporter,

21    it's okay.  The audio is really faint on my end.  I

22    can barely hear it.

CONFIDENTIAL

 1                    THE REPORTER:  Okay.  Just a moment.

 2                    MR. JOHNSON:  I don't know whether he

 3      can hear that.  I apologize.  It's okay.  I can re-

 4      ask.

 5                    THE REPORTER:  Okay.

 6                    MR. JOHNSON:  It's okay.  I apologize.

 7                    THE REPORTER:  It's okay.

 8      BY MR. JOHNSON:

 9          Q    Sorry about that, Officer McCowan.  I didn't

10      realize it would be so faint.  So the question I was

11      asking, I believe you testified that use of force was

12      one of the components that you were evaluated on

13      weekly as part of your training.

14                    And my question is:  Was that evaluation of

15      the appropriateness of your determination as to when

16      canine force was appropriate?

17          A    Yes.

18          Q    Okay.  Did the use of force assessment look

19      at the force that was used by you or commanding of the

20      dog in a training scenario?  Or did it only look at

21      the decision to use force?  Does that make sense?

22          A    Can you repeat it one more time, sir?  I

Page 72

1      apologize.

2           Q    No problem.  So what I'm getting here is:

3      Is the evaluation of you looking at your decision to

4      use force or how much force you used?

5           A    Both.

6           Q    Okay.  So let's talk about how much force

7      you were trained to use.  Can you please walk me

8      through your training on how much force to use after

9      you've made an assessment that force is proper?

10          A    You only go -- you only use force up to the

11     point of gaining compliance.  That's stop the -- stop

12     the fighting, and lay on the ground, have both hands

13     out.  Then at that point in time, stop.  You go no

14     further.

15          Q    Okay.  Are there any other considerations

16     that you're trained to consider to determine when to

17     stop using force?  Other than gaining full compliance?

18          A    In a training scenario, no.  In real life,

19     it's not as black and white, I would say.

20          Q    What do you mean by that?

21          A    I would say that with canine, it's more of

22     whenever the threat ceases.  Whenever the threat

CONFIDENTIAL

Page 73

```
 1        ceases, use of force stops.  If they're laying on the
 2        ground -- if they're laying on the ground compliant,
 3        as long as I can for the most part see their hands and
 4        make sure there are no weapons involved, I will give
 5        the verbal command to disengage to the canine.
 6             Q     Okay.  So in your training, are there
 7        separate modules for determining whether or not a
 8        threat is continuing as compared to whether or not an
 9        individual is exhibiting combative or assaultive
10        behavior, as you testified earlier?
11             A     I don't recall if there was particular
12        modules as far as how they set it up.  I -- I don't
13        recall, sir.
14             Q     Understood.  But it's your testimony today
15        that the use of force for a canine is a different
16        standard, as you just articulated.  And that standard
17        is when the threat has ceased, that is when you are
18        trained to stop using force.  Is that correct?
19             A     Yes, sir.
20             Q     Understood.  And you're trained that that
21        threat that you seek to cease the threat means that
22        the individual does not have a weapon visible and is
```

Page 74

1    on the ground.  Is that correct?

2        A    Yes, sir.

3        Q    Are there other scenarios that you're

4    trained on that you could come across where you should

5    continue to use force?

6        A    If there is a -- if there is a weapon

7    involved.  If there are -- if -- if an inmate is

8    laying on the ground and being compliant with both --

9    if I can see both of his hands, I can't see a reason

10   as to why force would still be being utilized.

11       Q    Okay.  And is that because the inmate is on

12   the ground or would your response be the same if the

13   inmate was standing up?

14       A    They need to be -- they have to be laying on

15   the ground at that point.  If they were still

16   standing, I would consider them a threat.

17       Q    Understood.  And are you trained that an

18   inmate who is standing is necessarily, meaning always,

19   a threat regardless of how that inmate is presenting?

20       A    Yes.

21       Q    Understood.  So it's your testimony here

22   today that, as part of a training, you are trained

Page 75

1    that if an inmate is standing upright, regardless of

2    the gestures or anything else, that inmate presents a

3    threat to you.  Is that correct?

4         A    No, sir.

5         Q    Okay.  So what's incorrect about that

6    statement?

7         A    No, sir.  Just standing there not doing

8    anything, just standing there, is -- does -- as you or

9    I are just sitting here speaking, no, sir.  That is

10   not a means to use force.

11           It doesn't meet the aggressive actions as I

12   said before of some sorts.  Approaching somebody,

13   waving their hands around with a closed fist or open.

14   There's several factors that come into play when

15   deciding to use -- utilize force.

16        Q    Understood.  So it's not just the fact that

17   the individual is standing upright that is justifying

18   your use of force.  It is other gestures that inmate's

19   taking in connection with standing up.  Is that your

20   testimony?

21        A    Yes.

22        Q    Okay.  When you're going through the 480-

Page 76

1      hour training program, how many scenarios are you run

2      through where you are required to use force as

3      compared to scenarios you're run through where you're

4      required to restrain from using force?

5           A    I'd say they were -- oftentimes, we are

6      trained to not utilize force.  It's more often that we

7      utilize -- that we do not utilize force than we do

8      utilize force.

9           Q    And are you referring to the training

10     context or are you referring to your experience in the

11     field?

12          A    Training and field.

13          Q    Okay.  Speaking just about the training

14     component now, to the extent that we can, I believe

15     you said you were trained to -- it's about even?  Is

16     that correct?  Or --

17          A    No, sir.

18          Q    Okay.  So could you --

19          A    I would say 80/20 -- 85/15.  80 -- 85/15,

20     maybe more.  Even 90/10.  I apologize.  Probably 90

21     percent of the time, we're trained -- it's always try

22     your best to avoid using force if at all possible.

CONFIDENTIAL

1        Q    Okay.  So could we talk about that

2    particular training?  So when you say you're trained

3    to avoid the use of force if at all possible, what are

4    you trained on as possible alternative avenues to the

5    use of force of your canine?

6        A    There are many different possible -- use of

7    verbal and audible commands, warnings.  The use of

8    chemical agents.  After those are all -- after those

9    are all exhausted, then all the -- well, let's see if

10   there's anything else I'm missing.  Verbal audible

11   warnings, OC -- or chemical agent, I apologize.

12       Q    It's okay.

13       A    Other than any physical -- what's the word

14   I'm looking for?  Physical contact of the officers

15   that may very well be in the pod to attempt to get

16   inmates to comply with orders if they're, say,

17   fighting before canine responds.

18       Q    Okay.  And just to confirm.  Are these

19   techniques that are taught to all corrections officers

20   to de-escalate a situation or are these techniques

21   that are taught specifically to canine handlers for

22   canine handlers to use specifically to de-escalate a

CONFIDENTIAL

1      potential canine deployment?

2          A    They're -- as far as the verbal audible

3      warnings, and the deployment of OC, or I'm sorry,

4      chemical agent, those are -- that -- those sort of

5      things are taught to all correctional officers.

6          Q    Understood.  Is there any de-escalation

7      tactics that are taught specifically to canine

8      handlers that canine handlers are supposed to employ

9      before utilizing their canine?

10         A    No, sir.

11         Q    Understood.  Is it correct, then, that prior

12     to the use of force that either yourself or another

13     officer who you've been made aware of has done this,

14     must give a verbal command to stop fighting or to stop

15     engaging in whatever behavior is leading to the

16     response by the officer or yourself?  Is that correct?

17         A    Yes.

18         Q    Okay.  And is it your testimony, then, that

19     if an inmate does not comply with either an individual

20     verbal warning or multiple verbal warnings, that the

21     next level of de-escalation would be to deploy a

22     chemical agent to try to cease the engagement of the

CONFIDENTIAL

Page 79

1    behavior?

2         A    Yes.

3         Q    Understood.  And then if the warnings and

4    the chemical agents fail, then it's your understanding

5    that at that point, if you're a canine officer, it is

6    proper to utilize force up until the point in which

7    you have ceased the continuing threat posed by the

8    individual.  Is that correct?

9         A    Yes.

10        Q    Okay.  And from a training perspective, when

11   you are making your assessment as a canine officer as

12   to whether or not the threat is continuing, do you

13   have a list of things that you're looking for or is a

14   totality of what you're seeing that leads you to

15   determine that a threat has ceased?

16        A    The totality, sir.

17        Q    Okay.  And what are those circumstances in

18   totality that you're looking at and making decisions

19   about?

20        A    With -- that verbal warnings have been given

21   by control room officers, and our officers that have

22   been in the pod.  The chemical agent that has been --

Page 80

1    already been utilized, by policy, only three times.

2    Once all those are exhausted, I have to make -- at

3    what point is it going to -- what -- at what point is

4    it going to stop?  Whatever the situation.

5         Q    Understood.  And other than what you've

6    described already today, are there any criteria that

7    you're trained to look for to help you make an

8    assessment of when the threat has ceased?

9         A    I don't believe I understand your question,

10   sir.

11        Q    Other than what you've already testified to

12   today, are there any criteria that you learned in

13   training that you are supposed to apply when making an

14   assessment as to whether or not an individual is

15   continuing to pose a threat?

16        A    I don't know, sir.

17        Q    When you were being trained on these

18   criteria, were you verbally told what to look for or

19   were you given training materials that listed out, you

20   know, a number of things?

21        A    It -- I would say a mixture of all those

22   things plus experience.

CONFIDENTIAL

Page 81

1          Q    Okay.  So maybe let's focus just on the

2     classroom component of it and then let's focus on the,

3     you know, experience training piece of it.  So on the

4     classroom component, I believe you testified that you

5     received, like, actual, physical training materials

6     that included these kind of lists of things to look

7     for when determining whether or not a threat is

8     continuing.  Is that right?

9          A    I don't recall whether or not we were

10    actually given any particular information on it.  I

11    know that there was a training book that they would

12    give you at the beginning of school.  But I do not --

13    I don't remember whether or not there was anything of

14    that caliber in that training manual, sir.

15         Q    Okay.  After leaving school, have you ever

16    looked at that training book that you were provided?

17         A    No, sir.

18         Q    Okay.  So in the, you know, the experiential

19    side of your training, so the non-classroom component,

20    would you be provided or given training scenarios that

21    required you to exercise judgment and an understanding

22    of the totality of circumstances that would lead you

CONFIDENTIAL

Page 82

1     to cease using force?

2          A     Yes.

3          Q     Can you describe those for me?

4          A     What it is called is institutional

5     environment training.

6          Q     Okay.  Can you describe as much as you can

7     recall sitting here today about that training?

8          A     You -- it's -- all you -- all it it really

9     is they'll run you through a number of different

10    situations where you have to make a decision on

11    whether or not to actually utilize force or whether or

12    not to -- when it's right and when it's wrong.

13         Q     Okay.  Do you recall the specific situations

14    that you had to make a determination on as you sit

15    here today?

16         A     I -- there's dozens, sir.

17         Q     Okay.  Do you recall any of them?

18         A     Are you speaking of those that were taught

19    in the original, 480-hour school?

20         Q     Yes, sir.  Yes.

21         A     No, sir.  I do not recall any of -- of

22    those.  They're -- they're not much different than

CONFIDENTIAL

Page 83

```
 1    those that we do today.  But as far as the specific

 2    goes, I can't speculate on that.

 3         Q    Okay.  Do you recall in the 80-hour class

 4    what the scenarios were?

 5         A    You know, no, sir.

 6         Q    Okay.

 7         A    Not to any specifics.

 8         Q    Okay.  Do you recall as you sit here today

 9    what the scenarios are that you train on today?

10         A    Yes, sir.

11         Q    Okay.  Can you describe those for me?

12         A    Fights, riots, staff assaults, anything that

13    could possibly go wrong inside an institution.

14         Q    Okay.  So what specifically are you trained

15    on for fights?

16         A    Can you --

17         Q    Sure.  Let me take a step back.  I believe

18    you said you're trained on "fights, and riots, and

19    anything that could happen in a correctional setting."

20    Is that correct?

21         A    Yes, sir.

22         Q    Okay.  So what is your definition of a
```

Page 84

1    fight?  And what training do you receive to react to

2    that described scenario?

3        A    Definition of a fight is a physical

4    altercation between two or more individuals.

5        Q    Okay.  Understood.  And what's the training

6    that you received to respond to a physical altercation

7    between two or more individuals?

8        A    It's -- well, the institutional environment

9    trainings.  It's the situational training that we go

10   through during schools and during our in-services.

11       Q    Okay.  Can you specifically describe what

12   that training is?

13       A    Yes, sir.

14       Q    Okay.

15       A    So what we will do as canine officers is

16   simulate a fight with equipment -- with safety

17   equipment, and the canine officer will respond to said

18   incident and decide whether or not force needs to be

19   utilized at that time.

20       Q    Okay.  Do you recall when the officer needs

21   to make a determination as to whether or not force

22   needs to be used, do you recall the specific scenarios

CONFIDENTIAL

Page 85

1        that you recreate with protection?

2            A    Yes, sir.  It's if you continue to be

3        combative, or assault other officers, or you begin to

4        approach other inmates in a threatening -- I

5        apologize.  You begin to approach other inmates or

6        staff in a -- a -- what's the word I'm looking for?  A

7        combative manner.

8            Q    Okay.  And I'm trying to paint a picture

9        here.  So then is what you're saying you go through a

10       training class where you have a canine officer who is

11       roll-playing as a combative inmate.  You have another

12       officer who is roll-playing as another combative

13       inmate, and those two officers in their role plays are

14       simulating a physical altercation.

15                And then you are then, as the canine

16       officer, required to show up and observe that

17       interaction and then you're evaluated based on your

18       performance.  Is that what you're saying?

19           A    Yes, sir.  In a sense.  Yes, sir.

20           Q    Well, help me understand it.  Could you

21       maybe describe it in your words as opposed to mine?

22           A    It's pretty -- you've got it pretty close.

Page 86

```
 1        Yes, sir.

 2             Q    So what do I have wrong?

 3             A    Other than the show up, you respond to those

 4        incidents when called.

 5             Q    Okay.

 6             A    And then once you respond to those

 7        incidents, it's making decisions on whether or not

 8        force must be used if they're continuing combative

 9        behavior or not.

10             Q    Okay.  And during your training, are you

11        told to assume certain facts, you know, for example,

12        are you told to assume a certain fact when you are

13        first, you know, come into and arrive on the scene of

14        the simulated altercation?

15             A    No, sir.  You can't assume much of anything

16        in life.

17             Q    Understood.  Understood.  Is the scenario

18        changed in any way as you're going through it?  As

19        you're training?

20             A    Yes.  It can be.  If the officers decide to

21        change it, they can.  If there's -- it's role-playing.

22        It can go ten different ways.
```

CONFIDENTIAL

Page 87

1      Q    Understood.  And in your experience in the
2  field, is the simulated training that you receive
3  indicative of the interactions that you come across in
4  your patrol?
5      A    A lot of the situations that these officers
6  simulate, they have seen in the past.  So yes.
7      Q    Understood.  So the training that you
8  receive is based at least in part on actual incidents
9  within the VDOC correctional system?
10     A    Yes.
11     Q    Okay.  Is your training exclusively based on
12  instances, as far as you're aware, prior incidents
13  within the VDOC system?
14     A    Not all.  No, sir.
15     Q    Okay.  So you're aware that at least some of
16  the instances are, for lack of a better word, made up?
17     A    Yes, sir.
18     Q    Okay.  Understood.  I believe you said
19  you're specifically trained on riot response.  Is that
20  correct?
21     A    Depending on the situation, but yes, sir.
22     Q    Okay.  Did you specifically go through riot

CONFIDENTIAL

Page 88

1      training?

2            A     I have not yet to the point -- well, yes

3      I -- yes, sir.  I have.

4            Q     Okay.

5            A     I apologize.  Yes, sir.  I have.

6            Q     No problem.  It's okay.  When did you go

7      through riot training?

8            A     During the 480-hour school.

9            Q     Understood.  And is that a training that you

10     go through by yourself or with the canine that you're

11     training with?

12           A     Both myself and the canine that you're

13     training with.

14           Q     Okay.  So then would you have gone through

15     that training with Tessa?

16           A     Yes.

17           Q     Okay.  And when you're going through the

18     riot training, is there a different use of force

19     standard that you are trained on in a riot setting as

20     compared to a fight setting?

21           A     Yes.

22           Q     Could you explain that to me?

CONFIDENTIAL

Page 89

1        A    Strike force and TSU are also involved

2    during riots.

3        Q    Okay.  What was the acronym that you used at

4    the end there?  I apologize.  I'm not familiar with

5    it.

6        A    Strike force and TSU, they are a

7    specifically trained group of corrections officers

8    that the VDOC employs to deal with very large groups

9    of inmates that are assaultive or combative that's in

10   one area -- one particular area, which is a riot -- a

11   prison riot.

12            That's when they -- if something happens,

13   say, a riot does happen, canine, TSU, and strike force

14   will work together to quell the incident.

15       Q    Understood.  Other than strike force, is the

16   unit -- did you say TSU?

17       A    Yes.  Yes, sir.

18       Q    Okay.  What does TSU mean?

19       A    I actually do not know the acronym.

20       Q    That's okay.  But they're another unit

21   within the correctional system that is trained and

22   tasked with quelling certain types of conduct that

CONFIDENTIAL

1    occurs in VDOC, including large prisoner activities?

2         A    Yes.

3         Q    Okay.  As far as you're aware, does VDOC

4    policy define what a riot is?

5         A    Yes, sir.

6         Q    Okay.  And what's your understanding of what

7    the definition of a riot is under VDOC policy?

8         A    I do not know the specifics of what policy

9    says of the riot.  I apologize.

10        Q    That's okay.  Do you have a general sense of

11   kind of what it is?  I mean, for someone who is a --

12   well, you know, is it 50 inmates?  Does that qualify

13   as a riot?  Does it have to be a couple hundred?

14   What --

15        A    It can be any large -- I don't know that

16   there is a particular number that they use.

17        Q    Okay.

18        A    Any -- I would say that any large group of

19   inmates that is being combative to staff and is

20   refusing to, let's say, come off the yard or beginning

21   to destroy the state property, anything of those --

22   something of that nature would be considered a riot, I

CONFIDENTIAL

Page 91

1    would say.

2          Q    Understood.  And how are you made aware that

3    a riot is occurring?  Is there an individual tasked

4    with making the assessment that a riot is starting and

5    then communicating that to other officers?

6          A    I'm not sure, sir.

7          Q    Okay.  So how are you trained during riot

8    training to know when you should be utilizing riot

9    training?

10         A    It's -- personally, I have never been a part

11   of a riot.  That's why I'm having trouble -- that's

12   why I'm having trouble with these questions.  I've

13   never had to have been a part of a riot luckily.

14         Q    Yeah.

15         A    The -- I'll say that the -- who determines

16   whether or not it's a riot, if there's -- I can't say

17   that there is actually a particular person that

18   concludes that there is a riot going on.  I think

19   it -- it's just a general assumption that that is what

20   is happening.

21         Q    Understood.  And just to confirm.  I believe

22   you testified you have never actually experienced a

CONFIDENTIAL

1    riot in your career at VDOC.  Is that correct?

2          A     Not in real life.  No, sir.

3          Q     Understood.  Is -- well, let me take a step

4    back.  So we've been talking primarily about, for the

5    last little bit here, about the 480-hour program that

6    you went through.  With respect to the use of force

7    training and the scenarios that we just kind of spoke

8    about, are there differences between how you are run

9    through those scenarios in the 480-hour program

10   compared to the 80-hour certification you did with

11   Shadow?

12         A     No, sir.

13         Q     Okay.  So is it your testimony that it's the

14   same training that you can -- excuse me.  Let me start

15   over.  Is it your testimony that the 80-hour training

16   is the same scenarios that you go through in the 480-

17   hour training?

18         A     No, sir.  It doesn't necessarily have to be

19   the exact same scenarios.  The scenario changes on --

20   it -- they -- they just -- whatever -- whatever the

21   officer decides at that moment in time is what you'll

22   have to deal with.

CONFIDENTIAL

Page 93

```
 1          Q    Understood.

 2          A    And what you have to think -- make a

 3     decision -- make an informed decision on what's going

 4     on.  What's -- well, what they are doing.

 5          Q    Understood.  So it's your understanding that

 6     the training officers make determinations during the

 7     training as to the scenario that they're going to

 8     present you as the trainee with.  And then they make

 9     an assessment as to your response to whatever

10     situation that they have presented to you?

11          A    Yes.

12          Q    Understood.  And specifically as to your

13     training, I believe you testified -- well, let me take

14     a step back.  Did you specifically have different

15     training scenarios in the 80-hour certification you

16     did with Shadow as compared to the 480-hour training

17     that you had with Tessa and Rojo?

18          A    I apologize.  Can you repeat that last part

19     with the question -- the -- the question, sir?  Can

20     you repeat the question?  I apologize.

21          Q    Did you have the same training scenarios

22     with Shadow as you did with Tessa and Rojo?
```

CONFIDENTIAL

Page 94

1         A    For the most part of the same.  Yes.

2         Q    Okay.  And do you recall what's leading you

3    to say "for the most part"?

4         A    The officers, I mean, as far as role-playing

5    goes, they're never particularly exactly the same.

6    Different officers act different ways or do different

7    things to make you think about what you're doing.

8         Q    Understood.

9         A    I would say the -- the incidents themselves

10   are pretty well the same.  The actions of those

11   playing out those incidents are different.

12        Q    Understood.  So you may have a "fight"

13   scenario that two training officers play out in a

14   different way, but you would just refer to that as a

15   fight scenario training.  Is that what you're saying?

16        A    Yes.  That's -- that is -- I -- that is

17   institutional environment training.  Yes, sir.

18        Q    Understood.  Okay.  Are you trained on

19   performance evaluation reports for canines?

20        A    As officers, we do not -- we do not do the

21   evaluating.  The instructors evaluate.

22        Q    So when you -- okay.  Understood.  When you

CONFIDENTIAL

```
 1     are in the field and you are with Shadow, for example,

 2     are you required to do performance evaluation reports

 3     for Shadow?

 4          A    Yes.  Actually, yeah.  Yeah.  Yes.

 5          Q    Okay.  And what's the frequency by which you

 6     are required to complete those performance evaluation

 7     reports for Shadow?

 8          A    I don't know that I would actually call it

 9     an evaluation report.  It's something that we log on

10     DINGO.  It's a utilization report.  But -- but it --

11     it does include the evaluation of the dog -- of the

12     canine itself.

13          Q    Okay.

14          A    So but it's in a utilization report.

15          Q    Okay.

16          A    We don't actually do an evaluation report

17     itself.  But then DINGO utilizations, there is a part

18     in that DINGO system that allows you to evaluate said

19     canine.

20          Q    Okay.  So I'm going to ask you a couple of

21     questions about that.  But just to put the foundation

22     down, what is DINGO?
```

CONFIDENTIAL

1        A    DINGO is a computer system that the VDOC

2    employs to track canine utilizations, engagements,

3    veterinary visits, medical records.  I believe that's

4    it.

5        Q    Okay.  Has DINGO been in use since you've

6    been a VDOC employee?

7        A    I don't know, sir.

8        Q    Okay.

9        A    It has been employed -- DINGO has been

10   employed since I have been a canine handler.  Before

11   that, I could not say.

12       Q    Understood.  But ever since you've been

13   trained as a canine handler, DINGO has been the system

14   of record that you use to keep records on Shadow or

15   your --

16            MR. DAVIS:  I'm going to object to the

17   form of the question.  You can go ahead and answer.

18            THE WITNESS:  Yes.  Yes.  We also keep

19   paper copies as well, though.  Because as computer

20   systems go, a lot of times computer systems shut down,

21   and we lose everything.  So a lot of times, we will

22   keep paper copies as long as -- as well as the digital

CONFIDENTIAL

Page 97

```
 1    copy.

 2    BY MR. JOHNSON:

 3         Q    Okay.  Are you trained to use DINGO or are

 4    you trained to use paper copies?

 5         A    Both.

 6         Q    Okay.  So your training is to make a record

 7    both in Dingo and then also have physical records as

 8    well?

 9         A    Yes.

10         Q    Understood.  I believe you testified that

11    part of the evaluation that you do is of Shadow.  Is

12    that correct?

13         A    Can you repeat the question, sir?  I

14    apologize?

15         Q    Oh, of course.  I believe you testified that

16    as part of entering information into the DINGO system,

17    and the utilization report I believe is the term that

18    you used, part of that is an evaluation of the canine

19    itself?

20         A    A very small -- yes.  A very small part,

21    yes, sir.

22         Q    Okay.  And are you trained on how to
```

CONFIDENTIAL

Page 98

1    complete that part of DINGO?

2         A    By "evaluation," do you mean health

3    evaluation or performance evaluation, or --

4         Q    Well, let me take a step back.  What is it

5    that you are doing when you are entering in the

6    evaluation of the dog that you were just describing in

7    DINGO?  What is it that you are making an assessment

8    or an evaluation of?

9         A    Health.

10        Q    Is it --

11        A    On our side of it as officers, as canine

12   handlers, we are evaluating health of the canine.

13        Q    Okay.  And what goes into your assessment of

14   the health of the canine?

15        A    As far as DINGO goes?

16        Q    Yes.

17        A    That they are in working condition.

18        Q    Okay.  What does "working condition" mean?

19        A    That they are showing no lameness.  That

20   they are not physically showing any sign of pain.

21        Q    Okay.  As part of your training, are you

22   trained to examine and identify when a dog is feeling

1    lame, or physical pain, or any of the other items

2    you're required to make an assessment on?

3         A    Yes.  And experience helps as well.

4         Q    Okay.  But my question is a little bit more

5    specific.  Are you trained on how to make those

6    assessments?

7         A    Yes.

8         Q    Okay.  What is the training that you receive

9    and when did you receive it?

10        A    During the 480-hour school and as far as

11   what you trained on, just look for limping, anything

12   that you see that -- scratches, lesions, anything that

13   could prevent the canine from working.

14        Q    Understood.  Are there any other criteria

15   that you're trained to look for?

16        A    As far as canine health goes, no.

17        Q    I believe that you testified just a little

18   bit ago that you are required to retain a physical

19   copy of your records as well as entering information

20   into the DINGO system.  Is that correct?

21        A    It's just a safety protocol more or less

22   than it is anything in case we lose anything off the

CONFIDENTIAL

Page 100

1    DINGO because it had deleted some stuff in the past.

2         Q    Understood.  So I'm going to ask you about

3    that in a moment.  I believe you just testified to

4    this.  But there is no difference, then, between the

5    records that are kept in DINGO and the records that

6    you physically keep.  Is that correct?

7         A    The form that DINGO prints out does appear

8    different.  But as far as what is entered into it, the

9    information is the same.

10        Q    Understood.  So just the, you know, eventual

11   output of the same, but the underlying data is

12   identical?

13        A    Yes.

14        Q    Okay.  What did you mean when you said,

15   "Dingo has deleted things before"?

16        A    Crashes.  You'd lose certain particular --

17   you lose utilization, you lose bite reports.  That's

18   why we keep paper copies.

19        Q    Okay.  And is it your testimony that you are

20   aware that DINGO has, in fact, in the past crashed

21   that resulted in a loss of data?  Is that correct?

22        A    I know it happened once, but I cannot recall

Page 101

1      when.

2           Q    Do you recall if that happened while you

3      were a canine officer?

4           A    I had -- I don't recall, sir.  I know that

5      it's happened once that I -- that I know of at some

6      point in time because I think I lost a few things.

7      Luckily, I did have paper copies of those.

8           Q    Well, if you lost records, you would've

9      necessarily had to have been a canine officer.  Is

10     that correct?

11          A    Yeah.  I -- yeah.  I believe I was.  I

12     apologize.

13          Q    That's okay.  So then the incident we're

14     talking about now where the DINGO system lost data

15     would have been sometime between January 1st of 2018

16     and today.  Is that correct?

17          A    Yes, sir.

18          Q    Okay.  When you say you believe you lost a

19     few reports, can you explain that in more detail

20     around what you mean by "lost"?

21          A    Just lost them digitally, sir.  They were

22     deleted from the mainframe.

CONFIDENTIAL

Page 102

1      Q    Understood.  So when you used the word

2  "lost," what you're referring to is the data record

3  that was in the system was completely erased and

4  unrecoverable?

5      A    Digitally.  Yeah.

6      Q    Understood.  And you believe that happened

7  to -- you're aware that that happened to a number of

8  your records.  Is that correct?

9      A    Yes.  A few.  I didn't lost a lot, but I

10  lost -- I had a few things got deleted that I was able

11  to recover from paper copies.

12      Q    Understood.  Are you aware of other officers

13  having their information deleted as well?

14      A    I don't know, sir.

15      Q    So you're not aware of any other employee at

16  VDOC who, at the time that you lost records, lost

17  their DINGO records?

18      A    No.  I don't know, sir.  I apologize.

19      Q    Okay.  What did you do -- strike that.  What

20  did VDOC require you to do after your records in DINGO

21  were deleted?

22      A    We were -- had physical copies.  So it was

CONFIDENTIAL

Page 103

1      not -- it was not an issue.

2           Q    Was the data recreated in DINGO or did you -

3      - let me just stop there.  Was the data recreated in

4      DINGO from the hardcopy records that you had?

5                     MR. DAVIS:  Objection.  Calls for

6      speculation.

7                     THE WITNESS:  I don't recall sir.  I

8      don't recall whether or not they had us -- I believe

9      we just kept the paper copies.  We just kept the hard

10     copies instead of -- because we were at that point was

11     unsure of whether or not it would save them -- that

12     DINGO would save them to begin with because, at that

13     point in time, they would have been working on it.

14     The DOC was.

15                     So I don't think those few documents

16     that we lost were entered into DINGO.  Since we had

17     paper copies at that point, there was no need.

18     BY MR. JOHNSON:

19          Q    Okay.  So it's your understanding that your

20     reports, once they were deleted from DINGO, were never

21     recreated in DINGO.  Is that correct?

22          A    Yes, sir.

Page 104

1        Q    Okay.  The reports that you lost that you're

2    speaking about right now in DINGO, have you gone back

3    to try to find them?

4        A    In DINGO or --

5        Q    Yes, sir.  In DINGO.

6        A    No, sir.  They -- they are not existent in

7    DINGO.  And they weren't incident reports.  They were

8    90 -- I would say all of them were utilization reports

9    from just working inside the institution.  So it's not

10   necessarily something that I had responded to in the

11   past.  It was utilizations from working inside.

12       Q    Understood.  But as you sit here today, you

13   know for a fact that those utilization reports are

14   still unavailable in DINGO.  Is that correct?

15       A    I don't know that.  I don't know, sir.

16   It's -- that was several years ago.  They may have

17   found the -- system manager or someone down the line

18   may have found them and repopulated them into DINGO.

19   That I do not know.

20       Q    Understood.  But as you sit here today, you

21   have no understanding as to what happened to the

22   record -- the utilization reports of yours that were

CONFIDENTIAL

1    deleted in the DINGO system.  Is that correct?

2          A    No, sir.

3          Q    As part of either the -- well, let me break

4    it down.  Sorry.  As part of your 480-hour training,

5    are you trained on how to write an incident report?

6          A    Yes.

7          Q    Can you talk to me about the training you

8    receive on how to write an incident report?

9          A    What we done at that point in time was we

10   performed a mock incident and then wrote a mock

11   incident report reflecting the mock incident from

12   memory as best you could.

13         Q    Okay.  And were you trained on the process?

14   Was part of your training on the process of submitting

15   an incident report?

16         A    No, sir.  As far as submittal goes, at that

17   point in time all we did was write the incident report

18   and were evaluated on said incident report.

19         Q    Okay.  And what are you evaluated on?

20         A    The overall accuracy.

21         Q    Okay.  How are you evaluated on the overall

22   accuracy?

Page 106

 1        A    Overall accuracy of the how -- does it --

 2   does the incident report match what we're seeing

 3   happen as far as the incident itself goes.

 4        Q    Okay.  Are there specific modes or ways of

 5   writing that you are trained to write an incident

 6   report?

 7        A    No, sir.

 8        Q    Okay.  Are you given any instruction on

 9   preferred ways to describe or document an incident?

10        A    As long as it professionally written and

11   that it is grammatically -- everything is

12   grammatically correct within that incident report,

13   that's the only specifics that you really need.

14        Q    Okay.  Are you trained on what a

15   professional report means or looks like?  Or is that

16   left up to, kind of, your judgment?

17        A    It's your judgment.

18        Q    And what are you trained on in terms of

19   after you submit your -- let me strike that.  Sorry.

20   Let me start over.  What is your understanding of once

21   you have submitted your report, the ability for that

22   report to be changed?

CONFIDENTIAL

1      A    The only -- once the report is submitted, it

2    can -- it can be changed.  But once it is -- once the

3    report itself has been approved by a supervisor, then

4    it cannot be changed.

5         If you do a report, you send it to the

6    supervisor, that supervisor sees a grammatical error

7    or something along those lines, he will then send it

8    back to you to fix.  And once it's approved, it cannot

9    be -- once it's approved by the supervisor, it cannot

10   be -- what's the word I'm looking for?  It cannot be

11   changed after that.

12      Q    Okay.  Do you sign your incident reports

13   before you send them to your supervisor for review?

14      A    No.

15      Q    Okay.

16      A    They're --

17      Q    So -- please go ahead.  I apologize.  I'm

18   sorry.

19      A    It's okay.  There is not a -- all the

20   incident reports themselves are done on a system

21   called CORIS.  It's a computer system, so there's

22   no -- it's more of an e-signature than it is -- you

CONFIDENTIAL

1       don't physically sign those papers.

2            Q    Understood.  But you are trained and

3       instructed that you are not to sign off on an incident

4       report until your supervisor has reviewed it.  Is that

5       correct?

6            A    Yes.  There are -- when you -- when you

7       submit the incident report, it is technically already

8       signed by you -- e-signed.  I would say e-signed.

9       If -- as long as the supervisor sees that there's not

10      anything particularly wrong with that incident or with

11      that incident report, then it is approved.

12           Q    Understood.  So just to clarify, you

13      complete an incident report, and you e-sign it.  And

14      then it gets submitted to your supervisor who then

15      performs another level of review.  And if that

16      supervisor has changes to make, they can send it back

17      to you as the officer to have those changes made prior

18      to the report being finalized.  Is that correct?

19           A    Yes.

20           Q    Understood.  Do you have an awareness, other

21      than grammatical issues or spelling issues, of the

22      criteria that a supervisor uses to review an incident

CONFIDENTIAL

1    report from a canine officer?

2          A    I do not know, sir.  I am not or ever have

3    been a supervisor, sir.

4          Q    Understood.  Have you ever had any

5    conversations with any of your fellow canine officers

6    about what your supervisors look for in your incident

7    reports?

8          A    No, sir.

9          Q    Have you ever had a supervisor review your

10   report and request changes?

11         A    Yes.

12         Q    How frequently does your supervisor ask you

13   to make a change in one of your incident reports?

14         A    Not often.

15         Q    Okay.  Do you recall each specific time that

16   it's happened to you in your career at VDOC?

17         A    No, sir.

18         Q    Okay.  Do you think it's happened to you ten

19   times?

20         A    No, sir.

21         Q    Do you think it's happened five times?

22         A    Between five and seven, I would say.  Yes,

CONFIDENTIAL

Page 110

```
 1     sir.
 2          Q    Understood.  And when you have had a
 3     supervisor send back a report to you, what do you
 4     understand caused the supervisor to send the report
 5     back to you?
 6          A    As I said before, grammatical errors.
 7     Misspelled words, commas, periods, just something that
 8     is missing or the overall flow of the report to make
 9     it easier to read.
10          Q    What do you mean by "overall flow of the
11     report to make it easier to read"?
12          A    As far as -- as far as grammatical errors if
13     you have commas or periods in different positions or
14     if you have run-on sentences, something along those
15     lines.  That's about the only thing that are -- that
16     they -- each -- that is changed.
17          Q    Understood.  In your experience, have you
18     ever had a supervisor reorder or reorganize and
19     incident report that you wrote?
20          A    No, sir.
21          Q    Have you ever had a supervisor change any of
22     the words that you used to describe an incident?
```

CONFIDENTIAL

Page 111

1        A    No, sir.

2        Q    Have you ever had a supervisor make changes

3   to your report that you disagreed with?

4        A    That I don't recall.  I don't -- no, sir.

5   No, sir.

6        Q    Okay.  So every time that a supervisor has

7   sent you a report and asked you to make changes,

8   you've agreed with the changes that a supervisor has

9   asked you to make?

10       A    Yes, sir.  Are we speaking directly of while

11   I was in canine or when I was -- I was an officer?

12       Q    Ever.

13       A    Ever?  I think I only ever had an issue once

14   that I can recall, and I don't -- I can't remember the

15   specifics of it, sir.

16       Q    Okay.  And did --

17       A    It was while I was canine.  It was during my

18   time as canine.

19       Q    It was during your time as canine?

20       A    Yes.  I -- I apologize.  It -- I recall one

21   instance where I had a lieutenant actually, a

22   lieutenant changed some words around in my report that

Page 112

1      I did not agree with.  We come to an agreement that it

2      needed to stay the way it was, and it was -- there was

3      nothing as far as out of the way.  It still wasn't

4      particularly, completely, and totally changed.  It was

5      just not my words.

6             Q     Understood.  Was that Lieutenant Woods?

7             A     Lieutenant Woods?

8             Q     Yes.

9             A     Yes, sir.

10            Q     What do you recall about the words that you

11     wanted to use versus the words that Lieutenant Woods

12     wanted to use?

13            A     I can't recall the particular incident as

14     far as the specifics go, sir.

15            Q     Okay.  Do you recall the underlying incident

16     that gave rise to you having to document an incident

17     report?

18            A     I believe there was a group.  As I recall

19     it, there was a group of about 10 to 15 inmates that

20     were refusing to return to their housing assignment.

21     And the officer that was in that pod at that

22     particular time asked for canine assistance as I

1    recall.  The best that -- the best I recall.

2         Q    Okay.  Did Lieutenant Woods have a

3    different, as you sit here today and as you recall

4    today, do you recall having an understanding or

5    thinking that Lieutenant Woods had a different view of

6    this situation than you did?

7         A    I don't know, sir.

8         Q    Okay.  Do you recall Lieutenant Woods's

9    changes to your report as being accurate of the event?

10        A    I can't recall, sir, the specifics.

11        Q    Understood.  Just one more question.  Do you

12   recall why it was that you felt the need to disagree

13   with Lieutenant Woods and how he wanted to

14   characterize the event?

15        A    As I said before, sir, I can't recall the

16   specifics of what the particular issue was.

17        Q    Understood.

18        A    That myself and Lieutenant Woods had at that

19   point in time.

20        Q    Understood.  Do you still work with

21   Lieutenant Woods?

22        A    I believe he is still employed through the

Page 114

1     DOC -- through the -- through the Virginia Department

2     of Corrections, but I -- I do not directly work with

3     Lieutenant Woods.  No, sir.

4          Q    Okay.  Was he your supervisor at the time

5     you had a disagreement about your incident report?

6          A    My direct supervisor, no.  He was at that

7     point the shift commander of, as I recall it, A-Break

8     nights.

9          Q    Okay.  And the incident that we're talking

10    about here, did that occur at Red Onion?

11         A    Yes.

12         Q    Okay.  And other than Lieutenant Woods, have

13    you ever disagreed with a supervisor who was asking

14    you to make a change to your incident report?

15         A    No, sir.

16         Q    Okay.  Are you familiar with Mr. Corey

17    Johnson?

18         A    Yes, sir.

19         Q    How are you familiar with him?

20         A    An incident that he was -- he and I was

21    involved in in May of 2020.

22         Q    Okay.

CONFIDENTIAL

Page 115

1                    MR. JOHNSON:  Tim, I was just going to

2      jump in here really quick.  Now may be a good time to

3      take, maybe, a five-minute break as we might jump into

4      kind of a longer segment.

5                    So I'm happy to kind of keep going or

6      if folks maybe want five minutes or five to ten

7      minutes to take a quick break and then we can jump in.

8      My hope is that maybe -- actually, could we go off the

9      record, Madam Court Reporter?

10                   THE REPORTER:  Sure.  We're off the

11     record at 11:59 a.m.

12                   (Off the record.)

13                   THE REPORTER:  Okay.  We're back on the

14     record at 1:00 p.m.  Go ahead.

15     BY MR. JOHNSON:

16          Q    All right.  Officer McCowan, during our

17     lunch break that we just came back from, did you have

18     any conversations with anyone about your testimony

19     here today?

20          A    No.

21          Q    Okay.  So I believe you said when we

22     started, you had exhibit share loaded on a screen in

1    front of you.  Is that still the case?

2         A    I do.

3         Q    Okay.  Great.  I'd like to run through a few

4    documents with you.  And so just bear with me for just

5    a moment, please, as I have to transfer it out of a

6    private file into the public one.  So I'm going to do

7    that right now.

8                   MR. JOHNSON:  One moment.  Okay.  So

9    Officer McCowan, I am about to show you what's been

10   pre-marked as Defense Exhibit 1.  And give me one

11   moment.  It should now be populated in your marked

12   exhibits folder as Defense Exhibit 1, and it should be

13   a PDF.

14                   (Defense Exhibit 1 was marked for

15                   identification.)

16   BY MR. JOHNSON:

17        Q    Please let me know when you have accessed

18   the PDF that's marked as Defense Exhibit 1.

19        A    It is open.  Yes.

20        Q    Okay.  Great.  Have you ever seen what's

21   been pre-marked as Defense Exhibit 1 before?

22        A    I have.  This is a training transcript.

Page 117

1          Q     And what is it a training transcript of?

2          A     All the training that you've received

3    through the years of employment.

4          Q     Okay.  And is this particular training your,

5    Officer Brian McCowan's, training record?

6          A     It appears to be.  Yes.

7          Q     Okay.  Do you want to take a quick look

8    through the document to just confirm that this is in

9    fact your training record?

10         A     This is mine.

11         Q     Okay.  Are there any trainings that you have

12   taken as a VDOC employee that are not listed here?

13   And please take your time to review.

14         A     No, sir.

15         Q     Thank you.  Now, I believe earlier this

16   morning or earlier today, excuse me, we spoke about a

17   480-hour training class program that you participated

18   in.  And I believe that we also mentioned and spoke

19   about an 80-hour recertification program.

20               Is that correct?

21         A     Yes.

22         Q     Could you please first point me to the

CONFIDENTIAL

1    trainings that are on Defense Exhibit 1 that occurred

2    at the 480-Hour training?  If any.

3         A    Does this Exhibit 1, does this include all

4    of the pages listed or is it just the first page that

5    I'm seeing listed?

6         Q    I believe it's all pages.  There should

7    be --

8         A    All the pages.  It might take me a moment to

9    find it, then.

10        Q    Yes, sir.  I believe the exhibit should have

11   13 PDF pages.  I just want to confirm, does your

12   exhibit begin with -- in the bottom right-hand corner

13   there's what we refer to as a Bates Number that starts

14   with "Johnson" and then it says "582" and then it says

15   "000055."  Do you see that?

16        A    Johnson 582 -- yes.  I do see that.

17        Q    Okay.

18        A    It's almost hidden by these --

19        Q    By the sticker.  Yes, sir.  Is the last page

20   of the PDF in your exhibit Johnson 582 000067?

21        A    Yes.

22        Q    Understood.  So if you could please review

CONFIDENTIAL

Page 119

1    each of the pages and let me know which of the

2    trainings occurred at the 480-hour training.

3         A    I'm actually not seeing -- seeing it on any

4    of these pages.

5         Q    Understood.

6         A    Let me go back through it one more time and

7    make sure I didn't miss it.

8         Q    Okay.

9         A    It should be on here somewhere.  I do not

10   see it on here, sir.  I'm not sure why it's not

11   because it is an academy -- all training has to go

12   through the academy, so it should be on here.  But

13   it -- but it isn't.  I'm not sure why.

14        Q    Understood.  And in your review of what's

15   been marked as Defense Exhibit 1, did you see listing

16   any of the courses that you took when you performed

17   the 80-hour certification with Shadow?

18        A    I found neither.  I will run through it once

19   again.

20        Q    Thank you.

21        A    And make 100 percent sure.

22        Q    Thank you.

Page 120

1        A    As far as I can tell, it is not on the

2    transcript.

3        Q    Do you see on what's been -- excuse me.  On

4    what's been marked as Defense Exhibit 1, do you see

5    any trainings pertaining to canine or canine handling?

6        A    No.

7        Q    Okay.  All right.  And then just one last

8    question before I move away from this document.  Other

9    than the training courses that you underwent as part

10   of becoming a canine handler and your continuing

11   education as a canine handler, are there any other

12   trainings that you have received from VDOC that are

13   not listed in this document?

14       A    Not that I am aware of, sir.

15       Q    Understood.

16       A    I was unaware that the training with the

17   canines was not on here.  That actually surprises me.

18       Q    Understood.  Why does that surprise you?

19       A    It's all logged on this action or -- or this

20   form.

21       Q    As you sit here --

22       A    I'm not -- I'm not 100 percent sure why it's

CONFIDENTIAL

Page 121

1    not here.

2         Q    Understood.  I was just going to ask.  I

3    apologize for jumping in before you were finished

4    there.  I apologize.

5              So as you sit here today, do you have any

6    understanding as to why none of your canine training

7    is reflected in your training records?

8         A    No, sir.

9         Q    You would agree with me that that's what

10   this document reflects?

11        A    It does reflect all training that has been

12   done -- received for the most part.  Since it -- the

13   earliest date I found is since 2014.

14        Q    Understood.  Okay.

15        A    That's unusual.

16        Q    Okay.  So I apologize for the -- one sec.

17   Sorry.  Just give me a second here.  I am now going to

18   show you what's been pre-marked as Defense Exhibit 2.

19   Please let me know once you have opened what's been

20   marked as Defense Exhibit 2.

21                    (Defense Exhibit 2 was marked for

22                     identification.)

Page 122

1        A    All right.

2        Q    It's a bigger PDF, so it is still

3    transmitting on my end, and it may take a moment to

4    download on your end.  Okay.  I believe what's been

5    pre-marked Defense Exhibit 2 should now be in exhibit

6    share.

7        A    I have not received it yet.

8        Q    Okay.

9        A    There it is.

10       Q    Wonderful.  If you could go ahead and open

11   that and let me know once you've opened it.  You may

12   need to change the layout.  I had to -- I had to flip

13   the view, and there's an icon in the bottom.  If you

14   hover on the bottom of PDF, it says "Rotate all

15   pages."  And if you click that icon a couple times, it

16   will rotate the document so that it's in the portrait

17   mode.

18       A    Yes, sir.  I've got it straightened out.

19       Q    Understood.  Thank you so much.  Okay.  So

20   do you now have in front of you what's been pre-marked

21   as Defense Exhibit 2?

22       A    Yes.

CONFIDENTIAL

Page 123

1        Q    Okay.  And to confirm, even though the stamp

2   on this document is in the top right, do you see a

3   similar Bates stamp to what we discussed on the last

4   document?  Whereas this one starts with Johnson 582

5   000522?

6        A    Yes, sir.

7        Q    Okay.  Thank you.  Have you ever seen what's

8   been pre-marked as Defense Exhibit 2 before?

9        A    I have -- I have seen one of these before,

10  but this is an instructor's form not commonly -- not

11  used by a basic patrol handler.

12       Q    Understood.  So this is not a form that you

13  complete?

14       A    No.

15       Q    Okay.  What is your understanding of when a

16  supervisor completes this form?

17       A    I really don't have any understanding on it

18  other than what we're certifying on, the performance

19  measures.

20       Q    Okay.  So --

21       A    As far as the actual layout and things to

22  speculate on on this form, I really couldn't say.

Page 124

1       Q    Okay.  Understood.  So I'd like to point

2    your attention to the first column in the top left

3    about four lines down, it starts with "Class/Subject:

4    Quarterly Evaluations."  Do you see that?

5       A    Is this on the first page?

6       Q    Yeah.

7       A    "Class/Subject:  Quarterly Evaluations."

8    Okay.  Yes, sir.  I have -- I -- yes, sir.

9       Q    Okay.  Is this the quarterly evaluation you

10   spoke about earlier that I believe you testified that

11   you complete as part of DINGO and as part of your

12   evaluation or is this a different quarterly

13   evaluation?

14      A    A quarterly is an evaluation of you and the

15   dog that you do every -- you and the canine that you

16   do every three months.

17      Q    Understood.  So this evaluation report is

18   completed by your supervisor quarterly that evaluates

19   both you and your canine?

20      A    Yes.

21      Q    And this is not a report that you complete

22   in DINGO?  That is a separate function different from

CONFIDENTIAL

Page 125

1    this?

2          A    This is a supervisor "slash" --

3          Q    Okay.  And where it says about two columns

4    over from the "Class/Subject" line we were just

5    looking at, two lines up from there it says, "Handler

6    Name:  McCowan, Brian."  Do you see that?

7          A    Yes, sir.

8          Q    And do you understand that to be yourself?

9          A    Yes.

10         Q    And under "Evaluator," it says, "Jimmy

11   Stanley."  Do you see that?

12         A    Yes, sir.

13         Q    Okay.  And do you understand, is Jimmy

14   Stanley, was he or she your evaluator at the time?

15         A    Yes, sir.

16         Q    Okay.  Under "Canine Evaluation," under

17   "Objective," do you see where it says "Controlled

18   aggression"?

19         A    Under "Objective," yes.  "Controlled

20   Aggression."  That's what it says.

21         Q    Okay.  And then do you see to the right of

22   where it says "Controlled Aggression," there are a

CONFIDENTIAL

Page 126

1     number of measures listed that called "Performance

2     Measures"?

3          A    Yes.

4          Q    Are you familiar in any context with these

5     performance measures?

6          A    In usage, yes.  In -- as far as explanation

7     to verbatim, no sir.

8          Q    Okay.  How are you familiar with them in

9     usage?

10         A    In training.  During training, we use these

11    forms of controlled aggression to certify with.

12         Q    Okay.  Are these performance measures the

13    same measures that you and I were generally discussing

14    that you are evaluated on when you're going through

15    your canine -- either the 480-hour canine training or

16    the 80-hour canine training?

17         A    Yes.

18         Q    Are these the exact same criteria that

19    you're judged on?

20         A    Yes.

21         Q    Is the criteria and manner in which you're

22    evaluated on the performance evaluation report

CONFIDENTIAL

Page 127

1    identical to the criteria and manner in which you're

2    evaluated during training?

3        A    Yes.

4        Q    Understood.  Just a few more questions.

5    Going back to the very, very top of the page above

6    where it says "Quarterly evaluations," do you see

7    where it says "K9 Name:  Shadow"?

8        A    Yes.

9        Q    And you understand that to be the canine

10   that was assigned to you from 2019 through 2021?

11       A    2022.  And yes.

12       Q    Okay.  Yes.  Okay.  Excuse me, yes.  You're

13   right.  Sorry.  Through January of 2022.  Yes.  I

14   apologize.

15           And under "K9 Location," do you see where it

16   says, "Red Onion State Prison"?

17       A    Yes.

18       Q    And you understand that's the same Red Onion

19   State Prison that is the location of where, when you

20   were describing your familiarity with Mr. Corey

21   Johnson, that that's the same facility?

22       A    Yes.

CONFIDENTIAL

Page 128

1      Q    Okay.  Do you have any understanding of over

2   on the right under "Evaluator," where it says, "Jimmy

3   Stanley," it says, "Total Time Used: 3 hours 0

4   minutes"?

5      A    I do not.

6      Q    Okay.  In your experience handling Shadow,

7   did you and Shadow ever fail a quarterly performance

8   evaluation report?

9      A    No.

10      Q    And when we were speaking about your former

11   canine, Tessa, is the performance evaluation report

12   that Tessa failed after biting you this performance

13   evaluation report?

14      A    Yes.  I believe so.  As I've said before,

15   I'm not an instructor.  There may -- there may very

16   well be another one, but I am not aware of it.

17      Q    Understood.  But as you sit here today, your

18   understanding is that Tessa would have been evaluated

19   on a performance evaluation report similar to the one

20   that's been marked as Defense Exhibit 2.  And as a

21   result of that process is why she was unassigned from

22   you.  Is that correct?

CONFIDENTIAL

Page 129

1          A    Yes.

2          Q    Okay.  I think we can close this document.

3     Thank you, Officer McCowan.

4               Okay, Officer McCowan.  I'm going to show

5     you what's been pre-marked as Defense Exhibit 3.  Let

6     me know when you have Defense Exhibit 3 in front of

7     you.  It should be in the exhibit share now.

8                    (Defense Exhibit 3 was marked for

9                    identification.)

10         A    I have it.

11         Q    You got it?  Great.  Have you ever seen

12    what's been pre-marked as Defense Exhibit 3 before?

13         A    Yes.

14         Q    What is it?

15         A    This is a training form that we used to

16    record training times that we would personally -- that

17    we would -- I'm sorry.  We would log training on these

18    forms to keep as well as, I believe at that point,

19    they were logging it.

20              We would not -- we were not at point in time

21    were not personally logging training into DINGO.  We

22    were doing these.

CONFIDENTIAL

Page 130

1        Q     Understood.  So is what's been marked

2     Defense Exhibit 3 an example of a hard copy record

3     that you were required to keep that you were also

4     required to enter into DINGO?

5        A     Yes.

6        Q     Okay.  Do you see how this document also has

7     a Bates number in the top right-hand corner that

8     starts with Johnson 582 000470?

9        A     Yes.

10       Q     Okay.  If you could please scroll to, I

11    believe it's going to be PDF Page 5.  But for

12    identification purposes, the Bates number on the page

13    is Johnson 582 000474.

14       A     Yes, sir.

15       Q     And have you navigated to that -- that page?

16       A     Yes, sir.

17       Q     Okay.  Do you see on the page it says,

18    "Month/Year:  May 2020"?

19       A     Yes.

20       Q     Okay.  And do you see it says "Handler: K9

21    B. McCowan"?

22       A     Yes.

Page 131

1          Q    Okay.  And do you understand that to be

2      yourself?

3          A    Yes.

4          Q    And do you see off to the left, it says

5      "Canine Name: Shadow"?

6          A    Yes.

7          Q    And do you understand that to be your

8      assigned canine as of May 2020, Shadow?

9          A    Yes.

10         Q    Okay.  Do you see at the bottom of the PDF

11     about two lines from the bottom, there is a line that

12     says, under "Monthly Totals," "Total Number of Uses of

13     Force for the Month"?  Do you see that?

14         A    Yes, sir.

15         Q    And do you see a one listed next to it?

16         A    Yes, sir.

17         Q    Do you recall what that was?  That one

18     incident?

19         A    That was Mr. Johnson, sir.

20         Q    Okay.  And do you see right above it, it

21     says, "Total Number of Responses for the Month:  3"?

22         A    Yes, sir.

CONFIDENTIAL

Page 132

1        Q    Can you explain to me, do you have a memory

2   of what those responses were?

3        A    No, sir.

4        Q    Do responses represent instances where you

5   are called to arrive or respond to an event where you

6   determined use of force was not required?

7        A    Yes.

8        Q    Is there any other incidents that can happen

9   that will be reported as a response as compared to a

10  use of force?

11       A    Anytime we are called, it is considered a

12  response.

13       Q    Okay.  What is a utilization?

14       A    Utilizations are a -- a utilization -- let's

15  see.  How am I going to explain this?  Utilizations

16  are a way of keeping track of the time that you are

17  using -- that you are utilizing the dog or the canine

18  inside of an institution.

19            So you see on May the 1st, if you'll come

20  down to "Number of daily Utilizations," you'll see I

21  have three of those.  So that tells me that that day,

22  I had a total of three utilizations.

CONFIDENTIAL

Page 133

1          Whether it was a -- monitoring movements

2     from, let's say, 6:00 a.m. to 12:00 p.m., then I would

3     go on lunch from 12:00 to 1:00, I would then have

4     another utilization from 1:00 to 5:00 and then we

5     would wait.  At count time, which is at 5:00 p.m.,

6     that normally clears -- count clear is normally about

7     6:00.

8          Night shift will then start -- night shift

9     will then begin to pull night recreation there, and

10    then that is another utilization 'cause we monitor

11    that recreation.  So each utilization is a way of

12    explaining what we are doing when we are doing it.

13         Q    Understood.  Is there a difference between

14    utilization and patrol?   Let me ask that in a

15    different way.

16         It sounds like to me, and in a more layman

17    term, a utilization is anytime you are using the dog

18    outside of the kennel.  Is that true?

19         A    Inside of an institution.

20         Q    Yeah.  So while Shadow was at Red Onion,

21    unless Shadow was quite literally in the kennel, every

22    time you took Shadow out, that would qualify as a

Page 134

1      utilization.  Is that correct?

2           A    Yes.  By utilization, you are --

3      utilizations include that you patrol and monitor

4      offender movement.  That is -- the patrol part of it

5      is -- I would explain it as a subsection to -- to a

6      utilization.

7           Q    Okay.  So there's other ways that you can

8      utilize and report a utilization other than going on

9      patrol?

10          A    Yes.  Yes.

11          Q    Okay.  Could you explain those other ways

12     that you could utilize without going on patrol?

13          A    If you were, say, called out -- outside of

14     the institution.  If there was an escape, I'd say that

15     would -- that would probably be determined as a

16     utilization.  But you're still technically on patrol.

17          Q    Understood.  Okay.  If you were going to

18     report -- well, for example let's take Mr. Johnson's

19     incident.  If the only incident you responded to in

20     the month of May was to the incident with Mr. Johnson,

21     would you have reported one utilization and one use of

22     force?

CONFIDENTIAL

Page 135

1          A     I would have reported one response with one

2     use of force.  And those utilizations, we don't

3     necessarily have -- the utilization does not

4     necessarily mean that we responded to an incident.

5     It's that -- that we were inside the institution at

6     that time.

7          Q     I understand.  So if you were just out on

8     patrol, you would mark a utilization.  But if you

9     weren't on patrol and then you got called in to

10    respond, you wouldn't necessarily mark a utilization

11    for when you were called in if you weren't already out

12    on patrol?

13         A     No, sir.  If you were called in from being

14    off, that would be a utilization because you are going

15    from off-duty to on patrol.

16         Q     Understood.  So there is no instance where

17    you would have a use of force or a response but not a

18    utilization?

19         A     No, sir.

20         Q     Understood.  But you could have the inverse

21    where you could have a utilization without a response

22    or a use of force?

CONFIDENTIAL

Page 136

1          A    Yes.

2          Q    Okay.  Thank you.  All right.  I'm going to

3     ask that we keep this document up, but I'm going to

4     introduce another document as well and then we're

5     going to look at them together.  So give me just one

6     moment to do that.

7               Okay.  So Officer McCowan, I have put into

8     the exhibit share what's been pre-marked as Defense

9     Exhibit 4.  And it should be there in the exhibit

10    share for you.  Could you let me know when you access

11    to Exhibit 4?

12                    (Defense Exhibit 4 was marked for

13                    identification.)

14         A    Yes, sir.

15         Q    Okay.  Have you ever seen this document

16    before?

17         A    Yes.

18         Q    What is it?

19         A    It is a Patrol Utilization Summary.

20         Q    And what is a Patrol Utilization Summary?

21         A    It's a summary of the month, what you did in

22    that month while working inside of the institution.

CONFIDENTIAL

Page 137

1       Q    Are you there, Officer McCowan?

2       A    I am.

3       Q    Can you hear me?  Oh, okay.  I think we had

4   a little --

5       A    Issue?

6       Q    Internet issue.  Yeah.  I'm not sure what

7   happened there.  Maybe could we start over, and I'll

8   re-ask my question, and could we re-do the question

9   and answer?

10      A    Yeah.

11      Q    Because I didn't catch any of your response.

12  I apologize.  So I believe the question that was

13  pending before the internet glitch there was:  What is

14  a Patrol Utilization summary?

15      A    A Patrol Utilization Summary is a summary of

16  what you did in that month of -- as you see, it's the

17  number of responses.  You can go down the list here:

18  "Number of responses to staff assaults with

19  engagement, without."  It's just a summary of what

20  happened and what did not happen during that month.

21      Q    Understood.  And is this a form that you

22  complete?

CONFIDENTIAL

Page 138

1          A     Yes.

2          Q     Okay.  And do you complete this and submit

3     it to your supervisor?

4          A     Yes.

5          Q     And is that something you do monthly?

6          A     We -- we no longer use these.  It is tracked

7     through DINGO.

8          Q     Understood.  In May of 2020, would you

9     submit patrol utilization reports monthly?

10         A     Let's see if that was -- at that point in

11    time if we were still doing them, I do not recall

12    right off.  Yes.

13         Q     Okay.  And taking just one step back, is a

14    patrol utilization summary an example of a document

15    that you complete in DINGO now but also keep a hard

16    record of?

17         A     No, sir.  We no longer do the utilization

18    summaries.

19         Q     And do you recall when you stopped doing

20    utilization summaries?

21         A     The last one I have here is May of 2021.

22         Q     Is it your understanding --

CONFIDENTIAL

Page 139

1      A    Why, I do not recall.

2      Q    Understood.  So as you sit here today, is it

3  your understanding that you were no longer required to

4  do patrol utilization summaries starting in May of

5  2021?

6      A    Yes.  As far as I can recall, yes, sir.

7      Q    Okay.  And as you sit here today, you do not

8  have any understanding or knowledge of why you were no

9  longer required to complete a patrol utilization

10  summary as of May 2021?

11      A    No, sir.  I do not have any knowledge of

12  why.

13      Q    Okay.  Could I direct your attention to --

14  excuse me.  It's PDF Page 13 of Defense Exhibit 4.

15  The Bates stamp on that page is Johnson 582 000494.

16  And when you're on that page, just let me know.

17      A    Yes, sir.

18      Q    Okay.  Under "Types of Request," on the

19  fourth line down, do you see the line that says,

20  "Number of responses to offender fights without

21  engagement"?

22      A    Yes, sir.

Page 140

1         Q     And do you see it says five?

2         A     Yes, sir.  And the monthly training log said

3    three.  It must have been a typographical error on my

4    part.

5         Q     So just to be clear, if we flip back to

6    Defense Exhibit 3, under total number of responses for

7    the month, as we previously talked about it says

8    three.  But on Defense Exhibit 4 when you look at

9    "Number of Responses to Offender Fights without

10   Engagement," it says five?

11        A     Yes, sir.  It must have been a typographical

12   error on my part.

13        Q     Okay.  And as you sit here today, is that

14   your best recollection as to what happened or do you

15   know for a fact that you made a typographical error?

16        A     I know for a fact that I would have made a

17   typographical after -- after seeing this.  Yes.  I

18   made a typographical error.

19        Q     Understood.  But this line, "Number of

20   Responses to Offender Fights without Engagement"

21   should correspond to the Patrol Canine Training and

22   Utilization time record.  Correct?

CONFIDENTIAL

Page 141

1          A      Yes.

2          Q      There is no practical reason why these

3    reports should be different absent a mistake or

4    something else?

5          A      No, sir.   This was my mistake.

6          Q      Understood.   And then just to confirm on

7    Defense Exhibit 4, the "Number of Responses to

8    Offender Fights with Engagement," there is a one

9    listed.   That is the incident with Mr. Johnson.   Is

10   that correct?

11         A      Yes.

12         Q      Okay.  Understood.  Okay.  I apologize.

13   It's a little bit slow getting uploaded here but now

14   you should see what's been pre-marked as Defense

15   Exhibit 5.   Let me know when you have that.

16                     (Defense Exhibit 5 was marked for

17                      identification.)

18         A      Yes, sir.   I have it up.

19         Q      Okay.  Have you ever seen what's been pre-

20   marked as Defense Exhibit 5 before?

21         A      No, sir.

22         Q      Okay.  Do you see at the top of what's been

CONFIDENTIAL

Page 142

1    marked as Defense Exhibit 5, it says, "Basic Patrol

2    Canine Class Spring 2018"?

3         A    Yes.

4         Q    Okay.  And then do you see --

5         A    That --

6         Q    Sorry.  I apologize.  Please go on.

7         A    That's not me.

8         Q    Okay.  What do you mean by that's not you?

9         A    The McCowan that is listed, WRSP, that is

10   not me.

11        Q    Okay.  Who is that?

12        A    It is another officer from Wallens Ridge

13   State Prison who went to a canine school at -- in

14   February of 2018.

15        Q    Okay.  Do you know what that Officer

16   McCowan's first name is?

17        A    I do not, sir.

18        Q    Okay.

19        A    Logan maybe?

20        Q    Okay.

21        A    I believe.

22        Q    Okay.  Thank you.  I know this Spring 2018

CONFIDENTIAL

1    version was not what you attended.  Is this the same

2    program, though, that you would have attended?

3         A    It is the similar program.  Yes.

4         Q    Okay.  And now you should see what's been

5    pre-marked as Defense Exhibit 6.  It just went

6    through, so it should be there now.

7                   (Defense Exhibit 6 was marked for

8                   identification.)

9         A    Yes.

10   BY MR. JOHNSON:

11        Q    Okay.  Have you ever seen what's been marked

12   as Defense Exhibit 6 before?

13        A    No.

14        Q    Okay.  When you went through the canine

15   patrol training program in -- or excuse me.  Strike

16   that.  When you went through the canine patrol

17   training program, did you receive a summary of the

18   program similar or the same to what's been marked as

19   Defense Exhibit 6?

20        A    I do not recall whether or not I received

21   anything like this.

22        Q    Okay.  Do you recall receiving operating

CONFIDENTIAL

1      procedure 435.3?

2           A    Yes.  That's --

3           Q    Do you recall receiving -- oh, excuse me.

4      Go ahead.

5           A    I apologize.  It's not for -- the Operating

6      Procedure 435.3 was in the training -- was part of the

7      training manual at that point in time.   And to the

8      best of my knowledge, we did receive one of those

9      training manuals.  I apologize.  I had to clarify.

10          Q    I appreciate the clarification.   Thank you.

11     And is that the case for Operating Policy 420.1?

12          A    The Operating Procedure 420.1 is also in

13     that training manual.

14          Q    Understood.  And when you received the

15     Operating Procedure 435.3 and 420.1 in your training

16     binder, did you receive the entire operating procedure

17     or only selected portions of it?

18          A    No.  I don't recall, sir.

19          Q    Okay.  Do you recall, have you ever reviewed

20     the entire operating procedure 435.3 since you've been

21     an employee at VDOC?

22          A    No, sir.

CONFIDENTIAL

1      Q    Have you ever reviewed the entire Operating

2   Policy 420.1 since you've been an employee at VDOC?

3      A    Yes, sir.

4      Q    When was the last time you reviewed

5   Operating Policy 420.1 as an employee of VDOC?

6      A    I do not recall, sir.

7      Q    Do you recall your review having occurred

8   while you were a canine officer or prior to the time

9   you were a canine officer?

10      A    While.

11      Q    Understood.  So is it safe to say that you

12   reviewed Operating Policy 420.1 in its entirety at

13   some point between 2018 and today?

14      A    Yes.

15      Q    When you were going through the patrol

16   canine program, do you recall receiving any training

17   on any legal case law?

18      A    I don't recall, sir.

19      Q    Do you have an understanding as to whether

20   patrol canine officers who are currently training

21   undergo case law training on the use of force?

22      A    I do not know, sir.  I am not an instructor.

Page 146

1       Q     Understood.  But just to confirm, you

2    yourself have never undergone a VDOC-provided training

3    that provided you training on relevant case law as to

4    the use of force in a correctional setting?

5                  MR. DAVIS:  I'll object.  The question

6    mischaracterizes the witness's earlier statement.

7    BY MR. JOHNSON:

8       Q     You can answer.

9       A     Oh, okay.  I apologize.  Can you repeat the

10   question, sir?  I apologize.

11      Q     Okay.  No problem at all.  As an employee of

12   VDOC, have you ever been provided a training from VDOC

13   on the current case law regarding appropriate use of

14   force in a correctional setting?

15      A     Yes, sir.

16      Q     When?

17      A     During -- during correctional officer in-

18   services.  They go over the policy during that time.

19      Q     Do they go over the use of force policy or

20   do they go over case law?

21      A     They will show some examples of case law to

22   the best of my recollection.

CONFIDENTIAL

Page 147

1          Q    So you recall when you were going through

2    your correctional officer training in 2014 being

3    trained on the current case law that existed at that

4    time regarding the use of force in a correctional

5    setting?

6          A    Yes.  And they -- yes.

7          Q    As part of your canine handling training,

8    did you receive any case law training specific to the

9    use of canines in correctional settings?

10         A    Are we speaking of during the 480-hour

11   school?

12         Q    At any time.

13         A    Or at any time?

14         Q    At any time.

15         A    I do not -- I do not recall, sir.

16         Q    Okay.  I think we can put this document

17   away.  Okay.  I'm now moving in what's been pre-marked

18   as Defense Exhibit 7.  And please let me know when you

19   have it.

20                   (Defense Exhibit 7 was marked for

21                   identification.)

22         A    Yes, sir.

Page 148

1      Q    Okay.  Have you ever seen what's been pre-

2   marked as Defense Exhibit 7 before?

3      A    Yes, sir.

4      Q    What is it?

5      A    It's an email that I sent to Sergeant

6   Stanley.

7      Q    Okay.  And when did you email Defense

8   Exhibit 7 to Sergeant Stanley?

9      A    The 31st of May.

10     Q    Okay.  And what were you communicating to

11   Sergeant Stanley in what is marked as Defense Exhibit

12   7?

13     A    It reads that it doesn't look -- that he

14   changed my -- changed my -- I just wanted to let him

15   know that he had changed my report for the second

16   time.  But I -- I state that it does not look he

17   changed the wording at all.

18     Q    Okay.  And earlier today, we spoke about a

19   disagreement you had with a Lieutenant Woods about an

20   incident report while you were a canine officer.  Do

21   you recall that conversation?

22     A    With you?

Page 149

1      Q    Yes, sir.

2      A    Yes.  I do.

3      Q    Is this particular email the incident you're

4   talking about that you disagreed with Lieutenant

5   Woods?

6      A    No, sir.

7      Q    Okay.  Is this a different disagreement?

8      A    This wasn't necessarily a disagreement.

9   This was just me notifying my canine sergeant at that

10  time that he had slightly changed the report, not

11  anything, as it states in the email, as far as wording

12  goes it was exactly the same.  He just spaced it.

13     Q    Understood.  Would you email Sergeant

14  Stanley every time a superior to you changed one of

15  your reports?

16     A    If it was an extreme case, yes.

17     Q    Why was this an extreme case?

18     A    Because this was -- it had not been long

19  since myself and Lieutenant Woods had had the problem

20  to begin with.

21     Q    Okay.  What's the problem that you and

22  Lieutenant Woods had to begin with?

Page 150

1        A    The first report that he changed.  I don't

2    remember the specifics.

3        Q    Okay.  Is this email that's marked as

4    Defense Exhibit 7 the next report that Lieutenant

5    Woods changed of yours after the report that you

6    disagreed on, but you don't remember?

7        A    Yes.  This is the -- this is the second

8    incident that I had.  But like I said before, it was

9    nothing as far as wording goes.  He left all of that

10    alone.  He just spaced everything into paragraphs.  As

11    this email reads, I just wanted to notify Sergeant

12    Stanley that he had tampered with a file of mine.

13        Q    So you were notifying Sergeant Stanley that

14    Lieutenant Woods was tampering with a report of yours?

15        A    Yes.  It says in this email that "he had

16    spaced everything into paragraphs.  It doesn't look

17    like he changed the wording."  That's what I was

18    notifying him of.

19        Q    Understood.  And was there an operational

20    reason why Sergeant Stanley needed to know that the

21    report had been spaced?  Or were you expressing

22    frustration that Lieutenant Woods was altering your

CONFIDENTIAL

Page 151

1      report again?

2           A     I was instructed by Sergeant Stanley that if

3      Lieutenant Woods was to do anything to any of my

4      reports to immediately notify him --

5           Q     And what would --

6           A     -- at that time.

7           Q     Excuse me.  I apologize.  Understood.  And

8      what was your understanding of why Sergeant Stanley

9      was asking you to notify him every time Lieutenant

10     Woods changed anything about your incident reports?

11          A     Why?

12          Q     Yes.

13          A     To avoid any issues, I would assume.

14          Q     Do you know that or are you speculating?

15          A     That's -- I apologize.  That's probably --

16     that's probably speculation.  To be sure, I do not

17     know.  I apologize.

18          Q     That's no problem.  Does Lieutenant Woods

19     have a reputation for falsely changing incident

20     reports?

21          A     I don't know that I would say that it was

22     that he -- that he falsely changed his -- those

Page 152

1    reports.  He -- I don't know to be honest with you,

2    sir.

3         Q    Okay.  Does he have a reputation for

4    altering reports in ways in which line officers

5    disagree?

6         A    I don't -- I don't know, sir.

7         Q    Does he have a reputation -- do you

8    understand that other line officers have had

9    frustration with their reports being changed by

10   Lieutenant Woods, similar to your experience with

11   Lieutenant Woods?

12        A    No, sir.  I do not know.

13        Q    Do you have a memory of how many times after

14   you sent Defense Exhibit 7 Lieutenant Woods attempted

15   to alter your incident reports?

16        A    Can you repeat the question, sir?  I

17   apologize.

18        Q    Okay.  After you sent this email that's been

19   marked as Defense Exhibit 7, do you have an

20   understanding of how many times after this email

21   Lieutenant Woods attempted to change your report and

22   you had to report it to Sergeant Stanley?

CONFIDENTIAL

Page 153

1          A     To my knowledge, this was the last time.

2          Q     And do you have an understanding as to why

3     this was the last time Lieutenant Woods attempted to

4     change your report?

5          A     I do not.

6          Q     Did Lieutenant Woods for any period of time

7     regularly change your reports?

8          A     No, sir.  This is the only two instances

9     that I ever had issues.

10         Q     Okay.  And just to be clear, they're the

11    only two incidents you've had an issue with Lieutenant

12    Woods on.  But as you sit here today, you don't recall

13    what the underlying issue was that you had with how

14    Lieutenant Woods was changing the words you used in

15    your incident report.  Is that correct?

16         A     Yes, sir.

17         Q     Okay.  Do you have an understanding as to,

18    in both the incident that you don't recall and the

19    incidents that's captured in Defense Exhibit 7 as to

20    whether the VDOC approved the incident reports that

21    Lieutenant Woods changed?

22         A     I do not know, sir.

Page 154

1      Q    Do you have any understanding or were you

2  ever made aware that the reports that Lieutenant Woods

3  changed were rejected by VDOC?

4      A    I did not.  No, sir.

5      Q    Did you ever review the reports after

6  Lieutenant Woods changed them to sign off on them?

7      A    The first one, yes.

8      Q    Okay.  And what do you recall about

9  reviewing Lieutenant Woods's changes?

10     A    The only thing that I know, he just -- he

11 changed some wording.  Like I said before, once you --

12 once you submit the report, it has already been e-

13 signed by you.  But any supervisor at that point can

14 change it and therefore approve it.  Now, as far as

15 the changes itself, I do not know.

16     Q    Okay.  You should be able to see what's been

17 marked as Defense Exhibit 8.

18                (Defense Exhibit 8 was marked for

19                identification.)

20     A    Yes, sir.  I have it up.

21     Q    Okay.  Do you recognize what's been marked

22 as Defense Exhibit 8?

CONFIDENTIAL

Page 155

1         A     Yes.

2         Q     Okay.  What is it?

3         A     It's an email that was sent to me from

4    Sergeant Stanley.

5         Q     Okay.  And it was sent to you from Sergeant

6    Stanley on September 28, 2020.  Is that correct?

7         A     It looks to be.  Yeah.

8         Q     Do you have any reason to think that it's

9    not?

10        A     No.

11        Q     And why is Sergeant Stanley emailing you?

12   As you sit here today, what's your understanding of

13   why Sergeant Stanley was emailing you to put this

14   email in your and Shadow's records?

15        A     Recordkeeping.

16        Q     Did Sergeant Stanley ask you to keep records

17   of emails like this after every incident?

18        A     No, sir.  Just the ones that may have -- Mr.

19   Brown -- Mr. D. Brown filed a grievance sometime

20   after, and this is what Thelma Trapp sent to Jimmy

21   Stanley as a -- want -- he wanted me to put it in my

22   records just in case something got lost in translation

CONFIDENTIAL

Page 156

1   and we needed to find this at a different time.

2        Q    Understood.  So it was only select incidents

3   where Sergeant Stanley would reach out and ask you to

4   keep a record or secondary documentation of a

5   particular incident?

6        A    If there was something like this that had

7   come along where he had answered -- let's see.  What

8   exactly is this?  This is a response to a grievance.

9   Yes.  If there was a -- if he made a -- if he had to

10  respond to a grievance, we kept the -- we made a

11  record of those, a personal record of those as well as

12  he kept his.

13       Q    Okay.  And in Mr. Johnson's case, do you

14  recall ever receiving an email from Sergeant Stanley

15  asking you to keep any documentation or records from

16  the incident?

17       A    From the -- over the -- the grievance that

18  he filed to begin with, I believe there was.  Yes.

19       Q    Do you recall about when that was?

20       A    No.  No, sir.

21       Q    Okay.  Thank you.  I think we can put that

22  document away.  I think we're done with that one.

CONFIDENTIAL

Page 157

1          So now Officer McCowan, I'm going to turn to

2     just kind of having more of a conversation with you

3     again.  So right before we broke for lunch, I had

4     asked if you were familiar with Corey Johnson.  Do you

5     recall that?

6          A    Yes.

7          Q    Okay.  And I believe that you testified that

8     you were familiar with Mr. Johnson from an incident

9     that you both were involved in in May of 2020.  Is

10    that correct?

11         A    Yes.

12         Q    And that incident occurred at the Red Onion

13    State Prison.  Is that correct?

14         A    Yes.

15         Q    Okay.  And is it correct that the incident

16    occurred on May 2nd?

17         A    Yes.

18         Q    And just to confirm, is there any materials

19    or references that you have in front of you to help

20    you testify?

21         A    No, sir.

22         Q    Okay.  Thank you.  So on May 2nd, were you

CONFIDENTIAL

Page 158

1    on duty as a patrol canine handler?

2         A    Yes.

3         Q    And were you on duty at Red Onion State

4    Prison?

5         A    Yes.

6         Q    Okay.  Can you, as you sit here today, walk

7    me through everything you remember and recall from how

8    you became aware of Mr. Johnson and through this

9    incident?

10        A    I was unaware of Mr. Johnson up until the

11   point of the incident.

12        Q    Okay.  So what do you recall about May 2nd

13   before you met Mr. Johnson?

14        A    Just a normal working day.

15        Q    Okay.

16        A    Nothing particular that stands out.

17        Q    Okay.  And at some point, you got a call to

18   respond to an event.  Is that correct?

19        A    Yes.

20        Q    Okay.  Starting from when you received the

21   call, can you walk me through as best as you can

22   recall it everything that happened from the moment you

CONFIDENTIAL

Page 159

```
1     were informed that there was an incident that required

2     your response?

3          A    I was monitoring a -- let's see.  May the

4     2nd, 2020, I was monitoring for any movement on Bravo

5     yard.  So I was on the opposite end of where the fight

6     was.  I'm not sure who called the fight.

7               It was either the booth officer or the floor

8     officer, it could have been either one.  They called

9     the fight.  I responded.  Arrived probably within, I

10    would say, 30 seconds of the call within the pod.

11         Q    Okay.  What happened next?

12         A    As I was entering the pod -- let's see.

13    First slider or the second -- I got through the second

14    slider on the inside and witnessed Mr. Johnson and an

15    officer in close proximity with each other, and it

16    appeared as if Johnson was going towards that officer

17    in a threatening manner.

18         Q    Okay.  What else do you recall?

19         A    I then began giving Mr. Johnson warnings --

20    oral orders.  "State canine.  Get on the ground or I

21    will release the dog."  And he received -- not only

22    did he receive those from myself but Canine Officer
```

Page 160

1      Baker as well.  Baker was the first to respond to the

2      incident.

3           Q     Okay.  What happened next?

4           A     After I gave the three warnings to Mr.

5      Johnson, he refused to comply with those orders and

6      began to run towards another group of inmates that was

7      on the -- let's see.  Close to the cells.

8                 Let's see.  It was in A1, so it would have

9      been the inmates were laying scattered around the --

10     around the -- where the cells are located.  And he was

11     running towards those -- in the -- towards those other

12     individuals.

13                At that point in time, I deployed canine

14     Shadow striking Mr. Johnson on the right upper-wrist

15     area right above the wrist.  Let's see.  I then gave

16     Mr. Johnson several consecutive -- several consecutive

17     orders to stop fighting the dog and to let me see

18     his -- and to show me his left hand.

19                After a few -- after a few -- a few moments

20     to try to get him to comply, I then bent down to see

21     if I could -- he -- he wouldn't -- unfortunately, he

22     never would show me his left hand.  So I bent down to

Page 161

```
 1    see if I could physically see anything in his left

 2    hand.

 3           At that point in time, I did not.  I then

 4    verbally gave canine Shadow the command to disengage,

 5    and he did so.

 6       Q    Is there anything else that you recall?

 7       A    Let's see.  I then provided additional

 8    security in the pod while Mr. Johnson was taken to

 9    medical, and all other inmates that were in that pod

10    were frisk search -- frisk searched, and they returned

11    to their housing assignment.

12           Not only -- I'm sorry.  Not only did Mr.

13    Johnson go to medical but so did the individual he was

14    in the altercation with.

15       Q    Okay.  Is there anything else you recall?

16       A    Let's see.  I believe there was a question

17    about me patting the dog in one of his grievances.  I

18    do recollect -- I do recall patting the dog.  And why

19    that was -- it was to reinforce the verbal call off --

20    or I'm sorry.  The verbal disengagement.

21           That's -- as of right now, that's all I

22    recall.  If I can add anything to that I will as you
```

CONFIDENTIAL

Page 162

1      ask questions.

2           Q    Okay.  There should be in the exhibit share

3      what's been pre-marked as Defense Exhibit 9, and it's

4      going to be a video that's been produced to us in this

5      litigation.  So you're going to need to hit the

6      button.  And so when you have it up on your screen,

7      please let me know.

8                     (Defense Exhibit 9 was marked for

9                     identification.)

10          A    I have it playing.

11          Q    Okay.  So hit pause, and I just want to

12     confirm.  So what's been marked as Defense Exhibit 9

13     is a video with the File Name that begins

14     200502181502_R0SP113HUA100CENTER_(1)_1.wmv.  Is that

15     the file name that you see as well?

16          A    Yes, sir.

17          Q    Okay.  Great.  And have you ever seen this

18     particular video before?

19          A    Yes.

20          Q    What do you recognize this video as?

21          A    It -- I don't --

22          Q    Let me rephrase.  What is Defense Exhibit 9?

Page 163

1        A     This is a video of the incident with Mr.

2   Johnson.

3        Q     Thank you.  And is this a video of -- let me

4   strike that.  What is this area where the inmates are

5   currently called?

6        A     This is Alpha 1 pod.

7        Q     Okay.  So this video starts with a view of

8   Alpha 1 pod from the --

9        A     The center of the pod.

10       Q     The center of the pod.  Thank you.

11       A     Yeah.

12       Q     And if we look in the video before we play

13  it, there looks to be a cluster of inmates, some

14  wearing maroon shirts, some wearing white shirts, that

15  look to be on the top of the video against a wall of

16  what appear to be pay telephones?  Is that --

17       A     They're -- they are phones, yes.  But they

18  are not pay phones.

19       Q     They're not pay phones, they're just regular

20  telephones?

21       A     Yes.

22       Q     Okay.  And so it's correct to say that these

CONFIDENTIAL

1    individuals in the top of the video are lined up to

2    use the telephone.  Is that correct?

3        A    The telephone and the J Pay machine, which

4    is something that they download music on.

5        Q    Oh.  Understood.  Yep.  Okay.  So I'd like

6    to start if we could and play -- oh, go ahead.

7        A    Before we start the video, can we take a

8    break, please?

9        Q    Sure.  Yeah.  How long would you like?

10       A    Five, ten minutes.  Just a bathroom break.

11       Q    Oh, sure.  Should we reconvene at, do you

12   want to just say 2:30?

13       A    2:30 sounds great.

14               MR. JOHNSON:  Okay.  Thank you.  We'll

15   reconvene at 2:30.  Let's go off the record.

16               THE REPORTER:  Okay.  Off record at

17   2:18 p.m.

18               (Off the record.)

19               THE REPORTER:  Okay.  We're back on the

20   record at 2:35 p.m.  Go ahead.

21               MR. JOHNSON:  Okay.  Thank you.

22   //

Page 165

1    BY MR. JOHNSON:

2         Q    Okay.  Officer McCowan, so just before we

3    took a quick break, we were just starting to talk

4    about -- or you had just kind of given us what you

5    recall about the incident on May 2nd with Mr. Johnson.

6    And so I'd like to pick up there and ask you a couple

7    questions and then we'll take a look at the video that

8    we have pulled up, which is Defense Exhibit 9.

9              So I believe you testified earlier that you

10   were the second canine officer to respond to the

11   incident with Mr. Johnson and that Canine Officer

12   Baker was the first canine officer to respond on May

13   2nd to the incident with Mr. Johnson.  Is that

14   correct?

15        A    Yes.

16        Q    Okay.  When you came into Alpha Pod A1, what

17   was the first thing that you saw?

18        A    Mr. Johnson approaching the officer who had

19   gotten involved --

20        Q    And is that Officer --

21        A    -- in that altercation.

22        Q    In the altercation.  Okay.  Is that Officer

Page 166

1      Mullins or is that Officer Baker?

2           A     Mull.

3           Q     Officer Mullins?

4           A     Yes, sir.

5           Q     Okay.  So upon entering the A1 alpha pod,

6      the very first thing that you saw was Mr. Johnson

7      approaching Officer Mullins.  Is that correct?

8           A     That's best recollection.  Yes, sir.

9           Q     Okay.  And I believe you also testified that

10     you know, or you heard, that Officer Baker also gave

11     an order to Mr. Johnson that he had not complied with.

12     Is that correct?

13          A     Both inmates that were involved in that

14     altercation, but Canine Officer Baker gave the same

15     warnings that I did.

16          Q     Understood.  Did you hear Officer Baker give

17     Mr. Johnson the verbal warnings?

18          A     No, sir.  No.  I was not in the pod at that

19     time.

20          Q     So how did you know when you came into the

21     pod that verbal warnings had been given to Mr. Johnson

22     by Officer Baker?

CONFIDENTIAL

1          A     It's a requirement.

2          Q     Can you explain that?

3          A     It's a requirement that we give verbal

4     warnings.

5          Q     Okay.  Is it also a requirement in your de-

6     escalation practices to give a verbal warning before

7     you escalate to the next level of force?

8          A     Yes.

9          Q     And if you are unaware that a verbal warning

10    has in fact been given, how can you escalate or not?

11         A     That's why as I entered the pod, I gave

12    those same warnings.

13         Q     Okay.  Could you clarify that?  I may have

14    misunderstood your testimony earlier.  I thought you

15    testified that part of your decision to use force

16    against Mr. Johnson was that Mr. Johnson did not

17    comply with an order that Officer Baker had given him

18    and that you had an understanding of that when you

19    used force.

20               Is that correct?

21         A     In part.  I believe that this was

22    misunderstood.  As mister -- Officer Baker enters, he

1    gives the same warnings I do, our orders of "State

2    canine, stop fighting" or whatever at that time is

3    going on whether it be "stop fighting, get on the

4    ground," whatever the case may be.

5              Officer Baker enters the pod, gave his

6    warnings and even though -- because those warnings

7    have already been given, the moment I enter any pod in

8    any given situation, I still give those same warnings.

9    The officer in the pod gave those warnings.

10             The control booth -- the control -- the

11   control room officer that was firing the 40-millimeter

12   OC round -- I'm sorry -- that was firing the 40

13   millimeter gave the same -- gave similar warnings as

14   well.  It is a requirement.

15        Q    Understood.  But you did not know as a

16   matter of fact?

17        A    No, sir.  I was not there.

18        Q    Understood.

19        A    That's why I -- as -- that's why upon

20   entering, I gave those warnings as well.

21        Q    Understood.  So you were not aware as to

22   whether in fact either Mr. Johnson or the inmate he

Page 169

1   was fighting with had been given any verbal warnings

2   prior to your entering the alpha pod.  Is that

3   correct?

4        A    Yes, sir.  That is correct.

5        Q    Okay.  And did the warnings that other

6   officers may or may not have given, did that form part

7   of your basis to use force against Mr. Johnson?

8        A    No.

9        Q    Okay.  Did the warnings -- well, let me

10  start over.  I understand that it's your testimony

11  that Officer Baker would have given the same verbal

12  warnings that you've been trained to give.  Is that

13  correct?

14       A    Yes.

15       Q    Are the other officers who are in the alpha

16  pod trained to give the exact same warnings as you?

17       A    No.

18       Q    What warnings are they trained to give?

19       A    Instead of stating who they are and what --

20  instead of -- instead of saying, "State canine, get on

21  the ground or I'll release the dog," they just

22  wouldn't have said, "State canine" or "I'll release

Page 170

1    the dog."

2          They would have said, "Stop fighting.  Get

3    on the ground.  Stop fighting.  Get on the ground."

4    Something along those lines.

5          Q    Understood.  When you first gave your first

6    warning to Mr. Johnson, can you describe for me where

7    he was in the A1 pod?

8          A    As I was -- I gave my first warning as I was

9    breaching the threshold of the Alpha 1 slider.  As I

10   was looking for where the incident was, I seen what

11   was happening.  Mr. Johnson was approaching that

12   officer.  I then began -- started giving warnings

13   right then as I was coming through that threshold of

14   the door.

15         Q    Okay.  So you were giving him a verbal

16   warning to stop fighting.  You started giving that

17   warning before you crossed the threshold into the pod,

18   and you were giving it as you were crossing the

19   threshold and coming into the pod.  Is that correct?

20         A    I was giving -- I began giving that order as

21   I was crossing the threshold into the pod.

22         Q    Understood.  And had you made visual contact

CONFIDENTIAL

Page 171

1      with Mr. Johnson before you gave the order?

2           A    Can you repeat the question, sir?  I

3      apologize.

4           Q    Sure.  Had you actually seen with your own

5      eyes what was going on in the A1 pod before you gave

6      the order?

7           A    Yes.

8           Q    Okay.  So you had seen Mr. Johnson engaged

9      in a physical altercation with your own eyes prior to

10     issuing the warning?

11          A    No, sir.  I seen him approaching that

12     officer in a threatening manner.

13          Q    Okay.  Let me take a step back.  Before you

14     enter the pod, are you able to see into the pod?

15          A    No, sir.  I have no knowledge of what is

16     going on unless what is called over the radio.

17          Q    Okay.  So then before you step into the pod,

18     you don't actually know, other than what's been told

19     to you over the radio what's been going on.  Is that

20     correct?

21          A    Yes.

22          Q    So the information that you were reacting to

CONFIDENTIAL

1      to give the verbal command to Mr. Johnson was based on

2      what had been communicated to you over the radio, not

3      based on what you were observing as you entered the

4      pod.  Is that correct?

5          A    No.

6          Q    Okay.  So how did you base the information

7      to give the command on the pod when you could not see

8      the pod?

9          A    I don't understand what you're -- I think

10     we're -- I think we're having a miscommunication, sir.

11         Q    Okay.

12         A    We respond.  We're told that there is a

13     fight and where it's at.

14         Q    I understand.

15         A    I come respond to the pod.  I see that what

16     is happening isn't over and that Mr. Johnson is

17     approaching the officer in a threatening manner.  I

18     then begin giving warnings as I see what is going on.

19              I see what is going on -- what is happening

20     with Mr. Johnson and that particular officer as I come

21     through the threshold of that door.  Once I get --

22     once -- as I am going, I immediately start giving

CONFIDENTIAL

1     warnings as I see what is going on.

2          Q    I understand.  So is it contemporaneous,

3     then, that you approach the threshold of the pod,

4     observe Officer Mullins in close proximity to Mr.

5     Johnson, and then issue a verbal command.  Is that

6     your testimony?

7          A    Yes.

8          Q    Okay.  So your testimony is not that as you

9     were crossing the threshold and prior to that you

10    issued the command.  It was once you were in the pod,

11    you contemporaneously understand what's happening, and

12    you issue an order at that time.  Is that correct?

13         A    You -- I'm sorry.  Somebody was at the door.

14    Can you repeat that, please?  That was -- somebody

15    took my attention from me.  I apologize.

16         Q    That's okay.  Just to confirm, is there

17    somebody in the room with you?

18         A    No, sir.

19         Q    Okay.  Is there somebody from time to time

20    coming in to give you information?

21         A    No.  Somebody just looked through the

22    window, and I didn't know who it was.  I didn't know

CONFIDENTIAL

Page 174

1     if they were trying to get my attention or not.  I

2     apologize, sir.

3          Q    Understood.  And just to confirm, on the

4     screens in front of you, is it just the Veritext

5     application and the Veritext?  There's no other sorts

6     of documents or anything that you're referencing or

7     looking at from time to time?

8          A    No, sir.

9          Q    Okay.  Thank you.  The virtual environment,

10    it's a little bit hard to tell and then --

11         A    I understand.

12         Q    Yeah.  So thank you, though.  I appreciate

13    that.  And I apologize for having to just verify.

14         A    That's fine.

15         Q    It's a lot easier at times when we're all in

16    the same room and we can all, you know, transparency

17    helps.

18              Okay.  So I believe my understanding of what

19    you've just testified to is that you are called to the

20    Alpha 1 pod to respond to an inmate altercation.  And

21    as you are entering the pod and crossing the threshold

22    into the pod, you see Officer Mullins being approached

Page 175

1    in a threatening manner by Mr. Johnson.

2              At which point, you give Mr. Johnson a

3    verbal command to lie down on the ground or you'll

4    release your canine.  Is that correct?

5         A    Multiple verbal commands.  Yes.

6         Q    Do you recall how many?

7         A    No, sir.  I would say two to three.  Three

8    would be most -- three yeah.

9         Q    Understood.

10        A    Yeah.  We're going with it.  As I recall,

11   three -- there was three verbal warnings that I gave.

12        Q    Okay.  And what do you recall was Mr.

13   Johnson's response, either physical or verbally, to

14   your warnings?

15        A    There was no response.

16        Q    Can you describe what you mean by that a

17   little bit more?

18        A    There was no response as far as there was

19   no -- he physically nor verbally responded to my

20   orders.

21        Q    Understood.  So from your perspective, your

22   orders were just ignored and Mr. Johnson continued to

CONFIDENTIAL

Page 176

1    engage in whatever he was engaging in?

2        A    Yes.

3        Q    Understood.  When you say that you entered

4    the A1 pod and that you observed Mr. Johnson

5    approaching Officer Mullins in a threatening manner,

6    what do you recall about Mr. Johnson that made you

7    believe he was approaching him in a threatening

8    manner?

9        A    Close fisted.

10       Q    Okay.  Anything else?

11       A    Body language was somewhat -- I would say

12   combative or closed in.  It appeared as if that there

13   was a staff assault about to take place at that point

14   in time.

15       Q    Okay.  So I just want to confirm that I

16   understand what you just said.  So you understood that

17   Mr. Johnson had a closed fist and closed-in body

18   language that was suggestive to you based on your

19   training and experience that he was about to engage in

20   a physical altercation with Officer Mullins

21   imminently?

22       A    It -- it appeared that way.  Yes, sir.

CONFIDENTIAL

1          Q    Understood.  Is there anything else besides

2     the closed fist and the turned-in body language of Mr.

3     Johnson that led you to believe that he posed an

4     imminent physical threat to Officer Mullins?

5          A    He was approaching Officer Mullins.  Other

6     than --

7          Q    And when you --

8          A    And other than that no.

9          Q    Other than that, no.  Thank you for

10     clarifying.  And by "approach," what do you mean?  Do

11     you mean walking --

12          A    Walking -- walking towards or they were

13     fairly close, so he was walking towards.

14          Q    So as you were entering the A1 pod, Mr.

15     Johnson would have been walking toward Officer Mullins

16     as you're entering, and that's when you're yelling

17     your commands.  Is that correct?

18          A    Yeah.  And then --

19          Q    Okay.

20          A    Yes.

21          Q    Oh, please.  If there's something, please go

22     ahead.  I didn't mean to.

CONFIDENTIAL

Page 178

1       A    Yes.

2       Q    Okay.  Was there other -- sorry.  Let me

3    strike that.  Let me re-start the question.  Given

4    that Officer Baker had already entered the pod and

5    engaged his canine, is it possible that Mr. Johnson

6    did not hear your commands given the noise from the

7    dog that Officer Baker had engaged?

8       A    No, sir.  When we give commands, we are

9    pretty well screaming them.

10      Q    Okay.  So in your opinion, you know --

11      A    Yes.  In my opinion, he -- there was no

12   reason he did not hear those commands.

13      Q    Understood.  So just to confirm, in your

14   opinion there is no way Mr. Johnson could not have

15   heard your command to cease fighting and lay on the

16   ground?

17      A    Unless he has a disability that I was not

18   aware of.

19      Q    Understood.  And at this point in time,

20   which is after you've given your third verbal command,

21   had you seen Mr. Johnson possess any weapons?

22      A    Up to that point, no.

CONFIDENTIAL

Page 179

1      Q   Okay.  Did you have any information given to

2  you over the radio that Mr. Johnson had used a weapon

3  to attack the other inmate that he was engaged with?

4      A   No.

5      Q   At the time you gave your last command, I

6  understand that you've testified that you believed

7  Officer Mullins was at imminent risk of harm from Mr.

8  Johnson.  Was there any other inmates or officers who

9  you felt were at imminent risk of harm?

10     A   Yes.  As I was coming through the door, he

11  first approached Officer Mullins in a threatening

12  manner.  I began giving warnings.  He then turned away

13  from Officer Mullins and started running towards

14  another group of inmates that were lying face down

15  near the cells on the -- if we're looking at it from

16  the center view, it would have been on the right-hand

17  side.

18     Q   Okay.  As you sit here today or at the time,

19  did you have an understanding that that group of

20  individuals that you believe Mr. Johnson was running

21  towards, did you believe they were in danger from Mr.

22  Johnson?

CONFIDENTIAL

Page 180

1        A     Yes.

2        Q     And why did you believe that?

3        A     He was running towards then with closed

4    fists, closed-in body language, looked as if he was

5    ready to fight again.

6        Q     Understood.  But it could have been that he

7    was running away from the other canine that was

8    attacking the individual who he was in a fight with.

9    Correct?

10                  MR. DAVIS:  Objection.  Calls for

11   speculation.

12   BY MR. JOHNSON:

13       Q     You can answer.

14       A     I do not know.

15       Q     Okay.  So after giving your third warning to

16   Mr. Johnson, prior to making a decision to release

17   your canine, did you consider not releasing your

18   canine?

19       A     Yes.  I always consider it.

20       Q     Okay.  And what were the considerations that

21   were going through your mind at that time?

22       A     What was the cost of not using force versus

CONFIDENTIAL

1      the cost of using force.

2          Q    Okay.  And can you talk me through, like, I

3      know it was on the fly, but the calculus you were

4      making at that time specifically that led you to use

5      force in this instance?

6          A    Other inmates laying on the ground.  Mr.

7      Johnson was standing, running, being combative.  If at

8      that point he decided to assault another inmate that

9      was already laying on the ground, he could very easily

10     crush his skull -- crush the other inmate's skull

11     before I could have ever done anything about it, and

12     that would have been something else I would have had

13     to have answered for.

14              Instead of me explaining why I did

15     something, I would be explaining why I didn't do

16     something.

17         Q    Understood.  So after you made the

18     determination that based on what you were observing in

19     the pod after giving your third verbal warning to Mr.

20     Johnson, you decided to release your canine at that

21     time.  Is that correct?

22         A    Yes.

CONFIDENTIAL

Page 182

1      Q    Okay.  So once you made the decision to

2    release your canine, what do you recall happened last?

3      A    Canine Shadow struck -- I'm sorry, engaged

4    inmate -- or Mr. Johnson on the right wrist, right

5    above the right wrist -- right above the wrist,

6    stopping said final actions that I was speaking of

7    earlier.

8      Q    Okay.

9      A    Would you like me to continue to go?

10     Q    Yes, please.  Yes.  Please.

11     A     Mr. Johnson -- I worked my way around at the

12   table -- a way around the table 'cause he -- the way

13   that he landed, he was laying very in close proximity

14   to a table, so I had to work my way around that.

15          I then gave him multiple orders to stop

16   fighting the dog and to show me his left hand.  I'm

17   not sure if he never -- I can't say whether he never

18   heard me or just ignored it.  Said show it so I could

19   see his left hand.

20          I then bent down to see if I could visibly

21   see anything in his left hand.  I did not.  I then

22   verbally disengaged canine Shadow.

CONFIDENTIAL

Page 183

1      Q   Understood.  Okay.  So I'd like to break

2   down before we watch the video a little bit about what

3   you can recall now or just before we watch about the

4   time in which you first deployed Shadow on Mr. Johnson

5   and the time that you call or give Shadow the command

6   to disengage.

7          Do you have a recollection of what happened

8   after what happened or where Shadow first engaged with

9   Mr. Johnson?

10      A   There was only one engagement.

11      Q   Okay.  Can you describe it for me?

12      A   It was on the upper -- I'm sorry, lower

13   right arm upper -- right above the wrist.

14      Q   Okay.  And what do you recall happening

15   after Shadow engaged Mr. Johnson on the lower-right

16   arm?

17      A    Mr. Johnson complied with orders to get on

18   the ground.  I then worked my way around to take the

19   dog off at that point and see that he is hiding his

20   left hand from me.  I then tell him to stop fighting

21   the dog and to show me his left hand multiple times,

22   and he refused to do so.

CONFIDENTIAL

Page 184

1              And that's when I physically looked under

2      him to see if I could see a weapon or anything that he

3      could use to harm me or any other individual in the

4      pod.  And then I verbally disengaged Canine Shadow.

5         Q    Understood.  So from your perspective, Mr.

6      Johnson had not complied with your orders until he was

7      on the ground and you were able to look under him to

8      verify that there was no weapon on his person or in

9      his left hand.  Is that correct?

10        A    He never complied completely.  I took it on

11     good faith that there was nothing in his left hand at

12     that point.

13        Q    Okay.  Are you trained that you are able to

14     make subjective determinations about when an inmate is

15     complying with an order for purposes of disengaging

16     use of force?

17        A    I'm sorry.  Can you repeat the question,

18     sir?

19        Q    Sure.

20        A    I don't believe I understand what you're

21     asking.

22        Q    Sure.  In your training, are you permitted

Page 185

1    pretty wide latitude to make a judgment call as to

2    when or what qualifies as complying with an order that

3    you get?

4         A     Policy sets the standards and then we decide

5    at what point that policy doesn't necessarily work in

6    real life because as policy states -- so to gain

7    compliance, you see that you're supposed to have your

8    legs crossed, both hands out, complying with all

9    orders.

10              I subjectively made the decision to take --

11   to disengage canine Shadow to prevent any further

12   damage to Mr. Johnson even though he would not show me

13   his left hand.  He was not in 100 percent compliance,

14   I disengaged canine Shadow regardless because I did

15   not want to cause any undue damage.

16        Q     Understood.  So to just confirm, in terms of

17   policy, Mr. Johnson never complied with your order.

18   Notwithstanding, you still called off your canine in

19   this particular instance?

20        A     Yes.

21        Q     And the reason that you called off your

22   canine when you did was because you did not want to

Page 186

1    cause any further injury to Mr. Johnson beyond what

2    had already -- what he had already sustained up to

3    that point?

4         A    Yes.  That is correct, sir.

5         Q    Thank you.  And at the outset of today,

6    which I know seems like a long time ago, we were

7    talking about a concept called bite and hold as part

8    of your training.  Do you recall our conversation

9    around that?

10        A    Yes.

11        Q    Okay.  And do you recall testifying that you

12   were familiar with bite and hold within the

13   correctional canine training application, but you were

14   unaware of bark and hold within the correctional

15   canine setting.  Is that correct?

16        A    I am not aware of the bark and hold.

17        Q    Understood.  And when you released your

18   canine on Mr. Johnson, was the canine in bite and hold

19   mode?

20        A    I don't necessarily think I could call it a

21   mode.

22        Q    Okay.  Would technique be a better -- was

Page 187

1      your dog engaged in a bite and hold technique?

2           A    Yeah.  That's probably -- yeah.

3           Q    Understood.  Thank you.  Apology for the

4      terminology.  I --

5           A    That's all right.

6           Q    No tricks, just trying to get it right.

7      Okay.  All right.  Do you still have Defense Exhibit 9

8      pulled up and loaded on your screen?

9           A    Yes.

10          Q    Okay.  So we're not going to watch the

11     entire video, but I'd like for us to play through the

12     beginning of the video up until probably around the 50

13     second mark.  So if you could watch maybe the first

14     minute or so of the video and then let me know once

15     you've watched it and then we'll kind of go back

16     through it, but I'd like you to watch it once first.

17                    (Video played.)

18          A    I'm at 50.

19          Q    Okay.  Let's pause there.  So if you scroll

20     back to the 28 second timestamp and just let me know

21     when you're there.

22          A    You said 28?

Page 188

1          Q     Yes, sir.  28 seconds, yes.

2          A     Yeah.

3          Q     Okay.  So I'll just kind of talk as I play

4     it here on mine.  But if you play it, what it appears

5     in the top-left part of the video, there is an

6     altercation in the area where the phones and J Pay

7     machine are that we were speaking about earlier.

8               And it appears that two inmates are just now

9     at this timestamp engaged in an altercation.  Is that

10    correct?

11         A     Yes.

12         Q     And do you understand that one of these

13    inmates is Mr. Johnson?

14         A     Yes.

15         Q     And this is the altercation that we've been

16    describing that you respond to?  This is the beginning

17    of it.  Is that correct?

18         A     Yes.

19         Q     Okay.  So if we continue to play the video

20    through to the 32-second mark.  Let's get to that

21    point and then pause it.

22         A     There.

CONFIDENTIAL

Page 189

1      Q    Okay.  So it looks like in the middle of the

2    A1 pod here, there are three tables that are aligned

3    on a white line that bisects the room.  And towards

4    the top, there appears to be a correctional officer.

5    Is that correct?

6      A    Yes.

7      Q    And the correctional officer is Officer

8    Mullins.  Is that correct?

9      A    Yes.

10     Q    Okay.  And too, kind of off to the right off

11   Officer Mullins appears to be a door with a window in

12   it.  Is that the A1 pod slider that you were referring

13   to earlier that you came through as the threshold into

14   the A1 pod?

15     A    Yes.

16     Q    Okay.  So if we continue to play the video

17   through to 35 --

18              (Video played.)

19     A    Okay.

20     Q    What we just saw from 30 to 35 is Mr.

21   Johnson engaged on the ground with another inmate in

22   what appears to be a fist fight.  And Officer Mullins,

CONFIDENTIAL

Page 190

1    we don't have audio, but we can see Officer Mullins

2    responding with what appears to be a chemical agent of

3    some sort.

4         A    Yes.

5         Q    Of some sort.  Is that correct?

6         A    Not only -- let's see.  Let me rewind just a

7    buzz.  At -- I'll say, let me show you here.  At 33,

8    you can see a small puff of dust hit right behind

9    those two -- the two that's in an altercation.

10        Q    Oh, yeah.  Yeah.

11        A    Not only were the -- was the officer

12   utilizing OC, but the booth shot an OC powder round as

13   well.

14        Q    Understood.  Thank you.  So the booth OC

15   powder round that was deployed is at the 33 stamp as

16   you were just describing the puff of white that we see

17   on the video?

18        A    Yeah.

19        Q    Understood.  And then subsequent to that

20   beginning around the 34 or 35 mark, we see Officer

21   Mullins then secondarily coming over to deploy a

22   chemical agent as well?

CONFIDENTIAL

1      A    Yes.

2      Q    Understood.  And then if we let the video go

3   a little bit longer to about 40 -- one moment here.

4      A    Forty?

5      Q    Excuse me.  If you let the video play

6   through to the 55 mark, 55 second.

7            (Video played.)

8      A    There.

9      Q    Okay.  So what we just saw on the video is

10  Mr. Johnson and the other inmate continue to be

11  engaged in a physical altercation in around the same

12  spot in the A1 pod.  Officer Mullins ceased using his

13  chemical agent and backed off about 15 feet away from

14  the altercation.

15           And it appears that every inmate in the pod

16  other than Mr. Johnson and the inmate that he's

17  fighting is on the ground and complying with Officer

18  Mullins's command in the pod and the commands coming

19  from the command booth.  Is that correct?

20     A    Yes.

21     Q    Thank you.  So if you look in behind the

22  slider that we were just talking about a few minutes

CONFIDENTIAL

Page 192

1    ago, you can see what appears to be an officer and a

2    canine come through a secondary -- you know, from a

3    secondary room.  Do you understand that that's Officer

4    Baker?

5         A    Yes.

6         Q    Okay.  So let's continue to play the video

7    from the 55 mark.

8              (Video played.)

9    BY MR. JOHNSON:

10        Q    And if you stop it at the 58 to just

11   confirm, that will be Officer Baker crossing the

12   threshold with his canine into the pod.  Is that

13   correct?

14        A    Yes.

15        Q    So at the time that Officer Baker crosses

16   the threshold into the pod, Officer Mullins is pretty

17   far away from the fight between Mr. Johnson and the

18   other inmate.  It's hard for me to guess, but it looks

19   about 15 to 20 feet.  Is that accurate?

20        A    Yeah.  Yes.  It's fairly accurate.

21        Q    Okay.  And so Officer Baker enters the pod

22   and immediately appears to go straight to the -- the

Page 193

1    altercation.  And we can see that up through timestamp

2    1:02.  And it looks like at timestamp at 1:02 is when

3    Officer Baker and his canine engage.  Is that your

4    understanding?

5         A    Between 1:02 and 1:03, yes.

6         Q    Okay.  So again, I know you're not here,

7    would it be your belief that similar to you at this

8    moment at the 59-mark, Officer Baker is giving verbal

9    commands to "Stop fighting or I'll release my canine"?

10        A    Let's see.  Yes.  Let's -- I -- about 58 --

11   between 58 and 59.

12        Q    Understood.

13        A    Because as --

14        Q    You can sort of see --

15        A    You're coming -- as you're coming -- the

16   location of where they are, as you're coming through

17   that slider, you can actually see what's going on

18   before you cross the threshold.

19        Q    Okay.

20        A    But he -- yes.  He -- yeah.  He was

21   giving -- once he crossed the threshold, he then began

22   giving orders.

CONFIDENTIAL

Page 194

1      Q    Okay.  So then from, you know, around the

2   58-mark, 59-mark as Officer Baker is giving the

3   commands, he is coming in and he is observing that the

4   fight is continuing and that there does not appear to

5   be any response to any verbal commands that are being

6   given based on the fact that the fight is continuing.

7   Is that your understanding?

8      A    Yes, sir.

9      Q    Okay.  And as we continue to play the video

10  at around the 1:02 or 1:03 mark as the fight is

11  continuing, that is when Officer Baker releases his

12  canine on the other inmate that Mr. Johnson is

13  fighting with.  Is that correct?

14     A    Yes, sir.

15     Q    Okay.  Now, if we let the video play through

16  to the 1:08 mark.

17            (Video played.)

18     A    I'm on 1:08.

19     Q    Thank you.  If we look back to where the

20  slider was, the door is open so we can't see the

21  slider, but the threshold is there.  There looks like

22  there is an officer coming from the same location that

CONFIDENTIAL

Page 195

1    Officer Baker had.

2            Do you believe that that is you, Officer

3    McCowan?

4         A    Yes.

5         Q    Okay.  And so when you are coming out -- and

6    what room are you coming out of here in this 1:08

7    timestamp?

8         A    That is the vestibule area.

9         Q    Okay.  Is the vestibule where your canine is

10   kept when you're not on patrol or otherwise using the

11   canine?

12        A    No.

13        Q    Okay.  What's in the vestibule?

14        A    Sergeant's office.

15        Q    Understood.  Why were you in the vestibule

16   at that moment?

17        A    You had to cross -- you -- to get to the

18   front door, you have to cross the vestibule where the

19   sergeant's office is to get into the pod.

20        Q    Understood.  Okay.  So if we play from

21   the -- and sorry.  Just to confirm.  As of this

22   moment, the 1:08 mark, you have been informed that

CONFIDENTIAL

1      there is a fight in the A1 pod that you need to

2      respond to, but you have no other information.  Is

3      that correct?

4            A    Yes.

5            Q    Okay.  So if we play it from the 1:08

6      mark -- I'm sorry.  To just the 1:10 mark.

7                      (Video played.)

8            A    I'm on -- well, I'm on 1:10, 1:11.  Yes.

9            Q    Okay.  If you could go to 1:10 just because

10     it's the frame just before.

11           A    1:10.

12           Q    So this appears to be the frame where you're

13     maybe a step or two before the threshold but certainly

14     before the threshold of the A1 pod.  But as you were

15     just testifying earlier, you appear to be able to see

16     into the pod to an extent from there.  Is that

17     correct?

18           A    Yes.  Yes.

19           Q    It doesn't look to me, given the angle of

20     where you are and where the fight is, that you could

21     necessarily see the altercation, particularly given

22     Officer Baker's back is to you, so it appears he may

Page 197

```
 1    have been blocking any view.  But do you have a

 2    different memory that you were actually able to see

 3    the altercation from your vantage point at the 1:10

 4    mark?

 5          A    Let me play it.

 6          Q    Sure.  Yeah.  Take your time, please.

 7          A    At the 1:10 mark, it's more I see what -- I

 8    see the location.

 9          Q    Understood.

10          A    What -- I don't exactly know what is going

11    on at that point.  When it gets to 1:11, that's when I

12    realize that it looks as if Mr. Johnson is fighting

13    with that officer or appearing to approach in a

14    threatening manner.

15          Q    Okay.  Understood.  And let's maybe break

16    that down.  So you're coming through the door at the

17    1:11 mark, and you're now sufficiently beyond Officer

18    Baker to be able to see over Officer Baker's left

19    side?

20          A    Yes.

21          Q    And you're in the room enough that you're

22    able to see before Officer Mullins what's going on on
```

CONFIDENTIAL

1    the ground to the left of Officer Baker and to the

2    right of Officer Mullins, and you're now able to

3    identify that Mr. Johnson is still, at least at the

4    1:11 mark, appear to be engaged on the ground with

5    another inmate.  Is that correct?

6         A    From this view, that's what it looks like.

7         Q    Okay.  And do you have a different memory of

8    something else happening in reality at this time?

9         A    No, sir.  But it -- it was like -- we're one

10   second, two seconds, it doesn't mean -- in real life,

11   it happens very quickly.

12        Q    Oh, understood Officer McCowan.  And I'm

13   more just trying to go frame-by-frame.

14        A    Yes, sir.

15        Q    But I understand in context --

16        A    It went from he was fighting him to

17   approaching the officer in one second.

18        Q    Yes.  Understood.  So if we play to the

19   next, it's exactly as you described.  We can see.

20   Let's actually start from the 1:08, and we'll play

21   through to the 1:12.

22                  (Video played.)

Page 199

1    BY MR. JOHNSON:

2         Q    So let me know when you're at the 1:12.

3         A    At the 1:12.

4         Q    Thank you.  So this is exactly, I believe,

5    as you were just describing.  So we see it from the

6    1:11, it appears that Mr. Johnson is still on the

7    ground but then, to the 1:12 he pops up.  He stands up

8    and appears to be moving away from Officer Mullins.

9    Is that correct?

10        A    Let me play it again.  Between -- from the

11   time -- oh, hold on.  I accidentally -- hold on.

12   Between 9 and 11, he stands.  So 10, I can't really

13   see very little of what's going on.  By the time it

14   gets to 11, I am then able to see into the pod over

15   Officer Baker's left shoulder.

16             At this point -- from this view, from what I

17   recall, Mr. Johnson has already began to stand and go

18   toward Officer Mullins.  As I was coming through the

19   threshold here, I started giving warnings.  He pushes

20   Officer Mullins out of the way and begins going

21   toward -- well, I -- let's see.

22             Yeah.  We'll stop there right there at 1:11.

Page 200

1          Q    Okay.  So let's go maybe just frame-by-

2      frame.  So at the 1:11, I certainly see Mr. Johnson

3      pop up.  And it's hard to make out, but it looks like

4      when Mr. Johnson pops up, Officer Mullins's right arm

5      comes out.  Do you see that?

6          A    It looks like that on -- it does appear that

7      way on video.  I can't really -- like you said, it's

8      hard to make out.

9          Q    Yes.  It's hard to make out, but it does

10     appear that his right arm is raised from the 1:10 to

11     the 1:11 in what looks to be a straight line across

12     Mr. Johnson's chest.  Is that correct?

13         A    It does look that way.  It might be his left

14     arm.  I -- it's -- like you said, it's hard to -- it's

15     hard to see.  It looks like his right arm is more

16     towards his waist.

17         Q    Understood.  But it looks like an appendage

18     of Officer Mullins is raised and is pressing against

19     or making contact with Mr. Johnson.  Is that correct?

20         A    It does look that way from a camera -- from

21     this camera angle.  Yes, sir.

22         Q    Okay.  Understood.  Thank you.  And if we

Page 201

1    press play from there, it looks like Officer Mullins's

2    arm then drops down, at which point Mr. Johnson

3    stumbles forward a few feet.  And we see that in the

4    1:12.  Is that correct?

5         A    1:13.  Let me try that again.

6         Q    Sorry.  Yeah.

7         A    Yes.  It appears that -- it appears as much.

8    Yes, sir.

9         Q    Okay.  So it would appear, then, that Mr.

10   Johnson's momentum was being held up by Officer

11   Mullins.  At which point, when Officer Mullins moved

12   his arm, Mr. Johnson's momentum carried him forward a

13   few more feet as he stumbled, which is what we see in

14   1:11 and 1:12.  Is that correct?

15        A    I'm not sure, sir.  At that point, the

16   intentions were unclear.  As far as seeing it, it's

17   hard to say.  I'd rather not speculate on what was

18   actually going on.  You see the camera view, you see

19   what appears to be going on.

20             I can't think that I can speculate on what

21   is actually happening.

22        Q    Understood.  But do you disagree that the

Page 202

1    camera video that we just watched shows Mr. Johnson

2    standing up, Officer Mullins raising an arm, and then

3    lowering that arm, and then Mr. Johnson stumbling

4    after that arm is removed?

5        A    Yes.

6        Q    Okay.  Thank you.  So from the 1:12 mark, we

7    see Mr. Johnson stumble.  And at that point, at the

8    end of the 1:12 as it turns to 1:13 begins to turn his

9    body back towards the inmate he was fighting who was

10   on the ground.  Is that correct?

11       A    Turns back toward the inmate?  Yes.  He

12   does.  He was fighting with him --

13       Q    And at this time -- oh, thank you.  Sorry

14   about that.  And at this moment is when we see you,

15   Officer McCowan, and your canine Shadow about maybe

16   eight feet away from Mr. Johnson, and you now have

17   issued your second or --

18       A    I was starting on the second one.  Yes.

19       Q    Starting on the second verbal warning.  Is

20   that correct?

21       A    Yes.

22       Q    Okay.  And at this point, what are you

CONFIDENTIAL

Page 203

1    observing about Mr. Johnson at this point?

2         A    He was -- at this point, he had turned back

3    toward the inmate at this point.  And he was still

4    standing acting as if he was a threat.  As you can see

5    on camera, his hands are balled in a fist-like manner.

6              And at this point, I see that he may very

7    well again become assaultive towards that staff member

8    or the inmate that is complying with orders and lying

9    on the ground.

10        Q    Okay.  And if we click through to just to

11   play to the 1:13 mark.  Let me know when you get

12   there.

13        A    I'm there.

14        Q    So I believe what we saw in the 1:12 to 1:13

15   is that Mr. Johnson completes his body turn back

16   towards the inmate that's on the ground and then

17   proceeds to take at least what I count as two steps

18   back?  Do you agree?

19        A    Yes.  At -- yes.  Yeah.  Yes.

20        Q    And to confirm, this is you, Officer

21   McCowan, now closer to Mr. Johnson after he's taken a

22   few steps back.  And so you've observed Mr. Johnson

CONFIDENTIAL

1     taking two steps back at this point.  Is that correct?

2          A     According to the camera, yes.

3          Q     Okay.  And have you --

4          A     I don't personally recall the details.  The

5     things -- these things happen in a mere matter of

6     seconds.

7          Q     Understood.  So at the 1:13 mark, have you

8     given your third warning yet?

9          A     No.

10         Q     Okay.

11         A     I'd finished my second one.

12         Q     Understood.  So now, if we click through to

13    the 1:14 and then pause on 1:14.

14         A     Yes, sir.

15         Q     Okay.  What appears to happen between 1:13

16    and 1:14 is that you continue to come closer to Mr.

17    Johnson.  Mr. Johnson takes another step back in an

18    apparent attempt to sidestep Shadow going to what

19    appears to be engage him on his right side.  Is that

20    correct?

21                    MR. DAVIS:  Objection to form.  You can

22    answer.

CONFIDENTIAL

Page 205

1              THE WITNESS:  Yes.  It does appear that

2     way.  Yes, sir.

3     BY MR. JOHNSON:

4         Q     So as of the 1:14 mark, had you already

5     deployed Shadow and determined that it was proper to

6     use force against Mr. Johnson?

7         A     Between this deployment and the next, I gave

8     another warning giving him another opportunity to

9     comply with orders and to lay on the ground and stop

10    being a threat.  But what was your question, I'm

11    sorry?

12        Q     That's okay.  Understood.  I appreciate your

13    response.  So it looks like between the 1:13 mark and

14    the 1:14 mark after you've given your second verbal

15    warning that you instruct Shadow to engage Mr.

16    Johnson.

17             And we see that in 1:13 and 1:14 when Shadow

18    goes to engage Mr. Johnson on the right, and he takes

19    another step back in what appears to be a side-

20    stepping maneuver to avoid being bitten by Shadow.  Is

21    that correct

22        A     Yes, sir.

CONFIDENTIAL

Page 206

```
 1          Q    Okay.  And after making the decision to

 2    deploy Shadow and use force, you give Mr. Johnson

 3    another opportunity to comply with the orders, and you

 4    give a third verbal warning to stop or that you will

 5    use force again against Mr. Johnson.  Is that right?

 6          A    Yes, sir.

 7          Q    Okay.  So from the 1:14 mark to just play

 8    through 1:15 please.

 9                    (Video played.)

10          A    I'm there.

11          Q    I believe what we see here is Mr. Johnson

12    continuing to take two more steps back both from

13    Officer Mullins and from yourself.  Is that correct?

14          A    Yes.

15          Q    Okay.  At this point, when Mr. Johnson has

16    taken two steps back and you've given another warning

17    to him to cease engaging, who is in imminent threat of

18    danger at the 1:15 mark?

19          A    Had I not deployed, he could have -- in the

20    direction he was going, those six inmates just above

21    and the two to three that we can see below.

22          Q    Okay.  I believe it would appear to be one
```

CONFIDENTIAL

Page 207

1    inmate to Mr. Johnson's right, although his back to

2    that inmate, about eight or so feet away diagonally to

3    the right from Mr. Johnson.  And then in the bottom-

4    right corner about maybe 25 to 35 feet away, we see

5    other inmates lying on the ground.

6              Are those the inmates you're referring to

7    are in imminent danger from Mr. Johnson at the 1:15

8    mark?

9              MR. DAVIS:  Objection to the form of

10   the question, but Mr. McCowan, you can answer.

11             THE WITNESS:  Yes.

12   BY MR. JOHNSON:

13   Q     And the movements that Mr. Johnson has made

14   up to this point, the 1:15 mark, are these the

15   movements that you were talking about earlier when you

16   were describing Mr. Johnson running toward a group of

17   inmates?  Are the movements that we have seen up

18   through the 1:15 mark those movements?

19   A     As I recall them, yes.

20   Q     Okay.  Are there any other movements up

21   until this point that you recall that we haven't seen

22   on this video that led you to believe that Mr. Johnson

1    was running towards or presenting an imminent risk to

2    other inmates?

3         A    No, sir.

4         Q    And if we could actually -- and I apologize

5    for the bouncing around on the video.  There's not a

6    better way to do this.  If we can start at the 1:13

7    mark and then we're going to play through to the 1:16.

8    Or excuse me, 1:17.

9              (Video played.)

10        A    1:17.

11        Q    Okay.  Excuse me.  Thank you.  So what we

12   see from the 1:14 to 1:17 mark is Mr. Johnson now

13   having taken another few steps away from both you and

14   Officer Mullins.  Is that correct?

15        A    Yes.

16        Q    We also see from the 1:15 to the 1:17 that

17   your canine, Shadow, appears to be barking at Mr.

18   Johnson, and Mr. Johnson continues to back away from

19   canine Shadow.  Is that correct?  Specifically, from

20   1:15 to 1:16?

21        A     It -- he does not appear to be barking.  It

22   looks as if his mouth is closed.

CONFIDENTIAL

Page 209

1      Q    Understood.  Okay.  Thank you.  So at what

2   point between the 1:13 mark and the 1:17 mark did you

3   decide for the second time to deploy Shadow on Mr.

4   Johnson?

5      A    At the one -- between the 1:14 and the 1:15

6   after giving -- after saying -- after giving him my

7   warnings twice.  "State canine.  Get on the ground.

8   I'll release the dog" twice.  He then stepped out of

9   the way of the deployment and at that point in my

10   perception I seen that he was -- was attempting to be

11   a threat to someone else in that immediate area.

12        At that point in time, I did not know who or

13   why.  But at about 1:15, I would say I make that

14   decision.  Well, make that -- I make the decision to

15   use force if the third command was not followed.

16      Q    Understood.  And that's what we see in the

17   1:14 and 1:15 even though we can't hear it because the

18   video is you giving the third command.  But then we

19   obviously, you know, but we can see that, you know,

20   the deployment around the 1:15, 1:16 mark is the third

21   deployment of the canine.  Is that correct?

22      A    More between 15, 16, to 17.

CONFIDENTIAL

Page 210

1          Q    Got it.  Okay.  So what we see in 16 then,

2     what it looks like is Shadow first beginning to engage

3     Mr. Johnson.  Is that correct?  On his right arm?

4          A    Yes.  Yes.

5          Q    Got it.  So at the 1:16, Shadow engages Mr.

6     Johnson on the right arm.  And then if we keep playing

7     through, it looks like at the end of the 1:17, Shadow

8     has continued to engage on the right arm but to pull

9     Mr. Johnson continuously down to the right so he's now

10    hunched over a bit.  Shadow is still engaged.  Is that

11    correct?

12         A    Yes.

13         Q    Okay.  And then from 1:17 to 1:20, Shadow

14    actually drags Mr. Johnson to the ground, and Mr.

15    Johnson by the 1:20 mark is fully on the ground on his

16    stomach is what it appears from the video.  Is that

17    correct?

18                   (Video played.)

19                   MR. DAVIS:  Objection to form.  Go

20    ahead and answer.

21                   THE WITNESS:  Can you repeat the

22    question, please?  I apologize.

CONFIDENTIAL

Page 211

1    BY MR. JOHNSON:

2         Q    Of course.  No problem.  It appears by the

3    1:20 mark that Mr. Johnson is completely on the form

4    on his stomach.  Is that correct?

5         A    Yes.  But where you're -- the -- yes.  He is

6    for the most part on the ground by 1:20.

7         Q    Okay.  And Shadow is still engaged on Mr.

8    Johnson's right arm.  Is that correct?

9         A    Yes.

10        Q    Okay.  And at this time, what are you saying

11   to Mr. Johnson?

12        A    From -- let's see.  From the time the

13   engagement starts, which is about 16.  And he stays on

14   his -- he's on his feet completely until about 1:19.

15   And by 1:20, he is on the ground.

16             "Get on the ground.  Get on the ground and

17   stop fighting the dog.  Get on the ground."

18        Q    All right.  Is this when you're looking for

19   a weapon?

20        A    No.

21        Q    Okay.  Did you believe that Mr. Johnson had

22   a weapon at this point in time?

Page 212

1          A     I was unsure at that point.

2          Q     Okay.  And if we keep watching the video,

3    from 1:20 to about 1:29, Shadow is still engaged on

4    Mr. Johnson.  Is that correct?

5                     (Video played.)

6          A     Yes.

7          Q     Okay.  So then, the engagement with Mr.

8    Johnson, just by looking at the video, appears to

9    start at the 1:16 mark and lasts through the -- it's a

10   little bit hard to tell, but it's at the 1:34 or 1:35

11   mark?  Or is it longer?

12                    (Video played.)

13         A     I'm sorry.  Let's see.  1:40 -- let's see.

14   1:41.  Between 1:41 and 1:42.

15         Q     Understood.  So it starts at the 16 and then

16   goes to the 41, 42?

17         A     Yes.

18         Q     Understood.  Okay.  And so now that we have

19   just the parameter, let's go back to the 1:21, 1:22

20   mark when Mr. Johnson is first brought down to the

21   ground.

22                    So now that Mr. Johnson is on the ground,

Page 213

1    and it appears that Shadow has continued to engage

2    him, what imminent threat are you seeing to continue

3    to use the canine on Mr. Johnson at the 1:21 mark?

4         A    Possibility of a weapon.

5         Q    Okay.  But again, you didn't have any reason

6    to believe he had a weapon?

7         A    No.

8         Q    And playing forward from 1:21 up through

9    1:46, is the reason that you continued to use force

10   against Mr. Johnson because you were unsure of whether

11   he had a weapon?

12        A    Yes.

13        Q    Is there any other reason --

14        A    And that he would not show me his left hand.

15   I apologize for interrupting.

16        Q    Oh, no.  I apologize.  So could you repeat

17   your answer?

18        A    Yes.  I was unsure of whether or not -- the

19   possibility of the weapon was there, and I was

20   attempting to get him to show me his left hand so I

21   could make sure that there was no weapon in his left

22   hand that he had tucked under his chest at that point.

CONFIDENTIAL

Page 214

1      Q    Okay.  Given from where Mr. Johnson is at

2    the 1:21 mark, even if he had a weapon, what's your

3    understanding of how he could have caused imminent

4    harm from the position he was in?

5      A    If I were to disengage, and he had a weapon,

6    I would be stabbed.  I would -- he'd jump up if the

7    dog was not engaged and he had -- and I took him off

8    while he still had a weapon in his possession, I just

9    put every -- myself, canine, and every other

10   individual in that pod back into danger of being

11   stabbed or any sort of homemade weapon that can be

12   made.  Whether it's a soap in a bar sock -- or a bar

13   of soap in a sock or a homemade knife.

14     Q    Understood.  And is that determination that

15   you just described, were you trained to -- let me

16   start over.  Sorry.  Is your understanding that until

17   you can verify somebody doesn't have a weapon that you

18   should treat them as if they do?  For purposes of use

19   of force?

20     A    Can you repeat the question, please?  I

21   apologize.

22     Q    No problem.

CONFIDENTIAL

Page 215

```
 1          A    I don't believe I understood you the first

 2     time around.

 3          Q    That's not a problem.  Let me try to ask it

 4     a clearer way.  Is the justification for the use of

 5     force that an inmate may have a knife or a homemade

 6     weapon --

 7          A    Yeah.

 8          Q    Is that -- is that a reasoning that you are

 9     trained to react with a use of force to if you don't

10     know that an inmate has a knife or a homemade weapon?

11          A    Not necessarily.  We have to go off of what

12     we know as we are entering a pod where there is an

13     altercation that has happened.  And once we respond,

14     we have to add what we know to what we are seeing.

15          Q    Understood.  So what is it that you saw,

16     knowing that Mr. Johnson had fought another inmate,

17     been in close proximity to Officer Mullins, and been

18     next to the individual who Officer Baker deployed his

19     canine on, what did you see that led you to believe

20     that he would pull out a knife on you as compared to

21     earlier in the altercation?

22          A    That he would not show me his left hand.
```

CONFIDENTIAL

Page 216

1       Q   And that's the same left hand that he had

2   balled up in a fist when you entered the pod.  Is that

3   correct?

4       A   He had both of them balled into a fist.

5       Q   Got it.  And because he kept his left hand

6   balled in a fist, you believed that he was in fact

7   carrying a weapon?

8       A   Attempting to hide one, yes.

9       Q   Understood.  Even though he had not used

10   that weapon in the altercation up to that point.

11       A   I was unaware of whether a weapon had or had

12   not been used in that altercation.

13       Q   Understood.  Okay.  So I believe that you

14   said the altercation lasted through the 1:46 mark.  Is

15   that correct?

16       A   1:42.

17       Q   1:42.  Okay.

18       A   1:42 to 1:43, I believe, was the mark that

19   we were looking at.

20       Q   Okay.  So if maybe we could go to the 1:40

21   mark, could you identify for me between, you know,

22   1:40 and 1:45 where the specific timestamp where you

CONFIDENTIAL

1    tell or you give the command to Shadow to disengage?

2         A    About 1:00 -- I would say somewhere around

3    1:40 to 1:41 is where I give him the command.  You can

4    see me bent down there giving the command, and I bent

5    down for -- I -- I bent down earlier to see if I

6    could -- this is where I said I could -- if I could

7    see if there was anything in his hand or in his hands

8    that was balled up in a fist under his chest.

9              I bent down, I couldn't see anything, I

10   then -- I would say around 1:40 and 1:41, I give the

11   verbal command to disengage, and 1:43 he disengages

12   upon his own -- he releases on his own.

13        Q    Okay.  In your training with Shadow, do you

14   recall how long it would take Shadow to disengage in

15   your training after you give a command?

16        A    A couple of seconds.

17        Q    Okay.

18        A    Because it's congruent with what I'm seeing

19   here.

20        Q    Understood.  To say that back or just to

21   confirm, Shadow's release time in response to your

22   command, as we have seen on this video, is consistent

CONFIDENTIAL

Page 218

1    with Shadow's performance in training?

2        A    Yes.

3        Q    Understood.

4        A    Before we finish the video, can we have

5    about a five-minute bathroom break?

6        Q    Oh, of course.

7        A    I need to get another water.

8        Q    Of course.  Is now a good time?

9        A    Now is a perfect time.

10                MR. JOHNSON:  Okay.  Why don't we go

11    off the record, Madam Court Reporter?

12                THE REPORTER:  Okay.  Off record at

13    3:50 p.m.

14                (Off the record.)

15                THE REPORTER:  Okay.  We're back on the

16    record at 4:00 p.m.  Go ahead.

17                MR. JOHNSON:  Thanks.

18    BY MR. JOHNSON:

19        Q    Okay.  And Officer McCowan, now that we're

20    back from a break, just to confirm as we've been doing

21    all along, did you speak with anybody during yo8ur

22    break about your testimony here today?

Page 219

1          A      No, sir.

2          Q      Thank you.  So when we last broke, we were

3    discussing the 1:43 mark and the command that you gave

4    Shadow around that time to disengage.  And I'd like to

5    talk about from the 1:43 forward just those few

6    seconds that happened.  So after the 1:43 mark, can

7    you describe to the 1:46 what's happening?

8                    (Video played.)

9          A      I'm just backing off of the incident.

10         Q      Okay.  And are you saying anything to Mr.

11   Johnson at that time?

12         A      No.

13         Q      Okay.  Is Officer Mullins or who is this

14   other officer who has approached what looks to be to

15   the left or behind Mr. Johnson?

16         A      Might be -- that is Sergeant Massingill.

17         Q      Understood.  And do you recall what Sergeant

18   Massingill was saying to Mr. Johnson as he was

19   approaching?

20         A      No.

21         Q      Okay.  Do you recall if he said anything?

22         A      No, sir.  I -- I don't know.  Pods during

1    incidents like this are very loud.

2          Q    Okay.  And would you say incidents like this

3    are allowed throughout the entirety of the incident?

4          A    Yes.

5          Q    Okay.  And that would include when you first

6    came into the pod when you gave your commands to Mr.

7    Johnson?

8          A    Yes.

9          Q    Understood.  Thank you.  So having watched

10   the video again of this incident, I'd like to just

11   maybe ask just a couple of clarifying questions to

12   make sure that I, like, fully understood your

13   testimony here today.

14              So the first question to just kind of

15   clarify is:  On the first use of force on Mr. Johnson,

16   which --

17         A    There was only one use of force, sir.

18         Q    Understood.  You deployed your canine twice

19   on Mr. Johnson?

20         A    Yes.

21         Q    That's what you testified to earlier.  Is

22   that correct?

CONFIDENTIAL

 1        A    Yes.   Well, that was on -- yes.   The two

 2    deployments, one use of force.

 3        Q    Understood.   Thank you for clarifying.   I

 4    appreciate that.   Thank you.   So on the first

 5    deployment of Shadow at the 1:15 or 1:16 mark, having

 6    seen the video are you able to articulate each

 7    consideration that you have in your mind at that

 8    moment about why it is that force is justified against

 9    Mr. Johnson?

10        A    I don't think I understand the question,

11    sir.

12        Q    Sure.   Having seen the video, does it

13    refresh your recollection at all or make you think of

14    all the reasons that were in your mind as to why you

15    thought the use of force at the 1:15 mark against Mr.

16    Johnson was appropriate?

17        A    Yes.

18        Q    Can you explain those to me?

19        A    After responding, coming into the pod,

20    seeing -- knowing that there is an altercation from

21    the radio call, coming in and seeing Mr. Johnson stand

22    up and walk -- and come towards Officer Mullins

CONFIDENTIAL

Page 222

1  with -- at this time still close-fisted.  He then -- I

2  deployed canine Shadow.

3  Make sure I am getting everything.  Just

4  that.  Yeah.  So where was I?  You were asking me what

5  the reason I deployed to begin with was?

6  Q   Yes, sir.  So I can repeat the question too,

7  if that would help.

8  A   Please.  Please.  I am -- I am lost at the

9  moment.

10  Q   No problem.  It's been a long day, and I

11  understand.  So it's better that we have it clean, so

12  I appreciate the opportunity to re-ask the question.

13  At the 1:15 mark of the video, and having

14  seen the entire video again of the incident, can you

15  tell me everything that's in your mind regarding why

16  you think it is appropriate to use force against Mr.

17  Johnson?

18  A   Oh, okay.  I understand now.  As I -- this

19  is like I testified before.  I had to measure -- at

20  that point, I was measuring what would have been

21  worse?  The use of force or the non-use of force?

22  What happens if I don't use that force to stop the

Page 223

1    situation at hand versus what happens if I don't?

2            That is what I am calculating, basically the

3    entire time.  As -- as I'm seeing what's going on as

4    it's happening within those few seconds, I have to

5    measure which one could potentially be worse, the use

6    of or the non-use of force, the potential of what

7    could happen.

8        Q    Is there anything else that you were

9    thinking about or specifically considering to help you

10   make that determination?

11       A    No, sir.

12       Q    And just to be clear, when you say "the use

13   of force or non-use of force," you're referring to the

14   use of force of a canine or the non-use of force of a

15   canine.  Is that correct?

16       A    Yes.

17       Q    Thank you.  And --

18       A    It's really use of force in general.

19       Q    Understood.  But as applied to --

20       A    Applied to this, canine.  Yes.

21       Q    Understood.  And is there a difference in

22   your mind between how you would use a different force

CONFIDENTIAL

Page 224

1     modality than a canine as compared to if the canine

2     was the modality in which you used force?

3          A    No.

4          Q    Okay.  So you would deploy force in the form

5     of a canine in the same way and under the same

6     considerations that you would deploy force for any

7     other type of force that you use?

8          A    Yes.  If you wanted to roll the counter

9     back, you see Officer Mullins deploy OC as an attempt

10    to get those offenders to -- to stop fighting.  He at

11    this point measures the cost of doing something rather

12    than not doing something.

13          He decides to do something in attempt to

14    stop and cause less -- let's see.  Let me rephrase

15    that.  Let me start over.  He measures the cost of

16    doing something versus the cost of not.

17          At that point -- at that point, he deploys

18    OC, and it is ineffective.  It's not much different in

19    any form of use of force, whether it be verbal, with

20    chemical agents, non-lethal or lethal.

21          Q    Okay.  As of the 1:15 mark on the video,

22    were there any other considerations that you were

Page 225

1    thinking about in helping you determine whether or not

2    you were going to use force or whether or not you were

3    not going to use force?

4         A    No.  That was -- that is the main -- main

5    reason.

6         Q    Is it -- and I apologize for being pedantic.

7    I'm not trying to be difficult.  But is it the main

8    reason, meaning there are other reasons, or is it the

9    reason?

10        A    It is the reason.

11        Q    Okay.  So there's no other reasons?

12        A    No, sir.

13        Q    Thank you.

14        A    The -- I'm sorry.  To clarify, your question

15   was what was running through my mind at that time, and

16   there was no other reasons?  Yes, sir.  That -- yes.

17   That is correct.  That is the only reason.

18        Q    Okay.  Thank you.  Yep.  Okay.  I'm going to

19   ask if you'd keep the video just up, but I'm going to

20   just ask a couple questions about a few other kind of

21   related documents.  So if you give me just one second

22   here to put them in the --

CONFIDENTIAL

Page 226

1           Okay.  I apologize for the delay there.

2    What's been pre-marked as Exhibit 10 should be in

3    exhibit share now.

4                (Defense Exhibit 10 was marked for

5                identification.)

6        A    It looks as if I'm going to have to close

7    the video and then re-open it.

8        Q    Oh, okay.  Please do.  I apologize.  Thank

9    you.

10        A    I have it up.  Yes, sir.

11        Q    Okay.  Have you ever seen what's been pre-

12    marked as Defense Exhibit 10?

13        A    Yes, sir.

14        Q    What is it?

15        A    It is a canine bite report.

16        Q    What is a canine bite report?

17        A    It is a form that we use a reporting to

18    canine operations in the institution and to use in

19    court.

20        Q    And is the particular canine bite report

21    that's been marked as Defense Exhibit 10 the bite

22    report that you completed for the incident that we

CONFIDENTIAL

Page 227

1     just watched on Defense Exhibit 9 with Mr. Johnson?

2          A    Yes.

3          Q    Okay.  And just to confirm, you authored

4     this report.  Is that correct?

5          A    Yes.  I did.

6          Q    Okay.  Thank you.  Okay.  I'm going to

7     now -- it will take just a second -- load what's been

8     pre-marked as Defense Exhibit 11.  And just let me

9     know when you get there.

10                    (Defense Exhibit 11 was marked for

11                    identification.)

12         A    Yes.

13         Q    Okay.  And do you recognize what's been pre-

14    marked as Defense Exhibit 11?

15         A    Yes.

16         Q    What is it?

17         A    It's a Patrol Canine Utilization Report.

18         Q    What is a Patrol Canine Utilization Report?

19         A    It's quite similar to the bite report and --

20    to the bite report.  It's a form -- it's a -- it's

21    actually an older form, I believe.  It specifies

22    pretty much every piece of information that you could

CONFIDENTIAL

Page 228

1    use from the time that your shift started to the time

2    that y our shift ended.  Think of it as it's the paper

3    copy of your DINGO utilization.

4         Q    Understood.

5         A    It's basic -- it's more or less the same

6    thing, an you add everything that -- everything from

7    the bite report and from your IR, you add to one of

8    these as well.  And then you list witnesses and sign.

9         Q    Understood.  As far as your understanding,

10   is there any reason why incidents would be described

11   differently in a patrol canine utilization report

12   compared to a canine bite report?

13        A    No.

14        Q    Should the descriptions be nearly identical,

15   if not identical, between a canine bite report and a

16   patrol canine utilization report?

17        A    Yes.

18        Q    And what's been pre-marked as Defense

19   Exhibit 11 is the Patrol Canine Utilization Report

20   from the May 2nd incident with Mr. Johnson that we

21   just watched on video in Defense Exhibit 9.  Is that

22   correct?

Page 229

1      A    Yes.

2      Q    Okay.  And actually, before we move on from

3   this document I have one quick question for you.  It

4   looks like on the first page of this Patrol Canine

5   Utilization Report, it looks like there's a physical

6   signature on this document.  Is that correct?

7      A    It is.

8      Q    Okay.  And I know earlier we spoke, and I

9   apologize if I'm misstating, but I believe we spoke

10   that for certain records you have an electronic sign-

11   off and other records, you have a physical sign-off.

12   Is that correct?

13      A    Yes.  This is the physical.

14      Q    And so the Patrol Canine Utilization Report

15   at Exhibit 11 is an example of a report that you still

16   have to sign physically?

17      A    Yes.

18      Q    Okay.  And do you still sign these reports

19   physically today?

20      A    Yes.

21      Q    Understood.  And that is not the case for a

22   canine bite report, however?

CONFIDENTIAL

1        A     No, sir.  There is not a space to where you

2    can sign the canine bite report.

3        Q     Understood.  And do you give an electronic

4    sign-off in DINGO for the canine bite report?

5        A     When you -- no.

6        Q     Okay.

7        A     No.  There is not -- there is no e-sign on

8    the DINGO.

9        Q     Understood.  So you don't electronically

10   sign or physically sign the canine bite report?

11       A     The bite report was Exhibit 10.  Correct?

12       Q     Yes, sir.

13       A     I need to go back and look at it.

14       Q     No problem.  Yeah.  Exhibit 10.

15       A     No, sir.  There is no -- on the paper copy

16   side of things, there is no signature.  Although, your

17   name is stated on the top left-hand corner, pretty

18   much all other information is there other than a

19   signature.

20       Q     Understood.  And does the canine bite report

21   get submitted to your supervisor?

22       A     Yes.

1        Q    Your direct supervisor or every supervisor

2    in the canine unit?

3        A    My direct supervisor.  This -- all of this

4    gets sent to several different supervisory units.

5        Q    Understood.  And by "all of this," do you

6    mean incident report, bite report, patrol canine

7    utilization report?

8        A    All of it is placed in one folder and sent.

9        Q    Okay.  Other than the three documents that I

10   just described, the incident report, patrol canine

11   utilization report, and canine bite report, are there

12   any other reports that you can think of as we sit here

13   today that are included?

14       A    The anatomical figure, and the AIR, which

15   is -- both of those are medical forms.  They're not

16   necessarily canine.

17       Q    Understood.

18       A    But they are added in that folder.

19       Q    Understood.  If you could please, there

20   should be what's been pre-marked as Defense Exhibit 12

21   now in the exhibit share.  And it starts with Bates

22   number of Johnson 582 000507.

Page 232

        1                (Defense Exhibit 12 was marked for

        2                identification.)

        3       A    507?

        4       Q    Yes, sir.

        5       A    Yes, sir.  That is all correct.

        6       Q    Okay.  So first, have you ever seen what's

        7   been marked as Defense Exhibit 12 before?

        8       A    Yes.

        9       Q    What is it?

       10       A    It is the packet that is emailed after a --

       11   after an engagement has incurred -- has occurred.

       12   This is a packet that canine handlers put together and

       13   send to their immediate supervisor.  From there, it

       14   goes to about a dozen other places.

       15       Q    Understood.

       16       A    For investigation.

       17       Q    Understood.  So looking at the second page,

       18   that's with Bates stamp ends in 508, the top of the

       19   document says "Internal Incident Report."  Do you see

       20   that?

       21       A    Yes, sir.

       22       Q    And is this the incident report that you

Page 233

1    wrote documenting the incident with Mr. Johnson that

2    we saw in Exhibit 9?

3        A    Yes.

4        Q    And do you know if Lieutenant Woods or any

5    supervisor altered this report after you wrote it?

6        A    I have no knowledge it did.  No, sir.

7        Q    Do you have a suspicion that the report was

8    changed after you submitted it?

9        A    No, sir.

10       Q    Okay.  If we go to the document that ends in

11   Bates 509, do you recognize this document?

12       A    509?  Yes.

13       Q    What is it?

14       A    This is the -- this is the AIR.  This is a

15   medical form that the on-staff RN or LPN fills out.

16       Q    Okay.  So this is not a form that you

17   complete, but it's a form that's completed by the --

18       A    On-staff medical assistants.  Yes.

19       Q    On-staff medical.  Okay.  And how do they

20   get the information to complete this form?

21       A    The inmate, after the incident, is

22   immediately taken to medical where medical staff treat

1     him, and this is where they get that information.

2         Q    Understood.  Do you have a conversation with

3     the medical staff or is their information coming from

4     the inmate?

5         A    It's a little bit of both.

6         Q    Okay.  Can you explain what you mean by

7     that?

8         Q    So I will -- they get their information

9     from -- they get their information from several

10    different places.  Officers that know that there's a

11    fight occurring.  Okay?

12         So right here on the first part of

13    description of the incident, she says that the

14    "offender brought to medical due to an altercation."

15    So we -- we -- an officer or somebody or she has heard

16    it over the radio.

17         "3 lacerations to right lower arm/right

18    [sic] area.  Multiple puncture sites to right lower

19    arm/wrist.  Laceration to left side forehead at

20    hairline.  OC utilized."

21         So she is gathering all of her information

22    from officers, inmates, and my -- and if -- and myself

Page 235

1    if needed.

2         Q    Understood.  For purposes of this specific

3    report that we're looking at right here at Bates 509,

4    did you provide information to the nurse or are you

5    speculating as to where she got the information?

6         A    I -- this is speculation.  I didn't provide

7    any information to the nurse at that point in time,

8    but --

9         Q    Do you --

10        A    I have been asked for information in the

11   past.  So -- but not on this particular one.

12        Q    Understood.  And if you were asked for

13   information in the past, you would provide it to the

14   best of your recollection.  Is that right?

15        A    Yes, sir.

16        Q    But you don't recall in this particular

17   instance for purposes of this particular report

18   whether or not you were asked for information?

19        A    No, sir.

20        Q    Do you recall or have an awareness of any

21   VDOC officer who provided information for use in this

22   report?

CONFIDENTIAL

1          A    No, sir.

2          Q    All right.  And I think we can put --

3    actually, one sec.  Sorry.  Actually, really quickly.

4    The next document down that ends in 510, excuse me.

5    The top has a title of "Anatomical Figure."  What is

6    this page we're looking at here?

7          A    This is also a medical form that they fill

8    out alongside the AIR.

9          Q    Okay.  But it's separate from the AIR or is

10   it a part of the AIR?

11         A    No.  This is separate.

12         Q    Okay.  And is it your understanding that the

13   nurse completing this anatomical figure would rely on

14   the same information that they use to prepare the AIR

15   to prepare this anatomical figure report?

16         A    I don't know, sir.  I -- I feel like I would

17   have to speculate.

18         Q    Okay.  All right.  I think we can put this

19   document aside.  We're not going to go back to it.

20   There is one other document that I'd like for you to

21   just look at, but I won't question you on.

22              It's been pre-marked as Defense Exhibit 13,

1    and I've moved into the exhibit share now.  It's

2    another video of the incident, but I'd like to pull it

3    up and then talk about it for just a second.  So let

4    me know when you have what's been marked as Defense

5    Exhibit 13.

6                    (Defense Exhibit 13 was marked for

7                    identification.)

8         A    I have it pulled up.

9         Q    Okay.  Could you press play on what's been

10   marked as Defense Exhibit 13 and watch for a few

11   seconds to get some context?

12                   (Video played.)

13        A    Yes.

14        Q    Have you ever seen before what's been pre-

15   marked as Defense Exhibit 13?

16        A    Yes.

17        Q    And what is it?

18        A    This is a video of the incident with Mr.

19   Johnson.

20        Q    Okay.  And does this video show the same

21   incident that we watched in Defense Exhibit 9 but from

22   a different camera angle in the pod?

CONFIDENTIAL

Page 238

1        A    Yes.

2        Q    Okay.  Do you have any reason to think that

3    the videos are different in any way?

4        A    Not to my knowledge.  No, sir.

5        Q    Okay.  Thank you.  All right.  And I just

6    moved into -- apologies.  My computer is slow for a

7    second.  I just moved into the chat -- it's taking

8    just a moment -- but what's been pre-marked as Defense

9    Exhibit 14.  It should be up in just a moment.  And

10   just let me know when you have it up.

11                   (Defense Exhibit 14 was marked for

12                    identification.)

13       A    Yes, sir.

14       Q    Okay.  And have you ever seen what's been

15   pre-marked as Defense Exhibit 14?

16       A    Yes, sir.

17       Q    What is it?

18       A    These are pictures of the engagement.  Are

19   you talking about 14 or 13?

20       Q    Fourteen.  I apologize if I misspoke.

21       A    Fourteen.  Yeah.  I think you said "13."

22       Q    Oh, I --

CONFIDENTIAL

1        A     Fourteen is pictures of the engagement.

2        Q     Understood.  Thank you.  Apologies.  And

3    just for clarify, Defense Exhibit 14 is pictures of --

4    let's go one by one actually.  So it's hard to see,

5    but it starts off with in the bottom-right, there is a

6    very small print in pink of a Bates number that I

7    believe starts with 109.  It's just below the yellow

8    tag.  Sorry about --

9        A     That's what it appears to be, yes.

10       Q     Okay.  So starting on that, let's start with

11   that picture that ends in 109.  It appears to be a

12   pair of pants that Mr. Johnson was wearing at the time

13   of the incident.  Is that your understanding?

14       A     No, sir.

15       Q     Okay.  What is your understanding of --

16       A     That is the pair of pants that Mr. Guy was

17   wearing.  This is a picture that I took of Baker's

18   engagement.

19       Q     Understood.  So if we look at pictures 109,

20   110.  Picture 110 is Mr. Guy.  Is that correct?

21       A     Yes, sir.

22       Q     Okay.  And the rest of the pictures in this

Page 240

1    exhibit are all pictures of Mr. Guy's injuries after

2    the incident with Mr. Johnson.  Is that correct?

3         A    Yes, sir.

4         Q    Okay.  And just to confirm, none of the

5    pictures in Exhibit 14 relate to Mr. Johnson.  Is that

6    correct?

7         A    I'm sorry?  Can you repeat that, sir?

8         Q    Sure.  None of the pictures in Exhibit 14

9    are Mr. Johnson or his clothing.  Is that correct?

10        A    No, sir.

11        Q    Are any of the pictures in Exhibit 14

12   pictures of Mr. Johnson's wounds?

13        A    Yes.  Yes, sir.  I believe the numbers are

14   114, 115, 116, 117, and 118 are all of Mr. Johnson.

15   Numbers 109, 10, 11, 12, 13 are of Mr. Guy.

16        Q    Understood.  Than you.  And you took the

17   pictures of Mr. Guy.  Is that correct?

18        A    Yes, sir.  I did.

19        Q    Do you know who took the pictures of Mr.

20   Johnson?

21        A    Officer Baker.

22        Q    Do you know who the individual in 115 who

Page 241

1   appears to be providing treatment to Mr. Johnson?

2       A    I do not.

3       Q    Okay.  I have one more question and then if

4   it's okay with you, Tim, and Officer McCowan, I'm

5   going to ask to take just a five-second break.  I can

6   go back through my notes and just make sure I've hit

7   everything, but I think at least for our purposes

8   we're getting pretty close here.  So I really

9   appreciate your time, Officer McCowan and for bearing

10  through this.

11          Are you aware of prison systems outside of

12  VDOC utilizing canines for patrol purposes?

13      A    I am not aware.  No, sir.

14      Q    Okay.

15              MR. JOHNSON:  Okay.  If it's okay with

16  you, Officer McCowan, and Tim, could we take five

17  minutes and then we'll come back on the record and

18  I'll let you know if I have any more questions, but I

19  think we may be pretty close to, on our questioning,

20  wrapping up?

21              MR. DAVIS:  We can do that.

22              MR. JOHNSON:  Great.  Well, let's go

CONFIDENTIAL

Page 242

1    off the record, Madam Court Reporter.

2                    THE REPORTER:  Okay.  We're off the

3    record at 4:36 p.m.

4                    (Off the record.)

5                    THE REPORTER:  Okay.  We're back on the

6    record at 4:46 p.m.

7                    MR. JOHNSON:  Thank you.

8    BY MR. JOHNSON:

9         Q     So Officer McCowan, I did want to ask one

10   follow-up question relating to the incident with Mr.

11   Johnson that we saw in Exhibit 9.  Did you ever have

12   any knowledge or belief that Mr. Guy had a weapon when

13   he was engaged with Mr. Johnson?

14        A     No, sir.  I was at that point unaware of

15   whether or not there was a weapon confirmed or not.

16        Q     Understood.  And that applied to Mr. Guy as

17   well?  You were unaware?

18        A     No.  It was -- yes, sir.  I was unaware of

19   either -- whether either of those had a weapon.

20        Q     Understood.  Did you ever become aware,

21   either during the incident or after, if Mr. Guy in

22   fact had a weapon on him?

Page 243

1       A     No, sir.  I was not.  I don't believe that,

2    to my best recollection, that there was a weapon

3    found.  But whether or not he actually one on his --

4    in his possession at some point in time, no, sir.  I

5    do not.

6       Q     Understood.  Thank you.  Okay.  I don't

7    believe you mentioned this at the outset, but I do

8    want to confirm.  Are you a reservist or in the

9    military?

10      A     No, sir.

11      Q     Is there any reason that you can think of

12   sitting here today that you are not going to be

13   available for trial in this matter in January of 2023?

14      A     Not that I know of.  Nothing that I know of,

15   sir.

16      Q     Understood.

17              MR. JOHNSON:  Tim, that's all the

18   questions that I have at the moment.

19              MR. DAVIS:  Okay.  I guess --

20              MR. JOHNSON:  And I'll just --

21              MR. DAVIS:  If we can excuse Mr.

22   McCowan and the court reporter, we can follow-up after

CONFIDENTIAL

 1    we get off the record.

 2                    MR. JOHNSON:  Sure.  Yeah.  You don't

 3    have any questions for the witness?

 4                    MR. DAVIS:  I do not.

 5                    MR. JOHNSON:  Okay.  Great.  Well then,

 6    as the plaintiffs, we don't have any further questions

 7    for the witness.

 8                    THE REPORTER:  Okay.  Mr. Davis, do you

 9    want to give Mr. McCowan a chance to read and sign his

10    transcript?

11                    MR. DAVIS:  Yes.  Do you know how long

12    that would be to get that to him?

13                    THE REPORTER:  I'm not exactly sure.  I

14    would guess seven to ten days.

15                    MR. DAVIS:  Mr. McCowan, would you like

16    an opportunity to review your transcript to see that

17    it's accurate?

18                    THE WITNESS:  Yes, sir.

19                    THE REPORTER:  Okay.  We'll do that and

20    then when we go offline, I just wanted to ask you who

21    would like to place an order and that kind of thing,

22    and I may have a couple of spelling questions.  Okay?

CONFIDENTIAL

Page 245

1                    If that's going to be all, then we're

2     off the record at 4:49 p.m.

3                    (Signature reserved.)

4                    (Whereupon, at 4:49 p.m., the

5                    proceeding was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CONFIDENTIAL

Page 246

1                    CERTIFICATE OF DEPOSITION OFFICER

2                I, JANEL FOLSOM, the officer before whom the

3       foregoing proceedings were taken, do hereby certify

4       that any witness(es) in the foregoing proceedings,

5       prior to testifying, were duly sworn; that the

6       proceedings were recorded by me and thereafter reduced

7       to typewriting by a qualified transcriptionist; that

8       said digital audio recording of said proceedings are a

9       true and accurate record to the best of my knowledge,

10      skills, and ability; that I am neither counsel for,

11      related to, nor employed by any of the parties to the

12      action in which this was taken; and, further, that I

13      am not a relative or employee of any counsel or

14      attorney employed by the parties hereto, nor

15      financially or otherwise interested in the outcome of

16      this action.                        *Janel B. Folsom*

17                                           JANEL FOLSOM

18                                 Notary Public in and for the

19                                 Commonwealth of Virginia

20

21      [X] Review of the transcript was requested.

22

CONFIDENTIAL

Page 247

1              CERTIFICATE OF TRANSCRIBER

2              I, MEREDITH WEEKS, do hereby certify that

3      this transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                                    MEREDITH WEEKS

16

17

18

19

20

21

22

Page 248

1    Timothy Davis, Esquire

2    tdavis@oag.stat.va.us

3                        June 23, 2022

4    RE:  Johnson, Corey E. v. McCowan, Canine Officer Et Al

5         6/8/2022, Brian McCowan (#5267183)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 249

1    Johnson, Corey E. v. McCowan, Canine Officer Et Al

2    Brian McCowan (#5267183)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Brian McCowan                              Date

25

Page 250

1   Johnson, Corey E. v. McCowan, Canine Officer Et Al

2   Brian McCowan (#5267183)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Brian McCowan, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Brian McCowan                          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**[0 - 2nd]**

## 0

**0**  128:3
**000055**  118:15
**000067**  118:20
**000470**  130:8
**000474**  130:13
**000494**  139:15
**000507**  231:22
**000522**  123:5
**00582**  1:8
**05/02/2020**  7:7

## 1

**1**  6:8 7:17 20:16
  116:10,12,14,18
  116:21 118:1,3
  119:15 120:4
  162:14 163:6,8
  170:9 174:20
**1-4**  2:6
**1.wmv.**  162:14
**10**  6:3 7:4 29:19
  64:4 112:19
  199:12 226:2,4,12
  226:21 230:11,14
  240:15
**100**  51:2 119:21
  120:22 185:13
**109**  239:7,11,19
  240:15
**10:33**  64:14
**10:45**  64:7
**10:46**  64:17
**11**  7:6 199:12,14
  227:8,10,14
  228:19 229:15
  240:15
**110**  239:20,20
**114**  240:14
**115**  240:14,22

**116**  6:9 240:14
**117**  240:14
**118**  240:14
**11:59**  115:11
**12**  7:8 24:3,6,7
  26:13,17 29:17
  30:15 231:20
  232:1,7 240:15
**121**  6:10
**129**  6:12
**12:00**  133:2,3
**13**  7:9 118:11
  139:14 236:22
  237:5,6,10,15
  238:19,21 240:15
**136**  6:13
**14**  7:11,18 238:9
  238:11,15,19
  239:3 240:5,8,11
**141**  6:15
**143**  6:16
**14644**  246:16
**147**  6:19
**15**  28:14 29:7,19
  64:4 112:19
  191:13 192:19
  209:22
**154**  6:21
**16**  209:22 210:1
  211:13 212:15
**162**  7:3
**17**  209:22
**19**  23:9
**1:00**  115:14 133:3
  133:4 217:2
**1:02**  193:2,2,5
  194:10
**1:03**  193:5 194:10
**1:11**  196:8 197:11
  197:17 198:4
  199:6,22 200:2,11

201:14
**1:12**  198:21 199:2
  199:3,7 201:4,14
  202:6,8 203:14
**1:14**  204:13,13,16
  205:4,14,17 206:7
  208:12 209:5,17
**1:16**  208:7,20
  209:20 210:5
  212:9 221:5
**1:17**  208:8,10,12
  208:16 209:2
  210:7,13
**1:19**  211:14
**1:20**  210:13,15
  211:3,6,15 212:3
**1:21**  212:19 213:3
  213:8 214:2
**1:29**  212:3
**1:34**  212:10
**1:41**  212:14,14
  217:3,10
**1:42**  212:14
  216:16,17,18
**1:43**  216:18
  217:11 219:3,5,6
**1:45**  216:22
**1:46**  213:9 216:14
  219:7
**1st**  101:15 132:19

## 2

**2**  6:10 20:16
  121:18,20,21
  122:5,21 123:8
  128:20
**20**  34:12 192:19
  250:15
**20001**  3:8
**20005**  2:14
**200502181502**
  162:14

**2013**  15:12
**2014**  17:1,12 18:1
  19:22 121:13
  147:2
**2018**  6:15,16 19:20
  19:22 20:1,3
  23:16,21 26:5
  34:13,16 35:3,12
  35:13 36:1 41:3
  43:3 62:7,15,21
  101:15 142:2,14
  142:22 145:13
**2019**  127:10
**202**  4:17
**2020**  6:19 114:21
  130:18 131:8
  138:8 155:6 157:9
  159:4
**2021**  34:16 127:10
  138:21 139:5,10
**2022**  2:11 8:6
  34:18,19,20,21
  127:11,13 248:3
**2023**  243:13
**226**  7:5
**227**  7:7
**23**  248:3
**232**  7:8
**23219**  4:18
**237**  7:10
**238**  7:11
**25**  207:4
**26949**  247:13
**28**  155:6 187:20,22
  188:1
**2:18**  164:17
**2:30**  164:12,13,15
**2:35**  164:20
**2nd**  157:16,22
  158:12 159:4
  165:5,13 228:20

**3**

**3** 6:11 128:3 129:5
  129:6,8,12 130:2
  131:21 140:6
  234:17
**30** 159:10 189:20
  248:17
**31** 6:19
**31st** 148:9
**32** 188:20
**33** 190:7,15
**34** 190:20
**35** 189:17,20
  190:20 207:4
**3:50** 218:13

**4**

**4** 6:13 136:9,11,12
  139:14 140:8
  141:7
**40** 168:11,12 191:3
**41** 212:16
**42** 212:16
**420.1** 144:11,12,15
  145:2,5,12
**435.3** 144:1,6,15
  144:20
**480** 24:3,6,8,15
  26:13,17 27:5,6,10
  27:15,18 28:2
  29:16 30:15 47:12
  47:16 53:20 54:2
  54:4,7,9,14 55:3
  61:13 67:11,13
  75:22 82:19 88:8
  92:5,9,16 93:16
  99:10 105:4
  117:17 118:2
  119:2 126:15
  147:10

**4:00** 218:16
**4:36** 242:3
**4:46** 242:6
**4:49** 245:2,4

**5**

**5** 6:14 130:11
  141:15,16,20
  142:1
**5/2/2020** 7:5
**50** 34:4,4 90:12
  187:12,18
**50/50** 27:21
**507** 232:3
**508** 232:18
**509** 233:11,12
  235:3
**510** 236:4
**5267183** 2:16
  248:5 249:2 250:2
**55** 191:6,6 192:7
**58** 192:10 193:10
  193:11 194:2
**582** 118:14,16,20
  123:4 130:8,13
  139:15 231:22
**59** 193:8,11 194:2
**5:00** 133:4,5

**6**

**6** 6:16 143:5,7,12
  143:19
**6/8/2022** 248:5
**601** 3:7
**6:00** 133:2,7

**7**

**7** 6:17 147:18,20
  148:2,8,12 150:4
  152:14,19 153:19
**75** 53:6
**7:20** 1:8

**7:20cv00582** 8:10

**8**

**8** 2:11 6:20 8:6
  154:17,18,22
**80** 27:3 43:8 46:12
  46:18 47:1,5,11
  53:13,18 54:3,10
  55:3 61:13 67:12
  76:19 83:3 92:10
  92:15 93:15
  117:19 119:17
  126:16
**80/20** 76:19
**85** 28:14 33:17
**85/15** 28:13 76:19
  76:19

**9**

**9** 6:16 7:3 162:3,8
  162:12,22 165:8
  187:7 199:12
  227:1 228:21
  233:2 237:21
  242:11
**90** 28:9,13 76:20
  104:8
**90/10** 76:20
**9:19** 2:12 8:5
**9th** 4:17

**a**

**a.m.** 2:12 8:5
  64:17 115:11
  133:2
**a1** 160:8 165:16
  166:5 170:7 171:5
  176:4 177:14
  189:2,12,14
  191:12 196:1,14
**ability** 69:8,15
  106:21 246:10
  247:7

**abingdon** 28:22
**able** 37:14 40:4
  47:7 52:17 54:8
  102:10 154:16
  171:14 184:7,13
  196:15 197:2,18
  197:22 198:2
  199:14 221:6
**absent** 8:18 141:3
**absolutely** 63:13
**academy** 20:16
  119:11,12
**access** 12:19,19
  136:10
**accessed** 116:17
**accidentally**
  199:11
**accuracy** 105:20
  105:22 106:1
  248:9
**accurate** 113:9
  192:19,20 244:17
  246:9 247:5
**acknowledgement**
  250:3
**acknowledgeme...**
  8:15
**acknowledgment**
  248:12
**acronym** 89:3,19
**act** 94:6
**acting** 203:4
**action** 1:7 8:9
  58:22 59:7 61:3
  120:19 246:12,16
  247:8,12
**actions** 58:17,19
  58:20 75:11 94:10
  182:6
**active** 39:1

[activities - approach]                                                                           Page 3

**activities**  90:1
**actual**  53:4 81:5
  87:8 123:21
**add**  161:22 215:14
  228:6,7
**added**  231:18
**additional**  161:7
**additionally**  8:18
**additions**  250:6
**admin**  45:2,7
**administer**  8:15
**affiliated**  51:11
**age**  37:5,10
**agent**  77:11 78:4
  78:22 79:22 190:2
  190:22 191:13
**agents**  77:8 79:4
  224:20
**aggression**  24:20
  31:17 58:22
  125:18,20,22
  126:11
**aggressive**  44:11
  58:17,19,20,22
  59:7,11 60:1,16
  61:3 75:11
**ago**  12:18 24:12
  29:13 31:6 34:14
  50:11 99:18
  104:16 186:6
  192:1
**agree**  8:16,20 11:5
  12:16 112:1 121:9
  203:18
**agreed**  111:8
**agreement**  112:1
**ahead**  64:17 96:17
  107:17 115:14
  122:10 144:4
  164:6,20 177:22
  210:20 218:16

**air**  231:14 233:14
  236:8,9,10,14
**al**  8:9 248:4 249:1
  250:1
**aligned**  189:2
**allotted**  248:20
**allow**  11:6,6,8
**allowed**  53:2
  220:3
**allows**  95:18
**alongside**  236:8
**alpha**  44:19 45:5,9
  163:6,8 165:16
  166:5 169:2,15
  170:9 174:20
**alter**  152:15
**altercation**  84:4,6
  85:14 86:14
  161:14 165:21,22
  166:14 171:9
  174:20 176:20
  188:6,9,15 190:9
  191:11,14 193:1
  196:21 197:3
  215:13,21 216:10
  216:12,14 221:20
  234:14
**altered**  233:5
**altering**  150:22
  152:4
**alternate**  7:9
**alternative**  77:4
**anatomical**  231:14
  236:5,13,15
**andrew**  3:3 9:12
**andrew.johnson**
  3:9
**andy**  63:10
**angle**  7:10 196:19
  200:21 237:22

**annual**  42:10,15
  42:18
**answer**  11:9 18:13
  19:1,2 96:17
  137:9 146:8
  180:13 204:22
  207:10 210:20
  213:17
**answered**  156:7
  181:13
**anybody**  42:1 49:3
  218:21
**anytime**  132:11
  133:17
**apologies**  20:9
  238:6 239:2
**apologize**  21:20
  24:5 32:1,11 34:5
  36:17 37:17 38:21
  39:15 49:18 50:22
  51:7 53:6 56:6
  62:8,18 65:21
  66:19,21 67:17,20
  71:3,6 72:1 76:20
  77:11 85:5 88:5
  89:4 90:9 93:18
  93:20 97:14
  101:12 102:18
  107:17 111:20
  121:3,4,16 127:14
  137:12 141:12
  142:6 144:5,9
  146:9,10 151:7,15
  151:17 152:17
  171:3 173:15
  174:2,13 208:4
  210:22 213:15,16
  214:21 225:6
  226:1,8 229:9
  238:20

**apology**  187:3
**apparent**  204:18
**appear**  100:7
  163:16 194:4
  196:15 198:4
  200:6,10 201:9
  205:1 206:22
  208:21
**appeared**  159:16
  176:12,22
**appearing**  197:13
**appears**  61:2
  117:6 188:4,8
  189:4,11,22 190:2
  191:15 192:1,22
  196:12,22 199:6,8
  201:7,7,19 204:15
  204:19 205:19
  208:17 210:16
  211:2 212:8 213:1
  239:9,11 241:1
**appendage**  200:17
**appended**  250:7
**applicable**  9:2
  248:8
**application**  174:5
  186:13
**applications**  12:10
**applied**  62:5 64:21
  223:19,20 242:16
**apply**  80:13
**appreciate**  34:8
  144:10 174:12
  205:12 221:4
  222:12 241:9
**apprehension**
  24:20
**apprehensions**
  31:17
**approach**  85:4,5
  173:3 177:10

197:13
**approached**
174:22 179:11
219:14
**approaching**
58:21 75:12
165:18 166:7
170:11 171:11
172:17 176:5,7
177:5 198:17
219:19
**appropriate** 25:22
57:9 59:5 71:16
146:13 221:16
222:16
**appropriately**
67:16
**appropriateness**
71:15
**approve** 154:14
**approved** 107:3,8
107:9 108:11
153:20
**approximate**
21:21
**approximately**
19:9
**approximation**
61:8
**area** 48:19 89:10
89:10 160:15
163:4 188:6 195:8
209:11 234:18
**arm** 183:13,16
200:4,10,14,15
201:2,12 202:2,3,4
210:3,6,8 211:8
234:17,19
**arnold** 3:6 9:12,13
9:14

**arnoldporter.com**
3:9,10,11
**arose** 43:18
**arrangement**
11:10
**arrive** 58:15 86:13
132:5
**arrived** 159:9
**articulate** 221:6
**articulated** 65:2
73:16
**aside** 236:19
**asked** 51:20 111:7
111:9 112:22
157:4 235:10,12
235:18
**asking** 40:22
56:16 57:3 71:11
114:13 151:9
156:15 184:21
222:4
**aspect** 46:22
**assault** 85:3
176:13 181:8
**assaultive** 59:13
60:19 61:1,2 73:9
89:9 203:7
**assaultiveness**
59:13,16,18,19
65:6,7,13 66:1
**assaults** 83:12
137:18
**assessment** 67:22
70:7,7 71:18 72:9
79:11 80:8,14
91:4 93:9 98:7,13
99:2
**assessments** 99:6
**assign** 28:11
**assigned** 8:3 23:11
23:14 25:6,9 26:4

34:12,15 35:2,6,8
35:11,15,22 36:1,4
36:5,6,8,9 37:11
37:20 38:1 39:6
39:13,20 40:15,19
41:2,7,10,22,22
43:4,8 46:11
127:10 131:8
**assignment** 39:21
40:11 112:20
161:11
**assignments** 41:17
**assistance** 112:22
**assistants** 233:18
**assume** 44:21
86:11,12,15
151:13
**assumption** 91:19
**attached** 7:13
248:11
**attack** 179:3
**attacking** 180:8
**attain** 23:22
**attempt** 77:15
204:18 224:9,13
**attempted** 152:14
152:21 153:3
**attempting** 209:10
213:20 216:8
**attended** 143:1,2
**attention** 124:2
139:13 173:15
174:1
**attorney** 4:16 5:3
5:5 9:17 11:6 19:3
246:14 247:10
248:13
**attorneys** 9:8
**audible** 77:7,10
78:2

**audio** 70:21 190:1
246:8 247:3
**authored** 227:3
**authorized** 8:14
**available** 26:7
243:13 248:6
**avenue** 3:7
**avenues** 77:4
**avoid** 76:22 77:3
151:13 205:20
**aware** 40:5 42:13
65:17,22 78:13
87:12,15 90:3
91:2 100:20 102:7
102:12,15 120:14
128:16 154:2
158:8 168:21
178:18 186:16
241:11,13 242:20
**awareness** 46:5
55:20 108:20
235:20

**b**

**b** 6:5 7:1 45:3,14
130:21
**back** 27:7 43:12
43:12 46:15 50:7
56:15 64:16,22
70:13,14 83:17
92:4 93:14 98:4
104:2 107:8
108:16 110:3,5
115:13,17 119:6
127:5 138:13
140:5 164:19
171:13 187:15,20
194:19 196:22
202:9,11 203:2,15
203:18,22 204:1
204:17 205:19
206:12,16 207:1

[back - bottom]                                                                              Page 5

208:18 212:19
214:10 217:20
218:15,20 224:9
230:13 236:19
241:6,17 242:5
**backed** 191:13
**background** 11:1
14:22 15:2,5
**backing** 219:9
**baker** 160:1,1
165:12 166:1,10
166:14,16,22
167:17,22 168:5
169:11 178:4,7
192:4,11,15,21
193:3,8 194:2,11
195:1 197:18
198:1 215:18
240:21
**baker's** 196:22
197:18 199:15
239:17
**balled** 203:5 216:2
216:4,6 217:8
**bar** 214:12,12
**barbetto** 1:17 4:7
**barely** 70:22
**bark** 30:13,16
186:14,16
**barking** 208:17,21
**barr** 5:3 9:19
**base** 22:21 172:6
**based** 85:17 87:8
87:11 172:1,3
176:18 181:18
194:6
**baseline** 54:20
**basic** 6:14 30:19
54:6,7 123:11
142:1 228:5

**basically** 223:2
**basics** 47:3 54:13
**basis** 41:18 169:7
**bates** 7:17 14:2
118:13 123:3
130:7,12 139:15
231:21 232:18
233:11 235:3
239:6
**bathroom** 164:10
218:5
**bear** 116:4
**bearing** 241:9
**becoming** 19:11
120:10
**began** 159:19
160:6 170:12,20
179:12 193:21
199:17
**beginning** 19:22
81:12 90:20
187:12 188:16
190:20 210:2
**begins** 162:13
199:20 202:8
**behalf** 3:2 4:2 9:14
9:20
**behavior** 59:12
60:1,16 73:10
78:15 79:1 86:9
**beings** 38:18
**belief** 193:7
242:12
**believe** 14:6 19:20
26:11 32:15 37:3
37:19 39:15,16
40:14,21 43:20
45:20,21,22 46:3
46:10 47:20 50:13
51:4 53:10 55:2
56:4,7 57:15 59:2

62:8,8,12,19 69:11
70:4 71:11 76:14
80:9 81:4 83:17
87:18 91:21 93:13
96:3 97:10,15,17
99:17 100:3
101:11,18 102:6
103:8 112:18
113:22 115:21
117:15,18 118:6
118:10 122:4
124:10 128:14
129:18 130:11
137:12 142:21
156:18 157:7
161:16 165:9
166:9 167:21
174:18 176:7
177:3 179:20,21
180:2 184:20
195:2 199:4
203:14 206:11,22
207:22 211:21
213:6 215:1,19
216:13,18 227:21
229:9 239:7
240:13 243:1,7
**believed** 179:6
216:6
**bent** 160:20,22
182:20 217:4,4,5,9
**best** 18:17 76:22
105:12 113:1,1
140:14 144:8
146:22 158:21
166:8 235:14
243:2 246:9 247:6
**better** 52:4 87:16
186:22 208:6
222:11

**beyond** 186:1
197:17
**bigger** 122:2
**binder** 144:16
**bisects** 189:3
**bit** 11:1 20:13 38:9
41:5 43:4,13,14,17
43:19 44:10,13,18
45:10,12,17 92:5
99:4,18 141:13
174:10 175:17
183:2 191:3
210:10 212:10
234:5
**bite** 7:4,8 31:8,13
31:15,16,20 32:1,5
32:10,13,18,20
33:5,12,20 44:5
46:7 48:18 100:17
186:7,12,18 187:1
226:15,16,20,21
227:19,20 228:7
228:12,15 229:22
230:2,4,10,11,20
231:6,11
**biting** 41:6 45:22
128:12
**bitten** 205:20
**black** 57:13 72:19
**blank** 54:5
**blocking** 197:1
**body** 176:11,17
177:2 180:4 202:9
203:15
**bond** 47:6
**book** 81:11,16
**booth** 159:7
168:10 190:12,14
191:19
**bottom** 118:12
122:13,14 131:10

CONFIDENTIAL

131:11 207:3
239:5
**bouncing** 208:5
**bravo** 44:19 45:5
159:4
**breaching** 170:9
**break** 49:19 50:3,5
58:6 63:11,15
65:10 70:6 105:3
114:7 115:3,7,17
164:8,10 165:3
183:1 197:15
218:5,20,22 241:5
**brian** 2:10 6:8,17
6:21 8:7,9 10:4
117:5 125:6 248:5
249:2,24 250:2,4
250:12
**broke** 64:19 157:3
219:2
**broken** 24:8
**brought** 212:20
234:14
**brown** 155:19,19
**build** 37:16
**building** 45:3,7,9
48:19
**buildings** 45:5
**button** 162:6
**buzz** 190:7

**c**

**c** 3:1 4:1 5:1 8:1
45:3
**calculating** 223:2
**calculus** 181:3
**caliber** 81:14
**call** 9:9 14:12 16:1
16:3 95:8 158:17
158:21 159:10
161:19 183:5
185:1 186:20

221:21
**called** 10:5 23:7
58:8 82:4 86:4
107:21 126:1
132:5,11 134:13
135:9,11,13 159:6
159:8 163:5
171:16 174:19
185:18,21 186:7
**calls** 103:5 180:10
**camera** 200:20,21
201:18 202:1
203:5 204:2
237:22
**canine** 1:8,9,20
2:10 4:2,3,9 6:11
6:14 7:4,6 8:9
10:16 15:14,17
19:8,11 20:3 22:7
22:9,10,11 23:7,11
23:12,12,14,20
25:6,9,22 26:3,12
27:13,19 28:3,6
29:1,11,17 30:19
31:20 32:12 33:4
33:4 34:9,12,15
35:5,6,8 36:1,4,9
37:20 39:11,13,19
39:20,21 40:4,9,10
40:11 41:3,7,10,10
41:16,17 42:3,11
42:12,14,16 47:4
48:13 49:4,6,11
50:15 51:6,13
52:8,9,18 53:11
54:6,7 55:4,14,17
55:18,21,22 56:2,8
56:11,18,20 57:1
58:11,16 60:10
61:22 62:2,2,7,16
62:20,22 64:21

65:3 66:6 67:10
70:8 71:16 72:21
73:5,15 77:5,17,21
77:22 78:1,7,8,9
79:5,11 84:15,17
85:10,15 88:10,12
89:13 95:12,19
96:2,10,13 97:18
98:11,12,14 99:13
99:16 101:3,9
109:1,5 111:11,17
111:18,19 112:22
120:5,5,10,11
121:6 124:15,19
125:16 126:15,15
126:16 127:9
128:11 131:5,8
132:17 140:21
142:2,13 143:14
143:16 145:8,9,16
145:20 147:7
148:20 149:9
158:1 159:20,22
160:13 161:4
165:10,11,12
166:14 168:2
169:20,22 175:4
178:5 180:7,17,18
181:20 182:2,3,22
184:4 185:11,14
185:18,22 186:13
186:15,18,18
192:2,12 193:3,9
194:12 195:9,11
202:15 208:17,19
209:7,21 213:3
214:9 215:19
220:18 222:2
223:14,15,20
224:1,1,5 226:15
226:16,18,20

227:17,18 228:11
228:12,15,16,19
229:4,14,22 230:2
230:4,10,20 231:2
231:6,10,11,16
232:12 248:4
249:1 250:1
**canines** 16:4,7
21:6 25:11 26:16
27:14 30:3,9
31:12 41:14 47:8
49:12 50:13 51:5
51:15,18 53:2
55:7,13 62:6
94:19 120:17
147:9 241:12
**capacity** 1:14,15
1:18,19 2:2,2 4:6
4:6,8,8,11,11
**captured** 153:19
**card** 67:22
**career** 92:1 109:16
**carried** 201:12
**carrying** 62:14
216:7
**case** 52:5 99:22
116:1 144:11
145:17,21 146:3
146:13,20,21
147:3,8 149:16,17
155:22 156:13
168:4 229:21
**catch** 137:11
**cause** 53:8 54:4
133:10 182:12
185:15 186:1
224:14
**caused** 37:9 44:5
110:4 214:3
**cease** 73:21 78:22
82:1 178:15

206:17
**ceased** 73:17 79:7
  79:15 80:8 191:12
**ceases** 72:22 73:1
**cells** 160:7,10
  179:15
**center** 16:2,3
  21:19 163:9,10
  179:16
**certain** 86:11,12
  89:22 100:16
  229:10
**certainly** 196:13
  200:2
**certificate** 246:1
  247:1
**certification** 20:5
  27:11 31:11,15
  40:3 42:1,4,6,7,10
  42:15,19 43:18,19
  44:2 46:2,6,10
  47:22 48:12,21
  49:10 53:13 92:10
  93:15 119:17
**certifications**
  50:14
**certified** 8:21 27:1
  27:4,9 43:9 47:2
  47:17,21 48:4,5,7
  48:10,14 49:7
  51:15
**certify** 40:4 46:21
  47:1,6,7 49:12
  54:11 126:11
  246:3 247:2
**certifying** 31:12
  50:13 123:18
**chance** 244:9
**change** 63:1 86:21
  109:13 110:21
  114:14 122:12

152:21 153:4,7
  154:14 249:4,7,10
  249:13,16,19
**changed** 51:22
  52:3,4 62:13,17,22
  63:8 86:18 106:22
  107:2,4,11 110:16
  111:22 112:4
  148:14,14,15,17
  149:10,14 150:1,5
  150:17 151:10,22
  152:9 153:21
  154:3,6,11 233:8
**changes** 62:1 63:2
  63:5,6,20 66:20
  92:19 108:16,17
  109:10 111:2,7,8
  113:9 154:9,15
  248:10 250:6
**changing** 63:3
  151:19 153:14
**channels** 49:15
**characterize**
  113:14
**charlie** 45:6
**chat** 238:7
**chemical** 77:8,11
  78:4,22 79:4,22
  190:2,21 191:13
  224:20
**chest** 200:12
  213:22 217:8
**chief** 2:3 4:11
**chosen** 52:18
**chow** 45:7
**circumstances**
  44:5 79:17 81:22
**city** 17:15,17,18
**civil** 1:7 8:9
**clarification**
  144:10

**clarify** 22:8,14,19
  108:12 144:9
  167:13 220:15
  225:14 239:3
**clarifying** 20:11
  63:14 177:10
  220:11 221:3
**clarke** 1:13 4:5
**class** 6:14 24:3,6
  28:4,10 30:9 43:8
  54:10,10,14 83:3
  85:10 117:17
  124:3,7 125:4
  142:2
**classroom** 28:7,11
  28:15 29:7 81:2,4
  81:19
**clean** 222:11
**clear** 133:6 140:5
  153:10 223:12
**clearer** 215:4
**clears** 133:6
**click** 122:15
  203:10 204:12
**close** 58:20 61:8
  85:22 129:2
  159:15 160:7
  173:4 176:9
  177:13 182:13
  215:17 222:1
  226:6 241:8,19
**closed** 59:3,6
  75:13 176:12,17
  176:17 177:2
  180:3,4 208:22
**closer** 203:21
  204:16
**clothing** 240:9
**cluster** 163:13
**column** 124:2

**columns** 125:3
**combative** 73:9
  85:3,7,11,12 86:8
  89:9 90:19 176:12
  181:7
**combativeness**
  59:14 65:5,6,13
  66:1
**come** 20:15 40:13
  40:18 45:2 60:14
  74:4 75:14 86:13
  87:3 90:20 112:1
  132:19 156:7
  172:15,20 192:2
  204:16 221:22
  241:17
**comes** 200:5
**comfort** 56:16
**comfortable** 33:3
  33:8,9,15
**coming** 24:22 25:4
  54:4 170:13,19
  173:20 179:10
  190:21 191:18
  193:15,15,16
  194:3,22 195:5,6
  197:16 199:18
  221:19,21 234:3
**command** 31:21
  32:6,7 33:4,14
  56:17,18 57:17
  73:5 78:14 161:4
  172:1,7 173:5,10
  175:3 178:15,20
  179:5 183:5
  191:18,19 209:15
  209:18 217:1,3,4
  217:11,15,22
  219:3
**commander** 114:7

**commanding**
71:19
**commands** 77:7
175:5 177:17
178:6,8,12 191:18
193:9 194:3,5
220:6
**commas** 110:7,13
**committed** 33:19
**common** 39:11,18
**commonly** 123:10
**commonwealth**
1:10 4:3 8:16
246:19
**communicated**
172:2
**communicating**
11:3 91:5 148:10
**compared** 28:4
38:2 61:19 73:8
76:3 88:20 92:10
93:16 132:9
215:20 224:1
228:12
**competently** 14:18
**complete** 27:11,13
39:19 48:17 95:6
98:1 108:13
123:13 124:11,21
137:22 138:2,15
139:9 233:17,20
250:8
**completed** 15:6
16:19 35:9 41:20
46:11,14 53:12
54:9 124:18
226:22 233:17
248:17
**completely** 51:2
102:3 112:4
184:10 211:3,14

**completes** 123:16
203:15
**completing** 35:6
67:16 236:13
**completion** 27:15
**compliance** 72:11
72:17 185:7,13
**compliant** 57:12
73:2 74:8
**complied** 166:11
183:17 184:6,10
185:17
**complies** 57:16
58:7
**comply** 77:16
78:19 160:5,20
167:17 205:9
206:3
**complying** 60:2
184:15 185:2,8
191:17 203:8
**component** 27:10
28:11,12 29:8
76:14 81:2,4,19
**components** 60:13
68:1,3 69:14,14
71:12
**computer** 96:1,19
96:20 107:21
238:6
**concept** 30:13
31:2,8,10 186:7
**concepts** 65:13
**concluded** 245:5
**concludes** 91:18
**condition** 98:17,18
**conditions** 37:8
**conduct** 89:22
**conducting** 48:21
49:1 52:9

**conference** 8:14
**confirm** 16:15
61:11 63:20 77:18
91:21 117:8
118:11 123:1
141:6 146:1
157:18 162:12
173:16 174:3
176:15 178:13
185:16 192:11
195:21 203:20
217:21 218:20
227:3 240:4 243:8
**confirmed** 242:15
**confirming** 16:17
**congruent** 217:18
**connection** 75:19
**consecutive**
160:16,16
**consider** 72:16
74:16 180:17,19
**consideration**
221:7
**considerations**
72:15 180:20
224:6,22
**considered** 23:17
90:22 132:11
**considering** 223:9
**consistent** 217:22
**constantly** 37:1
**constitute** 9:6
**consultants** 48:22
**cont'd** 4:1 5:1 7:1
**contact** 77:14
170:22 200:19
**contemporaneous**
173:2
**contemporaneou...**
173:11

**context** 47:15
55:14 76:10 126:4
198:15 237:11
**continue** 68:15
74:5 85:2 182:9
188:19 189:16
191:10 192:6
194:9 204:16
213:2
**continued** 43:5
175:22 210:8
213:1,9
**continues** 208:18
**continuing** 73:8
79:7,12 80:15
81:8 86:8 120:10
194:4,6,11 206:12
**continuously**
210:9
**contraband** 55:11
**contracted** 37:3
**control** 79:21
168:10,10,11
**controlled** 24:20
31:17 125:17,19
125:22 126:11
**conversation**
13:12 148:21
157:2 186:8 234:2
**conversations**
109:5 115:18
**coordinator** 1:20
4:9
**copies** 96:19,22
97:4 100:18 101:7
102:11,22 103:9
103:10,17 248:14
**copy** 97:1 99:19
130:2 228:3
230:15

[corey - days]                                                                 Page 9

**corey**  1:5 3:2 8:8
  114:16 127:20
  157:4 248:4 249:1
  250:1
**coris**  107:21
**corner**  118:12
  130:7 207:4
  230:17
**correct**  17:3 27:16
  34:17 36:10 37:20
  40:16 45:10 46:2
  46:12 47:18 48:1
  49:9 50:16 51:6
  53:15 55:4 56:9
  56:13 59:5 62:7
  63:22 65:19 68:16
  69:16 73:18 74:1
  75:3 76:16 78:11
  78:16 79:8 83:20
  87:20 92:1 97:12
  99:20 100:6,21
  101:10,16 102:8
  103:21 104:14
  105:1 106:12
  108:5,18 117:20
  128:22 134:1
  140:22 141:10
  153:15 155:6
  157:10,13,15
  158:18 163:22
  164:2 165:14
  166:7,12 167:20
  169:3,4,13 170:19
  171:20 172:4
  173:12 175:4
  177:17 180:9
  181:21 184:9
  186:4,15 188:10
  188:17 189:5,8
  190:5 191:19
  192:13 194:13

  196:3,17 198:5
  199:9 200:12,19
  201:4,14 202:10
  202:20 204:1,20
  205:21 206:13
  208:14,19 209:21
  210:3,11,17 211:4
  211:8 212:4 216:3
  216:15 220:22
  223:15 225:17
  227:4 228:22
  229:6,12 230:11
  232:5 239:20
  240:2,6,9,17 250:8
**correction**  20:6
**correctional**  18:2
  18:3,5 19:7,12,21
  20:4,7,7 21:1,17
  21:18,18 22:15
  55:17 56:1 57:1
  65:4 78:5 83:19
  87:9 89:21 146:4
  146:14,17 147:2,4
  147:9 186:13,14
  189:4,7
**corrections**  1:13
  1:17,22 2:3,5 4:5
  4:7,10,12,13 16:22
  17:8 20:21 77:19
  89:7 114:2 250:6
**correctly**  51:11
**correlation**  43:20
  46:4
**correspond**
  140:21
**cost**  180:22 181:1
  224:11,15,16
**counsel**  246:10,13
  247:7,10 248:14
**count**  133:5,6
  203:17

**counter**  224:8
**county**  17:18,19
  17:20
**couple**  12:3,18
  13:4 47:10 63:14
  67:9 90:13 95:20
  122:15 165:6
  217:16 220:11
  225:20 244:22
**course**  11:8 25:2,3
  26:4,14,17,22
  28:22 29:2,9 35:6
  35:9 39:16 48:19
  97:15 211:2 218:6
  218:8
**courses**  119:16
  120:9
**court**  1:1 8:11
  11:16 70:12,20
  115:9 218:11
  226:19 242:1
  243:22
**cover**  18:10,11
**covered**  31:22
**covid**  23:9
**crashed**  100:20
**crashes**  100:16
**creek**  21:17
**criteria**  69:4,6,18
  69:22 80:6,12,18
  99:14 108:22
  126:18,21 127:1
**cross**  193:18
  195:17,18
**crossed**  170:17
  185:8 193:21
**crosses**  192:15
**crossing**  170:18,21
  173:9 174:21
  192:11

**crush**  181:10,10
**cs**  248:15
**current**  10:15
  15:13 146:13
  147:3
**currently**  36:13
  145:20 163:5
**cv**  1:8

**d**

**d**  6:1 7:15 8:1 45:4
  155:19
**daily**  132:20
**damage**  185:12,15
**danger**  179:21
  206:18 207:7
  214:10
**dania**  3:5 9:13
**dania.qahoush**
  3:11
**data**  100:11,21
  101:14 102:2
  103:2,3
**date**  2:11 121:13
  249:24 250:12
**dates**  21:21 22:1,4
**david**  1:22 4:10
**davis**  4:14 9:16,17
  13:4,9,12 14:8
  18:22 63:10,16
  64:6 96:16 103:5
  146:5 180:10
  204:21 207:9
  210:19 241:21
  243:19,21 244:4,8
  244:11,15 248:1
**day**  62:14,14
  132:21 158:14
  222:10 250:15
**daylight**  64:14
**days**  244:14
  248:17

CONFIDENTIAL

dc  2:14 3:8
de  77:20,22 78:6
  78:21 167:5
deal  89:8 92:22
decide  84:18 86:20
  185:4 209:3
decided  181:8,20
decides  92:21
  224:13
deciding  75:15
decision  71:21
  72:3 82:10 93:3,3
  167:15 180:16
  182:1 185:10
  206:1 209:14,14
decisions  79:18
  86:7
declare  250:4
decoy  31:18
decoys  31:13
deemed  250:6
defendants  2:7 4:2
  9:21
defense  6:7 116:10
  116:12,14,18,21
  118:1 119:15
  120:4 121:18,20
  121:21 122:5,21
  123:8 128:20
  129:5,6,8,12 130:2
  136:8,12 139:14
  140:6,8 141:7,14
  141:16,20 142:1
  143:5,7,12,19
  147:18,20 148:2,7
  148:11 150:4
  152:14,19 153:19
  154:17,18,22
  162:3,8,12,22
  165:8 187:7 226:4
  226:12,21 227:1,8

227:10,14 228:18
  228:21 231:20
  232:1,7 236:22
  237:4,6,10,15,21
  238:8,11,15 239:3
define  90:4
defines  61:1
definition  61:4,5
  83:22 84:3 90:7
delay  226:1
deleted  100:1,15
  101:22 102:10,13
  102:21 103:20
  105:1
delta  45:6
department  1:12
  1:16,21 2:5 4:4,7
  4:10,12 16:22
  17:8 51:10 114:1
depending  87:21
deploy  78:21
  190:21 206:2
  209:3 224:4,6,9
deployed  46:15
  160:13 183:4
  190:15 205:5
  206:19 215:18
  220:18 222:2,5
deploying  56:20
deployment  78:1,3
  205:7 209:9,20,21
  221:5
deployments
  221:2
deploys  224:17
deponent  248:13
  250:3
deposing  248:13
deposition  2:9
  7:18 8:4,7 9:4
  10:19 11:1,14

12:11 13:3 67:4,7
  246:1
describe  15:4,19
  24:2,17 36:22
  46:18 52:13 82:3
  82:6 83:11 84:11
  85:21 106:9
  110:22 170:6
  175:16 183:11
  219:7
described  45:18
  60:9,13 65:12
  80:6 84:2 198:19
  214:15 228:10
  231:10
describing  98:6
  127:20 188:16
  190:16 199:5
  207:16
description  6:6
  7:2,16 234:13
descriptions
  228:14
destroy  90:21
detail  46:19
  101:19
details  204:4
detection  55:11
determination
  70:2,8 71:15
  82:14 84:21
  181:18 214:14
  223:10
determinations
  93:6 184:14
determine  59:10
  59:22 72:16 79:15
  225:1
determined  132:6
  134:15 205:5

determines  91:15
determining  73:7
  81:7
diagonally  207:2
difference  57:19
  100:4 133:13
  223:21
differences  38:13
  47:11 53:21 61:17
  92:8
different  11:2
  23:10,12 24:9
  28:19 38:3,4,7
  39:12,12,20 40:10
  45:1 48:7,8 57:6
  68:1 69:13 73:15
  77:6 82:9,22
  86:22 88:18 93:14
  94:6,6,6,11,14
  100:8 110:13
  113:3,5 124:12,22
  133:15 141:3
  149:7 156:1 197:2
  198:7 223:22
  224:18 231:4
  234:10 237:22
  238:3
differently  228:11
difficult  225:7
digital  96:22 246:8
  247:3
digitally  101:21
  102:5
dingo  95:10,17,18
  95:22 96:1,5,9,13
  97:3,7,16 98:1,7
  98:15 99:20 100:1
  100:5,7,15,20
  101:14 102:17,20
  103:2,4,12,16,20
  103:21 104:2,4,5,7

CONFIDENTIAL

104:14,18 105:1
124:11,22 129:21
130:4 138:7,15
228:3 230:4,8
**direct**  114:6
139:13 231:1,3
**direction**  206:20
**directly**  111:10
114:2
**director**  1:15 4:6
**disability**  178:17
**disagree**  113:12
152:5 201:22
**disagreed**  111:3
114:13 149:4
150:6
**disagreement**
114:5 148:19
149:7,8
**discussed**  123:3
**discussing**  13:16
33:21 50:12
126:13 219:3
**disengage**  73:5
161:4 183:6
185:11 214:5
217:1,11,14 219:4
**disengaged**  182:22
184:4 185:14
**disengagement**
32:1 161:20
**disengages**  217:11
**disengaging**  32:4
184:15
**district**  1:1,2 8:10
8:11
**division**  1:3 8:12
**doc**  103:14 114:1
**document**  106:9
112:16 117:8
120:8,13 121:10

122:16 123:2,4
129:2 130:6 136:3
136:4,15 138:14
147:16 156:22
229:3,6 232:19
233:10,11 236:4
236:19,20
**documentation**
156:4,15
**documenting**
233:1
**documents**  7:17
13:11,14,20 14:2,6
103:15 116:4
174:6 225:21
231:9
**dog**  27:5 32:7,17
33:14,15,16 38:4
39:12 40:2 71:20
95:11 98:6,22
124:15 132:17
133:17 159:21
160:17 161:17,18
169:21 170:1
178:7 182:16
183:19,21 187:1
209:8 211:17
214:7
**dog's**  25:16
**dogs**  16:8,11 25:12
27:1,4,8
**doing**  10:13 33:9
35:18 75:7 93:4
94:7 98:5 129:22
133:12,12 138:11
138:19 218:20
224:11,12,16
**door**  49:18 170:14
172:21 173:13
179:10 189:11
194:20 195:18

197:16
**download**  122:4
164:4
**dozen**  232:14
**dozens**  33:13
82:16
**drags**  210:14
**drops**  201:2
**due**  37:10 234:14
**duly**  10:5 246:5
**dust**  190:8
**duties**  18:4 62:14
**duty**  39:1 135:15
158:1,3

| **e** |
| --- |

**e**  1:5 3:1,1 4:1,1
5:1,1 6:1,5 7:1,15
7:15,15 8:1,1
107:22 108:8,8,13
154:12 230:7
248:4 249:1,3,3,3
250:1
**earlier**  37:18
41:19 45:21,22
47:13,16 56:7,15
56:18 73:10
117:15,16 124:10
146:6 148:18
165:9 167:14
182:7 188:7
189:13 196:15
207:15 215:21
217:5 220:21
229:8
**earliest**  121:13
**easier**  110:9,11
174:15
**easily**  181:9
**eastern**  64:14
**education**  16:16
16:18 120:11

**educational**  15:5
**effectively**  37:14
**efficiencies**  54:19
**eight**  202:16 207:2
**either**  14:1 27:3
78:12,19 105:3
126:15 159:7,8
168:22 175:13
242:19,19,21
**electronic**  229:10
230:3
**electronically**
230:9
**email**  6:17,20
148:5,7 149:3,11
149:13 150:3,11
150:15 152:18,20
155:3,14 156:14
**emailed**  232:10
**emailing**  155:11
155:13
**emails**  155:17
**emily**  5:5 9:19
**employ**  78:8
**employed**  21:11
96:9,10 113:22
246:11,14 247:8
247:11
**employee**  49:4
96:6 102:15
117:12 144:21
145:2,5 146:11
246:13 247:10
**employees**  48:21
49:2
**employer**  17:14
**employment**  17:13
117:3
**employs**  89:8 96:2
**enable**  68:14

[ended - exhibit]                                                                    Page 12

**ended** 228:2
**ends** 232:18
  233:10 236:4
  239:11
**engage** 176:1,19
  193:3 204:19
  205:15,18 210:2,8
  213:1
**engaged** 171:8
  178:5,7 179:3
  182:3 183:8,15
  187:1 188:9
  189:21 191:11
  198:4 210:10
  211:7 212:3 214:7
  242:13
**engagement** 78:22
  137:19 139:21
  140:10,20 141:8
  183:10 211:13
  212:7 232:11
  238:18 239:1,18
**engagements** 96:2
**engages** 210:5
**engaging** 78:15
  176:1 206:17
**enter** 130:4 168:7
  171:14
**entered** 100:8
  103:16 167:11
  172:3 176:3 178:4
  216:2
**entering** 97:16
  98:5 99:19 159:12
  166:5 168:20
  169:2 174:21
  177:14,16 215:12
**enters** 167:22
  168:5 192:21
**entire** 21:7 26:13
  35:15 144:16,20

  145:1 187:11
  222:14 223:3
**entirely** 53:19
**entirety** 145:12
  220:3
**entitled** 14:6 18:16
  19:2
**environment** 82:5
  84:8 94:17 174:9
**equipment** 84:16
  84:17
**equivalent** 67:22
**erased** 102:3
**errata** 248:11,13
  248:17
**erratas** 248:15
**error** 107:6 140:3
  140:12,15,18
**errors** 110:6,12
**es** 246:4
**escalate** 77:20,22
  167:7,10
**escalation** 78:6,21
  167:6
**escape** 134:14
**esquire** 3:3,4,5
  4:14,15 248:1
**estimate** 29:19
**et** 8:9 248:4 249:1
  250:1
**evaluate** 94:21
  95:18
**evaluated** 67:14
  69:4,7,13,19 71:12
  85:17 105:18,19
  105:21 126:14,22
  127:2 128:18
**evaluates** 124:18
**evaluating** 25:16
  94:21 98:12

**evaluation** 6:10
  67:19 68:10,13
  69:12 70:1,1,3
  71:14 72:3 94:19
  95:2,6,9,11,16
  97:11,18 98:2,3,3
  98:6,8 124:9,12,13
  124:14,17 125:16
  126:22 128:8,11
  128:13,19
**evaluations** 67:19
  68:18,21 124:4,7
  127:6
**evaluator** 125:10
  125:14 128:2
**event** 113:9,14
  132:5 158:18
**events** 13:15
**eventual** 100:10
**everybody** 46:21
  58:10 64:9
**evidentiary** 9:3
**evolve** 63:5
**exact** 92:19 126:18
  169:16
**exactly** 24:11 94:5
  149:12 156:8
  197:10 198:19
  199:4 244:13
**examination** 6:2
  10:9 11:5
**examine** 98:22
**examined** 10:7
**example** 38:11
  55:9 56:17 58:8
  86:11 95:1 130:2
  134:18 138:14
  229:15
**examples** 146:21
**exclusively** 87:11

**excuse** 36:14 55:2
  92:14 117:16
  120:3 127:12
  139:14 143:15
  144:3 151:7 191:5
  208:8,11 236:4
  243:21
**exercise** 81:21
**exhausted** 77:9
  80:2
**exhibit** 6:8,10,11
  6:13,14,16,17,20
  7:3,4,6,8,9,11 12:9
  12:11 115:22
  116:10,12,14,18
  116:21 118:1,3,10
  118:12,20 119:15
  120:4 121:18,20
  121:21 122:5,5,21
  123:8 128:20
  129:5,6,7,8,12
  130:2 136:8,9,9,11
  136:12 139:14
  140:6,8 141:7,15
  141:16,20 142:1
  143:5,7,12,19
  147:18,20 148:2,8
  148:11 150:4
  152:14,19 153:19
  154:17,18,22
  162:2,3,8,12,22
  165:8 187:7 226:2
  226:3,4,12,21
  227:1,8,10,14
  228:19,21 229:15
  230:11,14 231:20
  231:21 232:1,7
  233:2 236:22
  237:1,5,6,10,15,21
  238:9,11,15 239:3
  240:1,5,8,11

CONFIDENTIAL

[exhibit - fist]                                                          Page 13

242:11
**exhibited**  60:1
**exhibiting**  59:11
  60:16 73:9
**exhibits**  7:13
  116:12
**existed**  147:3
**existent**  104:6
**experience**  16:4,6
  38:1 76:10 80:22
  81:3 87:1 99:3
  110:17 128:6
  152:10 176:19
**experienced**  91:22
**experiential**  81:18
**explain**  20:12
  31:14 32:3 38:6
  44:7,22 48:16
  54:1 56:21 57:11
  59:9,17 88:22
  101:19 132:1,15
  134:5,11 167:2
  221:18 234:6
**explaining**  41:19
  133:12 181:14,15
**explanation**  126:6
**explicit**  19:2
**expressing**  150:21
**extent**  52:2 76:14
  196:16
**extreme**  149:16,17
**eyes**  171:5,9

**f**

**f**  7:15
**face**  179:14
**facilities**  22:3,12
  23:13 35:20
**facility**  21:10,13
  21:22 22:15 23:8
  23:10 127:21

**fact**  65:22 75:16
  86:12 100:20
  104:13 117:9
  140:15,16 167:10
  168:16,22 194:6
  216:6 242:22
**factors**  75:14
**facts**  86:11
**fail**  42:1,9 79:4
  128:7
**failed**  42:15,18
  43:7,19 44:1 46:1
  46:6,9 128:12
**failing**  42:3,6
**fails**  248:19
**faint**  70:21 71:10
**fairly**  177:13
  192:20
**faith**  184:11
**falsely**  151:19,22
**familiar**  30:12,22
  31:7,10 34:9,11
  40:8 89:4 114:16
  114:19 126:4,8
  157:4,8 186:12
**familiarity**  127:20
**family**  16:12
**far**  32:20,21,22
  38:9 47:3 55:8
  57:3,14,14,18
  58:22 59:14 63:6
  65:16 67:18 68:6
  73:12 78:2 83:1
  87:12 90:3 94:4
  98:15 99:10,16
  100:8 105:16
  106:3 110:12,12
  112:3,14 120:1
  123:21 126:6
  139:6 149:11
  150:9 154:14

175:18 192:17
  201:16 228:9
**fast**  15:21 16:1
**february**  142:14
**federal**  11:16
**feel**  236:16
**feeling**  98:22
**feet**  191:13 192:19
  201:3,13 202:16
  207:2,4 211:14
**fellow**  109:5
**felt**  113:12 179:9
**female**  38:8
**field**  19:15,16 20:2
  20:11,17,20 21:2
  22:16 23:15 28:7
  28:8,10,11,14,17
  33:17 39:13,21
  40:10 76:11,12
  87:2 95:1
**fight**  84:1,3,16
  88:20 94:12,15
  159:5,6,9 172:13
  180:5,8 189:22
  192:17 194:4,6,10
  196:1,20 234:11
**fighting**  58:9
  59:20,21 72:12
  77:17 78:14
  160:17 168:2,3
  169:1 170:2,3,16
  178:15 182:16
  183:20 191:17
  193:9 194:13
  197:12 198:16
  202:9,12 211:17
  224:10
**fights**  83:12,15,18
  139:20 140:9,20
  141:8

**figure**  231:14
  236:5,13,15
**file**  1:7 116:6
  150:12 162:13,15
**filed**  8:10 155:19
  156:18
**fill**  23:7 236:7
**filling**  35:18
**fills**  233:15
**final**  182:6
**finalized**  108:18
**financially**  246:15
  247:11
**find**  104:3 118:9
  156:1
**fine**  20:10 174:14
**finish**  11:6 218:4
**finished**  121:3
  204:11
**firing**  168:11,12
**first**  9:10 10:5
  11:4,5 17:22
  19:19 20:1 30:19
  34:19 35:5,8
  37:11,20 40:10
  67:11 86:13
  117:22 118:4
  124:2,5 142:16
  150:1 154:7
  159:13 160:1
  165:12,17 166:6
  170:5,5,8 179:11
  183:4,8 187:13,16
  210:2 212:20
  215:1 220:5,14,15
  221:4 229:4 232:6
  234:12
**fist**  59:4,6 75:13
  176:17 177:2
  189:22 203:5
  216:2,4,6 217:8

[fisted - go]                                                                                          Page 14

**fisted**  58:21 176:9
  222:1
**fists**  180:4
**five**  24:12 29:20
  29:22 34:13
  109:21,22 115:3,6
  115:6 140:1,10
  164:10 218:5
  241:5,16
**fix**  107:8
**flip**  122:12 140:5
**floor**  159:7
**flow**  110:8,10
**fly**  181:3
**focus**  81:1,2
**folder**  116:12
  231:8,18
**folks**  115:6
**follow**  58:4 242:10
  243:22
**followed**  209:15
**following**  46:7
**follows**  10:7
**folsom**  2:15 8:3
  246:2,17
**food**  15:21 16:1
**force**  57:1,8,13,14
  57:16 58:16 59:1
  59:5 60:16 61:17
  62:2,5 63:7 64:20
  65:14 66:2,6,9,13
  69:3,14 70:1,2,3,7
  70:9 71:11,16,18
  71:19,21 72:4,4,6
  72:8,9,10,17 73:1
  73:15,18 74:5,10
  75:10,15,18 76:2,4
  76:6,7,8,22 77:3,5
  78:12 79:6 82:1
  82:11 84:18,21
  86:8 88:18 89:1,6

89:13,15 92:6
  131:13 132:6,10
  134:22 135:2,17
  135:22 145:21
  146:4,14,19 147:4
  167:7,15,19 169:7
  180:22 181:1,5
  184:16 205:6
  206:2,5 209:15
  213:9 214:19
  215:5,9 220:15,17
  221:2,8,15 222:16
  222:21,21,22
  223:6,13,13,14,14
  223:18,22 224:2,4
  224:6,7,19 225:2,3
**foregoing**  246:3,4
  247:4 250:5
**forehead**  234:19
**form**  28:5 96:17
  100:7 120:20
  123:10,12,16,22
  129:15 137:21
  169:6 204:21
  207:9 210:19
  211:3 224:4,19
  226:17 227:20,21
  233:15,16,17,20
  236:7
**formal**  16:16,18
**formalized**  16:10
**former**  128:10
**forms**  55:6,22
  126:11 129:18
  231:15
**forth**  50:7
**forty**  191:4
**forward**  201:3,12
  213:8 219:5
**fought**  215:16

**found**  104:17,18
  119:18 121:13
  243:3
**foundation**  95:21
**four**  34:13 124:3
**fourteen**  238:20
  238:21 239:1
**fourth**  139:19
**frame**  196:10,12
  198:13,13 200:1,2
**frequency**  95:5
**frequently**  63:5,6
  66:13 109:12
**friends**  16:13
**frisk**  161:10,10
**front**  12:5,13
  116:1 122:20
  129:6 157:19
  174:4 195:18
**frustration**  150:22
  152:9
**fto**  20:5
**full**  10:15 11:9
  27:5,6 31:16,18
  48:17,18,18 72:17
**fully**  210:15
  220:12
**function**  124:22
**further**  72:14
  185:11 186:1
  244:6 246:12
  247:9

### g

**g**  8:1
**gain**  185:6
**gained**  54:20
**gaining**  72:11,17
**gathering**  234:21
**general**  4:16 5:3,5
  9:17 90:10 91:19
  223:18

**generally**  24:13,17
  69:3 126:13
**gestures**  75:2,18
**getting**  72:2
  141:13 222:3
  241:8
**give**  11:8 26:7,8
  33:4,14 59:7,15
  73:4 78:14 81:12
  116:10 121:17
  136:5 166:16
  167:3,6 168:8
  169:12,16,18
  172:1,7 173:20
  175:2 178:8 183:5
  206:2,4 217:1,3,10
  217:15 225:21
  230:3 244:9
**given**  79:20 80:19
  81:10,20 106:8
  165:4 166:21
  167:10,17 168:7,8
  169:1,6,11 178:3,6
  178:20 179:1
  194:6 196:19,21
  204:8 205:14
  206:16 214:1
  250:9
**gives**  168:1
**giving**  56:17
  159:19 170:12,15
  170:16,18,20,20
  172:18,22 179:12
  180:15 181:19
  193:8,21,22 194:2
  199:19 205:8
  209:6,6,18 217:4
**glitch**  137:13
**go**  9:10 10:22
  12:21 20:15,16
  22:22 23:10,21

32:17 40:13 47:3
49:20 64:11,17,22
67:19 68:7 72:10
72:13 83:13 84:9
85:9 86:22 87:22
88:6,10 92:16
96:17,20 107:17
112:14 115:8,14
119:6,11 122:10
133:3 137:17
142:6 144:4
146:18,19,20
161:13 164:6,15
164:20 177:21
182:9 187:15
191:2 192:22
196:9 198:13
199:17 200:1
210:19 212:19
215:11 216:20
218:10,16 230:13
233:10 236:19
239:4 241:6,22
244:20
**goes**   20:18 57:3,14
63:7 67:18,19
83:2 94:5 98:13
98:15 99:16
105:16 106:3
149:12 150:9
205:18 212:16
232:14
**going**   10:22 11:4
12:2 13:19 14:22
24:9 25:5 27:21
47:9,22 50:6
54:16 56:15 75:22
80:3,4 86:18
88:17 91:18 93:3
93:7 95:20 96:16
100:2 115:1,5

116:6 121:2,17
126:14 127:5
129:4 130:11
132:15 134:8,12
134:17 135:14
136:2,3,5 145:15
147:1 157:1
159:16 162:4,5
168:3 171:5,16,19
172:18,19,22
173:1 175:10
180:21 187:10
193:17 197:10,22
199:13,20 201:18
201:19 204:18
206:20 208:7
223:3 225:2,3,18
225:19 226:6
227:6 236:19
241:5 243:12
245:1
**good**   8:2 9:11,16
10:11,14 63:11
115:2 184:11
218:8
**gotten**   165:19
**graduate**   15:8,11
**graduated**   17:3
**grammatical**
107:6 108:21
110:6,12
**grammatically**
106:11,12
**great**   10:11 12:16
13:2 14:21 19:6
116:3,20 129:11
162:17 164:13
241:22 244:5
**grievance**   155:19
156:8,10,17

**grievances**   161:17
**ground**   12:3 72:12
73:2,2 74:1,8,12
74:15 159:20
168:4 169:21
170:3,3 175:3
178:16 181:6,9
183:18 184:7
189:21 191:17
198:1,4 199:7
202:10 203:9,16
205:9 207:5 209:7
210:14,15 211:6
211:15,16,16,17
212:21,22
**group**   89:7 90:18
112:18,19 160:6
179:14,19 207:16
**groups**   89:8
**guess**   18:21 34:2
192:18 243:19
244:14
**guessing**   53:5
**guy**   239:16,20
240:15,17 242:12
242:16,21
**guy's**   240:1

**h**

**h**   6:5 7:1 249:3
**hairline**   234:20
**half**   13:10 27:22
28:1
**halls**   45:8
**hand**   10:2 118:12
130:7 160:18,22
161:2 179:16
182:16,19,21
183:20,21 184:9
184:11 185:13
213:14,20,22
215:22 216:1,5

217:7 223:1
230:17
**handle**   27:13 28:3
31:20 49:20
**handled**   27:14
**handler**   25:17
40:9 42:14 44:11
47:2 62:2 96:10
96:13 120:10,11
123:11 125:5
130:20 158:1
**handlers**   25:12
41:10,14 51:18
53:2 77:21,22
78:8,8 98:12
232:12
**handling**   16:4,7
21:6 120:5 128:6
147:7
**hands**   72:12 73:3
74:9 75:13 185:8
203:5 217:7
**happen**   40:1 83:19
89:13 106:3 132:8
137:20 204:5,15
223:7
**happened**   38:20
40:6 100:22 101:2
101:5 102:6,7
104:21 109:16,18
109:21 137:7,20
140:14 158:22
159:11 160:3
182:2 183:7,8
215:13 219:6
**happening**   91:20
170:11 172:16,19
173:11 183:14
198:8 201:21
219:7 223:4

**happens** 89:12
198:11 222:22
223:1
**happy** 115:5
**hard** 103:9 130:2
138:15 174:10
192:18 200:3,8,9
200:14,15 201:17
212:10 239:4
**hardcopy** 103:4
**harm** 179:7,9
184:3 214:4
**harold** 1:13 4:5
**health** 36:18,19
98:2,9,12,14 99:16
**hear** 15:22 24:4
30:16 70:22 71:3
137:3 166:16
178:6,12 209:17
**heard** 31:1,3,5
166:10 178:15
182:18 234:15
**hears** 32:7
**held** 22:2,10
201:10
**help** 12:14 33:2
47:10 58:13 80:7
85:20 157:19
222:7 223:9
**helping** 225:1
**helps** 99:3 174:17
**hereto** 246:14
247:11 250:7
**hesitate** 50:8
**hesitation** 24:21
**hidden** 118:18
**hide** 216:8
**hiding** 183:19
**high** 15:7,8,18,20
16:15,17 17:3,20

**highest** 15:6,7
16:18
**hired** 18:1
**hit** 162:5,11 190:8
241:6
**hobby** 16:12,14
**hold** 19:10 30:13
30:16 31:8,13,15
31:20 32:2,5,10,13
32:18,20 33:5,12
33:20 186:7,12,14
186:16,18 187:1
199:11,11
**home** 22:21
**homemade** 214:11
214:13 215:5,10
**honest** 152:1
**honestly** 30:19
**hope** 115:8
**hoping** 64:21
**hour** 13:10 24:3,6
24:8 26:13,17
27:3,10 29:17
30:15 43:8 47:5
47:11,12,16 50:6
53:13,18,20 54:4,7
54:9,10,14 55:3,3
61:13,13 67:11,12
76:1 82:19 83:3
88:8 92:5,9,10,15
92:17 93:15,16
99:10 105:4
117:17,19 118:2
119:2,17 126:15
126:16 147:10
**hours** 24:8,15
26:21 27:5,6,15,18
27:20 28:2,3
33:18 46:12,18
47:1 54:2 128:3

**housing** 18:6
112:20 161:11
**hover** 122:14
**human** 38:18 61:3
**humans** 11:3
25:12
**hunched** 210:10
**hundred** 90:13
**hunting** 16:8,11

**i**

**icon** 122:13,15
**idea** 62:15
**identical** 100:12
127:1 228:14,15
**identification**
116:15 121:22
129:9 130:12
136:13 141:17
143:8 147:21
154:19 162:9
226:5 227:11
232:2 237:7
238:12
**identify** 59:4
60:15 98:22 198:3
216:21
**ignored** 175:22
182:18
**ii** 21:16
**immediate** 209:11
232:13
**immediately** 151:4
172:22 192:22
233:22
**imminent** 177:4
179:7,9 206:17
207:7 208:1 213:2
214:3
**imminently**
176:21

**impact** 11:17
**important** 50:1
**incident** 7:3,8,9,11
84:18 89:14
101:13 104:7
105:5,8,10,11,11
105:15,17,18
106:2,3,5,9,12
107:12,20 108:3,7
108:10,11,13,22
109:6,13 110:19
110:22 112:13,15
112:16 114:5,9,14
114:20 131:18
134:19,19,20
135:4 141:9
148:20 149:3
150:8 151:10,19
152:15 153:15,18
153:20 155:17
156:5,16 157:8,12
157:15 158:9,11
159:1 160:2 163:1
165:5,11,13
170:10 219:9
220:3,10 222:14
226:22 228:20
231:6,10 232:19
232:22 233:1,21
234:13 237:2,18
237:21 239:13
240:2 242:10,21
**incidents** 40:5
42:13 86:4,7 87:8
87:12 94:9,11
132:8 153:11,19
156:2 220:1,2
228:10
**include** 95:11
118:3 134:3 220:5

**included** 81:6
  231:13
**including** 90:1
**incorrect** 75:5
**incurred** 232:11
**indian** 21:16
**indicative** 87:3
**individual** 1:14,18
  2:1 4:5,8,11 30:9
  58:20 59:4 73:9
  73:22 75:17 78:19
  79:8 80:14 91:3
  161:13 180:8
  184:3 214:10
  215:18 240:22
**individuals** 29:16
  29:22 35:19,19
  48:7,9 49:10
  50:12,14 51:5
  52:7 53:14 58:19
  84:4,7 160:12
  164:1 179:20
**ineffective** 224:18
**infections** 37:1
**information** 81:10
  97:16 99:19 100:9
  102:13 171:22
  172:6 173:20
  179:1 196:2
  227:22 230:18
  233:20 234:1,3,8,9
  234:21 235:4,5,7
  235:10,13,18,21
  236:14
**informed** 93:3
  159:1 195:22
**initially** 18:11
**injuries** 240:1
**injury** 186:1
**inmate** 57:16
  59:11 60:5,15

74:7,11,13,18,19
  75:1,2 78:19
  85:11,13 168:22
  174:20 179:3
  181:8 182:4
  184:14 189:21
  191:10,15,16
  192:18 194:12
  198:5 202:9,11
  203:3,8,16 207:1,2
  215:5,10,16
  233:21 234:4
**inmate's** 75:18
  181:10
**inmates** 58:9 60:3
  77:16 85:4,5 89:9
  90:12,19 112:19
  160:6,9 161:9
  163:4,13 166:13
  179:8,14 181:6
  188:8,13 206:20
  207:5,6,17 208:2
  234:22
**inside** 20:18 38:10
  40:4 44:14 54:8
  83:13 104:9,11
  132:18 133:19
  135:5 136:22
  159:14
**instance** 19:1 38:9
  40:1 111:21
  135:16 181:5
  185:19 235:17
**instances** 87:12,16
  132:4 153:8
**institution** 18:7
  20:19 23:3 29:1
  38:10 44:14,15,20
  45:2 47:8 83:13
  104:9 132:18
  133:19 134:14

135:5 136:22
  226:18
**institutional** 82:4
  84:8 94:17
**institutions** 22:10
  22:22 49:16
**instruct** 32:12
  52:17,19 205:15
**instructed** 58:9
  108:3 151:2
**instruction** 19:2
  106:8
**instructor** 25:19
  32:21 34:1 42:9
  53:9 67:17 128:15
  145:22
**instructor's**
  123:10
**instructors** 25:10
  31:4 49:14 51:8
  52:3 68:9,10
  94:21
**instructs** 18:22
**intelligence** 69:8
  69:15
**intended** 9:1
**intentions** 201:16
**interaction** 85:17
**interactions** 87:3
**interested** 246:15
  247:12
**intern** 5:3,5
**internal** 232:19
**internet** 137:6,13
**interns** 9:18
**interrupting**
  213:15
**interview** 20:15
**introduce** 9:9
  136:4

**inverse** 135:20
**investigation**
  232:16
**involved** 73:4 74:7
  89:1 114:21 157:9
  165:19 166:13
**ir** 228:7
**issue** 103:1 111:13
  113:16 137:5,6
  153:11,13 173:5
  173:12
**issued** 173:10
  202:17
**issues** 36:18,19
  108:21,21 151:13
  153:9
**issuing** 171:10
**items** 99:1

**j**

**j** 164:3 188:6
**jail** 28:22 29:4,12
**janet** 2:15 8:3
  246:2,17
**january** 34:21
  35:12 101:15
  127:13 243:13
**jeffrey** 1:9 4:3
**jimmy** 125:10,13
  128:2 155:20
**job** 2:16 15:14
  20:15 51:14 58:5
**jobs** 15:16,19 52:5
**john** 2:6
**johnson** 1:5 3:2,3
  6:3 8:8 9:10,11,12
  10:10 13:19 14:9
  14:10 63:13,17,18
  64:3,8,11,18 70:12
  70:16,20 71:2,6,8
  97:2 103:18
  114:17 115:1,15

116:8,16 118:14
118:16,20 123:4
127:21 130:8,13
131:19 134:20
139:15 141:9
143:10 146:7
157:4,8 158:8,10
158:13 159:14,16
159:19 160:5,14
160:16 161:8,13
163:2 164:14,21
165:1,5,11,13,18
166:6,11,17,21
167:16,16 168:22
169:7 170:6,11
171:1,8 172:1,16
172:20 173:5
175:1,2,22 176:4,6
176:17 177:3,15
178:5,14,21 179:2
179:8,20,22
180:12,16 181:7
181:20 182:4,11
183:4,9,15,17
184:6 185:12,17
186:1,18 188:13
189:21 191:10,16
192:9,17 194:12
197:12 198:3
199:1,6,17 200:2,4
200:19 201:2
202:1,3,7,16 203:1
203:15,21,22
204:17,17 205:3,6
205:16,18 206:2,5
206:11,15 207:3,7
207:12,13,16,22
208:12,18,18
209:4 210:3,6,9,14
210:15 211:1,3,11
211:21 212:4,8,20

212:22 213:3,10
214:1 215:16
218:10,17,18
219:11,15,18
220:7,15,19 221:9
221:16,21 222:17
227:1 228:20
231:22 233:1
237:19 239:12
240:2,5,9,14,20
241:1,15,22 242:7
242:8,11,13
243:17,20 244:2,5
248:4 249:1 250:1
**johnson's** 134:18
156:13 175:13
200:12 201:10,12
207:1 211:8
240:12
**join** 16:21 17:11
**joined** 17:22
**joshua** 5:3 9:19
**judged** 126:19
**judgment** 81:21
106:16,17 185:1
**jump** 14:17 66:22
115:2,3,7 214:6
**jumping** 121:3
**june** 2:11 8:6
35:13 36:1 41:3
248:3
**justification** 215:4
**justified** 221:8
**justifying** 75:17

**k**

**k** 6:16
**k9** 127:7,15
130:20
**keen** 21:17
**keep** 58:4 96:14,18
96:22 100:6,18

115:5 129:18
130:3 136:3
138:15 155:16
156:4,15 210:6
212:2 225:19
**keeping** 132:16
**kennel** 133:18,21
**kept** 100:5 103:9,9
156:10,12 195:10
216:5
**kind** 11:1 12:2,2
12:21 14:17,22,22
15:1 17:7 43:12
47:10,14 50:7
58:22 64:22 81:6
90:11 92:7 106:16
115:4,5 157:2
165:4 187:15
188:3 189:10
220:14 225:20
244:21
**kiser** 1:9 4:3
**kitchen** 45:7
**knew** 68:7,9
**knife** 214:13 215:5
215:10,20
**know** 11:8 12:17
13:22 14:3,6 17:7
18:12,22 21:22
22:4 33:1,21 34:4
34:5 36:19 38:19
38:22 39:11,18
41:9,12,15 43:3
44:21 46:15 48:9
48:12 50:3,4,5,6
53:3,9 54:5,13
62:10,11 64:4
65:16 66:8 67:15
67:18 68:10 71:2
80:16,20 81:3,11
81:18 83:5 86:11

86:13 89:19 90:8
90:12,15 91:8
95:8 96:7 100:10
100:22 101:4,5
102:14,18 104:13
104:15,15,19
109:2 113:7
116:17 119:1
121:19 122:11
129:6 136:10
139:16 140:15,16
141:15 142:15,22
145:22 147:18
148:15 150:20
151:14,17,21
152:1,6,12 153:22
154:10,15 162:7
166:10,20 168:15
171:18 173:22,22
174:16 178:10
180:14 181:3
186:6 187:14,20
192:2 193:6 194:1
197:10 199:2
203:11 209:12,19
209:19 215:10,12
215:14 216:21
219:22 227:9
229:8 233:4
234:10 236:16
237:4 238:10
240:19,22 241:18
243:14,14 244:11
**knowing** 215:16
221:20
**knowledge** 54:21
63:7 139:8,11
144:8 153:1
171:15 233:6
238:4 242:12
246:9 247:6

**knows** 47:2

**l**

**laceration** 234:19
**lacerations** 234:17
**lack** 17:13 87:16
**lame** 99:1
**lameness** 98:19
**landed** 182:13
**language** 176:11
176:18 177:2
180:4
**large** 89:8 90:1,15
90:18
**lasted** 216:14
**lasts** 212:9
**latitude** 185:1
**lauren** 3:4 9:13
**lauren.wulfe** 3:10
**law** 11:16 18:16
145:17,21 146:3
146:13,20,21
147:3,8
**laws** 9:3
**lay** 72:12 178:15
205:9
**laying** 73:1,2 74:8
74:14 160:9 181:6
181:9 182:13
**layman** 133:16
**layman's** 20:14
59:17
**layout** 122:12
123:21
**lead** 24:19,20
31:17 81:22
**leading** 52:1 78:15
94:2
**leads** 79:14
**learned** 80:12
**leaving** 81:15

**led** 177:3 181:4
207:22 215:19
**left** 52:4 106:16
124:2 131:4 150:9
160:18,22 161:1
182:16,19,21
183:20,21 184:9
184:11 185:13
188:5 197:18
198:1 199:15
200:13 213:14,20
213:21 215:22
216:1,5 219:15
230:17 234:19
**legal** 145:17
248:23
**legs** 185:8
**lesions** 99:12
**lethal** 224:20,20
**level** 15:6 16:18
18:8 56:16 78:21
108:15 167:7
**lie** 175:3
**lieutenant** 111:21
111:22 112:6,7,11
113:2,5,8,13,18,21
114:3,12 148:19
149:4,19,22 150:4
150:14,22 151:3,9
151:18 152:10,11
152:14,21 153:3,6
153:11,14,21
154:2,6,9 233:4
**life** 57:6 72:18
86:16 92:2 185:6
198:10
**limping** 99:11
**line** 9:19 104:17
125:4 131:11
139:19,19 140:19
152:4,8 189:3

200:11 249:4,7,10
249:13,16,19
**lined** 164:1
**lines** 107:7 110:15
124:3 125:5
131:11 170:4
**list** 6:15 14:1
21:15 22:1 79:13
137:17 228:8
**listed** 80:19
117:12 118:4,5
120:13 126:1
131:15 141:9
142:9
**listing** 119:15
**lists** 81:6
**literally** 133:21
**litigation** 162:5
**little** 10:22 11:2
20:13 28:6 43:13
92:5 99:4,17
137:4 141:13
174:10 175:17
183:2 191:3
199:13 212:10
234:5
**live** 17:15,17,18
**load** 227:7
**loaded** 115:22
187:8
**located** 160:10
**location** 2:13
127:15,19 193:16
194:22 197:8
**locations** 28:19
29:3
**log** 95:9 129:17
140:2
**logan** 142:19
**logged** 120:19

**logging** 129:19,21
**long** 13:8 18:5
19:6,18 21:22
30:18 31:5,6
35:11 50:21 73:3
96:22 106:10
108:9 149:18
164:9 186:6
217:14 222:10
244:11
**longer** 115:4 138:6
138:17 139:3,9
191:3 212:11
**look** 58:14 59:3,10
59:22 60:14 65:3
71:18,20 80:7,18
81:6 99:11,15
109:6 117:7 136:5
140:8 148:13,16
150:16 163:12,15
165:7 184:7
191:21 194:19
196:19 200:13,20
230:13 236:21
239:19
**looked** 81:16
173:21 180:4
184:1
**looking** 25:15 72:3
77:14 79:13,18
85:6 107:10 125:5
170:10 174:7
179:15 211:18
212:8 216:19
232:17 235:3
236:6
**looks** 106:15 155:7
163:13 189:1
192:18 193:2
194:21 197:12
198:6 200:3,6,11

**[looks - mentioned]**                                                                                              Page 20

200:15,17 201:1
205:13 208:22
210:2,7 219:14
226:6 229:4,5
**lose**  96:21 99:22
100:16,17,17
**loss**  100:21
**lost**  101:6,8,14,18
101:20,21 102:2,9
102:10,16,16
103:16 104:1
155:22 222:8
**lot**  17:6 87:5 96:20
96:21 102:9
174:15
**loud**  220:1
**lower**  183:12,15
234:17,18
**lowering**  202:3
**lpn**  233:15
**luckily**  91:13
101:7
**lunch**  115:17
133:3 157:3
**lying**  58:10 179:14
203:8 207:5

**m**

**m**  7:15
**machine**  164:3
188:7
**madam**  70:12,20
115:9 218:11
242:1
**main**  225:4,4,7
**mainframe**  101:22
**major**  17:14
**making**  79:11,18
80:13 86:7 91:4
98:7 180:16 181:4
200:19 206:1

**male**  38:8
**manager**  104:17
**maneuver**  205:20
**manner**  9:4 58:21
85:7 126:21 127:1
159:17 171:12
172:17 175:1
176:5,8 179:12
197:14 203:5
**manual**  81:14
144:7,13
**manuals**  144:9
**march**  34:20
**mark**  135:8,10
187:13 188:20
190:20 191:6
192:7 193:8 194:2
194:2,10,16
195:22 196:6,6
197:4,7,17 198:4
202:6 203:11
204:7 205:4,13,14
206:7,18 207:8,14
207:18 208:7,12
209:2,2,20 210:15
211:3 212:9,11,20
213:3 214:2
216:14,18,21
219:3,6 221:5,15
222:13 224:21
**marked**  116:10,11
116:14,18,21
119:15 120:4
121:18,20,21
122:5,20 123:8
128:20 129:5,8,12
130:1 136:8,12
141:14,16,20
142:1 143:5,7,11
143:18 147:17,20
148:2,11 150:3

152:19 154:17,18
154:21 162:3,8,12
226:2,4,12,21
227:8,10,14
228:18 231:20
232:1,7 236:22
237:4,6,10,15
238:8,11,15
**maroon**  163:14
**massachusetts**  3:7
**massingill**  219:16
219:18
**match**  25:11,16
106:2
**matched**  25:22
**materials**  12:13,19
80:19 81:5 157:18
**matter**  8:8 9:15
168:16 204:5
243:13
**maximum**  30:8
**mccowan**  1:8 2:10
4:2 6:8,17,21 8:8
8:9 10:1,4,11,16
14:11,12,14 63:19
64:19 65:9 71:9
115:16 116:9
125:6 129:3,4
130:21 136:7
137:1 142:9 157:1
165:2 195:3
198:12 202:15
203:21 207:10
218:19 241:4,9,16
242:9 243:22
244:9,15 248:4,5
249:1,2,24 250:1,2
250:4,12
**mccowan's**  117:5
142:16

**mean**  25:18 33:10
38:7,16 44:7
50:18 57:7 58:7
58:18 59:18 66:21
72:20 89:18 90:11
94:4 98:2,18
100:14 101:20
110:10 135:4
142:8 175:16
177:10,11,22
198:10 231:6
234:6
**meaning**  74:18
225:8
**means**  9:5 44:22
73:21 75:10
106:15
**meant**  65:9
**measure**  222:19
223:5
**measures**  123:19
126:1,2,5,12,13
224:11,15
**measuring**  222:20
**medical**  18:6 37:8
96:3 161:9,13
231:15 233:15,18
233:19,22,22
234:3,14 236:7
**meet**  40:3 75:11
**meeting**  68:11
**meld**  41:5
**member**  203:7
**memory**  18:14
105:12 132:1
152:13 197:2
198:7
**mention**  18:12
**mentioned**  29:5,13
117:18 243:7

CONFIDENTIAL

**mere** 204:5
**meredith** 247:2,15
**met** 158:13
**mid** 34:13
**middle** 45:3 189:1
**military** 243:9
**millimeter** 168:11
  168:13
**mind** 180:21 221:7
  221:14 222:15
  223:22 225:15
**mindful** 50:8
**mine** 85:21 117:10
  150:12 188:4
**minute** 115:3
  187:14 218:5
**minutes** 64:4
  115:6,7 128:4
  164:10 191:22
  241:17
**mischaracterizes**
  146:6
**miscommunicati...**
  172:10
**missing** 77:10
  110:8
**misspelled** 110:7
**misspoke** 36:15
  238:20
**misstating** 229:9
**mistake** 51:7
  141:3,5
**mister** 167:22
**misunderstood**
  167:14,22
**mixture** 80:21
**mock** 105:10,10
  105:11
**modalities** 55:7
**modality** 224:1,2

**mode** 122:17
  186:19,21
**modes** 106:4
**modules** 24:9
  53:18,20 73:7,12
**moment** 24:22
  25:1,4 29:13 50:9
  50:11 70:15 71:1
  92:21 100:3 116:5
  116:8,11 118:8
  122:3 136:6
  158:22 168:7
  191:3 193:8
  195:16,22 202:14
  221:8 222:9 238:8
  238:9 243:18
**moments** 160:19
**momentum**
  201:10,12
**monitor** 133:10
  134:3
**monitoring** 45:14
  133:1 159:3,4
**month** 34:19
  40:19 43:3,13
  130:18 131:13,21
  134:20 136:21,22
  137:16,20 140:7
**monthly** 131:12
  138:5,9 140:2
**months** 19:19,19
  20:1,3 23:16
  34:13 40:15
  124:16
**morning** 8:2 9:11
  9:16 10:11 117:16
**mountain** 21:18
**mouth** 208:22
**move** 120:8 229:2
**moved** 201:11
  237:1 238:6,7

**movement** 45:14
  134:4 159:4
**movements** 133:1
  207:13,15,17,18
  207:20
**moving** 147:17
  199:8
**mrsa** 37:3
**mull** 166:2
**mullins** 166:1,3,7
  173:4 174:22
  176:5,20 177:4,5
  177:15 179:7,11
  179:13 189:8,11
  189:22 190:1,21
  191:12 192:16
  197:22 198:2
  199:8,18,20
  200:18 201:11,11
  202:2 206:13
  208:14 215:17
  219:13 221:22
  224:9
**mullins's** 191:18
  200:4 201:1
**multiple** 30:3
  78:20 175:5
  182:15 183:21
  234:18
**multitude** 59:7
**music** 164:4

**n**

**n** 3:1 4:1 5:1 6:1
  7:15,15 8:1
**name** 8:3 9:11
  10:15 17:6 26:3,9
  28:20 125:6 127:7
  131:5 142:16
  162:13,15 230:17
**named** 34:9

**narcotics** 55:11
**nature** 60:3 90:22
**navigated** 130:15
**near** 179:15
**nearly** 228:14
**necessarily** 42:2,3
  59:6 74:18 92:18
  101:9 104:10
  135:3,4,10 149:8
  185:5 186:20
  196:21 215:11
  231:16
**necessary** 250:6
**need** 27:6 47:6
  49:20 50:5,9 57:1
  74:14 103:17
  106:13 113:12
  122:12 162:5
  196:1 218:7
  230:13
**needed** 27:10,12
  65:3 112:2 150:20
  156:1 235:1
**needs** 47:3 84:18
  84:20,22
**neither** 119:18
  246:10 247:7
**never** 20:6 38:10
  91:10,13,22 94:5
  103:20 146:2
  160:22 182:17,17
  184:10 185:17
**new** 41:3,7,10
**night** 133:8,8,9
**nights** 114:8
**noise** 178:6
**non** 81:19 222:21
  223:6,13,14
  224:20
**nope** 35:4

CONFIDENTIAL

[normal - okay]                                                              Page 22

normal   11:2
   158:14
normally   133:6,6
north   4:17 21:18
northwest   3:7
notary   2:15 8:14
   246:18 250:13,19
note   248:10
noted   250:7
notes   241:6
notify   12:21
   150:11 151:4,9
notifying   149:9
   150:13,18
notwithstanding
   185:18
number   30:8
   80:20 82:9 90:16
   102:7 118:13
   126:1 130:7,12
   131:12,21 132:20
   137:17,18 139:20
   140:6,9,19 141:7
   231:22 239:6
numbers   7:17
   240:13,15
nurse   235:4,7
   236:13

**o**

o   7:15,15 8:1
oag.stat.va.us
   248:2
oag.state.va.us
   4:19,20
oath   11:14,15
oaths   8:15
obedience   24:19
   48:18
object   96:16 146:5
objection   8:18
   11:7 103:5 180:10

204:21 207:9
   210:19
objective   125:17
   125:19
observe   85:16
   173:4
observed   176:4
   203:22
observing   9:20
   172:3 181:18
   194:3 203:1
obstacle   25:3
   28:22 29:2,9
   48:18
obviously   38:3
   209:19
oc   77:11 78:3
   168:12 190:12,12
   190:14 224:9,18
   234:20
occasion   66:17
occasionally   66:16
occur   29:8 114:10
occurred   118:1
   119:2 145:7
   157:12,16 232:11
occurring   91:3
   234:11
occurs   90:1
offender   134:4
   139:20 140:9,20
   141:8 234:14
offenders   224:10
office   4:16 5:3,5
   9:17 195:14,19
officer   1:8 2:10
   4:2 6:8,17,21 8:7
   8:9 10:1,11,16
   14:11,12,12,14
   15:14,17 18:2
   19:7,8,11,12,15,17

19:21 20:2,3,5,7,7
   20:12,17,21 21:2,3
   22:11,16,16 23:7
   23:11,16,21 40:3
   49:11 56:8 60:10
   61:22 62:7,20
   63:19 64:19 65:8
   71:9 78:13,16
   79:5,11 84:17,20
   85:10,12,16 92:21
   101:3,9 108:17
   109:1 111:11
   112:21 115:16
   116:9 117:5 129:3
   129:4 136:7 137:1
   142:12,15 145:8,9
   146:17 147:2
   148:20 157:1
   159:7,8,15,16,22
   165:2,10,11,12,18
   165:20,22 166:1,3
   166:7,10,14,16,22
   167:17,22 168:5,9
   168:11 169:11
   170:12 171:12
   172:17,20 173:4
   174:22 176:5,20
   177:4,5,15 178:4,7
   179:7,11,13 189:4
   189:7,7,11,22
   190:1,11,20
   191:12,17 192:1,3
   192:11,15,16,21
   193:3,8 194:2,11
   194:22 195:1,2
   196:22 197:13,17
   197:18,22 198:1,2
   198:12,17 199:8
   199:15,18,20
   200:4,18 201:1,10
   201:11 202:2,15

203:20 206:13
   208:14 215:17,18
   218:19 219:13,14
   221:22 224:9
   234:15 235:21
   240:21 241:4,9,16
   242:9 246:1,2
   248:4 249:1 250:1
officer's   18:3
officers   18:6,8
   39:12,19 41:17
   51:16 52:15,17,22
   55:21 68:14 77:14
   77:19 78:5 79:21
   79:21 84:15 85:3
   85:13 86:20 87:5
   89:7 91:5 93:6
   94:4,6,13,20 98:11
   102:12 109:5
   145:20 152:4,8
   169:6,15 179:8
   234:10,22
official   1:15,19 2:2
   4:6,8,11
offline   244:20
oftentimes   76:5
oh   97:15 137:3
   144:3 146:9 164:5
   164:6,11 177:21
   190:10 198:12
   199:11 202:13
   213:16 218:6
   222:18 226:8
   238:22
okay   8:2 9:22 10:1
   10:8,22 11:10,13
   11:20 12:13,16,22
   13:2,6,11,14,18
   14:12,14,15,16,16
   14:21 15:4,8,11,13
   15:19 16:3,6,10,15

**[okay - onion]**                                                                    Page 23

| | | | |
|---|---|---|---|
| 16:21 17:2,5,6,9 | 82:6,13,17 83:3,6 | 147:16,17 148:1,7 | 213:5 214:1 |
| 17:11,14,17,19,22 | 83:8,11,14,22 84:5 | 148:10,18 149:7 | 216:13,17,20 |
| 18:3,9,15,18 19:6 | 84:11,14,20 85:8 | 149:21 150:3 | 217:13,17 218:10 |
| 19:10,16,21 20:20 | 86:5,10 87:11,15 | 152:3,18 153:10 | 218:12,15,19 |
| 21:1,5,9,13,20 | 87:18,22 88:4,6,14 | 153:17 154:8,16 | 219:10,13,21 |
| 22:6,14,18,21 23:6 | 88:17 89:3,18,20 | 154:21 155:2,5 | 220:2,5 222:18 |
| 23:10,15,20 24:7 | 90:3,6,10,17 91:7 | 156:13,21 157:7 | 224:4,21 225:11 |
| 25:5 26:3,16,21 | 92:13 94:2,18,22 | 157:15,22 158:6 | 225:18,18 226:1,8 |
| 27:18,22 28:2,17 | 95:5,13,15,20 96:5 | 158:12,15,17,20 | 226:11 227:3,6,6 |
| 28:20 29:3,7,15,19 | 96:8 97:3,6,22 | 159:11,18 160:3 | 227:13 229:2,8,18 |
| 30:2,8,12 31:14,19 | 98:13,18,21 99:4,8 | 161:15 162:2,11 | 230:6 231:9 232:6 |
| 32:3,9 33:2,10,17 | 100:14,19 101:13 | 162:17 163:7,22 | 233:10,16,19 |
| 34:3,6 35:14,17,22 | 101:18 102:19 | 164:5,14,16,19,21 | 234:6,11 236:9,12 |
| 36:4,8,12,18,19,22 | 103:19 104:1 | 165:2,16,22 166:5 | 236:18 237:9,20 |
| 37:4,7,11 38:6,12 | 105:13,19,21 | 166:9 167:5,13 | 238:2,5,14 239:10 |
| 38:16,19,22 39:11 | 106:4,8,14 107:12 | 169:5,9 170:15 | 239:15,22 240:4 |
| 40:8 41:6,9,12,16 | 107:15,19 109:15 | 171:8,13,17 172:6 | 241:3,4,14,15,15 |
| 42:13 43:16,22 | 109:18 111:6,16 | 172:11 173:8,16 | 242:2,5 243:6,19 |
| 44:4,15,17,21 45:9 | 112:15 113:2,8 | 173:19 174:9,18 | 244:5,8,19,22 |
| 45:12,16,20 46:9 | 114:4,9,12,16,22 | 175:12 176:10,15 | **old**   15:2 37:6 39:2 |
| 46:14,18 47:20 | 115:13,21 116:3,8 | 177:19 178:2,10 | 39:5,8 |
| 48:3,5,20 49:6,17 | 116:20 117:4,7,11 | 179:1,18 180:15 | **older**   31:4 227:21 |
| 49:21,22 50:2,9,10 | 118:17 119:8 | 180:20 181:2 | **once**   13:5,6 38:9 |
| 50:11,18 51:20 | 120:7 121:14,16 | 182:1,8 183:1,11 | 68:10 80:2 86:6 |
| 53:7,17 54:1,19 | 122:4,8,19 123:1,7 | 183:14 184:13 | 100:22 101:5 |
| 55:1,6,16 56:15 | 123:15,20 124:1,8 | 186:11,22 187:7 | 103:20 106:20 |
| 57:7,15,19,22 | 124:9 125:3,13,16 | 187:10,19 188:3 | 107:1,2,2,8,9 |
| 58:13 59:2,9,16,21 | 125:21 126:8,12 | 188:19 189:1,10 | 111:13 119:18 |
| 60:4,8,12,19,22 | 127:12,12 128:1,6 | 189:16,19 191:9 | 121:19 122:11 |
| 61:4,11,16 62:4 | 129:2,4 130:6,10 | 192:6,21 193:6,19 | 154:11,12 172:21 |
| 63:9,15,16,17 64:2 | 130:17,20 131:1 | 194:1,9,15 195:5,9 | 172:22 173:10 |
| 64:3,5,11,13,16,19 | 131:10,20 132:13 | 195:13,20 196:5,9 | 182:1 187:14,16 |
| 65:8,12 66:5 67:3 | 134:7,11,17 136:2 | 197:15 198:7 | 193:21 215:13 |
| 67:6,9 68:3 69:2,6 | 136:7,15 137:3 | 200:1,22 201:9 | **ones**   155:18 |
| 69:11,18,21 70:21 | 138:2,13 139:7,13 | 202:6,22 203:10 | **onion**   20:22 21:3,6 |
| 71:1,3,5,6,7,18 | 139:18 140:13 | 204:3,10,15 | 21:10 22:16,21 |
| 72:6,15 73:6 | 141:12,12,19,22 | 205:12 206:1,7,15 | 35:14,20,21 36:13 |
| 74:11 75:5,22 | 142:4,8,11,15,18 | 206:22 207:20 | 44:15,17 46:15 |
| 76:13,18 77:1,12 | 142:20,22 143:4 | 208:11 209:1 | 114:10 127:16,18 |
| 77:18 78:18 79:10 | 143:11,14,22 | 210:1,13 211:7,10 | 133:20 157:12 |
| 79:17 81:1,15,18 | 144:19 146:9,11 | 211:21 212:2,7,18 | 158:3 |

CONFIDENTIAL

**open** 12:11 75:13
  116:19 122:10
  194:20 226:7
**opened** 121:19
  122:11
**operating** 63:21
  143:22 144:5,11
  144:12,15,16,20
  145:1,5,12
**operation** 54:5
**operational**
  150:19
**operations** 2:4
  4:12 51:13 52:8
  52:18 226:18
**opinion** 178:10,11
  178:14
**opportunity** 17:13
  205:8 206:3
  222:12 244:16
**opposed** 27:20
  58:1 85:21
**opposite** 159:5
**oral** 159:20
**order** 48:14 53:1
  58:4 166:11
  167:17 170:20
  171:1,6 173:12
  184:15 185:2,17
  244:21
**orders** 59:15 60:2
  77:16 159:20
  160:5,17 168:1
  175:20,22 182:15
  183:17 184:6
  185:9 193:22
  203:8 205:9 206:3
**original** 54:14
  82:19
**outcome** 246:15
  247:12

**output** 100:11
**outset** 25:7 186:5
  243:7
**outside** 8:17 48:22
  56:11 133:18
  134:13 241:11
**overall** 105:20,21
  106:1 110:8,10

## p

**p** 3:1,1 4:1,1 5:1,1
  8:1
**p.m.** 115:14 133:2
  133:5 164:17,20
  218:13,16 242:3,6
  245:2,4
**packet** 7:8 232:10
  232:12
**page** 6:2,6 7:2,16
  118:4,19 124:5
  127:5 130:11,12
  130:15,17 139:14
  139:15,16 229:4
  232:17 236:6
  249:4,7,10,13,16
  249:19
**pages** 118:4,6,8,11
  119:1,4 122:15
**pain** 98:20 99:1
**paint** 85:8
**pair** 239:12,16
**pants** 239:12,16
**paper** 96:19,22
  97:4 100:18 101:7
  102:11 103:9,17
  228:2 230:15
**papers** 108:1
**paragraphs**
  150:10,16
**parameter** 212:19
**part** 13:11 16:11
  27:14 28:3,7

30:15 31:11,15
  41:8 43:3 49:3
  53:18 55:2 60:9
  60:19 61:12 62:12
  65:14 66:1 71:13
  73:3 74:22 87:8
  91:10,13 93:18
  94:1,3 95:17
  97:11,16,18,20
  98:1,21 105:3,4,14
  120:9 121:12
  124:11,11 134:4
  140:4,12 144:6
  147:7 167:15,21
  169:6 186:7 188:5
  211:6 234:12
  236:10
**participant** 6:15
**participated**
  117:17
**participating** 8:13
**particular** 25:21
  25:22 40:2 42:12
  73:11 77:2 81:10
  89:10 90:16 91:17
  100:16 112:13,22
  113:16 117:4
  149:3 156:5
  158:16 162:18
  172:20 185:19
  226:20 235:11,16
  235:17
**particularly** 44:9
  44:11 94:5 108:10
  112:4 196:21
**parties** 8:16,19
  246:11,14 247:8
  247:11
**partly** 41:8
**passed** 39:3

**passing** 31:4
**passive** 31:17
**patrol** 6:11,13,14
  6:16 46:16 55:4
  55:14,18 56:1
  87:4 123:11
  133:14 134:3,4,9
  134:12,16 135:8,9
  135:12,15 136:19
  136:20 137:14,15
  138:9,14 139:4,9
  140:21 142:1
  143:15,16 145:15
  145:20 158:1
  195:10 227:17,18
  228:11,16,19
  229:4,14 231:6,10
  241:12
**patrolling** 45:13
  45:17
**patting** 161:17,18
**pause** 50:3 162:11
  187:19 188:21
  204:13
**pay** 23:18 163:16
  163:18,19 164:3
  188:6
**pdf** 116:13,18
  118:11,20 122:2
  122:14 130:11
  131:10 139:14
**pedantic** 225:6
**pending** 137:13
**people** 49:12 52:4
  52:13
**percent** 28:9,10,14
  28:15 29:7 33:17
  34:4 51:2 53:6
  76:21 119:21
  120:22 185:13

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **percentages** 28:10 | 84:3,6 85:14 97:7 | 198:22 206:9 | 214:10 215:12 |
| **perception** 209:10 | 99:1,18 102:22 | 208:9 210:18 | 216:2 220:6 |
| **perfect** 9:22 19:6 | 171:9 175:13 | 212:5,12 219:8 | 221:19 237:22 |
| 218:9 | 176:20 177:4 | 237:12 | **pods** 219:22 |
| **perfectly** 30:20 | 191:11 229:5,11 | **playing** 85:11,12 | **point** 13:22 26:6,7 |
| **perform** 50:14 | 229:13 | 86:21 94:4,11 | 26:8 27:2 28:21 |
| **performance** 6:10 | **physically** 98:20 | 162:10 210:6 | 29:6 35:21 40:2 |
| 85:18 94:19 95:2 | 100:6 108:1 161:1 | 213:8 | 42:10 45:15 49:14 |
| 95:6 98:3 123:18 | 175:19 184:1 | **plays** 85:13 | 50:20 51:8,19 |
| 126:1,5,12,22 | 229:16,19 230:10 | **please** 9:9 15:19 | 72:11,13 74:15 |
| 128:7,11,12,19 | **pick** 25:10 165:6 | 25:1 50:8 72:7 | 79:5,6 80:3,3 88:2 |
| 218:1 | **picture** 85:8 | 107:17 116:5,17 | 101:6 103:10,13 |
| **performed** 68:14 | 239:11,17,20 | 117:13,22 118:22 | 103:17 105:9,17 |
| 105:10 119:16 | **pictures** 238:18 | 121:19 130:10 | 113:19 114:7 |
| **performs** 108:15 | 239:1,3,19,22 | 142:6 147:18 | 117:22 124:1 |
| **period** 40:19 | 240:1,5,8,11,12,17 | 162:7 164:8 | 129:18,20 138:10 |
| 153:6 | 240:19 | 173:14 177:21,21 | 144:7 145:13 |
| **periods** 110:7,13 | **piece** 81:3 227:22 | 182:10,10 197:6 | 154:13 158:11,17 |
| **permitted** 9:1 | **pink** 239:6 | 206:8 210:22 | 160:13 161:3 |
| 184:22 | **place** 25:10 176:13 | 214:20 222:8,8 | 175:2 176:13 |
| **persistence** 59:14 | 244:21 | 226:8 231:19 | 178:19,22 181:8 |
| **person** 91:17 | **placed** 231:8 | **plus** 80:22 | 183:19 184:12 |
| 184:8 | **places** 232:14 | **pod** 58:8,10 77:15 | 185:5 186:3 |
| **personal** 156:11 | 234:10 | 79:22 112:21 | 188:21 197:3,11 |
| **personality** 25:12 | **plaintiff** 1:6 3:2 | 159:10,12 161:8,9 | 199:16 201:2,11 |
| 25:16 38:4,7,12 | 9:15 | 163:6,8,9,10 | 201:15 202:7,22 |
| 41:4,4 | **plaintiffs** 244:6 | 165:16 166:5,18 | 203:1,2,3,6 204:1 |
| **personally** 46:3 | **play** 70:14 75:14 | 166:21 167:11 | 206:15 207:14,21 |
| 53:3 91:10 129:16 | 94:13 163:12 | 168:5,7,9 169:2,16 | 209:2,9,12 211:22 |
| 129:21 204:4 | 164:6 187:11 | 170:7,17,19,21 | 212:1 213:22 |
| **perspective** 79:10 | 188:3,4,19 189:16 | 171:5,14,14,17 | 216:10 222:20 |
| 175:21 184:5 | 191:5 192:6 194:9 | 172:4,7,8,15 173:3 | 224:11,17,17 |
| **pertaining** 120:5 | 194:15 195:20 | 173:10 174:20,21 | 235:7 242:14 |
| **phase** 20:16,16 | 196:5 197:5 | 174:22 176:4 | 243:4 |
| **phone** 12:19 | 198:18,20 199:10 | 177:14 178:4 | **police** 29:10 |
| **phones** 163:17,18 | 201:1 203:11 | 181:19 184:4 | **policies** 67:6 |
| 163:19 188:6 | 206:7 208:7 237:9 | 189:2,12,14 | **policy** 24:21 27:2 |
| **photos** 7:11 | **played** 70:18 | 191:12,15,18 | 41:12 42:5,9 47:4 |
| **phrase** 30:16,22 | 187:17 189:18 | 192:12,16,21 | 47:7 50:20 57:18 |
| **physical** 44:12 | 191:7 192:8 | 195:19 196:1,14 | 57:20 58:1,3,4 |
| 77:13,14 81:5 | 194:17 196:7 | 196:16 199:14 | 62:5,10,11 63:1,2 |

[policy - purposes]                                                                    Page 26

63:3,5,6,20 65:15
66:6,9,13 80:1
90:4,7,8 144:11
145:2,5,12 146:18
146:19 185:4,5,6
185:17
**pool** 51:17
**poorly** 55:10
**pop** 200:3
**pops** 199:7 200:4
**populated** 116:11
**porter** 3:6 9:12,13
9:14
**portion** 33:19
**portions** 144:17
**portrait** 122:16
**pose** 80:15
**posed** 79:7 177:3
**position** 22:2,4,10
214:4
**positions** 110:13
**possess** 178:21
**possession** 214:8
243:4
**possibility** 213:4
213:19
**possible** 60:6,7
76:22 77:3,4,6
178:5
**possibly** 83:13
**potential** 65:6
78:1 223:6
**potentially** 57:1
223:5
**powder** 190:12,15
**practical** 141:2
**practice** 41:13
57:20
**practices** 167:6
**pre** 116:10,21
121:18 122:5,20

123:8 129:5,12
136:8 141:14,19
143:5 147:17
148:1 162:3 226:2
226:11 227:8,13
228:18 231:20
236:22 237:14
238:8,15
**prefer** 14:13
**preferred** 106:9
**preparation** 67:3
67:7
**prepare** 236:14,15
**prepared** 247:3
**preparing** 13:2
**presence** 8:17
**present** 5:2 93:8
**presented** 93:10
**presenting** 74:19
208:1
**presents** 75:2
**press** 201:1 237:9
**pressing** 200:18
**pretty** 27:21 31:22
57:13 61:8 85:22
85:22 94:10 178:9
185:1 192:16
227:22 230:17
241:8,19
**prevent** 99:13
185:11
**previously** 140:7
**primarily** 92:4
**print** 239:6
**prints** 100:7
**prior** 7:18 15:13
15:16 35:2 78:11
87:12 108:17
145:8 169:2 171:9
173:9 180:16
246:5

**prison** 20:22 21:3
21:17 35:15 55:14
89:11 127:16,19
142:13 157:13
158:4 241:11
**prisoner** 90:1
**private** 116:6
**probably** 35:12
53:5 55:9 76:20
134:15 151:15,16
159:9 187:2,12
**problem** 34:6
37:18 39:16 49:19
72:2 88:6 146:11
149:19,21 151:18
211:2 214:22
215:3 222:10
230:14
**procedural** 9:2
**procedure** 24:21
144:1,6,12,15,16
144:20
**procedures** 63:21
**proceeding** 2:13
8:22 245:5 247:4
**proceedings** 246:3
246:4,6,8 247:6
**proceeds** 203:17
**process** 48:12
105:13,14 128:21
**processes** 11:2
**produced** 8:21
162:4
**professional**
106:15
**professionally**
106:10
**program** 1:20 4:9
6:16 24:8 29:16
29:17 30:16 47:12
47:12,16 49:4

50:15 51:22 53:13
53:18,21 54:16
55:3,3 60:14
61:13,14 67:10,11
67:12,13 76:1
92:5,9 117:17,19
143:2,3,15,17,18
145:16
**programs** 53:17
**promotion** 23:17
23:19
**proper** 58:16
60:17 70:2 72:9
79:6 205:5
**property** 90:21
**protection** 85:1
**protocol** 99:21
**provide** 14:1
235:4,6,13
**provided** 56:5,9
56:12 61:5 81:16
81:20 146:2,3,12
161:7 235:21
**providing** 241:1
**proximity** 159:15
173:4 182:13
215:17
**public** 2:15 116:6
246:18 250:19
**puff** 190:8,16
**pull** 133:9 210:8
215:20 237:2
**pulled** 165:8 187:8
237:8
**puncture** 234:18
**purposes** 12:20
13:21 17:5 46:16
67:14 130:12
184:15 214:18
235:2,17 241:7,12

CONFIDENTIAL

**pushes**  199:19
**put**  95:21 136:7
  147:16 155:13,21
  156:21 214:9
  225:22 232:12
  236:2,18

## q

**qahoush**  3:5 9:14
**qualified**  246:7
**qualifies**  185:2
**qualify**  90:12
  133:22
**quarterly**  42:1,7,9
  42:15 43:6,7,18
  44:1 46:1,6 124:4
  124:7,9,12,14,18
  127:6 128:7
**quell**  89:14
**quelling**  89:22
**question**  11:6,9
  21:21 22:19 32:14
  37:17 39:14 50:22
  55:10 62:19 63:11
  65:20 70:4 71:10
  71:14 80:9 93:19
  93:19,20 96:17
  97:13 99:4 113:11
  120:8 137:8,8,12
  146:5,10 152:16
  161:16 171:2
  178:3 184:17
  205:10 207:10
  210:22 214:20
  220:14 221:10
  222:6,12 225:14
  229:3 236:21
  241:3 242:10
**questioning**
  241:19
**questions**  12:3
  15:1 18:12 47:10

47:15 51:20 56:16
  63:14 67:9 91:12
  95:21 127:4 162:1
  165:7 220:11
  225:20 241:18
  243:18 244:3,6,22
**quick**  43:11 49:19
  65:8 115:2,7
  117:7 165:3 229:3
**quickly**  37:13
  198:11 236:3
**quite**  15:22 21:22
  24:4 37:6 39:2
  133:21 227:19

## r

**r**  3:1 4:1 5:1 7:15
  7:15 8:1 249:3,3
**r0sp113hua100c...**
  162:14
**radio**  171:16,19
  172:2 179:2
  221:21 234:16
**raise**  10:2 23:18
**raised**  200:10,18
**raising**  202:2
**random**  41:11
  44:6,8
**randomly**  45:18
**ranked**  68:1,4
**reach**  156:3
**react**  32:17 84:1
  215:9
**reacting**  171:22
**read**  50:20 68:21
  70:13 110:9,11
  244:9 248:9 250:5
**reads**  42:5,9
  148:13 150:11
**ready**  180:5
**real**  57:6 72:18
  92:2 185:6 198:10

**reality**  198:8
**realize**  71:10
  197:12
**really**  19:1 65:8
  70:21 82:8 106:13
  115:2 123:17,22
  199:12 200:7
  223:18 236:3
  241:8
**realm**  60:6
**reason**  14:17 23:5
  37:2 41:6,18 43:4
  44:10 46:1 57:22
  74:9 141:2 150:20
  155:8 178:12
  185:21 213:5,9,13
  222:5 225:5,8,9,10
  225:17 228:10
  238:2 243:11
  248:11 249:6,9,12
  249:15,18,21
**reasoning**  215:8
**reasons**  221:14
  225:8,11,16
**reassign**  42:3
**reassigned**  41:22
  42:11,16
**reassignment**
  41:14,19
**recall**  18:13 21:21
  22:1 24:7,11,13,17
  26:3 29:18,21
  30:2,5,8,20 36:3
  38:13 39:10 40:12
  41:2 42:17 43:13
  44:4 60:22 61:5,6
  61:7,16 62:1,15,21
  63:3 65:1 66:4,8
  67:2 68:2,4,6 69:3
  69:6,10,20 73:11
  73:13 81:9 82:7

82:13,17,21 83:3,8
  84:20,22 94:2
  100:22 101:2,4
  103:7,8 109:15
  111:4,14,20
  112:10,13,15,18
  113:1,1,3,4,8,10
  113:12,15 114:7
  131:17 138:11,19
  139:1,6 143:20,22
  144:3,18,19 145:6
  145:7,16,18 147:1
  147:15 148:21
  153:12,18 154:8
  156:14,19 157:5
  158:7,12,22
  159:18 161:6,15
  161:18,22 165:5
  175:6,10,12 176:6
  182:2 183:3,14
  186:8,11 199:17
  204:4 207:19,21
  217:14 219:17,21
  235:16,20
**receipt**  248:18
**receive**  60:10
  67:21 68:18 84:1
  87:2,8 99:8,9
  105:8 143:17
  144:8,16 147:8
  159:22
**received**  24:18
  32:4 55:16,22
  56:11 65:18 66:3
  69:12 81:5 84:6
  117:2 120:12
  121:12 122:7
  143:20 144:14
  158:20 159:21
**receiving**  143:22
  144:3 145:16

156:14
**recertification**
  117:19
**recertify**  42:12
**recognize**  154:21
  162:20 227:13
  233:11
**recollect**  161:18
**recollection**  13:15
  13:21 14:3,5
  18:17 43:17
  140:14 146:22
  166:8 183:7
  221:13 235:14
  243:2
**reconvene**  64:6
  164:11,15
**record**  6:9,12 8:4
  8:5,19 9:9 10:14
  14:5 49:20 64:12
  64:13,15,17 70:18
  96:14 97:6 102:2
  104:22 115:9,11
  115:12,14 117:5,9
  129:16 130:2
  138:16 140:22
  156:4,11,11
  164:15,16,18,20
  218:11,12,14,16
  241:17 242:1,3,4,6
  244:1 245:2 246:9
  247:5
**recorded**  9:4
  246:6
**recording**  8:21
  246:8 247:4
**recordkeeping**
  155:15
**records**  96:3,14
  97:7 99:19 100:5
  100:5 101:8 102:8

102:16,17,20
103:4 121:7
155:14,16,22
156:15 229:10,11
**recover**  102:11
**recreate**  85:1
**recreated**  103:2,3
  103:21
**recreation**  133:9
  133:11
**red**  20:22 21:3,6
  21:10 22:16,21
  35:14,20,21 36:13
  44:15,17 46:15
  114:10 127:16,18
  133:20 157:12
  158:3
**reduced**  246:6
**refer**  14:13 94:14
  118:13
**referenced**  248:6
**references**  157:19
**referencing**  174:6
**referring**  17:8
  76:9,10 102:2
  189:12 207:6
  223:13
**reflect**  121:11
**reflected**  121:7
**reflecting**  105:11
**reflects**  121:10
**refresh**  13:14
  221:13
**refreshed**  13:21
  14:2,5
**refused**  160:5
  183:22
**refusing**  90:20
  112:20
**regarding**  58:15
  70:3 146:13 147:4

222:15
**regardless**  74:19
  75:1 185:14
**regional**  28:22
**regular**  41:13
  163:19
**regularly**  153:7
**reinforce**  161:19
**rejected**  154:3
**relate**  240:5
**related**  225:21
  246:11 247:7
**relating**  242:10
**relationship**  37:12
**relative**  246:13
  247:10
**release**  32:8,12,19
  33:5,20 56:18
  58:11 159:21
  169:21,22 175:4
  180:16 181:20
  182:2 193:9 209:8
  217:21
**released**  186:17
**releases**  33:14
  194:11 217:12
**releasing**  180:17
**relevant**  146:3
**rely**  236:13
**remedial**  42:8
**remember**  18:18
  18:20 22:5 46:19
  62:11 81:13
  111:14 150:2,6
  158:7
**reminded**  18:10
**remote**  2:13 12:17
**remotely**  8:17
**removed**  202:4
**reorder**  110:18

**reorganize**  110:18
**repeat**  27:7 32:14
  37:17 39:14 41:1
  50:22 62:18 65:20
  70:10 71:22 93:18
  93:20 97:13 146:9
  152:16 171:2
  173:14 184:17
  210:21 213:16
  214:20 222:6
  240:7
**rephrase**  56:6
  162:22 224:14
**repopulated**
  104:18
**report**  6:10 7:4,6
  67:22 95:9,10,14
  95:16 97:17 105:5
  105:8,11,15,17,18
  106:2,6,12,15,21
  106:22 107:1,3,5
  108:4,7,11,13,18
  109:1,10 110:3,4,8
  110:11,19 111:3,7
  111:22 112:17
  113:9 114:5,14
  124:17,21 126:22
  128:8,11,13,19
  134:8,18 148:15
  148:20 149:10
  150:1,4,5,14,21
  151:1 152:21,22
  153:4,15 154:12
  226:15,16,20,22
  227:4,17,18,19,20
  228:7,11,12,15,16
  228:19 229:5,14
  229:15,22 230:2,4
  230:10,11,20
  231:6,6,7,10,11,11
  232:19,22 233:5,7

CONFIDENTIAL

235:3,17,22
236:15
**reported** 2:15
132:9 134:21
135:1
**reporter** 8:2,3
9:22 10:8 64:10
64:13,16 70:12,14
70:17,18,20 71:1,5
71:7 115:9,10,13
164:16,19 218:11
218:12,15 242:1,2
242:5 243:22
244:8,13,19
**reporting** 226:17
**reports** 94:19 95:2
95:7 100:17
101:19 103:20
104:1,7,8,13,22
107:12,20 109:7
109:13 138:9
141:3 149:15
151:4,10,20 152:1
152:4,9,15 153:7
153:20 154:2,5
229:18 231:12
**represent** 132:4
**reputation** 151:19
152:3,7
**request** 109:10
139:18
**requested** 70:19
246:21
**require** 102:20
**required** 27:13,19
28:3 76:2,4 81:21
85:16 95:2,6 99:2
99:18 130:3,4
132:6 139:3,9
159:1 250:13

**requirement**
167:1,3,5 168:14
**requires** 41:13
47:5
**reserved** 245:3
**reservist** 243:8
**respect** 67:13 92:6
**respond** 84:6,17
86:3,6 132:5
135:10 156:10
158:18 160:1
165:10,12 172:12
172:15 174:20
188:16 196:2
215:13
**responded** 104:10
134:19 135:4
159:9 175:19
**responding** 190:2
221:19
**responds** 77:17
**response** 18:9
74:12 78:16 87:19
93:9 132:9,12
135:1,17,21
137:11 156:8
159:2 175:13,15
175:18 194:5
205:13 217:21
**responses** 131:21
132:2,4 137:17,18
139:20 140:6,9,20
141:7
**responsibilities**
18:4
**responsible** 50:12
**responsiveness**
69:8,15
**rest** 239:22
**restrain** 76:4

**result** 54:20 62:22
128:21
**resulted** 100:21
**retain** 99:18
**retire** 36:12,14,16
37:9
**retired** 34:20,22
37:5 39:1,3 52:4
**retirement** 43:10
**return** 112:20
248:13,17
**returned** 161:10
**review** 13:11
24:21 66:13 67:3
67:6 68:21 107:13
108:15,22 109:9
117:13 118:22
119:14 145:7
154:5 244:16
246:21 248:7
**reviewed** 7:18
66:5,9 67:1 108:4
144:19 145:1,4,12
**reviewing** 154:9
**revisited** 41:18
**rewind** 190:6
**richard** 4:15 9:18
**richmond** 4:18
**ridge** 21:17 142:12
**right** 10:2,13 14:1
23:1 30:12 63:16
81:8 82:12 104:2
115:16 116:7
118:12 120:7
122:1 123:2
125:21 127:13
128:2 130:7
131:20 136:2
138:12 157:3
160:14,15 161:21
170:13 179:16

182:4,4,5,5 183:13
183:13,15 187:5,6
187:7 189:10
190:8 198:2
199:22 200:4,10
200:15 204:19
205:18 206:5
207:1,3,4 210:3,6
210:8,9 211:8,18
234:12,17,17,18
235:3,14 236:2,18
238:5 239:5
**riot** 87:19,22 88:7
88:18,19 89:10,11
89:13 90:4,7,9,13
90:22 91:3,4,7,8
91:11,13,16,18
92:1
**riots** 83:12,18 89:2
**rise** 112:16
**risk** 179:7,9 208:1
**river** 21:18
**rn** 233:15
**roanoke** 1:3 8:11
**robinson** 2:1 4:10
**rojo** 26:18,19
27:15,20 29:22
47:17 48:6,10,13
49:7 93:17,22
**role** 15:13 18:1
20:12 23:6,22
52:16 85:13 86:21
94:4
**roles** 19:10,14
**roll** 85:11,12 224:8
**room** 11:20 12:4
12:17 79:21
168:11 173:17
174:16 189:3
192:3 195:6
197:21

**rotate** 122:14,16
**roughly** 17:2
    19:22 20:1 22:1
    28:9 34:16
**round** 168:12
    190:12,15
**routine** 31:16,18
    48:18,18,19
**routinely** 66:15
**rules** 9:3
**run** 57:5 76:1,3
    82:9 92:8 110:14
    116:3 119:18
    160:6
**running** 60:2,2
    160:11 179:13,20
    180:3,7 181:7
    207:16 208:1
    225:15
**runs** 18:7 20:17
    45:3,8
**rvorhis** 4:20

**s**

**s** 3:1 4:1 5:1 6:5
    7:1,15 8:1 249:3
**safe** 145:11
**safety** 84:16 99:21
**save** 103:11,12
**saw** 165:17 166:6
    189:20 191:9
    203:14 215:15
    233:2 242:11
**saying** 85:9,18
    94:15 169:20
    209:6 211:10
    219:10,18
**says** 90:9 118:14
    118:14 122:14
    125:3,5,10,17,20
    125:22 127:6,7,16
    128:2,3 130:17,20

131:4,12,21
    139:19 140:1,7,10
    142:1 150:15
    232:19 234:13
**scattered** 160:9
**scenario** 71:20
    72:18 84:2 86:17
    92:19 93:7 94:13
    94:15
**scenarios** 74:3
    76:1,3 81:20 83:4
    83:9 84:22 92:7,9
    92:16,19 93:15,21
**scene** 58:15 60:15
    86:13
**school** 15:7,9,18
    15:20 16:16,17
    17:3,20 27:3 28:6
    30:19 33:13 39:21
    47:5 53:12 54:4,7
    54:8 68:12,15
    81:12,15 82:19
    88:8 99:10 142:13
    147:11
**schooling** 15:6
    53:1
**schools** 29:11
    52:18,19 84:10
**score** 42:11
**scratches** 99:12
**screaming** 178:9
**screen** 115:22
    162:6 187:8
**screens** 12:5,8
    174:4
**scroll** 130:10
    187:19
**search** 48:19
    161:10
**searched** 161:10

**sec** 121:16 236:3
**second** 121:17
    148:15 150:7
    159:13,13 165:10
    187:13,20 188:20
    191:6 198:10,17
    202:17,18,19
    204:11 205:14
    209:3 225:21
    227:7 232:17
    237:3 238:7 241:5
**secondarily**
    190:21
**secondary** 156:4
    192:2,3
**seconds** 159:10
    188:1 198:10
    204:6 217:16
    219:6 223:4
    237:11
**security** 161:8
**see** 8:5 21:16
    25:11 34:13 37:17
    40:1 73:3 74:9,9
    77:9 99:12 118:15
    118:16 119:10,15
    120:3,4 123:2
    124:4 125:6,11,17
    125:21 127:6,15
    130:6,17,20 131:4
    131:10,13,15,20
    132:15,19,20
    137:16 138:10
    139:19 140:1
    141:14,22 142:4
    143:4 154:16
    156:7 159:3,12
    160:7,8,15,17,20
    161:1,1,7,16
    162:15 171:14
    172:7,15,18,19

173:1 174:22
    182:19,20,21
    183:19 184:2,2
    185:7 190:1,6,8,16
    190:20 192:1
    193:1,10,14,17
    194:20 196:15,21
    197:2,7,8,18,22
    198:19 199:5,13
    199:14,21 200:2,5
    200:15 201:3,13
    201:18,18 202:7
    202:14 203:4,6
    205:17 206:11,21
    207:4 208:12,16
    209:16,19 210:1
    211:12 212:13,13
    215:19 217:4,5,7,9
    224:9,14 232:19
    239:4 244:16
**seeing** 79:14 106:2
    118:5 119:3,3
    140:17 201:16
    213:2 215:14
    217:18 221:20,21
    223:3
**seek** 73:21
**seen** 87:6 116:20
    123:7,9 129:11
    136:15 141:19
    143:11 148:1
    162:17 170:10
    171:4,8,11 178:21
    207:17,21 209:10
    217:22 221:6,12
    222:14 226:11
    232:6 237:14
    238:14
**sees** 107:6 108:9
**segment** 115:4

CONFIDENTIAL

**select**  156:2
**selected**  144:17
**send**  107:5,7,13
  108:16 110:3,4
  232:13
**sense**  19:4 34:3
  71:21 85:19 90:10
**sent**  111:7 148:5
  152:14,18 155:3,5
  155:20 231:4,8
  248:14
**sentences**  110:14
**separate**  27:9 73:7
  124:22 236:9,11
**september**  155:6
**sergeant**  1:9 4:3
  6:18,20 148:5,8,11
  149:9,13 150:11
  150:13,20 151:2,8
  152:22 155:4,5,11
  155:13,16 156:3
  156:14 219:16,17
**sergeant's**  195:14
  195:19
**sergeants**  49:15
  50:15 51:6,9,12
  52:8 53:14
**service**  37:2
**services**  84:10
  146:18
**set**  73:12
**sets**  185:4
**setting**  12:2 55:17
  56:1 57:2 65:4
  83:19 88:19,20
  146:4,14 147:5
  186:15
**settings**  147:9
**seven**  15:3,4
  109:22 244:14

**shadow**  34:9,11,15
  34:22 35:2,3,5
  36:5,8,9,12,14,16
  37:9,11,12 38:1,2
  38:8,10,13,15 39:5
  40:15,18 43:4,8,9
  46:11,11 47:21,22
  48:4,5,10,13 49:7
  53:13,19 61:14,20
  92:11 93:16,22
  95:1,3,7 96:14
  97:11 119:17
  127:7 128:6,7
  131:5,8 133:20,21
  133:22 160:14
  161:4 182:3,22
  183:4,5,8,15 184:4
  185:11,14 202:15
  204:18 205:5,15
  205:17,20 206:2
  208:17,19 209:3
  210:2,5,7,10,13
  211:7 212:3 213:1
  217:1,13,14 219:4
  221:5 222:2
**shadow's**  155:14
  217:21 218:1
**share**  12:9,11
  115:22 122:6
  129:7 136:8,10
  162:2 226:3
  231:21 237:1
**sheet**  248:11
**shift**  114:7 133:8,8
  228:1,2
**shirts**  163:14,14
**short**  23:4,4,4,8
  35:18,18,19,19
**shot**  190:12
**shoulder**  199:15

**show**  58:10 85:16
  86:3 116:9 121:18
  129:4 146:21
  160:18,22 182:16
  182:18 183:21
  185:12 190:7
  213:14,20 215:22
  237:20
**showing**  58:20
  98:19,20
**shows**  202:1
**shut**  96:20
**sic**  234:18
**side**  44:19 81:19
  98:11 179:17
  197:19 204:19
  205:19 230:16
  234:19
**sides**  45:1
**sidestep**  204:18
**sign**  98:20 107:12
  108:1,3,13 154:6
  228:8 229:10,11
  229:16,18 230:2,4
  230:7,10,10 244:9
  248:12
**signature**  107:22
  229:6 230:16,19
  245:3 246:16
  247:13
**signed**  108:8,8,8
  154:13 248:20
**similar**  123:3
  128:19 143:3,18
  152:10 168:13
  193:7 227:19
**similarities**  47:11
**simulate**  33:6,11
  84:16 87:6
**simulated**  86:14
  87:2

**simulating**  85:14
**sir**  11:12,19 12:15
  13:1 14:20 17:10
  19:5 20:4 22:13
  22:17 25:4,18
  26:2 28:19 30:1,7
  30:14 32:14 34:5
  36:3 37:10,17
  39:14 40:7,12,22
  41:11,15 42:17
  43:15,21 44:3,6
  45:11 46:4,8 48:2
  48:8,11,15,17 49:2
  49:5,8,22 50:17
  51:13 52:11,15
  53:6 54:22 55:12
  55:15,19 56:3,10
  56:14 57:4,18,21
  58:12 59:6 60:11
  60:18,21 61:10,15
  61:21 62:18 63:2
  63:7 64:1 65:11
  65:16,20 66:4,7,11
  67:2,5,8,17 68:2,6
  69:10,20 70:5
  71:22 73:13,19
  74:2 75:4,7,9
  76:17 78:10 79:16
  80:10,16 81:14,17
  82:16,20,21 83:5
  83:10,21 84:13
  85:2,19,19 86:1,15
  87:14,17,21 88:3,5
  89:17 90:5 91:6
  92:2,12,18 93:19
  94:17 96:7 97:13
  97:21 101:4,17,21
  102:14,18 103:7
  103:22 104:5,6,15
  105:2,16 106:7
  109:2,3,8,17,20

**[sir - spelling]**                                                                                          Page 32

| | | | |
|---|---|---|---|
| 110:1,20 111:1,4,5 | 230:15 232:4,5,21 | 191:22 193:17 | **space** 230:1 |
| 111:10,15 112:9 | 233:6,9 235:15,19 | 194:20,21 | **spaced** 149:12 |
| 112:14 113:7,10 | 236:1,16 238:4,13 | **slight** 23:18 | 150:10,16,21 |
| 113:15 114:3,15 | 238:16 239:14,21 | **slightly** 149:10 | **speak** 13:8 65:9 |
| 114:18 117:14 | 240:3,7,10,13,18 | **slow** 141:13 238:6 | 218:21 |
| 118:10,19 119:10 | 241:13 242:14,18 | **small** 16:8 97:20 | **speaking** 28:9 |
| 120:14 121:8 | 243:1,4,10,15 | 97:20 190:8 239:6 | 75:9 76:13 82:18 |
| 122:18 123:6 | 244:18 | **soap** 214:12,13 | 104:2 111:10 |
| 124:8,8 125:7,12 | **sit** 18:17 30:21 | **social** 38:15,16,17 | 128:10 147:10 |
| 125:15 126:7 | 37:7 39:18 40:8 | 38:18 | 182:6 188:7 |
| 130:14,16 131:14 | 41:2,9 43:16 44:1 | **sock** 214:12,13 | **specialized** 21:5 |
| 131:16,19,22 | 44:4 52:6,20 61:6 | **solely** 51:14 | 53:1 |
| 132:3 135:13,19 | 61:7 63:3 69:2 | **solutions** 248:23 | **specific** 32:16,20 |
| 136:14 138:17 | 82:14 83:8 104:12 | **somebody** 49:18 | 48:9 60:13 82:13 |
| 139:6,11,17,22 | 104:20 113:3 | 58:7 75:12 173:13 | 83:1 84:22 99:5 |
| 140:2,11 141:5,18 | 120:21 121:5 | 173:14,17,19,21 | 106:4 109:15 |
| 141:21 142:17 | 128:17 139:2,7 | 214:17 234:15 | 147:8 216:22 |
| 144:18,22 145:3,6 | 140:13 153:12 | **somewhat** 176:11 | 235:2 |
| 145:18,22 146:10 | 155:12 158:6 | **sorry** 13:5 15:22 | **specifically** 32:17 |
| 146:15 147:15,22 | 179:18 231:12 | 34:18 36:14 38:21 | 38:6 44:17 56:21 |
| 148:3 149:1,6 | **sites** 234:18 | 41:1 42:7 45:13 | 65:1 77:21,22 |
| 152:2,6,12,16 | **sitting** 11:16,17 | 55:9 56:6 71:9 | 78:7 83:14 84:11 |
| 153:8,16,22 154:4 | 28:4 38:14,19 | 78:3 105:4 106:19 | 87:19,22 89:7 |
| 154:20 155:18 | 46:20 75:9 82:7 | 107:18 121:17 | 93:12,14 181:4 |
| 156:20 157:21 | 243:12 | 127:13 129:17 | 208:19 223:9 |
| 162:16 166:4,8,18 | **situation** 25:21 | 142:6 161:12,20 | **specifics** 68:7 83:7 |
| 168:17 169:4 | 33:13 56:22 77:20 | 168:12 173:13 | 90:8 106:13 |
| 171:2,11,15 | 80:4 87:21 93:10 | 178:2 182:3 | 111:15 112:14 |
| 172:10 173:18 | 113:6 168:8 223:1 | 183:12 184:17 | 113:10,16 150:2 |
| 174:2,8 175:7 | **situational** 84:9 | 195:21 196:6 | **specifies** 227:21 |
| 176:22 178:8 | **situations** 57:8,11 | 201:6 202:13 | **speculate** 18:21 |
| 184:18 186:4 | 82:10,13 87:5 | 205:11 212:13 | 34:1,7 43:2 53:5 |
| 188:1 194:8,14 | **six** 19:19,19 20:1,3 | 214:16 225:14 | 62:9 83:2 123:22 |
| 198:9,14 200:21 | 23:16 40:15,19 | 236:3 239:8 240:7 | 201:17,20 236:17 |
| 201:8,15 204:14 | 206:20 | **sort** 16:16 23:21 | **speculating** 32:22 |
| 205:2,22 206:6 | **skills** 246:10 247:6 | 53:1 78:4 190:3,5 | 151:14 235:5 |
| 208:3 219:1,22 | **skin** 37:1 | 193:14 214:11 | **speculation** 103:6 |
| 220:17 221:11 | **skull** 181:10,10 | **sorts** 75:12 174:5 | 151:16 180:11 |
| 222:6 223:11 | **slash** 125:2 | **sound** 11:10 64:4 | 235:6 |
| 225:12,16 226:10 | **slider** 159:13,14 | **sounds** 133:16 | **spelling** 108:21 |
| 226:13 230:1,12 | 170:9 189:12 | 164:13 | 244:22 |

**spend**  26:22
**spoke**  13:4 47:13
  92:7 117:16,18
  124:10 148:18
  229:8,9
**spot**  191:12
**spring**  6:15 142:2
  142:22
**stabbed**  214:6,11
**staff**  23:4 60:5
  83:12 85:6 90:19
  137:18 176:13
  203:7 233:15,18
  233:19,22 234:3
**staffed**  23:4,8
  35:18,19,20
**staffs**  60:3
**stamp**  123:1,3
  139:15 190:15
  232:18
**stamps**  14:2
**stand**  199:17
  221:21
**standard**  65:2
  66:2 73:16,16
  88:19
**standards**  68:11
  185:4
**standing**  74:13,16
  74:18 75:1,7,8,17
  75:19 181:7 202:2
  203:4
**stands**  158:16
  199:7,12
**stanley**  1:10 4:3
  6:18,20 125:11,14
  128:3 148:6,8,11
  149:14 150:12,13
  150:20 151:2,8
  152:22 155:4,6,11
  155:13,16,21

156:3,14
**start**  64:22 92:14
  106:20 133:8
  137:7 164:6,7
  169:10 172:22
  178:3 198:20
  208:6 212:9
  214:16 224:15
  239:10
**started**  39:8
  115:22 170:12,16
  179:13 199:19
  228:1
**starting**  91:4
  139:4 158:20
  165:3 202:18,19
  239:10
**starts**  118:13
  123:4 124:3 130:8
  163:7 211:13
  212:15 231:21
  239:5,7
**state**  10:14 11:7
  20:22 21:3,17
  29:10 35:14 90:21
  127:16,19 142:13
  148:16 157:13
  158:3 159:20
  168:1 169:20,22
  209:7
**stated**  230:17
**statement**  75:6
  146:6
**states**  1:1 149:11
  185:6
**statewide**  1:19 4:9
**stating**  169:19
**stay**  68:11 112:2
**stays**  211:13
**stenographic**  9:5

**step**  43:12 83:17
  92:3 93:14 98:4
  138:13 171:13,17
  196:13 204:17
  205:19
**stepped**  209:8
**stepping**  205:20
**steps**  203:17,22
  204:1 206:12,16
  208:13
**sticker**  118:19
**stipulation**  9:6
**stomach**  210:16
  211:4
**stop**  20:6 72:11,11
  72:13,17 73:18
  78:14,14 80:4
  103:3 160:17
  168:2,3 170:2,3,16
  182:15 183:20
  192:10 193:9
  199:22 205:9
  206:4 211:17
  222:22 224:10,14
**stopped**  59:20
  138:19
**stopping**  59:21
  182:6
**stops**  73:1
**straight**  192:22
  200:11
**straightened**
  122:18
**street**  4:17
**strike**  39:17 89:1,6
  89:13,15 102:19
  106:19 143:15
  163:4 178:3
**striking**  160:14
**struck**  182:3

**stuff**  100:1
**stumble**  202:7
**stumbled**  201:13
**stumbles**  201:3
**stumbling**  202:3
**styles**  11:3
**subject**  124:3,7
  125:4
**subjective**  184:14
**subjectively**
  185:10
**submit**  106:19
  108:7 138:2,9
  154:12
**submittal**  105:16
**submitted**  106:21
  107:1 108:14
  230:21 233:8
**submitting**  105:14
**subscribed**  250:14
**subsection**  134:5
**subsequent**  190:19
**sufficiently**  197:17
**suggestive**  176:18
**summaries**  138:18
  138:20 139:4
**summary**  6:13,16
  136:19,20,21
  137:14,15,15,19
  138:14 139:10
  143:17
**superior**  149:14
**supervisor**  107:3,6
  107:6,9,13 108:4,9
  108:14,16,22
  109:3,9,12 110:3,4
  110:18,21 111:2,6
  111:8 114:4,6,13
  123:16 124:18
  125:2 138:3
  154:13 230:21

231:1,1,3 232:13
233:5
**supervisors** 25:15
25:21 109:6
**supervisory** 52:16
231:4
**supposed** 78:8
80:13 185:7
**sure** 27:8 37:18
41:1 51:1,2 62:20
64:6 65:22 66:17
66:19 70:6,11,17
73:4 83:17 91:6
115:10 119:7,10
119:13,21 120:22
137:6 151:16
159:6 164:9,11
171:4 182:17
184:19,22 197:6
201:15 213:21
220:12 221:12
222:3 240:8 241:6
244:2,13
**surprise** 120:18
**surprises** 120:17
**surroundings**
44:13
**suspicion** 233:7
**sussex** 21:16
**sustained** 186:2
**swear** 8:17 10:2
**sworn** 8:19 10:5
246:5 250:14
**system** 87:9,13
89:21 95:18 96:1
96:13 97:16 99:20
101:14 102:3
104:17 105:1
107:20,21
**systems** 96:20,20
241:11

**t**

**t** 6:5 7:1,15,15
249:3,3
**table** 182:12,12,14
**tables** 189:2
**tactics** 78:7
**tag** 239:8
**take** 8:4,14 11:15
25:2 37:13 40:3
43:11 49:19 50:3
50:5 63:10,14
64:4 83:17 92:3
93:13 98:4 115:3
115:7 117:7,13
118:8 122:3
134:18 164:7
165:7 171:13
176:13 183:18
185:10 197:6
203:17 206:12
217:14 227:7
241:5,16
**taken** 8:8 10:19
37:2 50:3 117:12
161:8 203:21
206:16 208:13
233:22 246:3,12
247:9
**takes** 20:17 37:16
37:16 54:2,2
204:17 205:18
**talk** 43:12 56:20
72:6 77:1 105:7
165:3 181:2 188:3
219:5 237:3
**talked** 140:7
**talking** 28:9 56:17
63:20,21 64:20
92:4 101:14 114:9
149:4 186:7
191:22 207:15

238:19
**tampered** 150:12
**tampering** 150:14
**tasked** 89:22 91:3
**taught** 77:19,21
78:5,7 82:18
**tdavis** 4:19 248:2
**technically** 27:1
108:7 134:16
**technique** 186:22
187:1
**techniques** 77:19
77:20
**telephone** 164:2,3
**telephones** 163:16
163:20
**tell** 10:6 18:20
32:18 120:1
174:10 183:20
212:10 217:1
222:15
**tells** 132:21
**ten** 28:10 86:22
109:18 115:6
164:10 244:14
**term** 35:18 60:19
97:17 133:17
**terminology** 187:4
**terms** 20:14 59:17
106:18 185:16
**tessa** 26:9,12,22
27:15,20 29:22
35:10,11,15,20,22
36:5,10 37:19,19
37:22 38:2,8,9,13
38:20,22 39:8
40:15,20 42:22
43:14,17,18,18
44:1,5,13,18 45:10
45:12,17,22 46:6,9
47:17 48:5,10,13

49:7 61:18 88:15
93:17,22 128:11
128:12,18
**tessa's** 41:6
**testified** 10:7 14:4
45:21 47:20 50:13
51:4,21 53:10
55:2 56:5,7 69:12
71:11 73:10 80:11
81:4 91:22 93:13
97:10,15 99:17
100:3 124:10
157:7 165:9 166:9
167:15 174:19
179:6 220:21
222:19
**testify** 12:14 14:19
157:20
**testifying** 12:20
13:21 47:16 55:1
186:11 196:15
246:5
**testimony** 62:4
65:10 73:14 74:21
75:20 78:18 92:13
92:15 100:19
115:18 167:14
169:10 173:6,8
218:22 220:13
248:9 250:8
**thank** 10:17 14:9
14:11 16:21 17:11
17:19 18:9 20:11
25:5 29:15 34:8
65:12 70:16
117:15 119:20,22
122:19 123:7
129:3 136:2
142:22 144:10
156:21 157:22
163:3,10 164:14

164:21 174:9,12
177:9 186:5 187:3
190:14 191:21
194:19 199:4
200:22 202:6,13
208:11 209:1
219:2 220:9 221:3
221:4 223:17
225:13,18 226:8
227:6 238:5 239:2
242:7 243:6
**thanks** 14:16
218:17
**thelma** 155:20
**thing** 24:4 39:22
47:4 110:15
154:10 165:17
166:6 228:6
244:21
**things** 24:14 53:4
59:8 60:3,8,12
78:5 79:13 80:20
80:22 81:6 94:7
100:15 101:6
102:10 123:21
204:5,5 230:16
**think** 14:18 21:19
25:1 91:18 93:2
94:7 101:6 103:15
109:18,21 111:13
129:2 137:3
147:16 155:8
156:21,22 172:9
172:10 186:20
201:20 221:10,13
222:16 228:2
231:12 236:2,18
238:2,21 241:7,19
243:11
**thinking** 62:15,21
113:5 223:9 225:1

**third** 178:20
180:15 181:19
204:8 206:4
209:15,18,20
**thought** 25:21
167:14 221:15
**threat** 72:22,22
73:8,17,21,21
74:16,19 75:3
79:7,12,15 80:8,15
81:7 177:4 203:4
205:10 206:17
209:11 213:2
**threatening** 58:21
85:4 159:17
171:12 172:17
175:1 176:5,7
179:11 197:14
**three** 19:9 39:7
80:1 124:16
132:21,22 140:3,8
160:4 175:7,7,8,11
175:11 189:2
206:21 231:9
**threshold** 170:9
170:13,17,19,21
172:21 173:3,9
174:21 189:13
192:12,16 193:18
193:21 194:21
196:13,14 199:19
**tim** 13:4,19 14:9
64:3 115:1 241:4
241:16 243:17
**time** 2:12 6:12 9:8
17:13 18:5 19:19
21:7 22:7,8,9,22
23:17 25:2 26:6,7
26:8 27:2,4 28:21
29:6 30:18 31:6
33:14,16 34:4

35:15,21 40:2,6,9
41:17 42:10 45:10
45:15 49:14 50:4
50:8,20 51:8,9,19
51:21 52:1 53:11
53:12 61:9 64:14
66:22 70:10 71:22
72:13 76:21 84:19
92:21 101:6
102:16 103:13
105:9,17 109:15
111:6,18,19
112:22 113:19
114:4 115:2
117:13 119:6
125:14 128:3
129:20 132:16
133:5,22 135:6
138:11 140:22
144:7 145:4,8
146:18 147:4,12
147:13,14 148:16
149:10,14 151:6,9
153:1,3,6 156:1
160:13 161:3
166:19 168:2
173:12,19,19
174:7,7 176:14
178:19 179:5,18
180:21 181:4,21
183:4,5 186:6
192:15 197:6
198:8 199:11,13
202:13 209:3,12
211:10,12,22
215:2 217:21
218:8,9 219:4,11
222:1 223:3
225:15 228:1,1
235:7 239:12
241:9 243:4

248:19
**timeframe** 248:8
**times** 13:4 23:9
27:13,18 48:8
51:20 63:5 80:1
96:20,21 109:19
109:21 122:15
129:16 152:13,20
174:15 183:21
**timestamp** 187:20
188:9 193:1,2
195:7 216:22
**timothy** 4:14 9:16
248:1
**title** 10:15 49:9,12
236:5
**today** 9:13,20
10:12 11:11,17,21
12:14,20 13:16,22
14:14,19 18:17
20:8 30:21 37:7
38:14,19 39:18
40:9 41:2,9 43:16
44:1,4 46:20 52:6
52:20 61:6,7 62:5
63:4 67:4,7 69:2
73:14 74:22 80:6
80:12 82:7,15
83:1,8,9 101:16
104:12,20 113:3,4
115:19 117:16
121:5 128:17
139:2,7 140:13
145:13 148:18
153:12 155:12
158:6 179:18
186:5 218:22
220:13 229:19
231:13 243:12
**today's** 13:2 17:5

CONFIDENTIAL

**told** 80:18 86:11
  86:12 171:18
  172:12
**top** 123:2 124:2
  127:5 130:7
  141:22 163:15
  164:1 188:5 189:4
  230:17 232:18
  236:5
**total** 24:6 128:3
  131:12,21 132:22
  140:6
**totality** 79:14,16
  79:18 81:22
**totally** 18:14 112:4
**totals** 131:12
**towers** 18:6
**track** 96:2 132:16
**tracked** 138:6
**trailer** 29:9
**train** 20:14 26:16
  27:19 29:22 30:3
  32:17 35:3 37:14
  39:12,19 49:12
  51:5,15,18 52:22
  53:2 83:9
**trained** 24:14,19
  26:13 28:18 29:4
  30:9 31:14,20
  32:12,22 37:19
  40:11 53:14 55:7
  55:10,13 56:22
  57:8,16 58:14
  59:3,3,10 60:14
  61:9,17 62:1 72:7
  72:16 73:18,20
  74:4,17,22 76:6,15
  76:21 77:2,4 80:7
  80:17 83:14,18
  87:19 88:19 89:7
  89:21 91:7 94:18

96:13 97:3,4,22
  98:22 99:5,11,15
  105:5,13 106:5,14
  106:18 108:2
  147:3 169:12,16
  169:18 184:13
  214:15 215:9
**trainee** 93:8
**trainees** 20:14
  25:11 30:2
**trainer** 49:7
**trainers** 51:18
**training** 6:9,11
  16:11 19:15,17
  20:2,12,17 21:2
  22:16 23:15,20,22
  24:2,9,15,18 25:3
  25:6,7 26:4,14,17
  26:22,22 27:10,12
  28:4,5 29:8,16,17
  30:9,15 32:4,16,20
  33:3,6,11,18,19,20
  39:9,19,21 46:12
  46:14,19,22 47:12
  48:22 49:1,11
  51:21,22 52:2
  53:1,12 54:20
  55:4,16,22 56:5,8
  56:12,19 57:3,5
  60:9,13,20,22
  61:11,12,18,19
  64:20 65:18 66:2
  67:10,14,16 68:14
  68:19,22 69:13
  71:13,20 72:8,18
  73:6 74:22 76:1,9
  76:12,13 77:2
  79:10 80:13,19
  81:3,5,11,14,16,19
  81:20 82:5,7 84:1
  84:5,9,12 85:10

86:10,19 87:2,7,11
  88:1,7,9,11,13,15
  88:18 91:8,9 92:7
  92:14,15,17 93:6,7
  93:13,15,16,21
  94:13,15,17 97:6
  98:21 99:8 105:4
  105:7,14 116:22
  117:1,2,4,5,9,17
  118:2 119:2,11
  120:9,16 121:6,7
  121:11 126:10,10
  126:15,16 127:2
  129:15,16,17,21
  140:2,21 143:15
  143:17 144:6,7,9
  144:13,15 145:16
  145:20,21 146:2,3
  146:12 147:2,7,8
  176:19 184:22
  186:8,13 217:13
  217:15 218:1
**trainings** 52:9
  54:6 84:9 117:11
  118:1 119:2 120:5
  120:12
**transcriber** 247:1
**transcript** 8:21
  116:22 117:1
  120:2 244:10,16
  246:21 247:3,5
  248:6,18,20 250:5
  250:8
**transcriptionist**
  246:7
**transfer** 41:13
  116:5
**translation** 155:22
**transmitting**
  122:3

**transparency**
  174:16
**trapp** 155:20
**travel** 23:11,14
**treat** 214:18
  233:22
**treatment** 241:1
**trial** 243:13
**tricks** 187:6
**tried** 38:11
**trouble** 91:11,12
**true** 133:18 246:9
  247:5 250:8
**trust** 33:15
**truth** 10:6,6,7
**try** 12:19 50:6,7
  76:21 78:22 104:3
  160:20 201:5
  215:3
**trying** 51:3 85:8
  174:1 187:6
  198:13 225:7
**tsu** 89:1,6,13,16,18
**tucked** 213:22
**turn** 157:1 202:8
  203:15
**turned** 177:2
  179:12 203:2
**turns** 202:8,11
**twenty** 15:3,4
  19:18
**twice** 209:7,8
  220:18
**two** 9:18 12:6,7
  27:14 30:11,12
  42:4,6,8 45:1,8
  58:9 84:4,7 85:13
  94:13 125:3,5
  131:11 153:8,11
  175:7 188:8 190:9
  190:9 196:13

CONFIDENTIAL

**[two - use]**                                                                 Page 37

198:10 203:17
204:1 206:12,16
206:21 221:1
**type**  224:7
**types**  24:14 89:22
139:18
**typewriting**  246:7
**typographical**
140:3,11,15,17,18

**u**

**u**  7:15
**u.s.**  8:10
**unable**  42:11
**unassigned**  37:22
128:21
**unavailable**
104:14
**unaware**  120:16
158:10 167:9
186:14 216:11
242:14,17,18
**unclear**  201:16
**undergo**  52:22
145:21
**undergoing**  48:20
**undergone**  146:2
**underlying**  100:11
112:15 153:13
**understand**  8:20
11:13,17 15:1
27:8 31:2 33:2
40:21 47:10 51:3
54:16 58:13 65:14
69:22 70:4 80:9
85:20 110:4 125:8
125:13 127:9,18
131:1,7 135:7
152:8 169:10
172:9,14 173:2,11
174:11 176:16
179:6 184:20

188:12 192:3
198:15 221:10
222:11,18
**understanding**
25:15,20 37:8
41:16 43:22 52:7
52:21 55:20 57:17
57:20 67:15 79:4
81:21 90:6 93:5
103:19 104:21
106:20 113:4
121:6 123:15,17
128:1,18 138:22
139:3,8 145:19
151:8 152:20
153:2,17 154:1
155:12 167:18
174:18 179:19
193:4 194:7 214:3
214:16 228:9
236:12 239:13,15
**understands**  32:7
**understood**  20:9,9
24:13 25:14 26:10
26:12 27:7 28:8
28:14 29:12,21
30:21 31:3,7
32:11 34:8,22
35:2 39:5,15
43:11 44:12 45:16
45:20 46:5,9 47:9
49:3 50:2 51:4,10
51:14,17 52:6,20
53:10,17 54:12,15
56:4 58:6 62:19
64:2 66:21 67:21
73:14,20 74:17,21
75:16 78:6,11
79:3 80:5 84:5
86:17,17 87:1,7,18
88:9 89:15 91:2

91:21 92:3 93:1,5
93:12 94:8,12,18
94:22 96:12 97:10
99:14 100:2,10
102:1,6,12 104:12
104:20 108:2,12
108:20 109:4
110:2,17 112:6
113:11,17,20
118:22 119:5,14
120:15,18 121:2
121:14 122:19
123:12 124:1,17
127:4 128:17
130:1 133:13
134:17 135:16,20
137:21 138:8
139:2 140:19
141:6,12 144:14
145:11 146:1
149:13 150:19
151:7 156:2 164:5
166:16 168:15,18
168:21 170:5,22
174:3 175:9,21
176:3,16 177:1
178:13,19 180:6
181:17 183:1
184:5 185:16
186:17 187:3
190:14,19 191:2
193:12 195:15,20
197:9,15 198:12
198:18 200:17,22
201:22 204:7,12
205:12 209:1,16
212:15,18 214:14
215:1,15 216:9,13
217:20 218:3
219:17 220:9,12
220:18 221:3

223:19,21 228:4,9
229:21 230:3,9,20
231:5,17,19
232:15,17 234:2
235:2,12 239:2,19
240:16 242:16,20
243:6,16
**underwent**  120:9
**undue**  185:15
**unfortunately**
25:18 33:22
160:21
**unit**  21:18 51:6
52:8 89:16,20
231:2
**united**  1:1
**units**  18:6 231:4
**unrecoverable**
102:4
**unsure**  103:11
212:1 213:10,18
**unusual**  121:15
**uploaded**  141:13
**upper**  160:14
183:12,13
**upright**  75:1,17
**usage**  55:4,14,17
55:18 56:1 126:6
126:9
**use**  17:6 23:12
27:19,20 29:10
49:13 55:7,13
56:2 57:1,8,12,14
57:16 58:15 59:1
59:5 60:16 61:17
62:5,22 63:7
64:20 65:14 66:2
66:5,9,13 69:3,14
69:22 70:2,3,6,8
71:11,18,21 72:4,7
72:8,10 73:1,15

74:5 75:10,15,18
76:2 77:3,5,6,7,22
78:12 88:18 90:16
92:6 96:5,14 97:3
97:4 112:11,12
126:10 132:6,10
134:21 135:2,17
135:22 138:6
145:21 146:4,13
146:19 147:4,9
164:2 167:15
169:7 181:4 184:3
184:16 205:6
206:2,5 209:15
213:3,9 214:18
215:4,9 220:15,17
221:2,15 222:16
222:21,21,22
223:5,6,12,13,14
223:14,18,22
224:7,19 225:2,3
226:17,18 228:1
235:21 236:14
**uses** 9:1 108:22
131:12
**usual** 39:22
**utilization** 6:12,13
7:6 95:10,14
97:17 100:17
104:8,13,22
132:13,14 133:4
133:10,11,14,17
134:1,2,6,8,16,21
135:3,8,10,14,18
135:21 136:19,20
137:14,15 138:9
138:14,17,20
139:4,9 140:22
227:17,18 228:3
228:11,16,19
229:5,14 231:7,11

**utilizations** 95:17
96:2 104:11
132:14,15,20,22
134:3 135:2
**utilize** 47:7 62:2
75:15 76:6,7,7,8
79:6 82:11 134:8
134:12
**utilized** 59:1 62:16
74:10 80:1 84:19
234:20
**utilizing** 65:3 78:9
91:8 132:17
190:12 241:12

**v**

**v** 1:7 248:4 249:1
250:1
**va** 4:18
**vantage** 197:3
**vdoc** 17:7,11,14,14
17:22 19:7 21:11
40:6,9 41:12
42:14 48:21 49:2
49:4,6 50:15
53:15 55:22 56:8
56:9,12 62:6
65:14,18 87:9,13
89:8 90:1,3,7 92:1
96:1,6 102:16,20
109:16 117:12
120:12 144:21
145:2,5 146:2,12
146:12 153:20
154:3 235:21
241:12
**vdoc's** 51:6
**verbal** 32:1,4,6,7
73:5 77:7,10 78:2
78:14,20,20 79:20
161:19,20 166:17
166:21 167:3,6,9

169:1,11 170:15
172:1 173:5 175:3
175:5,11 178:20
181:19 193:8
194:5 202:19
205:14 206:4
217:11 224:19
**verbally** 80:18
161:4 175:13,19
182:22 184:4
**verbatim** 126:7
**verify** 174:13
184:8 214:17
248:9
**veritext** 8:4 174:4
174:5 248:14,23
**veritext.com.**
248:15
**version** 143:1
**versus** 28:11 57:20
112:11 180:22
223:1 224:16
**vestibule** 195:8,9
195:13,15,18
**veteran** 54:15
**veterinary** 96:3
**video** 7:3,9 8:14
12:9,11 162:4,13
162:18,20 163:1,3
163:7,12,15 164:1
164:7 165:7 183:2
187:11,12,14,17
188:5,19 189:16
189:18 190:17
191:2,5,7,9 192:6
192:8 194:9,15,17
196:7 198:22
200:7 202:1 206:9
207:22 208:5,9
209:18 210:16,18
212:2,5,8,12

217:22 218:4
219:8 220:10
221:6,12 222:13
222:14 224:21
225:19 226:7
228:21 237:2,12
237:18,20
**videoconference**
2:9 3:3,4,5 4:14
4:15 5:4,6
**videos** 238:3
**view** 113:5 122:13
163:7 179:16
197:1 198:6
199:16 201:18
**virginia** 1:2,11,12
1:16,21 2:4 4:4,4
4:7,9,12,16 8:11
8:16 16:22 17:8
29:10 114:1
246:19
**virtual** 12:2 174:9
**virtually** 8:22
**visible** 73:22
**visibly** 182:20
**visiting** 23:1,2
**visits** 96:3
**visual** 170:22
**volunteer** 52:22
**volunteered** 52:17
53:8
**vorhis** 4:15 9:18
**vs** 8:8

**w**

**w** 1:13 4:5
**waist** 200:16
**wait** 133:5
**walk** 69:21 72:7
158:6,21 221:22
**walking** 60:4
177:11,12,12,13

177:15
**wall** 163:15
**wallens** 21:17
  142:12
**want** 11:7 18:11
  18:20,21 33:22
  63:19 115:6 117:7
  118:11 155:21
  162:11 164:12
  176:15 185:15,22
  242:9 243:8 244:9
**wanted** 18:10
  56:19 112:11,12
  113:13 148:14
  150:11 155:21
  224:8 244:20
**warden** 1:8 4:2
**warning** 78:20
  167:6,9 170:6,8,16
  170:17 171:10
  180:15 181:19
  202:19 204:8
  205:8,15 206:4,16
**warnings** 77:7,11
  78:3,20 79:3,20
  159:19 160:4
  166:15,17,21
  167:4,12 168:1,6,6
  168:8,9,13,20
  169:1,5,9,12,16,18
  170:12 172:18
  173:1 175:11,14
  179:12 199:19
  209:7
**washington** 2:14
  3:8
**watch** 183:2,3
  187:10,13,16
  237:10
**watched** 187:15
  202:1 220:9 227:1

228:21 237:21
**watching** 212:2
**water** 218:7
**waving** 75:13
**way** 14:13 58:3
  59:2,7 62:16,21
  86:18 94:14 112:2
  112:3 132:16
  133:11,15 176:22
  178:14 182:11,12
  182:12,14 183:18
  199:20 200:7,13
  200:20 205:2
  208:6 209:9 215:4
  224:5 238:3
**ways** 86:22 94:6
  106:4,9 134:7,11
  152:4
**we've** 33:20 50:2
  92:4 188:15
  218:20
**weapon** 73:22
  74:6 179:2 184:2
  184:8 211:19,22
  213:4,6,11,19,21
  214:2,5,8,11,17
  215:6,10 216:7,10
  216:11 242:12,15
  242:19,22 243:2
**weapons** 73:4
  178:21
**wearing** 163:14,14
  239:12,17
**wednesday** 2:11
  8:6
**week** 24:3,6,7
  26:13,17 29:17
  30:15 42:4,6,8
  68:11,15
**weekly** 68:13,18
  69:12 71:13

**weeks** 247:2,15
**wells** 5:5 9:19
**went** 16:17 22:9
  33:18 48:13 51:22
  53:11,19,20 61:12
  61:18,19 67:10
  92:6 142:13 143:5
  143:14,16 198:16
**western** 1:2 8:11
**white** 57:13 72:19
  163:14 189:3
  190:16
**wide** 185:1
**william** 1:17 4:7
**window** 173:22
  189:11
**wise** 17:18,19,19
**witness** 8:17,19,20
  10:5 13:20 96:18
  103:7 205:1
  207:11 210:21
  244:3,7,18 246:4
  248:8,10,12,19
**witness's** 146:6
**witnessed** 159:14
**witnesses** 228:8
**wonderful** 11:13
  14:21 122:10
**woods** 112:6,7,11
  113:2,5,13,18,21
  114:3,12 148:19
  149:5,19,22 150:5
  150:14,22 151:3
  151:10,18 152:10
  152:11,14,21
  153:3,6,12,14,21
  154:2,6 233:4
**woods's** 113:8
  154:9
**word** 77:13 85:6
  87:16 102:1

107:10
**worded** 55:10
**wording** 148:17
  149:11 150:9,17
  154:11
**words** 85:21 110:7
  110:22 111:22
  112:5,10,11
  153:14
**work** 18:6 28:7,9
  33:17 37:14 40:4
  54:8 64:8 89:14
  113:20 114:2
  182:14 185:5
**worked** 182:11
  183:18
**working** 38:10
  43:5 98:17,18
  99:13 103:13
  104:9,11 136:22
  158:14
**worse** 222:21
  223:5
**would've** 27:2
  101:8
**wounds** 240:12
**wrapping** 241:20
**wrist** 160:14,15
  182:4,5,5 183:13
  234:19
**write** 105:5,8,17
  106:5
**writing** 106:5
**written** 9:6 57:18
  58:1,4 106:10
**wrong** 82:12 83:13
  86:2 108:10
**wrote** 105:10
  110:19 233:1,5
**wrsp** 142:9

[wulfe - zoom]

| wulfe   3:4 9:13 | z |
|---|---|
| **x** | **zip**   14:3 |
| **x**   6:1,5 7:1 246:21 | **zoom**   8:13 |
| **y** | |

**y**   228:2
**yard**   45:14,14,17
  90:20 159:5
**yeah**   10:18 28:1
  47:14 54:18 63:13
  64:8 69:17 91:14
  95:4,4 101:11,11
  102:5 124:6
  133:20 137:6,10
  155:7 163:11
  164:9 174:12
  175:8,10 177:18
  187:2,2 188:2
  190:10,10,18
  192:20 193:20
  197:6 199:22
  201:6 203:19
  215:7 222:4
  230:14 238:21
  244:2
**year**   15:11 16:21
  17:2 23:9 43:1
  130:18
**years**   12:18 19:9
  19:16 24:12 37:16
  52:3 104:16 117:3
**yelling**   177:16
**yellow**   239:7
**yep**   22:20 32:16
  64:10 164:5
  225:18
**yo8ur**   218:21
**young**   16:9

Rules of Supreme Court of Virginia

Part Four - Pretrial Procedures

Depositions and Production at Trial

Rule 4.5

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 21 days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion

to suppress under Rule 4:7(d)(4) the court holds
that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.