IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

------------------------------------
COREY E. JOHNSON,

          Plaintiff,               CIVIL ACTION NO.
                                     7:20cv582

v.

(K-9) OFFICER McCOWAN, et al.,

          Defendants.
------------------------------------


DEPOSITION UPON ORAL EXAMINATION
OF ERNEST BURWELL,
TAKEN ON BEHALF OF THE DEFENDANTS


City of Lipa, Province of Batangas,
the Philippines

September 12, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

------------------------------------

COREY E. JOHNSON,

        Plaintiff,            CIVIL ACTION NO.
                                 7:20cv582

v.

(K-9) OFFICER McCOWAN, et al.,

        Defendants.
------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF ERNEST BURWELL,
TAKEN ON BEHALF OF THE DEFENDANTS

City of Lipa, Province of Batangas,
the Philippines

September 12, 2022

Appearances:

On behalf of the Plaintiff:

ANDREW JOHNSON, ESQUIRE
Arnold Porter Kay Scholer LLP
601 Massachusetts Ave, NW
Washington, DC   20001
(202)942-5000
andrew.johnson@arnoldporter.com


On behalf of the Defendants:

TIMOTHY E. DAVIS, ESQUIRE
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, VA   23219
(804)786-4805
tdavis@aog.state.va.us

                         I N D E X

DEPONENT                    EXAMINATION BY        PAGE

ERNEST BURWELL        Mr. Davis                     4


                         EXHIBITS

NO. DESCRIPTION                                   PAGE

1    8/8/22 Ernest Burwell Police Consulting       6
     report

2    8/29/22 Ernest Burwell Police                 6
     Consulting report

3    Police Executive Research Forum document     77
     "Guidance on Policies and Practices for
     Patrol Canines"

4    Kerr v. West Palm Beach case                 77

5    Operating Procedure 435.3                    77

6    Brian McCowan deposition transcript          77

7    Center pod video (retained by counsel)       85

8    Eric Baker deposition transcript            124

9    3 photographs                               124

10   Incident Report                             124

11   Matthew Bernocco deposition transcript      136

12   William Barbetto deposition transcript      140

Deposition upon oral examination of ERNEST BURWELL, taken on behalf of the Defendants, before Juanita Harris Schar, CCR, RMR, CRR, an E-Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, by videoconference, commencing at 7:58 p.m. Eastern Standard Time, on September 12, 2022, in the City of Lipa, Province of Batangas, the Philippines; and this in accordance with the Federal Rules of Civil Procedure.

- - - - - -

ERNEST BURWELL, was sworn and deposed on behalf of the Defendants, as follows:

EXAMINATION

BY MR. DAVIS:

Q.    Mr. Burwell, my name is Timothy Davis.  I represent the defendants in this matter.  Could you please state your full name for the record?

A.    Ernest Burwell, B-U-R-W-E-L-L.

Q.    And are you an expert witness who's been retained by the plaintiff in this lawsuit?

A.    Yes.

Q.    Could you describe for me what you consider to be the scope of your expertise that you offered in this case?

A.    Well, it would basically consist of

constitutional rights violations.  So there would have to be a plaintiff for me to be involved.

Q.    Okay.  As a little more specific, are you testifying as somebody with an expertise in the use of canines and law enforcement use of force?

A.    Yes.

Q.    Okay.  You authored an initial expert report and a rebuttal to the defendants' expert, correct?

A.    Correct.

Q.    Okay.  I am going to screen share those in a second.

Forgive me.  I'm having some remote network hiccups.

Okay.  Mr. Burwell, can you see the document I have screen shared just now?

A.    Yes.

Q.    Is this your initial expert report?

A.    From looking at the top, it could be either that or the rebuttal.  I can't see the rest of it.

Q.    Okay.  Let me -- it was submitted August 8th.

A.    Yes.  That's my report.  Yes, I see that now.

Q.    Okay.  And is this your rebuttal report?

A.    Yes.

MR. DAVIS:  Mrs. Schar, I'd like to make these Defendants' Exhibits 1 and 2.

(Burwell Defendants' Exhibit Nos. 1 & 2 were marked for identification.)

BY MR. DAVIS:

Q.    Mr. Burwell, do you have a hard copy of these reports with you?

A.    Yes.

Q.    Okay.

A.    No, it's digital.  It's not a hard copy.

Q.    But do you have a copy available for your access?

A.    I can get them up, yes.

Q.    Okay.  It may be easier if we all just follow along with our own copies rather than screen sharing all of these.  There are a couple other documents that I'd like to screen share over the course of the deposition.  If at any time you want me to pull up the document to show you what I'm looking at, just let me know.  I'll be happy to do it.

A.    Okay.

Q.    Now, Mr. Burwell, I expect given your expert testimony experience that you've been deposed before?

A.    Yes.

Q.    Okay.  So we'll skip some of the preliminaries and get right to it.

The one thing I wanted to put here on the record, given the time difference that we have with everybody here, it is 8:00 p.m. on Monday, September 12th, East Coast time.  I understand it is 8 a.m. on the 13th where you are giving your testimony right now.  We are going to try to go till about 12 a.m. East Coast time and assess where we are and if we need to, carry this over to a later time.

So, Mr. Burwell, did you speak to anyone in preparation for this deposition?

A.    No.

Q.    Did you review any materials other than those that you have listed in your initial and supplemental reports?

A.    Not that I think would apply to this case, no.

Q.    Could you elaborate on that?

A.    Well, there's a 2020 -- it's basically out of California, is what it is.  It's a -- well, that's not true either.  It's a national consensus on police use of force that I reviewed.  That's something that's -- that's around the same time of your case.

And it talks a lot about deescalation and so forth.

Q. And do you believe your review of that document would inform your testimony today?

A. Wouldn't change anything.

Q. You wouldn't rely on that document in any way?

A. No.

Q. Okay. Is there any reason you feel you wouldn't be able to testify today?

A. No reason.

Q. All right. I'd like to ask a couple of questions first about your background.

According to your CV, you began working for the LA Sheriff's Department in 1977. Is that correct?

A. Correct.

Q. Did you work in law enforcement at all before that time?

A. No. I was only 21 years old.

Q. And according to your CV, you retired in 2006. Is that correct?

A. Yes.

Q. So did you spend that entire duration with the LA Sheriff's Department?

A. Yes.

Q. Do you have any other experience working in

law enforcement?

A.    No.

Q.    During your time with the Los Angeles Sheriff's Department approximately how much of that period did you spend working in a confinement setting?

A.    I wouldn't be able to estimate that.  The first part of my career was spent in a custodial environment.  Of course, with the Sheriff's Department, it could be up to five years.  But it was a little less than that.  It was quite a bit less than that for me because I went -- they recruited me into working undercover narcotics at Pepperdine University in Malibu, California, which allowed me to go to patrol a lot sooner.  But then I would work overtime at the jail, so I don't know how to tell you how much I did.  But it was a lot.

Q.    So less than five years of doing that work full-time and then intermittently for overtime after that?

A.    Yes.  A lot of overtime.

Q.    And you said this was in a jail?

A.    Yes.  We had several different jails.  We had over 20,000 inmates.  So it could either be at one of the towers, which one side was female, the other side was male.  It could have been up at Peter J.

Pitchess Honor Ranch, which was -- it was medium, maximum, and supermax facilities.  Or it could have been down at downtown Los Angeles at the men's central jail.  It's just various places I could have done overtime.

Q.    When you were doing your overtime work were you working as an -- I don't know if a correctional officer would be the proper term for a deputy working in the jail, but a similar function?

A.    I would be working as a corporal in the jail.  Two-striper.

Q.    Okay.  And the jails that you worked in, did any of those house convicted prisoners or was it all pretrial detainees?

A.    That's hard to say.  Because some of the people that were brought back to central jail were being housed to go to other prisons.

Q.    So it was --

A.    It could be --

Q.    -- I guess at various locations?

A.    Yes.  Sorry to cut you off.  I know I just broke the rule.

It could be a temporary reassignment for the inmate or it could be an inmate that had another charge that was brought back to the county jail for

court processing in downtown.

Q.    And were convicted prisoners housed separately from the detainees?

A.    You know, I don't remember.  I don't think so.  Not unless they were keep-away.

Q.    I want to ask now about your experience with canine handling.  When did you first start working as a canine handler?

A.    Well, I got my first dog right towards the end of 1983.  Then I started working the dog, I think around January, somewhere in there, 1984.

Q.    Now, I guess I'll start with the first dog you worked with.  Was this a dog used for patrol purposes, for detection, mixed use?  What sort of dog were you working with?

A.    Well, could you define "patrol"?  Because in the jailhouse they're listing and at VDOC they're listing dogs as patrol dogs.  So to me, a patrol dog, my function was to go out and search for high-risk felony suspects and armed misdemeanor suspects in hiding.

Q.    Well, let me ask it this way.  So a dog that is used as a patrol dog that you would use for searching for suspects, would that dog have been trained as a way to use force against a suspect when

12

you found them?

A.    Yes.  But it depends on the handler controlling the dog.  It doesn't mean because you let a dog go find somebody the dog automatically bites.  It's more of a handler control-type search where if you can't see the person and you're doing a search at night, the dog has a possibility of getting in there and biting the suspect.

Q.    That situation, would that be something that the dog is trained to do or would that be something that would have gone incorrectly?

A.    All of the dogs that we use are trained to bite and hold.

Q.    Okay.

A.    Or find and bite if the handler can't see it.  Or if the suspect is so dangerous, yeah, let the dog go in and bite.

Q.    Now, did you also handle narcotics or any other kind of detection dogs?

A.    No.  With the Los Angeles County Sheriff's Department they're not dual purpose.  They're trained for one thing.

Q.    Did you handle these dogs when you were working in the jails or any confinement setting?

A.    No.  We did not use dogs, police dogs,

13

patrol dogs, any type of other than maybe a search dog for narcotics, but that was a whole different game and a whole different dog.

Q. Understood. During your career was there any occasion where you were handling a dog and the dog bit a suspect?

A. Many, many times.

Q. Do you know approximately -- excuse me, approximately how many?

A. I know exactly how many.

Q. How many would that be?

A. I bit 425 suspects, armed felony -- mostly armed felony and high-risk suspects.

Q. And you said none of that occurred in the jail setting? That was all in the street?

A. None of those occurred in the jailhouse setting. That's correct.

Q. Okay. When did you start working as a canine trainer?

A. I think right around 1990.

Q. And were -- at that time were you only training other handlers in the Sheriff's Department or did you also train people at other agencies?

A. The answer is yes to both of those.

Q. Okay. Did you start with just working with

the Sheriff's Department or did you immediately go to work with other law enforcement entities?

A.   I don't understand.

Q.   When you first began working as a trainer -- excuse me.  I'll withdraw the question.

Was there a particular discipline that you trained dogs in?

A.   Discipline.  Well, there's a method. There's different -- there's different philosophies on how to train a dog, such as the so-called guard and bark nonsense.  There's also the find and bite. There's also the handler control, which that's what I -- that's what I taught, was handler control.

Q.   And so were you only training patrol dogs or did you also train detection dogs?

A.   I trained a couple of detection dogs, also, that worked with our patrol dogs.  One was a cadaver dog, and the other one was -- there was a couple of what would you call them?  Search and rescue dogs.

Those dogs, by the way, were not taught. They were of a different breed, mostly of a Labrador retriever, and they were not taught to bite whatsoever. What I did teach them once they found somebody was to bark, bark, bark.

Q.   Understood.  Did you have any

certifications while you were working as a trainer?

A.    Yes.

Q.    Could you describe those?

A.    I have a -- well, I had at the time -- it's expired since, was a California Peace Officer Standards in Training Police Dogs certification, evaluator's certificate.  If that came out right.

Q.    Any other certifications?

A.    Well, I have an Advanced Peace Officer Standards and Training certificate.  The Sheriff's Department is not in the -- in the hand-out-certificates mode.  But I had a lot of training certificates from Adlerhorst International.

Let me spell that for Mrs. Schar. A-D-L-E-R-H-O-R-S-T International.

That's a canine training facility and vendor.

I have a lot of certificates from things such as passing the Olympics with my dog where I placed with the dog.  Police Olympics for myself that I placed in, in power lifting, certificates for attending certain classes through other agencies.  Which really has nothing to do with actual police work and common sense.

Q.    How long did you continue as a trainer with

16

the department?

A.    Until the end of 2003.

Q.    Did you ever train dogs for use in a jail or prison?

A.    No, I did not.  I don't believe in it.  As a matter of fact, I recommended to my department that we not do that.

Q.    And so that also includes no training of anybody outside of your department; is that correct?

A.    To use in the jail?

Q.    Correct.

A.    Yes.

Q.    When did you stop working as a canine handler?

A.    2004.

Q.    And was there any reason that you stopped working with dogs?

A.    Yes.

Q.    What was that?

A.    My department took the dog away from me, my last dog, because I had reported some wrongful doings, basically a wrongful death caused by a member of the department who happened to be best friends with the Sheriff.  I also reported out the switching of a suspect that I'd found -- that I had found and there

was an actionable bite by another canine handler.  The same lieutenant was involved with that.  They switched out an innocent person for the suspect that I had found and put that person in prison.  It still bothers me to this day that there was nothing I could do about it.  I tried.  And as a result, well, stuff happens.

Q.    Understood.  Did you continue working on in law enforcement after that time?

A.    Well, I was still -- I still continued.  I took the sergeant's exam and in November of 2004 I was placed on the intent-to-promote list to be a sergeant.  That was pretty close to my -- getting close to my 30-year retirement if I was to use up my saved time, overtime, holiday time and so forth, which I ended up doing.  I don't want to sit behind a desk.  I'm a canine handler.  I'm a SWAT guy.  That's what I know but, you know, when you get 50 years old, time catches up to you.

I never believed that till my brother told me that:  Just wait till you're my age.

Q.    You said you retired from law enforcement in 2006.

A.    August 14th, 2006.  Correct.

Q.    Is that when you began doing expert and consulting work?

A.    No.    It was actually 2005 when I started my -- it was -- I don't know.  I guess it was by the good Lord's design or whatever you want to call it.  It was a Taser case presented to me by a guy by the name of -- that I used to work for a lot by the name of Roger Clark.  And he asked me to handle a Taser case, which I did.  It was against our department.  I was a Taser instructor, also.

Q.    So do you know how many cases you've provided expert testimony in?

A.    I have no idea.  I don't keep track of that.

Q.    Okay.  The cases that you do testify in as an expert, are they all civil rights lawsuits?

A.    Yes.  Well, no.  That's not true.  Some of them are criminal where a person has criminal charges.  I might testify for them on the dog bite end of it.  Or where they've been shot.

Q.    And so in these criminal cases do you exclusively testify on behalf of the accused?

A.    Well, no.  Not necessarily.  Because, you know, a lot of these cases there's always -- most of the time there's a lot of officers involved on scene and with the incident, and so I would testify that certain officers did nothing wrong.  Usually there's

maybe one or two that might be doing something wrong, but that's it.  But I do testify that the other officers, let's say, that were there on scene or whatever, most of them didn't do anything wrong.  They followed policies and procedures and did the right thing.

Q.   How about in civil cases?  Do you ever testify on behalf of the government?

A.   No.  They don't call me.

Q.   So I'd like to look, if you have your initial report available, at page 67, the list of your cases.

A.   Okay.

Q.   These cases you've listed here, are these all civil rights civil actions?

A.   Yes.

Q.   All these cases involve claims of excessive force?

A.   Yes.

Q.   And in each of these did you testify for the plaintiff?

A.   Yes.

Q.   Did --

A.   No.  No.  On some of these cases I testified on behalf of -- like Dillon Rock, I testified

20

on behalf of one of the canine handlers there in that case.

Q.    What was the name of that one?

A.    Dillon Rock vs. Officer Cummings.  It's about four down, I think.  Five down.

Q.    So you said in that case you testified on behalf of the officers?

A.    Yeah.  Except the one officer, which was the -- the one -- there were two canine handlers there. I think it was Officer Cummings that I testified against, but I think it was Officer White or Miller, one of the two, I testified -- they were canine handlers, also.  I testified on their behalf.

Q.    So you were retained on behalf of codefendants who were not adverse in the case, but fair to say your testimony implicated another of the canine handlers?

A.    I didn't say any of that.

Q.    How would you describe it then?

A.    I didn't say that I was retained by any codefendants.  I was retained by the plaintiffs.  Just because I'm retained by the plaintiffs does not mean that I won't testify on behalf of defendants.

Q.    I understand.  That's my mistake then.

So you offered then testimony on behalf of

the plaintiff in that case that was favorable to a couple of the defendants?

A.    That's correct.

Q.    Okay.  Now, in these cases that are listed here, in each of those did you find that at least a defendant used excessive force?

