1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
2                   Roanoke Division

3    ----------------------------------

4    COREY E. JOHNSON,

5                        Plaintiff,

6    v.                                  CASE NO.
                                        7:20cv582
7    (K-9) OFFICER McCOWAN, et al.,

8                        Defendants.

9    ----------------------------------

10

11

12

13

14                   VIDEOCONFERENCED

15          DEPOSITION UPON ORAL EXAMINATION

16               OF PATRICK H. HURLEY

17        TAKEN ON BEHALF OF THE DEFENDANTS

18               Richmond, Virginia

19               September 13, 2022

20

21

22

23        ---------------------------------------

24        KATHLEEN BEARD ADAMS, CCR, RPR, CRR

25                 Court Reporter

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF VIRGINIA
2                  Roanoke Division

3    ----------------------------------

4    COREY E. JOHNSON,

5                         Plaintiff,

6    v.                                CASE NO.
                                       7:20cv582
7    (K-9) OFFICER McCOWAN, et al.,

8                         Defendants.

9    ----------------------------------

10

11

12

13

14                  VIDEOCONFERENCED

15          DEPOSITION UPON ORAL EXAMINATION

16              OF PATRICK H. HURLEY

17        TAKEN ON BEHALF OF THE DEFENDANTS

18              Richmond, Virginia

19              September 13, 2022

20

21

22

23        ---------------------------------------

24        KATHLEEN BEARD ADAMS, CCR, RPR, CRR

25                  Court Reporter

1    APPEARANCES:

2    On behalf of the Plaintiff:

3        ANDREW CROMWELL JOHNSON, ESQUIRE

4        Arnold & Porter

5        10th Floor Three Embarcardero Center

6        San Francisco, California 94111-024

7        202.942.5631

8        andrew.johnson@arnoldporter.com

9

10   On behalf of the Defendants:

11       TIMOTHY E. DAVIS, ESQUIRE

12       Assistant Attorney General

13       Office of the Attorney General

14       Criminal Justice & Public Safety Division

15       202 North 9th Street

16       Richmond, Virginia 23219

17       804.225.4226

18       tdavis@oag.state.va.us

19

20

21   Also Present:  William J. Hudson, e-Notary Public

22

23

24

25

```
 1                    I  N  D  E  X

 2   DEPONENT                                      PAGE

 3   Patrick H. Hurley

 4        Examination by Mr. Davis                   4

 5

 6

 7

 8                    EXHIBITS

 9   NO.    DESCRIPTION                            PAGE

10   1      Expert report (initial)                 6

11   2      Expert report (rebuttal)                6

12   3      Police One - Factors that influence    29
            the use of force in a correctional
13          institution

14   4      VDOC Use of Force Procedures           37
            (OP 420.1)
15
     5      VDOC Canine Operating Procedure        39
16          (OP 435.3)

17   6      Human Rights Watch - Cruel and         41
            Degrading, The Use of Dogs for Cell
18          Extractions in U. S. Prisons

19   7      McCowan deposition transcript          56

20   8      Bernocco 30(b)(6) deposition           80
            transcript
21
     9      Photographs                            88
22
     10     Accident - Injury Report               89
23

24

25
```

```
 1                    Videoconferenced deposition upon oral
 2      examination of PATRICK H. HURLEY, taken on behalf of
 3      the Defendants, before Kathleen Beard Adams, CCR,
 4      RPR, CRR, sworn by William J. Hudson, e-Notary
 5      Public for the Commonwealth of Virginia at large,
 6      taken pursuant to notice, commencing at 10:04 a.m.,
 7      on September 13, 2022; and this in accordance with
 8      the Federal Rules of Civil Procedure.
 9                    -  -  -  -  -
10                    PATRICK H. HURLEY, having been first
11      duly sworn, was examined and testified as follows:
12                          EXAMINATION
13      BY MR. DAVIS:
14           Q.    Good morning, Mr. Hurley.  My name is
15      Timothy Davis.  I'm an attorney for the defendants
16      in this case.
17                    Could you please state your name for the
18      record?
19           A.    Yes, sir.  Pat Hurley, H-U-R-L-E-Y.
20           Q.    And, Mr. Hurley, are you an expert
21      witness retained by the plaintiff in this lawsuit?
22           A.    I am.
23           Q.    And could you describe for me what you
24      consider to be the scope of your expertise that you
25      are offering here?
```

1        A.     I laid that out in the beginning of the

2    reports, to look at the policies, procedures,

3    practices, and to see if the force used upon

4    Mr. Johnson was necessary, appropriate, or

5    excessive.  I'm paraphrasing.

6        Q.     Understood.  You authored the initial

7    expert report and rebuttal to the defendants' expert

8    report in this case, correct?

9        A.     Correct.

10        Q.     All right.  I'm going to pull those up

11    right now.

12             And so, Mr. Hurley, for use of the

13    documents today I'll be using the screen share here

14    in the Zoom.  If there is ever a point where you

15    need me to go to a particular part of the document

16    or zoom in on something, anything like that, just

17    let me know and we'll work with that.

18             Can you see the document that's being

19    screen shared right now?

20        A.     I can.

21        Q.     Is this your initial expert report?

22        A.     I believe it is.  Yes.

23             MR. DAVIS:  All right.  I'd like to make

24    this Defendants' Exhibit 1?

25

```
 1                  (Defendants' Exhibit 1 was marked for
 2                   identification.)
 3    BY MR. DAVIS:
 4          Q.    Can you see this document here?
 5          A.    Yes.
 6          Q.    Is this your rebuttal report?
 7          A.    Yes.
 8                MR. DAVIS:  All right.  I'd like to make
 9    this Defendants' Number 2.
10                (Defendants' Exhibit 2 was marked for
11                   identification.)
12    BY MR. DAVIS:
13          Q.    Mr. Hurley, do you have copies of these
14    reports aside from the screen share available for
15    your access here?
16          A.    I do.
17          Q.    Okay.  So it may be a little easier when
18    we're talking about the report itself, since we'll
19    be talking about those a lot, to not just have that
20    constantly up on screen share.  So I'm going to take
21    those down.  There will be some other documents I'll
22    be putting up here today.
23          A.    Understood.
24          Q.    Given your expert experience,
25    Mr. Hurley, I would guess you've been deposed
```

```
1    before.

2         A.    Yes.

3         Q.    Okay.  So I'll skip the preliminaries

4    here.

5               Just a couple of questions for you.  Did

6    you speak to anyone to prepare for today's

7    deposition.

8         A.    Yes, I did.

9         Q.    Who did you speak with?

10        A.    Mr. Johnson --

11        Q.    How --

12        A.    -- Andrew Johnson.

13        Q.    Pardon me.

14              How long did you speak with Mr. Johnson?

15        A.    Maybe 45 minutes.

16        Q.    Did you review any materials to prepare

17   for today other than those that you've listed in

18   your reports?

19        A.    No.

20        Q.    Is there any reason you feel you'd be

21   unable to testify today?

22        A.    No.

23        Q.    So I'd like to ask a couple of questions

24   about your background.

25              You have experience working in
```

1    corrections, correct?

2         A.    Yes.

3         Q.    Could you describe your corrections

4    career for me?

5         A.    It started in 1980 at the Chillicothe

6    Correctional Institute, Chillicothe, Ohio, where I

7    was a substance abuse counselor.  Then I transferred

8    to the Department of Developmental Disabilities for

9    a two-and-a-half-year stint working at a facility

10   for those folks who had disabilities.  Went back to

11   Chillicothe as a case manager/ classification

12   specialist, worked in various positions.  Moved over

13   to Ross Correctional Institution, a new institution

14   which was opening, and went and worked at a field

15   facility for -- I can't remember how -- about six or

16   seven years.  Worked at five different facilities.

17   Did headquarters twice.  Was a deputy warden for ten

18   and a half years, a warden for about five and a half

19   years, was their special forces commander for about

20   a year and a half.  Without looking at my CV, these

21   are rough estimates.  And then finished my career in

22   the headquarters as the bureau chief for

23   construction and maintenance, which was responsible

24   for all the large capital projects for the agency.

25   And that was my experience or tenure with the Ohio

1    Department of Corrections.

2              Then I worked for the Ohio Department of

3    Youth Services as a consultant for about six and a

4    half years to help them get into compliance with --

5    or the conditions of complying with a consent

6    judgment.  Specifically I was responsible for

7    helping them getting into compliance with the

8    use-of-force stipulation of that consent judgment.

9         Q.    And is that the Stickrath case you're

10   referring to there?

11        A.    Yes.  Yes.

12        Q.    Okay.  So I'll come back to that because

13   I'm going to have a few questions about that case.

14              When did you last work for the Ohio

15   Department of Corrections?

16        A.    Excuse me.  I believe it was 2009, but

17   again I'd have to refer to my CV.

18              (Reporter clarification).

19        A.    It should be on my CV.  I have it as

20   2008.  Sorry.

21   BY MR. DAVIS:

22        Q.    Was there any point in your corrections

23   career when you worked as a security officer?

24        A.    There was not.

25        Q.    And so there would not have been any

1    occasion where you would have used force on an

2    inmate?

3         A.    That's not correct.

4         Q.    When would you have done that?

5         A.    Throughout my career in literally almost

6    every position I held I used force.  The exception

7    would be when I was bureau chief for construction,

8    activation and maintenance.  Maybe when I was the

9    commander of the special forces, or STAR team they

10   called it.  I even used force when I was a

11   consultant to the Ohio Department of Youth Services.

12             So the unique thing about Ohio

13   corrections was everyone was trained to use force.

14   Everyone was expected to respond, even the

15   secretaries.  When I first started my career

16   secretaries were weapons-trained and they would

17   stand on the perimeter outside the prison during fog

18   conditions to prevent a potential escape.  So the

19   approach and the philosophy was different and we

20   were all expected to know how to do that and we were

21   expected to respond.

22        Q.    Okay.  So in addition to having to use

23   force yourself did you ever oversee or investigate

24   uses of force by other officers?

25        A.    Yes.

```
 1              Q.     Would you describe that role for me?
 2              A.     Okay.  That started at the beginning of
 3     my career in 1980 even as a substance abuse
 4     counselor.  The institution had use-of-force review
 5     committees, a three-member panel, and they had a
 6     mixture of disciplines sit on that panel.  And there
 7     would be the inmates, there would be the officers,
 8     and we'd look at the reports, and as a committee we
 9     would make determinations with independent votes
10     about whether we felt the force was necessary,
11     appropriate, or within the guidelines.
12              I did that throughout my career.  When I
13     became deputy warden I was responsible for reviewing
14     all use-of-force cases.  Again there was a committee
15     evaluation that came to me where I looked at all the
16     incident reports, the videos, those kinds of things.
17     Then as warden again was responsible for reviewing
18     those things, accepting the recommendations or
19     referring it back for further investigation or
20     referring it to a different committee for
21     investigation, any of those types of things.
22              And then in my role with the Ohio
23     Department of Youth Services as a consultant I was
24     responsible for designing their use-of-force review
25     process and then conducting the quality assurance
```

1    portion of that for all the facilities.  So again I

2    was looking at the videos of the cases, the incident

3    reports, and the work of those folks who were

4    assigned the first level of use of force review.

5          Q.    Thank you.  During your time on the

6    use-of-force review committee and other instances

7    where you were reviewing use of force did you ever

8    review instances of the use of canine force?

9          A.    No, because we didn't use canines except

10   for institutional search purposes.  And in my role

11   with the Nunez monitoring team I reviewed their

12   policies and had input on that and those kind of

13   things, which I put references in my report

14   regarding the Nunez stance about canine -- canine

15   policy.

16         Q.    And I'll also have some additional

17   questions about the Nunez case.

18         A.    Sure.

19         Q.    Did you have experience training

20   officers in the use of force?

21         A.    Yes.

22         Q.    And in what role?

23         A.    Certainly in my role as the inspector,

24   or I think it's listed as the inspector of

25   institutional services.  That was with Chillicothe

1    Correctional.  And spoke at the in-services about

2    inmate grievance procedures and how I would handle

3    use-of-force incidents.  And then in my role as

4    deputy warden certainly I spoke at all the employee

5    in-services and again explained what was appropriate

6    force, what would be excessive force, those kinds of

7    things.  As warden did the same thing, spoke at all

8    the in-services and sometimes used some of the cases

9    we had had to demonstrate what was reasonable and

10   acceptable force, even high-level force, and when

11   force was unnecessary or excessive.  Then again in

12   my role with the Ohio Department of Youth Services

13   taught classes at almost every pre-service class and

14   then taught all the supervisors about planned

15   interventions and appropriate force.  So, yeah,

16   that's the experience I can recall at the moment.

17        Q.    Other than your work as a consultant or

18   an expert witness, have you ever been involved in

19   litigation against either the Department of

20   Corrections or correctional staff?

21        A.    I'm not sure I understand your question

22   clearly.

23        Q.    Have you ever been in a lawsuit against

24   correctional staff or your Department of Corrections

25   aside from your work as an expert?

```
 1          A.    Well, as a deputy warden I was the
 2   subject of many lawsuits when I was working in my
 3   career, if that's the question you're asking.
 4          Q.    No.  And I'm certainly familiar with the
 5   volume of lawsuits that can come with the job, but
 6   have you ever been adverse to your department or
 7   other correctional staff in a lawsuit?
 8          A.    Do you mean serving for plaintiff's
 9   counsel or serving for a defendant --
10                (Reporter clarification)
11          A.    I'm saying that I'm not sure that I
12   clearly understand what he's asking me.  Is he
13   asking me have I served as a subject-matter expert
14   for plaintiff's counsel always or have I ever served
15   as an expert for defendants' counsel?
16   BY MR. DAVIS:
17          Q.    Well, let me ask that question then.
18   Have you ever served as a subject-matter expert for
19   defendants in a correctional lawsuit?
20          A.    Yes.
21          Q.    And do you recall what cases those were?
22          A.    I'd have to look at the CV.  I know one
23   was the Maryland Department of Corrections.  I was
24   retained by the Maryland Attorney General's Office.
25   I was consulted by the South Carolina Department of
```

1   Corrections.  Unfortunately, that was not directly a

2   use-of-force case.  It was a protection-from-harm

3   case.

4        Q.   Was the Maryland Department of

5   Corrections case -- was that a use-of-force case?

6        A.   Yes.  Oh, I'm sorry.  It was protection

7   from harm.

8        Q.   Have you ever testified as a defense

9   expert in any use-of-force case?

10        A.   At the moment I can't recall that.  I

11   can't recall that specific issue.

12        Q.   Are all of the cases listed in your --

13   in your report civil rights cases brought by a civil

14   action?

15        A.   I believe so.  And, again, I'm not an

16   attorney, so if I misrepresent anything it may be

17   that I may not understand that it was or was not a

18   civil case, but it's my understanding that the

19   majority of them were.

20        Q.   You don't recall any criminal cases

21   you've testified as an expert in?

22        A.   No.

23        Q.   Are those primarily use-of-force cases

24   or a range of different kind of claims brought in

25   those?

```
 1           A.    They're a range.
 2           Q.    Okay.  Aside from use-of-force cases
 3   what else have you testified to?
 4           A.    Protection from harm.  They were, I
 5   guess, conditions-of-confinement issues, such as
 6   access to medical care, in-custody death related to
 7   overdose issues, civil rights violations in terms of
 8   racial disparity or equal access to certain
 9   classifications or programs or disabilities.  It
10   could be a mixture of those things.
11           Q.    Did the use-of-force of cases you've
12   testified in have any incidents involving the use of
13   a canine?
14           A.    They have not.
15           Q.    Are there any cases that you have
16   testified in since you submitted your initial
17   report?
18           A.    Yeah.  Well, a very short deposition is
19   what I want to say.  And it was related to
20   Mr. Lemuel.
21           Q.    Mr. Lemuel is the plaintiff?
22           A.    Yes.  I'm trying to find that right now.
23                 I apologize.  That would be probably on
24   page 6 of the CV.  It looks like the date is October
25   2021.  And for some reason my printer put gray marks
```

```
 1   across the right side of my page so I can't see the
 2   whole page, but it looks like Case Number
 3   1:20-cv-01875.
 4        Q.    All right.  I see that one there.  So
 5   you recently have given deposition testimony in that
 6   case?
 7        A.    It was very brief, but yes.  We had
 8   internet issues, so after about ten minutes they
 9   decided they would reschedule, and then I believe
10   they talked settlement.
11        Q.    Well, let's hope we don't have that come
12   up today.
13             I'd like to ask about a couple of the
14   consulting matters that you've been involved in.
15             Let's first talk about the Stickrath
16   case.  So what do you recall were the facts of this
17   case?
18        A.    As I said, it was conditions of
19   confinement, so issues related to access to medical
20   care, access to mental health care, appropriate
21   levels of educational opportunities and programming,
22   but primarily excessive force.
23        Q.    Was this a class action?
24        A.    It was.  This was a case that was
25   brought before the courts before I became involved,
```

1   so it was already settled by the time they asked me

2   to come help.  I believe the Department of Justice

3   was involved in that along with the plaintiffs'

4   counsel.  And, yes, it was a class-action

5   settlement.

6          Q.    Okay.  And so that was a consent decree

7   with Department of Justice involvement?

8          A.    That's my understanding, yes.

9          Q.    And was this involving -- was this

10  involving adult corrections or juvenile?

11         A.    It was juvenile.

12         Q.    And did this involve a single facility

13  or the whole department?

14         A.    The entire department.

15         Q.    What was your role as consultant?

16         A.    It was to evaluate their use-of-force

17  processes and then to develop a review process and

18  training programs to help them to come in compliance

19  with the use-of-force portion of that stipulation,

20  which they did achieve several years in advance of

21  the closure of the settlement agreement.  It was one

22  of the first components to be released I guess would

23  be the legal term.  And the use-of-force issue was

24  never brought back before the courts.

25         Q.    And so you said there were -- there were

1    use-of-force stipulations in the consent decree?

2         A.    It was -- that may not be the legal

3    technical term for that, but certainly a major

4    component of that consent judgment was related to

5    use of force.