A.    Correct.

Q.    Did any of these cases involve the use of a canine against a prisoner?

A.    No.  Well, when you say "prisoner," once they're handcuffed, they're a prisoner, so yeah.

Q.    Okay.  But an incarcerated person.

A.    No.

Q.    Is there any other testimony that you have given since you have issued the report with this list?

A.    No.  But I do have a trial coming up day after tomorrow.

Q.    What is the name of that case?

A.    Oh, gosh.  It's Carlos versus I think -- Carlos versus something Arizona.

Q.    And what court is that in?

A.    Somewhere in Arizona.  I don't know.

Q.    Do you know if it's federal court?

A.    Yes.  It is near Phoenix somewhere.  So it would probably be in Phoenix, the court.

Q.    Understood.  And is that a local law enforcement case?

A.    What does that mean?

Q.    Police or sheriff's department?  Who was the defendant?

A.    Oh, it would be the police department. Many police departments.  There was many involved.  It was a SWAT call.  But I can't get into too much of the case because it's protected documents.  I can tell you a little bit but not too much.

Q.    Understood.  I think that's all we need to know.

I'd like to take a look at the report itself now.  The first thing I'd like to do is clarify where specifically you offer an opinion in this report.

A.    Basically, my whole report is an opinion, but can you direct me to what page you're talking?

Q.    Well, let's start on page 6.

A.    Okay.  I'm on page 6, summary of opinions.

Q.    And so is this here, the summary -- did each of these items correspond to another portion of the report?

A.    Yes.  I would have supporting documents and further information to support my opinions.

Q.    So then the summary of opinions here, are

23

these your final conclusions and then the subsequent portions of the report are your analysis and your citations to support those?

A.    Yeah, basically.  Let me make it pretty simple.  Basically, my opinions are the use of objectively unreasonable force, the lack of training that was given to the canine handlers, and the reports don't support the video.  And the video is my main supporting document for these opinions.  But all this other stuff comes into play.  Of course, then you have Kmiecik's version of what happened.  But that's basically my report.

Oh, and also a lengthy dog bite.

Q.    So you said your opinions are there was objectively unreasonable force, lengthy dog bite, you said a lack of training, the reports did not match the video.  And was there anything else in there?

A.    The lack of training.

MR. JOHNSON:  Object to form.  You can answer.

A.    Yeah.  The lack of training.  And the lack of following policies and procedures.

BY MR. DAVIS:

Q.    Okay.

A.    And U.S. Supreme Court decisions, appellate

court decisions, and again, those things that were given to -- or that the department lists in their training and policies and procedures, they don't follow them.

There is one other thing.  The failure to supervise this incident either by being on scene or administratively supervising this incident by looking at videos and comparing that with the police -- with the VDOC bite report and incident reports.

Q.    Understood.  So I'd like to take these up one at a time.

In your first summary opinion you state that "Law enforcement canine bites can cause more severe injuries than other less lethal weapons when used improperly; they are more severe than a Taser... and can be more severe than a gunshot wound."

Do you see that portion of your opinion there?

A.    I know what you're talking about, yes.  If you're in summary 1.

Q.    So what is the standard you use here to judge or to assess the severity of potential injuries?

A.    Well, I qualified as a dog bite expert in federal court, not as a medical examiner or a doctor but as a dog bite recognition expert in San Diego.  And

25

like I told you, I have had over 425 bites with all of my police dogs.  And I've seen well over a thousand bites.  And now with the police consulting business, I have seen another additional probably 150 bites minimum.  And I've seen scalps ripped off, I've seen death occur.  I'm talking about stuff on video.  Nothing that I -- I haven't actually seen.  We're talking about femoral arteries being ripped open and the person bleeds to death.  We're talking about body parts being removed.  We're talking about the seriousness of a dog bite being infected and causing -- causing damage to an unborn baby that's going to be lifelong -- life -- a lifelong event for that child that's born deaf because of medication that had to be given to the mama or the mama lose the leg.

These are the types of things that I can tell you are more severe than a gunshot or most -- since Taser has changed their policies and procedures, more so than I -- than a Taser, unless a Taser is misused.  But each one of those, Mr. Davis, I'm telling you each one of these uses-of-force tools can be -- used improperly, cause the same thing.  Any use-of-force tool, like in the Chauvin case, on the George Floyd, it was used improperly and too long, so...

Q.    So let's start off then with assuming that these tools are used the way that they're intended and the way that that is expected.  Would a dog bite be more or less likely to cause loss of life than a gunshot?

A.    Well, not all gunshots cause loss of life.  Many of them do not.  Most of them do not.  However, if you keep shooting, yeah, you're going to get loss of life.  A canine has not caused loss of life in 30 to 35 years, but they've caused great bodily injury or deadly -- which constitutes deadly force when you have broken bones and unconsciousness or missing -- disfigurement.  That's deadly force.  Same as a gun.  So there's no difference in the terminology.

Q.    You said a dog has not caused a fatality in 33 years?

A.    I said 30 to 40 years.  That would be the George Pettaway case.

Q.    Let me ask the same question then regarding Tasers.  Do you know from your experience whether dog bites or Tasers have caused more incidents where the suspect is killed?

A.    That is way beyond me.  That's way beyond most medical experts.  If you talk to Taser, the Taser wasn't what was killing people.  If you talk to -- if

27

you look at this organization called Truth Not Tasers that follows each Taser death, they have over a thousand and some deaths that they're reporting as caused by a Taser, which -- which I can't tell you that.  All I can tell you is because I was a Taser instructor, when you use the Taser properly and in the proper locations, most likely it does not cause any type of problem.  However, if you use the Taser -- an example is using the Taser on somebody that's in an elevated position.  It could cause death or serious bodily injury, such as a broken neck from the fall. Paraplegic, quadriplegic for that matter.

Q.    Understood.  So, Mr. Burwell, you also state:  "Other than a canine, there is no other use of force tool that is allowed to be used for an extended period of time:  Not a baton, a Taser, kicks, fist strikes, saps, bean bag shotgun, carotid restraint, projectile launchers, or a flashlight."

Are these qualitatively different uses of force or is your testimony that a dog bite is more severe because it is engaged for a longer period of time?

A.    Well, the dog bite can be more severe because of the different bacteria and the strains of bacteria placed into the human body from a dirty canine

mouth.  That's one.

The second part of the dog bite is you don't know where the dog's going to bite, you don't know if you can get the dog off the bite.  I'm not talking about you.  I'm talking about the law enforcement canine handler.  There's no guarantees with a dog as it has its own personality, its own traits, its own drives.  So unless there's a mechanism of shutting that canine off, death could result.  Serious bodily harm could result or -- and disfigurement.

As in Taser or anything else, law enforcement officers know that if they use a baton for an extended period of time, death could occur.

And if administration was to look at -- let's take like this case.  If McCowan would stand over Johnson with a baton and beat him for 37 or 27 seconds, I believe he would have been fired.  He may have been prosecuted.  So why should a dog be allowed -- and I'm not asking you a question.  I'm just saying, why would a dog be allowed to bite a person beyond what the generally accepted practices are throughout the country, which is at max usually ten seconds?

And I have that supported by a Los Angeles County Commander.  His name is Charles Sid Heel, H-E-E-L.  And he did a survey.  Most dog bites last

29

less -- ten seconds or less.  That's because you apply pain and you recall the pain.  And you allow the person to surrender.  You always have the chance of applying pain again.

Q.    Is that survey cited in your report?

A.    I don't know.

Q.    You said that --

A.    I can go to the bottom and look.  It probably would be in my CV, not on the report.

Q.    You said the officer's name was Charles Heel, H-E-E-L?

A.    Yeah.  Charles Sid Heel.  The book is called, Less Lethal.

Q.    Let me ask then about a couple other comparison points for what you had said about the extended period of time.  It wasn't listed here, but would you consider chemical or OC spray something that would also have an effect for an extended period of time?

A.    If you used OC spray for an extended period of time, you're going to suffocate the person most likely.

Q.    So not the use of it, Mr. Burwell, but the effect of it.  Is the painful effect still in place regardless of when the officer stops deploying the

spray?

A.    There will still be a lingering effect of pain in the eyes or in the lungs, but that's usually controlled.  It's -- it's never -- I have never seen anything where it's caused death or where anybody has sprayed anybody for an extended period of time.  And, also, you give them treatment right after the incident.  So it certainly doesn't cause infections or anything like that.

It's a whole different -- chemical spray and irritants are different.  But used improperly, could also cause death.  Or for that matter, used improperly, with certain chemical irritants you could burn the house down if you used it improperly and kill the person.

Q.    Understood.  I'd like to move on now to opinion No. 2.  You state in there:  "It is unreasonable and excessive use of force to release a dog to bite a prisoner who is passively resisting an officer's commands and otherwise poses no safety risk..."  How do you define passive resistance within this report?

A.    Well, passive resistance is very simple.  If a person is backing away, trying to avoid being hit, that's passive.  If the person is just not following

31

the command, that's passive.  If the person is -- let's say the subject, we'll call him, is not threatening, making threats towards the officer or advancing on the officer or trying to swing at the officer, just being noncompliant, is not anything other than passive. That's all that is.

Q.    Now, are there particular standards in the industry or from legal standards that set the boundaries of what level of force can be used to overcome passive resistance?

A.    Verbal.

Q.    And what is the basis for that?

A.    The basis is that's the industry standards of care.  That's put out through all of the -- well, it's put out, number one, through Graham v. Connor. Second off, it's put out through the International Association of Chiefs of Police.  And that's all put out -- the Graham v. Connor standards are put out to every agency in the United States.  You have other organizations that also put this stuff out through policies and procedures, such as Lexipol, L-E-X-I-P-O-L.  Lexipol policies.  You have other organizations such as the Police Executive Research Forum.  They also put out guidelines for officers on passive and nonpassive suspects, aggressive, assaultive

behavior by suspects.

Q.    And all those sources state that only verbal commands can be used in the face of passive resistance?

A.    The officer may be able to use control holds.  But other than verbal, only hands on should be used.  According to the standards of care throughout the United States, the generally accepted practices would be -- the next step would be control holds.  It would be hands on, is what I'm trying to say.  Not with a dog, not with fists, not with a baton, OC spray, or a Taser.

Q.    And so is that the same basis for your statement that Mr. Johnson's failure to get on the floor when ordered to do so is, "without more, insufficient and an unreasonable basis to justify the use of a canine..."?

A.    Well, you've kind of shortened that up. According to the video, from what I saw as a reasonable canine handler, Mr. Johnson never had the opportunity to get on the floor.

Q.    So, Mr. Burwell, I'm just looking at your language here in the summary opinion.

A.    I've got to change glasses.  I fogged up. I'm sorry.  Hold on a second.  The humidity here is

just incredible.

Q. Take your time.

A. I'm good. So you said?

Q. You say: "...at worst, the incident reports and deposition testimony establish that Mr. Johnson did not get on the floor when he was ordered to by VDOC officers. This, without more, is insufficient and an unreasonable basis to justify the use of a canine as a means of force." Do you see that language there?

A. Yes.

Q. What I'm asking is, are you relying on the same standards you just told me about a couple of minutes ago, Graham vs. Connor, the International Association of Chiefs of Police, the -- what was the P-E-R-F? What does that for?

A. P-E-R-F. P-E-R-F, Police Executive Research Forum.

Q. Yes. So do those standards --

A. Kmiecik has it in his report, also. So he's using the same standards. Also the VDOC policies and procedures and training.

Q. Your testimony is that the VDOC policies and training forbid the use of force again a passive inmate?

A.    Yeah.   And not giving the person time to get on the ground.   Sure.

Q.    Okay.   I'd like to move on to summary opinion No. 3.   First part A of this, you state that "...within five seconds of entering the A-1 Pod, Officer McCowan gave Shadow two separate orders to bite Mr. Johnson.   Even if Officer McCowan had made canine announcements as claimed in his report and his deposition...Mr. Johnson never had time to comply..."

A.    Show me where you're reading so I can keep up with the -- my hearing -- I have really bad hearing.

Q.    Sure.   I was just kind of summarizing this to save us a little bit of time, but I'll read the section here.

"Neither Officer Baker nor Officer McCowan gave Mr. Guy or Mr. Johnson sufficient time to comply with any of their commands before releasing their canines.   Specifically, Shadow unsuccessfully attempted to bite Mr. Johnson within two seconds of Officer McCowan entering the pod.   This was followed with another successful bite to Mr. Johnson's right arm only three seconds later.   In sum, within five seconds of entering A-1 Pod, Officer McCowan gave Shadow two separate orders to bite Mr. Johnson.   Even if Officer McCowan made canine announcements as claimed in his

35

report and his deposition (the video does not contain audio), Mr. Johnson never had time to comply because Officer McCowan had his dog lunging at Mr. Johnson within two seconds of Officer McCowan entering the pod. Generally accepted practices regarding canine deployments require that the handler allow the person ample time to respond to the commands."

With respect to that portion of your opinion, is there a standard for a minimum amount of time needed to allow for a suspect, or in this case an inmate, to respond to officer commands?

A.     The amount of time is what's reasonable. The amount of time could be anywhere -- it could be up to several hours, depending on each situation.  Such as on a SWAT call.  It could be hours.  But in this type situation I think that being reasonable, holding the dog back and not having the dog lunge and chase at him, at Mr. Johnson, holding the dog back and giving him three, four, five more additional seconds, six seconds, even then, that may not be enough because Mr. Johnson was passive.  And as long as he's passive, just standing there, even if he didn't get on the floor and he's just standing there not making any threats towards anybody, not trying to assault anybody, but simply not getting on the floor, that's passive.  So it could have

been 20 or 30 seconds. There -- and additional backup could have been there and they could have gone hands on and placed him in handcuffs.

There was no need for a dog in this situation and there was certainly no time for him to comply with the lunging dog. There was nothing. There was -- from the -- from within two seconds of Officer McCowan entering that pod, there was no time, and two seconds is not enough after just coming out of a fight, after being pepper sprayed. I don't know how the effects were on him.

But only being passive, two seconds is not enough time to comply. And it was Officer McCowan that made Mr. Johnson look not passive. By having a dog lunge at him, having that dog trying to bite him and the dog missed, how do you remain perfectly still and passive and go to the ground without the fear of being attacked by an animal? It's not possible.

Q. Sir, so just in response to the question of whether there is a set minimum amount of time for offenders to respond to a command, is it fair to say your response is that it's circumstance-dependent?

A. Circumstantial -- the circumstances in each incident would vary, yes.

Q. Okay.

A.    However, I did say this.  The only time the dog would be able to be used in -- as a serious use of force is if that person -- whether announcements were made or not doesn't matter -- whether that person became aggressive towards the police officer.  Or in a life-threatening type situation, or was in fact armed and the officer saw the weapon.  You see, that's how it changes.  But in this case none of that occurred.

Q.    Understood.  I'd like to jump ahead to now the background section of your report.  We're going to go back and forth a little bit between now sort of the body of the report and the summary opinions just so I can sort of understand which portions of the report correspond to which of your summary opinions.

So Part A here in the background:  "Canines are considered a use of force tool in the law enforcement context."

A.    What page are you on?

Q.    Is that included here in support of your summary opinion No. 1?

A.    What page are you looking at, please?

Q.    I'm looking at page 8.

A.    Background.  I'm there with you.  These are based on -- this is based on my supporting documents to support what I believe in.  To support my opinions,

38

basically.

Q.    Right.  Sir, so -- well, let me back up a little bit.  I am trying to understand in your report what -- you know, of this analysis and discussion here, whether that is included as supporting the opinions that you listed beginning on page 6.

A.    Yes.

Q.    Okay.  So this part beginning on page 8, is that here in support of No. 1 in your summary of opinions?

A.    Gosh, I have to back up to No. 1.  Hold on.

No.  It's in support of all my opinions.

Q.    It's in support of -- okay.  Thank you.

So you cite to the Graham vs. Connor case on page 8 and the three-factor test that's included in that case.  Is that correct?

A.    Correct.

Q.    Is that your standard or your framework for determining whether the use of force in this case was proper or reasonable?

A.    Yes.  Because this is what VDOC teaches their patrol dog handlers.  Or supposedly teaches them.

Q.    On page 9 you state that -- I'll strike that question.

A different statement on this page, that

39

"...general law enforcement standards require providing ample opportunity to surrender."

A.    Are you back on page 9 or 8?

Q.    I'm on page 9.

A.    Okay.  Yeah.  That's the first -- that's the second paragraph, first paragraph that was not continued.

Q.    And in support of that you cite to a document issued by the Police Executive Research Forum. Is that correct?

A.    Yes.  That's one of many.

Q.    Okay.  I'm going to screen share again.

Can you see this document?

A.    Yes, I see it.

Q.    Okay.  Is this the document cited?

A.    Yes, it is.

Q.    Okay.  I'm going to go to page 17.

Before I go there, I want to look at a little bit of the background here.  So it says page 7 at the bottom of the page, it's page 9 of the PDF.  And I can -- I can scroll through when you get to the bottom of the page, but from reading this introductory segment, can you tell if this document is directed towards community law enforcement or does it also apply to corrections?

A.     It -- it applies to canine -- law enforcement canine handlers.  I think it would apply whether it is corrections or a patrol dog out on the street or a dual-purpose dog.  Or it could even apply to a dog that's assigned as a patrol dog in a security guard type of situation where the dog has been trained by civilian handlers to conduct bite work.  That's the best way to put it.