6         Q.    Was there a monitor or some other third

7    party appointed to oversee the settlement?

8         A.    There was.

9         Q.    And so in your consultant role were you

10   retained by the monitor?

11        A.    No.  I was retained by the agency.

12              And I want to clarify something.  I

13   didn't have a traditional contract in the

14   traditional sense.  They had me as, I guess, a

15   part-time employee, but it was with the

16   understanding that I was a consultant.

17        Q.    Understood.  Was there anything in this

18   case involving use of canines?

19        A.    There was not.

20        Q.    Okay.  Now I want to ask you about the

21   Nunez case.  Actually, before I move on to Nunez,

22   has the Stickrath case -- has that been closed or is

23   that still ongoing?

24        A.    It was closed.  I don't know the exact

25   year.

1        Q.    Okay.   Now I'll ask about the Nunez

2    case.   So what is your understanding of the facts in

3    that case?

4        A.    And, again, there's a lot of components

5    to the settlement agreement, but it was a conditions

6    of confinement, similar to the one in Ohio; access

7    to medical care, access to mental health care,

8    physical conditions of the facility, and excessive

9    force.

10       Q.    Was this also a class action?

11       A.    Yes.   And again it involved

12   participation by the Department of Justice.   They

13   joined the plaintiffs' counsel together.

14       Q.    And did that also end up as a consent

15   decree?

16       A.    Yes.

17       Q.    And do you recall whether the scope of

18   that case -- well, actually, let me back up.

19            Were the plaintiffs in this case -- were

20   they convicted prisoners or were they pretrial

21   detainees?

22       A.    It was everybody, so you had a mixture.

23   They had pretrial detainees, they had some from my

24   understanding who were awaiting transfer to the

25   state correctional system, then you also had ICE

```
 1    detainees.  So it was a mixture of detention folks.
 2         Q.    Was -- did this only relate to a single
 3    facility?
 4         A.    No.  New York Department of Corrections
 5    has nine facilities, and one of those is even a
 6    barge that's on the river.  So when people refer to
 7    Rikers Island they may think of one jail, but
 8    actually there's several jails on Rikers Island.
 9         Q.    Okay.  So this was -- was this -- did it
10    cover the entire New York Department of Corrections
11    or just the Rikers Island complex?
12         A.    It's my understanding that it was the
13    entire department.
14         Q.    So what was -- what was your role in
15    Nunez?
16         A.    My role was to review all training
17    materials related to the consent judgment, to make
18    recommendations to the monitor on whether to accept
19    those training materials or require modifications to
20    those training materials, to observe the actual
21    training of those subjects.  And then to monitor a
22    large volume of use-of-force cases has been a
23    mixture; men, women, adults, young adults,
24    adolescents.  I was targeted with focusing on the
25    adolescents wherever they went and have continued to
```

1    do that.  But, again, I've reviewed use-of-force

2    cases for every jail in the New York Department of

3    Corrections.

4         Q.    What was your recommendation regarding

5    the training materials?

6         A.    Well, if I felt that the sequence of the

7    material was out of order, where students wouldn't

8    necessarily learn the building blocks of the

9    training program, where perhaps deescalation was out

10   of sequence, not emphasized properly, whether some

11   techniques from a defensive tactics or a restraint

12   standpoint were prone to cause injuries or prone to

13   have positional-asphyxiant issues, I would make

14   recommendations regarding that.

15             And it covered a lot of topics in the

16   use-of-force arena; chemical agents, taser,

17   defensive tactics, cell extraction, something they

18   called a probe team, and use-of-force policy

19   instruction, all the refresher lesson plans, the

20   crisis intervention.

21             And I'm just trying to focus on things

22   that would be purely related to use of force.  I'm

23   probably forgetting something, but I've made

24   multiple reviews of all those training curriculums

25   and observed those training curriculums, sometimes,

1  more than once, participated in some of those,

2  including their defensive tactics, and had them

3  dismiss OC spray only to have that reversed.

4      Q.    Did any of that involve use of canines?

5      A.    They do have canines, as I said in my

6  report, so I was tasked with reviewing the canine

7  policy and making recommendations.  I was also

8  tasked with meeting with the commissioner, their

9  legal counsel, their emergency services unit, which

10  has the canine unit, to address concerns and make

11  recommendations regarding changing some of their

12  procedures.  And then throughout that time I've

13  looked at their policy with the team and it would be

14  team recommendations.

15      Q.    Were your recommendations accepted by

16  the monitor?

17      A.    Yes.

18      Q.    Do you know if your recommendations are

19  included in any of the monitor's reports that they

20  filed with the court?

21      A.    They most likely would be.  They're not

22  identified as mine.  And it wouldn't be just

23  isolated to issues regarding canines.  My

24  recommendations or narratives may be in many of

25  those reports, but they're never identified as an

24

1    individual monitoring team member.

2         Q.    Okay.  Do you know if the

3    recommendations that you made -- are those still in

4    effect with that agency?

5         A.    Yes, as far as I know.  We're -- that's

6    still an active consent decree and we're still

7    actively involved in the monitoring process, so

8    every month I have things to review related to

9    Nunez.

10        Q.    You also mentioned in your

11   qualifications consulting with the Department of

12   Homeland Security.  Could you describe what you did

13   there?

14        A.    Okay.  And that's one I'm still

15   involved.  So they conduct either virtual or on-site

16   inspections or investigations of ICE detention

17   facilities and/or border patrol stations, and I've

18   done both.  And we look at all kinds of conditions

19   of confinement.  It's similar to an American

20   Correctional Association audit, so we may be looking

21   at things such as the arsenal inventories, to PREA,

22   to use of force, to the grievance procedure, quality

23   of food, clothing.  There's a large gamut of things.

24        Q.    And is this connected with any active

25   litigation?

1      A.     No.

2      Q.     Is there any other consulting work --

3   aside from the expert testimony you've listed and

4   the work with DHS and the Nunez and Stickrath cases,

5   any other consulting you've done about use of force

6   or use of canines?

7      A.     I would say I have with disability

8   rights of Pennsylvania, and that involved

9   pre-litigation issues regarding the Department of

10  Youth Services in Pennsylvania.  I did look at a

11  number of use-of-force cases for them, drafted

12  recommended use-of-force policies and/or

13  use-of-force review processes.

14         There's a small private facility in

15  Ohio, I helped defend them, but also in that process

16  spoke with the facility director about things that I

17  thought they should change, improve, or things they

18  were doing very well in their use-of-force review

19  process.

20     Q.     You said that was a juvenile department?

21     A.     Yes.

22     Q.     Any other consulting?

23     A.     No.

24     Q.     All right.  In that case I'd like to

25  move on to the report itself.  And before we get to

1   anything with the substance of it I want to ask if

2   you can clarify for me where your opinions are that

3   you offer in this report.  I see there's a list of

4   opinions beginning on page 53 and continuing to the

5   end of the report.  Is anything else in the body of

6   the report offered as an opinion by you?

7         A.    Well, I believe that it would.  I make

8   comments throughout all those sections for issues

9   which I think are the foundations of my opinions.

10  Particularly the rebuttal report where I disagree

11  with the defense expert, I explain why I disagree

12  and then provide the rationale for that

13  disagreement.

14               So they may not be officially labeled as

15  an opinion, but I think if I'm saying I disagree and

16  why I disagree that loosely that would be considered

17  an opinion, but I've summarized those and provide

18  the conclusions at the end of the reports.

19        Q.    Okay.  So that portion at the end is

20  your list of opinions.  And that -- the body of the

21  opinion preceding that, that's your analysis and

22  citations in support of those?

23        A.    Yes.

24        Q.    Okay.  So when we get to the end of the

25  initial report I think we'll want to look back and

```
1     just so I can better understand which parts of the

2     report correspond to which of your opinions.  We'll

3     get to that later.

4              So I'd like to start with -- the heading

5     is IV, Expectations Regarding Use Of Force.  It's

6     beginning on page 4 of your report.

7              On the next page you cite to two Supreme

8     Court cases, Kingsley versus Hendrickson and Graham

9     versus Connor.  Do you see where those citations

10    are?

11         A.    Are we on page 5 now?

12         Q.    Yes, sir.

13         A.    Yes.

14         Q.    And you refer to those cases as

15    providing an objective reasonableness framework for

16    use-of-force incidents, correct?

17         A.    Correct.

18         Q.    Is that the framework you used to

19    evaluate the use of force here in this case?

20         A.    Yes, in part.

21         Q.    Would you elaborate?

22         A.    I think I made a reference to a

23    different case later with that.  It spoke about the

24    need for force, the proportionality, whether the

25    force was tempered, and relationship to injuries.
```

1    Q.    Is that the Whitley case you cite on

2    page 8?

3    A.    Yes.

4    Q.    And so are you using both of those

5    standards in conjunction here?

6    A.    I did.  And, again, I'm not a lawyer, so

7    I'm going to answer that question this way:

8    Historically there's been, shall we say, a gray area

9    related to which case law applies to convicted

10   people versus pretrial detainees, but I think I

11   explain in my report that the Graham versus Connor

12   has historically been discussed in corrections as

13   one of the foundations for assessing use of force.

14   So, given that it's mentioned by the Virginia

15   Department of Corrections, I included it in the

16   discussion.

17   Q.    Okay.  So also considered the Whitley

18   case?

19   A.    Yes.

20   Q.    Okay.  So beginning on page 6 you take

21   an excerpt from an article.  It's from a website

22   PoliceOne.com.  The name of the article is Factors

23   that influence the use of force in a correctional

24   institution.  And that continues on to page 8 of the

25   report.  Do you see that?

 1        A.     Yes.

 2        Q.     So I'm going to screen share that

 3   article.  Can you see this, Mr. Hurley?

 4        A.     Yes.

 5               MR. DAVIS:  All right.  And we're

 6   actually here on page 2 of the article.  Madam Court

 7   Reporter, I'd like to make this Defendants' Number

 8   3.

 9               (Defendants' Exhibit 3 was marked for

10               identification.)

11   BY MR. DAVIS:

12        Q.     There are a few -- there are factors you

13   list here in this excerpt.  There are a few others

14   that are included in the article but omitted from

15   your excerpt.  Was there any particular reason for

16   leaving those factors out?

17        A.     There was not.  And if so, it may be

18   related to a download where it maybe didn't capture

19   everything.  So if you display those, I'll address

20   that, but -- or if I did not, then I probably have a

21   reason why I did not.  I don't recall.  I know I've

22   used this in other reports, so I don't know as we

23   sit here right at the moment.

24        Q.     And that's okay.  I just wanted to see

25   if there was a particular reason.

1          There are a couple of the factors that

2   you listed here that I wanted to talk about, the

3   first being the factor -- the first factor you list

4   here, "The need for physical force is reduced in the

5   controlled environment that exists in an

6   institution."

7          Could you explain how you think that

8   factor is implicated by the use of force in this

9   case?

10   A.    Sure.  This incident was isolated to one

11  housing unit.  So there's no indication or

12  information that it was getting out of control or

13  involved any other area but the area right where

14  Mr. Johnson and Mr. Guy were engaged in a fight,

15  just those two.

16          Responders were on the way.  It appeared

17  that Officer Mullins was using his radio before I

18  was actually able to see the fight on the floor.

19  From indications in the report those radio calls did

20  go out, the responders were on the way.

21          And the article is correct.

22  Correctional facilities by design have the ability

23  to isolate incidents quickly.  I haven't had the

24  opportunity to see the facility, but looking at what

25  was available through that video it was contained to

1    that area.

2         Q.    So the next factor, "Rapid multiple

3    officer response minimizes the need for use of force

4    options."

5              From your review do you recall how many

6    officers were present during the altercation and the

7    subsequent use of force.

8         A.    Well, there was Officer Mullins, K-9

9    Handler Baker, K-9 Handler McCowan, I believe a

10   sergeant responded and/or maybe one other officer,

11   but those were sufficient numbers for the situation

12   because, again, the fighters were separated, all the

13   other inmates were on the ground or sitting and away

14   from the incident.  So it was -- it was a controlled

15   situation.

16        Q.    The next factor listed here,

17   "Surveillance technology aids in early detection and

18   suppression of situations that require use of

19   force."

20             Did you feel that the surveillance

21   cameras had any effect as far as the way or the

22   manner that the officers responded here.

23        A.    I'm not sure I understand your question

24   fully.

25        Q.    Well, that factor is listed as

1    suggesting that having cameras/surveillance

2    available in a correctional setting certainly allows

3    an early intervention by staff.  Do you feel that

4    that had any effect on the outcome of this incident?

5         A.    I don't know for certain, but what it

6    appears was that the response was fairly rapid and

7    sufficient.  There's no documentation to indicate

8    who may have been viewing the video live, but

9    traditionally when a call for help goes out, the

10   control-room officer, or in a similar situation the

11   folks that have access to those cameras, focus on

12   that location and/or move cameras so they can see

13   what's going on, so they have a good assessment of

14   the magnitude of the situation or the lack thereof.

15             But, again, responders were quick, so

16   this talks about if the system is working and being

17   monitored responders get there quickly.  And it

18   appears that was the case in this situation.

19        Q.    The next factor states, "The physical

20   design of the institution aids in the isolation of

21   problem areas."  And you mentioned before in this

22   instance that the -- you know, the location of the

23   fight and the response was in the housing unit.

24             Now, as far as the officers and inmates

25   who were there in the housing unit other than Mr. --

1    excuse me -- Mr. Johnson and Mr. Guy, those -- those

2    people were not physically isolated from the inmates

3    who were fighting, correct?

4         A.    I disagree with that characterization of

5    the scene.

6         Q.    Why is that?

7         A.    I'll admit that they were still out on

8    the floor of the unit, but there was no one in close

9    proximity to that fight.  There was only one inmate

10   that I saw.  And I believe the rebuttal expert -- or

11   the defense expert mentioned that one inmate showed

12   indications he was going to run towards that fight

13   at one point very early on.  That part is reflected

14   in the video, but that person also quickly stopped

15   and dropped to the floor and was in the compliant

16   position.

17              So -- I apologize.  That's an alarm

18   sounding there.

19              For effective control that was

20   sufficient.

21        Q.    But you would acknowledge there were no

22   walls or cell doors or other physical barriers that

23   would have obstructed movement on the pod floor?

24        A.    Yes.  Correct.

25        Q.    The next factor, "The ability to wait

1    out potential violent confrontations and control the

2    moment of initial contact reduces the need for

3    physical force options."

4              Now, here the altercation had already

5    begun and was in progress at the time the officers

6    were called to respond, correct?

7         A.    Correct.

8         Q.    Okay.  So this would be distinct from

9    something like a cell extraction where the staff may

10   be able to wait out the inmate or choose the time

11   that they intervene?

12        A.    That part is correct, but -- and I

13   acknowledge that.  And one of the clips that I

14   provided from the Nunez monitor's report related to

15   the timely use of force to keep everyone safe.

16              So I understand that when inmates are

17   fighting you have to intervene, and that's what

18   officers have to do for protection from harm.  So

19   I'm not disputing that they needed to intervene to

20   stop a fight.  They did.  And that's not when the

21   time is to wait, but I do disagree that McCowan

22   needed to take immediate action when he entered the

23   door.  That's where I think this point applies.

24        Q.    Understood.  Not listed there as a

25   separate factor but it's included in that block

1    quote where it states, "Rule violations result in

2    disciplinary action rather than a physical arrest

3    process that oftentimes led to physical

4    confrontations."

5              In this instance the rationale for the

6    initiation of force was -- at least the rationale

7    offered by staff you would agree was the need to

8    control an ongoing altercation; is that correct?

9         A.    Are you asking me if I recognize that's

10   what they offered or that I agree --

11        Q.    Right.  Right.

12        A.    I recognize that's what they offered.

13        Q.    So do you think this language here has

14   any application involving, you know, a delayed

15   disciplinary charge in lieu of an arrest that could

16   potentially escalate into a physical confrontation?

17        A.    I do because -- and I explain that in

18   the rebuttal report because I believe a failure to

19   recognize deescalation of the event based upon the

20   actions of Mr. Johnson and the actions of everyone

21   else in the pod -- and I agree with Mr. Burwell's

22   report where he says Mr. McCowan had his patrol

23   canine that was trained in protection at his side,

24   that was an effective barrier against Mr. Johnson if

25   that was needed.

36

1       Q.     The last factor listed here is "The

2    availability of on-site rapid supervisory response

3    limits the decision-making role of the individual

4    officer."

5              From the evidence you've reviewed did

6    you see whether a supervisor was on site and

7    available in this instance?

8       A.     It's my understanding a sergeant

9    responded to that scene fairly quickly.

10      Q.     In your experience is the responding

11   officer always required to consult with a supervisor

12   in a time-sensitive response?

13      A.     No.

14      Q.     Okay.  The next section I'd like to talk

15   about here begins on page 8 and is titled

16   Proportionality Is Key.  We've referred to this a

17   few minutes ago with the Whitley factors that you

18   list here.

19              From your review of DOC's canine and

20   use-of-force policies do you believe these factors

21   are incorporated into those policies?

22      A.     I do not.

23      Q.     You do not?

24      A.     Correct.

25      Q.     Okay.  Could you elaborate on that?

```
 1          A.     And I may not have understood your
 2   question, but are we speaking specifically to the
 3   use of canines?
 4          Q.     Let's start with the use-of-force
 5   policy.  And I will bring that up, if you'll give me
 6   just a second.
 7          A.     Okay.
 8                 MR. DAVIS:  Madam Court Reporter, let's
 9   make this our Number 4.
10                 (Defendants' Exhibit 4 was marked for
11                  identification.)
12   BY MR. DAVIS:
13          Q.     So there's a couple points of the policy
14   I want to highlight and just ask if you believe this
15   is -- if you're in agreement with the
16   proportionality standard and the Whitley factor.
17                 First, this highlighted language here,
18   "The use of force is restricted to instances of
19   justifiable self-defense, protection of others,
20   protection of property, prevention of escapes, and
21   to maintain or regain control, and then only as a
22   last resort and in accordance with the appropriate
23   statutory authority."
24                 Do you believe that language is
25   consistent with the proportionality standard?
```

1       A.    Except for proportionality I don't

2  believe it is addressed in that statement.