Q.     I'm now going to move down a page.  There are some definitions here.  This is page 8 on the page.  It's page 10 as listed on the PDF.  And there are some definitions on this page; deployment, apprehension, apprehension with contact.  Would you consider any of these, particularly apprehension, distinct from the use of a dog to gain control of a prison disturbance?

A.     I think I understand you.  Well, the deployment of the dog, when it's brought into the pod, that's a deployment.  Whether the dog is -- the dog has been brought into a potential situation and it has the ability to be used as such.  As a bite dog.

Apprehension, well, that would be where the suspect surrenders, or the prisoner if you want to call it, surrenders and complies with the commands.  Or let's say the prisoner is behind a jail cell door and doesn't want to come out.  Well, the suspect sees the

dog and the prisoner comes out.  That would be -- according to this, it would be an apprehension/ surrender.  But it would be not -- there would be no bite involved.

The third one you're talking about here is an apprehension with a bite, and I think the reason they say contact is because they're also considering the dog's paws.  They're considering any type of injury that was -- that occurred to the subject or suspect as a result of the canine.  Whether it be from the teeth, the paws, or whatever.  A muzzle ram or a head butt.

Q.    Understood.  I'm going to scroll down now to pages 17 and 18, and that is 19 and 20 on the PDF. I believe this is the portion of this document that you cited in your report.  There's discussion here about agency policy requiring the issuance of a warning when possible and ample time for a subject to surrender.  Do you see that language?

A.    Yes.

Q.    Does this document elaborate or define what is meant by an ample opportunity to surrender?

A.    Well, there's no exact timeframe given. That would be impossible to do.  So it has to be done with what's reasonable.  And like we just talked about, what is the suspect doing that there would be the need

42

to bite right away?  What is the rush to bite somebody if they're passive?  Until that changes -- and in between that time, that's when they're making the announcements.  So unless something changes to where the suspect is aggressive or the inmate or the -- whatever you want to call them, unless they change their behavior from passive to aggressive, keep making announcements.  Keep giving advisements what you want the person to do.  But when you're threatening to use force with a lunging dog, that's pretty hard for the person to think and follow those commands.

Q.    I will turn off the screen share now.

A.    Thanks.  That's much better.

Q.    So continuing on now to Part B in your report, and give me just a second here.

On page 9, continuing into page 10, you list some subsections here, Roman numerals i, ii, and iii.  And those pertain to the dog basically being an animal that acts on its own and is not necessarily under the full control of the handler.  Do you see those?

A.    Yes.

Q.    Did the evidence you reviewed in this case show that Shadow, the dog handled by Officer McCowan, bit anybody in this instance other than Corey Johnson?

A.    No.  Are you talking about just in this incident?

Q.    In this incident.  Yes.

A.    In this incident Shadow did not bite anybody that I'm aware of other than Mr. Johnson.

Q.    Okay.  Was there any evidence you saw that Mr. Johnson was bitten on an improper part of the body, something like the chest or the head?

MR. DAVIS:  Excuse me just one second.  Why don't we go off the record here.  It looks like Andy might have gotten locked out.

(Recess)

BY MR. DAVIS:

Q.    On the record now.  Mr. Burwell, I'll repeat my last question.

Was there any evidence you have reviewed to show that Mr. Johnson was bitten somewhere other than his extremities, such as in the area of the chest or the head?

A.    No.  Actually, what you asked me was an appropriate -- in an appropriate area, I believe.

Q.    So could you elaborate on that?

A.    Well, before we got cut off you asked me was Mr. Johnson bit in an unappropriate -- I'm summarizing -- an unappropriate area such as the head

44

or the chest.  Well, with the second question I said no, but with the first question you asked, which I didn't get to answer, any bite would have been inappropriate.

Q.    So aside from the circumstances of the decision to engage, which we are going to cover that quite a bit today, was there any bite to a part of the body that the dog is not supposed to bite?

A.    You're correct.  There was not.

Q.    Did you find that at any point in this incident Officer McCowan did not have control over Shadow?

A.    Yes.

Q.    In what part of that?

A.    On the video, let's see, it was towards the end of the bite where Officer McCowan's report does not match up with the video at all.  He said the dog released immediately.  That's not what the video shows. As an expert in the field of canines, what I saw was Officer McCowan having trouble getting the dog to release and had to rip the dog off the bite.  Actually had the dog picked up off the front feet with Mr. McCowan's [sic] arm stretched out with the dog's jaws wrapped around his -- with the dog's jaws wrapped around Mr. Johnson's wrist area.  The dog was pulled

45

off the bite.  The dog didn't release on its own.  In other words, the dog didn't release as Officer Baker's dog did.

Q.    Understood.  Subsection v now, you referred to there being over 100 different strains of bacteria that can be -- that a person can be infected with from a dog bite.  What is your source of that information?

A.    That information came from the testimony from several doctors, but the one that sticks out in my mind was the Richard May vs. San Mateo, California. The doctor testified that there were over 100 different strains of bacteria.  And, also, I was made aware of that through -- what's the name of the hospital?  Los Angeles County Medical Center in Los Angeles.  It's a county facility.  The doctors explained to the canine handlers that dog bites could easily become infected and they need -- they wouldn't suture any of them up because of the infection.

Q.    So you mentioned testimony from a witness in another case and information that you got from a hospital.  Was that published information?  Where did you gather that information from the hospital?

A.    Just like we're talking.  From the doctor directly.

Q.    Okay.

46

A.    And from the doctor on the witness stand in the May case.

Q.    Do you have a medical background, Mr. Burwell?

A.    No, I don't.

Q.    The same question regarding your statements here about the symptoms that can develop from a tetanus infection.  What is the source of that information?

A.    That all comes from the doctors I've listened -- the one major doctor I listened to testify in the May case and it comes from taking suspects -- everybody that the Los Angeles County Sheriff's Department -- anybody that received a dog bite, whether it be a canine handler on a search bitten by a civilian dog or whether a suspect bitten by a county dog, everybody got a tetanus shot no matter what.

Q.    So the evidence you reviewed in this case, did you see anything to show that Mr. Johnson sustained an infection from this bite?

A.    I don't know much about the after injuries so I couldn't opine on that.  I don't know.

Q.    So moving on to subpart vii now, you state: "Due to the terrifying experience of being attacked by a dog, a person cannot make sound judgment calls and will mostly try to defend themselves from the attack.

The person being attacked by a dog will generally writhe and try to defend themselves from the animal. These are natural reactions and do not constitute resistance.  A canine handler must understand what a person will do when being attacked."

A.   Give me the page so I can catch up to you. It's easier if you just give me the page.

Q.   11.

A.   11?

Q.   Yes, sir.

A.   Got it.  Okay.  Yes.  That is correct. That's what I wrote.

Q.   So I'd like to explore that a little bit. Stating that a person cannot make sound judgment calls and mostly try to defend themselves from the attack, what is your basis for that statement?

A.   Well, the basis for that statement is me being a trainer, and another one is that I've had so many different bites and I've seen so many different bites, I've seen how suspects respond to being bit, I have been bit, and I know that when I'm being bit, I can't make a sound judgment other than trying to get the dog off of me.  I'm in fear.  Total terror.

And so then if I back that up with the International Association of Chiefs of Police

information, the Department of Justice, and appellate court rulings, that's how I put this together.  It's very simple.

Q.    Is there a particular publication from the International Association of Chiefs of Police that states this?

A.    Yes.  It's in the 2015 -- well, there's more than that.  It's the 2015 papers and policies. There are two different versions of it.  It's also in other versions.  I think I have attached it in this report from the IACP, which is the International Association of Chiefs of Police.

Q.    Bear with me for just one second.

A.    And another one that comes from, to help you, is Hartsell vs. City of San Diego.

Q.    Could you spell that?

A.    H-A-R-T-S-E-L-L vs. City of San Diego. It's in my report.

Q.    Is that a finding made by the Court?

A.    The appellate court, yes.  Ninth Circuit.

There's another one that's called Cooper v. Brown.  That's -- I made a mistake in my report because I was thinking of Hartsell.  I put Ninth Circuit.  It's actually the Fifth Circuit.  Cooper is C-O-O-P-E-R.

Q.    What was the other party's name?

A.    Brown.

Q.    You said that was the Fifth Circuit?

A.    Yeah.  It's in my report.

Q.    And is that inevitably the reaction of any person who is bitten by a dog, is to resist or try to get the dog off of them?

A.    Or writhe.  It's not to resist.  See, that's the problem we're having here.  Everybody thinks when a person is writhing and flailing around and screaming and carrying on it's resisting.  It's not.  And it's not fighting the dog either.  It's called terror.  There are many videos I could share with you of actual police dogs biting humans and what they do.  I have many videos of this.

Q.    Understood.

A.    As a matter of fact, Johnson was probably the most compliant person I had ever seen while being bit.

Let me rephrase that.  Mr. Johnson took this dog bite better than anyone I've ever seen as far as not trying to look like he's resisting or such as Officer Johnson [sic] said he was, "Stop fighting my police dog."  That never happened.  He wasn't fighting the police dog.

Q.    Okay.  I'd like to move on now to Part C

50

here.  This is beginning on page 11.  It's titled: Handler Control Method is the Method Used For Attack Trained Police Dogs.  And we're going to continue on to the next page.  You describe the handler control method of deployment here and you describe it as, quote, "...if a canine makes physical contact with a suspect while searching, there is a reasonable expectation that the canine will apprehend the person by biting.  If the police service dog locates a suspect but cannot make physical contact with him, it will alert his handler to the presence of the suspect by barking."

So the method that you are describing here, does this apply to a circumstance where there is not a search for a suspect?

A.    I'm trying to explain -- how I can explain this.  I wrote this, by the way, for the LA County Sheriff's Department.  So most of my work was based on searching for the hidden with a police dog.  That's what the dog was designed to do, is search for suspects.  Secondary is a use-of-force tool.

You're correct.  This is written for searches.  If I were to -- if a canine handler for the Sheriff's Department were to set the dog on somebody that they could clearly see that was passive, most likely they would be fired.  I don't know of any

51

document that covers siccing a dog on a passive suspect. There's nothing to cover that. Other than Graham v. Connor and the appellate court decisions.

So I'm just explaining what a police dog does. What a law enforcement or police-trained -- a bite -- an attack dog. Let's call it that. What an attack dog will do and what a human will do.

Q.    So then in this instance does this technique have any application to a circumstance where a handler gives a command to the dog to bite somebody who's visible as opposed to a suspect who's hidden?

A.    If we look at it -- I think what you're asking me is how does this apply to the Johnson-McCowan case.

Q.    Sure.

A.    And how I would explain that is McCowan had the dog on leash and he comes charging into the pod. Officer Mullins had to point out to Officer McCowan who the other suspect was that was in the fight. Officer McCowan with his dog -- what's that dog's name? Storm or whatever. I forgot. What's that dog's name?

Q.    Shadow.

A.    Shadow. Thank you. Shadow was on leash and the handler was allowing the dog -- this is the handler control part. The dog wasn't unleashed to

52

where it could go bite on its own.  The dog's being controlled by the handler and the handler is allowing the dog on leash to chase after Mr. Johnson.  In this case, which I would support this using what we just read, is if Officer McCowan would have held the dog back on leash, the dog would have began barking.  Barking, barking, barking.  Not biting.  Being held back from the bite.  That's handler control.  Then the handler gives Mr. Johnson ample time to surrender and follow those commands that he wants him to do without -- without biting.  The only time the bite should have occurred -- and then the bite occurred because it was handler control.  The handler allowed the dog to do what it did.  That's what I'm talking about.

Q.    So --

A.    I'm sorry.  This wasn't something the dog just did on its own.  This was something that the handler did.

Q.    So it's your testimony that Mr. McCowan had control of the dog at the time of the initial bite?

A.    Yes.  But when you say control, control means he controlled the dog to allow it to bite.  He could have controlled the dog not to bite, too.  And he didn't have to do any commands to do that.  It was

53

simply control the dog by controlling the leash.  It's that simple.

Q.    Now, after Mr. Johnson went to the ground, you state in here, "He" -- referring to Officer McCowan -- "also just stood there watching the dog bite Mr. Johnson as he lay on the floor."

This is at the top of page 13.

A.    Yes.

Q.    Is it your testimony that after the dog and Mr. Johnson went to the ground that Officer McCowan did not have control of the dog at that point?

A.    No, he had control of the dog at that point.  Control of the dog -- I think we're trying to -- I think you and I have a miscommunication gap here.  Control of the dog means he can allow the dog to bite or he can allow the dog -- or control the dog not to bite.  Officer McCowan is in control of this situation.  What he wasn't in control of is getting the dog off the bite in a timely manner or the dog releasing as it should have.  But then again, I don't have the audio to show that Officer McCowan gave the dog any verbal command to release.  All he did was rip the dog off the bite.

Q.    Understood.  So I'd like to ask now about the excerpt here from the case Kerr vs. City of West

54

Palm Beach.  Give me just a second.

A.    You remember we were talking about IACP?

Q.    Yes, sir.

A.    That was on page 15 of my report.

Q.    Okay.  I'm going to screen share another document now.  This is a copy of the Kerr case from LexisNexis.  Beginning with the language that you cite in this excerpt, the first sentence being, "Dogs in the canine unit were trained to 'bite and hold' a suspect." The second paragraph beginning, "Under the bite and hold method of training, a dog seeks to subdue a suspect by biting his arm or leg..."

After those two paragraphs there's a third paragraph that is a block quote in italics here.  In the excerpt here in your report it begins with, "The handler will remove the dog at the first possible moment the canine can safely be released."

I have looked for that language in this case and I'm not able to find it in here.  It does continue on to the next paragraph that's here at the top of page 14 that begins, "The severity of an apprehended suspect's injuries can be reduced if the handler has complete control over the actions of his dog."

Do you see what I'm talking about here in

55

the case language?

A.    We're talking about IACP and now you're talking about Kerr vs. West Palm Beach Florida.

Q.    Yeah.

A.    Yeah, Kerr.  That's right.

Q.    So this -- I'll represent that this language here in the third paragraph in your excerpt here does not appear in the Kerr case.

A.    Okay.  Let me go back to my report.  You're on page 14?

Q.    13.

A.    13 of my report.  Hold on.  Okay.  What you're talking about here is when it says -- I don't think you've quite found it because I found it.  Let's see.

MR. DAVIS:  I don't know if we have a way to give him control over the --

A.    No, that's okay.  I don't need it.

I think what we have here is you're right.  The handler -- the second paragraph here is -- should be part of -- I think I got -- moved it around when I was doing some organizational stuff.  That's -- that's from the IACP.  Above that is the -- is Kerr.  But the third part -- but now if you go back where it says, "The severity of an apprehended suspect's injuries can

56

be reduced if the handler has complete control over the...dog," I would have to go through here because I'm sure that's where that came from.  It's in both Kerr and IACP.  But I would have to check that.  I don't remember.

Q.    Okay.  So your testimony is this language you think is in the IACP document you referenced earlier.  That was the 2015 policies?

A.    Yes.

Q.    Okay.

A.    Yeah, because it backs up West Palm Beach canine.  That's where it comes from.  And by the way, that policy that IACP were reading also is -- it's written into the Seattle canine deployment policy, the LA County Sheriff's canine policy, the Los Angeles Police Department canine policy.  So I know that's exactly where that came from.  I made a mistake by -- not necessarily a mistake but it was my restructuring got messed up.

Q.    Understood.  I'd like to move on now to Section D, which is titled, "VDOC's Canine Policies and Trainings Only Selectively Incorporate Generally Accepted Standards and Omit Significant Practices." This is beginning on page 14.

A.    Yes.

Q.    Is there a particular summary opinion that this section corresponds to?

A.    I don't know.  I'd have to go back and look back to where we were talking about in opinions 1 through 6 or 7 or whatever it is.

Are you waiting for me?

Q.    If you are able to find anything that it corresponds to.

A.    Oh.  Hold on.  Let me go back up to the top of my report.  Sorry.  I didn't know you were waiting.

I think it's more along what I testified to.  You asked me in the beginning if there was anything else and I talked about the training.  Yeah.  No. 6 -- No. 6.

Q.    No. 6?  Okay.

A.    5 and 6, the policies for the VDOC canine program.

Q.    Thank you.

Now, you state here that "The standards" -- meaning the VDOC policy -- "appear to be modeled on the International Association of Chiefs of Police...Papers and Policies."  What's the reason for you making that assertion?

A.    Well, they point out several things in the VDOC policies and procedures and training that pretty

58

much mirror image the IACP, which mirror images the Graham v. Connor and the Kerr case. All these are -- all these are combined so when you start listing, grant that all these cases that VDOC has listed in their policies and procedures and basically their training, it's the same thing listed in the IACP. So to me, they're following that.

Q.    Which portions of the policy are you contending follow the IACP policies?

A.    Well, if we go to -- if you go to page 44 of my report, and if you look at where it says, Objective Reasonableness Test (Graham v. Connor), that's exactly what's listed in the IACP. And then if you have -- you have guidelines set by Kerr vs. City of West Palm Beach. That's exactly what's listed in the IACP stuff. If you look at the canines are not deadly force, well, that was also listed in the IACP. Bite ratios, that's also listed in the IACP. Bite and hold, bark and hold, that's listed in the IACP. Written policies must exist. Well, they do, but they're not followed. It's also listed by Terry Fleck and your expert, written policies. That's what Kmiecik has on his website.