3       Q.    I will continue on.  Also language here,

4  "Force will not be used for vindictive or

5  retaliatory purposes.  The use of force is never

6  justifiable as punishment."

7            Again do you see that as being

8  consistent with the Whitley factors?

9       A.    It's not specifically mentioned in

10  Whitley, but that is my understanding.  It's part of

11  the constitutional requirements of reasonable force

12  or appropriate force, that it's never used for

13  punishment or vindictive or retaliatory purposes.

14            And that language is common throughout

15  the corrections industry, excuse me, as is that

16  first paragraph that we reviewed, with the exception

17  of the piece that I mentioned.  Most agencies have a

18  phrase or clause that speaks to not only as a last

19  resort, excuse me, but the minimum amount necessary

20  to regain control or words to that effect.

21       Q.    Okay.  So I'm going to move down to

22  another section of the policy here.  We're on page 7

23  of the policy now under III.  And this states,

24  "Non-force methods of control should be used

25  whenever possible and the minimum necessary force

```
 1    should be used to gain control only when non-force
 2    methods have failed or are not appropriate."
 3              Sorry.  One more I want to highlight
 4    here.  "Only the amount of force that is reasonably
 5    necessary to overcome resistance, mitigate an
 6    incident, or gain control under the circumstances,
 7    is permissible."
 8              Do you feel that this highlighted
 9    language incorporates the proportionality standard?
10         A.    It does.
11              MR. DAVIS:  I'm going to turn to the
12    canine policy now.
13              Okay.  Sorry for the delay there.
14              Madam Court Reporter, I would like to
15    make this our Number 5.
16              (Defendants' Exhibit 5 was marked for
17               identification.)
18    BY MR. DAVIS:
19         Q.    And, Mr. Hurley, this is the VDOC canine
20    policy, correct?
21         A.    Correct.
22         Q.    Okay.  I'm going to highlight some
23    language here.  It says, "While one of the greatest
24    values of canine teams lies in the deterrence effect
25    of their presence, their use is authorized only when
```

1   the circumstances justify such use.

2             "The Canine Officer should be constantly

3   aware that a Corrections Officer may use only the

4   amount of force necessary to maintain control, and

5   that the use of canine under such circumstances

6   constitutes the use of force or the implied use of

7   force.

8             "In determining the amount/type of force

9   to be used, the Canine Officer should take into

10  consideration all circumstances known to them."

11            Do you feel that this also incorporates

12  the proportionality standard?

13       A.    I do not.

14       Q.    Could you elaborate?

15       A.    There is no guidance here to explain

16  when the use of that high-level type of force would

17  be justified.

18       Q.    So your testimony is that you think

19  additional restrictions should be explicit in the

20  policy for it to be proportional?

21       A.    Yes.

22       Q.    If I could move on now to the next

23  section, the heading is VDOC's Use of Force Policies

24  Are Not In Line With National Correctional Stances

25  Regarding Constitutional K-9 Use.  This is page 9 of

1    the report.  Do you see that section, sir?

2         A.    Yes, I do.

3         Q.    So the first subheading under there,

4    Canine Use Of Force In The Confinement Setting Is

5    Rare.  You cite to an article by Human Rights Watch

6    for the proposition that the use of canines as an

7    instrument of force in confinement settings is the

8    exception to correctional practice and not the rule.

9    And you further state that "...the few jurisdictions

10   that used canines to maintain order and secure

11   prisoner compliance most typically used them for

12   cell extractions..."

13             I'd like to pull up that article.

14        A.    Sure.  Excuse me.

15        Q.    I'll scroll down to the title here.

16   Mr. Hurley, is this the article cited in your

17   report?

18        A.    I believe it is.

19             MR. DAVIS:  Madam Court Reporter, I'd

20   like to make this our Number 6.

21             (Defendants' Exhibit 6 was marked for

22              identification.)

23   BY MR. DAVIS:

24        Q.    So, Mr. Hurley, do you recall where in

25   this article it discusses how many state

```
 1    correctional systems use canines for purposes other
 2    than cell extractions?
 3            A.    I don't recall that as we sit here.
 4            Q.    Let me -- I'll start with the summary
 5    and if you want to read that.  Let me know when you
 6    need me to scroll down.
 7            A.    Okay.  Okay.
 8            Q.    (Scrolling.)
 9            A.    Sure.
10            Q.    All right.  I'm going to move down now
11    to page 11 of the article.  Let me know when you
12    would like me to continue scrolling here.
13            A.    Okay.
14            Q.    (Scrolling.)
15            A.    Stop.  You're going to have to scroll
16    up.
17            Q.    Oh.  Sorry about that.
18            A.    It's been a while since I've had my
19    Evelyn Wood speed reading course.
20                  Okay.
21            Q.    (Scrolling.)
22            A.    Okay.
23            Q.    (Scrolling.)
24            A.    Okay.
25            Q.    (Scrolling.)
```

43

```
 1          A.    Stop, please.  Can you back up just a
 2   little, please?
 3          Q.    Oh.  My apologies.
 4          A.    Okay.
 5          Q.    (Scrolling.)
 6          A.    Go ahead.
 7          Q.    (Scrolling.)
 8          A.    Stop, please.
 9                Okay.  Down a little more.
10          Q.    (Scrolling.)
11          A.    And stop.
12                Okay.  Go on down to the next page.
13          Q.    (Scrolling.)
14          A.    And stop.  Okay.
15          Q.    (Scrolling.)
16          A.    Okay.
17          Q.    (Scrolling.)
18          A.    Okay.  Go ahead.  Sorry.
19          Q.    Okay.  And that's the end of that
20   portion.
21                So is it fair to say that this article
22   focuses on these seven states and their use of dogs
23   for the purpose of cell extractions?
24          A.    I didn't take the article that way, that
25   they were only to be focused on cell extractions,
```

1   although that certainly is the highlight of that,

2   because it speaks to some commissioner saying the

3   dog won't be brought onto the unit at all without

4   the commissioner's approval, reaching out to former

5   directors or high-level corrections officials to get

6   their opinions about the use of canines.  So I took

7   the article to represent overall use of canines in a

8   correctional setting and for what purposes.

9        Q.    Okay.  So then do you take the article

10  to state that only those states listed in the

11  article use canines as a force vehicle?

12       A.    No, I didn't take it to read that way.

13  And I can't quote the entire -- I tried to quote

14  parts of it and then break that down into of those

15  that they mentioned using cell extractions how many

16  were left.  I think it came down to two, and they

17  rarely used those.  But I believe it also spoke to

18  -- I did reread the article this morning -- that

19  maybe 37 states had canine units for use and many of

20  those were used for escape apprehension, drug

21  detection, searches, those kind of things, but

22  again, yes, there was a heavy concentration on cell

23  extraction.

24       Q.    And your reference to 37 states that use

25  canines for some purpose, is that anywhere in your

1    report?

2         A.    I don't recall.  And, again, that's my

3    recollection of that.  I'd have to read it again to

4    be absolutely certain.

5         Q.    Can you testify at this time to the

6    number of states that use canines for force

7    purposes?

8              MR. JOHNSON:  Object to form.  You can

9    answer if you know, Mr. Hurley.

10        A.    I don't know.  And I researched trying

11   to find anything that would indicate that or

12   summarize that, and I was not able to find any

13   research that established that number.  So, no, I

14   can't.

15   BY MR. DAVIS:

16        Q.    And you also -- I'm turning to page 10

17   of your report.  You refer to the fact that

18   Immigration and Customs enforcement doesn't use

19   canines for force, control or intimidation of

20   detainees.

21              In the materials that you reviewed or

22   from your consulting experience do you understand

23   the reason for why they don't use canines for ICE

24   detention?

25        A.    The methods they currently have to

```
 1    resolve disturbances are sufficient.  No, I don't
 2    have direct knowledge of their rationale for that,
 3    but it aligns with what I'm aware of as generally
 4    accepted correctional practice.  And that also
 5    aligns I believe with Mr. McCowan's testimony that
 6    he was not aware of any other correctional system
 7    that used canines for control purposes.
 8         Q.    And do you know whether Officer McCowan
 9    is in a position to know the practices of other
10    state correctional systems?
11         A.    I do not know that, but in general
12    specialty units and assets like that tend to be very
13    interested in their specialty.  So, for instance,
14    special tactics units, they have a strong interest
15    in that, and my experience is they usually know what
16    their sister states are doing or what other places
17    are doing.  It's not out of the realm of
18    possibility.  I can't say that he would.
19         Q.    Turning back to the question about ICE
20    detention, are the people who are detained by
21    Immigration and Customs Enforcement -- is that
22    population people who are currently serving
23    sentences for criminal convictions?
24         A.    Technically, no, but some of them are
25    maximum-security detainees who are back in an ICE
```

47

1    detention facility after serving significant time at

2    a state correctional facility for violent crimes.

3    So they're not necessarily all minimum-security

4    detainees.

5         Q.    Do you know what share of the detainee

6    population the maximum-security individuals are?

7         A.    I do not.  I do know that some

8    facilities have a significant portion of their

9    population that falls in that category, but I can't

10   give you that statistic.

11        Q.    So I'm going to move on to your next

12   section here titled At A Minimum, The Correctional

13   Industry Recognizes Canine Use Of Force Should Be

14   Limited To Situations Involving Imminent Risk Of

15   Severe Bodily Harm Or Death.

16        A.    What page are you on?

17        Q.    This is page 10 of your report.

18        A.    All right.  Okay.

19        Q.    You state, "General use of force

20   incidents like inmate-on-inmate fights rarely, if at

21   all, justify the types of injuries caused by

22   canines..."

23              Is there a particular source or basis

24   for that statement, any policy or industry standard

25   that you're referring to?

```
 1          A.    Other than force is not to be used to
 2   inflict unnecessary pain or proportionality.
 3          Q.    Do you have any statistics or
 4   information regarding the rate of serious injury
 5   that can be caused by inmate-on-inmate fights?
 6                MR. JOHNSON:  Object to the form.  You
 7   can answer if you know, Mr. Hurley.
 8          A.    I do not, but I know that's something
 9   that is tracked.
10                I'm going to answer that question this
11   way:  I'm committed to confidentiality clauses in
12   most of the work I do, so I can say in the
13   monitoring process and in the DHS process some of
14   that involves knowing what the injuries were related
15   to a fight or the use-of-force portion of that,
16   whether the inmate's injuries were caused by the
17   fight or caused by the use of force, or whether
18   those injuries are consistent with the force, if it
19   was necessary, the types of methods that were used.
20                Throughout my career I've used that.  I
21   see that used by many agencies.  I know there are
22   some elaborate data systems to assess that.  I can
23   say that if you did look at our monitor's report for
24   the Nunez consent judgment there would be graphs and
25   statistics in there and pages dedicated to that type
```

```
 1    of issue, both inmate-on-inmate fights and

 2    inmate-on-staff, and use of force, and

 3    differentiating the level of injuries and the cause

 4    of injury.

 5    BY MR. DAVIS:

 6        Q.    Understood.  And just to clarify,

 7    certainly I don't want you to feel like I'm asking

 8    you to disclose any sort of protected or

 9    confidential information during our time today.

10        A.    I will say the American Correctional

11    Association in their performance-based standards

12    have assessments they use related to issues like

13    that, and they also look at medical reports to see

14    how many injuries the medical department assesses

15    and the source of those injuries.  So it comes

16    through several different channels.

17        Q.    Did you consider any of that information

18    in drafting your report?

19        A.    Well, globally, just speaking about

20    proportionality, but looking at the Johnson case

21    just on what was available to me and what I

22    received.  I just considered the event as it

23    happened to Mr. Johnson.

24        Q.    Understood.  Further down that page you

25    state, "Canine deployment must be very high on the
```

1    use of force continuum because of the potential and

2    high likelihood of severe injury to the subject.

3    The precautions used in K-9 and K-9 Handler training

4    confirm these concerns.  The training is extensive,

5    lengthy, and strictly controlled."

6              Are you referring in that excerpt there

7    to the DOC canine training or general standards?

8         A.    Both, although I'm critical of their

9    training later, but in terms of the length of their

10   training, certainly lengthy, the duration of it,

11   they did have some things where they're referring to

12   strictly controlled.  They did have a lot of detail

13   regarding what the decoy should do or what

14   protective gear the decoy should wear and

15   precautions to avoid unnecessary bites and

16   accidental bites.  So that portion of their training

17   acknowledges and recognizes the risk of injuries

18   that a canine can produce.

19        Q.    Now, referring to the extensive and

20   lengthy nature of canine training, do you just

21   attribute that to the potential injuries and level

22   of force that are involved?

23        A.    No, I do not.

24        Q.    What else would you consider there?

25        A.    I would consider the things in the

```
 1   standards that the defense expert referenced and

 2   some of the things that are mentioned in VADOC

 3   canine training curriculum.  My problem with it, as

 4   I said in the rebuttal report, was they really

 5   didn't have any details of terms for certain

 6   factors, such as what is excessive force, what is

 7   proportionality, cognitive bias, and/or normal human

 8   reactions to a canine.

 9        Q.    Thank you.

10              You excerpt from Mr. Burwell's report

11   regarding the nature of injuries that could be

12   potentially caused by a canine.  Do you agree with

13   his assessment that dog bites are more severe than

14   injuries from a taser?

15        A.    Yes.

16        Q.    Could you elaborate on that?

17        A.    Part of my responsibilities for the

18   Nunez consent judgment was to review training

19   curriculum such as use of force.  The Taser X2 was

20   part of that.  And I observed the delivery of that

21   training.  So in that training and in the materials

22   the -- there are some concerns about inducing

23   seizures.  There is controversy about potential

24   heart capture it's called, capturing the rhythm of

25   the heart, and maybe having serious problems there.
```

1    So there's precautions about taser placement, but

2    for the most part they really talk about how to

3    remove the probe safely and treat it with an alcohol

4    swab or something and have the medical staff check

5    the person.  But in general the likely injury that a

6    person suffers from that is two pin pricks, so to

7    speak, small red spots on their body.  So you're not

8    talking about torn skin, broken bones, ripped flesh,

9    or destroyed nerves, those kind of things.  So if I

10   -- I would rather be shot with a taser than bitten

11   by a canine.

12         Q.    Would you know what the rate of fatality

13   or lethal injury is from a taser versus from a dog

14   bite?

15               MR. JOHNSON:  Object to form.  You can

16   answer if you know, Mr. Hurley.

17         A.    I don't know.  I've researched the area

18   related to in-custody death related to restraint

19   methods, but not specific to canine.

20   BY MR. DAVIS:

21         Q.    Okay.  Let me ask as well about

22   Mr. Burwell's statement that a dog bite can be more

23   serious than a gunshot.  Do you agree with that

24   assessment?

25         A.    I'm going to defer to his expertise in

1    terms of, you know, seeing more of those things than

2    I would have ever seen.  But also I have looked at

3    some research articles related to emergency room

4    physicians or different experts in the canine field

5    of the types of injuries that canines can produce.

6         Q.    Okay.  But in your experience is a

7    gunshot a more-likely-to-be-lethal use of force than

8    a dog bite?

9         A.    I would not necessarily agree with that

10   because people do survive gunshots.  It depends on

11   where you shoot the person.  And it's in my training

12   related to gangs and things.  I've watched a lot of

13   videos where -- either actual footage or

14   reenactments where suspects were shot multiple times

15   and didn't die and still assaulted the police.  And

16   then I've seen, as I include in my reports, cases

17   where a canine was engaged in lethal behavior and

18   the handler himself, the police officer, had to

19   shoot the canine to save their life.

20              So -- and the handlers in this case even

21   spoke about, you know, it could be lethal -- like

22   any use of force can be lethal if it's not used

23   properly.  And that's why they guide the dog to bite

24   certain parts of the body, to avoid biting a person

25   on the neck or the head or areas that could be

54

1  fatal.

2      Q.    So I'll ask again the same question I

3  asked regarding tasers.  Do you know any statistical

4  information about the relative lethality of a

5  gunshot versus that of a dog bite?

6           MR. JOHNSON:  Object to form.

7  Mr. Hurley, you can answer if you know.

8      A.    Yeah.  I do not.

9  BY MR. DAVIS:

10     Q.    Okay.  So further down, on page 11 of

11 your report, you excerpt from the -- I guess the

12 journal Academic Emergency Medicine an article that

13 they wrote about dog-bite injuries.

14          Did you review Mr. Johnson's medical

15 records in this case?

16     A.    I don't recall as we sit here.

17     Q.    Do you recall whether any of the

18 injuries he sustained correspond with the injuries

19 listed in this excerpt here?

20     A.    I do not recall.

21     Q.    Turning to page 12, you cite to an

22 article authored by Peter Meade and the source is

23 Science Direct.  In the first bolded language in

24 that excerpt you state, "We also observed that

25 police dog bites tended towards higher numbers of

55

1    bites in the central areas of the body: the head,

2    the upper arms, and chest."

3              From your review of the evidence was

4    Mr. Johnson bitten in any of these areas?

5        A.    He was not, but it did appear to me on

6    the video shortly after Officer McCowan entered the

7    pod the canine leapt high, very high, at

8    Mr. Johnson, and it appeared to me that the canine's

9    head was at Mr. Johnson's head level or right in

10   that area.

11       Q.    And did you see from the evidence

12   whether the dog actually connected on a bite when it

13   hit -- it moved in that direction?

14       A.    I couldn't see like a bite and hold, but

15   I also could not tell if, you know, the teeth were

16   engaged on Mr. Johnson's body.  The video is not

17   clear enough for me to be able to make that

18   determination.

19       Q.    Do you know whether Mr. Johnson claimed

20   that the dog had connected?

21       A.    I don't recall that, but I do recall

22   something related to an abrasion or a bump on his

23   head or something to that nature.

24       Q.    Did he attribute that to the dog?

25       A.    I don't recall him attributing that to

1    the dog.