Q.    You think that also follows the IACP guidance?

A.    Yes.

Q.    Thank you.  And so this quoted language at the bottom of page 14, is that from the same IACP policy, the 2015 one?

A.    What part are you looking at?

Q.    There's a block quoted, italicized paragraph at the end of page 14 that states, "The natural reaction of a person being bitten by a canine is to struggle and attempt to fend off the attack."

A.    That's written -- that's from the IACP, correct.  But they don't include that inside the VDOC policies.  That's one of my major concerns.

Q.    What is the IACP?

A.    The IACP is the International Association of Chiefs of Police.  It consists of sheriffs, not deputies but sheriffs themselves, and police chiefs. Basically from all over the nation.  All over the globe for that matter.  But mostly throughout our nation, the United States.  And they get together with agencies such as PERF.  I can list them all.  There's 11 or 12 -- 12 of them and they get together and they come up with the best practices for all kinds of different things.  But in this case best practices for canine units and the use of force.  But they have them for traffic stops, they have them for computer crimes, they

have them for -- they establish policies and procedures if any department wants to use them.  Many departments do.

Q.    So those are model policies?

A.    Model policies that they can get from IACP. All they have to do is insert their name from the department.

I would give you all those names that the IACP uses but it's -- I'm afraid I might lose you if I try to flick out of here.  But it's the Department of Justice, it's CALEA, all kinds of major policy setters.

Q.    I understand.

So turning now to page 15, going over into page 16, and this block quoted language here that you cite to on the IACP 2001, 2015 policy, do you know if this is the current model policy that they use?

A.    I believe this is the current one.

Q.    So part of the definition of passively hiding in this excerpt here, it states that it refers to "...individuals who generally have no known history or suspicion of being violent or who have no known serious criminal histories..."

Would that component of that definition there be applicable to convicted prisoners?

A.    It's possible.

61

Q.    How would that be so?

A.    Well, the officer wouldn't have any idea what the prisoner was convicted of or what he's in jail for or if he's a detainee fighting something in court. The officer doesn't need 20/20 -- should not use 20/20 hindsight just as in civil litigations we don't use 20/20 hindsight to judge the officer's actions. So what has to be looked at is what's happening at the time the force was used, what's happening at the incident -- with the incident, with the officer and the subject. What was happening at the time.

Q.    Continuing on in that sentence, it also states "...where there is no reasonable suspicion that the person is armed and/or violent (for instance, hands are visible and there is no suggestion of a hidden weapon or intent to fight)..."

Now, it highlights the hands being visible as removing a reasonable suspicion of a person being armed. Would hands being hidden be a factor that could be considered in whether somebody's more likely to be armed?

A.    It would depend on the situation. But in my expertise, working the jails and working the field, it's my opinion that a person inside a jail or custody facility is less likely to be armed than a suspect

62

that's committed murder out on the street and is hiding.

Q.    Well, aside from a suspect who's committed murder, how about just a general criminal suspect?

A.    In general?  Persons inside a custody facility are most likely unarmed.  Because they have -- they're constantly being checked.  Their rooms are being searched, their bodies are being checked by officers.  They're constantly being patted down.

Q.    Now, continuing on that paragraph, about halfway, little more than halfway through it, it states, quote, "Consider the consequence of using a level of force similar to that of a canine, such as a Taser or nightstick, to gain compliance of a passively hiding suspect."

Would you agree with this language that a Taser or a nightstick is a similar level of force to a canine?

A.    It all depends on how it's used.  As a matter of fact, I would consider a dog bite -- taking out the possibility of an infection and the location of the bite, I would consider a five-or-six-second dog bite no more than a baton strike or a Taser deployment. However, leaving the dog on for an extended period of time and ripping the dog off the bite is apples and

63

oranges to the Taser and to the nightstick.

Also, the nightstick doesn't have a brain. Neither does the Taser.  Other than a computer chip. So what drive the dog is working in and how the dog is going to obey the handler, that's a whole new ballgame. It's a whole -- it's apples and oranges.

Q.    I'd like to move on to page 16 now.  After the block quote ends you state, quote, "VDOC policies and training materials do not consistently treat canines as a use of force, and instead emphasize (incorrectly) that canines are not considered 'deadly force.'"

Are you offering that as an opinion that a canine constitutes deadly force?

A.    Well, it depends on the situation.  Yes, it could.  I'm working on a case right now that's deadly force.  Death occurred.  Deadly force does not mean you have to kill somebody.  Deadly force -- as I explained to you earlier, deadly force is that which is where a person has lost consciousness, requires lengthy hospitalization, disfigurement, things of that nature. That's what's considered deadly force by the industry standards of care.  This is nothing I'm making up. This is just what the supporting documents say.

Q.    So anything that could cause significant

injury is deadly force?

A.   Boots to the head, carotid restraint, pressure on the back, positional asphyxia.  Anything that is used improperly could cause deadly -- could be deadly force.  A Taser used across the heart could be deadly force.  A Taser in a high -- in an elevated situation could be deadly force where the person fell and became a quadriplegic.  As in canine, you rip somebody's ear off, that could be considered deadly force because you have disfigurement.  It doesn't have to be death.  I'm just telling you what most policies say.

Q.   What policies are those?

A.   The ones I've read throughout the nation, what's considered deadly force.

Q.   So this is just miscellaneous police use-of-force policies?

A.   Yes.  And that written by the IACP, what constitutes deadly force.  And by the LA County Sheriff's Department, by Seattle, Arizona, and various other agencies that I've read their policies and procedures.

Q.   Understood.  Now, what do you mean here when you state that the policies do not consistently treat canines as a use of force?

65

A.     What I mean is the department doesn't track, doesn't -- doesn't follow up on any investigation when the dog is used as deadly force, according to the 30(b)(6) witness that you had, that Mr. Johnson had.  I don't see that.  As a matter of fact, even Officer McCowan testified he doesn't know where all this stuff goes once it's done.

Nobody came and talked to him about -- or had a postbite interview or anything like that.  It's just the bite occurred, nobody looked at anything.  Had they looked at something, they would have noticed the video does not match up to the police report either by Baker or by McCowan.

Q.     So your statement that policies don't treat canines as a use of force has to do with whether they are consistently investigated?

A.     Partly, yes.

Q.     Partly.  What else do you mean there?

A.     Well, they're allowed to just run into the pod and bite whoever is not following the so-called hands up -- I'm sorry, on the floor prone, arms extended, palms up.  That's the only reason that these guys are getting bit.

Q.     Does that make the use of a canine not a use of force under policy?

66

A.    They're not considering it as use of force, the way I look at it.  Or it would be -- any type -- any type of force used on another individual, a human, should be investigated, other than simple handcuffing. Or control holds.  Any time there's anything like the projectile weapon that was used with the pepper -- what do you call it?  I forget which model they used.  They deployed the pepper powder in a -- probably a 40-millimeter staged weapon.  The pepper spray.  All that, that should have been written and investigated and witnesses talked to.  Nothing was done in this case.  This is not the first case from the VDOC that I see this stuff happening to.

Q.    Okay.  So just to be clear, Mr. Burwell, you are not testifying then that canines are not considered force under DOC policy?

A.    Oh, they're considered force, but they're not investigating the force.  I think that's where we're miscommunicating.  They definitely consider -- and in the policies that I read, they're considering the use of force by a canine as severe use of force.

Q.    You also state that "...the VDOC use of force policy does not specifically discuss deployment of canines at all."  Did you review VDOC's canine policy when you were doing your -- doing your report?

A.    Well, what I reviewed was everything that was -- I was sent, which included canine -- I guess would be canine policies and procedures.  Patrol -- it was called patrol.  Patrol canines.

Q.    I would just like to look at the list of documents that you listed as having reviewed.

A.    I don't have that before me.

Q.    It's one of the exhibits to your report.

A.    You know, when you talk to me about this stuff, there's a -- this is 27 seconds and it takes a lot of work, which I can't remember everything unless you show me.  There's so much work involved in this. So when you were talking to me about the use of force, if you go back and look at the -- on the page I started with on Exhibit E, it talks in here about control of the canine, repeated applications of force, postbite reviews, interviews.  It's not being done.  But it's right here on paperwork.  Everything is on paperwork. It's just not being done.  How's that?

Q.    I'd like to just stick to what it says here in the report.

A.    That's what I'm trying to show you.

Q.    So let me ask again.  In your list of documents that you reviewed -- I'm looking at page 73 of your initial report.

68

A.    Hold on.  I've got to get there.  Wait a second.  Okay.

Q.    Item No. 40 that is listed there, and it states, VDOC Operating Procedure 435.3, Canines, Bates stamped Johnson 582001097 through 001125.

A.    And 41 is a continuation of that.

Q.    41 lists, VDOC Operating Procedure 420.1, Use of Force.

A.    That's all part -- that's all together.  Yeah.

Q.    Those are two policies.

A.    Right.

Q.    Let me ask then, why is it significant that the use-of-force policy doesn't specifically cover canines if there is a canine policy?

A.    The use of force should.  If you're asking me why they don't, I have no clue.

Q.    I'm asking why it's significant.

A.    Because that's all part of Graham v. Connor.  That's how officers operate under Graham v. Connor, the three-prong test.  Whether it be -- and that needs to be in the general use-of-force policy and in the canine deployment policy.  It would be no different than having the Taser or the baton in the standard use-of-force policy and then having a separate

69

policy talking about the baton, when and how to use it, how to report it, and those things. So whatever force you're using is actually covered by the general use-of-force policy and then it gets more specific into the deployment of that use-of-force tool. And that is covered under each tool.

Q. So I'm going to screen share another document now.

Now, this is a copy of Operating Procedure 435.3. This is the canine operating procedure. You see this, sir?

A. I do.

Q. Paragraph 7 up at the top states: "Although the use of a canine is not regarded as deadly force, the utmost discretion should be used when releasing a canine to apprehend a fleeing suspect or armed and dangerous subject. The use of a canine is regarded as use of force and will be reviewed in accordance with Operating Procedure 420.1, Use of Force."

So does it appear that this policy incorporates the general use-of-force policy?

A. That's correct.

Q. Okay. So is it still significant to you that the canine standards are not also included in the

70

general use-of-force policy if the separate canine policy incorporates that general policy?

A.    Well, the way you're putting it, as long as it's listed in the canine policy -- I'm talking about the -- oops.

Q.    Sorry about that.  I'm sorry.  I ended the --

A.    That's okay.  I don't need it.  I don't need it.  You're good.

Q.    Okay.

A.    As long as the general use-of-force policy is covered in the canine policy, then I think that's acceptable.  However, I still believe that each use-of-force tool -- and again, they can't all be covered in the use-of-force policy.  That's why each -- like boots.  I don't think boots are mentioned, but they talk about the use of force.  The use of force covers everything, okay?  In general.  But more specifically, the canine policy covers the general use of force in its policies so it's just the way the department has it.

Q.    Okay.

A.    I think I should make it a little more clear.  The canine handler must follow the general use-of-force policy no matter what.

71

Q.    Understood.  Turning to page 19, you state: "The supervisors must have a progressive discipline of a misbehaving handler or dog, up to and including removing the dog or handler, or both, from the K-9 program."

A.    I'm on page 19.  And you're looking at Fleck.  Are you talking about Mr. Fleck's view of this?

Q.    It's at the end of that paragraph.

A.    Yeah.  That's -- you're talking about what Mr. Fleck and Mike Kmiecik teach.  Or preach.  How is that?

Q.    So that part about the supervisors needing to have progressive discipline, that comes from Mr. Fleck's program?

A.    Yes.  Well, not now.  It's -- I'm sorry to say, but Mr. Terry Fleck, he passed away in 2019, I believe.

Q.    But the materials that they cited from him, that includes this requirement of progressive discipline?

A.    It does.  And it also comes from Mr. Kmiecik's view of this.

Q.    Is that in the policies that you reviewed?

A.    Yes.

Q.    Okay.  Turning now to your opinions

72

section, this is beginning on page 20, Part A is titled, "The Use of a Canine Against Mr. Johnson Was Improper."

Before we get started on that, can you tell me if this section here, Part A, corresponds to any of your summary opinions?

A.   Well, sure it does.

Q.   Could you say which ones?

A.   All of them.

Q.   All?

A.   When you get into my opinions, the summary of my opinions, well, now we're into my opinions.  They correlate with each other.

Q.   So this section is offered in support of all of your top-line opinions?

A.   My top -- that's a better way to put it. Thank you.  My top-line opinions were just basically a summary for you to know what I was going to be opining on.  And now we're getting into my opinions.

Q.   Okay.  And so this is broken down, there are three parts here and part one, The Use of a Canine Against Mr. Johnson Was Objectively Unreasonable.  You list a) the severity of the crime at issue; b) whether the suspect...poses an immediate threat to the safety of law enforcement officers or others; and c) whether

73

the suspect...is actively resisting arrest or attempting to evade arrest by flight.

So is this the Graham test here?

A.    It is.

Q.    On page 21 in the first full paragraph you're talking about the altercation between Mr. Johnson and Mr. Guy.  You state, quote, "These types of altercations occur all the time in the correctional setting."  What is your basis for that statement?

A.    My experience.

Q.    Do you have any statistical information or data about the frequency of inmate fights?

A.    No.

Q.    Do you have any information about what the outcome of these fights are as far as the injuries sustained by the people involved?

A.    No.  We're talking about in a custodial environment.

Q.    Yes, sir.

A.    Yeah.  Most of these fights go unheard of. Nobody knows about them, inside a jail cell or wherever.  This one just happened to be in a pod.  So nobody really knows.  And these guys really don't want to get caught fighting.  Because they don't want to get put in solitary confinement.  So most fights go unseen

or unheard.  So there's no way to document -- there's no way of having documentation or statistics to show this.

Q.    So does your assessment that these are -- it's just a routine thing that occurs all the time, does that account for the security classification of the inmates who are involved, whether they're maximum security inmates or whether it's a lower level?

A.    Usually -- look, it doesn't matter what classification they are.  It depends on what one did to the other one, what they're accused of.  Maybe it's a macho thing.  I don't know.  All I know is that I have broken up numerous fights and most of them there were no injuries.  Maybe a black eye or a cut lip or something like that.  You write them up, they go into a disciplinary hearing and usually into some type of confinement for awhile as punishment and that's it.  Or the privileges were taken away.  It's really not considered that big a deal.  It could be black on white, black on black, white on white.  It could be racial.  It could be another -- a gang against gang.  Who knows what it could be.  But in general, it's not that big a deal.

Q.    Have you ever seen a severe injury caused by one of these fights?

A.    No.  I have not.

Q.    I'm going to pull up another document. Give me just a second.

A.    I have to correct my last statement.  Yes, I am aware of serious injuries that were caused by inmates fighting.  That's because the deputies were allowing these fights to happen in front of them and that's part of the reason that Sheriff Baca is in prison right now, is the use of force in the jailhouse and allowing prisoners to fight.  And deputies watching it and encouraging it.

Q.    And what is your source of that information?  Was that something that occurred while you were working in the department?

A.    It occurred while I was on the department, but I never actually witnessed that.  It was things I heard about.  If I would have seen something like that, I would have reported it.

Q.    What types of injuries were sustained?

A.    Oh, serious head trauma, broken arms, things of that nature.  That's what I learned about. And I also heard about it through the -- there's a reporter by the name of Celeste -- I can't remember her last name.  She works for witnessla.com.  Also the court, some of the court records that I viewed talked

about the injuries.  It was big amongst the department when it was going on.

Q.    If you will bear with me for just a second.

All right.  You state at the end of that paragraph, the sentence ending in footnote 18, "...Officer McCowan even testified that they had no reason to believe that any weapons were involved."  You see that statement there?

A.    Yes.

Q.    I would like to screen share this.

MR. DAVIS:  Actually, before I do the screen share, Madam Court Reporter, I just want to take a check of what exhibits we have referenced so far.  Just so I have a number to keep track.

THE REPORTER:  The only things you specifically said you wanted to mark as exhibits were 1 and 2, were the report and the supplemental report.

MR. DAVIS:  Okay.  I apologize.  Can we go back and go ahead and mark the other documents that we discussed so far?  And they're sill up in order here on the PDF.  So the Police Executive Research Forum, we'll make that No. 3.  Kerr v. City of West Palm Beach, we'll make that No. 4.  Operating Procedure 435.3, we'll make that No. 5.  And then No. 6 here, this is Officer McCowan's deposition transcript.

THE REPORTER:  Okay.

(Burwell Defendants' Exhibit Nos. 3, 4, 5 & 6 were marked for identification.)

BY MR. DAVIS:

Q.   So resuming that question, Mr. Burwell, I'm going to highlight the language that you cited here. This is your basis for saying that he didn't have a reason to believe there was a weapon; is that correct?

A.   I can't see -- I can't see it.  It's too small.

Q.   Let me zoom in for you.  Can you see that?

A.   Thank you.  Yeah.  Perfect.

Q.   Okay.  Now, just continuing on --

A.   The answer to your -- the answer to the last question was you're correct.  That's where I got that information.

Q.   That's what you cited.  Okay.

He does qualify that answer, correct?