2         Q.    I'm turning to page 13 of your report.

3    You quote Officer McCowan as -- or cite to his

4    testimony on the footnote 12 on the accompanying

5    text.  You state that, "The VDOC K-9 Handlers'

6    expectations of what the offender had to do to be in

7    compliance - face down with arms out and palms up,

8    or with hands on the back of the head with legs

9    crossed..."

10             I want to pull up Officer McCowan's

11   deposition transcript.

12        A.    Okay.

13        Q.    Can you see this, Mr. Hurley?

14        A.    You may have to enlarge that if you

15   could.

16        Q.    How about now?

17        A.    One more time.

18             Okay.  Thank you.

19             MR. DAVIS:  All right.  So you cite to

20   page 77.  Just if you want to read that I'll scroll

21   down and give you -- and, Madam Court Reporter,

22   let's make this Defendants' Number 7.

23                  (Defendants' Exhibit 7 was marked for

24                   identification.)

25                  THE DEPONENT:  Okay.  Scroll down just a

```
 1    little bit, please.
 2              MR. DAVIS:  (Scrolling.)
 3              THE DEPONENT:  Okay.  Stop.
 4    BY MR. DAVIS:
 5        Q.    Are you finished reading that?
 6        A.    Yes.
 7        Q.    I'm going to go down to 185 is the other
 8    page you cited in support of that statement.
 9        A.    Yes.  If you could scroll back up just a
10    little.
11        Q.    (Scrolling.)
12        A.    And back up just a little.
13        Q.    (Scrolling.)
14        A.    Okay.
15        Q.    So just in those excerpts there wasn't
16    any testimony there about requiring hands to the
17    back of the head, correct?
18        A.    Correct, but if you could pull that back
19    up.
20        Q.    Sure.
21        A.    Okay.
22        Q.    Is there anywhere else you can recall in
23    that testimony that that requirement of compliance
24    was testified to?
25        A.    No, I do not.  It is possible that I
```

1    misread that for looking at other depositions -- you

2    know, included that and that did make a reference.

3        Q.    Okay.

4        A.    I'll also say that usually when people

5    are asking the subject to be with legs crossed

6    that's usually in a kneeling position with their

7    hands still on the back of their head.  That's a

8    very common surrender position somebody puts the

9    person in, so...

10        Q.    Understood.  Immediately after that text

11    you state that Mr. Johnson sustained injuries to

12    several parts of his body.  Are you testifying that

13    he was bitten anywhere other than the right wrist or

14    forearm area?

15        A.    No, but, again, I don't recall the exact

16    locations of the injuries at this point.

17        Q.    Okay.

18        A.    Yes.  I mean, those two areas.

19        Q.    Further down that page you state, "By

20    comparison, to achieve certification for other use

21    of force devices, the officer has to be subjected to

22    the impact of the device."

23            What are you -- are you basing that

24    statement on?

25        A.    My training, the training I observed in

1  different facilities, policies that I've seen.  So,

2  for instance, I mentioned the OC spray.  That's

3  pretty standard, where a person has to be subjected

4  to the agent to become certified in the use of that

5  agent.  A taser is one of those other items that the

6  person that's subjected to the effects of the taser

7  becomes certified to carry a taser.

8         Q.    Do you know if an officer is expected to

9  be subjected to being hit with impact munitions

10  before he can use those?

11        A.    No, not that I'm aware of.

12        Q.    Okay.

13        A.    But I think I also make that point in my

14  report in that same paragraph.  I say, "There is a

15  reason officers are not subjected to the impact of a

16  bullet or some 'less lethal' devices; the risk of

17  death or serious injury is too great."

18              So the beanbag rounds, rubber bullets,

19  those kind of things, would be what I'm talking

20  about there.  I wasn't trying to say they have to be

21  subjected to everything.

22        Q.    So would you consider an impact round to

23  be comparable at a level of force for a canine?

24        A.    Comparable or just below the canine.

25        Q.    Were you asking me that or --

```
 1           A.    No.  I'm saying that.
 2           Q.    Okay.  And officers who are training
 3   with a canine, they may wear some protective
 4   equipment, but they do assume the possibility that
 5   they could be bitten somewhere other than the part
 6   of the body that the equipment is covering.  Is that
 7   fair to say?
 8           A.    That is fair to say.
 9           Q.    The last three paragraphs on this page
10   13 -- it begins with a statement, "There is no K-9
11   handler, trainer, corrections officer... that I
12   know, who would ever lie on the ground and subject
13   themselves to the risk of injury these dogs can
14   inflict."  And that continues on to the bottom of
15   the page.
16                 Is there a source for this excerpt aside
17   from your individual personal experience of being
18   near a canine in a demonstration?
19           A.    Other than knowing those handlers.  For
20   instance, a highway patroller, or that particular
21   handler.  And I meant to say without the protective
22   gear.
23           Q.    Okay.
24           A.    That's a key phrase I missed.  But I
25   don't know anybody that would without any protective
```

1    gear subject themselves to the risk associated with

2    a canine under a bite-and-hold command.

3        Q.    And you had testified before that the

4    patrol canines were not used in your agency during

5    your time in corrections; is that correct?

6        A.    That's correct.  We --

7        Q.    At what -- oh, I'm sorry.  Go ahead.

8        A.    We did use canines for the search

9    purposes.  So we would conduct a facility search we

10   did introduce canines into the search process and/or

11   search of visitor and employee property when they

12   came into the facility and the search of cars in the

13   parking lot for drug interdiction purposes.  I have

14   also authorized and used canines for escape,

15   apprehension, or pursuit purposes.

16       Q.    And so was it one of those dogs that was

17   the demonstration that you referred to here?

18       A.    Correct.

19       Q.    I'm turning now to page 14.  You cite to

20   the International Association of Chiefs of Police as

21   stating that they stressed that canines should be

22   kept on a lead when tracking suspects to maintain

23   control and reduce bites, and that canines should

24   not be used for routine calls or crowd control.

25               Was the dog in this incident involving

1   Mr. Johnson -- was it ever taken off lead?

2        A.    No, not that I'm aware of.

3        Q.    Did the source that you cited, the

4   limitation on using canines for routine calls and

5   crowd control, did it specify whether that was in

6   the context of community police or was that extended

7   to a correctional setting?

8        A.    Most likely the context of community

9   policing.

10       Q.    So after that text there is an excerpt

11  here from one of the monitor's reports from the

12  Nunez case.  Do you know what industry or legal

13  standards the monitor was relying on when they

14  reviewed the canine policies?

15       A.    Probably those case laws that I

16  referenced earlier in my report, Graham versus

17  Connor or Whitley.  And I, again, didn't necessarily

18  share that or cite that with -- with me or the rest

19  of the team.

20       Q.    Okay.  What was the -- what was the

21  monitor's directive here in reviewing the policies?

22  Was it to implement best practices?  Was it just to

23  reach a constitutional minimum?

24       A.    None of the things that we do associated

25  with the consent judgment or monitoring is to drive

 1   towards best practice.  That's outside the scope of

 2   what we're charged with doing.  And it's my

 3   understanding that the court is always striving to

 4   have the least amount of -- interference is probably

 5   not the right word, but just looking for the most

 6   reasonable, least restrictive alternative to

 7   practice to achieve constitutional conditions, only

 8   that which is absolutely necessary.

 9            And I know I'm not saying that in proper

10   legal terms.  Those are layman's term.  You know,

11   I'd have to look up that language, but that's the

12   intent.

13        Q.   Okay.  Is the Nunez consent decree --

14   and they've had various changes that were

15   implemented from that.  Do you know if that's

16   considered an industry standard by other agencies?

17        A.   No, I do not.

18        Q.   And I believe you testified to this

19   earlier, but following this report from the monitor

20   was there a final policy that was approved and

21   implemented?

22        A.   Yes, I believe so.  There was already an

23   existing policy that was being modified to account

24   for concerns and to try to limit the use of canines

25   in conditions where serious bodily injury or death

1    were evident or imminent.

2        Q.    Was -- did you review the final

3    modifications?

4        A.    Most likely, but we reviewed those

5    policies several times, three or four times, during

6    the revision process.  So for me to be able to sit

7    here to say with confidence absolutely I did that, I

8    cannot do that, but --

9        Q.    Okay.

10       A.    -- most likely.

11       Q.    And it cites to -- or it includes the

12   standard in here on SBI, imminent and immediate

13   threat of serious bodily injury or death.  Is there

14   a particular threshold or standard that was used

15   here for determining a level of threat that would --

16   that would be at that level, I guess?

17       A.    I can't recall a specific standard, but

18   I know that we've had discussions about conditions,

19   and many of those being associated with escape

20   apprehension or a true riot where there's of control

21   of the facility or a unit, where weapons were being

22   used, serious injuries were occurring, and all their

23   methods were not effective or available, and where

24   it was obvious that somebody may die or may be

25   permanently injured, but it was necessary for

```
 1    protection from harm and saving lives to intervene.
 2              MR. DAVIS:  Okay.  Can we go off the
 3    record?
 4              (Off-the-record discussion)
 5              (Recess from 11:54 a.m. to 1:00 p.m.)
 6    BY MR. DAVIS:
 7         Q.   Mr. Hurley, I want to ask you now about
 8    subsection C, entitled VDOC's Policies On Use Of
 9    Canines As An Instrumentality Of Force Are Outliers
10    On When Canines May Be Used.  This is beginning on
11    page 15.
12         A.   Okay.
13         Q.   In the first sentence of that section
14    you state, "The use of K-9s for routine use of force
15    events in correctional settings is so rare that VDOC
16    is the exception rather than the rule."
17              Could you explain that statement?  Have
18    you reviewed policies or practices in other
19    correctional agencies about when canines are used?
20         A.   I'm not aware of correctional agencies
21    using canines very often.  The ones that I found
22    restrict it to certain types of things, such as
23    escape apprehension, drug interdiction, or imminent
24    danger of death or serious injuries.
25         Q.   What states did you look at?
```

1         A.    Well, when I worked with Department of

2    Homeland Security I looked at the use-of-force

3    policies associated with theirs, New York, Ohio

4    certainly.  I reviewed Indiana, but not recently.

5    They did use canines at one point.  I believe

6    Pennsylvania, but again not in recent history.

7         Q.    Any others?

8         A.    In some of the cases that I've handled

9    for civil matters, reviewed those use-of-force case

10   -- or policies.  But, you know, to specify which

11   states and which policy, you know, I can't sit here

12   and say other than those that I mentioned.

13        Q.    Okay.

14        A.    But I know I had a use-of-force case in

15   Maine, Louisiana prison parishes, Colorado,

16   Wisconsin, Oklahoma, and then Homeland Security

17   would be California, New Mexico, Arizona, Florida --

18        Q.    When you --

19        A.    -- Pennsylvania.

20        Q.    Excuse me, Mr. Hurley.  I'm sorry to

21   interrupt there, but when you were just referring

22   to, I think, the Colorado -- or California, Arizona,

23   a few others, that list there, you said those were

24   Homeland Security policies?

25        A.    Those -- yes.  Starting with California

1    and the rest that I named, yes.

2         Q.    Okay.  So those are federal guidelines

3    and those are just the locations that --

4         A.    Each facility has their own use-of-force

5    policy.

6         Q.    Now, are those ICE facilities?

7         A.    Yes.

8         Q.    Okay.  And the list you gave earlier of

9    Maine, and I think you said Louisiana, Colorado,

10   Wisconsin, and Oklahoma -- did you say those are

11   ones you reviewed for case testimony?

12        A.    Yes.

13        Q.    Okay.  And of those states you listed

14   none of them -- your testimony is none of them

15   permit canines except in specific circumstances?

16        A.    That's correct, but, again, it's been

17   years since I reviewed the Indiana policy or

18   Pennsylvania.  So best as I can recall.

19        Q.    And you continue on to some discussion

20   about VDOC's use-of-force policy and the force

21   continuum.  In your experience do other correctional

22   agencies have a hierarchy of force that requires

23   certain levels of force to be exhausted before an

24   officer can move on to the next step up?

25        A.    Not completely.

1          Q.     Could you explain?

2          A.     Most use-of-force policies allow the

3    officers to escalate to higher levels of force

4    options depending on the conditions they're

5    confronted with, but in general the policies speak

6    to start with verbal commands or deescalation

7    attempts, and then usually it's things such as soft

8    -- what they call soft-hand techniques or OC spray.

9    You know, there's not consistency in the industry of

10   which comes first.  Sometimes they'll advocate for

11   the use of OC spray versus doing hands-on.  I

12   understand that.  I don't have a problem with those

13   two things being interchangeable.  But then when

14   they get into devices or instruments that may cause

15   serious injury or the potential for serious injury

16   or for death they are higher on the use-of-force

17   continuum and usually there's more specific

18   requirements of conditions that should be met if an

19   officer chooses to use those.

20                So, for instance, a person in custody

21   just refusing to move or verbally swearing at a

22   staff member does not justify the use of a baton, so

23   to speak, to strike the person in custody.  If a

24   person is old, sick, and weak, and can be controlled

25   with soft-hand techniques, that has to be taken into

69

```
1   consideration.  So, therefore, again the use of a

2   taser, a baton, canine, would not be appropriate for

3   somebody who is feeble because they can be

4   controlled through other methods that are more

5   proportionate with the type of threat they might

6   impose.

7        Q.    Do these policies spell out the

8   circumstances when a particular -- excuse me -- a

9   particular level of force is allowed?

10        A.    Well, without violating my

11   confidentiality cause --

12        Q.    Sure.

13        A.    -- I'll just speak in general of a major

14   metropolitan use-of-force policy that does give

15   specifics.  It differentiates between types of

16   resistance.

17             Passive-resistance things might be

18   somebody just standing there refusing to move or

19   they might be verbally saying -- you know, swearing

20   at the officer or staff or saying "I'm not going to

21   do it" or sitting down refusing to move.  Those

22   kinds of things fall under the category of passive

23   resistance.  And so then they talk about it would be

24   appropriate for the officer to try to talk to the

25   person or just use their hands to try to lift the
```

1    person up and guide them where they want them to go.

2              Active resistance then is described as

3    somebody that may try to walk away from the officer

4    or hold onto a door handle or hold onto a pole and

5    do active things to keep themselves from being

6    moved, but is not considered to be a direct threat

7    to the officer for injury or death because the

8    actions are just directed at resisting being

9    restrained or resisting being moved, but not

10   aggressive or assaultive actions.

11              Then the next level would be aggressive

12   resistance where the offender is trying to punch the

13   officer or making moves consistent with those kind

14   of things, combined with other types of threat.

15   They can get into lethal or deadly-force instances

16   where they have a weapon, they are attacking

17   somebody, they're using the weapon, injuries are

18   occurring, those kinds of things.

19              So then they give examples in each of

20   those categories of the types of options in the

21   use-of-force continuum that would be appropriate for

22   responding to that type of resistance.  And if it's

23   not in a policy necessarily then where they teach

24   the policy and teach defensive tactics they give

25   examples and go over those kinds of things.  And

```
 1    they may have examples of what a reasonable officer
 2    would do when confronted with this type of
 3    situation.
 4              So I've conducted and seen other
 5    agencies do that type of thing, where they'll have
 6    simulated guns, simulated knives.  And really they
 7    talk about, well, this is a 70-year-old guy that's
 8    five-foot-three and 90 pounds who does have a knife
 9    but you're 40 feet away from them, can you use
10    deadly force?  And the answer is no, given the
11    parameters of this situation.
12              So they go over those kinds of things
13    and explain why it is or isn't, or they use video
14    from actual events and they present those to the
15    class, and they will stop it perhaps and say, "At
16    this point what's the good decision?  What are
17    acceptable decisions?"  And there's different ways
18    to put that out.
19              So the concept of the policy is tied to
20    real events with real examples to help reinforce
21    what is considered reasonable force for the types of
22    things the officers encounter on a daily basis.
23    Q.    Okay.  So you mentioned just now one
24    example of a policy that was a little more
25    structured, about what the parameters would be for
```

```
 1    different steps of escalation of force, and you also

 2    mentioned some training that just sets out scenarios

 3    where that might be put into practice.

 4              The policy that you referred to, do you

 5    know, is that typical for the use-of-force policies

 6    that are in other agencies or is there more variety?

 7         A.    There's variety.  A lot of them have

 8    that boilerplate language I call it where the phrase

 9    of using the minimum amount of force necessary to

10    regain control or protect someone from harm or

11    protect another or stop an escape -- that language

12    is in almost all use-of-force policies.  And there's

13    also the phrase that, no, you don't have to go

14    through the entire continuum step by step.  It's

15    understood.  But it's also understood that if you

16    have a person at the passive-resistance level you're

17    not going to necessarily hit them with a baton or

18    use an instrument of force that's going to cause

19    significant injury based upon their behavior that

20    you're confronted with.

21         Q.    And you say that that's understood.

22    Does that mean that it's there in the face of the

23    policy?

24         A.    I can't say that -- to that specific

25    example that I gave it's in the face of the
```

1  policies.  No, I cannot say that.

2      Q.   Okay.  And you on that same page take

3  issue with the -- that the DOC use-of-force policy

4  doesn't speak directly to canine deployment, and you

5  compare it to the provisions in there on chemical

6  agents.  So I kind of want to talk about that

7  segment of your report here.

8          Now, first, there is a separate policy

9  that VDOC uses for use of canines, correct?

10     A.   There is.

11     Q.   And that policy incorporates the general

12 use-of-force principles into it; is that fair to

13 say?

14     A.   I have to look back at that canine

15 policy.

16          I'll say yes without reviewing it for

17 the moment --

18     Q.   Okay.

19     A.   -- the general use-of-force principles.

20     Q.   Now, the excerpt that you have from the

21 policy about -- here where it refers to the use of

22 OC spray -- these provisions in here -- just to be

23 clear, it looks like these were amended and added

24 after the incident with Mr. Johnson, correct?