A.   How?

Q.   I'm looking here at line 18, continuing onto the end of page 213 here.  He states:  "I was unsure of whether or not -- the possibility of the weapon was there, and I was attempting to get him to show me his left hand so I could make sure that there was no weapon in his left hand that he had tucked under

78

his chest at that point."

So had Officer McCowan testified conclusively that he didn't believe there was a weapon or that he was uncertain about whether there was?

A.    Would you back up the -- just a little bit, a couple of...?  Hold on right there.

Well, he says he didn't have any reason to believe he had a weapon.  The answer was clear.  No. But when they play the video now, he's trying to -- McCowan looks to me like he's trying to justify the lengthy dog bite and that's where he's not sure whether he has a weapon now.

Well, I can't go by just this.  I've got to compare the video to the -- the video to depositions, to reports.  And if you look at the video, when the dog -- when McCowan is starting to chase Mr. Johnson, Mr. Johnson's hands comes up by his chest.  It's clear there's nothing there.  There are no weapons involved. And now he's trying to justify once McCowan -- Mr. Johnson is on the ground, McCowan is trying to justify leaving the dog on a bite because he's unsure whether there's a weapon.  He didn't say there's a weapon. He's just unsure.  He's not lying.  But what he's saying is he's unsure.  But when he was asked the first question, he knew he didn't have a weapon.

Q.   Your testimony is that he knew he didn't have a weapon.

A.   That's what he said.  Did you have any reason to believe he had a weapon?  No.

But now when we get into the dog bite part of it on the video:  Oh, well, I couldn't see his other hand.

Q.   Is not having a reason to believe the same thing as having knowledge that there isn't one?

A.   It's not the same.  He said he didn't have a weapon.  He had no reason to believe that.  But then when we get into the video, he says he's not sure.  And that's simply a way to cover up the lengthy dog bite.

Q.   I'll leave it at that.

Now, further down on the page it's talking about the attempt to use OC spray.

A.   Are you staying on screen share or are we going back --

Q.   Let's go back to your report.

A.   Okay.

Q.   I apologize.

A.   Don't apologize to me for anything, Mr. Davis.  You really -- seriously, you are all good with everything you do.  It's perfect.  Thank you.

Q.   All right.  Well, I'll clarify.

Back in your report, page 21, the last paragraph, you discuss the attempt to use OC spray. You state at the time Officer McCowan approached Mr. Johnson, "At this point, the officers could have made another attempt to utilize the OC spray with a much higher likelihood of success while still using a less lethal use of force tool than a canine."

Did you see any testimony from any of the officers that they thought this was a possibility at that time?

A.    I didn't read anything from any other officers.  Just McCowan.  And Baker.  Oh, and all the experts and stuff like that.  But I never -- I never read anything from any of the other officers in the -- involved in this.

Q.    I'm just referring to Officer McCowan and Officer Baker.  Was there anything in their testimony where they stated they thought a second use of OC spray was a possibility at that point?

A.    Well, Baker wouldn't apply to this because Baker is busy with Guy.  So the only one you have is talking to Mr. -- or Officer McCowan.  And I believe he might have been asked about that, but I don't recall. I know -- I'm sure he testified that he had pepper spray on him, but he didn't use it.

Q.    Let me ask about the OC spray.  In your experience, is an officer permitted to keep using OC spray if the first use was ineffective?

A.    Depends on what's happening.  It depends on how long the spray was, where the spray hit the body part.  There's a lot of things that are involved.  Again, when you spray somebody with pepper spray, they're not going to be passive.  They're going to scream out in pain most likely and grab their face and jerk around.  It's the same thing.

Q.    If an officer uses OC spray once and that doesn't work to gain control of the situation as the officer is attempting to do, is he allowed to just keep using it?

A.    No force -- you're not allowed to do any force for an extended period of time that may cause death.  If you're talking about going to an alternative use of force, it may be possible the officer needed to do that.  But this is a hypothetical you're asking me that doesn't fit in this case.

Q.    Why does it not fit?

A.    Because you're -- it never occurred.  If you're talking about the pepper spray that was used on the back of Mr. Johnson's head, he was never sprayed in the face.  And Mr. -- and Mr. McCowan -- or Officer

82

McCowan never tried to pepper spray him.  So what you're asking me is a hypothetical that doesn't correlate with this case at all.

Just so you know, we're going to have a lot of thunder here you're going to hear so we'll -- I'll try to not talk when it goes off.

Q.    Okay.  Was Officer McCowan in the room the first time the OC spray was attempted?

A.    No.

Q.    So would he have known that there was a miss of the target area?

A.    No.  He would not.  He wouldn't know -- unless he smelled it, he wouldn't know it was used.

Q.    From your experience, if OC spray is used and it misses the target area of the face does it still have some effect on the subject just from lingering in the air?

A.    It may or it may not.  I don't believe in this case it did.  Well, it may have.  I'm not sure. There was no testimony to that.  Officer McCowan never testified that he had a little lingering effect when he -- when he came in through the room.  Neither did Baker.  And neither did Mullins.  Mullins never said anything about any pepper spray.  Effects to his own self or even from the powder.

Q.    Does OC spray have an airborne effect aside from just -- just as a general matter, aside from, you know, being applied directly to a person?

A.    Yeah.  It made me laugh because my daughter was being a real jerk.  She wouldn't come out of her room so I shot a little spray under the door.  She came out.  It just made me laugh because it was just something that went into the air.  And so yes, it does.

Q.    Okay.

A.    And it's a little different for me. Because I trained a lot of canine handlers and SWAT guys.  That was one of my collateral duties, was working in oleocapsicum resin, oleocapsicum resin spray and all kinds of tear gases or a combination thereof. So that's why I've got a hoarse voice and all kinds of problems.  But the lingering effects -- the thing I'm trying to get at here is there was no mention in any report of anybody having any effects of the tear gas by the officers.  And with oleocapsicum resin spray, it has a sweet odor to it.  It should have been recognized and written into the report.

Q.    I'm moving on to the next sentence here. You state:  "Regardless, there would have been no need for OC spray if Officer McCowan followed generally accepted standards and held the dog back in order to

84

give Mr. Johnson ample time to comply..." What standards are you referring to there?

A.    Graham v. Connor standards.  The generally accepted standards for a passive suspect or inmate or subject.  A passive person.  How's that?

Q.    Would you consider using OC spray at that time instead of using the dog to have been excessive force?  Would any force, in your view, have been allowed there at all?

A.    The only force that would be allowed, in my view, would have been hands on by other officers. Having Officer McCowan detain Mr. Johnson by having the dog bark at him until backup got there, which would have only been seconds, and go hands on and handcuff Mr. Johnson.  That is the only force that should have been used at that time.  That's it.

Q.    So OC spray, in your view, would not have been permissible?

A.    It would not.  Any use of force would not, other than hands-on control holds.  Or verbal.

Q.    Moving on to page 22, Subsection b) in the first paragraph, the last sentence there, referring to the video, you state, "The altercation was over."  Mr. Johnson was still on his feet at that point, correct?

A.    Yes.  However, that question you asked me,

because I'm looking at the video in my head, doesn't make sense.  You said at that point Mr. Johnson was on his feet.  He was on his feet once Officer Mullins pulled him off and pushed him away.  Yes.  He was on his feet then.  He was never on his feet fighting with inmate Guy.  That's not true.  On the ground when the officers intervened, got in the middle of this.  Johnson was not on his feet.  They were rolling around on the ground like in a UFC competition.

Q.    Understood.  Then the second paragraph there right after footnote 20, you state:  "In his Canine Bite Report, Officer McCowan attempts to describe Mr. Johnson as turning 'toward Officer S. Mullins in what appeared to be an assault on staff.' But this is contradicted by the video evidence which shows Mr. Johnson actually taking a step away from Officer Mullins."

I'd like to pull the video up now so I'm going to screen share.  And I guess this will be No. 7.

(Burwell Defendants' Exhibit No. 7 was designated for identification and retained by counsel.)

A.    Which video are we playing here?

BY MR. DAVIS:

Q.    This is the center pod video.

86

A.   Okay.  It's not the other one.  All right.

Q.   So we're starting this on the timestamp on the --

MR. JOHNSON:  Tim, sorry to interrupt you. Just for identification purposes, do you want to identify the Bates number of this document?

MR. DAVIS:  I can't remember which one is which.  Andy, I can go back and find that.  This is -- this is just pod video center.  I can't remember if that's Bates 1 or 2.

MR. JOHNSON:  Got it.  Okay.  Thank you. No problem.  Sorry to interrupt, Tim.

MR. DAVIS:  No.  You had the right idea.  I just don't have our production list in front of me.

BY MR. DAVIS:

Q.   So we're at timestamp 18:10:02 on the screen.  The fight is underway and we're just going to let this play for a little bit.

As I pause here at timestamp 18:10:10, this is showing Officer Mullins pulling Mr. Johnson off of the fight.  Correct?

A.   Yes.

Q.   Okay.  And Officer McCowan is entering the pod at this point.

A.   He's coming towards the entryway.  He's not

entered yet.

Q.   Okay.  We'll play it from here.

All right.  Now, at this point Mr. Johnson appears to be facing away from Officer Mullins right now.  Correct?

A.   Yes.  And Officer Mullins is pointing his arm and his finger direct straight out at Mr. Johnson.  It appears as though he's showing Officer McCowan who he wants to bite with the dog.

Q.   We'll play again.

We'll pause here at 18:10:14.  Now, as Johnson took a step away from Officer Mullins, he turns his body towards Officer Mullins.  Does he not?

A.   Well, no, that's not what I see.  What I see is his head is turned towards Officer McCowan with the dog coming.  And he's stepping backwards away from Officer Mullins.  He's stepping backwards.  It's not -- you've got a dog coming.  He doesn't want to get bit.

Q.   So from a couple of seconds ago when Johnson was facing towards the right of the screen, what we're seeing here in the video, to this point where we've paused it, he's turned his body maybe not a full 180 degrees but about that counterclockwise.  Correct?

A.   Unless you go frame by frame, I'm not going

to opine on something that you're just telling me.  I have it frame by frame and I can show you on my share screen of it frame by frame if you'd like.  I have taken it and made it that way.

Q.    Well, let's just -- we'll play again and pause as we go.  So we see him pulled.  Are you testifying that Mr. Johnson does not rotate in the direction towards the left of the screen?

A.    Well, he rotates a little bit.  Counterclockwise.

Q.    So does this contradict Officer McCowan's statement in his report that Johnson had turned towards Officer Mullins?

A.    Yes, it does.  He didn't turn towards Officer Mullins.  He's turning to get away from this dog that's coming.  He's -- it looks like he's preparing -- from what I've seen, over and over with my experience, he's preparing to take a dog bite.  He's concerned for his welfare right now.  McCowan -- I mean Mr. Johnson is.

Q.    Regardless of what Mr. Johnson is thinking here, though, he has turned in that direction.  No?

A.    Big deal.  He doesn't have a choice.  If he turns the other way, he's going to be facing the dog face on.  He has no choice but to turn

counterclockwise.

Q.    So I'm just asking if Officer McCowan's statement in his report here that Johnson turned towards Officer Mullins is contradicted by what we see in this video.

A.    Yeah.  That's not -- that's not what's happening here.  You're not going to get me to concede with you that Johnson was turning to face or assault Officer Mullins.  It's very simple that Johnson is turning his body away to protect himself from being bit.  If he -- if he turned it in a counterclock -- counterclockwise direction -- this is all creative report writing.  The fact is Johnson turned his body away, away from Mr. -- Officer McCowan and that dog to keep from getting bit.

As a matter of fact, if you show the next couple of frames, you show him try to sidestep the dog. That's what's happening.  To change this any other way, I'm not going to go with it.  Sorry.

Q.    Don't apologize.

So we'll continue playing this for another couple of seconds.

Now we've paused here at 18:10:18.  This is about the time that Mr. Johnson is bitten by the dog.

A.    No, it is not.

90

Q.    What time would you say the bite occurs?

A.    Back up.

Q.    We'll play again.

A.    Right there.

Q.    So that's 18:10:17.

A.    Just before that you saw the dog lunge and nip at him.  That's considered a dog bite.  Whether it actually broke skin or not, I see the dog made contact.

Q.    Are you testifying that the dog makes contact twice with him there?

A.    Yes.  Just before the 17.  It's very quick. It might even be within the same second.

Q.    We'll continue on.

A.    If you'd like to back up I can -- I'd really like to back up a little bit.

Q.    No.  I think that's all the questions I have from the video right now.  So I would just like to go back to the report.

A.    Oops.  I lost my report.  Hold on.  I've got it back.

You'll have to give me about a five-minute break here.  I need to use the restroom.  We've been sitting for two and a half hours.

Q.    Tell you what.  We can probably all use one.  Why don't we take five minutes.  We can take ten

if you need it, Mr. Burwell.

A.    Five is fine.  You wanted to finish this because tomorrow I have to prep for a trial.

Q.    Let's go off the record.

(Discussion off the record.)

(Recess)

BY MR. DAVIS:

Q.    Mr. Burwell, I would like to move on now to Subsection 2 here titled, "Officer McCowan and Officer Baker Failed to Act in Accordance With VDOC Policies and Generally Accepted Standards and Practices."  Do you see that section beginning on page 24?

A.    Yes.

Q.    On page 24 you state:  "First, Officer Baker and Officer McCowan both failed to act in accordance with VDOC training and generally accepted standards and practices when they rushed into A-1 Pod and both immediately engaged their canines on Mr. Johnson and Mr. Guy."

Then on page 25 you state:  "According to these officers, VDOC K-9 officers are required and trained to give at least three verbal warnings before deploying a canine on an inmate."

So is it your testimony that DOC policy -- or training required the giving of warnings and that

92

these officers were both aware of that requirement?

A.   Yes.  And to allow ample time to follow those orders.

Q.   That's also part of the training?

A.   Yes.

Q.   You state here on page 25 there was not enough time for Mr. Guy or Mr. Johnson to comply.  Are you offering opinion as to whether the use of force against Mr. Guy was appropriate?

A.   Well, I haven't been retained to, but if it's needed, yeah.  Because he wrote a report saying what McCowan did.

Q.   All I'm asking is whether you're offering that in your report.

A.   Sure.  Yeah.  I'm offering that.

Q.   So you discuss the amount of time between when the officers came into the room and when they engaged the dogs on the inmates.  And you talk about first Officer Baker engaged his dog on Guy about four seconds after he came into the room.  Wouldn't Johnson have had more than that time to comply?

A.   I'm sorry.  I don't follow the question.

Q.   Wouldn't Mr. Johnson have had more time than Mr. Guy did to comply with orders?

A.   That doesn't make sense to me.  I'm sorry.

93

I don't mean to be condescending or something but...

Q.    No.  Sure.  So Officer Baker came into the room and he engaged his dog on Guy within what you have determined was about four seconds.  But Mr. Johnson wasn't bitten then, right?

A.    Mr. Johnson was not.

Q.    So from the time Officer Baker came into the room, during that time between when he came in and when he engaged Mr. Guy, and then for several seconds after, Mr. Johnson could have stopped fighting at that point, correct?

A.    Maybe.  Maybe not.  It depends on what -- what Guy was doing to him and how they were interlocked and wrestling around on the floor and whether or not he -- and whether or not Mr. Johnson knew that Mr. Guy was being bit.  He may not have known with being in a struggle like that.

Q.    Would Mr. Guy have been fighting back if he was being bitten by a dog?

A.    I don't know what Mr. Guy was doing.  All I know is he was getting bit and he was then -- apparently, he was the aggressor, if we're talking about Guy.  He wound up on the bottom of the dog pile. And he did have ahold of Mr. Johnson while Mr. Johnson got on top.  So I don't know.  That's something that

94

wasn't explained in the reports.  But it appeared, though, they were still struggling with each other and that's why -- that is why Officer Baker bit the guy on the bottom.  But it's hard to tell.  I don't -- it's my opinion that Mr. Johnson didn't know that Guy was being bit by a police dog and was pulled off by Officer Mullins and then he started regaining his composure to see what was going on with the surroundings.  I don't think he was aware.  It was too quick to be aware.

Q.    Do you recall how much time passed between when Officer Baker came into the room and when Mr. Johnson was bitten?

A.    I don't recall the amount of time. However, it has little bearing on the amount of force that was used.  And at the time force was used. Remember, we talked about this.  What was happening at the time, Mr. McCowan -- Officer McCowan came running into the room with his dog and gave warnings.  We're not talking about Baker now.  We're talking about McCowan and Johnson's interactions.  You have a passive suspect with a canine handler that come running in with a fight that was over and attacked him.

Q.    Is your testimony then that everything that happened right up to that moment did not have any bearing on whether this was a proper use of force?

95

A.    On who?  What are you talking about?

Q.    On Mr. Johnson.

A.    Everything that happened -- I'm not saying the pepper spray nor the -- the projectile was excessive at the time it was used by Officer Mullins.

What I'm saying is the interaction between Mullins -- McCowan and Johnson, the use of force was inappropriate, was not reasonable.