25     A.   That may be correct.  I think I received

74

```
 1     different versions of the policy, revised or not.
 2     So if this comes from a later version, understood.
 3          Q.    Sure.  So just looking at -- you know,
 4     at the direct quote in here, it says there in
 5     parentheses changed May 1st, '21.
 6          A.    Yes.
 7          Q.    And that is -- I'll just -- I'll
 8     withdraw that question.
 9               Let me ask you, do you believe that the
10     use of OC spray in this incident was appropriate?
11          A.    Yes.
12          Q.    Okay.  Now, the policy here contemplates
13     at least some circumstances where there would be a
14     need for prior authorization before using OC spray,
15     correct?
16          A.    Correct.
17          Q.    Was there prior authorization here?
18          A.    Not that I'm aware of.
19          Q.    So the exception to the need for
20     authorization and this language here on page 15
21     states, "Except when there is immediate danger of
22     physical violence toward other persons by an
23     offender inmate or probationer/parolee..."
24               Would you -- given that you had
25     testified that you believe the use of OC was
```

1    appropriate in this instance, would you believe at

2    the time it was used there was an immediate danger

3    of physical violence that justified the use of it?

4         A.    I do.

5         Q.    Okay.  Now, the policy language here on

6    chemical agents also includes some provisions about

7    pre-clearing for medical conditions; is that

8    correct?

9         A.    That's correct.

10        Q.    And it states in there that you check

11   for medical restrictions if time permits, correct?

12        A.    Correct.

13        Q.    So in an ongoing-fight situation would

14   that be something that would permit time to do such

15   a review?

16        A.    The key word there is "ongoing," an

17   active fight.  So time did not permit for a medical

18   check, or contraindications as it's referred to,

19   when Mr. Guy attacked Mr. Johnson, while Mr. Johnson

20   was defending himself or engaging in a fight.  They

21   didn't have time to call the medical department.  I

22   understand that.  And those are common practices in

23   the correctional industry, and it's also common

24   practice to add these types of precautions

25   associated with tasers, associated with electronic

1    immobilization devices, or chemical agents.  So --

2         Q.    And what would be the reason for

3    reviewing for contraindications, for checking for --

4    for a medical condition?

5         A.    Because if that use-of-force option

6    creates a serious medical concern, then the security

7    staff have to try to figure out a different option

8    to control the situation or deal with an offender

9    when possible.

10        Q.    So, to your knowledge, what sorts of

11   medical conditions might, you know, exacerbate the

12   concern from using chemical agents or from using

13   electronic equipment?

14        A.    It could be seizures.  It could be

15   asthma.  It could be heart conditions.  You know,

16   it's never been my job to know and determine all the

17   medical conditions that are contraindications.

18   That's what the medical staff are there for.  It's

19   their job just to tell the security staff, "We don't

20   support the use of that option; figure out a

21   different option" or "These are the types of options

22   that don't present a medical contraindication."

23        Q.    Now, would there be any sort of similar

24   preexisting medical condition that would exacerbate

25   the effect of a dog bite in a way similar to the

```
 1    ones that you just explained here could exacerbate
 2    the effect of chemicals or a taser?
 3         A.    Again, I'm not a doctor or a nurse, and
 4    I would defer to them.  As a layman, I would think
 5    folks with heart conditions or trauma issues that --
 6    or mental health issues, their inability to
 7    understand what's going on, could escalate the
 8    situation.  So given those considerations that a
 9    licensed professional might make, I could see where
10    they could say a dog is contraindicated.
11         Q.    Okay.  Now, on subsection (g), which
12    also includes some language highlighted there, that
13    states, "In a contained area to compel an offender
14    inmate or a probationer/parolee to comply with
15    direct orders when no alternative method of
16    persuasion is effective and other types of force are
17    deemed not appropriate."
18              So that requirement there by the
19    language of this provision applies in the instance
20    of a closed area, correct?
21         A.    I'm sorry.  I was trying to find that
22    section.  What page are you on?
23         Q.    Page 16.
24         A.    16.  Okay.  I was looking for a large G
25    instead of a small G.
```

```
 1                   Okay.  What was your question?
 2        Q.    That subsection there applies in the
 3   instance of a contained area; is that correct?
 4        A.    Yes, for item (g).
 5        Q.    And would that be distinct from a
 6   situation that we saw here, a fight on a pod floor
 7   with other inmates and officers in the vicinity?
 8        A.    I'm sorry.  I was reading and not
 9   listening.
10        Q.    Sure.  Would you consider that distinct
11   from the situation that we had here in this case?
12        A.    For this particular subsection, yes,
13   it's different.
14        Q.    Okay.
15        A.    It's distinct.
16        Q.    It also refers to -- another section you
17   highlighted talks about "Repeated use of chemical
18   agents within a short period" not being permitted;
19   "A pause between each application is necessary to
20   allow the chemical agents to take effect and to
21   determine if the offender inmate or
22   probationer/parolee is compliant."
23                   So, in your experience, does OC spray
24   have a delayed onset of effect?
25        A.    It can.
```

79

```
 1          Q.    Okay.

 2          A.    Yes.

 3          Q.    Does a dog bite?

 4          A.    I think a dog bite has an instantaneous

 5     effect.

 6          Q.    Okay.  I'm turning to page 17 now.  At

 7     the end of the first paragraph you refer to the

 8     testimony of VDOC's 30(b)(6) designee testifying

 9     that "...nothing in the operating procedures

10     required patrol canine officers to use other forms

11     of less lethal force before utilizing their

12     canines."  Do you see that --

13          A.    Okay.  Yes.

14          Q.    -- right there?

15          A.    Yes.  Yes.

16          Q.    Okay.

17          A.    Yes.

18          Q.    And you testified a moment ago that a

19     use-of-force policy that incorporates a continuum of

20     force -- I believe you stated that most of those

21     policies would permit an officer to escalate to a

22     higher level of force if circumstances required

23     that.

24          A.    Yes.

25                MR. DAVIS:  Okay.  I'm going to share
```

```
 1    now.  This is the 30(b)(6) deposition transcript.

 2    Madam Court Reporter, I'd like to make this

 3    Defendants' Number 1, 2, 3, 4, 5, 6, 7 -- 8.

 4              (Defendants' Exhibit 8 was marked for

 5               identification.)

 6    BY MR. DAVIS:

 7         Q.   Can you read this okay, Mr. Hurley?

 8         A.   You might want to enlarge it just a

 9    little bit for me, please.

10              Okay.  Thank you.

11         Q.   Okay (scrolling).

12         A.   You might have to scroll back up.  I'm

13    sorry.

14         Q.   (Scrolling.)

15         A.   That's okay.

16         Q.   And so the designee does testify here

17    that the operating procedure does not expressly

18    state that canine officers are required to use other

19    forms of less lethal force before using the canine.

20    However, do you see immediately before that he

21    states, "...if you become a canine officer, you get

22    trained on how to use your dog, which would be the

23    last resort"?

24         A.   I'm sorry.  If you could point that out

25    for me.
```

1        Q.      (Indicating.)

2        A.      Okay.  Okay.

3        Q.      So then would you consider that training

4    then as instructing the canine handlers that -- that

5    the dog is higher up in the continuum?

6        A.      I might if the training materials or

7    curriculum had any details or points where they

8    could demonstrate they taught the things that he

9    just mentioned, or if their canine handlers in their

10   deposition testimony could articulate that, or there

11   was documentation of any scenarios they conducted to

12   demonstrate that, but I didn't find any of those

13   details or evidence to corroborate or validate his

14   statement in this deposition.

15       Q.      I'm looking now at your statement here

16   at the end of the next paragraph where you stated,

17   "In no arena is a person in retreat considered to be

18   posing an immediate threat and yet the VDOC Use of

19   Force Policy allowed for this action because it was

20   silent regarding any precautions, restrictions or

21   controls for this very high level use of force."

22            So from your review of the evidence, did

23   Officer McCowan indicate either in his reports or in

24   his testimony that he, in fact, perceived

25   Mr. Johnson to be retreating?

82

```
 1           A.    No.  I did not see that he indicated
 2    that he perceived retreat.
 3           Q.    So would a -- how would a more
 4    structured continuum of force or the other policy
 5    restrictions you talk about here -- how would that
 6    have caused Officer McCowan to have perceived what
 7    Mr. Johnson was doing any differently?
 8                 MR. JOHNSON:  Object to form.  You can
 9    answer if you have any idea, Mr. Hurley.
10           A.    I will answer the best I can with the
11    way I think I understand the question, or I'll refer
12    to my experience or training or training I've
13    witnessed.
14                 And I think this comes out of the
15    rebuttal report.  I didn't see any evidence of
16    teaching the canine handlers or officers to
17    understand human behavior that could be interpreted
18    in various ways so that when you see things you have
19    a broader range of interpretation.  Some it could be
20    a threat and some it's a sign of deescalation or
21    natural reaction to things, natural reaction to a
22    predator.  And that's why I focused on the flight,
23    fight or freeze response, which is the normal
24    behavior not consistent with the training.  It's
25    just any normal human being is going to do certain
```

1    things when they face a significant threat.

2              So when you have that type of threat

3    attached to your side through a leash and you're

4    responsible for using that force it's incumbent upon

5    the agency to talk about natural responses of humans

6    beings and their behaviors which may not constitute

7    a threat, and to take into consideration when

8    they're observing the behavior, where they enter

9    into a situation.  And there is no evidence that

10   that was taught.  And the national standards that

11   the defense expert referenced brought out that

12   cognitive bias was a key component of canine

13   training, and I didn't find any evidence of that.

14   And that goes directly to this incident, in my

15   opinion.

16   BY MR. DAVIS:

17        Q.   Okay.  I think we'll be getting to that

18   section of your report relatively soon.

19              There are a couple other statements here

20   I wanted to ask you about in the next section here,

21   being VI, VDOC's Canine Policies Fail To Take Into

22   Consideration Other Challenges To Controlling

23   Actions And Reactions In Canine Deployments, here on

24   page 17.

25        A.   Okay.

1      Q.    In the first subsection here you discuss

2    K-9 unpredictability, and that includes an excerpt

3    here in reference to the Nunez case.

4              Was there a point that you found in your

5    review of the evidence that the canine acted in this

6    instance unpredictably or was outside of Officer

7    McCowan's control?

8      A.    I did not.

9      Q.    Okay.  And you include an excerpt from

10   DOC's training curriculum on the following page,

11   here on page 18.  Would you acknowledge that DOC

12   training recognizes the issue of canine

13   unpredictability?

14     A.    Yes.  That's my actual statement.

15     Q.    On page 20 you discuss how Officer

16   McCowan had been bitten by the first canine that was

17   assigned to him.  He testified that after he had

18   been bitten by his first dog he was no longer

19   assigned to that dog, correct?

20     A.    Correct.

21     Q.    Okay.  And so then he began training on

22   the next dog, which was the one that was involved in

23   this incident with Mr. Johnson, correct?

24     A.    Correct.

25     Q.    Did you see any evidence that that dog,

1    Shadow, ever bit Officer McCowan or somebody else

2    who he had not been directed to bite?

3        A.    I did not.

4        Q.    All right.  You state that, "K-9

5    unpredictability and uncontrollability should be

6    incorporated into the VDOC Use of Force policy."

7              In what way would that be incorporated?

8        A.    Well, I think to emphasize the risk

9    associated with canines in a facility, that other

10   staff could be bitten, offenders could be bitten

11   unintentionally, and, therefore, extreme caution

12   must be exercised where you take these canines and

13   how you use them and into what situations you go.

14       Q.    From your review of the evidence are

15   VDOC canine handlers and the dogs themselves trained

16   in obedience to reduce the likelihood of an

17   accidental bite?

18       A.    It was in the training curriculum.

19   Again, there was a lot of detail about that.  There

20   is detail about training the dog, what actions they

21   would take to teach the canine proper behavior,

22   whether it was sit and hold, how to respond to

23   someone who had surrendered, those kinds of things.

24   There wasn't a lot -- there was some discussion

25   about teaching handlers or a discussion of how much

```
1   correction to give at times, harsh correction, harsh
2   voice, tug on the lead, those kinds of things.  So,
3   yes, there was some documentation of obedience
4   training.
5         Q.    And then you also note in here that --
6   you say the canine training prohibits the repeated
7   applications of force.
8               And then you include an excerpt from the
9   training manual, and that states not to continue
10  with the application of force and -- if it's working
11  and not use the dog multiple times when the
12  pain-compliance force has not worked to that point.
13              Are you offering the opinion that
14  Officer McCowan did not comply with his training?
15        A.    Based upon comments from Mr. Burwell and
16  my training, the exposure to different types of
17  things such as painful-bites techniques, where --
18  yes, we were trained that, okay, if you continue to
19  apply a pain-compliance technique beyond a certain
20  point you're actually escalating the use-of-force
21  event and you could cause the offender to become
22  aggressive when they, in fact, were not, they're
23  just responding to the pain.
24              So given that the continuation -- this
25  was at least the second or third bite upon
```

```
 1    Mr. Johnson, as I understand it.  He had several
 2    injuries to the forearm and the wrist and he was on
 3    the ground.  He was in a compliant position.  So the
 4    need to continue that -- first, the bite wasn't
 5    necessary.  Second, the need to continue was not
 6    necessary.  And it lasted much longer than, you
 7    know, a short application of pain compliance.
 8         Q.    So I want to unpack a little bit what
 9    you just said.
10              You stated that you understood this to
11    be the second or third bite on Mr. Johnson.  What
12    evidence are you relying on to inform your opinion
13    that he was bitten multiple times?
14         A.    One, the medical report.  I did look at
15    that over the lunch break.  I looked at the photos
16    of the injuries.  And I reviewed the video again.
17    And it looks like when K-9 Shadow approaches
18    Mr. Johnson in the area where they're going to go to
19    the ground, Mr. Johnson testified that he gave the
20    dog his arm because he didn't want to get bitten in
21    the face.  And it looks like the dog does grab Mr.
22    Johnson by the forearm.  And that appears to be
23    consistent with McCowan's testimony and the defense
24    expert's review of the video that the dog has
25    Mr. Johnson by the arm and they go to the ground.
```

1    It looks like the dog switches position, you know,

2    it's not totally clear from the video, but maybe

3    closer to the wrist or hands than the forearm area.

4    So it appears from the photos that he's got bite

5    marks in several areas on his arm.  And then the

6    duration.

7         Q.   I'd like to -- give me just a second

8    here.

9         A.   While you're doing that can I give you a

10   specific page that I looked at from the medical

11   documentation?

12        Q.   Sure.

13        A.   That would be Johnson 582000102.  So

14   that's at 582000102.

15             MR. DAVIS:  And I'll have to -- I don't

16   have that document prepared at the moment, so we may

17   want to go back to that at a later time today.

18             I do have the photos here and I'd like

19   to take a look at those.

20             THE DEPONENT:  Sure.

21             (Defendants' Exhibit 9 was marked for

22              identification.)

23   BY MR. DAVIS:

24        Q.   Now, Mr. Hurley, are you offering an

25   opinion from your review of the photos or the

1    medical records based on any kind of expertise in

2    identifying bite marks?

3         A.    No, I'm not offering that, but the

4    medical notes indicate that they're from a dog bite

5    or dog encounter.  As a matter of fact, Johnson in

6    582000100 -- 582000100, at the top of that note

7    says, "Refer to dog bite QUD chart."

8              So this appears to me that this is in

9    his medical file associated with what I believe to

10   be the emergency room.  This is for May 2nd, 2020.

11             I'm sorry.  Bear with me.

12        Q.    That's okay.  I need to get this pulled

13   up myself.  I will take this off the screen share.

14        A.    Sure.

15             Yeah.  That was from Norton Community

16   Hospital.  N-O-R-T-O-N Community Hospital.

17        Q.    Okay.  And so while I am pulling up the

18   medical record here I would like to go back to the

19   photos.

20        A.    Sure.

21             MR. DAVIS:  Madam Court Reporter, can we

22   make this our Number 10?

23             (Defendants' Exhibit 10 was marked for

24             identification.)

25

 1    BY MR. DAVIS:

 2         Q.    Is there anything that you identify in

 3    this photo as indicating that there were multiple

 4    bites?

 5         A.    Not from the photo, but, again, from the

 6    photos associated with the medical records.  So --

 7    and I'm sorry -- Johnson 582000003.  And I believe

 8    this is probably the facility nurse note prior to

 9    sending him to the community hospital.  "Offender

10    brought to medical due to altercation.  Lacerations

11    x 3 to right lower arm/wrist..."

12              I can't quite make that out.

13              "Multiple puncture sites to right lower

14    arm/wrist.  Laceration to left side forehead at

15    hairline.  OC utilized.

16              "All lacerations and punctures cleaned.

17    Offender will be sent to Emergency Room for repair

18    of lacerations.  Dressings applied to wounds to

19    control bleeding.  Reddened area across low back."

20              So based upon the facility

21    documentation, based upon the emergency room

22    documentation, combined with the photos, I'm using

23    their medical assessments to say there were multiple

24    locations.

25         Q.    Okay.  Is this the document you're

1    referring to here?

2         A.    It appears to be, yes.

3         Q.    Okay.  And I still need to -- let me

4    stop the screen share a moment.

5              I can't seem to combine these, so we'll

6    just take a look at the other Bates page that you

7    referred to.  This is Bates page 100 from the

8    medical records from the hospital chart that you

9    were discussing earlier.

10        A.    Yes.

11        Q.    Okay.  And what's the portion of this

12   that you referred to for...

13        A.    I'm going to look at my document.  I

14   made several references, so it's probably not that

15   particular Bates number.  Let me get that for you.

16   That will be the Bates number ending in 102.

17        Q.    Okay.  That's just a few pages down.  Is

18   it this?

19        A.    Yes.

20        Q.    Okay.  So from the documents that you

21   reviewed and the video can you tell whether Officer

22   McCowan gave an additional command for the dog to

23   bite as opposed to the dog adjusting its grip?

24        A.    I cannot.

25        Q.    Okay.  And Officer McCowan had testified

1    that he released the dog from Johnson to avoid

2    further harm to him even though he stated that

3    Johnson had not complied with his order to remove

4    his left hand, correct?