Q.    And it has no bearing to your opinion that all of these other attempts were made and were not effective?

A.    There were no other attempts made to get Johnson to comply.  Johnson was complying.  He was pulled off.  The fight was over.  And now he's -- Johnson is trying to protect himself from being bit. That's the bottom line.

Q.    I'd like to move on now to page 27 of your report.

A.    Okay.

Q.    You refer back to the PERF guidelines that state, "handlers must consider all aspects of the situation at hand and consider noncanine options before deciding whether to deploy a canine."  You state: "Specifically, PERF recommends the following:  When possible, handlers should consider alternative tactics

before deploying a canine.  The canine may not always be the best tool to accomplish a goal, so handlers should consider options that may be safer for everyone involved and for the canine."

Does this guidance allow for any sort of emergency circumstances where there isn't time to consider alternative tactics?

A.    Yeah.  It should give time for the person to follow orders prior to deploying a police dog.  You should use time, talking, and tactics.  That's what they're talking about here.  Consider alternative tactics.  The alternative tactics in the situation was one, verbal and allow time; second, wait for backup to arrive.  Which was within seconds away and the officer should have known that.  And to go hands on with McCowan.  Not to release a dog on him.  It was totally inappropriate to release the dog at any time in this incident on Mr. McCowan [sic], according to the video.

Q.    So, Mr. Burwell, I'm just looking at this language here in your report that states when possible, consider alternative tactics before deploying a canine.

Does that language permit some kind of -- or consider some kind of emergency circumstances where there would not be sufficient time to consider alternative tactics?

A.    I think it's case-specific.  I think that language is case-specific for each -- each and every deployment of a canine.  You know, we're talking about before deploying a canine.  Were there the options of making announcements, were there options of waiting for a surrender, or did it need immediate deployment.  That's what they're talking about.  It's trying to teach the officer, are there other options than just using the dog to bite somebody.  They're trying to teach the goal is to take somebody into custody and it's not always the best to use the dog.

Q.    So, Mr. Burwell, there was one part of this that I had passed over so I do want to go back to page 26.  This is also referring to the PERF, and it's a block quote near the top of the page and it states: "Agencies should issue at least one audible warning before deploying a canine, giving the subject an opportunity to surrender."  So the minimum number of warnings under the PERF guidance is just one, correct?

A.    Is one.

Q.    Yes.

A.    According to this situation, it was San Diego Police Department.  They're talking about specifics here.

Q.    Well, this --

98

A.    Go down a little farther.  It says warnings.  It doesn't say a warning.  And give time to surrender.  It doesn't talk about just one little, tiny area of this.  You've got to read the whole paragraph. You can't just pick and choose out of the Bible what you want.

Q.    I'm just referencing this language here that states they should issue at least one audible warning.  Then it states that some agencies exceed that.  So --

A.    That's correct.  As well as the VDOC.

Q.    So the DOC training exceeds this guidance?

A.    Correct.

Q.    Okay.  Jumping back ahead now, Subsection B on page 27, it is titled, "Even If There Was Justification For the Use of a Canine on Mr. Johnson, the Duration of the Bite Was Objectively Unreasonable."

Is there a particular one of your top-line opinions that this corresponds to?

A.    Hold on.  I've got to turn this back up. Now, say that again, please.

Q.    Subsection B is called, "Even If There Was Justification For the Use of a Canine on Mr. Johnson, the Duration of the Bite Was Objectively Unreasonable."

A.    Yeah, the duration was unreasonable.

Q.    So does this correspond to your summary opinion No. 4?  On page 7.

A.    Let me go back to page 7.  You're jumping me around here.  It's hard to keep up.

Yeah.  No dog should have been released. And any duration would have been objectively unreasonable.  But even if a bite was reasonable, the length of this bite was unreasonable.

Q.    Okay.  So that matches with that opinion.

A.    It does.

Q.    So the sentence preceding footnote 41.

A.    Well, what page are you back to again?

Q.    28.  My apologies.  Actually, let's look at the beginning of that paragraph, about in the middle of the page, and you state, quote:  "A reasonable canine handler would have called the dog off the bite from a distance and not bent down to see if the inmate had a weapon."  In this instance Officer McCowan's dog was on a leash, correct?

A.    Yes.

Q.    And you stated earlier that Officer McCowan was -- he was supposed to have control over the dog while this situation was ongoing, correct?

A.    Yes.

Q.    How would he have been able to call the dog

off from a distance?

A.    Verbally.  Just call the dog back.

Q.    What --

A.    The leash -- if you look at the video, the leash wasn't a one-foot leash.  He had it coiled up.  It looked to me like a six-foot leash, and so all he had to do is hold the end of the leash, step back, and recall the dog back.  And so if McCowan believed or even had a suspicion that Johnson had any type of weapon, it would be completely unreasonable for a trained corrections officer to bend his face down to look to see if he had a weapon.  And to --

Q.    So if --

A.    As he stated, to be merciful, to call the dog back without seeing the hand is completely unreasonable.  So there's no reason that the dog could not be recalled back verbally.

Q.    I'm sorry for interrupting there.

Your testimony then is calling the dog off at a distance means the length of the leash?

A.    He could have even dropped the leash and called the dog back.

Q.    Would he have had control of the dog if he had dropped the leash at that point?

A.    Yes.  He should have verbal control of his

dog at all times.  That's according to what Fleck and everything I -- everything that I taught, every -- every certification that you have to take, you have to be able to call the dog back to the handler with one verbal command with no leash.

Q.    They were in a room full of officers and inmates at that time, correct?

A.    No, they were not.  It wasn't full of officers.  And it's not full -- there was probably 30 inmates scattered around the entire outside of the place and a few in the middle, and at the time of the bite I think there was only two, maybe three corrections officers.  There may not even have been that many inside the pod.

Q.    So your testimony is that he could have -- or should have released the leash, stepped back a distance, and recalled the dog from there?

A.    I think what I need to do is as we do this, so you understand this, train you as we go.  It's almost like you don't understand canine work.  And I apologize.  I don't mean to be condescending, but here's the deal.  It goes like this.  The canine handler must have control of his dog verbally at all times.  Whether he's on a leash, electric collar. Doesn't matter what it is.  When the canine handler

tells -- I better slow down for Mrs. Schar.  She's going to hit me.

The canine handler must have verbal control of the dog at all times, leash or no leash.

Q.    Understood.  You also state here that "...Officer Baker testified that it is the responsibility of other security staff to search an inmate suspected of carrying a weapon, not that of a K-9 officer."  So I would like to pull up Officer Baker's transcript here.  Let me get to the right page.

And so the testimony you cited is the excerpt beginning at the highlighted text here on line 8.

A.    Can you enlarge that?  I really can't see it.

Q.    Is that better?

A.    One more.  Yes, got it.

Q.    Okay.  Take your time.  And let me know if you need me to scroll down.

A.    No.  What's the question?

Q.    Well, is the text that you cited there, the testimony, isn't that referring to a frisk search for a weapon?  Rather than a visual search.

A.    I think what we were talking about is generally a frisk search with hands on for any type of

contraband.

Q.    And a dog handler would not be able to do a frisk search on an inmate because he also has the dog with him, correct?

A.    It depends on how well the dog responds to the handler.  Now, these dogs that come from Europe, the dogs are being -- the dogs are able to be placed in a down position and the handler do a pat-down of the suspect.  It's only if the suspect responds by turning around to assault the handler that the dog will bite them.  I don't -- I don't practice this because there's a possibility of a bite could occur if the suspect were to have some type of -- some type of movement which the dog might take as aggressiveness.  The dogs don't reason so I would never want to put the dog in that type of situation because I believe in handler control. The handler has to control the situation the best he can.  And that includes eliminating bites if at all possible.  So don't place the dog in that situation to bite somebody.

But if he has -- if the handler does have complete control over the dog verbally, they can do it. And the handler can call the dog off before the bite occurs, sure.  But I don't think it's a good practice. I don't think it's a good practice to have the dog in

104

the jail at all anyway.  A bite dog.

Q.    At least in this instance the practice that Officer Baker is describing here is like you said, not putting their hands on the inmate to frisk him while he also has the dog on the leash.  Is it fair to characterize it that way?

A.    I think it's fair.

Q.    And so that is a -- wouldn't that be a different thing from a visual search for a weapon while there's an engagement that's in progress?

A.    I really don't follow where you're going with this because we've gone from -- are you asking me a hypothetical or something that occurred in this case, or what are you getting at?

Q.    I'm asking whether what Officer Baker is talking about here is similar to what Officer McCowan did.

A.    I still don't understand.  I don't think any of these canine handlers would want to be patting down a suspect.  Are you talking about in general just patting somebody down?  That's not their job.

Q.    Well, Officer McCowan didn't pat down Mr. Johnson, but you were refuting his action of visually trying to get a look at Mr. Johnson's hands by this testimony from Officer Baker that he doesn't pat down

inmates while he's handling the dog.

A.   You've got this totally confused now.  What I said was it was objectively unreasonable for Officer McCowan to claim he bent over to look to see if McCowan -- if Johnson had a weapon in his hand because he couldn't see his left hand.  That is completely unreasonable.  When -- when would an officer -- I'll tell you this.  I don't want to ask questions.  I don't believe any reasonable officer would have bent over if they thought somebody had a weapon in their hands to maybe stab them in the face or do whatever.  That's the time you want to step back away from the suspect, not bend over to look.

Q.   We'll move on.

So you also state on this page that "The purpose for recalling the dog is to stop the pain from the bite, allowing Mr. Johnson to understand what he is being ordered to do."  So in your experience is a person unable to understand orders or comply while the dog bite is occurring?

A.   Most people that's correct.

Q.   Now, are there any standard practices or guidelines or anything that you have seen that require handlers to call the dog off before the suspect has complied?

A.    If you look at Cooper v. Brown -- I've listed it in my report -- it -- and also Hartsell vs. San Diego, the courts talk about how is a person expected to put their hands behind their back or expose their -- functionally put their hands behind their back when they're being attacked by a police dog.  It's not reasonable.  And in this case it's not reasonable.  But you're trying to say to me that Johnson never complied, and I'm telling you from what I viewed and what I read, Johnson was completely compliant, more so than any person I've seen about to be attacked or while being attacked.

Q.    Let me follow up then.  What is the officer supposed to do if he calls the dog off and the suspect or the inmate continues to resist or continues to act violently?

A.    Bite him again.  But there's no evidence with that hypothetical -- bite him again, but there's no evidence whatsoever that that's what occurred in this incident.  And when you say continue to resist, you never talked about whether it was passively resisting or aggressively resisting.  There's a difference.  And if he's passively resisting, in this case, there was no reason for the bite.

Q.    So if a person is actively resisting during

the bite, is that still a reason to disengage, in your view?

A.    Yes.  As I've testified several times already, that what a person will do is writhe while being bit.  That doesn't constitute resistance.  That constitutes pain.  It doesn't mean fighting the dog.  It means it hurts like hell.  And that's backed up according to the International Association of Chiefs of Police, the Department of Justice, and many, many, many other police departments.

Q.    So when you refer to the inability of somebody to be fully compliant while a dog bite is going on, what actions of Mr. Johnson's are you referring to there?

A.    Mr. Johnson didn't do anything.  He was totally compliant.

Q.    Well, so what then is the relevance of any of this about a person not being able to comply while a dog bite is happening?

A.    What is the relevance?  Because your officer said:  Stop fighting my dog.

That's what he said in the deposition.

I thought he said that.  Maybe somebody else.  But I'd have to look again.  The relevance of this whole thing is that when a person is being bit,

they're not going to be able to hold perfectly still and the officer should have been trained and should have known that when a person is being bit, they'll flail around.  It doesn't mean they're resisting.  It doesn't mean they're fighting the dog.

And we can go over this over and over and over, but I'm still going to give you the same thing.

Q.    Sure.  So let me ask it a different way. From your review of the evidence could you see whether Mr. Johnson pulled his left hand out from under his chest?

A.    No.

Q.    You couldn't see or you're testifying that it didn't happen?

A.    I'm saying I couldn't see it.

Q.    Okay.  Now, Officer McCowan had testified that Mr. Johnson didn't do that.  Correct?

A.    I don't recall.  I think that's what he testified to.  Yeah.  But not word for word.  You'd have to show me again.

Q.    Okay.  Would you consider if that testimony was accepted that him not showing his left hand would be something you would attribute to the reaction that you talked about to an ongoing dog bite?

A.    Yeah.  To keep your other arm where it's

109

not going to get bit.  Sure.

Q.    I want to ask now about the discussion here at the bottom of page 29 that's referring to the dog's prey drive.  Do you see that?

A.    The bottom of page 29?

Q.    The last paragraph.

A.    Yeah.

Q.    What is the source of that information?

A.    That's the IACP.  Partly from me.  The very last line is actually part IACP and part mine.

Q.    And so what is your basis for that?  Is it just experience with training dogs?

A.    No.  The IACP tells what will happen.  It talks about the longer the bite, the more severe the injury.  And for me, I put in what prey drive means so that you would understand prey drive means to vanquish and kill.  According to the Webster Merriam Dictionary, that's exactly what it means.  And when the person is on the ground, the prey drive is really enhanced on a prey-driven dog.

Q.    So then is the dog attempting to kill any suspect or inmate or whoever it may be that it bites?

A.    If it -- if in prey drive and it didn't have a handler to control that drive, that's what they're trying to do.  Yes.  Kill them.

Can we go back to you?  Are you done with the screen share for a minute?

Q.    Yeah.  We are.

And you would also say the dog drive -- excuse me, the dog is in prey drive and it's attempting to kill the subject even if it's biting a part of the body that you would not really attribute to a lethal bite?

A.    That's correct.  If you look at the dog's actions, what the dog is doing with the prey, the dog is shaking it back and forth, trying to kill it. That's the purpose.

Q.    All right.  I want to talk now about the photos.  Before I pull those up, you state that you have qualified as an expert in identifying police canine bites in federal court.  Are you offering an opinion here as a bite mark expert?

A.    Yes.

Q.    Is there part of your CV or your other qualifications that you would reference as supporting your expertise in that area?

A.    Yes.  Using my canine skull, my experience and training, yes.

Q.    Is there a particular part of your experience and training?  Have you been educated in

identifying bite marks or have any training or anything like that?

A.    I have experience and training, yes, identifying bite marks.

Q.    Could you elaborate on that?

A.    Yeah.  I told you I have a lot of bites and I have seen where the dog bites and I've seen what the damage is caused.  I've seen other dogs bite and what the damage is caused.  So when you start looking at over a thousand bites, maybe 2,000 bites, I think that's pretty good experience to identify bite marks.

And I've seen -- let me go even further. I've seen bites from dogs that don't have the actual four canines where they just used the rear molars to hold the bite, versus dogs that only use the front canines to bite.

Q.    You referenced training as well.  Was there any specific training you went through for identifying bite marks?

A.    Just the Sheriff's Department showing bites.  You know, showing -- oh, and by the way, I was the -- to help you with that, I was the canine unit statistician.  I developed a canine computer program to monitor and track all bites, and I was responsible as my collateral duty to report those bites, the location

112

of the bites on the body, what the bites looked like, how many bites occurred, and give those to the Sheriff every month.  So that was another one of my qualifications I should have mentioned to you.

Q.    So what -- are there any particular objective criteria that you look for when you're assessing a dog bite?

A.    One is the way the dog is removed from the bite.  Two, how long the dog bite lasted.  And three, what was the behavior of the dog when it was biting.  And, also, what was the suspect doing when the dog was biting.  The other one is where the person was bit on the body.  The -- unfortunately, I don't have the dog's teeth to -- I don't know what the jaw looks like because each dog is somewhat different because they chew on things.  Their teeth are not -- there's no two dogs identical.  So to do this scientific analysis is nearly impossible other than to use a standard canine skull of that -- of a Belgian Malinois and a German Shepherd of roughly the same size.  And it's only for demonstrative purposes to show where the canines are located on the body and where they're located on the skull to show they match up.

Q.    Okay.  And so what did you consider to assess Mr. Johnson's bites here?

A.    Well, the things I considered about -- the first thing is there's more than one bite.  I can see some puncture -- some dark puncture marks look like where the dog did his first lunge and nipped him in the wrist.  The next part of the bite --

Q.    Excuse me.  I don't mean to interrupt, Mr. Burwell, but we're going to pull the photos up in a second to take a look and you can show me where you're referring to there.

But what I meant more was what evidence did you use to assess these bites here?  It was the video and the photos?

A.    Yeah.  The video and the pictures, both.

Q.    Okay.

A.    Because the video doesn't show that Mr. Johnson was flailing around like I would expect him to be doing being bit.

Q.    And what were the cases where you qualified as a bite expert?

A.    Hartsell vs. San Diego.  And May vs. San Mateo.

Q.    Is that May, M-A-Y?

A.    Correct.

Q.    And Hartsell I think you said was a Ninth Circuit case.  Do you know what the trial court was?

114

A.     No.

Q.     Do you know what the trial court was for May vs. San Mateo?

A.     No, I don't recall.

Q.     Okay.  I just want to take a look at your references here.  Are those listed in your list of expert testimony?

A.     I don't think so.  The cases are listed on what I've opined on.  I've already testified to in deposition and trial.  But some of those are getting old now so I don't know if they're in there or not.  I only gave you the last four years.