5         A.    That's what he testified to, yes.

6         Q.    Okay.  I'm moving on now to subsection

7    B, which is called Natural Responses and Failures To

8    Recognize It.  So regarding the citation here, the

9    first excerpt in footnote 34, this is -- it appears

10   to be an article from a website Medical News Today.

11   Along with it it has the URL for a video.  Do you

12   see that?

13        A.    Yes.

14        Q.    Do you know if that article is from a

15   peer-reviewed journal?

16        A.    I do not.

17        Q.    Do you know if this is an accepted view

18   in the community of people with the relevant

19   specialty here, I would guess psychologists or

20   psychiatrists?

21             MR. JOHNSON:  Object to form.  Mr.

22   Hurley, you can answer if you know.

23        A.    I don't know the answer to that

24   question.

25             What I do know is my next reference is

1  to a clip from Psychology Today, which has been in

2  existence from my understanding for a long time, and

3  it's consistent with the material contained in the

4  VADOC basic correctional officer training.  They do

5  have a fairly extensive section detailed about

6  fight-or-flight responses.  I think I referenced

7  that, but perhaps not, in this report.  Maybe that

8  was in the Garrett report.

9           But contained within the basic officer

10  training curriculum VADOC has a fairly extensive

11  section on fight-or-flight responses, which aligns

12  with these two citations that I made.  I'm not sure

13  that I could pull that up at the moment, but I know

14  that I saw that.

15  BY MR. DAVIS:

16     Q.    So you understand that to be a part of

17  the basic officer training?

18     A.    Yes.  Correct.

19     Q.    Okay.  Now, are you offering any

20  testimony here regarding the fight-or-flight-or-

21  freeze response based on your own experience in

22  psychology or a related field?

23     A.    No.  And I don't hold myself out to be a

24  psychologist --

25     Q.    Okay.

94

1          A.     -- but I can rely upon my training or

2     research and, in fact, I incorporated the flight or

3     fight -- flight-or-fight response or freeze response

4     in the training that I developed for the Ohio

5     Department of Youth Services related to being in

6     compliance with a consent judgment in use-of-force

7     matters.  And I referenced other sources to get the

8     foundation for some of that.

9          Q.     There is another excerpt then that

10    begins on page 23 and continues into page 24.  This

11    is from Dr. Homer Venters, the report states,

12    "Former Medical Director for the New York City

13    Department of Corrections."

14              Would you tell me what the relevance of

15    that excerpt is to this case?

16         A.     He talks about dual loyalty, and he

17    explains that -- how medical staff can fail to

18    follow their charge, I guess, or see offenders as

19    their patients and respond to their reactions and

20    behaviors as patients and/or witness use-of-force

21    events which have fatal results where those staff

22    fail to recognize that a person is in medical duress

23    because they'd become tainted, that's my word, or

24    jaded, for lack of a better word.  So they fail to

25    recognize natural human responses.

1        So this is another way of supporting my

2   contention that you have to be able to recognize

3   normal reactions to certain things because it can

4   result in a use-of-force death when you fail to

5   recognize those things.

6        I think that's also true in the

7   corrections industry in general.  Many times inmates

8   no longer have a luxury of being viewed as having

9   normal human reactions.  There is a tendency to

10  interpret everything they do as resistance, threat,

11  or aggression.  So those reactions that any of us

12  would have are not recognized or only interpreted in

13  one way, which then can result in serious injury,

14  excessive force, or in-custody death.  It can happen

15  to the medical staff and it can happen to the

16  corrections staff.

17        And I believe it happened in this case

18  because there was no training to recognize the

19  natural reaction to a predatory canine ready to bite

20  or given the command to bite.

21        Q.    And after that excerpt you discuss the

22  need for officers to be trained on fight, flight or

23  freeze.  How is a correctional officer supposed to

24  distinguish a fight-flight-or-freeze reaction from

25  something that is genuinely threatening?

1          A.    Part of that comes through training

2     and --

3          Q.    What -- I'm sorry.  Go ahead, sir.

4          A.    So I already mentioned that you may use

5     existing material, events, incidents, videos where

6     somebody can assess what happened and say, "Okay.

7     Here's a reaction.  Here's what this inmate is

8     doing.  So let's go over this or let's run you

9     through some scenarios to test that."

10              Because if you never discuss it, if you

11    never provide any examples, once again you don't

12    deal with cognitive bias.  And the only way to deal

13    with cognitive bias is to include it in your

14    training.  That's why that national standard talked

15    about cognitive bias.  But I didn't find any

16    evidence that the VADOC canine training curriculum

17    did deal with cognitive bias or documented that they

18    ever had.

19         Q.    Now, at least on part of this reaction

20    that you discussed here, flight, fight or freeze,

21    the first of those reactions being fight, correct?

22         A.    (No response.)

23         Q.    I mean irrespective of the inmate's

24    intentions, whether it's a natural reaction or

25    whether it's something premeditated, if an inmate

1    has a fight response to something isn't that still a

2    security concern that would require a response?

3          A.    It can, but it doesn't mean that it

4    requires a significant-injury type of response.  So

5    let me explain it this way:  Lots of times people

6    think of fight and flight as a great big response.

7    So I'm going to punch you and knock you out type of

8    fight response.  Well, there's very subtle types of

9    things that represent fight response.  For instance,

10   if a fly lands on my forehead or a mosquito bites

11   me, as most people do I'd probably slap that

12   mosquito or brush that fly off.  That's a very minor

13   form of a fight response.  It doesn't fall into this

14   triggering all these emotions and everything, but

15   it's just a normal reaction.

16              He just came out of a fight.  He -- as I

17   explained in my rebuttal report, he doesn't know

18   necessarily who all is still around him or is a

19   potential adversary.  So when he comes up, as

20   Officer Mullins pulled him up, it's a neural

21   response for him possibly to still be in

22   self-defense mode.  It doesn't mean that he intends

23   to attack the officer, it doesn't mean that he's

24   going to hurt anybody else, but he's still in that

25   fight-or-flight response.

1            Recognizing that, as I said in my

2    rebuttal report, many officers would announce

3    themselves and break that concentration and that

4    response to let him know I'm the staff, I'm not an

5    adversary, I'm not a threat, to help break -- break

6    that fight-or-flight response that he's in.  The

7    other piece of that is, I'm sorry, if I came up off

8    the ground and turned and saw a canine who was ready

9    to lunge at me, that also might be a natural

10   response for self-preservation and protection.

11            So you can have those reactions, but it

12   doesn't mean that you're a threat to the officer.

13        Q.    And aside from the positioning of his

14   hand and his fist you also talk about Johnson making

15   an effort to get the dog to stop biting, how that

16   would have been a natural response, and how Officer

17   McCowan should have recognized that response.

18            What behaviors did you observe Johnson

19   engaging in while he was being bitten that's

20   consistent with him attempting to get the dog to

21   stop biting?

22        A.    It appeared to me that when he was on

23   the ground face down with Shadow engaged on his hand

24   or forearm or something, that the free hand may have

25   been up either pushing on the dog's face or trying

1    to protect his hand or protect his head or some such

2    motion.  The video is from a distance that I cannot

3    be certain exactly what Mr. Johnson was doing.  It

4    did not appear to be aggressive or, quote, fighting

5    the dog.  It appeared to be a behavior that would be

6    consistent with fight or flight, trying to remove

7    the dog.

8         Q.    So your testimony is the reaction is

9    what he's doing with the free hand?

10        A.    From what I can see.  And that would be

11   consistent with Mr. Burwell's report talking about

12   the natural reaction of people to struggle against

13   the bite or try to get away from the bite.

14        Q.    I'd like to move on now to here on page

15   25, the next section, which is Failure Concerning

16   Warnings.

17             You discuss the bark-and-hold practice

18   included in an excerpt there.  To your knowledge, is

19   the bark-and-hold practice applicable in a

20   correctional setting?

21        A.    Not necessarily as defined by searching

22   a building, and that's what my understanding is from

23   these articles, they were talking about when they

24   reference bark and hold.  But the concept still

25   applies, and Mr. Burwell referred to that, that

1   Mr. McCowan could have just had his canine bark

2   while Mr. McCowan had the canine in a hold type of

3   command.  So Johnson is standing in front of him,

4   the canine is still barking but realizes it's not

5   been given the command to bite, so creating a

6   barrier between McCowan and Johnson as a way to

7   contain the situation, evaluate, and start dialogue.

8          Q.    Do you know if that's something that

9   would be incorporated into bark-and-hold training is

10  to use the dog in that manner during a fight

11  situation as compared to a search context?

12         A.    I do not, but from the canine handlers

13  I've had experience with it's my understanding they

14  all have that ability, to use their canines to hold

15  a suspect at bay or subject in a position in front

16  of them where they can contain the situation.

17         Q.    And the canine handlers you're referring

18  to, are those police dogs or are those in

19  corrections?

20         A.    They were associated with the highway

21  patrol, the Ohio State Highway Patrol.  One of those

22  handlers that I referenced in my report was a

23  corrections officer, but he also served as a county

24  sheriff's deputy.  So his canine was his county

25  sheriff's deputy's canine, but he also brought it in

1    for corrections work.

2         Q.    Okay.  Would that dog not have been

3    trained for patrol use similar to the VDOC dogs

4    we've been talking about here or would that dog have

5    been trained in more of a search-and-apprehension

6    method like a police dog?

7         A.    He did use the dog in the county jail

8    where he worked.  I don't know the extent of all

9    that, but he also used it for search and

10   apprehension.

11        Q.    Do you know whether bark-and-hold dogs

12   bite more or less often than bite-and-hold dogs?

13        A.    From what I found from research it was

14   about the same, as I recall.

15        Q.    And what was your source for that

16   information?

17        A.    Probably one of those that are listed in

18   my footnotes, but I'd have to go back and look.  I

19   didn't put that in the report, I don't believe.

20        Q.    Okay.

21        A.    And that's as I can recall.

22        Q.    Now, here on page 26 you include an

23   excerpt from the training curriculum.  And the VDOC

24   training, according to this excerpt, requires the

25   canine handlers to give warnings; is that correct?

1        A.     That's correct.

2        Q.     When you say whether it was realistic

3    for Mr. Johnson to hear, understand, and

4    instantaneously respond to warnings given by Officer

5    McCowan, can you state or affirm from your

6    experience or from the sources that you have

7    researched if there is a sort of a standard reaction

8    time?

9        A.     I can't cite a source that gives a

10   standard reaction time.

11       Q.     Okay.

12       A.     But I think that the training and

13   testimony goes to giving them a reasonable chance to

14   respond to the command.  And I know Mr. Burwell

15   spoke to that too.

16              I would hope that if I were coming up

17   out of a situation where I had to defend myself, and

18   Mr. Johnson did because Guy had the upper hand and

19   was really pounding on him for the first part of

20   that fight, that I would need a little time, more

21   than a second or two, to get my faculties, take in

22   what was around me, understand what I was being

23   asked to do, and the chance to comply to it.

24              And Officer McCowan had dispatched K-9

25   Shadow on Mr. Johnson in approximately two seconds.

 1   And you may be able to give multiple commands in two

 2   seconds, but there's no time in between each of

 3   those commands to expect a person to -- a normal

 4   human being to have a reasonable time to respond to

 5   that.  Plus, I'm sorry, if you have an

 6   attack-trained canine at your side, telling me to

 7   get on the ground and expose my body with my face

 8   down to a canine that's very likely going to bite me

 9   and hurt me, I'm going to hesitate to do that.  I

10   really am.  And I think that's natural.

11        Q.   I'm moving on to the next section,

12   Failure Concerning Excessive Force.  We're still

13   here on page 26.

14        A.   Okay.

15        Q.   You state that, "According to the VDOC's

16   Statewide Canine Coordinator" and it appears your --

17   actually, there is not a footnote there.

18        A.   Correct.

19        Q.   You state, "...the K-9 Handlers were not

20   trained regarding excessive force issues, except

21   that perhaps using a K-9 in a cell extraction event

22   might lead to excessive force."

23             Do you happen to recall where in his

24   deposition transcript this might be?

25        A.   I would have to go back and look.  And I

```
 1   apologize.  There were two different coordinators
 2   from my understanding.  And I'll say their names
 3   incorrectly, but I believe the first one was -- is
 4   it Bernocco, something like that?
 5        Q.    Yes.  And so that's the -- that was the
 6   30(b)(6) designee.
 7        A.    Then the second one was a sergeant.  And
 8   I apologize for not having that reference there.  I
 9   would have to find it.
10        Q.    Let me pull up Major Bernocco's
11   transcript here.
12        A.    Okay.  I'll try to find it myself.
13        Q.    And I'll zoom in a little bit for you.
14   Is this what you're referring to here?
15        A.    If you could just scroll up a little bit
16   and let me see what was asked before that or where
17   they're at.  I'm just seeing an answer.
18        Q.    So I'm referring to your portion of the
19   report in here that states that the Statewide Canine
20   Coordinator testified that K-9 handlers were not
21   trained regarding excessive-force issues.
22        A.    Okay.
23        Q.    And I did want to focus on this
24   testimony here where it appears that Major Bernocco,
25   the current statewide canine coordinator, states
```

```
 1    here -- and I believe this might be the section

 2    you're referring to.

 3         A.    Okay.  It could be.  At least it matches

 4    with that topic.

 5         Q.    Now, it appears that in the same answer

 6    he states that they train to use appropriate force

 7    needed at the time of the incident or situation at

 8    hand and we always train to use the least amount of

 9    force.

10              Is that -- would that be consistent with

11    training on the issue of excessive force?

12         A.    Not necessarily.  And if you pull the

13    page back up, he goes on to say that, "We don't

14    train on excessive force."  Can we go back to that

15    page?

16              So here are my concerns:  You need to

17    have some training so staff can recognize and can

18    understand what types of things constitute

19    unnecessary excessive force.  And when I looked at

20    the VADOC use-of-force policy or training materials,

21    in their definitions of excessive force they use the

22    term "excessive force".  Well, it's hard to define a

23    term when you use the term to make the definition.

24    Excessive force is when you use excessive force.

25    Well, that's not guidance.  How does a person know
```

```
 1   what constitutes excessive force if the definition
 2   uses the same term?  There's no clarification there.
 3        Q.    Understood.
 4              Your following testimony on page 27
 5   about scenario-based training and the requirement
 6   for detailed scenario guides -- are there any
 7   industry standards that you're referring to for
 8   that?
 9        A.    No.  I can't speak to industry
10   standards.
11              When I worked for the Ohio Department of
12   Corrections those were some of the requirements that
13   our training academy required us to live by, so to
14   speak.  Also when I worked for the Department of
15   Youth Services as a consultant again the training
16   department required that level of detail to approve
17   the lesson plan.  And then just from experience from
18   running scenarios that if you don't have guidance
19   from the instructors scenarios can get out of hand
20   and people can get hurt, the instructors, the
21   students, those kind of things.
22              And so you have to have good controls on
23   the speed at which you're going to go and when
24   you're going to go that speed what the role player
25   may do so it matches with the skills that have been
```

1    taught up to that point, and safe words so you can

2    stop a scenario if it gets into the realm of where

3    somebody has been hurt, and that everybody

4    understands those safe words, and basically why

5    you're conducting the scenario, what you expect to

6    get out of that, what the objectives are, what you

7    expect the students to take away, how you're going

8    to recap those points, the important ones that match

9    the training material at that stage of the lesson

10   plan.  So without those things it's just all over

11   the map and you have no quality control and you

12   can't verify what was done.

13              And, in fact, one of the sergeants,

14   which I think was a statewide canine coordinator --

15   he was asked, "Do you know if the person you

16   supervised was taught some of these things?"

17              He said, "Unless I taught them, I don't

18   know."

19              So he verified the concern that I have,

20   when you don't have those types of details even the

21   instructors don't know what other instructors

22   taught.

23        Q.    On that same page you discuss Officer

24   McCowan's testimony that they're trained to stop

25   using force when the threat has ceased, and you

1   state that that is not the correct standard for

2   excessive force.

3              What in your experience is the correct

4   standard for excessive force?

5        A.    What page are we on?

6        Q.    I think that is on 27.

7        A.    Okay.  Sorry.

8              Okay.  I see that.  And I may not have

9   included a reference to their -- the handlers'

10  collective understanding of what constitutes threat.

11             They were equating failure to fully

12  comply, from their testimony, as the threat

13  remaining.  And there were variations of what full

14  compliance meant.  Some of the testimony indicated

15  that if they weren't in full compliance they could

16  still be considered a threat.

17             So my concern was with their

18  understanding and definition of threat as being not

19  in full compliance, so, therefore, you have the

20  passive or no resistance but in noncompliance as

21  being considered a threat.  So my concerns were with

22  their definitions and classification of threat.

23        Q.    You next include an excerpt from

24  Mr. Burwell on page 27 and going into 28.  Are you

25  adopting that as part of your opinion?

1           A.      Yes.

2           Q.      Do you have experience with the

3     prey-drive behavior in dogs?

4           A.      I do not.

5           Q.      Okay.  Do you have experience with the

6     reaction -- seen the reactions of a person being bit

7     by a dog?

8           A.      No, not directly, but from research and

9     watching the videos, and I can rely upon other

10    experts, which I've done in this case --

11          Q.      Uh-huh.

12          A.      -- and trust his expertise and his

13    experience, which is extensive.

14          Q.      Turning now to page 28.  This is section

15    VII here.  It's False Narratives And False

16    Justifications.

17                  This includes an excerpt from one of the

18    -- it appears to be one of the monitor's reports

19    from the Nunez case.  And you put some language in

20    there that talks about ostensibly lawful

21    applications of physical force to mask the

22    intentional infliction of punishment, retaliation or

23    reprisal on prisoners.

24                  Have you seen any evidence here that

25    Officer McCowan intended to punish or retaliate

1     against Mr. Johnson?

2          A.     No, but with the knowledge of infliction

3     of pain and injury -- you know, it's

4     disproportionate to the objective risk.  And that's

5     the rest of the quote -- or parts of the quote from

6     Mr. Martin.

7          Q.     Did you include this to speak to any

8     belief that this, in fact, was the situation here,

9     that Officer McCowan was using pretextual force as

10    an intention to punish Mr. Johnson or to retaliate

11    against him in some way?