MR. DAVIS:  So I don't see those listed in the case list.  Andy, would you be able to get a court and docket number for those?

MR. JOHNSON:  Sure.  Yeah.  That's not a problem.

MR. DAVIS:  Okay.

A.     Those are not listed on my cases?

BY MR. DAVIS:

Q.     I did not see them on the material used to render opinion.

A.     Look at my cases that I've testified on.  It's a document I sent to you.  You should have it.

Q.     Okay.  Hartsell is there.  It lists the

number but it doesn't list the court it was in.  I would guess it would be one of the California district courts, but I could not speculate which one.

I do not see May here.  I might have missed it but it might be an older one, too.

A.    Yeah, it's an older case.

Q.    Okay.  Well, we will -- we'll get to those. I want to look at the photos now.

So these are the three photos that you reference here in your report, beginning Bates No. 116, then 117, and 118.  So let's look at 116 first.

What is your assessment of this photo?

A.    The assessment of this photo are the long lacerations and deep, deep gashes that were produced by the front canines.  And that's only the top -- that's either the top or the bottom two.  I can't tell which it is.  And it looks to me like a result of being ripped, the dog was ripped off the bite.

Q.    Okay.

A.    It wasn't removed properly.

Q.    Do you see evidence in this photo of there being two bites?

A.    Not with the "confidential" across the front.  But the next one does.

Q.    So let's go to that.  This is 117.  Do you

116

see evidence in this photo of there being two bites?

A.    You're still on the same picture.

Q.    This is -- these are different pictures.

A.    It looks like the same picture.  I'm seeing --

Q.    They are very similar, but if you look at the bottom right, the Bates numbers are in sequence.

A.    It might be the same Bates number but I'm just saying it's the same picture.  It's the same...

Q.    If you look back at your report on page 30 and 31, those two photos are also the same angle of the wrist and are similar looking but they are separate. They're at least separate pages here.  So let me ask, can you tell from this view either of there being two bites?

A.    No.  It's a picture on page 32 -- on page 32 it shows the additional bite.

Q.    Okay.  So we're on page Bates 118, that's page 32 of your report.  Where in this photo do you see evidence of two bites?

A.    Just above to the left of the big, deep lacerations there are canine punctures, very small punctures.  I don't know how deep they are because they're not ripped.  But there are two other additional punctures there which would give you two additional

punctures on the other side of the arm.  One bite should be -- let me explain.

Q.    Sure.

A.    What you see with the two gashes, on the other side of the arm there should also be some bite marks.  This is either the top or the bottom canines. I can't tell.  And on the other side should be the top or the bottom canines.  If you go to the left in this photo, you have the two black marks, they match up with the same set of canines as the rip marks.  That's the bite mark I believe was the nip.  When the dog first came in.  Those two bite marks should also be on the other side of the arm, but I don't have enough photos to go farther to show you the other side of the arm.  I don't have those.  I don't think they were taken.

Q.    Let me -- I'm going to move my cursor.  Is this the marks that you're talking about, this highlighted area?

A.    The one in the bottom left corner, yes. Bottom right corner.  Sorry.

Q.    This one here?

A.    Yes.

Q.    Okay.

A.    That could be another one that you just pointed out above it, too.  To the left, above and

118

left.

Q.    Okay.  So --

A.    But I'm not saying that that is.  I'm saying the one that you're showing me, that you circled, and the one below that, that's another bite mark.

Q.    Below that is here?

A.    No.  Farther down.

Q.    Here?

A.    Yes.  Correct.

Q.    And so those are, looking at the picture, just for the record, a little bit to the left as we're looking at it, of the visible wound?  Or the more visible wound?

A.    Yes.

Q.    Would this be consistent with the dog potentially adjusting its grip after it had initially bitten?

A.    Well, that's not what the dogs are taught to do.  The dog is taught to bite and hold.  So I don't believe that to be true.  I believe that was the second bite.  Or I'm sorry.  That was the initial bite where the dog tried to make contact and then reset the bite on the wrist.  As it was coming in.

So you could call it that if you want, but

119

it's a second bite.  I don't care how you look at it.
The dog should not be readjusting the bite.  Bite and
hold, that's what it means.  It doesn't mean rebite.
That's how you prevent injuries, is -- that's why we
teach that.  And again, this should not have occurred.
These long gashes -- if the dog was actually biting
with a full-mouth bite, these bites with these long
gashes would never have occurred.

Q.    Did you review Mr. Johnson's medical
records?

A.    No.  I may have scanned through but I don't
remember reviewing them enough to make -- I'm not the
medical doctor so it doesn't matter to me.

Q.    Let me move on to page 33.

A.    You want to stop the screen share?

Q.    Yes.

You referred to Officer McCowan's
"...failure to consider disengaging Shadow within a
reasonable amount of time exacerbated the injuries to
Mr. Johnson..."  What, from your review of the
evidence, would have been a reasonable amount of time
for him to disengage?

A.    If the dog bite was reasonable in the
beginning?

Q.    I'm asking you what would be a reasonable

amount of time.

A.    Zero.   There was no time for the -- zero. The dog should never have bit him.

Q.    Okay.   So then let's put that question aside.  If the initial bite, in your view, had been proper, what would have been a reasonable amount of time for him to have engaged him?

A.    The amount of time from the time he first bit standing until he was on the floor.  And then release.  So we're talking just seconds.  With that hypothetical.

Q.    Can you explain your reasoning there?

A.    Well, the whole purpose was to get -- it looked to me like -- after watching the video again, it looked to me like Mr. Johnson went to the floor to comply.  So as he was going to the floor, once he got to the floor, compliance was achieved.  Whether it was done by his own will or the dog did it.  But it looked to me like Mr. Johnson complied and did that himself. That's when the dog should have been removed from the bite.  Compliance was achieved.

Q.    We'll move on to this next subpart C titled, "The Reports Submitted By the Canine Officers Involved in Mr. Johnson's Attack Do Not Comply With Recognized Standards."  Again, I want to look back at

121

the summary opinions.  This appears to correspond to summary No. 5.  Yeah.  That's probably the closest. And that one states that "The VDOC Canine Program Policies do not align with generally accepted law enforcement standards and practices on use of force or use of canines."

A.    Yeah.  5.

Q.    Uh-huh.

A.    Sure.

Q.    So the IACP reporting guidelines that you refer to throughout this section, does that come from the same policy paper, the 2015 one that you referred to earlier?

A.    I think it's in 2001 and 2015.

Q.    Now, are those considered minimal requirements for reporting or best practices?

A.    Yeah, they're best practices.  And the reason it's done is for supervision purposes.  And to later be able to refresh your memory in the event of any type of civil proceedings or criminal proceedings.

Q.    Would you consider -- do you know if these are widely adopted by correctional agencies?

A.    I would have to go back and look.  I believe it is in the VDOC report-writing section.  I'd have to look again, but I think they're the same.

Write complete and articulate reports, accurate reports.

Now, I'll give you the one we're talking about, were canine announcements made -- were canine announcements made, it doesn't really apply to this case.  Other than talking to the other inmates is the only way this would apply.  Because there were no other officers to hear it.  So they would have to question the other inmates to see what they heard.

Q.    Okay.  I just would like to go down the list here.  Starting with the first topic, "what led the officer to believe the suspect was dangerous," wouldn't it be understood from the reports that these are incarcerated inmates at a maximum security prison?

A.    All I can tell you is, so?  I put them there.  I put many of them there.  They were a lot more dangerous out on the street than they are behind bars.

Q.    And did the report say that the inmates had been fighting and not following commands?

A.    Yeah, it says that.

Q.    Okay.  On the tactics that were deployed, what does that mean there?

A.    What tactics?  What tactics did they use?  They just ran in with police dogs and one ran in and bit Guy right away and the other one come running in

123

and bit Johnson right away.  What tactics did they use? Did they try to use the -- hold the dog back and use additional announcements for any amount of time?  It doesn't say anything about it.  They didn't.  And we're talking specifically report writing.  Because the video surely doesn't back that up.

Q.    Well, but what -- if your contention is that they didn't do any of those things, then what would you have included in the report per this section here?

A.    I would have included in my report the urgency and the need to bite Johnson immediately after running into the pod.  What was the urgency?  What was the immediacy of using serious force?  It's not listed. Because, certainly, McCowan did not -- he did not see any of this before he used force.

Q.    All right.  Another section here on page 34, the names of all involved officers, supervisors, and witnesses.  Are you aware that the other officer witnesses to this incident would have submitted their own reports?

A.    They should have submitted reports as to what they've seen, what they heard, and then there should have been an investigation.  In the reports there should have been someone to list what other

inmates heard and seen.  They should have talked to the inmates who started the fight.  What was the fight about.

Q.    So the other inmates in there that you are -- or the other witnesses that you believe were omitted from this are other inmates?

A.    Yes.  And the person that shot the projectile.  What did that person see?

Q.    I'm going to share another document now.

MR. DAVIS:  Madam Court Reporter, I think I missed the last couple.  What number exhibit are we up to?

THE REPORTER:  You had marked the video as No. 7.  That's the last one that you designated.

MR. DAVIS:  Let's make Officer Baker's transcript No. 8, the photos 9, and then this incident report will be 10.

(Burwell Defendants' Exhibit Nos. 8, 9 & 10 were marked for identification.)

BY MR. DAVIS:

Q.    Mr. Burwell, have you seen this document when you were reviewing the evidence?

A.    Can you move out a little?  Can you go down a little farther?

Stop, please.  I don't remember seeing this

right offhand.  I may have, but I don't remember it.

Q.    So I'll represent that this is the incident report that was compiled in this case from the internal incident reports that were individually submitted by the officer witnesses, and included in this is the report of Officer Dean, a defendant in the case who was the pod gunman.

So having seen this document, do you still maintain that the officer witnesses to this incident were not sufficiently identified in the reports?

A.    In either Baker or Johnson's report, no -- McCowan's report, they were not identified.

Q.    What would be the need to identify them in Officer Baker or Officer McCowan's reports if those officers, the other witnesses, would be submitting their own reports?

A.    Each officer should identify the other officers that were there or involved.  In all of the reports.  Each one should identify the others so that nothing is overturned or missed.

Q.    So it's just for the sake of completeness?

A.    And supervision.  No one is left out.

Q.    I'll move on to the next segment here, whether the deployment was approved by a supervisor. You state that "A supervisor was available for

126

approving of the canine deployments..."  What was your basis for that statement?  What evidence were you looking at?

A.   Could you stop screen share, please?

Q.   Yes.

A.   And you were saying?

Q.   You had stated that "A supervisor was available for approving of the canine deployments but there is nothing written authorizing the deployment." What was the evidence you saw about the availability of a supervisor here?

A.   I didn't see -- I didn't see the availability of a supervisor or an -- at any time the bites actually occurred.  I think it's Messingill (phonetic) -- I don't know how to spell it -- was the pod sergeant.  The pod sergeant should have been present and been able to direct or stop these bites. Any time there's a fight, there should have been a supervisor present to coordinate this incident.  With the police dogs or any type of use of force.

Q.   There's also a number of categories you list here, time elapsed between the announcement of deployment, time elapsed between deployment and suspect contact, distance of the dog from the handler when contact was made, duration of the contact between the

127

dog and the subject.

Now, this incident was captured on video so what would be the additional value of having that information in the written reports?

A.    Well, it needs -- it needs to be written so that the supervisors can see it in the event they don't see the video.  They need to see what was written and be able to compare it with the video for supervision. They need to also be able to view this and read about it to make sure it was reasonable and within the policies of the VDOC and the standards of care for canine deployments.

Q.    Were there reports from any other bite incident that you reviewed to assess consistency with these standards?

A.    Well, I don't want to get myself in trouble.  I don't want to have -- I don't want to get sanctioned for talking about a case that has a protective order so I would have to ask Mr. Johnson if I can talk about the Garrett incident.

Q.    Well, let me ask, Mr. Burwell, did you review any documents -- documents of any other incident with Johnson Bates stamps?

A.    I don't recall if I did or not.  Not with Johnson Bates stamps.  I don't recall that I did.

128

Q.    Okay.  We'll keep the Garrett matter separate.

A.    Mr. Johnson, are you still with us?

(No response.)

MR. DAVIS:  Let's go off the record.

(Discussion off the record.)

BY MR. DAVIS:

Q.    We can go back on the record.

Mr. Burwell, there were a couple of the matters you pointed out in Officer McCowan's report that I wanted to ask you about.  You state -- I'm looking at page 37 -- that Officer McCowan's statement that upon arrival Johnson and Guy were involved in a physical altercation, you state that was contradicted by the video evidence due to the fact that Johnson had been -- had been pulled off of Guy right before Officer McCowan arrived.

They had been fighting pretty much immediately before Officer McCowan came into the pod, correct?

A.    They were rolling around on the ground before -- before Officer McCowan saw it, yes.

Q.    Now, I believe Johnson was being pulled off of Guy at the time that Officer McCowan arrived there, right?

129

A.   No, I believe -- I believe Officer Mullins had already pulled Guy off and pushed him away.

Q.   I'll save us spending time on looking at the video for this.

The next statement you look at, you state that Officer McCowan's statement that at this time Officer Baker and his assigned canine had engaged Guy and both offenders were refusing to comply with all orders, you state that is an incorrect opinion because at that time Guy was lying down on the ground.

Is it your opinion that Johnson was also being compliant at the time Officer McCowan came into the room?

A.   Yes.  The fight had been separated, the dog had been removed, and the altercation was over by the time McCowan came into the pod and was able to see what was going on.

Q.   You also take issue with the fact that the report does not mention that McCowan had attempted to deploy unsuccessfully.  I assume meaning the instance when the dog lunged at Mr. Johnson on the first attempt.

Why do you think that needed to be included in the report?

A.   Because that's the first attempt to attack

Mr. McCowan.  I'm sorry, Mr. -- Officer McCowan to use the dog Shadow to attack Mr. Johnson.  That's the first attempt.  There was no need for that.  That should have been written in there that he tried to attack him but had failed.

Q.    You say McCowan had to tug and choke Shadow for at least six seconds.  Was this based on what you saw in the video?

A.    Correct.

Q.    Did you review Officer McCowan's testimony where he explained what was happening in the video?

A.    I did.

Q.    I want to take a look at that.  And so starting here, line 13, plaintiff's counsel and Officer McCowan have an exchange.

A.    Could you enlarge it?

Q.    Yes.

A.    Perfect.

Q.    I want to slide it over a little bit.

Can you see that?

A.    Yes.

Q.    Okay.  It appears from this exchange that the dog disengaged at around the 1:40 -- it says about 1:42 or 1:43, and in your report as well you put the time of disengagement at 1:43.  Do you see that on

131

page 38 of your report?

A.    1:36 to 1:43?

Q.    That's your view of the video, is that 1:43 is the disengagement?

A.    Yes.

Q.    Now, Officer McCowan states from his review of the video that he disengaged the dog at around timestamp 1:40 or 1:41.  Do you see that testimony there here on page 217?

A.    What I see, what you're showing me is:

      "Answer:  1:42.

      "Question:  1:42.  Okay.

      "Answer:  1:42 to 1:43, I believe, was the mark that we were looking at."

      That's what I see right now you're showing me.  I don't know....

Q.    Let me scroll down.

A.    Okay.  There you go.  He's saying he gave the command.  But that doesn't mean he released.

Q.    What I'm asking is, he says he gave the command at timestamp 1:40 and the dog released at timestamp 1:43.

A.    Okay.

Q.    So -- and I'm not asking if you agree with this from your review of the video, but if you accept

132

that testimony, that's about a three-second time to release.  Correct?

A.    He's talking about a verbal command, not physical.

Q.    So from the time of the verbal command to release, to that point that is three seconds.  Correct?

A.    For verbal, yes, but that's not what occurred.  We're talking about a physical release because the dog wouldn't let go.

Q.    So your testimony is that he physically attempted to remove the dog before giving the verbal command?

A.    I would have to go back to the video and look at the exact times, but what I recall is he started choking the dog, lifting the dog up off the ground, and I believe that's when he gave the verbal command to release.  But then the dog didn't release and the dog was ripped off the bite.  The dog never did open its mouth and release on its own.  The dog was ripped from the bite.  It is plain to see.  It's clear.

Q.    Would you consider a three-second time lapse between a verbal command and the dog being removed to be an excessive amount of time?

A.    What I would say is it's -- that's not consistent with the dog's training.  It's not

133

consistent with the industry practice, standards of care in accordance with the certifications that the dog must go through annually and bimonthly training.  When the dog is given a command, the dog must immediately obey that command, not wait two or three seconds to do whatever the handler wants it to do.  It must do it right when the handler tells it.

Q.    Your testimony is that the dog is supposed to instantaneously from the time of the command release.  With that, there's no lapse of time for the dog to process the command?

A.    Whether it's -- whether it be release, sit, down, stay, come, or when you tell the dog no to whatever it's doing, it should cease doing whatever it's doing and follow the command the handler gave. Such as you see your dog going after a small kid, you immediately recall the dog and the dog does it immediately.  Or you see your dog to run out in the street while you're doing a search, you recall your dog.  You tell your dog to down.  The dog lays down immediately.  There's no delay.