12         A.     Not under that definition, no, but I am

13    saying it was not proportionate to the actions that

14    Mr. Johnson presented to Mr. McCowan.

15         Q.     So that if you were to draw any

16    conclusions based on this language from Nunez,

17    you're saying the basis for that would be just the

18    nature of the force incident itself?

19         A.     Well, I'll deal a little bit with the

20    pretextual part.  It appears the practice in VADOC

21    and the canine handlers -- and as I spoke to a

22    moment ago, their definition of threat is anything

23    but 100 percent in compliance of some nature, be

24    that down on the ground, hands out, palms up, or

25    some variation of that.  That appears to be their

1    testimony.  That appears to be what they did in this

2    case.

3           So that sets the stage for a very quick

4    use-of-force authorization.  And some of them also

5    testified to they thought about what they would have

6    to answer to versus doing nothing or doing

7    something.  And in their apparent definition doing

8    something means use force.  Now, does it mean stop

9    and hold?  Does it mean engage in verbal

10   deescalation?  Does it mean you step back when you

11   can, give space?  So I think from what I've seen it

12   appears that pretextually they are predisposed for a

13   very quick decision to use a high level of force.

14           MR. DAVIS:  Madam Court Reporter, I

15   noticed it seemed like you may not have gotten all

16   of that.

17   BY MR. DAVIS:

18       Q.    And, Mr. Hurley, I apologize.  It

19   sounded like you broke up a little bit there.  Did

20   that --

21       A.    Okay.  I can repeat if you need me to.

22   My internet gave me an unstable notice a second ago.

23   So did I cut out?

24       Q.    It's still a little bit shaky right now.

25       A.    Do you want me to try to call in and

```
 1   pick up the audio that way?
 2         Q.    Do we want to take maybe five minutes
 3   and see if when we come back if we've got a little
 4   bit of a better connection, and if that doesn't work
 5   we can try calling in?
 6               Yeah.  That's fine.
 7               MR. JOHNSON:  Is that okay with you,
 8   Pat?
 9               THE DEPONENT:  That's fine.
10               (Recess from 2:29 p.m. to 2:38 p.m.)
11   BY MR. DAVIS:
12         Q.    Okay.  I'm turning now to page 25.
13   After the excerpt you included there you state that,
14   "There is evidence that a false or exaggerated
15   narrative was used in this case.  Among other
16   things, the K-9 handler (Officer McCowan) claimed
17   that Mr. Johnson made an aggressive or threatening
18   move towards the officer (Officer Mullin) who had
19   used chemical agents."
20               Did the evidence you reviewed indicate
21   that this was a false statement by Officer McCowan
22   rather than his -- being his genuine perception?
23         A.    I'm sorry.  What page are you on?
24         Q.    29.
25         A.    Okay.  I thought I heard 25.
```

1        Okay.  And your question is?

2        Q.    From the evidence you reviewed did that

3   show you that the statement made by Officer McCowan

4   was false instead of being his genuine perception of

5   what was occurring?

6        A.    It doesn't match the video evidence and

7   it doesn't match the video evidence that was

8   presented to him during his deposition when he had

9   opportunities to recognize or acknowledge that

10  Mr. Johnson was stepping back.  I think it goes to

11  the -- partially to the pretextual concerns that I

12  discussed just prior to the break and some of the

13  interpretations of lack of full compliance

14  represents threat.

15         So if you're not looking for other

16  things, and if you interpret every behavior as a

17  threat, that leads to exaggerated claims where your

18  world only perceives actions in one way.

19       Q.    Did you review reports of any other bite

20  incident by Officer McCowan that you believe to be

21  false?

22       A.    I don't believe I did.  I guess what I'm

23  trying to say here is that I believe the canine

24  handlers are predisposed to interpret many behaviors

25  as a threat.

1      Q.    I understand.

2      A.    But --

3      Q.    I'm sorry to cut you off, sir.  I'll let

4  you go ahead.

5      A.    -- which in the experiences that I've

6  had, experience directly with officers myself, in

7  use-of-force events I've monitored, I'm not seeing

8  officers react the same way to the same situation

9  under the same circumstances.  Their perceptions

10  would be different because they have been trained in

11  the use other techniques so it would not necessarily

12  have drawn the same conclusions.  They would have

13  seen it for what it was.

14      Q.    So I'll ask the same question regarding

15  reports of other bite incidents.

16            Well, let me ask you, did you review any

17  reports of any other bite incidents other than this

18  one?  I won't ask you to disclose information you

19  obtained solely through the Garrett matter since I

20  understand you have a protective order in that.

21      A.    Okay.  And again they both -- I've

22  looked at information in both cases, but for me to

23  sit here and say specific to Officer McCowan I can't

24  say that in particular.  I believe I have, but, you

25  know, there's a blending for me in terms of an

1   overlap of materials.  Does that make sense?  That's

2   in one part probably where the basic correctional

3   officer training issue came into play.

4        Q.    Yeah.  And so -- well, then let me ask,

5   are there any reports from any other bite incidents

6   or any materials regarding other bite incidents by

7   DOC handlers that you have listed in the materials

8   that you reviewed for your report?

9        A.    If they were received as part of

10  Garrett, yes.  Would that make sense?  I don't know

11  how to answer that question correctly, I guess.  But

12  they -- those issues weren't relied upon for this

13  case.

14       Q.    Okay.

15       A.    But let me put it this way:  I just

16  tried to focus on this particular incident --

17       Q.    Uh-huh.

18       A.    -- and the factors of this incident.

19       Q.    Okay.  So you aren't offering any

20  opinion about any other incidents here?

21       A.    No.

22       Q.    Okay.

23       A.    Other than what I picked up from their

24  deposition testimony or the statewide coordinator

25  testimony or training curriculum information or the

 1    lack thereof.

 2              And I did want to add to one of my

 3    previous answers, if that's okay.

 4         Q.    Sure.

 5         A.    You asked me a question related to is

 6    there a national standard requiring scenario guides

 7    or instructions and those kinds of things, or a

 8    question to that effect, so --

 9         Q.    Uh-huh.

10         A.    And I talked about my experience with

11    the Ohio Department of Youth Services, part of the

12    consent judgment, one of the monitoring team members

13    was responsible for training, a person by the name

14    of David Roush, and he did review all the training.

15    I saw him at some of those training sessions.  So he

16    was one of the driving forces for the style of the

17    lesson plans, the details of the lesson plans and

18    requirements for the lesson plans.  So it was an

19    additional, I guess, requirement to comply with his

20    request to meet the training standards.

21         Q.    And which case did you say that was in?

22         A.    That was SH versus Stickrath.

23         Q.    And that -- I think you testified that

24    did not include any canine issues, correct?

25         A.    Correct.

1        Q.    Okay.

2        A.    But just going to my expectations for

3    scenario guides and the details of the scenario

4    guides, that's where my reference would come from.

5        Q.    I'm going to move on now to the next

6    section of your report.  This is Section VIII,

7    Event, beginning on page 29.

8        A.    Okay.

9        Q.    You discuss the possibility of using a

10   fight break-up technique while the fight was ongoing

11   with Mr. Johnson and Mr. Guy.  In your experience is

12   it normally the expectation for a correctional

13   officer to physically place themselves into an

14   inmate fight to attempt to break it up?

15       A.    No.  And that's not what my report is

16   implying.  In fact, we train against getting between

17   two fighters.  That's stupid.  It'll get you -- so

18   the technique that I'm referencing is applied from

19   behind the inmate, and it usually takes two people

20   to apply it to both inmates.

21            So the training does teach to separate.

22   And it is effective.  I've used it.  I've watched

23   other staff use it.  So it's one option that was

24   available here.  And the reason I say that is

25   because when Officer Mullins did pull Mr. Johnson to

1    separate him from the fight Mr. Johnson separated.

2        Q.    On page 33 you discuss that it appeared

3    that Mr. Johnson was trying to step around Officer

4    Mullins and that he appeared to be trying to

5    deescalate himself.

6            Did you gather from anything in his

7    testimony that this was what he was intending to do

8    here?

9        A.    Not on this point directly, but he did

10   testify that he had not been and would not be

11   aggressive towards the officers, that he had no

12   intention of hurting an officer.

13            Looking at the video, at his behavior

14   associated with that, that matches his testimony in

15   this case, because at that point with Officer

16   Mullins he's in direct contact with Mr. Johnson.  So

17   if there's ever an opportunity for Mr. Johnson to

18   assault an officer, to do so that it would be

19   perceived as a threat, this is the moment.  They are

20   face to face, body to body, and Mr. Johnson steps

21   away.

22       Q.    And I'm going to jump ahead to your

23   analysis here --

24       A.    Sure.

25       Q.    -- that begins on page 47.

1      A.     Okay.

2      Q.     On 47 and going into 48 you refer to the

3   30(b)(6) designee's testimony that scenario-based

4   training wasn't required; it would have varied

5   depending on who ran the session.

6            Do you recall from your review of the

7   evidence whether Officer McCowan himself testified

8   about whether he went through scenario training?

9      A.     The dog handlers or canine handlers did

10  testify that they had gone through scenario

11  training.  They made reference to that, but most of

12  those were fairly generic without any detailed

13  description of what actually was conducted during

14  that training, and there was no documentation to

15  validate (video transmission interruption)...

16            THE REPORTER:  Mr. Hurley, we lost you.

17            THE DEPONENT:  I may have to call in.

18            MR. JOHNSON:  Let's go off the record.

19            (Recess from 2:53 p.m. to 2:57 p.m.)

20            (The answer was read by the reporter.)

21  BY MR. DAVIS:

22      Q.     Mr. Hurley, on pages 49 to 50 you

23  discuss that the testimony of the two canine

24  officers along with Major Barbetto was inconsistent

25  about what they understood compliance to be:

```
 1    Officer McCowan stated that compliance meant hands
 2    out, legs crossed, complying with orders; Major
 3    Barbetto said that compliance meant hands out, palms
 4    up and not moving; and Officer Baker said that --
 5    that attempting to fight off a bite was not in
 6    compliance.
 7              How were those answers inconsistent with
 8    one another?
 9         A.   I'm sorry.  You're on page 49?
10         Q.   Going into page 50 and ending at
11    footnote 65.
12         A.   I'm going to -- and I'll answer that
13    question, but I think I need to get an adaptor for
14    my phone so I can put in a headset so I can hear the
15    questions.
16         Q.   Okay.
17         A.   I'll answer if you want before we take a
18    break, but -- I'm not trying to avoid the question,
19    but --
20              MR. DAVIS:  No.  Why don't we go back
21    off for five minutes?
22              MR. JOHNSON:  Yeah.  That's what I was
23    going to suggest.  Why don't we take a five-minute
24    break and we'll re-ask the question to him and pick
25    up from your pending question.
```

```
 1              (Recess from 2:59 p.m. to 3:06 p.m.)

 2

 3              MR. DAVIS:  Madam Court Reporter, could

 4    you please read back to Mr. Hurley the last question

 5    I asked before we went off the record?

 6              (The question was read by the reporter.)

 7              (Off-the-record discussion)

 8              THE DEPONENT:  So I'm sorry.  I don't

 9    want you to have to ask the question again, but I

10    heard you say they seemed similar to you, so why am

11    I saying there's differences.  In essence, that's

12    how I recall the question.

13    BY MR. DAVIS:

14         Q.    That's the gist of it, yes, sir.

15         A.    Okay.  So each definition is slightly

16    different on what position the inmate has to be in

17    to achieve compliance or be considered in compliance

18    in reference to different things.

19              You know, legs crossed, both hands out?

20    I don't recall seeing inmates on the ground in this

21    video with legs crossed.  So I'm not sure when and

22    exactly how.  Is that a kneeling position with your

23    legs crossed as I described earlier or face down

24    legs crossed?  Is that only in one person's

25    definition?  You know, when is the
```

 1    surrender-compliant position is what I'm trying to

 2    get at.  And if there's differences among the

 3    handlers, then how are inmates supposed to know

 4    exactly what the correct position is?

 5              And I understand there is inmate

 6    handbook direction about get on the ground, do those

 7    kind of things, but it just seems to me that each

 8    handler had a different understanding of exactly

 9    what he was supposed to do to be considered no

10    longer a threat.

11       Q.    Understood.

12              I'm turning now to page 52, and you

13    reference Mr. Barbetto's testimony.  This is at the

14    end of the first paragraph.  And you state that, "He

15    did not suspect the presence of a weapon and" --

16    this is referring back to his own prior use-of-force

17    incidents when he was a canine handler.

18              "He did not suspect the presence of a

19    weapon and did not base his use of force decision

20    solely upon a suspicion of a weapon and they were

21    trained to consider the totality of circumstances

22    when making use of force decisions."

23              Is your testimony here then that canine

24    use is only justified in the presence of a weapon?

25       A.    No, that's not my testimony, but I would

1    expect that before you would use this level of

2    use-of-force options.  What I was trying to use, to

3    tell it a little better, his testimony for was to

4    demonstrate that the lack of ability to see an

5    inmate's hands was not necessarily sufficient for

6    his deployment of the canine.  In part that was

7    Mr. McCowan's continued justification, the continued

8    bite-and-hold technique used by his canine, because

9    he was not able to see Mr. Johnson's hand.

10        Q.    And so are you saying that's not

11   sufficient according to the standard that

12   Mr. Barbetto had articulated there, or is that, you

13   know, in accordance with your opinion and your

14   understanding of use-of-force principles?

15        A.    I'm going to just speak to the

16   conditions of this situation because it gets

17   convoluted if we try to talk about all kinds of

18   different scenarios.  But given what Mr. McCowan was

19   faced with when he entered the unit, and the

20   considerations that I've discussed in my report, and

21   options that he had, and one of those was to use the

22   canine as a barrier and start that dialogue to gain

23   compliance, and/or you have an offender who is

24   actually engaging in compliant behavior, he gave his

25   arm to the canine and went to the ground.  You know,

1    those indicators are of compliance, not of threat,

2    not of continued threat.

3         Q.    I'm continuing on that page.  You

4    discuss Officer McCowan's testimony, and then at the

5    end of the third paragraph you state, "To use

6    Officer McCowan's logic, if a police officer arrived

7    on the scene of a fight and had not seen a weapon,

8    did not have any reason to believe one of the two

9    people in the fight had a weapon, the police officer

10   could and should shoot one of the fighters 'just to

11   be sure.'"

12         We talked about this somewhat earlier,

13   but in this instance here with this statement are

14   you saying that the shooting is comparable to the

15   use of the canine?

16         A.    It's a high level of force.  I'm

17   applying Officer McCowan's logic as an analogy to a

18   rule-enforcement situation.  He also testified that

19   he didn't have reason to suspect that Mr. Johnson

20   had a weapon, and he also testified that all other

21   force options had been used, so the only thing left

22   was the use of the canine.

23         Well, that's not standard practice and

24   that's not what officers are supposed to do when

25   they arrive on the scene.  They're supposed to

1    assess the situation and establish their control of

2    the situation, and that includes using verbal

3    engagement, taking the time if you've got time to

4    establish safety for yourself -- he had that with

5    that canine -- and use that advantage to talk the

6    person through compliance.  But in McCowan's world,

7    according to his testimony, when he arrived on the

8    scene all those other things were out the window and

9    he was already a long way down the use-of-force

10   continuum to a very short decision-making matrix to

11   process that "I'm going to deploy the canine" almost

12   instantaneous.

13        Q.    I'm going back to that statement and the

14   comparison you make there.  In your experience, and

15   all other things being equal, would you expect a

16   greater likelihood of a weapon being present in a

17   prison fight compared to a street fight?

18        A.    Not necessarily.  And I don't know how

19   many weapons are found in street fights.  Certainly

20   I've seen and responded to and reviewed thousands of

21   cases involving inmate-on-inmate fights, some with a

22   weapon and some without.  So, yes, for officer

23   safety you always have to be concerned that there

24   may be a weapon or there could be a weapon, but it

25   doesn't mean that you go to a high level of force

1    immediately upon -- I mean when you've just

2    encountered, when you arrive into the unit, without

3    knowing any of the other factors or without taking a

4    moment to assess those factors when you have the

5    chance to do so.

6            You know, officers around the country

7    every day have to deal with these situations without

8    the luxury of a canine to protect them.  And in many

9    situations they're able to gain compliance, still be

10   safe, without necessarily using force in a situation

11   like this one and address their concerns safely.

12       Q.    Okay.  I'd like to move on now to the

13   list of opinions here beginning on page 53.

14       A.    Okay.

15       Q.    As we discussed at the beginning of the

16   deposition, just for my understanding of what is

17   being offered as an opinion here and what's being

18   offered in support of those opinions, I wanted to

19   walk through with you to see if you believe that,

20   you know, any particular parts of your opinion, you

21   know, support any particular ones of these sort of

22   bottom-line opinions at the end of the report.

23            So starting with opinion number 1, "The

24   use of a K-9 in this case was not warranted or

25   supported by accepted correctional practices, nor

1    was it consistent with law enforcement practices for

2    K-9 deployments.  Mr. Johnson was not resisting or

3    demonstrating any threat when a K-9 was commanded to

4    bite him and cause serious permanent injuries."

5                Is there any particular sections of your

6    report that you consider to be in support of this

7    opinion?

8         A.    Yes.

9         Q.    Okay.  What are those?

10        A.    I'll have to get the pages out, but the

11   sections where I reference the Human Rights Watch

12   research regarding the use of canines in the

13   correctional industry; the Department of Homeland

14   Security policy regarding prohibiting the use of

15   canines in a use-of-force event or the presence of a

16   canine with the presence of detainees; monitoring --

17   or the monitor's report related to the restrictions

18   for the use of canines in the corrections

19   environment; references to Mr. Burwell's report, and

20   some citations he made in his experience as a law

21   enforcement officer and a law enforcement officer

22   who has used canines, trained canine teams and

23   evaluated canine teams.  So I think those would be

24   some of the -- and my review of thousands of

25   use-of-force cases -- would be the support where

1    it's not consistent with accepted correctional

2    practice or normal practice.