And this is things that are all done in certification.  The sit, down, stay, come, heel, and the obedience part of it, it's all done.  Oh, the call off the bite before the bite is instantaneous.  There's

134

no delay.  The call when the dog is on the bite is instantaneous.  There's no delay.

Q.    Let's go to page 40 now.  Looking at Officer Baker's report, you discuss here in the second bullet point that "Officer Baker's account contradicts the timeline set up by Officer McCowan in his report." And those contradictions you're referring to are what happened pretty much immediately upon Officer McCowan's arrival into the pod.  Correct?

A.    Correct.

Q.    And this all happened in pretty rapid succession, correct?

A.    Yes.

Q.    Okay.  You also take issue or point out in Officer Baker's report that he did not include the aggressive and threatening description that Officer McCowan put in his report.  Is there any kind of standard requiring that level of description be used in incident reports?

A.    Sure.  Officer Baker is describing Mr. McCowan -- I'm sorry, that Officer Baker is describing Johnson's behavior as being compliant.

Q.    He's describing the turning towards Officer Mullins as being compliant?

A.    Basically, he's describing Mr. Johnson as

135

being compliant.  That's correct.

Q.    Did you see any evidence from Officer Baker's testimony that he believed that Johnson was being compliant at that time?

A.    I believe there was testimony that he saw Johnson go to the floor and was compliant.  I believe he said that Johnson was compliant.

Q.    Was that after the dog engaged?

A.    I think it was after the dog engaged.

Q.    Okay.  Did you see anything from his testimony that he believed Johnson was in compliance at that time when Officer McCowan entered the room and Johnson had been pulled off of the altercation?

A.    You'd have to back me up and show me testimony because I can't remember that much.  I mean...

Q.    Okay.  I'm just asking.

A.    It's -- I don't remember that.

Q.    And Officer Baker at this time with this part that he's describing here, he would have been primarily focused on securing Mr. Guy.  Is that fair to say?

A.    Yes.

Q.    All right.  At the bottom of page 40 and going on to page 41, you state that VDOC does not have

136

a policy on reviewing bite reports.  You acknowledge in here that DOC does require the reports to be sent to supervisors.  Correct?

A.    Yes, but if I recall, the 30(b)(6) witness testified that they don't always look at the stuff.  That's what I recall reading.

Q.    Let's take a look at that.

A.    What page are we going to?

Q.    I need to pull up the transcript.  We'll make this our next exhibit here.

(Burwell Defendants' Exhibit No. 11 was marked for identification.)

BY MR. DAVIS:

Q.    Now, let's start here at line 23.  I'll just read it.  It states:

"So I'll give you an example.  If a bite -- if an engagement occurred and a bite happened, I will get" -- and this is Mr. Bernocco, the 30(b)(6) designee talking here -- "when the opportunity presents itself, I will get a text or a phone call from the kennel sergeant or my lieutenant saying that a bite occurred at Red Onion State Prison, in this pod, at this time. I may know what dog and what handler.  I may not at that time.  It's just preliminary information that, hey, something happened.  That way I can let the people

that work above me, my chain of command, know that, hey, be ready for information to come because we just had a canine engagement.

"And then throughout the next few hours, I may get bits and pieces of more information. But within -- probably within four hours of everything being done and everything settled, we made sure the inmate was taken care of and things, then they've got time to put their dog up, and they have time to write the reports and put it in DINGO, write their reports in CORIS, they'll have all the pictures taken, and they can put this package together. And they e-mail this package of the bite report, the incident reports, a copy of their rabies documentation, all the pictures are uploaded, and camera numbers of what cameras I might be able to view the incident on, so that I can review the bite to make sure it looks appropriate to the training that we gave the staff. So all that comes to me in a package.

"And once I get that and I review everything and I feel everything looks appropriate, then I'll send that up to Randall Mathena. And I review the video. And if the synopsis of the bite report and incident reports matches what I see on the video, then I'm satisfied that it was appropriate; and

138

if it wasn't, then we would do whatever mitigating circumstances we have to."

I'll stop there. Do you regard that testimony as stating that the practice is to review all of these reports and the video?

A.    I agree that that is what your expert testified to, that that is the practice. But that's not what's being done.

Q.    What evidence do you have that they are not reviewing bite reports?

A.    There was some other testimony that I reviewed but I can't remember the name, that the stuff is not being tracked properly. But I can't recall the information.

Q.    We'll go back to the testimony that you cited. So looking at page 305, you cite beginning on line 16 -- I'll just read that here:

"Question: Again, this section just says that the canine bite report needs to be sent to these individuals; correct?

"Yes.

"There's no requirement here that these particular individuals review that bite report?

"That they -- do what?

"That they review it. There's no actual

requirement in this operating procedure that these individuals that receive the bite report, review it?

"The canine policy wouldn't dictate that, no.

"Is there another policy that would?

"I don't think so.

"Okay.  So the canine policy doesn't dictate it, and you're not aware of any other policy that would require them to actually review those reports?

"No.

"There's no requirement here that the canine bite reports get reviewed by the Special Investigations Unit; is that correct?

"That's correct.  There's no requirement."

He is testifying at that point that a requirement that the supervisors review the bite reports is not expressly stated in the policy.  Is that correct?

MR. JOHNSON:  Object to form.

BY MR. DAVIS:

Q.    You can answer, Mr. Burwell.

A.    Yeah.  He just testified that there's no policy or procedures that anybody review the stuff.

Q.    He also testified in that same deposition

140

that it is his practice to review all the bite reports.

Correct?

MR. JOHNSON:  Object to form.

A.    That is his practice.  That doesn't mean it's being done, and I found no documents whatsoever to indicate that that had been done with this incident.

MR. DAVIS:  I'll share another document now.  This is the deposition transcript of the former statewide canine coordinator, Major Barbetto.  I'd like to make this our next exhibit.

(Burwell Defendants' Exhibit No. 12 was marked for identification.)

BY MR. DAVIS:

Q.    Mr. Barbetto states here in response to this question:  "And the way the process worked is after the bite report and IIR were sent to you, you were required to review and make an assessment regarding whether or not the engagement was appropriate; is that correct?"  And he answers: "Correct."

So Mr. Barbetto also testified to his practice of reviewing the bite reports.

A.    He did.

Q.    Okay.

A.    But there's no documents to show that he

wrote anything to show -- to indicate that that was done. There's no -- there's no follow-up report. I don't have it.

Q. Understood. Looking at page 41, you discussed DOC failing to adequately review bite statistics to determine if there were problem dogs or handlers. From your review of the evidence did you see anything to show you that prior to this incident there were problems with Officer McCowan's handling of his canine that should have been caught and corrected by supervisors?

A. I don't have anything to show that.

Q. Okay. Did you review any evidence to show you that there were similar problems with any other canine officer that should have been caught and corrected? Limited to the evidence in this case.

A. Oh. Thank you. No.

Q. All right. We're in the home stretch here.

A. No way. Come on.

Q. Believe it or not.

Subsection D, "VDOC Does Not Train Its Officers Regarding Use of Canines As a Use of Force Tool in Accordance With Best Practices."

Does this correspond to your summary opinion No. 6?

142

A.    I'll have to go -- let me remember the page I'm on.  41?  Let me go to 6.

Yes.  In part, sure.

Q.    Okay.

A.    And 5.  And 4.

Q.    Any others?

A.    No.  We're on page what, 43?

Q.    41.

A.    Okay.  I'm back.

Q.    What training materials did you consider for this portion of your report?

A.    All of the training materials supplied by VDOC.  Training materials that I get from Sheepdog Guardian.  Information on other cases from Sheepdog Guardian.  Training materials from other agencies and how they deploy their dogs.  Of course, we talked about the appellate court decisions, district court decisions.  Again, the IACP; P-E-R-F, PERF.  The Department of Justice.  And consent decrees that are placed on departments from the Department of Justice, such as the one that was placed on the New Orleans Police Department where they had a substantial amount of bites and after the consent decree in one year they only had one.

Q.    All of those sources that you just named,

143

are all of those listed in the index in your report?

A.    I would think so.  Of course, what I call them is supporting documents.

Q.    Right.  That section of it.  All right. You state, "When compared to the national standards, VDOC does not adequately teach how individuals will respond to a canine attack."  Is that referring back to the IACP standard you referred to earlier?

A.    It's the generally accepted practices, yes. And IACP.  And other departments.

Q.    What other departments?

A.    Seattle, LAPD.  LA County Sheriffs.  Other agencies throughout the nation.

Q.    The next part is, "VDOC fails to adequately inform canine handlers on the seriousness of dog bites."  You state you were unable to find any VDOC training that addresses the seriousness of dog bites. Is there a standard or best practice that requires that information to be covered in training?

A.    Well, it should be.  The seriousness of the dog bite?  It's no different than the seriousness of a Taser if the Taser is used too long, or across a certain part of the body.  You know, know dart to heart they call it.  Or any type of use-of-force tool that is used lengthily or improperly.  And dog bites are no

144

different.  They need to be explained, the seriousness of what a dog bite can do.

Q.    So again, is there a national standard or best practice that requires that information to be included in training?

A.    Well, it would come from appellate court decisions where you're going to find that.

Q.    Do you know which ones?

A.    Not right offhand, no.

I know the Ninth Circuit Court talks about like in Lowry vs. Hartsell.  No, Lowry vs. City of San Diego.  It talks about -- L-O-W-R-Y, Lowry, and it talks about dog bites are a serious use of force.

Q.    Does it state that dog handlers need to be told that when they're trained?

A.    I don't know.

Q.    Okay.  In the next subsection, stating, "VDOC K-9 officers are not adequately trained."  Again, you state that "According to the VDOC, compliance is face down, arms out and palms up but this cannot be achieved when a dog is biting a human.  In this case, the dog had Mr. Johnson's wrist in its jaws."  That is referring to his right wrist.  "There was no way Mr. Johnson could comply by placing his arms out and palms up."

Was he physically unable to take his left hand out?

A.    Well, you're talking about the left hand. He was trying to protect that, I'm sure.  But the right hand, there was nothing he could do to palms up his hand with the dog's jaws biting and pulling on that arm.  Nothing.

Besides, if you're looking at that, if you're going by compliance is face down, arms out, palms up, almost every one of those inmates laying around on the floor could have been bit.  According to those guidelines.

Q.    All right.  The next subpoint, "VDOC does not comply with recognized standards regarding canine team certification."  You referred to standards about a third party needing to be involved in training.  Excuse me, a third-party to be involved in certifying the canine team.

Do you know what standards that refers to?

A.    Well, the standards are established by the North American Work Dog Association, the United States Police Canine Association, California POST, and various other.  Almost everybody outside the jail facilities have somebody other than their own department certify their dogs for patrol.  For the certification.

146

Example, I was a certified canine evaluator for the State of California.  However, I could not certify -- my department would not allow me to certify the dogs that I trained because I was not a third party.  I was involved with the training.  Nor could any canine handler within our unit certify the dogs.  They weren't board certified like me.  However, I would get -- I would get other canine evaluators from different agencies to come in and evaluate our canine unit on an annual basis and I would also evaluate other canine units on an annual basis, which training I was not involved with.

No inhouse certifications, is what I'm trying to say.  Monetary involvement such as the training -- the vendor or who sold the dog to the department or any organization that trained the dog. It has to be done by somebody that's not involved at all with the department.

Q.    And that is included in those standards as that it needs to be a purely nonagency, outside party?

A.    An outside party, correct.  No VDOC members at all.

Q.    Nobody within the agency.

A.    That's correct.

Q.    What effect would that have on the dog's

performance?

A.    Well, it's not the dog's performance.  It's the good old boy system.

Q.    Can you clarify?

A.    Yeah.  If I see something wrong with somebody's dog within my own department, most likely I wouldn't want to say that that dog handler is having a problem because who's going to back me up in the field? Or what supervisor is going to have a problem with me saying that our dogs aren't fit?  However, I could do that as a trainer, which my department was quite different.  But in reality, it's a good old boy system. Yeah, okay, you almost passed.  We're good.  Just go ahead.  You're good.  I'll certify you.

It doesn't work like that.

Q.    So you're saying that the trainers can be internal to the agency but that the certifying individuals cannot?

A.    They could be if they -- I don't know. It's possible.  But it's best to have a third party look at the dog.

Q.    I'm asking again because you -- did you say your department trained inhouse?

A.    No, we sent out dogs originally to a vendor for six weeks.  Then they come back to me and I would

148

train them for six, eight weeks, however long they needed, and then an outside canine handler, a certified canine handler would come in and evaluate the dog on obedience, control work, building searches, area searches.  And if it was a dual-trained dog, then they would do it for other departments.  Not mine.  We don't do dual-trained dogs.  But other departments, if there was narcotics involved, they would see if the dog could find an alert on a certain odor.

Q.    When you trained other dog handlers within the agency did you determine whether they passed their training?

A.    Yes.  I did.

Q.    Okay.  But those concerns that you mentioned about a conflict of interest that you have alleged could cause problems with certification, that would not be a concern with making a decision to pass somebody or not at canine school?

A.    No.  I think I need to explain more then.

When the dog is at Adlerhorst International and completes six weeks of training, it's the owner of the training facility that passes the dog and gives them a certification.  When the dog comes back to me at the Sheriff's Department, I give an additional training in the field on actual deployments to make sure that

149

the canine is performing properly, and then also through the week I will also do canine training not in the field but in a training type of environment to make sure the dog is performing properly. And then I also give SWAT environment training.

Sure, I have the ability to say whether the dog is working properly or not. I also have had the ability to take the problems that I would observe between the dog and the handler to the canine sergeant and let the canine sergeant make a determination, take that to the lieutenant and determine whether the dog should be removed from the field or both the canine team or the canine handler get a different dog.

There's a lot of things that go into that. I didn't have the ability to actually remove the dog. Only to report it and to say, hey, this dog isn't working properly.

Q. The canine coordinator who you made that report to, that's also somebody in the Sheriff's Department, right?

A. It's a supervisor. Yes.

Q. Okay. So that's still -- that decision is ultimately coming from inhouse?

A. Well, sure. We're not talking about certification. I did not certify our dogs.

It's going to get real noisy right now. Hold on. Rain. It's a downpour.

Q. You're not coming through too loud on your end so I think we can keep going.

You state that the training documents indicate that VDOC is aware of Graham vs. Connor and that the officers in this incident did not follow their training. So again, are you acknowledging that the training incorporates what you contend is the applicable standard for the use of force?

A. Graham v. Connor?

Q. Yes.

A. That's -- that's the leading policy, also, after Kerr vs. West Palm Beach Florida. These both occurred around the same time, Graham v. Connor and Kerr vs. West Palm Beach. I had to modify our training completely to make sure it aligned with not only the training but statistics and everything else to make sure we were in compliance with Graham v. Connor and Kerr. Also, with appellate court rulings. Such -- and another was Chew vs. Gates and Mendoza v. Block. All these things come into play. And to also advise the canine handlers of these and every Wednesday to critique each handler on the searches that they did for the week and each handler be honest enough to sit and

say, Hey, these were the mistakes I made, we can do better.  We can fix these.

Sometimes you make mistakes with a dog.  Or the dog didn't perform properly.  But unless the handler is totally sincere, the canine trainer can't correct the problems or address them and fix them.

But your question was do I certify our own dogs?  No.  I do not.

MR. DAVIS:  I believe that is all the questions that I have.  Andy may have some follow-up questions for you.

THE DEPONENT:  Mr. Davis, I just want to thank you for your kindness.

MR. DAVIS:  Oh, thank you for being flexible today.  I'll let plaintiff's counsel jump in here.

THE DEPONENT:  Okay.

MR. JOHNSON:  Thank you, Tim.

Mr. Burwell, I don't have any follow-up questions so I'll give it back to Tim to conclude.

MR. DAVIS:  Okay.  Well, thank you, Mr. Burwell.  I think we can go off the record now.

(Discussion off the record.)

THE DEPONENT:  I don't need to read and sign.  Court reporters don't make mistakes.

152

(Signature waived.)

(The deposition concluded at 12:39 a.m.

Eastern Standard Time.)

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Juanita Harris Schar, CCR, RMR, CRR, an E-Notary Public for the Commonwealth of Virginia at large, of qualification in the Circuit Court of the City of Virginia Beach, Virginia, and whose commission expires April 30, 2026, do hereby certify that the within named deponent, ERNEST BURWELL, appeared before me at Lipa City, Province of Batangas, the Philippines, by videoconference, as hereinbefore set forth, and after being first duly sworn by me, was thereupon examined upon his oath by counsel for the respective parties; that such examination was recorded in Stenotype by me and reduced to computer printout under my direction; and that the foregoing constitutes a true, accurate, and complete transcript of such examination to the best of my ability.

I further certify that reading thereof and signature thereto were expressly waived.

I further certify that I am not related to nor otherwise associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal this 17th day of September, 2022, at Virginia Beach, Virginia.

*Juanita Harris Schar, CCR*
------------------------

Notary Public

Certified Court Reporter No. 0313085