3              Mr. Johnson was not resisting or

4    demonstrating any threat.  When he had the

5    opportunity to assault an officer and they were

6    physically in contact he did not do that.  He, in

7    fact, stepped away from that officer and as

8    documented in the video and through deposition

9    testimony he took five steps back at least.  And

10   Officer McCowan acknowledged that.  And I believe

11   that was either for the second deployment or at the

12   first deployment.  And I gave supporting references

13   to fight-or-flight responses that would explain

14   Mr. Johnson's behavior.  And no one documented that

15   he made any verbal threats towards any staff.  I

16   never saw a statement that he said "I'm going to

17   hurt you, stab you, slap you, kick you, punch you,

18   kill you" or do any such thing.

19              So that wouldn't support a claim that

20   Mr. Johnson had intentions to assault.  He didn't

21   step towards staff in an aggressive manner.  He

22   stepped back.

23        Q.    Okay.  Same question for opinion number

24   2.

25        A.    I think I just described some of that.

1      Q.     Okay.

2      A.     Yeah.  Well, one thing I didn't speak

3  to, in reviewing the video, particularly as

4  Mr. Johnson is going to the ground and as he's going

5  he uses his left hand to brace himself as he goes to

6  the ground, an open palm, like that (indicating), as

7  he's going down.  And, as I said, he had that hand

8  out in front of him at some point while the canine

9  was still engaged where his hand was visible or

10  accessible to Officer McCowan.  So his hand wasn't

11  hidden under his body the entire time.  In fact, it

12  was out where it could be seen in some manner in

13  front of McCowan for a significant portion of that

14  prolonged bite and particularly going down to the

15  ground.

16          So, to my opinion, the video evidence

17  does not support every contention that Officer

18  McCowan is making.

19      Q.    Just to follow up on that last bit

20  there, did you see in the video his hand go under

21  his body?

22      A.     For a brief moment.  I would have to

23  watch that video again.  I don't know if we want to

24  do that.

25      Q.     I'm just asking from your recollection.

1    A.    I believe it did, but for not very long.

2  And that can be part of the response of protecting

3  your fall to the ground or going to the ground.  Is

4  it normal for any of us to tuck our arms under the

5  body when someone is trying to restrain them?  Yes,

6  that can happen and does happen, but it didn't stay

7  there it did not appear to me for very long, that

8  his other hand it appears came out, but again from a

9  distance it's hard to tell.

10    Q.    Okay.  Opinion number 3 I did not see

11  discussed in the body of the report, unless I'm

12  mistaken.  Was there anywhere prior to this opinion

13  where you talked about the bite ratio?

14          Mr. Hurley, you're on mute.

15    A.    Sorry.  I must have touched the mouse.

16          I do recall discussing that prior to

17  that statement.  It could be a crossover between the

18  other case and this one --

19    Q.    Okay.

20    A.    -- but it goes to the difficulty to make

21  a valid assessment given the frequency of loss of

22  records.

23    Q.    And that loss of records you're

24  referring to is from the DINGO system, correct?

25    A.    Correct.

1    Q.    Did you review any documents that

2  pertained to calculating the bite ratio based on

3  incident reports that were filed in the CORIS

4  system?

5    A.    I don't believe I did.  If that's a new

6  system, I didn't receive, that I'm aware of,

7  anything associated with that.  The only thing I

8  would have reviewed, and I'll probably say it wrong,

9  is their monthly canine patrol reports.

10   Q.    Uh-huh.

11   A.    And that references if they're just

12  routine patrol or if they're responding to an

13  incident.  And then I would have to look at the

14  actual incident itself to get the description and

15  find out what they encountered and whether they

16  engaged or did not engage.

17   Q.    Can you speak to from your experience if

18  a bite ratio was known what an acceptable ratio of

19  bites versus canine responses would be?

20   A.    The only thing that I saw that was

21  related to that was in some of the research

22  articles, that anything above 30 percent, but those

23  were applied to law enforcement in the community,

24  not in a corrections environment.  So, to my

25  knowledge, there is no minimum acceptable bite ratio

1    for the corrections environment.  It's all

2    street-cop use in the community where the ratio is

3    considered.  But I think it's important for an

4    agency to know how often canines are used in a

5    use-of-force event and sort of to have what they

6    deem to be appropriate, necessary or correct.

7               And I think the point of this is with a

8    system that loses data or makes it really difficult

9    to make an accurate assessment, the oversight

10   portion of that suffers.  You can't have a robust

11   oversight system if your data keeps missing or if

12   you're not doing an analysis on your own.

13        Q.    Understood.

14               Moving on to opinion number 4, do you

15   have any corresponding analysis anywhere else in

16   your report regarding this opinion?

17        A.    You mean other than his testimony?

18        Q.    No.  I mean any discussion or sources

19   cited in your report about what you state here in

20   opinion number 4.

21        A.    Well, I'm not sure -- rephrase that

22   question because I'm not sure exactly what you're

23   asking me to answer.

24        Q.    So does -- is there any discussion, you

25   know, in the main body of the report, what we've

1    been talking about for most of the day, related to

2    this ultimate opinion that you offer here, number 4

3    on page 53, regarding Mr. Barbetto?

4         A.    I don't know if there was a dedicated

5    section of the report to this specific point,

6    perhaps the collection of different sections of the

7    report where there was testimony about these types

8    of issues, but again I was going to the oversight

9    concern or even within the training curriculum they

10   talk about proper supervision of the canine program.

11   Well, these things in this item number 4 would fall

12   into that category.

13        Q.    So from your review of the evidence did

14   that show you whether Mr. Barbetto reviewed the

15   video and bite reports after each use-of-force

16   event?

17        A.    From his testimony I didn't see

18   documentation of that; in other words, any form with

19   his signature that he had reviewed it, at least as I

20   recall.  And he indicated that he did look at those,

21   as it says here, but the investigators never

22   contacted him or got his opinion or sought him out

23   to say "Was this the proper use of a canine, was

24   this okay, or is it something they should have done

25   differently?"  None of that.

1        And even though he said in his prior

2   experience, as I understand it, he had conducted

3   use-of-force investigations, he just hasn't

4   conducted canine use-of-force investigations.  And

5   if I'm mischaracterizing that, I apologize, but

6   that's what I recall.

7        Q.    Well, Mr. Barbetto was experienced prior

8   to being the statewide coordinator as a canine

9   handler, correct?

10       A.    I believe so, yes.

11       Q.    Would it be -- would it be fair to state

12   from that that he would have familiarity with policy

13   and training requirements and the practices

14   involving use of force?

15            MR. JOHNSON:  Object to form.

16   Mr. Hurley, you can answer if you know.

17       A.    He should have.  My concern here is it

18   doesn't appear that he was applying it in any manner

19   which would constitute effective oversight.  He was

20   basically looking at it but not making any

21   conclusions and leaving it up to the investigators

22   or the investigations division to make all the

23   determinations.  And they weren't consulting him and

24   he wasn't engaging them, so I'm not sure what the

25   purpose was for him to review the cases if he didn't

 1   really do anything with it.

 2   BY MR. DAVIS:

 3        Q.    And I'll move on to opinion number 5.

 4   Is there any portion of your report that corresponds

 5   to this opinion?

 6        A.    I can't recall that specific other than

 7   McCowan's deposition, which is referenced in this

 8   footnote 93.

 9        Q.    So is your opinion here that it was

10   improper to have patrol canines trained for that

11   purpose and not for -- well, let's start with

12   contraband detection.

13             What would be the reason why that would

14   be improper?

15        A.    I'm not saying training a canine for

16   contraband detection would be improper.  It is

17   proper, and I have used canines for contraband

18   detection.

19             I guess the point I was trying to make

20   here is, I didn't see training of those canines that

21   are being used in the facilities for any other

22   purpose other than patrol.  Now, VADOC may have

23   other canines that are used for these other

24   purposes, but they're not the canines that are

25   walking inside the prison is my understanding.  They

1   have other canine resources to do those other

2   things, but it appears to be the sole purpose for

3   the canines in the prison -- it is for a show of

4   force and/or a use of force and not for anything

5   else.

6       Q.    If there were other canines that were

7   used for -- let's pick the contraband example right

8   now.  And so if there were canines trained for the

9   purpose of use of force in patrol and canines -- a

10  different group and different handlers trained for

11  contraband detection, would that be a problem, in

12  your view?

13      A.    Not based on the way you phrased the

14  question, no, but my concern is -- let's take that

15  large case that I've referenced in the Nunez report

16  in district court.  It's my understanding those

17  canines are capable of doing various things and

18  they're not solely at the jail for the purpose of

19  use of force only.  They do have detection

20  capabilities and primarily are used for that.  And

21  they're not routinely used for a fight break-up or

22  this type of event.

23             So it seems to me the VADOC focused on

24  use of force with the canines, that that's their

25  mission and that's their purpose and that's how we

1   use them.

2         Q.    From your experience do you know whether

3   different breeds of dog would be more or less

4   effective in those different roles?

5         A.    I do not.  Again, the research talks

6   about different breeds have stronger predatory

7   instincts or responses and some may not have that as

8   strongly as others.  So it would depend on the

9   purpose of what you use them for, but I'm not the

10  expert.  That's why we have Mr. Burwell.

11        Q.    Okay.  On opinion number 6 is there any

12  specific portion of your report that you would offer

13  in support of that?

14        A.    Well, I think throughout my report, you

15  know, I talked about how officers routinely respond

16  to fight break-ups and different options that they

17  have to use.  So saying it was reasonable for an

18  officer to choose to use a canine to respond to this

19  incident with Mr. Johnson's behavior does not match

20  with what other corrections officers are doing

21  across the country.

22              No weapons were found and McCowan

23  testified that he didn't have any reason to believe

24  that Mr. Johnson had a weapon.

25              I cannot find that any reasonable time

1    was allowed for Mr. Johnson to comply with orders to

2    get on the ground if, in fact, he was given the

3    number of orders that Officer McCowan claims that

4    were given.  He might be able to state those orders

5    within two seconds, but give the person the time to

6    actually respond to it.  And that's the reason I

7    also included the parts about the OC spray in using

8    an application and giving the person the time to

9    experience the effects.  Same concept, just applied

10   differently.  So he didn't have time to respond and

11   comply.

12          Then there are assessment criteria.

13   I've talked about that.  It doesn't have

14   fight-or-flight or normal human reactions to a

15   threat.  And so, therefore, if they don't train

16   that, they don't understand that, they're not going

17   to recognize it.  And it didn't because he was

18   reacting in a way consistent with fight or flight.

19   So I think that addresses number 6.

20          MR. DAVIS:  Ms. Adams, did you get all

21   of that last part?

22          THE REPORTER:  I think I did.  I think

23   his picture froze, but I don't think his voice

24   froze.

25          (Answer read by the reporter.)

```
 1              THE REPORTER:  Did I get it all?

 2              THE DEPONENT:  Yes.  From my end, yes.

 3   BY MR. DAVIS:

 4       Q.    Okay.  On opinion number 7 is there a

 5   particular part of your report corresponding with

 6   that?

 7       A.    Yes.  In my report I talked about their

 8   policies, the use-of-force continuum, where it fell

 9   in there or not.  I cited some testimony from the

10   canine statewide coordinator or other canine

11   handlers.  And I think we even went through some of

12   that testimony while we were speaking.

13              So, yes, based on those things from the

14   testimony, from the requirements of compliance,

15   which I mentioned, I think that supports number 7.

16       Q.    Same question for number 8.

17       A.    Okay.  I included snapshots of video

18   evidence in my report, and within those snapshots I

19   also provided text boxes to demonstrate what I was

20   seeing.  So I think it's factual, as far as I see

21   it, that Mr. Johnson stepped away from Officer

22   Mullins, did not do anything aggressive to Officer

23   Mullins, nor did he do anything aggressive towards

24   any other staff.  And, in fact, the video shows he

25   did not step toward any staff member after he was
```

1    separated from the fight.  And Officer McCowan

2    acknowledged that during deposition testimony when

3    he was given the chance to watch the video there.

4                He was not running around frantically

5    trying to find a person to assault.  I don't think

6    there's anything in that video that suggests or

7    coincides with running around frantically.  It

8    appears that he turned his attention to the canine,

9    which was flying at him at his level, and that

10   appears to be where his attention was focused when

11   the canine arrived.  And, again, the commands to get

12   on the ground were given really before he had a

13   chance to comply.  He didn't have a chance to do all

14   of that before that canine was on him.

15               And then I cited a portion of

16   Mr. Burwell's report.

17        Q.    Number 9.  Are you offering the same

18   materials in support of that?

19        A.    Yes.  Part of it was Mr. Burwell's

20   report, part of it's my experience, part of it's

21   from watching thousands of use-of-force cases, my

22   own officers that I supervised doing the things that

23   I'm talking about.

24        Q.    Now, I did want to ask about one

25   component of this opinion.  You discussed that

```
 1    Officer McCowan was in no significant danger, K-9
 2    Shadow was trained in handler protection and would
 3    have been a barrier to keep Mr. Johnson away if
 4    Mr. Johnson had approached aggressively.
 5                 Did Officer McCowan suggest that -- or
 6    attempt to justify that the initial bite of
 7    Mr. Johnson on the ground -- that it was necessary
 8    for him to defend himself?
 9         A.    I don't recall him making that claim
10    because he was referencing alleged aggressive
11    movement toward Officer Mullins.
12         Q.    I'll need just one second here,
13    Mr. Hurley.
14                 All right.  Just a quick question about
15    your rebuttal report.  On page 14 into page 15 you
16    discuss the involvement of Dave Robinson, the Chief
17    of Corrections Operations, one of the defendants in
18    this case.  Is there a particular part of
19    Mr. Kmiecik's report that you are including this
20    discussion to rebut?
21         A.    He determined that they had adequate
22    oversight, adequate supervision.  So this goes to
23    the lack of -- lack of responsiveness, lack of
24    awareness, regarding issues with canine policy or
25    canine training issues.  So I think his lack of that
```

1  level of awareness does not establish robust

2  oversight.

3      Q.   And so you were just offering that in

4  response to the general conclusion of -- regarding

5  supervision?

6      A.   Yes.  Where the defense expert

7  referenced that they had adequate supervision as a

8  group.  There was accurate supervision -- and I'm

9  paraphrasing.  And that's also referenced in the

10 training curriculum as one of the things that's

11 required for a good -- a valid canine program is to

12 have adequate supervision or oversight.

13          MR. DAVIS:  Okay.  I have nothing

14 further.

15          MR. JOHNSON:  All right.  I don't have

16 any follow-up questions for Mr. Hurley at this time.

17          MR. DAVIS:  Okay.  Thank you,

18 Mr. Hurley.

19          We can go off the record.

20          (Signature not waived.)

21          (The deposition concluded at 3:51 p.m.)

22

23

24

25

```
 1                    DEPOSITION ERRATA SHEET

 2   Case Caption:  Corey E. Johnson v. (K-9) Officer

 3             McCowan, et al.

 4   Deponent:  Patrick H. Hurley

 5   Deposition Date:  September 13, 2022

 6

 7        I have read the entire transcript of my
     deposition taken in the captioned matter or the same
     has been read to me.  I request that the following
 8   changes be entered upon the record for the reasons
     indicated.  I have signed my name to the Errata
 9   Sheet and the appropriate Certificate and request
     both to be attached to the original transcript.
10

     Page/Line Nos.  Correction/Reason
11   _____  _____

12   _____  _____

13   _____  _____

14   _____  _____

15   _____  _____

16   _____  _____

17   _____  _____

18   _____  _____

19   _____  _____

20   _____  _____

21   _____  _____

22   _____    _____

23   Signature:_____  Date: _____
                  PATRICK H. HURLEY
24

25
```

1                    CERTIFICATE OF DEPONENT

2    COMMONWEALTH OF VIRGINIA
     CITY OF _____
3
         Before me, this day, personally appeared PATRICK
4    H. HURLEY, who, being duly sworn, states that the
     foregoing transcript of this deposition, taken in
5    the matter, on the date and at the place set out on
     the title page hereof, constitutes a true and
6    complete transcript of said deposition.

7

8
                     ---------------------------
9                         PATRICK H. HURLEY

10

11
         SUBSCRIBED and SWORN to before me this _____
12   day of _____, 2022, in the jurisdiction
     aforesaid.
13

14

15   _____   _____
16   My Commission Expires          Notary Public

17

18

19

20

21

22

23

24

25

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2             I, William J. Hudson, Electronic Notary
     Public for the Commonwealth of Virginia at large, of
3    qualification in the Circuit Court of the City of
     Richmond, Virginia, and whose commission expires May
4    31, 2023, do hereby certify that the within named
     deponent, PATRICK H. HURLEY, appeared before me, as
5    hereinbefore set forth, and was duly sworn by me.

6             I further certify that I am not related
     to nor otherwise associated with any counsel or
7    party to this proceeding, nor otherwise interested
     in the event thereof.

8
              Given under my hand and notarial seal
9    this 16th day of September 2022.

10

11

12

13

14

15

16

17                      _____
                             Electronic Notary Public
18                      Notary Registration No. 7253936

19

20

21

22

23

24

25

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2           I, Kathleen Beard Adams, CCR, RPR, CRR,
    do hereby certify that the within named deponent,
3   PATRICK H. HURLEY, appeared before me, as
    hereinbefore set forth, and after being first duly
4   sworn, was thereupon examined upon his oath by
    counsel for the respective parties; that his
5   examination was recorded in Stenotype by me and
    reduced to computer printout under my direction; and
6   that the foregoing constitutes, to the best of my
    ability, a true, accurate, and complete transcript
7   of such examination.

8           I further certify that I am not related
    to nor otherwise associated with any counsel or
9   party to this proceeding, nor otherwise interested
    in the event thereof.

10

11          Given under my hand this 16th day of
    September 2022.

12

13

14

15

16

17                      *Kathleen Beard Adams*
                        Certified Court Reporter
18

19

20

21

22

23

24

25