Page 1

            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
                     Roanoke Division

_____

                                :

COREY E. JOHNSON,               :

                                :

Plaintiff,                      :

                                :

v.                              : Case No. 7:20cv582

                                :

(K-9) OFFICER MCCOWAN,          :

et al.,                         :

                                :

Defendants.                     :

_____:


            Monday, September 12, 2022


        Remote Zoom Videoconference deposition
of MICHAEL W. KMIECIK, II, taken with the
witness participating from his residence at 459
Sundance Drive, Bartlett, Illinois, beginning at
9:57 a.m., Eastern Standard Time, before Ryan K.
Black, a Registered Professional Reporter,
Certified Livenote Reporter and Notary
Public in and for the Commonwealth of
Pennsylvania.

Page 2

A P P E A R A N C E S:


 ARNOLD & PORTER KAY SCHOLER LLP
 BY:   ANDREW C. JOHNSON, ESQ. - Via Zoom
 601 Massachusetts Ave, NW
 Washington, DC   20001
 202.942.5000
 andrew.johnson@arnoldporter.com

 Representing - Plaintiff

 COMMONWEALTH OF VIRGINIA
 OFFICE OF THE ATTORNEY GENERAL
 BY:   TIMOTHY DAVIS, ESQ. - Via Zoom
 2020 North 9th Street
 Richmond, Virginia   23219
 804.786.2071
 tdavis@oag.state.va.us
 Representing - Defendants

I N D E X

TESTIMONY OF:  MICHAEL W. KMIECIK, II      PAGE

By Mr. Johnson...................................4

By Mr. Davis...................................143

E X H I B I T S

EXHIBIT            DESCRIPTION                    PAGE

Kmiecik 1    Mr. Kmiecik's Final Initial

             Expert Report.....................18

Kmiecik 2    Curriculum Vitae of Mr. Kmiecik...36

Kmiecik 3    Appendix A to Final Initial

             Report............................58

Kmiecik 4    Appendix B to Final Initial

             Report............................60

Whereupon --

MICHAEL W. KMIECIK, II,

called to testify via Zoom videoconference,

having been first duly sworn or affirmed, was

examined and testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q.   Good morning, Mr. Kmiecik.  Thank you for your time here today and for being here.  Can you, just for the record, please, just state your full name?

A.   Sure.  It's Michael W. Kmiecik, K-M-I-E-C-I-K, the Second.

Q.   Okay.  And what do you do Mr. Kmiecik?

A.   I'm a police officer and a -- on the side, a consultant.

Q.   Okay.  And are you currently a law enforcement officer?

A.   Yes, I am.

Q.   And where are you currently a law enforcement officer?

A.   I work for the Village of Bartlett in Illinois, Bartlett Police Department.

Q.   And how long have you been a police officer there?

Page 5

A.    23 years.

Q.    Okay.  And what rank do you hold in the -- the police department?

A.    At the Bartlett Police Department, I hold the rank of officer.  And on our multijurisdictional task force, which is the Northern Illinois Police Alarm System Mobile Field Force, I hold the rank of lieutenant.

Q.    Okay.  And in your capacity as an officer are you -- do you utilize canines within your duties as an officer?

A.    Yes, I do.

Q.    And how do you utilize canines?

A.    We utilize canines in odor detection for narcotics, as well as cadaver, which is human remains detection, and patrol dog capacity, which entails criminal apprehension, tracking and article and evidence recovery and searches.

Q.    Okay.  Are there any other purposes or uses that you utilize canines for in your capacity as a law enforcement officer?

A.    No.

Q.    Okay.  And are you trained to utilize canines for each of those different uses that you've just described?

Page 6

A.    Yes.

Q.    Can you describe that training for me?

A.    Sure.  I started as a canine-handler in 2004, went through a 380-hour basic handler course.  After that, I attended in-service training, not just for utilizing the dog, but in classroom and lecture, and then continued on with maintenance training from there.

In 2016, I went back through the 380-hour basic course when I got assigned a second dog, and continued our maintenance training from there, as well as classroom and lectures related to the use and deployment of the dogs.

Q.    Okay.  And in the training that you just described, did it address each particular type of use that you were explaining earlier that you utilize canines for, or was it specific to one particular type of use?  Specifically, were you training, for example, specifically on cadaver dogs?

A.    I'm not sure I understand the question.  Could you repeat it?

Q.    Sure.  Was your training to be a canine handler general, or was it specifically tailored

Page 7

to each of the particular uses you described that you actually utilize canines for in your job?

So I believe you that you mentioned you utilize canines for cadaver purposes, for drug detection purposes, and I believe there was a couple other purposes that you mentioned. And my question is, is your training specifically tailored to those particular uses, or is your training of a general nature?

A.    Understood.

It's a general nature, but then it goes into discipline-specific training, as well.

Q.    Could you describe that for me?

A.    Sure.  There's general handling skills, such as obedience and praise and rewards and corrections, environmental conditions.  Those would be general-type training for basic handling skills.  And then it would be specific to the discipline, such as, let's say, aggression control, criminal apprehension or bite work.

Then there would be specific training on articles and evidence recovery.  There would be specifics to building searches.  There would be specifics to conducting area searches.  There would be specifics related to cadaver, human

Page 8

remains.  There would be specifics related to narcotics contraband detection.

Q.  Okay.  And I believe you mentioned that after you go through the general training that I believe you were just describing, there's a more discipline-specific training; is that correct?

A.  Well, it would be maintenance training.

Q.  Okay.  And then, maybe, can you describe in more detail what you mean by maintenance training?  Does that training focus on ensuring the prior general training is being maintained, or does that maintenance training focus on discipline-specific updates and developments that either the canine or handler need to learn and develop?

A.  Understood.  The answer is yes to both.

So you continue your general handling skills, as well as your discipline-specific skills as well.  Maintenance training is meant to sustain and enhance the dog and the handler and the team's overall performance, to identify and correct any operational deficiencies or concerns, and to enhance or move into advanced skill sets.

Q.  Okay.  I believe that you mentioned, as part of your general training, one of the

Page 9

particular types of work you do is bite work; is

that correct?

     A.   Yes.  That's correct.

     Q.   If you are not using, in your day-to-day

job, canines in any sort of force aggression or

force multiplier-type capacity, what sorts of

bite training are you being trained on with

respect to, for example, training a drug-sniffing

dog?

     A.   Counsel, I'm sorry.  I'm not sure that I

understand your question.

     Q.   Sure.  So I believe that you testified

earlier that you do not use canines in any sort

of force capacity; is that correct?

     A.   That we do not use the dog in any type

of force capacity?

     Q.   Yes.

     A.   No, that's not correct.

     Q.   Okay.  So let's start over.  Let's go

back, then, because I believe that you mentioned

you used canines for cadaver purposes.  Is that

correct?

     A.   Yes.  That's correct.

     Q.   Would using a canine for a cadaver

purpose ever involve using a canine in a force

Page 10

situation?

A.    No.

Q.    Okay.  I believe --

A.    That's an odor --

Q.    Oh, go ahead.

A.    I'm sorry?

Q.    Oh, I'm sorry.

A.    That is an odor discipline.

Q.    Okay.  And I believe you also mentioned that you use canines as drug detection purposes. Is that correct?

A.    Yes.

Q.    In using a canine in a drug detection capacity, do you ever use a canine as a force -- as a tool of force in that capacity?

A.    No.  That also is an odor-detection discipline.

Q.    Okay.  And what other capacities do you use canines for, other than cadaver -- a cadaver capacity or a drug-detection capacity?

A.    Also in a patrol capacity.  And that patrol capacity does include criminal apprehension or bite work, also aggression control.  It would be conducting building searches for live humans, conducting area

Page 11

searches for live humans, conducting tracking for

live humans, as well as conducting article or

evidence searches and recoveries, which would be

related to the scent of live humans.

Q.   Understood.

Prior to 2004, did you have any

experience in working with canines in a law

enforcement capacity?

A.   Yes.

Q.   Okay.  Could you describe that

experience for me?

A.   Sure.  Prior to my employment with the

Bartlett Police Department, in 1999 I worked for

the Glendale Heights Police Department, which is

a village in the State of Illinois.  And I was a

civilian law enforcement officer, handled animal

complaints, parking ordinance enforcement, things

like that.  And I worked with a dog trainer with

bloodhounds, for teaching trailing of

bloodhounds.

Q.   And was that training focused on -- I

believe the term you used earlier was odor

detection.  Is -- for that type of use; is that

correct?

A.   So there -- odor and scent are actually

Page 12

two separate and distinct disciplines. So when I'm referring to odor, I'm referring to the detection of a substance, such as a narcotic or human remains, explosives, that kind of nature.

When we're talking about scent, the scent detection is the detection of live humans. So for the trailing dogs, such as a bloodhound, we'd be in the scent-detection realm, looking for human odor -- live human odor.

Q. Understood. Thank you so much. That makes sense. Thank you.

Prior to training of bloodhounds for scent-detection work, had you worked with canines in a law enforcement capacity?

A. No.

Q. Okay. So is it accurate to say that the training of bloodhounds was the first time that you trained and/or worked with canines in a law enforcement capacity?

A. Yes. That's correct.

Q. Okay. And that -- and about -- I believe you said -- was it two years that you worked for, I believe, the Glendale Township? I'm sorry. I may have mispronounced the name, but --

Page 13

A.    It's no problem.  Glendale Heights

Police Department.

Q.    Glendale Heights?

A.    Yeah.  I worked there for four years,

from 1995 to 1999.

Q.    And during that period, were you

training and using bloodhounds for the entirety

of your stint there?

A.    No.  It was intermittent.

Q.    How was it intermittent?

A.    So I would assist in laying tracks as a

decoy and learning with the instructor in that

capacity.  So when they needed assistance laying

these tracks and setting the tracks or trails for

the bloodhounds, I would assist with that.  So it

wasn't a full-time duty.

Q.    Okay.  And other than the assisting

with the training, were you utilizing, in your

operational -- day-to-day operational duties,

canines?

A.    From 1995 to 1999, I was not.

Q.    I'm just getting a couple documents

ready to move in here that we can look at.

Before I -- we move on to looking at

your report -- so when you began working with

Page 14

canines then, after you left Glendale Heights, have you ever, in the course of utilizing canines in your day-to-day law enforcement duties, ever utilized or deployed a canine on a suspect or another human?

A.    So, Counsel, I just want to be very clear on your question.  Are you talking about deploying the dog to search for a person, or are you talking about deploying the dog to apprehend or to bite a person?

Q.    Both.

A.    Okay.  The answer to that question is yes.

Q.    Okay.  Could you explain each instance for me?

A.    I can't explain each instance, other than there are hundreds of deployments that I've been involved in since 2004, when I became a full-time canine handler.  So we're in that 18-year mark for that.  But I have deployed the dog numerous times in suspect searches, looking for criminal offenders or suspected criminal offenders, missing people, suicidal subjects, that kind of capacity.  And those are too many to number and to describe.

I've used the dog to apprehend or bite a criminal suspect in multiple occasions, specifically four.  I've used my dog very judiciously and expect that my fellow canine-handlers will do the same.

Q.    Since 2004, can you estimate how many times you've utilized a canine either to search an individual for any reason or to bite an individual for any reason?

A.    Sure.  I would estimate searching for individuals would be in the hundreds, and to bite an individual, four times.

Q.    Do you remember the four incidents where you deployed a canine to bite an individual?

A.    Yes.

Q.    Can you describe each of those incidents at just kind of a general level of what happened?

A.    Sure.  One would be at a local liquor establishment, a bar.  We had a bar fight going on in the parking lot of this bar.  Two officers were attempting to arrest an individual that was involved in this fight.  And I came approaching with the dog.  An individual -- the person who was being arrested, his friend tried to come to the officers on their back side and tried to

Page 16

prevent them from making the arrest.  And at that time, I utilized the dog to prevent that from happening.

Another incident, we had a stalking suspect who was attempting to gain entry into his ex-girlfriend's residence, in which case we deployed the dog to search for and locate. And we were able to do that.  The dog found the individual, at which time he resisted arrest, and the dog was utilized in that capacity to assist in the physical arrest of the individual.

We had a subject that had taken off from a traffic stop, who had a criminal history.  The dog located him and he attempted to evade arrest from there, and he was apprehended by the dog.

And the fourth one was a individual who was involved in a domestic situation, as well as a criminal damage to property utilizing a knife. That individual was searched for and located and attempted to evade arrest and resist arrest, and he was apprehended as well.

Q.    In each of those four uses, was there an investigation done into whether or not the use of force was proper?

A.    Yes.

Page 17

Q.   And do you know the outcome of each of those investigations?

A.   Yes.

Q.   As you recall, sitting here today, what was the outcome of each investigation?

A.   That the use of force was objectively reasonable under the standards pursuant to our policy.

Q.   All right.  Mr. Kmiecik, do you have Exhibit Share open?

A.   Yes, sir.  I do.

Q.   Okay.  Perfect.

So I'm going to -- give me just a moment here -- introduce our first exhibit.  So please let -- it should be there now, but please let me know, you know, once you're able to see it.

A.   It would be under the file "Marked Exhibits"; is that correct, sir?

Q.   Yes, sir.  It will be in that folder, and it should just appear as a PDF.

A.   Sure.  Exhibit 1?

Q.   Yes.

A.   And would you like me to open that, Mr. Johnson?

Q.   Yes, please.

Page 18

(Kmiecik Exhibit No. 1, Mr. Kmiecik's Final Initial Expert Report, was introduced electronically.)

THE WITNESS:   Mr. Johnson, I have it open.

MR. JOHNSON:   Thank you, sir.

BY MR. JOHNSON:

Q.   Have you ever seen what's been marked as Exhibit 1 before?

A.   Yes.

Q.   What is it?

A.   Well, this is my Final Initial Expert Report.

Q.   And is this the expert report that you're offering in connection with the case here that you're testifying today?

A.   Yes, sir.

Q.   And before we kind of jump into your report, I just kind of wanted to ask you some background questions.  Have you ever testified as an expert before for the Virginia Department of Corrections?

A.   No.

Q.   Is this case the first time that you've testified for the Virginia Department of

Page 19

Corrections as a canine expert?

A.   Yes.

Q.   Have you ever testified in any case as a canine expert?

A.   I have been retained by counsel, but I've never testified.

Q.   How many times have you been retained by counsel?

A.   This will be the third.

Q.   Okay.  I apologize.  Let me --

A.   I'm sorry.  This will be the fourth.  I apologize.  There were three before.

Q.   Let me just reask the question again. It was a little imprecise.

How many times have you been retained by counsel in your capacity as a canine expert?

A.   Four.  This will be the fourth time.

Q.   Okay.  And can you describe for me each case in which you were retained as a canine expert?

A.   Sure.  I was retained as a canine expert in a case called Gary versus City of North Chicago, et al.  That was in the Northern District of Illinois Eastern Division.  That related to a dog biting a armed robbery suspect.

Page 20

I was retained as a expert witness in a case called Walker versus County of Madison, et al., in the Eastern District of Wisconsin.  That case involved a dog bite -- a police dog bite of a plaintiff related to a very complicated stolen auto, car chase, shots fired at police type of an incident.

I was retained as a expert witness in a case called People v. Meister.  That would be a criminal case in the State of Illinois.  I was retained by the defendant's counsel related to a narcotic contraband detector dog sniff of a vehicle.  That was in the Circuit Court of Boone County, Illinois.

Q.   And is it correct to -- that in each of the three cases you just described, you did not offer any expert testimony but you were just retained?  Is that correct?

A.   That's correct.  I authored an expert opinion report but did -- did not testify.

Q.   In the -- the first case that you described, the Gary case, how did that case resolve?

A.   After I had rendered my written opinion, the plaintiff's witness was deposed, and then my

Page 21

understanding from the attorney in that case was that the plaintiff's expert wound up agreeing with me in a majority of the points and then the case was settled.

Q.    And in the Walker case, what was the outcome of that case?

A.    After I had submitted my expert opinion, the Town of Madison, as well as the defendant officers, were granted summary judgment on qualified immunity grounds.

Q.    And what about the people versus Meister?

A.    In that particular case, after I had rendered my opinion and submitted it to the attorney, the attorney never called me back and needed any further assistance from me.

Q.    Do you know how that case resolved?

A.    I don't.

Q.    And none of -- not -- none of the three cases we just talked about, the Gary case, the Walker case or the People vs. Meister case, involved a incarcerated person; is that correct?

A.    That's correct.

Q.    And each of those cases involved a police interaction with a civilian member of the

Page 22

public; is that correct?

A.    Right.    It was a law enforcement seizure.

Q.    If we look now at page -- I'm going to refer -- if it's okay with you, I'm going to refer -- when I refer to a page number, it will be the stamped page number on your actual report. I believe it may be one or two off from the page number that's on the counter, so if I'm saying "Page 2," I'm referring Page 2 of the report, if that's okay.

A.    Understood.

Q.    So I believe on Page 2 of your report you begin to list all the documents that you reviewed and looked at as part of forming your opinions in this case; is that correct?

A.    Yes.    That's correct.

Q.    Are there any documents that you reviewed as part of forming your opinions in this case that are not listed on Pages 2, 3, 4, 5, 6, 7 or 8?

A.    Counsel, what I'm looking at is the documents go to Page 11, the documents that I reviewed for the initial report, and -- and the top of Page 12.

Page 23

Q.   And is there anything listed there that -- or is there anything that is not listed through Items 1 through 124 that are -- that form part of the basis of your opinion?

A.   I -- if I could clarify your question, Mr. Johnson.  Are you talking about just on my initial opinion or are you talking my initial opinion as well as my rebuttal?

Q.   Just your initial opinion.

A.   The 124 would be the correct number.

Q.   So there are no other documents that you reviewed as part of your reaching the opinions that you've expressed in this report that are not included in this list; is that correct?

A.   Not that I could recall.  Correct.

Q.   Okay.  Can you identify for me each opinion that you're offering in this case?

A.   Sure.  If -- would you scroll down on to the methodology, I'm offering a couple opinions there:  Was the dog bite consistent with applicable use of force standards; in other words, was it -- was the dog bite in this case used in a good-faith effort to restore and maintain order?  Was the dog -- the use of the dog in this particular case used as a last

Page 24

resort?  Was the dog -- the use of the dog in this particular case proportionate?  Was the dog used in an objective -- objectively reasonable manner?  Was the dog and the handler properly trained?  Was the dog and the handler properly certified?  And were -- were the policies of the Virginia Department of Corrections related to canine and use of force consistent with industry use-of-force standards?  And did the Department of Corrections fail to supervise in this particular case?

Q.    And just so I understand, are these the opinions that you're offering, or are those the questions that you were asked to evaluate by your counsel?

A.    Those were the questions asked to evaluate, and those are what I rendered my opinions on.

Q.    Okay.  Could you identify for me the opinions that you're rendering in this case?

A.    Sure.  Identify in the document or identify --

Q.    If you could identify in your report by page number each opinion that you you're offering, and the specific opinion?

Page 25

A.   Sure.   Let me pull it up over here.
Go down to -- Page 64 starts the summary of my
opinions, which lists all of my opinions and the
basis for those opinions.

So on Page 64 here -- 65 would start the
summary of my overall opinions.

Q.   So looking at Page 65 of your report,
where it begins, "In summary, I am of the overall
opinions," and then there's a series of bullets
listed after that introduction, are those
bullets, then, the actual opinion -- the opinions
that you're offering in this case?

A.   They are the opinions that I'm offering
in this case.  And prior to that in the report is
my support for each one of those opinions.

Q.   Do you mean the entire report before it,
or these paragraphs where -- that are preceding
in the overall opinion and summary section?

A.   The so each one of those opinions that
are bulleted, starting on Page 65, after, "In
summary, I am of the overall opinion," I go into
those opinions in support, in much more detail
prior to that in the report.   Each section is
broken down individually.

Q.   Okay.   So for your first opinion, could

Page 26

you show me where, previously in the report, you kind of break down and describe this section more specifically?

A.    Sure.    That first opinion is related to training.    And if we turn to Page 24, where it starts "United States Police Canine Industry Standards."

Q.    Understood.

So beginning under the heading of "United States Patrol Canine Industry Training Standards" and continuing through to page -- is it 27 where you start to list a few more documents?    But continuing through to Page 27, is that where you're describing in more detail your analysis of the training?

A.    Yes, sir.    That's correct.

Q.    Okay.    And other than the documents that you have listed here as forming the basis of this opinion, are there any other documents or materials that you relied on in forming your opinion regarding the sufficiency of Officer McCowan and Canine Shadow's training?

A.    No.

Q.    And if we go back -- I apologize to ask you to go back, but I believe it starts on Page

Page 27

68 is the next opinion, I believe, or is the next bullet, "I am of the opinion that on or about," it starts there -- or is that -- that's the certification standards.  That's --

A.    That would be the next opinion.

Q.    So could you show me where previously in the report you go into more detail concerning this opinion?

A.    Sure.  If you want to go to Page 30, I believe it is -- let's see here, 30, yes.  At the bottom of the page, Mr. Johnson, you'll see United States Patrol Canine Industry Certification Standards.

Q.    Understood.

So starting from United States Patrol Canine Industry Certification Standards at the bottom of Page 30 and continuing through, it looks like, the entirety of Page 31 is your analysis of the patrol canine industry certification standard as applies to Officer McCowan; is that correct?

A.    That's correct.  And both of those sections that we just discussed, training standards and certification standards, are also addressed in the appendix, Appendix A and

Page 28

Appendix B --

Q.    Thank you.

A.    -- of my report.

Q.    Thank you.

So beginning on Page 71, your opinions move in from training and begin to look to focus on the actual incident involved.  And we start with --

A.    Mr. Johnson, I just want to get down to Page 71, if that's all right, sir?

Q.    Oh, yeah.  Of course.  Of course.  It was taking me a second to navigate there as well.  Sorry about that.

A.    No problem.  I'm there.

Q.    It looks like -- the opinion that I'm looking at begins with "The use of Canine ET."

A.    Yes, sir.

Q.    So could you describe the opinion you're offering here?

A.    Sure.  So what I opined in this particular paragraph, or bullet, is that the use of force of Canine ET, which was handled by Officer Baker, was the only available force option that was left at that particular time, given a escalating force option scenario

Page 29

in a tense and uncertain and rapidly evolving situation.  All the prior force options that were used at the time that this dog, ET, was deployed, had been exhausted and proved to be futile, And therefore, given the totality of the circumstances, the use of the dog was proper in order to stop an ongoing active threat.

Q.   And what documents did you look at to form the basis of this opinion?

A.   I'm going to scroll back up, if I may?

Q.   Oh, please do.  Yeah.

A.   Okay.  So the documents that I used, Mr. Johnson, start on Page 41, and the documents that I used start after, "I formed this opinion from a review of the following materials and documents."  And at the top there we have Whitley v. Albers, Whitten v. Gunter, the two video files that were provided to me by the defendant's counsel of the Virginia Attorney General's Office, as well as internal documenting reports from the Virginia Department of Corrections starting with the internal incident report from Scottie Mullins and the internal incident report generated by Seth -- Officer Seth Dean, the internal incident report generated by Officer

Page 30

JW Shepherd, a case called Graham v. Connor, the internal incident report generated by the handler handling Canine ET, Officer Baker, as well as the operating procedures of the Department of Corrections, Number 435.3.

The rest of the documents that are listed there pertained more so to my opinions in relate to officer McCowan.

Q. Did you review or consider the deposition testimony of either Officer Baker or Officer McCowan in this case?

A. Generally in this case, or are we talking about the opinion that we're discussing right now?

Q. Either.

A. Yes.

Q. So you have reviewed the Deposition transcripts of both Officer Baker and Officer McCowan; is that correct?

A. That's correct, yes.

Q. But neither of those documents are listed in your report as forming the basis of any of your opinions; is that correct?

A. I'd have to double-check upwards, if I may?

Page 31

Q.   Please do.

A.   Well, right away, on Page 5, I did review Baker's deposition there.  Number 38 is the bullet number there.

And on Page number 2, Bullet Point Number 5, McCowan deposition.

Q.   And which opinions do those two documents form the basis of?

A.   I'm sorry.  Can you repeat your question?

Q.   Sure.  Which two doc -- which opinions do those two documents form the basis of?

A.   I'm just going to scroll through my footnotes, Mr. Johnson.

Q.   Please take your time.

A.   Okay.  McCowan's deposition was used and cited under "Officer McCowan's good faith effort to maintain and restore order," and that would be at Footnote Number 334, which would be at the top of Page 37.  Also Footnote 336, Page 37.

McCowan's deposition, Footnote 396 on Page 44 there.  That would be under "the duration of Canine Shadow's bite."

Footnote 418 on Page 47 would be under "Johnson's opportunity to peacefully surrender."

Page 32

Footnote 431, that's under the same heading on Page 49.

Footnote 471, which is on Page 53, and that would be under "Officer McCowan's compliance with Commonwealth of Virginia Department of Corrections policy."

Footnote 471, page 53, same heading.

471, Page 54, same heading.

And for deposition, we've got Footnote 528, and that would be under the same heading.

Footnote 570, in the overall summary of opinions, McCowan's dep.

Footnote 623, overall summary of opinions, Page 75.

Footnote 633 on Page 76, McCowan deposition, overall summary of opinions.

Footnote 649, McCowan deposition, Page 78, overall summary of opinions.

Footnote 653 McCowan dep, Page 79, overall summary of opinions.

Footnote 665, Page 80, overall summary of opinions.  That's the McCowan deposition.

And that looks like all.  I may have missed one or two in there going through a lot of footnotes.

Page 33

Q.    Thank you.  Other than the opinions that you just described, are there any opinion where you -- that you are offering in this case where you reviewed the deposition transcript of Officer McCowan and Officer Baker?

A.    On this initial report?  Are you including --

Q.    Just this initial report.

A.    Not that I can recall.

Q.    Thank you.

We've been going for about an hour.  Do we want to take maybe a 5- or 10-minute break and we'll come back?

A.    I have no issues.  Whatever you guys would like to do.

MR. JOHNSON:  Is 5, 10 minutes okay?

MR. DAVIS:  10 is fine.  Do you want to go off the record and we'll figure it out.

(Recess taken.)

BY MR. JOHNSON:

Q.    So, Mr. Kmiecik, I believe you testified earlier that this is the first time that you have been retained and are testifying as an expert for the Virginia Department of Corrections; is that correct?

Page 34

A.    Yes.

Q.    Are you being compensated as an expert for the Virginia Department of Corrections?

A.    Yes.

Q.    And how are you being compensated?

A.    I'm being compensated by the hour.  I did attach my fee schedule to my report.  And so the structure is -- it is $150 per hour with a retainer fee of $1,500, which covers the first 10 hours worth of work, and then $150 an hour for report and review and production of the report thereafter.  And then for deposition it's $250 per hour.

Q.    Okay.  Is your compensation related to this matter in any way tied to the outcome?

A.    No, it is not.

Q.    And how were you retained by the Virginia Department of Corrections?

A.    I'm sorry.  I don't understand your question.

Q.    How did you come to be in a relationship with the Virginia Department of Corrections where they retained you as an expert?

A.    I received a call from the defendant's attorney, a Mr. Tim Davis.

Page 35

Q.   Do you have any understanding as to why you were identified to be an expert in this case?

A.   Not that I recall.

Q.   Do you have any relationships with anybody at the Virginia Department of Corrections?

A.   I have no personal relationship with anybody at the Department of Corrections.  I do run a website, Sheepdog Guardian Consulting, which compiles canine case law, as well as teach and instruct in canine search and seizure.  As part of my website, we do have a membership, and I do believe that there are officers from the Department of Corrections that are members of our website.  I don't recall ever personally speaking to anybody there.  The only time I've ever actually, that I can recall, speaking to anybody from the Department of Corrections for the Commonwealth of Virginia is when I attended a seminar here in Chicago, called HITS, which is the Handler Instructional Training Seminar, where I sat through a hour, maybe hour and a half, seminar lecture from -- that was given by Major Barbetto from the Department of Corrections for the Commonwealth of Virginia, and there was

Page 36

somebody else with him, but I can't recall who that was.

Q.   Did you stay in contact with Mr. Barbetto after the HITS conference?

A.   No, not that I recall.  I never spoke to him again after that.

And our conversation was very brief after his seminar.  It basically related to me just introducing myself.

Q.   So if you could switch over to the Exhibit Share, there's a exhibit that's -- there's a couple more exhibits, but the first -- the first new one is Exhibit 2.  And if you could open Exhibit 2 for me.

A.   I still have that Exhibit 1 open.  Do I just click that arrow back to get back?

Q.   You should be able to.  You should be able to, yes.

A.   Okay.

Q.   And you may need to click on the Marked Exhibits folder again to update it.  It might not auto refresh for you, so --

A.   Okay.  I do see Exhibits 1, 2 and 3.

(Kmiecik Exhibit No. 2, Curriculum Vitae of Mr. Kmiecik, was introduced electronically.)

BY MR. JOHNSON:

Q.    Perfect.  If you could click on Exhibit 2 and then let me know when you have it open.

A.    Okay.  It's open.

Q.    Great.  And have you seen Exhibit 2 before?

A.    Yes, I have.

Q.    And what is Exhibit 2?

A.    That's my curriculum vitae.

Q.    Okay.  And can you walk me through -- beginning on Page 2 where you list your professional experience, could you walk me through and just kind of describe, at a high level, each entry that's listed under your professional experience?

A.    Sure.

So at the top there under Professional Experience, it says "2022 to present, developed 8-hour course curriculum for Canine Legal Updates Course, Missouri:  Agency Administrator, Supervisor & Trainer liability, certified by the Missouri Peace Officers Standards and Training."

I was just in Missouri earlier this year -- I cannot remember the date -- where I

Page 38

taught a three-day course.  The last day of that course is a eight-hour block of instruction on supervision of a canine unit.  So that would be that entry there.

In order to get that approved, I had to put together a course curriculum and send that for approval to the Missouri Peace Officers Standards in Training, which is POST.

The next entry is I developed 16-hour course curriculum Canine Legal Updates Course Wisconsin:  Patrol Dog and Narcotics-contraband Detection for the Waukesha Technical College. That would be the second two times I presented there, one in 2021 and one in 2022.  And that's a seminar on canine search and seizure for law enforcement.

The next entry is Developed 16-hour Curriculum Canine Legal Updates Course for Missouri, which was certified and approved by the Missouri Peace Officers Standards in Training, which is their POST.  I presented in the state of Missouri both from 2020 and 2022 -- I'm sorry, 2021 and 2022.  I developed the curriculum in 2020.

That -- both those were in -- one was in

Page 39

Cape Girardeau, Missouri, and the other one was in Jefferson City, Missouri.  Again, that's canine search and seizure.

The next entry is Developed 16-hour Course Curriculum Canine Legal Updates Illinois: Patrol Dog and Narcotic-contraband Detector Dog for Mobile Training Unit Number 13, which is the East Central Mobile Law Enforcement training. That, again, is a 16-hour curriculum that needed to be sent in and approved and certified by the Illinois Law Enforcement Training and Standards Board, which would be the Illinois version of POST.  So I did a two-day 16-hour canine search and seizure class there.

In 2020, the next entry there is the Indiana Law Enforcement Training Provider.  So I developed a 16-hour, two-day course for canine search and seizure for the State of Indiana. That was approved by the Indiana Law Enforcement Training Council there, which again is their version of POST, or the Law Enforcement Training and Standards Board.

When -- so I'll just stop there.  When the courses are approved by the State, the officers who attend will get continuing

Page 40

legal -- continuing education credits for successfully completing the course.  So I did that for Indiana as well.  That's canine search and seizure class.

In 2019, the next entry there, Developed an 8-hour course curriculum, Canine Legal Updates Course, Alabama, Patrol and Narcotics.  So that was an 8-hour course that I put together for Alabama canine law enforcement officers and taught that course there.  Again, it's canine search and seizure, a little bit more of an abbreviated because it's a one-day 8-hour versus a two-day 16-hour.  I've taught there in Alabama bam several times.

In 2019 there, the next entry is Owner Operative Sheepdog Guardian Consulting, Canine Legal Update Website.  That's my website there.  Again, as I previously said, I put together a compilation of the most comprehensive canine case law and statutory law that's -- compiles all The case law and statutory law related to canine search and seizure, as well as discipline-specific issues, such as we were discussing earlier, a patrol dog discipline, a odor dog discipline such as narcotics,

Page 41

explosives, accelerants, cadaver, human remains detection.

In 2019 to present, a member of the Illinois Tactical Officers Association Canine Committee, and I'm assigned to the subgroup of patrol canines.  With that group, what we do is we put together training and training opportunities for canine handlers in the State of Illinois, specifically members who are people who -- canine handlers that are members of the Illinois Tactical Officers Association.

The next entry there, 2018 to present, owner and CEO and lead trainer for Sheepdog Guardian Consulting, LLC.  That's when my wife and I opened up our consulting company.

1999 to present, as we discussed earlier, that's my tenure as a police officer with the Village of Bartlett here in Illinois.

Then it goes kind of into more specific dates there.  In 2022 I developed an 8-hour course, Canine Legal Updates, for Florida. Agency, Administrator, Supervisor, Trainer Liability.  That was for the Palm Beach County Sheriff's Office in Florida.

The reason that you're seeing different

Page 42

states in there is because the way -- when I develop a curriculum, I develop a curriculum that's specific to the jurisdiction in which we're presenting in, and so we will look at search and seizure issues that are related to that specific location.

So as an example, in the case that we're looking at there, the Canine Legal Updates for Florida, we're looking at specific canine search and seizure related to the State of Florida court cases, as well as the 11th Circuit Court of Appeals. So we do cover other case law that is trending or important throughout the country, but try to tailor it more specific to Florida and the 11th Circuit Court of Appeals, as well as the Supreme Court there.

The next entry there is Developed 16-hour course curriculum Canine Legal updates for Florida. So I did a two-day patrol and explosive -- narcotic and explosive dog seminar, and then I did a one-day supervisor update. I actually did that twice. That was a week long. So I did one two-day course followed by a supervisor course, followed by another two-day course there, and that was for the Palm Beach

Page 43

County Sheriff's Office in Florida.

The next entry we have there is Developed a 8-hour course curriculum for Canine Legal Updates, Texas:  Agency, Administrator, Supervisor & Trainer Liability.  That was approved by the Texas Commission on Law Enforcement Standards for continuing education credits in the state of Texas.  That was in Mansfield, specific for canine supervisor issues.

Next entry on there is Developed 2-hour presentation for Canine Legal Update Narcotic-contraband Detector Dog for the Blueline K9 Training Conference.  There I did a 2-hour seminar block for narcotic-contraband detector dogs related to search issues at that conference there, and I also did a 2-hour block which, for some reason, is not on there, but did a 2-hour presentation for patrol dogs, as well, at that same conference.

Next entry is Developed 8-hour course curriculum for Saginaw Chippewa Indian Tribe: Search & Seizure for the Saginaw Chippewa Indian Tribal Police.  I did a search and seizure class for their entire agency at the Saginaw Chippewa Indian Tribe.

Page 44

Next entry there is Developed 16-hour course curriculum Canine Legal Updates Louisiana: Patrol and Narcotic-contraband Detection Dog. Put a curriculum together for Louisiana for a two-day course on canine search and seizure, and that was eligible for continuing education credit through the Louisiana POST, Peace Officers Standards in Training Council.

Q.    Could I ask you just a quick question there?  This is very helpful.  Let me ask you a quick question.  When you were putting together these programs and you have a split program between a patrol -- for example, a patrol and narcotic program, how much of your training is focused on the patrol aspect and how much is focused on the narcotic detection aspect?

A.    That's a great question, Mr. Johnson.

So what we do in my class is we do a building block-type instructional lesson, so we start with very general industry standards that relate to pretty much all canine handlers, kind of as we discussed earlier during this deposition.  So there's a general search and seizure that all handlers need to be familiar with.  And then that includes our court

Page 45

structure, criminal and civil liability,

general training standards, general certification

standards, general industry standards.  And then

we go right into, from there, once we have that

foundation laid, go into those, canine

discipline-specific.

So once we get done with the generalized

instruction on that, then it's about half and

half from there, patrol versus whatever other

discipline that we're talking about, whether

it be narcotics or explosives, like that.

Q.   And so about how many hours of the

16-hour course then would be focused on patrol

training?

A.   Let's see here.  Well, the general

standards apply to patrol dogs, as well.  So

we're probably talking a good 8 to 10 -- 8 to 10

hours that are going to be dedicated to the

patrol discipline.

Q.   If you don't include the general

training hours and you just looked at the hours

focused exclusively on just patrol dog training,

how many hours would that account for of the 16?

A.   Probably -- and I'm -- I'm estimating

here, it's probably in that range of about six,

Page 46

six hours.

Q.   And does that differ based on the jurisdiction that you are presenting to?

A.   No, that's pretty consistent.  As long as it's a 16-hour course, that would be pretty standard.

Q.   And what about for an 8-hour course?

A.   For an 8-hour course, we're probably down into the three -- if I'm doing both at the same time, meaning that I'm doing a patrol plus I'm doing another discipline, we're probably going to be in the range of about three hours there.

Q.   And so in looking at -- at these -- the training programs that you've developed, as you were describing earlier, is the primary difference between the 16-hour courses in the different jurisdictions just localized legal differences between what law enforcement is allowed to do in that jurisdiction, or are there other differences in the presentations?

A.   The former would be the correct answer.  The difference really is just how the courts are interpreting the search and seizure issues related to that jurisdiction.

Page 47

Counsel, as you probably know better than anybody, each jurisdiction has their own nuances.  And depending on what the state constitutional -- and how the state courts rule on those constitutional issues within their own particular state really kind of drives law enforcement power and authority.

Q.   And it would be accurate to say then that the canine focus of the trainings, then, is nearly identical from presentation to presentation?

A.   Yes and no to that question.  If I can expound a little further?

Q.   Please do.

A.   So we have -- you know, we have our general search and seizure principles, and what I -- what we do in our courses is we try to -- we apply the dog to those search and seizure principles.  So while, yes, we have some very general information that's fairly consistent throughout the United States, there are some very specific nuances depending on where you're at the in the country and local jurisdictions.

Q.   And I believe you were making that comment within the context of a narcotic search

Page 48

and seizure.  Does -- does that -- does your point apply equally to patrol canines?

A.   Yes, it does.

Q.   Okay.  And can you walk me through how you've gone about developing these training curriculums and what standards you've looked at to have an ability to put forward these training materials?

A.   Sure.  I have extensive training in my background as a law enforcement officer.  I have over 9,000 hours in training throughout my career from 1995 through present.  I've focused most of my training on search and seizure.  And I am an instructor in -- certified instructor in use of force, which deals with seizures, at least in the law enforcement environment or setting.

And over the time, I've developed a passion for reading and understanding case law related to search and seizure, and I'm very, very close friends with a search and seizure attorney who teaches law enforcement here in the State of Illinois and the State of Arizona -- he's also a law professor -- who taught me how to read and kind of apply these cases in these particular settings.

Page 49

And so, going through all the trainings that I have over these years with the specific focus on these search and seizure issues and the use of force, as well as I just recently graduated as a certified force science analyst from the Force Science Institute as applying and putting all of this together, and went through instructor development courses and went through several instructor courses. I'm a Taser Energy Weapons instructor by Axon, a chemical weapons instructor. I'm a less lethal weapons instructor. I'm a defensive tactics instructor, OC pepper spray instructor. I'm a RAP instructor. I'm sure I'm missing some in there.

But each one of these courses for instructor, not only do they talk about the actual skill sets and things that you need to be able to teach that to other end users. They also go through the legal aspects and the search and seizure as it relates to those specific skill sets.

So I just recently was approved by the Illinois Law Enforcement Training and Standards Board as a certified instructor in search and seizure. And then putting that all together

Page 50

with my experience in canine, that's how we've developed these courses.

Q.   Do you hold any certifications in canine training?

A.   In canine training, no.

Well, let me back up.  I do have a certification from the North American Police Work Dog Association as a professional decoy.

Q.   Understood.

Other than the certification as a professional decoy, do you have any professional certifications relating to the training of canines?

A.   No.

Q.   And I believe you testified earlier today that you've been a patrol officer your entire career; is that correct?

A.   I've been a patrol officer.  I'm a designated officer in charge.  I have been through front-line supervisory skills training, which is a certified course through the Illinois Law Enforcement Training and Standards Board. And I am currently the team lieutenant with the Northern Illinois Police Alarm System Mobile Field Force and oversee the canine team in that

Page 51

unit.

Q.    Understood.

Is that the only supervisory experience you have of overseeing and being responsible for a canine unit?

A.    Yes.

Q.    And how long have you held those responsibilities?

A.    I was promoted to lieutenant earlier this year, and I was promoted to sergeant of that team last year, 2021.

Q.    Could you clarify for me, then, at which point in time, either in 2021 or earlier this year, that you took actual responsibility for oversight and supervision of the canine unit?

A.    In 2021, when I was promoted to sergeant.

Q.    Okay.  Do you remember the approximate month that that was, or quarter, even?

A.    I'm going to -- could I look at my CV?

Q.    Oh, please do.  Yes.

A.    I'm not sure --

Q.    Yeah.  It's an open-book test.  It's not a memory test.  I apologize.

A.    Oh, no problem.

Page 52

I'm just trying to remember what the actual month was, and I don't know if it's on here or not, but --

Q.   No, please take your time.  Yeah. Please.

A.   I don't see it.  I don't see the actual -- I don't see the actual month on there. I want to say it was -- I'd be guessing.  It was sometime in 2021 that I was promoted to sergeant. And I would say, you know, somewhere in the summer range.

Q.   Okay.  Understood.  Thank you.

Other than the training that you received in connection with your law enforcement responsibilities, is there any formal training or certification that you've done regarding the training of canines?

A.   Yes.  I started the process of becoming a trainer with the North American Police Work Dog Association, and I started that -- it's an apprenticeship training.  And I -- I did that for approximately a year before everything else took over and I just did not have time to keep up with that.

Q.   And do you remember -- do you recall, as

you sit here today, approximately when you started that apprenticeship?

A.    It was 2016 or 2017.

Q.    Okay.  And you participated in the apprenticeship for about a year, is that correct, before ceasing engaging in the program?

A.    Well, I -- yes.  I -- yes.

Q.    And outside of participating in the apprenticeship for a year, is there any formal training or certification that you've undertaken or received, particularly related to canines?

A.    I'm sorry.  Can you repeat that?

Q.    Sure.  Other than the training that you've received in the context of your law enforcement career, as well as the one-year apprenticeship that you did, have you received any trainings or certifications relating to canines?

A.    Other than in my law enforcement capacity?  Is that your question?

Q.    Yes.  Other than the training that you've been provided as part of your law enforcement training as a law enforcement officer and the apprenticeship that you did for a year, have you received any canine trainings or

Page 54

certifications?

A.    Understood.  No.

Q.    And other than the canine trainings that you've received as part of your law enforcement training and the one-year apprenticeship that you -- that you did, have you received any training or certifications in cert -- in how to supervise and/or develop or train canine units?

A.    I'm sorry.  Can you repeat that?

Q.    Sure.  Have you received any training in how to supervise canine units?

A.    Other than the front-line supervisory skills that was for general law enforcement, no.

Q.    Okay.  Have you received any training on how to develop and monitor canine programs within a statewide law enforcement entity?

A.    Formalized training, no.

Q.    Do you have any experience developing statewide canine training and supervision programs?

A.    Can you repeat that?  I'm sorry.

Q.    Do you have any experience developing statewide canine supervision or training programs?

A.    Yes.

Page 55

Q.   Can you please describe that?

A.   Sure.

So I was hired as a consultant with the United States Department of the Interior, the National Park Services, to consult on their entire canine unit policy, as well as the United States Department of Interior, Fish and Wildlife. I was hired to consult on writing their protocols related to certification.

Q.   Can you describe each of those experiences in a little bit more detail?  What do you -- and what, specifically, you were writing policies to certify?

A.   Sure.  So with the United States Department of Interior for the National Park Services, they retained me to consult, review their policy, and make recommendations that would be consistent with canine industry standards as it relates to their patrol -- or their -- their canine unit, which included patrol, narcotics, and tracking, those type of disciplines, as well as their use of force.

And so I did a policy review on that, made the recommendations consistent with the industry standards, with the supporting

Page 56

documentation that went with that.  For the United States Department of Interior for the Fish and Wildlife, they are in the process of revising their certification standards for their canine teams, which did include patrol, and their patrol dogs as well as their odor detector dogs.

So I reviewed the certification standards that they had and compared them With the industry standards and made my recommendations on how to improve their certifications.

Q.   As you sit here today, do you recall both of your -- in both instances were your recommendations adopted?

A.   Yes.

Q.   And, again, those were -- each of those experiences were with federal law enforcement agencies pertaining to law enforcement of civilians; is that correct?

A.   Can you repeat the question?  I'm not sure I understood what you meant.

Q.   Each of those experiences that you just described did not relate to a prison setting; is that correct?

A.   Correct.  Yes.

Q.   And each of those entities that you just described were federal law enforcement entities; is that correct?

A.   Yes.

Q.   And as far as you're aware, neither of those federal entities operate a prison system; is that correct?

A.   I have no idea.  I -- the National Park Services does not, because I read their policy and nowhere in their policy did it mention a correctional facility.

Q.   And none of -- your recommendations did not require you to evaluate any sort of correctional setting; is that correct?

A.   Correct.

Q.   If we could, for just a moment -- if I could ask you to go back to the Marked Exhibits folder.

A.   Okay.

Q.   And just let me know when you've navigated back there.

A.   Okay.  I am there.

Q.   Okay.  Do you see a document that's been marked as Exhibit 3?

A.   Yes, I have it.

Page 58

(Kmiecik Exhibit No. 3, Appendix A to Final Initial Report, was introduced electronically.)

BY MR. JOHNSON:

Q.    Awesome.  Do you -- if you could open that up and then let me know when you have that open?

A.    Okay.  I have that open now.

Q.    Perfect.

And have you ever seen what's been marked as Exhibit 3 before?

A.    Yes, I have.

Q.    And what is it?

A.    It's Appendix A to my final initial report.

Q.    And what does Appendix A describe?

A.    It details the training documents that I reviewed for Officer McCowan and Canine Shadow related to this case.

Q.    And as you sit here today, are there any documents that you reviewed that are not listed here?

A.    I'm going to take a quick scroll through, if I may, Mr. Johnson?

Q.    Please take your time.

Page 59

A. Related specifically to this document, I don't see any -- I don't see anything missing out of there.

Q. I'm going to ask you to -- oh. Go ahead. I'm sorry.

A. I didn't say anything.

Q. Oh. Sorry. I think there was maybe some static in the line. I apologize. It sounded like you were started saying something. I didn't mean to cut you off. Sorry about that.

A. No problem.

Q. If we can navigate back -- we're done with this document. If we can navigate back to the Marked Exhibits folder?

A. Yes, sir.

Q. There should now be another document marked Exhibit 4.

A. Yes, sir.

Q. If you can click on that and open that document, as well.

A. It's open.

Q. Okay. And have you ever seen what's been marked as Exhibit 4 before?

A. Yes, I have.

///

Page 60

(Kmiecik Exhibit No. 4, Appendix B to Final Initial Report, was introduced electronically.)

BY MR. JOHNSON:

Q.   And what is Exhibit 4?

A.   Mr. Johnson, Exhibit 4 is Appendix B to my final initial report.

Q.   Okay.  And what is Appendix B listing?

A.   The document details what I reviewed and related to Officer McCowan and Canine Shadow's certification and proficiency assessments.

Q.   Okay.

A.   I'm sorry.  Certification.

Q.   So we can put -- put that document away. We're done with that one.  Thank you.

A.   You're welcome.

Q.   So I'd like to switch gears now and focus back on the opinions -- each specific opinion that you're offering in this case, and I'd like to -- to have you, you know, as best as you can -- and please feel free to point me to places in the report, to the extent it's helpful -- if you could explain each of your opinions and just -- and in somewhat layman's terms, to describe for each kind of opinion you're

Page 61

offering, what -- what specifically -- what conclusion you've reached?

A.   Sure.  Are we opening back up the document or are we --

Q.   Yes, sir.  So if we could -- if we could open back up Exhibit 1, and I believe if we start on page -- where we kind of started a few hours ago, on Page 65 under the middle line where it says, "In summary."  Or if there's another way you'd like to go through, that's fine, but we could, you know, start here, if that would be -- that makes sense?

A.   Sure.

So the first opinion that I came to here on Page 65 is that Officer McCowan and Canine Shadow had met or exceeded the minimum maintenance training standards pursuant to United States patrol service dog industry standards.

So when we were looking, when I am forming an opinion related to training standards, there is no -- really, there -- there's no federal or state requirement in Virginia that says that handlers and teams need to meet a minimum specific number of hours.  So what I do is I kind of look at what are the industry

Page 62

standards, and I think what we have here is we have some goal posts to meet.

So we look at -- generally speaking, the industry is at 16 hours per month of minimum training. So where did we come up with that 16-hour number? And the 16 hours is supported by all of the national canine associations, the major ones, I should say: The North American Police Work Dog Association, the United States Police Canine Association, the National Police Canine Association, the National Narcotic Detective Dog Association. It's also supported by the, quote/unquote, scientific community, which kind of writes the standards for the industry. That started as a group called SWGDOG, which was the Scientific Working Group on Dogs and Orthogonal Detector Guidelines, and it has now moved over to the National Institutes of Standards and Technology, as well as the Academy Standards Board and the American Academy of Forensic Sciences and the American National Standards Institute. They've all kind of taken up this -- best way to describe it is best practice standards.

The scientific community, though,

Page 63

is focused on detector dogs and not on the apprehension or biting patrol dogs.  But when we take -- we can put kind of this goal post together.  A mentor of mine who I took over for in 2019 after his passing, Terry Fleck, had conducted a study, polled 28,000 police dog handlers from across the United States, and what he found was a vast majority, specifically 99 percent of canine handlers across the United States at least met a minimum of a 16-hour maintenance training regimen.

As I go out and teach throughout the country, I conduct my own survey and I've found that we are in a 90.5 percent range.  So we know that those are kind of the, I guess you'd call it, yardstick for measuring maintenance training.

So I formed the opinion based on Appendix A and the documents that I reviewed there that are listed in Appendix A that Officer McCowan and Canine Shadow met those standards.

Q.   Other than the -- the temporal aspect of the training -- of Officer McCowan's training, did you look at the substance of his training?

A.   I did, yes.

Q.   And what was your -- are you offering

Page 64

any opinions about the substance of this training?

A.   The substance that you're referring to, the overall substance?  Overall is what your question is?

Q.   Yes.  Let me take a step back.

What I'm trying to understand in your opinion is whether or not your opinion is that Officer McCowan met or exceeded the minimum maintenance training because of the number of hours that he went through, or if you actually looked at the substance of what he was trained on in connection with the temporal aspect of that training?

A.   Sure.  Understood.

So looking at everything in their totality, I reviewed the documents provided by the Department of Corrections for the Commonwealth of Virginia on the training curriculum that they have, as well as reviewing Officer McCowan's training records, it's certainly -- and I've reviewed training records based on my consulting, a lot, training records from across the country.  And when you look at Officer McCowan's and compare those to what I

Page 65

have seen in my experience, they are consistent with meeting the industry standards. And that includes not just the training time, but the fact that the handler and the trainers are hitting all of their disciplines -- their trained disciplines within those specific periods of time, that they're doing proficiency assessment testing. Proficiency assessment is -- it's related to certification, but it's also related to training in order to test to see where the handler and the dog, or the team overall, are at.

So I did look at all of those aspects to form that opinion.

Q. Do the standards require that an officer train with the same canine the entire time they go through training?

A. I'm sorry. I don't think I understand your question. Could you repeat that?

Q. Yeah.

When an officer -- does the standard require an officer to start training with a canine and finish training with that same canine?

A. I don't -- the standard doesn't say either way. And industrywide, when you go out and look at these training facilities, routinely

Page 66

a handler may start with one particular dog. Let's say, so that I could put this into perspective and into context, if a handler goes to a basic course, let's say with a private vendor or even within their own agency if they're large enough to have a training program, it's not uncommon in the industry for a handler to start with one dog and then finish with another dog, because maybe the dog and the handler don't mesh together, their personalities clash, or it's just the dog washes out of the program or the handler either has too high of a personality for that particular dog or the handler has too low of a personality for that dog.  So there's a lot of things that go into that.

But it's not uncommon in the industry for there to be a switching of dogs throughout that process.

Q.   What was your understanding of how Officer McCowan and Canine Shadow were trained with respect to the actual deployment of Canine Shadow, meaning what's your understanding of how Officer McCowan was trained to release Shadow?

A.    Well, the Department of Corrections in their training program talked about -- are

Page 67

you -- are you referring to -- I'm not sure I understand your question, before I start down that road.

Q.   Sure.   I'm asking a general question about what is your understanding of how Officer McCowan was trained to release Canine Shadow?

A.   Well, there's several aspects related to that.  There's the technical skills of releasing the dog and having the dog release and apprehend the decoy, versus the question of when would that be appropriate.  So both of those components are listed in the Commonwealth of Virginia's Department of Corrections training curriculum.

Q.   All right.  And so let's -- let's take each of those this turn.  So what's your understanding of how Officer McCowan was trained regarding the circumstances in which it was proper for him to release Canine Shadow?

A.   Well, there are two points to that because there are -- well, there are actually three points to that.

        The first point is that there's a policy in place for general use of force guidelines that the Department of Corrections has.  Also, there is the Canine Policy that more specifically

Page 68

relates to the deployment and use of the dog in those settings. And then we have our -- our training curriculum. In the training curriculum, they -- the Department of Corrections discusses a standard of objective reasonableness under a case called Graham v. Conner. It talks about the severity of the crime, the immediacy of the threat, and the level of active resistance or evasion.

Q. Okay. And given that that's in the training material, I guess what I'm trying to understand is, your opinion here is that Officer McCowan and Canine Shadow met or exceeded the training standards. And I guess I'm just trying to probe, given that that's in the training material, is it your opinion that just by virtue of that being in the training material that that's sufficient, or are there other aspects of the training that allow -- that permitted you to reach the opinion that Officer McCowan and Canine Shadow were sufficiently trained?

MR. DAVIS: Objection to form.

THE WITNESS: Well, when you look at those --

MR. DAVIS: You can go ahead and answer.

Page 69

THE WITNESS:  When you look at the totality of these documents, that is what I'm basing my opinion on.  Officer McCowan went through the approved course as a basic canine handler, actually twice, one at the higher level, and then the 80 hours with Canine Shadow, as well as the policies that are in place.

So when you put those into the totality and then you look at the records of the continuing maintenance training or the continuing training or in-service training, that's how we come up to that opinion.

BY MR. JOHNSON:

Q.  Well, let's get back to talking about kind of the differences between how Officer McCowan was trained as to the situations when it's proper to release a canine, but then also the technical training as to how to do it.

So I believe we answered the first but not the second.  So what's your understanding of the technical training Officer McCowan received as to how, once the decision's been made to deploy Canine Shadow, to actually deploy Canine Shadow?

A.  Sure.  Understood.

Page 70

So again, if we're looking at the training curriculum that is in place by the Virginia Department of Corrections, there are curriculum that are in place there that talk about decoying and all of -- the decoying is part of that learning the technical skills needed for the release of a dog.  And then when we look at those curriculum and we put them together with the proficiency assessment and the certifications that Officer McCowan and Canine Shadow went through; all of those skill sets were tested and Shadow -- Canine Shadow and Officer McCowan passed those assessments.

So in their totality, when you look and take all of these and put them all together, that's how we take a look at the technical skill. So the technical skills are really those proficiency assessment and the certification.

Q.   And is it your opinion that the training and certification program employed by the Virginia Department of Corrections is a sufficient and complete training program?

A.   Yes.

Q.   And do you know how officers are trained?  Other than the fact that a training

manual exists, do you know how officers are actually trained to release their canines?

A.    I don't think I -- I -- I don't understand your question.

Q.    Do you -- do you -- are you aware of how the Virginia Department of Corrections actually instructs its handlers to release canines?

A.    Well, I've not personally seen their training, nor have I personally attended their trainings.

Q.    I believe you did review Mr. Barbetto's deposition transcript, though, correct?

A.    I did, yes.

Q.    And in reviewing his transcript, did you become aware of how Virginia Department of Corrections instructs its canine handlers to release canines?

A.    I'd have to relook at the testimony from Mr. Barbetto, but in very general terms, yes.

Q.    I'm sorry.  I'm confused.  I thought you said you were not aware of how they did it, and I believe you just testified that you are aware of how they train?

A.    No.  What I -- you're mischaracterizing, Mr. Johnson, what I said.  I said I didn't

Page 72

personally attend their trainings nor did I personally see their training.

Q. Understood. Are you -- the question I'm asking is a bit more -- and it's not -- I'm not trying to be tricky in any way. I'm just asking do you know specifically how the Virginia Department of Corrections instructs and trains its officers to release a canine?

A. In a very general sense, looking at, as you said, Mr. Barbetto's testimony, as well as Sergeant Stanley's testimony, as well as Officer McCowan's testimony as well, when you put all of those together, there is a general understanding or perception as to how the dogs are trained and what the training program looks like.

Q. Okay. Can you describe that for me?

A. Sure. They have a more than 400-hour course that they attend. As part of that course, they have lecture classroom portions where they have learning objectives that they have to meet. They also have their technical, actual skill sets, and those skill sets, when we look at their proficiency assessment as well, that's how we see that their skill sets are meeting at least the minimum standards, so in that general sense

Page 73

there.

Q.   Okay.   My question's a bit more specific.   My question is very specifically focused on one particular aspect of the general training that you just described, and it's particularly on the training as it pertains to how an officer should release their canine. And my question to you is, what is your understanding of how the Virginia Department of Corrections trains its officers to release canines?

A.   Well, they've train their officers pursuant to their training curriculum under a standard of reasonableness.

Q.   Okay.   And do you specifically know what that is?

A.   It's listed in the training curriculum documents.   And they talk about, specifically within those documents, the Graham v. Connor factors; that being the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, or whether the suspect is actively resisting arrest or attempting to evade arrest.   And then we have the policy and -- the Department of Corrections'

Page 74

policy on use of force, and you couple that

within canine policy, as well.

So those three documents right there

discuss when it would be appropriate to release

their dog.

Q.    Yes.   I understand that.   And, again, my

question's different.   We -- we had -- earlier, I

believe, already discussed the circumstances in

which it's appropriate to release a dog.   And my

questioning now is focused on a very different

aspect, which is the technical release of the

dog.

And so what I'm asking you is, what is

your understanding of the technical training that

the Virginia Department of Corrections provides

to its canine handlers to technically release

a canine once that handler has made the

determination that force is necessary?

A.    Sure.   So they have in their training

curriculum their search for decoy, so that would

be a technical -- a technical skill set.   They

have in their training curriculum decoying.   That

would be a technical still set there.

And then when you look at their actual

markings or ratings for their proficiency

Page 75

assessment, you can see all the skill sets that the dog is being tested on.

Specifically, there is also their institutional environmental training that they have a curriculum on, as well as their obedience they had a curriculum on.  So they had these curriculums that are in place that are teaching these specific skill sets.

Q.    Do you have an understanding of the command that the Virginia Department of Corrections instructs its handlers to give to release a canine?

A.    I'm sorry.  Can you repeat that question?  I want to make sure I understand it.

Q.    Do you have an understanding of the command that the Virginia Department of Corrections teaches to its canine handlers to release a canine?

A.    The actual command?

Q.    Yes.

A.    Is that your question?  I don't recall. I don't recall seeing that.

Q.    Do you have an understanding of the actual command that the Virginia Department of Corrections teaches to its canine handlers to

Page 76

release a canine after it's engaged?

MR. DAVIS:  Objection.  Asked and answered.

Excuse me.  That was pertaining to release?

MR. JOHNSON:  Yes.

MR. DAVIS:  I'll withdraw the objection then.

THE WITNESS:  Could you repeat the question?

BY MR. JOHNSON:

Q.  Sure.

Do you have an understanding of the command that the Virginia Department of Corrections teaches to its canine handlers to release a canine after it's engaged?

A.  Okay.  I thought that was the same question also.  I apologize.  I don't recall.

Q.  Okay.  So just to clarify, you don't recall the command that's given to engage a canine and you don't recall the command that's given to release the canine after it's engaged; is that correct?

A.  That's correct.

Q.  So let's move to your next opinion that

Page 77

starts with "The use of Canine ET," and I believe it begins on Page 71.

A.    Okay.

Q.    And so could you walk me through this opinion?

A.    Sure.  So specifically what I put on here in my report, what my opinion is, is that "The use of Canine ET was the only force option in an escalating, tense, uncertain and rapidly evolving situation that proved necessary and effective to compel Guy's -- that would be Arthur Guy -- compliance.  All prior force options had failed, and therefore a reasonable officer in Officer Baker's position, given the totality of the circumstances, would believe that the use of Canine ET in a directed manner to stop an ongoing threat to other inmates and staff would be reasonable, necessary, and a last resort."

So what I'm talking about in that particular statement of my opinion is, again, if we look at the situation in its totality, we have Arthur Guy and plaintiff, Mr. Johnson in this case, who were engaged in a physical fight in a maximum security pod at the Red Onion State Prison.

Page 78

By my count, there's about 25 inmates inside this pod at the time of the fight. We have one correctional officer inside the pod at that particular time, that being Officer Mullins, when this fight breaks out.

Officer Mullins and the gunman both issue warnings to Mr. Johnson and Mr. Guy to stop fighting, and then those warnings were not heeded. So the gunman, Officer Dean, fires an OC -- a 40 millimeter OC impact grenade into the area in which the fight was occurring. That did not stop Mr. Johnson and Mr. Guy from fighting.

At that point, Officer Mullins attempts to pepper spray the individuals. And as he's pepper spraying, he reports that he issues warnings. That does not stop them.

Now, at that particular time, we have -- another situation that is developing is, we see an unknown inmate start to run towards or in the direction of the fight, physical fight between Mr. Guy and Mr. Johnson, and we have Officer Mullins still in there by himself. So he's trying -- his attention is focused or redirected towards the individual who's running at them.

Then, once Officer Mullins is able to

get this person -- this unknown inmate under control and compliant and on the ground, he brings his attention back to Mr. Johnson and Mr. Guy, who are continuing to fight after the deployment of pepper spray, after the deployment of the OC grenade round, 40-millimeter, after multiple warnings have already been given, and Officer Mullins attempts to spray them again.

This does not prove effective.

At this point, Officer Dean launches three 40-millimeter rounds at Mr. Johnson and Mr. Guy and was warning them to stop fighting. None of this seemed to work. They continued to fight. As a matter of fact, during this time, Mr. Johnson, who was initially on the bottom of the fight, reverses and gets on top of Mr. Guy.

At that point, that is when Officer Baker breaches the pod and sees what is occurring there; all right? So given the escalation in force that the officers had already used, as well as those warnings, and Arthur Guy and Mr. Johnson not heeding those warnings and failing to stop fighting, I believe that it was a necessary positive force to use the dog to stop that fight from occurring, and that's the basis in general.

Page 80

Q.   And I just wanted to clarify for this particular opinion in particular, this is just focused on the deployment of Canine ET; is that correct?

A.   In this opinion, yes, sir.

Q.   Okay.  Okay.  Could we move to the next opinion?

A.   Sure.

Q.   And I believe this --

A.   Would be --

Q.   Please go ahead.

A.   I'm sorry.  Go ahead.

Q.   No, I think we're on the same page.  Go ahead.

A.   The use of Canine Shadow, is that where you're at, on Page 71?

Q.   Yes, sir.

A.   So my opinion there is the use of Canine Shadow was the only force option in an escalating, tense, uncertain and rapidly evolving situation that proved necessary and effective to compel Johnson's compliance.  All prior force options had failed, and therefore a reasonable officer in Officer McCowan's position, given the totality of the circumstances, would believe that

Page 81

the use of Canine Shadow in a directed manner to stop an active ongoing threat to other inmates and staff would be reasonable, necessary.

And a last resort.  And the basis for this opinion is everything that I have already prior -- previously discussed related to Officer Baker and Canine ET.

We have a physical fight that broke out. We have an officer who is by themselves in a pod, maximum security pod, with 25 inmates.  There's a 40-millimeter OC grenade that has been launched in an effort to try to break them up, as well as warnings, both by the government, Officer Dean who fires  that 40-millimeter OC grenade, as well as Officer Mullins who is directly inside the pod with them.

At that point we have the OC deployment by Officer Mullins, with warnings for them to stop fighting.  We have this unknown inmate who still comes in at that point running towards Officer Mullins and the fight generally. Everybody else inside the pod, with the exception of Arthur Guy, Mr. Johnson, Officer Mullins and this unknown inmate, are on the ground at this particular point.

Page 82

Officer Mullins needs to direct his attention to ensure that he's not going to be under attack or that this unknown inmate is not going to join in and attack Arthur Guy or Mr. Johnson, so he directs his attention away, has to get this person under control.  This is all happening very, very fast.

Once Officer Mullins is able to get this unknown inmate under control, he then refocuses his attention back to the physical fight and attempts a second OC spray, and with warning announcements.  This does not temper Mr. Guy or Mr. Johnson's continuation into this physical fight.

So we've used verbal warnings, we've used OC spray, we've used an OC grenade, and then Officer Dean starts to fire three 40-millimeter directed impact rounds at Mr. Johnson, who is now on top of Arthur Guy.  Those prove ineffective.

So we have verbal; we have pepper spray; we have OC grenade; and we have at least three, at this point, 40-millimeter directed fire impact rounds that have been deployed.

Arthur Guy and Mr. Johnson have not stopped fighting.

Page 83

Now we've introduced Officer Baker and Canine ET into that mix, at which time as soon as -- or, contemporaneously, very soon after Canine ET bites Arthur Guy in the calf, Arthur Guy surrenders, putting his arms out to his side, at which time Mr. Johnson continues to fight Arthur Guy. Mr. Johnson's on top of Arthur Guy at this time and he continues to assault him.

At this particular time, Officer Mullins goes in and attempts to pull Arthur Guy -- I'm sorry, correction -- Mr. Johnson off of Arthur Guy and -- to prevent any further injury and to stop this -- to Arthur Guy and to prevent this fight from further occurring;

At this time is when Officer McCowan is breaching the A1 pod door. And from the videos of the incident which I reviewed, and as I note here, as I'm reviewing this, I have 20/20 vision of hindsight. I can stop this video frame by frame by frame by frame and watch it, but Officer McCowan does not have that luxury. Officer McCowan is going to react, as any officer would, to what he sees happening in the moment that is happening in a split second.

And when I stopped the video, right at

Page 84

the time that Officer McCowan is breaching the A1 pod, you can see that Mr. Johnson and Officer Mullins are tied up with each other, and it appears from multiple angles on this still image that Mr. Johnson is assaultive towards Officer Mullins.

So, seeing that, if I were in Officer McCowan's shoes coming into this, I came to the conclusion that it would be a reasonable belief that Officer McCowan was being assaulted or under attack by Mr. Johnson.

Now, the question becomes did Officer McCowan know of all these past escalating force options. Well, when we look at the testimony we look at Sergeant Stanley's testimony in this. Sergeant Stanley testifies that the standard operating procedure in these inmate-on-inmate fights is that there's a horn that's blown, warnings are given, an OC grenade is launched. OC is used. Directed impact weapons are used. So entering -- that's what a canine handler would reasonably expect when they enter into the pod.

So seeing all of this, with having that in its totality, seeing Johnson and Mullins -- Mr. Johnson and Mr. Mullins appear to

Page 85

be tied up with each other, that appears to be a reasonable assault on a staff member.

And so when I look at, I believe -- that's how I came to my conclusion and my opinion here -- it was necessary at that particular point for Officer Mullins -- or, excuse me, Officer McCowan to use Canine Shadow to stop and end that particular threat and get Johnson under control.

Q.   Is it your opinion that an inmate has to lay prone on the ground with their arms out, as you described Mr. Guy, to surrender?

A.   You're asking me is it my opinion that a inmate has to lay prone with their arms out?  Is that your question?

Q.   It is.  I believe you testified that -- and we can have Mr. Black read it back, but I believe you testified that part of your opinion was that you observed Mr. Guy surrender. And I'm just trying to understand that statement. And so my question is --

A.   Sure.

Q.   -- I believe you testified that Mr. Guy laid on the ground with his arms out and that is what led you to conclude that he surrendered.  Is that accurate?

Page 86

A.   Understood.  That is accurate.

Now, I think what your question just was is is it my opinion that they have to do that.

Q.   That is my question, yes.

A.   Okay.  So we're on the same page, then.

That's not necessarily my opinion.  But what I would say to your question is that Mr. Johnson testified at the deposition that it was his understanding that when the dogs come into the particular location that the inmates are at, that everybody get down on the ground.

So while it's not my opinion that an inmate or an offender would have to get into that position before a surrender was apparent, certainly as part of my opinion, or at least going towards my opinion, there was an understanding by Mr. Johnson prior to this incident that when dogs come into the cell block or into the pod that there's an understanding that everybody needs to get down.

(Cell phone interruption.)

MR. JOHNSON:  Excuse me.  I'm sorry for that.

BY MR. JOHNSON:

Q.   I believe you also testified that it's

Page 87

your opinion that Mr. Johnson was assaultive towards Officer Mullins at the time that Officer McCowan entered the pod; is that correct?

A.    My testimony is that I think it is a reasonable belief for an officer coming through the A1 pod threshold, seeing that in the moment, would be reasonable in their belief that Johnson was assaultive towards Officer Mullins.

Q.    And can you explain what specifically about, as you saw it on the video, leads you to believe that that -- that would be reasonable?

A.    So when you still image -- when I still-imaged, Officer McCowan right at the threshold of the A1 pod door, actually, you can see he's kind of leaned over and his head is kind of cocked as if he's looking into the pod and seeing what is occurring.  At that particular moment in that still image, you see that Officer Mullins and Johnson are locked up with each other.

So when you put this into context, from Officer McCowan's perspective, he gets a report that there's a fight inside the A1 pod.  And he's responding to that fight within this A1 pod and hits that threshold and he sees

Page 88

Mr. Johnson locked up with Officer Mullins, that to me -- I have seen that before, on the street in real life as a police officer, that locking up is an indication that the officer is in trouble and that the officer is being assaulted.

So I think that's a reasonable belief, when he sees this in that split second moment, that as soon as he sees that when he's entering the pod, that that would be a reasonable belief seeing a correctional officer locked up with a inmate.

Q.    Would your opinion change if, in fact, Mr. Johnson was, instead of as you described, just hypothetically speaking, walking away or had his back to Officer Mullins, as compared to as you were just describing?

A.    Well, it -- are you -- you're giving a hypothetical here, --

Q.    Yes.

A.    -- but are you saying that Officer McCowan doesn't see that?

Q.    I'm saying, hypothetically speaking, if when Officer McCowan -- holding everything else consistent -- when Officer McCowan comes to the threshold of the A1 pod, if Mr. Johnson has his

Page 89

back and is not facing Officer Mullins, would that change your opinion as to the reasonableness of Officer McCowan's decision?

MR. DAVIS:  Objection to form.

You can answer.

THE WITNESS:  There has to be some greater context here, because that's not what happened.  Because -- because you -- you see this in the moment, right, this perception.

Now, whether Johnson was assaulting Officer Mullins or not, whether it was perceived is the question.  Did Officer McCowan perceive this?  And I think that's a reasonable perception.

Now, he didn't just turn his back and take a couple steps away, so I think it's an unfair question, because there was more to that, that we see in the video and we can see that in the still images.

So the question that you're asking that you're expecting me to answer is, what are the other factors in context, right?  Is this person in an athletic stance?  Does this person have their fists clenched?  Is this person looking in the direction of the other party of the fight?

Page 90

Is this person looking in the direction of other inmates?  So my opinion overall would not change, but we need to understand that in its full context, your hypothetical.

BY MR. JOHNSON:

Q.   Okay.  So I just want to make sure I understand your answer there.  Is your answer there that your overall assessment of the reasonableness as to Officer McCowan's conduct wouldn't change if the conduct between Mr. Johnson and Officer Mullins was different?

MR. DAVIS:  Object to the form.

You can answer.

THE WITNESS:  It wouldn't change if there was further context.

BY MR. JOHNSON:

Q.   I guess I'm trying to understand what that means.  So I guess what I'm trying to ask is, hypothetically, if you were to assume that everything you just said about the incident, and holding all the facts consistent, but instead assume that Mr. Johnson doesn't have a balled fist but takes two steps away, or is taking two steps away from Officer Mullins at the time Officer McCowan enters the A1 pod, would that set

Page 91

of facts change your overall opinion as to the reasonableness of the use of force?

A.   I can't give a question to that -- an answer to that hypothetical question because I need to view that in its full context and I would need to see the speed at which that was occurring.

Q.   But it's your view, that in viewing the footage here, that the conduct Mr. Johnson engaged in from the second before Officer McCowan got to the threshold of the A1 pod until the moment in which Canine Shadow bites Mr. Johnson -- I apologize for that interruption.

MR. JOHNSON:   Let me start -- Mr. Court Reporter, could you read that back?   I'm sorry. I apologize.

(Referred-to testimony read back.)

BY MR. JOHNSON:

Q.   Okay.   Was assaultive towards Officer Mullins?

A.   From the time that Officer McCowan enters the A1 pod to the time of the bite, it is my opinion that Johnson's behavior was assaultive to Officer Mullins.   Is that --

Q.   Yes.

Page 92

A.   -- the question?  No.

Q.   So at what periods of time is Mr. Johnson assaultive, in your opinion, towards Officer Mullins?

A.   Towards Officer Mullins, we're looking at that time that he has locked up with Officer Mullins, and the time immediately following that when he is in close proximity to Officer Mullins with his hand balled in a fist.

Q.   Isn't that the time that Officer McCowan is entering the pod?

A.   The moment that Officer McCowan is entering the pod is the moment in time Mr. Johnson and Officer Mullins are locked with each other.

Q.   And then -- and it's at that point that Officer McCowan makes a determination to release Canine Shadow.  That's correct?

A.   Well, I wasn't in Officer McCowan's head, but from the video it appears as though that is in that general range of time frame --

Q.   Did you review --

A.   -- based on Officer McCowan's actions.

Q.   I apologize.  Okay.

I was going -- did you review Officer

Page 93

McCowan's deposition testimony regarding what he was considering at the time he entered the A1 pod?

A.    Yes.

Q.    Does -- does -- did that review refresh your recollection as to what he was thinking at the time?

A.    Well, he was thinking that Officer Mullins was under assault; that there was an assault on staff, pursuant to his deposition testimony.

Q.    And again, just -- it's your opinion that the video reflects -- the reason that it was reasonable for Officer McCowan to release his canine is that the video -- in part, the video reflects Mr. Johnson in what could reasonably be appearing to Officer McCowan as an assaultive conduct towards Officer Mullins; is that correct?

A.    In -- in part, yes, because it didn't just stop -- Mr. Johnson's actions didn't stop there, so there's further analysis that needs to be looked at.  But for that part, the answer is yes.

Q.    Okay.  So what are -- what's the further analysis of Mr. Johnson's conduct that you are

Page 94

describing?

A.   So again, we're looking at this in its totality.  It's not just, you know, one second here, one second here, one second here.  We've got to put this into its totality.

After the disengagement with Officer Mullins, Mr. Johnson is standing there with his fists balled up.  He's in very close proximity to Officer Mullins.  He's in very close proximity, still, to Arthur Guy.  And it is that in that -- this general range of time here that canine -- that Officer McCowan releases Canine Shadow, initially.

It appears, from my viewing of the video, that Mr. Johnson starts to take a step back as he is seeing -- and I think he testified to seeing the dog coming in his direction.  And at that particular point, Johnson testified that he heard the canine handler or -- in this general time frame, telling him to get down on the ground.  But instead of getting down on the ground, very quickly, and this -- this is -- I have been in many use of force incidents on the street dealing with suspects, and this is happening very, very fast.  And so we are talking

Page 95

about looking and trying to analyze and determine the appropriate level of force in milliseconds, and trying to capture what the suspect or the offender or the inmate in this particular case is doing at those moments.

And so as Canine Shadow starts to make his approach, it appears as though he slips on the hard surface slick floor within that pod, missing Johnson.

Now, Johnson does not put his hands up in the air. At no point on the video do I see, at this particular time, Canine Shadow jumping at Mr. Johnson's face and trying to bite him in the face. As a matter of fact, the dog hit, I believe it's a metal table and bench that's right there as Johnson starts to step back. And at this particular point, as he's starting to step back, he's still in this athletic stance.

Now, is this Johnson simply trying to escape and get away from the dog? Maybe. But the question is what does that action look like to Officer McCowan? It doesn't look like hands up in the air in a surrender position. It doesn't look like I'm getting on the ground, putting my arms out in a surrender position,

Page 96

and Mr. Johnson doesn't say anything to Officer McCowan like, okay, okay, I give up, I surrender. None of that's said, or at least we don't have audio, but nobody testifies to that, nor is it documented in any of the reports.

So as the dog starts to spin around, we still see Johnson in this kind of athletic fight-type stance. So the question is, if I'm in that position as a reasonable officer viewing, knowing what I already know, seeing what I saw and perceived what I saw, is it reasonable for me to believe that Mr. Johnson is still actively resisting or still attempting to fight.

The answer to me is yes, which is the basis for my opinion. At that point we had Johnson making this spinning motion and that is when -- and starting to turn, to move in a particular direction. It is in a direction away from Officer Mullins. It is in a direction away from Mr. Guy. But it is still in a direction where there are several inmates that are down on the ground. So the question is, to Officer McCowan -- to me if I was in his shoes -- is he, Mr. Johnson, going over to initiate another fight? He's not given me any indication at this

Page 97

point that his assaultive nature has come down. He's not given me any indication that he's attempting to surrender. So I believe at that particular point, at the moment in time that Shadow bit Johnson and that -- in his hand, when we added that into its totality, that a reasonable officer in Officer McCowan's shoes would believe that Johnson is still an active threat, and that this not a situation that is deescalating, but this is a situation that is, in fact, escalating.

Other escalating force options have failed. Mr. Johnson is not in custody. He's not complying. He's not attempting to surrender. There is a perception that not only did he assault Mr. Guy; there's a perception that he assaulted Officer Mullins.

Officer McCowan at this particular time does not know if Johnson's armed, and, yes, he did testify that he did not know if Mr. Johnson was armed, but he also testified that if he was armed, he could be stabbed.

Officer McCowan didn't know if Guy was injured. Officer McCowan did not know at that point if Mr. Mullins was injured. This is

Page 98

happening very, very fast.  And when we look at

the speed of what is happening here and looking

at it from a perspective of a reasonable officer

in that position, I think it's reasonable for

Officer McCowan to have reached the conclusion

that it was necessary to use Canine Shadow to

end this rapidly evolving, tense and uncertain

situation.

Q.    I believe one of the statements that you

made about this -- about this opinion and the

last opinion we were discussing as well, is that

you have been in this situation before, that

that's -- part of the -- the -- the basis of your

opinion is that you've -- you've been in these

force situations before where you've had to use

canine force; is that correct?

A.    Well, not just canine force, but any

levels of force.  The speed at which these

situations are happening, they're very, very

fast.  And you -- the -- as an officer in these

situations, and from what you're seeing, you're

trying, in a split second, to make an appropriate

decision about the level of force that is needed

to end a situation that is potentially very

dangerous, not just to you but to other officers

Page 99

that may be on scene and to others that might be around.

And this case has all of that.  It has other officers, it has Officer McCowan, it has inmates, and there were inmates directly in the direction in which Mr. Johnson kind of was turning and moving towards when Canine Shadow actually bit him.

So when you look at all of this, from my experience on the street, it's happening very fast.  It's unfolding very, very fast.  And Officer McCowan only has a split second to make the correct decision, and that's why it's an objectively reasonable decision.

Q.    But I believe that you testified earlier today that you've never been a correctional officer; is that correct?

A.    That's correct, yes.

Q.    And I believe that you testified earlier that you've never worked in a correctional setting; is that correct?

A.    Yes.  Yes, meaning that's correct.

Q.    Thank you.  And so the considerations -- well, let me -- let me strike that.

Page 100

Is it your belief that a correctional setting and a -- and I think the phrase you used is "on the street," or "a street setting" are completely analogous?

A.   No.  I think I there are some similarities, but there are obvious differences.

Q.   And do you think any of those similarities or differences bear or have impact on an assessment of the reasonableness of the use of force?

A.   I do.

Q.   Do you discuss any of those differences in your report?

A.   I do.

Q.   Okay.  Could you point out where?

A.   Sure.  First of all, if we go up to -- bear with me while I find this, sir.

If we go to Page 34, I think the most -- well, there's several differences there, but on Page 34 if you look at where it says "good faith effort to maintain and restore discipline," I think the major difference in my mind between a street encounter and a encounter within a correctional facility, not just a correctional facility, but we're talking about a state

Page 101

correctional facility, and we're also talking about a maximum security and the A pod's being the max within that max security setting. These -- well, let me stop there.

The big difference between a street encounter and an encounter within this Red Onion State Prison is the constitutional standard in which the force is analyzed under.  That's the biggest difference.

On the street, the other difference is, we talked about up in -- I'll get to it, sir. I think the point that I was about to make is actually in my rebuttal, but I would stand on that being the major difference there that's in this report.

Q.   Okay.  And just to be clear, you're identifying -- the section "Officer McCowan's Good Faith Effort to Maintain or Restore Discipline," you're identifying that section as representative of a difference, or are you identifying this section as actually addressing differences between street and correctional settings?

A.   I think the answer -- if I understand -- could you repeat your question so I

can understand it better?

Q.   Sure.  Let me be a little bit more direct about it.

I don't see anything in section "Officer McCowan's Good Faith Effort to Maintain or Restore Discipline" that discusses or addresses any differences or similarities between correctional and street settings.  And I'm just asking for you to identify for me where in that section you describe and address those considerations.

A.   Oh.  I understand your question. It's not specifically stated in there, but we're looking at two different standards.  One is a seizure standard and one is not a seizure standard.  That's the huge difference.

Now, it doesn't specifically state in there that point, specifically.

Q.   Right.

A.   But that's --

Q.   But you've only been trained and have experience on law enforcement search and seizure standards, so you don't have any training or experience in correctional settings; is that correct?

Page 103

A.   I have experience in teaching canine use of force issues to standards related to pretrial detainees, as well as convicted prisoners, in my canine classes.  I've had jailers -- canine handlers who worked in jails, who deal with pretrial and convicted.  And I've had canine -- state canine DOC officers come through my class.  So I have to address those issues and the standards based off of the case law related to that.

Q.   But the experience that you're relying on to make an assessment as to the reasonableness of the conduct at issue here is rooted in your experience as a law enforcement officer on the street; is that correct?

A.   Based on what I just described earlier in my deposition, yes.

Q.   Okay.  So it's not based on your experience as a correctional canine handler?

A.   Correct.

Q.   And it's not based on your experience operating in a correctional setting with canines used for patrol purposes; is that correct?

A.   Correct.

Q.   And your report does not specifically

Page 104

address differences between your experience and differences -- as an officer on the street using force and differences between a correctional officer use of force; is that correct?

A.    Specifically and verbatim, no.

Q.    Bear with me one moment here.  I'm just navigating back down to the summary section of your report.  Just give me a second here.

So if we look at your next opinion on the bottom of Page 71, let's start to have a conversation there, and maybe you could just start to explain, as we've been doing, this opinion a bit and I'll have a few questions. But maybe we can start with just your explanation of what your opinion is here.

A.    Sure.

I think it relatively speaks for itself. I'm of the opinion Officer McCowan's use of the Canine Shadow to bite and hold Johnson was in a good faith effort to maintain or restore discipline given the totality of the circumstances that Officer McCowan faced.  And then I cite several things here which I stand by: That Mr. Johnson was engaged in this physical fight; and while maybe not initially was he

Page 105

assaultive towards Guy, he certainly became assaultive towards Guy, being Arthur Guy; that Johnson appears to be assaultive towards staff members, which I think we've already discussed here.

Johnson had not been searched for weapons.  Again, I think we've already discussed that here.  Other inmates were in close proximity.

Johnson failed to comply with the officer's orders to get on the ground for restraint; that Johnson failed to comply after the following force options had already been deployed; a 40-millimeter launched OC round; two separate and distinct OC spray bursts; and four 40-millimeter launched directed impact rounds.

Q.   Did you make an assessment as to -- as part of this opinion as to whether or not the way in which Officer McCowan engaged Canine Shadow to bite and hold Johnson was proper?

A.   I'm sorry.  Can you repeat that, Mr. Johnson?

Q.   Did you -- as part of this opinion, did you make an assessment as to whether or not Officer McCowan's technique in deploying Canine

Page 106

Shadow to bite and hold Mr. Johnson was proper?

A.    The actual technique, I'm not -- I'm still not sure.  I'm still not sure what you're asking.  I apologize about that.

Q.    No.  No.  No.  No problem.  It's a poor question.  I apologize.

As part of this opinion, did you assess whether or not Officer McCowan followed his training on bite and hold when he engaged Shadow on Mr. Johnson?

A.    Okay.  One more time.  I think I'm understanding.  But one more time, please.

Q.    No problem.

Did you make an assessment as to whether or not Officer McCowan followed his training on bite and hold techniques when he deployed Canine Shadow on Mr. Johnson?

A.    I don't recall if I specifically addressed the technical aspects of Officer McCowan's deployment or not, specifically in the opinion.

Q.    Would that -- could your opinion change depending on the technique that was used?

MR. DAVIS:  Object to form.  You can answer.

Page 107

THE WITNESS:  No, it does not, and it would not.

BY MR. JOHNSON:

Q.  And why is that?

A.  Because I'm looking at the overall totality of the circumstances.  And from my -- in my experience, from our train -- my training as a patrol dog handler, as well as my deployments on -- in realtime with a patrol dog, even if I were to have specifically stated or not, there's nothing in there, from a technical standpoint, that would lead me to a different opinion.

Q.  But, again, you've never handled a canine in a correctional setting, correct?

A.  Correct.

Q.  Okay.  Are you offering any opinions on the adequacy of the Virginia Department of Corrections training on bite and hold techniques?

A.  Specifically on their bite and hold techniques, no.

Q.  Okay.  Let's move to your -- to your next opinion.  And that belief -- excuse me.  For me it's on Page 72 and it's under -- starts with the bullet, "I'm of the opinion."  Maybe could you just -- please go ahead.

Page 108

A.    I think we're on the same page. "I'm of the opinion Officer's McCowan's use of Canine Shadow to bite and hold Johnson was not excessive, malicious, or sadistic.  Is that what we're referencing?  We're referencing the same page here?

Q.    Yes, sir.

A.    Based on, again, the totality of everything we've pretty much covered so far, there's nothing in the record that I reviewed that would support that Officer McCowan used Canine Shadow in a malicious or sadistic manner. And I've already opined and discussed at great length about the reasonableness, or at least in my opinion, the reasonable perception and the reasonableness of Officer McCowan's decision to deploy.  Therefore, my opinion is that it wasn't excessive either.  But there's nothing in the record, or nothing that I viewed or reviewed that would lead me to believe that Officer McCowan was acting in a malicious or sadistic manner towards Mr. Johnson.

Q.    Do you have an opinion on how long a canine engagement -- strike that.

Is it your view here that the length of

Page 109

the time in which Canine Shadow was engaged on Mr. Johnson could never be a basis for an excessive use of force?

A.   Mr. Johnson, I'm sorry.  I have no idea what you're getting at.  I don't understand that question.

Q.   Sure.  So I believe what you said that what led you to conclude in this opinion that the use of force was not excessive here was the totality of the circumstances that you talked me through earlier; is that correct?

A.   Yes, sir.

Q.   So my question to you is:  Can it ever be the case where the length of a dog bite itself is a justification for a finding of an excessive use of force because the dog bite itself was too long?

A.   You're speaking in general terms?  Is that my understanding of your question?

Q.   Yes.

A   Yes.  Then I certainly would not dispute that.  I would agree.

Q.   And what -- what is your -- as a canine expert, help me understand what is your opinion on the length of canine bites and the

Page 110

circumstances in which we should be evaluating whether or not a -- the temporal aspect of a bite becomes excessive in and of itself?

A.    Great question, Mr. Johnson.  And this is one of those actually fairly easy questions to answer, although it would seem that it would be complicated.  Again, it comes back to what is the totality of the circumstances.  It's like any other force option that a officer would -- may be using, whether in corrections or on the street.

Once the individual is no longer a threat to the safety of the officer or to others, that is, not actively -- or is not actively resisting arrest, then the time after that, that any force would be applied, patrol canine or not, in my opinion,  would start breaching that threshold into excessive.

Q.    Okay.

A.    The main point of that is the immediacy, you know, whether this person is still a threat to the safety of the officer or -- or others that might be around.

Q.    And is part of your opinion that you're expressing here the -- or included within the opinion, "I am of the opinion that officer's

Page 111

McCowan's use of Canine Shadow to bite and hold Johnson is not excessive," is part of that opinion your conclusion that the length of the dog bite here was not excessive?

A.    Yes.  That is my opinion.

Q.    Okay.  And could you -- I apologize because we've probably talked about the answer to this in a couple different responses, but just for consistency, could you just explain one more time your -- the basis for your belief as to why the length of the dog bite was not excessive here?

A.    Sure.  And I -- I developed and discussed this at length in my opinion -- my final initial report under the "Duration of Canine Shadow's Bite" section.  But once -- and we're talking about the moment -- in my mind, we're talking about the moment in time that Canine Shadow is on the bite and biting, Mr. Johnson, until the time that the dog releases the bite.  Are we on the same page there, Mr. Johnson?

Q.    Yes, sir.

A.    Okay.  So when Canine Shadow actually does bite Mr. Johnson and grabs him by the wrist,

Mr. Johnson and Canine Shadow go down onto the ground.  And that is the position that Officer McCowan is ordering and expecting Johnson to do, at that particular point, given his orders -- that is, Officer McCowan's orders to Johnson.

Now, when Johnson goes to the ground, what happens is, based on my view -- reviewing of the video, his left hand comes down and goes underneath the torso of his body as Canine Shadow has hold of the right arm -- the right wrist, specifically.  And Officer McCowan works his Way with Canine Shadow kind of up towards Mr. Johnson's head area.

Now, Officer McCowan testifies, and based my review of the video, it appears consistent that Officer McCowan is unable to see Johnson's left hand because it's tucked up or curled up under Johnson's upper torso.

So the question again to me comes back to what would a reasonable officer seeing this with all of the facts and circumstances already known to him believe or perceive is the case here.  So let's -- going back to that, part of this analysis is Officer McCowan did not know whether Mr. Johnson was armed.  He did not know

Page 113

whether Officer Mullins had been injured.  He did not know whether Guy had been injured.  And although he testified that there was no -- he didn't have any reason to believe that Mr. Johnson was armed, he also said had Mr. Johnson been armed, "he would have been able to stab me."  And he specifically mentions that in his -- Officer McCowan's testimony.

So when I -- you start putting all this together, we have noncompliance; we have this escalating force options that don't appear to be -- not "don't appear," they are not working; we now have Canine Shadow on the bite; we have Johnson, from at least Officer McCowan's perspective, he can't see Johnson's left hand, although he's telling -- Officer McCowan is ordering Johnson to put his arms out.  Johnson is not complying.

And then we take this a step farther and take a look at, again, what is the entire environment happening here.  We have inmates that are laying on the ground trying to -- and Officer McCowan on that side over here.  Officer Mullins -- the only three people in this pod from the Commonwealth of Virginia Department of

Page 114

Corrections is Officer Mullins, Officer Baker and Canine ET who is dealing with Arthur Guy and the inmates over in that area, and then we have Officer McCowan and Canine Shadow who is dealing with Mr. Johnson.

Officer Mullins starts to walk over towards Officer McCowan, Canine Shadow and Mr. Johnson, but then he disappears.  So we just have Officer McCowan and Canine Shadow kind of alone with Mr. Johnson with a left hand that's concealed with unknown weapons, and we have these other individuals over here.  I think that it would be reasonable for an officer to leave Shadow on the bite because at this particular point Johnson is still a threat.

And the question becomes, well, when is he not a threat.  I would say he's not a threat when he actually shows his left hand, but he doesn't do that.  And I think, realizing that Johnson's not going to comply at this particular point, Sergeant Massengill, I think is his name, starts to come in and approach Officer McCowan and Johnson and Canine Shadow.

That is -- at that point McCowan has to make a decision here.  Is Johnson not showing me

Page 115

his hands in an act of defiance or resistance? Is he still a threat here, or is Johnson just not capable of showing me his hands?

And I think what Officer McCowan, as he testified to, was he took it in a good faith effort that Mr. Johnson was no longer a threat and just couldn't put his left hand out, and that's when he releases the dog.

So we have this specific time period here where there's still this, at least, perception of a threat from Officer McCowan from Mr. Johnson. But once we start having another officer coming over to assist and as this period is going on, Officer McCowan's not under attack. He makes this good faith belief that Johnson's going to comply once the dog comes off.

So when we look at all of these in their totality from this perspective of what a reasonable officer would believe, if I was in Officer McCowan's shoes I certainly -- I would have believed that it would be reasonable to leave Shadow on that bite until the time Officer McCowan did. We're talking 26 seconds, by my calculation, based on the review of the record.

Q.  Can you explain the difference between

Page 116

the opinion that we were just discussing, really the -- the three opinions that are at the bottom of Page 72, the "I am of the opinion," beginning with "I am of the opinion that Officer McCowan was not excessive," and that it's not an unnecessary and wanton infliction of pain.  And then I think there's a -- there's a third one that says "the bite and hold was appropriately matched to the seriousness of the offense." That continues onto Page 73.  And then the next opinion on Page 73 is, "I am of the opinion Officer McCowan's use of Shadow to bite and hold Johnson was a last resort."

Do you see those opinions?

A.    Yes, sir, I do.

Q.    What are the differences between those opinions and then the opinion that comes next on Page 73 that says, "It was objectively reasonable for Officer McCowan to -- to unleash his canine given this particular circumstance"?

A.    So the difference between those opinions is the -- really, the officers's intent, in my opinion.  Did the officer act in some intentional manner, or the objective reasonable standard is that there is no intent, you know, required.  And

Page 117

so the different standards have -- are differentiated by an intent.

Q.   Okay.  So let's walk through each one, then, and maybe you can identify and differentiate it for us, then.  So starting with, on Page 72, "I am of the opinion it was not excessive, malicious or sadistic"?

A.   Sure.  So I think the -- in that terms, my opinion is that Officer McCowan did not intend to use excessive or he wasn't intending to act in a malicious manner, nor was he intending to act in a sadistic manner towards Mr. Johnson.

Q.   Got it.  So this is getting at Officer McCowan's subjective state of mind?

A.   Correct.

Q.   Okay.  What about the next opinion?

A.   The next opinion is the same thing. It's going into the officer's subjective state of mind.  There is nothing in there that would -- nothing in the record or nothing that I reviewed that would lead me to believe that Officer McCowan intentionally inflicted this pain on Mr. Johnson.  That wasn't, at least, his subjective -- subjective intent to be unnecessary.

Page 118

Q.   Is that the same for the next opinion, as well?

A.   Appropriate?  Yes, that would be the same for the next opinion.

Q.   And then, I presume, same as the last-resort opinion, as well?  This kind of cluster of opinions seems to be getting at the objective state of mind of Officer McCowan, and then you -- then are we getting into the more objective tests after these, kind of, four opinions?  Is that the right way to read it?

A.   Yes, Mr. Johnson.  That's correct.

Q.   Okay.  Okay, so starting, then, with "I'm of the opinion it was objectively reasonable," that is your opinion regarding the objective reasonableness of Officer McCowan's conduct in this case?

A.   That's correct.  Yes, sir.

Q.   Okay.  So could you walk me through this opinion, then, as well?

A.   Sure.

As I stated in the opinion there, "it was objectively reasonable for Officer McCowan to believe that the use of Canine Shadow against Mr. Johnson, or Johnson, in a directed manner to

Page 119

stop an active ongoing threat to other inmates and staff would be reasonable, necessary and a last resort."

Is that where we're at or did I miss one here?

Q.    Yeah.

A.    That's where we're at.

Then I continued on here.  I talked about Johnson had committed a serious offense. And when I'm talking about a serious offense, I'm talking about that he was involved in this physical assault and battery with Arthur Guy; that at least there was a perception, and I think a reasonable perception by Officer McCowan that Johnson was assaultive towards Officer McCowan. And, in fact, as cited in the opinion, he was cited for those offenses under Department of Corrections.  I go on to say that Johnson was assaultive or threatening towards staff members gathering around.  We talk about that.

As an immediate threat to the safety of staff or other inmates, I said here, and I stand by the opinion, that he was engaged in this, again, this physical fight, this assaultive nature with Arthur Guy; that at least from

Officer McCowan's perspective, that he was assaultive towards Officer Mullins.

Again, he had not yet been searched for weapons, and I think we've discussed that at some length there; that Mr. Johnson was not only in close proximity to Officer Mullins, but he was moving or in close proximity to those other inmates. And there are three inmates, specifically, based on my review of the video, three, maybe even four, but three for the moment, that Johnson was running or going in the direction of as Canine Shadow actually bit him.

Johnson failed to comply with the officer's orders to get on the ground for restraints. That goes for the totality of circumstances from the time that the fight began until he was on the ground with Canine Shadow.

Johnson failed to comply after the following force options. Again, going back to this totality, we have a 40-millimeter OC grenade that was launched; we had warnings that were given; we have two rounds of OC spray that were -- that were given; and we had another canine bite the other inmate there. All warning announcements were given. And so when we look at

Page 121

this in its totality there, I think we have a

serious offense that is occurring.  I think we

have -- it would be reasonable for Officer

McCowan to believe, based on all of these

circumstances, that Mr. Johnson was an immediate

threat to the safety of officers or others that

were nearby.

And then we look at -- the third

objective factor in this analysis is, was he

actively resisting.  I think, as I pointed out

in my bullets there, Johnson appeared to be

assaultive towards staff members, or at least I

believe that to be a reasonable belief or

perception of Officer McCowan; that Johnson

failed to comply with the officer's orders to get

on the ground for restraint.  I think there's

-- based on my review of the record, as well as

the video, that that is a consistent statement;

that he failed to comply after the following

force options.  Again, we have this 40-millimeter

OC that was launched.  We have warnings that were

given.  We have two bursts of OC.  We have

another canine bite on another inmate and canine

warning announcements being given.

So I think when we look at these three

Page 122

objective factors in their totality, given the fact that this is happening very, very fast, and it's very easy for us to sit here and Monday morning quarterback it and look at it from a 20/20 hindsight, but Officer McCowan didn't have that luxury to do that.  He had to react in realtime when things are happening very fast about the appropriate level of force.

And so I think when we take a look at this, really, full picture here with those three factors as guiding us, I think that's where I come up with my opinion that it was objectively reasonable.

Q.   So if we look at the next opinion that I believe starts -- it's about three-quarters of the way down on Page 76, for me, at least.  It says, "I'm of the opinion Officer McCowan's use of Canine Shadow."

A.   And just to continue on so I make sure we're together, "To bite and hold Johnson was no longer than was necessary to manage Johnson's targeted behavior"?

Q.   Yeah.  We're on the same one.

A.   Okay.

Q.   So what's the difference between

Page 123

that opinion and the opinion we looked at before -- well, kind of a cluster of opinions we looked at before about, kind of, the duration and reasonableness of the bite?

A.    There really -- there really is not a difference in the opinion there.  The opinions are consistent.

Q.    Got it.

A.    I was answering -- well, we'll just leave it at that.

Q.    Okay.  So there's -- there's -- there's no difference in what you're analyzing or evaluating.  They're -- it's the same.  You're opining on the same issue; is that correct?

A.    Correct.

Q.    Okay.  Okay.  So let's move to the next opinion that's on, I believe, close -- kind of somewhat close to the top of Page 77, that states, "I am of the opinion Plaintiff Johnson received sufficient opportunity for a peaceful surrender prior to the release of Canine shadow by Defendant Officer McCowan."

A.    Yes.

Q.    So could you walk me through this opinion?

Page 124

A.   Sure.  So a lot of it is things that we have discussed already.  Again, if we look at things in its totality, when this fight broke out between Mr. Johnson and Arthur Guy, immediately or very close after the start, we have Officer Mullins who was standing right there and Officer Dean who was up in the gun post giving orders for them to stop fighting and to lay down.  Neither Mr. Johnson nor Mr. Guy complied with either of those orders.

Then we have this 40-millimeter OC grenade that gets launched in there.  That has zero effect.  So we have three instances where Mr. Johnson had an opportunity to peacefully surrender there.  At that point we have Officer Mullins who deploys his pepper spray and gives warnings with those pepper spray, and Mr. Johnson had an opportunity to surrender there peacefully, but he didn't.

Then we have another burst of OC spray from Officer Mullins with orders to comply and to stop fighting.  Again, Mr. Johnson has this opportunity to surrender peacefully but he does not.

Then we have three rounds that were

Page 125

launched from Officer Dean's 40-millimeter less lethal launcher. He gave orders pursuant to the reports and the records that I reviewed. Again, Mr. Johnson had three more additional opportunities to surrender but he didn't.

And then we have Canine ET being handled by Officer Baker come in and bites Arthur Guy. He then has another opp -- warnings being given there. He has an opportunity to surrender. Mr. Johnson does not.

And then he is pulled from -- or -- or assisted from Mr. Johnson, however you would wish to characterize it. He had an opportunity peacefully to surrender there -- he chose not to -- as Officer McCowan is coming in and, according to his own testimony and Mr. Johnson's own testimony, Officer McCowan is giving warning.

So he had ample opportunity, ample time, ample warnings to peacefully surrender and chose not to. So I think I counted -- if I'm correct in my report, I counted at least 16 warnings announcements and opportunity to surrender before Canine Shadow actually bit Mr. Johnson on that right wrist.

Q.    And again I just want to make sure we

Page 126

have -- I have your prior testimony correct.  You have not received training -- correct -- on correctional -- well, strike that.

Let me rephrase.  Let me rephrase the question.  Sorry.

I'm just going to move on.

So if we go to the next opinion, I believe that you offer on the bottom of 78, it's your -- it's the opinion that says "Officer McCowan utilized Canine Shadow to bite and hold Plaintiff Corey Johnson in a manner consistent with the policies of the Virginia Department of Corrections."

A.    Yes.

Q.    And is that the opinion that you're offering -- a opinion that you're offering in this case?

A.    Yes.

Q.    Okay.  And when you -- help me understand a little bit more of the details of this opinion.  When you say, "in a manner consistent with the policies of the Virginia Department of Corrections," what specifically are you referring to?

A.    So I reviewed -- as part of my analysis

Page 127

of this case, I reviewed as I -- it says right below there, the Department of Corrections Operating Procedure 420.1, which is use of force, as well as the Department of Corrections Operating Procedure indicated under 435.3.

When I looked at the order, both orders, the use of force and the canine policy, and I viewed the video and read the depositions, I'm not seeing anything with what Officer McCowan did in deploying Canine Shadow to be inconsistent with the policies that I reviewed.

Q.   Understood.  So is this opinion saying, then, that it's your -- it's your view that Officer McCowan's conduct was in line with 420.1 and 435.3?

A.   Correct.  I don't see -- I didn't see any inconsistencies, necessarily, in there.

Q.   Okay.  Okay.  So let's go to your next opinion.  It's on 79 at about the middle of the page.  So can you briefly give me an overview of the opinion you're offering here and how it's similar or different to the previous opinion that we were just discussing?

A.   Okay.  Sure.  So I opined that the Department of Corrections policies regarding

Page 128

patrol canine and patrol canine use of force is consistent with applicable United States law enforcement and correctional standards, with the exception of requiring the issuance of a warning when possible before deploying a canine, providing ample time for the subject to surrender.

So the difference is is that I was -- in my prior opinion versus this opinion, is that I was looking to see if Officer McCowan's actions with Canine Shadow were inconsistent with the policies as set forth by the Commonwealth of Virginia Department of Corrections.

And then I kind of looked at the overall policies related to the use of force, as well as the canines, for their consistency with industry standards, both law enforcement and correctional standards because, while some are different, some would still be the same, such as warning announcements and not permitting the dog, you know, necessarily to bite longer than was necessary, which we've already discussed, and to kind of review this from the law enforcement, that's based on my training and my experience, as well as my experience in consulting agencies on

Page 129

policies related to canines specific to the law enforcement side.  But I also looked at the standards that would be set by governing or certifying bodies within the correctional institution.

On the police side of things, we have -- or the law enforcement -- general law enforcement, we have the Commission on Accreditation for Law Enforcement Agencies, which is CLEA.  On the correction side of things they have the American Correctional Association.  And so I looked at the corrections -- the policies and looked for inconsistencies from the American Correctional Association, and I found that the Department of Corrections gave consistent policies with the industry standards; however, there is an exception to that and that is that, in the policy for canine deployments, the Department of Corrections does not specifically state in the policy that handlers are required to issue pre-canine deployment warning announcements.

That is a industry standard for patrol canine, but there aren't -- that's the 99 percent rule.  There is an exception to that rule, and

Page 130

that is, if you look at the case law related to it, the exception would be if an individual is known or reasonably believed to be armed with a handgun.  That obviously doesn't apply to this case, so I did look at that.  And that's the discrepancy that I did find in the Department of Corrections policy related to the standards in the industry.

That being said, I found that the Department of Corrections actually had received awards from the American Correctional Association based on their outstanding policies.  I checked the canine unit policies in relation to the canine standards for American Correctional Association.  They appears to be in line with that, and I didn't see any inconsistencies there.

And then for the actual canine warning announcement, while I would prefer that it would be in their policy, it is in the training records, or in the -- in the training, and they discussed that in Mr. Barbetto's deposition and testimony there.

Q.   So is this opinion getting at the sufficiency of the Virginia Department of Corrections use of force and canine policy?

Page 131

A.   My overall opinion is that they meet the minimum standards that I reviewed, which would be the law enforcement industry standards, and then the standards that were set by the American Correctional Association.

Q.   Okay.  And other than those two standards, this opinion isn't touching on any compliance with anything other than those two standards?

A.   The general use of force and general patrol canine industry standards as well as the American Correctional Association, correct.

Q.   Thank you.

Okay.  So let's keep moving forward to your next opinion that I believe starts at the very top of Page 81.

A.   Yes.

Q.   And I believe the -- well, I'll let you, -- my question will be if you could please kind of walk me through and describe it, so maybe we'll just kind of start there.  No need for me to couch anything.

A.   Okay.  We're talking about bite ratios?  Are we on the same page, Mr. Johnson?

Q.   Yes, sir.

Page 132

A.    Okay.  So we look at bite ratios, and that is the total number of bites versus the total number of apprehensions.  And we kind of have a yardstick to measure that, that comes from a case called Kerr v. City of West Palm Beach, Florida, out of the 11th Circuit.

And so the industry uses some discussion in that case as kind of the yardstick of what is an appropriate indicator of either misbehaving dogs or misbehaving handlers, or both; an indication of mismanagement or improperly trained dogs and improper supervision.  And the benchmarks set for that in that case was a 30 percent bite ratio.  Now, there was some testimony during that particular case, Kerr versus City of West Palm Beach, Florida, that some agencies, law enforcement agencies, that is, even put the benchmark at about 20 percent.

So the industry standard is, our benchmark for bite ratios, apprehensions with bites force versus the total apprehensions, to be in or around or lower than that 20 to 30 percent range.  And so the information that was provided to me by the Commonwealth of Virginia Department of Corrections shows that there was a -- a 11

Page 133

percent overall and a 14 percent bite ratio at its -- the six prisons where patrol canines were regularly assigned.  The bite ratio at the Red Onion State Prison was 14 percent.  So they have an overall bite ratio of 11 percent, and then within Red Onion state prison where this incident occurred, a 14 percent bite ratio.

So when we're just looking at bite ratios alone, there's nothing about the bite ratios that were provided that would set a red flag of misbehaving handlers, misbehaving dogs, misbehaving supervisory staff or, yeah, an indication of improper training.  And so that's the basis for my opinion there.

Q.  Okay.  So these statistics that you rely on here, I believe you testified they come directly from the Virginia Department of Corrections; is that correct?

A.  That's what were given to me by the department of -- given to me by the department -- or the Attorney General's Office through the Department of Corrections.

Q.  And so if those numbers, for whatever reason, were inaccurate or changed, would your opinion here change?

Page 134

A.    I'd have to see what the inaccuracies were and see the correct numbers.  Maybe it would change, maybe it wouldn't, depending on what those numbers would be at.

Q.    Could you explain that a little bit more?  What would cause your opinion to change?

A.    Sure.  If there was -- if we were -- if we had bite ratios that were higher than that 20 to 30 percent bite industry benchmark or yardstick, then I would consider a different opinion.  But I would look at this in its totality, but that is a yardstick measurement that I would use.

Q.    Understood.

So if the percentages creeped up to the 20 percent threshold, that would cause you to at least reevaluate this opinion; is that correct?

A.    I would reevaluate it, correct.

Q.    Okay.  And the reason for the 20 percent threshold is that that is the accepted industry standard?

A.    This case specifically says 30 percent.  But then in a passing reference it says some agencies do use the 20 percent benchmark.  So while I'm instructing supervisors and agencies

Page 135

and handlers, I do say 20 percent is -- is the

benchmark that you want to really step up your

investigation and ensure that you don't have

misbehaving dogs or misbehaving handlers or

improper training happening.

Q.    Got it.  Okay.  We've been going for

almost two hours.  Are you doing okay?

A.    Yeah.  I'm okay.  I will, sometime in

the near future, need a quick break.  But we're

okay.

MR. JOHNSON:  Why don't we go off the

record Mr. Court Reporter.

(Recess taken.)

BY MR. JOHNSON:

Q.    All right.  So when we left off, I

believe we were just about to discuss your next

opinion that starts on Page 81 of your report,

that begins with, "I'm of the opinion Defendants

and John Does did not have an affirmative duty."

A.    Yes, sir.

Q.    So maybe could you walk me through this

opinion and what you're saying here?

A.    Sure.  So I specifically say, "do

not have affirmative duty to intervene because

Officer McCowan's use of Canine Shadow to bite

Page 136

and hold Johnson was an exercise of a good faith effort to maintain and restore order."

I teach, you know, failure to intervene. I teach intervene in my use of force classes. And I'm of the opinion that Officer McCowan, his use of Canine Shadow was appropriate and proper in this case. And because I have formed that opinion, the other defendant officers in this would not have an affirmative duty to intervene because it wasn't improper for Officer McCowan to use Canine Shadow in this case.

Q. Okay. So is this opinion just focused on the John Doe defendants who were -- or is this focused on all defendants?

A. Well, specific -- the opinions -- that line of the opinion specifically is addressed to the John Doe defendants.

Q. Okay. But this -- the -- this opinion covers not just the John Doe defendants, but everybody?

A. My entire opinion? I just want to make sure I'm understanding your question.

Q. Yeah. So let me take a step back. On Page 81, there's an overall opinion that says "I am of the opinion defendants, John

Page 137

Does 1-4."  So my question is are you including all defendants or are you specifically just talking about the John Does?

A.   This specific opinion is related to the John Does 1 through 4, specifically.

Q.   And if those John Does are no longer in the case, you would not be offering this opinion; is that correct?

A.   If they --

MR. DAVIS:  Object to form.

You can go ahead and answer.

THE WITNESS:  If they were dismissed or released from the case, I would have no reason to opine on that.

BY MR. JOHNSON:

Q.   Okay.  And is your next opinion where you specifically list Defendant Warden Kiser, Defendant Officer Staley, is this just the specific version of the same prior opinion that you were just kind of talking about, just as applies to Kiser and Staley?

A.   That's correct, yes, Mr. Johnson.

Q.   In your last opinion on Page 81, are there additional considerations that went into your assessment as to whether or not there was a

Page 138

failure to discipline that are different than what you just described?

A.   No, there is not.

Q.   Okay.  And so continuing onto Page 82 at the top in your first opinion, this is the opinion that starts with "Warden Kiser and Defendant Staley did not fail to train correction officers on the proper use of canines and use of force," is that opinion for the same reasons that -- that -- did you reach that opinion, I guess, for the same reasons you were just describing?

A.   Yes, that's correct, Mr. Johnson.

Q.   Okay.  So if we could continue down to Page 82 and pick up with your opinion that starts with "I am of the opinion it was not foreseeable."

A.   Okay.  I got that.  I am of the opinion it was not foreseeable that Defendant Warden Jeffrey Kiser and Defendant Jimmy Staley failed to properly train, supervise or discipline defendant Officer McCowan and the other prison officers and that it led to prisoners being bitten and mauled by patrol canines even though they posed no threat because Officer McCowan's use of Canine Shadow to bite and hold Johnson was

Page 139

an exercise of a good faith effort to maintain and restore order.  Is that the correct --

Q.   Yes.

So could you walk me through what it is that you're opining here?

A.   I think it -- I'm sorry.  I think it speaks for itself, that in the pleading documents Plaintiff has alleged that it was foreseeable that Defendant Kiser and Staley failed to properly train, supervise and discipline, which led to prisoners being bitten and mauled.

In this particular matter, I've opined that Officer McCowan's use of Canine Shadow was proper, and therefore, based on this situation or case, would not make it foreseeable to Defendant Kiser or Staley that they were improperly training, supervising or disciplining officers related to canine force.

Q.   And are you using foreseeability in the legal sense of the word?

A.   I'm using it in the plain language of foreseeable.

Q.   Okay.  I believe you testified a moment ago that you were using it from plaintiff's complaint; is that correct?

Page 140

A.   That is correct.

Q.   So that's a legal doctrine of Whether or not something is foreseeable, and I believe -- I'm just trying to understand.  Are you opining here that it's your opinion as a canine expert that it was legally not foreseeable?

A.   Yes.  Yes.

Q.   Okay.  The next opinion begins with, "I am of the opinion Defendant William Barbetto and Harold Clarke and David Robinson did not fail to properly investigate McCowan's improper deployment of Canine Shadow because Officer McCowan's use of Canine Shadow to bite and hold Johnson was an exercise of a good faith effort to maintain and restore order."

Is that correct?

A.   Yes.

Q.   And is the reason that you make this conclusion because -- or you are expressing this opinion because you found the deployment to be a reasonable use of force?

A.   Yes.

Q.   Is there anything else that forms the basis of this opinion, other than that

Page 141

conclusion?

A.    No.

Q.    If it were to be found that the use of force was not reasonable, would your opinion here change?

A.    No.

Q.    And why is that?

A.    Looking at my prior opinion about the training and the certification and the proficiency assessments of Officer McCowan and Canine Shadow, as well as Sergeant Staley's deposition testimony related to his investigation into this matter.

Q.    And moving on to your next opinion, if it were to be found that the use of force here was not reasonable, would your opinion regarding Mr. Barbetto's, Mr. Clarke's and Mr. Robinson's training change?

A.    That would be the first bullet on Page 83?  Is that my understanding?

Q.    Yes, sir.

A.    No, it would not change my opinion.

Q.    And why is that?

A.    Again, for the same answer as before, based on my review of Officer McCowan's training

Page 142

records, his proficiency records and his certification records.

Q. Is this true for the next opinion, as well, the one that is the second full bullet on Page 82 or -- excuse me -- 83?

A. With the Footnote 682 on it; is that correct?

Q. Yes.

A. That's correct. That would be the same opinion.

Q. Would your next opinion in the next bullet change, the one that ends in Footnote 683, if it were to be found that the use of force here was unreasonable?

A. My opinion would not change.

Q. And again, same question for what I believe is your last opinion here.

A. Correct. My opinion would not change.

Q. Okay. And again, here, this last opinion is opining on the use of the term "foreseeability" here. You're using it in the legal sense of the term; is that correct?

A. Yes. I'm sorry. I did not understand your prior question on that, but I do now. And I maintain my prior answer, and the answer to this

Page 143

question is yes.

Q.   And would this opinion, your last opinion, change if the bite ratios numbers that were provided to you changed in any way?

A.   Well, my answer to that would not change from our previous discussion on bite ratios.  It would -- I would have to look at the overall change in the numbers before I could form any opinion one way or another on that.

MR. JOHNSON:  Let me take just a few minutes here just to kind of go back through everything, but I believe I may be close to being able to be done, provided Tim has any questions.  But let me take five minute and maybe let's come back on at 20, so 1:20.

(Recess taken.).

MR. JOHNSON:  So plaintiffs have concluded their questioning and we'll turn it over to Mr. Davis.

MR. DAVIS:  Thank you.

EXAMINATION

BY MR. DAVIS:

Q.   Mr. Kmiecik, I just want to, as plaintiff's counsel was asking you earlier, just understand which parts of your report incorporate

Page 144

which evidence that you reviewed and aligns with particular opinions.  So I just want to go down the list, and I'll try to keep this brief.  But just relating the summary opinions back to the discussion in, sort of, the body of your report.

So the first opinion found here starting on Page 65 that pertains to the training that was conducted and your opinion on that, where in the body of your complaint, if anywhere, does that correspond as far as the analysis and the facts that you are incorporating into that?

A.   I'm sorry, Mr. Davis.  Can you repeat that?

Q.   Sure.  I need to find the page that that aligns with.  Give me just one second.

So beginning on Page 24, United States Patrol Canine Industry Training Standards, and that section continues through Page 30, is that the basis for your summary opinion here on Page 65?

A.   Yes, it is.

Q.   Okay.  And so your summary opinion here, does that incorporate the citations and the analysis in that section of the opinion we just discussed?

Page 145

A.   Yes, it does.

Q.   Okay.  The next summary opinion, beginning on Page 68, this is pertaining to certification.  Looking back at the body of the report, there's a section United States Patrol Canine Industry Certification Standards.  That begins on Page 30.  It continues through Page 34. That analysis and the citations, does that correspond to that summary opinion on Page 68?

A.   Yes, it does.

Q.   All right.  For the next part of the body of the report, and that seems like it could potentially correspond to a few of your summary opinions, this is "Officer McCowan's good faith effort to maintain or restore discipline."  It begins on Page 34 and it continues through Page 42.  Could you identify which of your summary opinion incorporate that analysis in citations?

A.   Sure.  Give me just a moment.  I'm going to scroll through this.

Okay.  So my summary opinions that are related to that -- to your question are going to be found on Page 71.  "The use of Canine Shadow was the only force option in an escalating, tense, uncertain and rapidly evolving situation

Page 146

that proved necessary and effective to compel Johnson's compliance.  All prior force options had failed, and, therefore, a reasonable officer in Officer McCowan's position, given the totality circumstances, would believe that the use of Canine Shadow in a directed manner to stop an active ongoing threat to other inmates and staff would be reasonable, necessary and a last resort."  As well as the following opinion, "I am of the opinion Officer McCowan's use of Canine Shadow to bite and hold Johnson was in a good faith effort to maintain or restore discipline, given the totality of the circumstances Officer Brian McCowan faced," followed by the sub-bullets there.

"I am of the opinion Officer McCowan's use of Canine Shadow to bite and hold Johnson was not excessive, malicious or sadistic."  That would be on Page 72.  "I am of the opinion Officer Brian McCowan's use of Canine Shadow to bite and hold Johnson was not an unnecessary and wanton infliction of pain," also on Page 72.

And then the following:  "I am of the opinion Officer Brian McCowan's use of Canine Shadow to bite and hold Johnson was appropriately

Page 147

matched to the seriousness of the behaviors that Officer McCowan intended to control," followed by the sub-bullets there.

On Page 73, the main bullet, "I am Of the opinion Officer Brian McCowan's use of Canine Shadow to bite and hold Johnson was a last resort."  Followed by the following bullet:  "I am of the opinion it was objectively reasonable for Officer McCowan to believe that the use of Canine Shadow against Johnson in a directed manner to stop an active ongoing threat to other inmates and staff would be reasonable, necessary and a last resort," followed by the sub-bullets there, as well as the main bullet on Page 76, kind of at the bottom:  I am of the opinion Officer McCowan's use of Canine Shadow to bite and hold Johnson was no -- you know what, that actually falls under the duration.  Okay.  So that would be the end of it.

Q.   Okay.  Okay.  So that was starting on Page 71 and continuing through the sub-bullets on Page 76.

So the next section of the body of the report, beginning on Page 42, Duration of Canine Shadow's bite, that goes from Page 42, I believe,

Page 148

through 49.  No.  Sorry.  42 through 44.  And then there's another section after that.  So Page 42 through 44, the duration of Canine Shadow's bite, could you tell me which summary opinions that corresponds to?

A.    Sure.  I would direct you to Page 76 --

Q.    Okay.

A.    -- where it says -- the main bullet, kind of halfway through or at the lower portion of that page:  "I am of the opinion Officer McCowan's use of Canine Shadow to bite and hold Johnson was no longer than was necessary to manage Johnson's targeted behaviors."

Q.    Okay.  So next section of the body of the complaint, beginning Page 44, Johnson's opportunity to peacefully surrender, and that continues on to Page 49.

A.    Okay.  Direct your attention back To Page 77, and my opinion and bullet there. "I am of the opinion Plaintiff Johnson received sufficient opportunity for a peaceful surrender prior to the release of Canine Shadow by Defendant Officer McCowan."

Q.    Okay.  Next section, beginning Page 49, Officer McCowan's compliance with Commonwealth of

Page 149

Virginia Department of Corrections policies, and that continues through Page 55.

A.   Mr. Davis, I'd direct your attention to Page 78, the lower main bullet there that says: "I am of the opinion Defendant Officer Brian McCowan utilized Canine Shadow to bite and hold the Plaintiff Corey Johnson in a manner consistent with the policies of the Virginia Department of Corrections," and the sub-bullets there.  Yeah.

Q.   Okay.

A.   Continuing on Page 79.

Q.   So the next section, Patrol Canine Policy of the Commonwealth of Virginia Department of Corrections consistent with accepted United States law enforcement standards, beginning Page 55, continuing through Page 62.

A.   Mr. Davis, I would direct your attention to Page 79 of my report, main bullet at the bottom of the page: "I am of the opinion the Commonwealth of Virginia Department of Corrections policies regarding patrol canine and patrol canine use of force is consistent with applicable United States law enforcement and correctional standards, with the exception of

Page 150

requiring the additions of a warning when possible before deploying a canine, providing ample time for a subject to surrender."  And that moves down through those sub-bullets through Page 80.

Q.   Okay.  And I think this is the last section before reaching the summary portion. Bite ratios, beginning Page 62 continuing through Page 64.

A.   Yeah.  I would direct your attention to Page 81, Mr. Davis, at the very top of the bullet says:  "I am of the opinion the Commonwealth of Virginia Department of Corrections patrol canine bite ratios -- 11 percent overall, 14 percent at six of its prisons, where patrol canines were regularly assigned, and 14 percent at the Red Onion State Prison -- was lower than the United States patrol canine industry average of 30 percent.  I am of the opinion Commonwealth of Virginia Department of Corrections' bite ratio was an indication of a properly trained and supervised canine unit," and the following sub-bullets that go along with that on Page 81.

Q.   Okay.  Thank you.  And what we just discussed here, is it your testimony that your

Page 151

summary opinions incorporate the full analysis

and citations of the corresponding portions from

the body of the report?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    And your remaining summary opinions,

beginning on Page 81, starting with the opinion

about the duty to intervene, through the end of

the report, based on your citations in the

footnotes is it fair to state that those opinions

incorporate just your prior analysis and opinions

from the rest of the report?

A.    Yes.   That's correct.

Q.    Okay.   On that one summary opinion

regarding the duty to intervene by Defendant

John Does and in relation to questions from

plaintiff's counsel about whether that opinion

was limited to the John Does, I would represent

that the current status of the case is that I

believe John Doe 4 was never substituted, but

John Does 1 through 3 have been substituted as

Defendants Baker, Dean and Carroll.

So let me just ask, then, regardless of

the identity of those defendants, is it fair to

Page 152

characterize your opinion there on Page 81 is that there was no duty to intervene on the part of the Joe Does or any individual because there was no predicate improper use of force?

A.   Yes.   That's correct.   That is my opinion.

Q.   Okay.   Thank you.

A couple of follow-up questions about some of the answers you provided earlier in your testimony about your background and your personal history.   You had testified about different canine disciplines that you had trained.   I believe you said you had worked with cadaver detection dogs, narcotic detection dogs and patrol dogs.   In your experience, is the same dog used for a variety of disciplines like that or do different dogs specialize?

A.   So the answer to that question is, yes, both directions.   We consistently see dual or multipurpose dogs that would be trained in multiple disciplines, such as a patrol narcotics dog or a patrol explosive dog or a patrol cadaver dog.   But we also see, depending on the area of the country, those dogs also being very specific to their disciplines.

Q.   And in your experience, would there be anything unusual or improper if an agency trained individual dogs just for one discipline?

A.   No, not at all.

Q.   How long have you been working with patrol dogs, just from your time in law enforcement?

A.   18 years, since 2004.

Q.   And you still work with them now?

A.   Yes, that's correct.

Q.   Now, how long have you been training other canine handlers and their dogs?

A.   I've been training other canine handlers -- I started in that 2016-2017 as part of the apprenticeship for the North American Police Work Dog Trainer.  And then I continued after that.  And actually before that I trained in the use of force aspects and the search and seizure aspects since, probably, in the area of 2012.

So handlers, I've been training in the search and seizure related to canine use of force and canine search and seizures since about 2012, but specific where I had hands on with the dog was that 2016 to 2017 range.

Page 154

Q.    Okay.  How long -- I think you had testified you had trained for other uses of force, either generally or other modalities. Can you elaborate on that a little bit?

A.    Sure.  So I became a use of force instructor in 2010 or 2011, and that would be the general principles of use of force.  And then in just July of this year I graduated and was certified as a Certified Force Science Analyst, and that is the human factors and the human components that go into actual use of force. So speed of assault, speed of attack, the psychological aspects, memory aspects of the use of force.

And then in 2017-2018, I started to become an instructor in handcuffing, defensive tactics, which also includes baton use.  In 2019 I became a certified instructor for less-lethal deployments, so that would be similar, in this case, to the 40-millimeter launcher that was used; a chemical weapons instructor, which would be similar to the OC that was launched from that less lethal 40-millimeter, as an example, as well as an OC or pepper spray instructor.

I'm also an instructor in firearms.

Page 155

I'm a rifle instructor -- rifle carbine instructor.  I'm a RAP instructor, which is a restraint -- it's a restraint-type device -- instructor.

I'm also certified as an instructor through Axon, which is for Taser energy weapons or conductive energy weapons weapon systems.

Q.   Now, how long have you -- how long have you been doing the consulting you testified about regarding use of force policies and training with outside agencies?

A.   Since 2018.

Q.   Are those trainings or policies, when you consult with another entity, either at a local police department or a state agency, are those approved by any kind of state oversight body?

A.   The instruction that I do, that I provide, they are, in many cases, approved and reviewed by the governing board for law enforcement within that particular state.

As an example, as I testified to earlier, our consulting firm, and me specifically, are an Indiana law enforcement training provider.  We've been approved through

Page 156

the Texas Commission of Law Enforcement, which is Texas's governing body for law enforcement training; the Missouri POST, which is the Peace Officer Standard and Training in Missouri; as well as Michigan, under the Michigan Commission on Law Enforcement; the Illinois Law Enforcement Training and Standards Board; Arkansas, we were approved under their commission, or I was, I should say, and on my curriculum that I developed; and just most recently, the Georgia Peace Officers Standards and Training Board, Georgia POST.

Q.   Are there any particular resources that you rely on when you're developing your training or policy consulting?

A.   Yes.  We rely on industry standards, and so we get those industry standards from multiple sources.  As I was testifying earlier, there's kind of these goal posts that are up.  So we look at what is the lowest standard, what is the higher standard, and kind of look to make sure that those policies and the instruction is within those limits.

So from a certification standpoint, we're looking at the scientific community that I

Page 157

talked about earlier, the National Institute of Standards and Technology, the Academy Standards Board, the American Academy of Forensic Sciences, the American National Standards Institute.

I happen to be an observer on the ASB board, which is the Academy Standards Board, on the Dogs and Sensors Committee, where I don't have any voting power but I get to observe the practices and procedures that go into their best standards and best practices standards that they develop.

We also look at the main national canine associations, so again, we would look at the North American Police Work Dog Association; the National Narcotic Detector Dog Association, which doesn't just do narcotic detection, it does patrol disciplines and other disciplines as well; the United States Police Canine Association and the National Police Canine Association.  So we take those and we kind of use them as our goal posts for best practice or industry standards when we're reviewing these policies and we're putting the curriculum together.

More specifically, when I'm doing a policy review or we're putting a curriculum

Page 158

together, we more narrowly -- narrow or tailor that to be jurisdiction specific. So as an example, just put together a curriculum that was approved by the Georgia Peace Officers Standards and Training, Georgia POST. We're looking at not just those very wide industry standards, but are there any restrictions that are put on canine use related to search and seizure or training or certification standards within that particular state, and then within that particular Federal Circuit Court of Appeals, so that we're consistent there.

Q.   And in your experience, those industry standards you just testified about, are those adopted by corrections agencies as well as by law enforcement? Do you know how that applies?

A.   Sure. Well, the standards are -- a lot of them are very generalized, but then they're very discipline-specific. So while we will -- there is no -- per se, there's no federal law that there are standards. And in most states there aren't any even standards related to canine. There's only about 19 states that actually have any standards for canine through legislation that would lend guidance within that

Page 159

state.  And the majority of those 19 states, they're not even mandatory compliance.  They are voluntary compliance.  So there's really nothing in the industry that's really solid.

So there are certain aspects of each of those standards where they are applicable to both law enforcement and corrections.  And then there are other standards that would be applicable only to law enforcement and would not have any application to the corrections setting.

Q.   And you testified that you have trained correctional officers for use of canines, correct?

A.   Correct.  I've had correctional officers that have attended our training classes.  A lot of what we see are dogs that are used in a county jail under the direction of a sheriff, so they are going to be dealing with pretrial detainees. They'll be dealing with also convicted -- convicted prisoners as well.  But I've also had state correctional employees come through my course as well.  I've had Indiana Department of Corrections come through.  Just most recently I taught a course in South Carolina where the South Carolina Department of Corrections were present.

Page 160

So we do have correctional officers that do come through the course.

Q. You testified that you reviewed DOC's canine training curriculum as part of the evidence you considered in forming your report here, correct?

A. Yes.

Q. Did you find that that curriculum comported with industry training standards, at least as far as those applied to corrections?

A. Yes. And they complied with the -- what I found is that they were consistent with the American Correctional Association standards that they use.

Q. Okay. I believe you had testified regarding your opinion that -- about whether an inmate has to be prone with his arms out in order to be considered to have surrendered. Do you recall that part of your testimony?

A. Yes, sir.

Q. Okay. And I believe you had said that not in all situations would that be necessary; is that correct?

A. That's correct.

Q. So the instructions that an officer is

Page 161

giving to the inmate, would that affect your opinion in any way?

A.   Yes, it would.

Q.   How so?

A.   So if the officer is telling the person "Back off.  Let me see your hands," to me that indicates this is compliance with that order. If the officer's telling the inmate "Get on the ground, get on the ground," and the individual's not showing their hands and is not getting on the ground, then that would be the difference there.

So it's what is the officer specifically telling the inmate to do at that particular moment, and the instructions or the orders given by the officer, are they clear and concise.

In this particular case, the testimony and the reports indicate they were instructing Mr. Johnson to get on the ground.  That's a pretty clear, concise order.

Q.   So I want to ask about your testimony regarding, you know, applying your knowledge of working as a street officer, is maybe the best term to use, to a correctional setting.  So when you reviewed the facts in this case, you considered the evidence that is cited throughout

Page 162

your report, correct?

A.   Yes.

Q.   Okay.  And then you also applied your knowledge and expertise from your experience and training in law enforcement, correct?

A.   Yes, as well as my experience as an instructor, and a certified instructor in many of these categories that are also used by corrections, such as the less lethal launcher, the less lethal chemical munitions, the OC and pepper spray, as well as the dog.

Q.   So could you describe for me how you adapt your experience in law enforcement to evaluating something that occurs in a correctional setting?

A.   Sure.  As I testified earlier, there are different standards that are at play when we were talking about the appropriate use or level of force in different settings.  The law enforcement setting or the police setting, we're looking at a standard of objective reasonableness.  That is the industry standard for use of force for street officers.

When we are looking at use of force within a correctional facility, there are two

Page 163

other standards that apply.  One standard is for pretrial detainees, and a different standard is for those who are convicted.  So we're looking at -- and when we -- when I teach these officers and when I have law enforcement on the street, we're talking about one standard.  When we're talking about jail -- like sheriff's jails, local jail settings, we're talking about two different standards.  And then when we're talking about a state correctional facility, we're talking about a different standard yet.

So in the pretrial detainees, we would talk about standards related to pretrial detainees.  Again, we're looking at a standard of objective reasonableness, but its application includes a little bit more than what the street officer would be.  Again, examples would be is this a tumultuous cell block.  You know, things like that would come into play.

And then in the correctional side of things, we're looking at an analysis of whether the officer subjectively was acting in a malicious or sadistic manner.  So these are three different -- different analysis that we use.  And so I considered -- I -- I considered all three of

Page 164

those analysis when I was opining and looking through and reviewing this case in its totality.

Q.   So aside from the variations in the legal frameworks, are there any facts on the ground or differences in the environment or in the context that you were considering when you looked at this case?

A.   Yes.

Q.   Could you explain that?

A.   Sure.

So when we're looking at a law enforcement environment, the obvious difference there is we're dealing with unknown environments, but we're also dealing with unknown offenders. By that I mean, we may be in a residential area, we may be in an urban area, we may be in a wooded area, and each one of those environments have different safety concerns for the officer. We might be dealing with an offender, an unknown offender. We don't know anything about their background. We don't know their criminal history. We may have very limited facts about what is transpiring in that particular moment.

In the correctional setting, the difference is, is that the officers generally

Page 165

know the status of the inmates that are in there. As an example, if you're at the Red Onion State Prison, the correctional officers who work there will know what level of security that facility is going to be at.  If you're in a particular pod, certain offenders at Red Onion State Prison are going to be in a -- who are at different security levels, higher security levels, are going to be in a different pod.  So the correctional officer versus the federal police officer is going to have a much better understanding of the type of individual that they're dealing with, as opposed to law enforcement.  There's an example there.

Q.   So there's -- I'm sorry I cut you off, if you want to repeat that again?

A.    No.  I was finishing up there.

Q.    Okay.  So in this instance, those factors that you just talked about here, are you able to give an opinion on how that would have affected an officer's decision-making in this particular incident?

A.    Well, yes.  I believe that the correctional environment, having known offenders and having a known criminal history and a known

Page 166

violent tendency, if you would, based on where that individual is in the particular maximum security prison, certainly could weigh on the officer's response.  Because the individuals that are in a particular pod, for example, may have prior violent tendencies than do others in other pods or in other locations within that correctional facility.  And that's completely different than what the officer is dealing with on the street in an unknown environment.

Q.   And do you feel that your law enforcement and training experience in combination with the discovery materials that you were provided in this case, that you were in a sufficient -- that you had sufficient knowledge to render an opinion here?

A.   Yes, I do.

MR. DAVIS:  All right.  Thank you. I have nothing further from defendants.

MR. JOHNSON:  Nothing further from plaintiff's side.

(Deposition concluded -- 2:58 p.m.)

Page 167

C E R T I F I C A T E

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 27th day of September, 2022.

_____
Notary Public

**[& - 62]**                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&** 2:3 37:22 43:5 43:22 | **1:20** 143:15 | **2022** 1:12 37:19 38:14,22,23 41:20 167:20 | **40** 78:10 79:6,11 81:11,14 82:17 82:22 105:14,16 120:20 121:20 124:11 125:1 154:20,23 |

**1**

**1** 3:7 17:21 18:1 18:9 23:3 36:15 36:23 61:6 137:5 151:22
**1,500** 34:9
**1-4** 137:1
**10** 33:12,16,17 34:10 45:17,17
**11** 22:23 132:25 133:5 150:14
**11516** 167:22
**11th** 42:11,15 132:6
**12** 1:12 22:25
**124** 23:3,10
**13** 39:7
**14** 133:1,4,7 150:14,16
**143** 3:4
**150** 34:8,10
**16** 38:9,17 39:4,9 39:13,17 40:13 42:18 44:1 45:13,23 46:5,17 62:4,6,6 63:10 125:21
**18** 3:8 14:20 153:8
**19** 158:23 159:1
**1995** 13:5,21 48:12
**1999** 11:13 13:5 13:21 41:16

**2**

**2** 3:9 22:10,10,13 22:20 31:5 36:13,14,23,24 37:3,6,9,12 43:11,13,16,17
**20** 132:18,22 134:9,16,19,24 135:1 143:15
**20/20** 83:18 122:5
**20001** 2:4
**2004** 6:4 11:6 14:18 15:6 153:8
**2010** 154:6
**2011** 154:6
**2012** 153:20,23
**2016** 6:9 53:3 153:25
**2016-2017** 153:14
**2017** 53:3 153:25
**2017-2018** 154:15
**2018** 41:12 155:12
**2019** 40:5,15 41:3 63:5 154:17
**202.942.5000** 2:5
**2020** 2:9 38:22 38:24 39:15
**2021** 38:14,23 51:11,13,16 52:9

**23** 5:1
**23219** 2:10
**24** 26:5 144:16
**25** 78:1 81:10
**250** 34:12
**26** 115:23
**27** 26:12,13
**27th** 167:20
**28,000** 63:6
**2:58** 166:22

**3**

**3** 3:10 22:20 36:23 57:24 58:1,11 151:22
**30** 27:9,10,17 132:14,22 134:9 134:22 144:18 145:7 150:18
**31** 27:18
**334** 31:19
**336** 31:20
**34** 100:18,20 145:7,16
**36** 3:9
**37** 31:20,20
**38** 31:3
**380** 6:4,10
**396** 31:21

**4**

**4** 3:3,12 22:20 59:17,23 60:1,5 60:6 137:5 151:21

**400** 72:17
**41** 29:13
**418** 31:24
**42** 145:17 147:24 147:25 148:1,3
**420.1** 127:3,14
**431** 32:1
**435.3** 127:15
**435.3.** 30:5 127:5
**44** 31:22 148:1,3 148:15
**459** 1:16
**47** 31:24
**471** 32:3,7,8
**49** 32:2 148:1,17 148:24

**5**

**5** 22:20 31:2,6 33:12,16
**528** 32:10
**53** 32:3,7
**54** 32:8
**55** 149:2,17
**570** 32:11
**58** 3:11

**6**

**6** 22:20
**60** 3:13
**601** 2:4
**62** 149:17 150:8

**[623 - albers]**                                                    Page 2

| | | | |
|---|---|---|---|
| **623** 32:13 | **804.786.2071** 2:10 | **accreditation** 129:9 | **adequacy** 107:17 |
| **633** 32:15 | **81** 131:16 135:17 | **accurate** 12:16 | **administrator** |
| **64** 25:2,5 150:9 | 136:24 137:23 | 47:8 85:25 86:1 | 37:21 41:22 |
| **649** 32:17 | 150:11,23 151:8 | **act** 115:1 116:23 | 43:4 |
| **65** 25:5,7,20 61:8 | 152:1 | 117:10,11 | **adopted** 56:14 |
| 61:15 144:7,20 | **82** 138:4,14 | **acting** 108:21 | 158:15 |
| **653** 32:19 | 142:5 | 163:22 | **advanced** 8:23 |
| **665** 32:21 | **83** 141:20 142:5 | **action** 95:21 | **affect** 161:1 |
| **68** 27:1 145:3,9 | **9** | 167:16 | **affirmative** |
| **682** 142:6 | | **actions** 92:23 | 135:19,24 136:9 |
| **683** 142:12 | **9** 1:7 | 93:20 128:10 | **affirmed** 4:4 |
| **7** | **9,000** 48:11 | **active** 29:7 68:8 | **aforesaid** 167:5 |
| | **90.5** 63:14 | 81:2 97:8 119:1 | **agencies** 56:18 |
| **7** 22:21 | **99** 63:8 129:24 | 146:7 147:11 | 128:25 129:9 |
| **71** 28:5,10 77:2 | **9:57** 1:18 | **actively** 73:23 | 132:17,17 |
| 80:16 104:10 | **9th** 2:9 | 96:12 110:13,13 | 134:24,25 |
| 145:23 147:21 | **a** | 121:10 | 155:11 158:15 |
| **72** 107:23 116:3 | | **actual** 22:7 | **agency** 37:21 |
| 117:6 146:19,22 | **a.m.** 1:18 | 25:11 28:7 | 41:22 43:4,24 |
| **73** 116:10,11,18 | **a1** 83:16 84:2 | 49:17 51:14 | 66:5 153:2 |
| 147:4 | 87:6,14,23,25 | 52:2,7,7 66:21 | 155:15 |
| **75** 32:14 | 88:25 90:25 | 72:21 74:24 | **aggression** 7:19 |
| **76** 32:15 122:16 | 91:11,22 93:2 | 75:19,24 106:2 | 9:5 10:23 |
| 147:14,22 148:6 | **abbreviated** | 130:17 154:11 | **ago** 61:8 139:24 |
| **77** 123:18 148:19 | 40:12 | **adapt** 162:13 | **agree** 109:22 |
| **78** 32:18 126:8 | **ability** 48:7 | **added** 97:6 | **agreeing** 21:2 |
| 149:4 | **able** 16:8 17:16 | **additional** 125:4 | **ahead** 10:5 59:5 |
| **79** 32:19 127:19 | 36:17,18 49:18 | 137:24 | 68:25 80:11,12 |
| 149:12,19 | 78:25 82:8 | **additions** 150:1 | 80:14 107:25 |
| **7:20cv582** 1:6 | 113:6 143:13 | **address** 6:16 | 137:11 |
| **8** | 165:20 | 102:10 103:8 | **aided** 167:13 |
| | **academy** 62:19 | 104:1 | **air** 95:11,23 |
| **8** 22:21 37:20 | 62:20 157:2,3,6 | **addressed** 27:25 | **al** 1:7 19:23 20:3 |
| 40:6,8,12 41:20 | **accelerants** 41:1 | 106:19 136:16 | **alabama** 40:7,9 |
| 43:3,20 45:17,17 | **accepted** 134:20 | **addresses** 102:7 | 40:13 |
| 46:7,8 | 149:15 | **addressing** | **alarm** 5:7 50:24 |
| **80** 32:21 69:6 | **account** 45:23 | 101:21 | **albers** 29:17 |
| 150:5 | | | |

**[aligns - arrested]** <span style="float:right">Page 3</span>

**aligns** 144:1,15
**alleged** 139:8
**allow** 68:19
**allowed** 46:20
**american** 50:7
52:19 62:8,20,21
129:11,14
130:11,14 131:4
131:12 153:15
157:3,4,14
160:13
**ample** 125:18,18
125:19 128:6
150:3
**analogous** 100:4
**analysis** 26:15
27:19 93:21,25
112:24 121:9
126:25 144:10
144:24 145:8,18
151:1,12 163:21
163:24 164:1
**analyst** 49:5
154:9
**analyze** 95:1
**analyzed** 101:8
**analyzing**
123:12
**andrew** 2:3
**andrew.johnson**
2:5
**angles** 84:4
**animal** 11:16
**announcement**
130:18
**announcements**
82:12 120:25
121:24 125:22

128:20 129:22
**answer** 8:16
14:12 46:22
68:25 89:5,21
90:7,7,13 91:4
93:22 96:14
101:24 106:25
110:6 111:7
137:11 141:24
142:25,25 143:5
152:18
**answered** 69:19
76:3
**answering** 123:9
**answers** 152:9
**anybody** 35:5,8
35:16,17 47:2
**apologize** 19:10
19:12 26:24
51:24 59:8
76:18 91:13,16
92:24 106:4,6
111:6
**apparent** 86:14
**appeals** 42:12,15
158:11
**appear** 17:20
84:25 113:11,12
**appeared** 121:11
**appearing** 93:17
**appears** 84:4
85:1 92:20
94:14 95:7
105:3 112:15
130:15
**appendix** 3:10
3:12 27:25,25
28:1 58:1,14,16

60:1,6,8 63:18
63:19
**applicable** 23:21
128:2 149:24
159:6,8
**application**
159:10 163:15
**applied** 110:15
160:10 162:3
**applies** 27:20
137:21 158:16
**apply** 45:16
47:18 48:2,24
130:4 163:1
**applying** 49:6
161:21
**apprehend** 14:9
15:1 67:9
**apprehended**
16:15,21
**apprehension**
5:17 7:20 10:23
63:2
**apprehensions**
132:3,20,21
**apprenticeship**
52:21 53:2,5,9
53:16,24 54:5
153:15
**approach** 95:7
114:22
**approaching**
15:22
**appropriate**
67:11 74:4,9
95:2 98:22
118:3 122:8
132:9 136:6

162:18
**appropriately**
116:8 146:25
**approval** 38:7
**approved** 38:5
38:19 39:10,19
39:24 43:6
49:22 69:4
155:16,19,25
156:8 158:4
**approximate**
51:18
**approximately**
52:22 53:1
**area** 7:24 10:25
78:11 112:13
114:3 152:23
153:19 164:15
164:16,17
**arizona** 48:22
**arkansas** 156:7
**arm** 112:10
**armed** 19:25
97:19,21,22
112:25 113:5,6
130:3
**arms** 83:5 85:10
85:13,23 95:25
113:17 160:17
**arnold** 2:3
**arnoldporter.c...**
2:5
**arrest** 15:21
16:1,9,11,14,20
16:20 73:23,24
110:14
**arrested** 15:24

**[arrow - barbetto]**

**arrow** 36:16
**arthur** 77:11,22
  79:21 81:23
  82:4,19,24 83:4
  83:4,7,7,10,11
  83:13 94:10
  105:2 114:2
  119:12,25 124:4
  125:7
**article** 5:18 11:2
**articles** 7:22
**asb** 157:5
**aside** 164:3
**asked** 24:14,16
  76:2
**asking** 67:4 72:4
  72:5 74:13
  85:12 89:20
  102:9 106:4
  143:24
**aspect** 44:15,16
  63:21 64:13
  73:4 74:11
  110:2
**aspects** 49:19
  65:12 67:7
  68:18 106:19
  153:18,19
  154:13,13 159:5
**assault** 83:8 85:2
  93:9,10 97:16
  119:12 154:12
**assaulted** 84:10
  88:5 97:17
**assaulting** 89:10
**assaultive** 84:5
  87:1,8 91:19,23
  92:3 93:17 97:1

105:1,2,3 119:15
  119:19,24 120:2
  121:12
**assess** 106:7
**assessment** 65:7
  65:8 70:9,18
  72:23 75:1 90:8
  100:9 103:12
  105:17,24
  106:14 137:25
**assessments**
  60:11 70:13
  141:10
**assigned** 6:10
  41:5 133:3
  150:16
**assist** 13:11,15
  16:10 115:13
**assistance** 13:13
  21:16
**assisted** 125:12
**assisting** 13:17
**association** 41:4
  41:11 50:8
  52:20 62:9,10,11
  62:12 129:11,14
  130:11,15 131:5
  131:12 157:14
  157:15,18,19
  160:13
**associations**
  62:7 157:13
**assume** 90:19,22
**athletic** 89:23
  95:18 96:7
**attach** 34:7
**attack** 82:3,4
  84:11 115:14

154:12
**attempted** 16:14
  16:20
**attempting**
  15:21 16:5
  73:24 96:13
  97:3,14
**attempts** 78:13
  79:8 82:11
  83:10
**attend** 39:25
  72:1,18
**attended** 6:5
  35:19 71:9
  159:15
**attention** 78:23
  79:3 82:2,5,10
  148:18 149:3,18
  150:10
**attorney** 2:8
  21:1,15,15 29:19
  34:25 48:20
  133:21
**audio** 96:4
**authored** 20:19
**authority** 47:7
**auto** 20:6 36:22
**available** 28:23
**ave** 2:4
**average** 150:18
**awards** 130:11
**aware** 57:5 71:5
  71:15,21,22
**awesome** 58:5
**axon** 49:10
  155:6

**b**

**b** 3:5,12 28:1
  60:1,6,8
**back** 6:9 9:20
  15:25 21:15
  26:24,25 29:10
  33:13 36:16,16
  50:6 57:17,21
  59:12,13 60:18
  61:3,6 64:6
  69:14 79:3
  82:10 85:16
  88:15 89:1,15
  91:15,17 94:16
  95:16,18 104:7
  110:7 112:19,23
  120:19 136:23
  143:11,15 144:4
  145:4 148:18
  161:6
**background**
  18:20 48:10
  152:10 164:21
**baker** 28:23 30:3
  30:10,19 33:5
  79:18 81:7 83:1
  114:1 125:7
  151:23
**baker's** 31:3
  77:14
**balled** 90:22
  92:9 94:8
**bam** 40:14
**bar** 15:19,19,20
**barbetto** 35:24
  36:4 71:19
  140:10

[barbetto's - blueline]                                                                    Page 5

**barbetto's** 71:11 72:10 130:21 141:17
**bartlett** 1:17 4:22,23 5:4 11:13 41:18
**based** 46:2 63:17 64:23 92:23 103:9,16,18,21 108:8 112:7,15 115:24 120:9 121:4,17 128:24 130:12 139:14 141:25 151:10 166:1
**basic** 6:4,10 7:17 66:4 69:4
**basically** 36:8
**basing** 69:3
**basis** 23:4 25:4 26:18 29:9 30:22 31:8,12 79:25 81:4 96:15 98:13 109:2 111:10 133:14 140:25 144:19
**baton** 154:17
**battery** 119:12
**beach** 41:23 42:25 132:5,16
**bear** 100:8,17 104:6
**becoming** 52:18
**began** 13:25 120:16
**beginning** 1:17 26:9 28:5 37:12

116:3 144:16 145:3 147:24 148:15,24 149:16 150:8 151:8
**begins** 25:8 28:16 77:2 135:18 140:9 145:7,16
**behavior** 91:23 122:22
**behaviors** 147:1 148:13
**belief** 84:9 87:5 87:7 88:6,9 100:1 107:22 111:10 115:15 121:13
**believe** 7:3,5 8:3 8:5,24 9:12,20 10:3,9 11:22 12:22,23 22:8,13 26:25 27:1,10 33:21 35:13 47:24 50:15 61:6 69:19 71:11,22 74:8 77:1,15 79:23 80:9,25 85:3,15 85:17,22 86:25 87:11 95:15 96:12 97:3,8 98:9 99:15,19 108:20 109:7 112:22 113:4 115:19 117:21 118:24 121:4,13 122:15 123:17

126:8 131:15,18 133:16 135:16 139:23 140:4 142:17 143:12 146:5 147:9,25 151:21 152:13 160:15,21 165:23
**believed** 115:21 130:3
**bench** 95:15
**benchmark** 132:18,20 134:9 134:24 135:2
**benchmarks** 132:13
**best** 60:20 62:23 62:23 157:9,10 157:21 161:22
**better** 47:1 102:1 165:11
**big** 101:5
**biggest** 101:9
**bit** 40:11 55:11 72:4 73:2 97:5 99:8 102:2 104:13 120:12 125:23 126:20 134:5 154:4 163:16
**bite** 7:20 9:1,7 10:23 14:10 15:2,8,11,14 20:4,4 23:20,22 31:23 91:22 95:13 104:19 105:20 106:1,9 106:16 107:18

107:19 108:3 109:14,16 110:2 111:1,4,11,16,19 111:21,25 113:13 114:14 115:22 116:8,12 120:24 121:23 122:20 123:4 126:10 128:21 131:23 132:1,14 132:20 133:1,3,5 133:7,8,9 134:8 134:9 135:25 138:25 140:14 143:3,6 146:11 146:17,21,25 147:6,16,25 148:4,11 149:6 150:8,14,20
**bites** 83:4 91:12 109:25 125:7 132:2,21
**biting** 19:25 63:2 111:19
**bitten** 138:23 139:11
**black** 1:19 85:16
**block** 38:2 43:14 43:16 44:19 86:18 163:18
**bloodhound** 12:7
**bloodhounds** 11:19,20 12:12 12:17 13:7,15
**blown** 84:18
**blueline** 43:12

**[board - canines]** Page 6

**board** 39:12,22
  49:24 50:22
  62:20 155:20
  156:7,11 157:3,6
  157:6
**bodies** 129:4
**body** 112:9
  144:5,9 145:4,12
  147:23 148:14
  151:3 155:17
  156:2
**book** 51:23
**boone** 20:13
**bottom** 27:11,17
  79:15 104:10
  116:2 126:8
  147:15 149:20
**breaches** 79:18
**breaching** 83:16
  84:1 110:16
**break** 26:2 33:12
  81:12 135:9
**breaks** 78:5
**brian** 146:14,20
  146:24 147:5
  149:5
**brief** 36:7 144:3
**briefly** 127:20
**brings** 79:3
**broke** 81:8 124:3
**broken** 25:24
**building** 7:23
  10:24 44:19
**bullet** 27:2 28:21
  31:4,5 107:24
  141:19 142:4,12
  147:4,7,14 148:8
  148:19 149:4,19

150:11
**bulleted** 25:20
**bullets** 25:9,11
  121:11 146:14
  147:3,13,21
  149:9 150:4,23
**burst** 124:20
**bursts** 105:15
  121:22

**c**

**c** 2:1,3 4:13
  167:2,2
**cadaver** 5:15
  6:20 7:4,25 9:21
  9:24 10:19,19
  41:1 152:13,22
**calculation**
  115:24
**calf** 83:4
**call** 34:24 63:15
**called** 4:3 19:22
  20:2,9 21:15
  30:1 35:20
  62:15 68:6
  132:5
**canine** 6:3,24
  8:14 9:24,25
  10:13,14 14:4,19
  15:5,7,14 19:1,4
  19:16,19,21 24:8
  26:6,10,22 27:12
  27:16,19 28:16
  28:22 30:3
  31:23 35:10,11
  37:20 38:3,10,15
  38:18 39:3,5,13
  39:17 40:3,6,9

40:10,16,19,22
  41:4,8,10,21
  42:8,9,18 43:3,9
  43:11 44:2,5,21
  45:5 47:9 50:1,3
  50:5,25 51:5,15
  53:25 54:3,8,11
  54:15,19,23 55:6
  55:18,20 56:4
  58:18 60:10
  61:16 62:7,10,11
  63:9,20 65:15,22
  65:22 66:20,21
  67:6,18,25 68:13
  68:20 69:4,6,17
  69:23,23 70:10
  70:12 71:16
  72:8 73:7 74:2
  74:16,17 75:12
  75:17,18,25 76:1
  76:15,16,21,22
  77:1,8,16 80:3
  80:15,19 81:1,7
  83:2,4 84:21
  85:7 91:12
  92:18 93:15
  94:12,12,19 95:6
  95:12 98:6,16,17
  99:7 103:1,4,4,7
  103:7,19 104:19
  105:19,25
  106:16 107:14
  108:3,12,24
  109:1,24,25
  110:15 111:1,16
  111:19,24 112:1
  112:9,12 113:13
  114:2,4,7,9,23

116:19 118:24
  120:12,17,23
  121:23,23
  122:18 123:21
  125:6,23 126:10
  127:7,10 128:1,1
  128:5,11 129:18
  129:21,24
  130:13,14,17,25
  131:11 135:25
  136:6,11 138:25
  139:13,18 140:6
  140:13,14
  141:11 144:17
  145:6,23 146:6
  146:10,17,20,24
  147:6,10,16,24
  148:3,11,22
  149:6,13,22,23
  150:2,13,18,22
  152:12 153:12
  153:13,22,23
  157:12,18,19
  158:7,23,24
  160:4
**canines** 5:10,13
  5:14,20,24 6:18
  7:2,4 9:5,13,21
  10:10,19 11:7
  12:13,18 13:20
  14:1,2 41:6 48:2
  50:13 52:17
  53:11,18 71:2,7
  71:17 73:11
  103:22 128:16
  129:1 133:2
  138:8,23 150:15
  159:12

**[capable - close]** Page 7

capable  115:3
capacities  10:18
capacity  5:9,16
  5:21 9:6,14,16
  10:14,15,20,20
  10:21,22 11:8
  12:14,19 13:13
  14:24 16:10
  19:16 53:20
cape  39:1
capture  95:3
car  20:6
carbine  155:1
career  48:12
  50:17 53:15
carolina  159:24
  159:25
carroll  151:23
case  1:6 16:6
  18:15,24 19:3,19
  19:22 20:2,4,9
  20:10,21,22,22
  21:1,4,5,6,13,17
  21:20,21,21
  22:16,20 23:17
  23:22,25 24:2,11
  24:20 25:12,14
  30:1,11,12 33:3
  35:2,10 40:19,21
  42:7,12 48:18
  58:19 60:19
  68:5 77:23 95:4
  99:3 103:9
  109:14 112:22
  118:17 126:17
  127:1 130:1,5
  132:5,8,13,15
  134:22 136:7,11

137:7,13 139:15
  151:20 154:20
  161:16,24 164:2
  164:7 166:14
cases  20:16
  21:20,24 42:11
  48:24 155:19
categories  162:8
cause  134:6,16
ceasing  53:6
cell  86:18,21
  163:18
central  39:8
ceo  41:13
cert  54:7
certain  159:5
  165:6
certainly  64:22
  86:15 105:1
  109:21 115:20
  166:3
certification
  27:4,13,16,20,24
  45:2 50:7,10
  52:16 53:10
  55:9 56:4,7
  60:11,13 65:9
  70:18,20 141:9
  142:2 145:4,6
  156:24 158:9
certifications
  50:3,12 53:17
  54:1,7 56:11
  70:9
certified  1:20
  24:6 37:22
  38:19 39:10
  48:14 49:5,24

50:21 154:9,9,18
  155:5 162:7
certify  55:13
  167:4
certifying  129:4
change  88:12
  89:2 90:2,10,14
  91:1 106:22
  133:25 134:3,6
  141:5,18,22
  142:12,15,18
  143:3,5,8
changed  133:24
  143:4
characterize
  125:13 152:1
charge  50:19
chase  20:6
check  30:24
checked  130:12
chemical  49:10
  154:21 162:10
chicago  19:23
  35:20
chippewa  43:21
  43:22,24
chose  125:14,19
circuit  20:13
  42:11,15 132:6
  158:11
circumstance
  116:20
circumstances
  29:6 67:17 74:8
  77:15 80:25
  104:22 107:6
  109:10 110:1,8
  112:21 120:16

121:5 146:5,13
citations  144:23
  145:8,18 151:2
  151:10
cite  104:23
cited  31:17
  119:16,17
  161:25
city  19:22 39:2
  132:5,16
civil  45:1
civilian  11:16
  21:25
civilians  56:19
clarify  23:5
  51:12 76:19
  80:1
clarke  140:11
clarke's  141:17
clash  66:10
class  39:14 40:4
  43:23 44:18
  103:8
classes  103:4
  136:4 159:15
classroom  6:7,12
  72:19
clea  129:10
clear  14:7
  101:16 161:15
  161:19
clenched  89:24
click  36:16,20
  37:2 59:19
close  48:20 92:8
  94:8,9 105:8
  120:6,7 123:17
  123:18 124:5

**[close - constitutional]**                                           Page 8

143:12
**cluster**  118:7
  123:2
**cocked**  87:16
**college**  38:12
**combination**
  166:13
**come**  15:24
  33:13 34:21
  62:5 69:12 86:9
  86:18 97:1
  103:7 114:22
  122:12 125:7
  133:16 143:15
  159:21,23 160:1
  163:19
**comes**  81:20
  88:24 110:7
  112:8,19 115:16
  116:17 132:4
**coming**  84:8
  87:5 94:17
  115:13 125:15
**command**  75:10
  75:16,19,24
  76:14,20,21
**comment**  47:25
**commission**  43:6
  129:8 156:1,5,8
**committed**  119:9
**committee**  41:5
  157:7
**commonwealth**
  1:21 2:8 32:5
  35:19,25 64:19
  67:12 113:25
  128:12 132:24
  148:25 149:14

149:21 150:12
  150:19
**community**
  62:13,25 156:25
**company**  41:15
**compare**  64:25
**compared**  56:8
  88:15
**compel**  77:11
  80:22 146:1
**compensated**
  34:2,5,6
**compensation**
  34:14
**compilation**
  40:19
**compiles**  35:10
  40:20
**complaint**
  139:25 144:9
  148:15
**complaints**
  11:17
**complete**  70:22
**completely**
  100:4 166:8
**completing**  40:2
**compliance**  32:4
  77:12 80:22
  131:8 146:2
  148:25 159:2,3
  161:7
**compliant**  79:2
**complicated**
  20:5 110:7
**complied**  124:9
  160:11

**comply**  105:10
  105:12 114:20
  115:16 120:13
  120:18 121:15
  121:19 124:21
**complying**  97:14
  113:18
**components**
  67:11 154:11
**comported**
  160:9
**comprehensive**
  40:19
**computer**
  167:13
**concealed**
  114:11
**concerning**  27:7
**concerns**  8:22
  164:18
**concise**  161:15
  161:19
**conclude**  85:24
  109:8
**concluded**
  143:18 166:22
**conclusion**  61:2
  84:9 85:4 98:5
  111:3 140:20
  141:1
**conditions**  7:16
**conduct**  63:13
  90:9,10 91:9
  93:18,25 103:13
  118:17 127:14
**conducted**  63:6
  144:8

**conducting**  7:24
  10:24,25 11:1,2
**conductive**
  155:7
**conference**  36:4
  43:13,15,19
**confused**  71:20
**connection**
  18:15 52:14
  64:13
**conner**  68:6
**connor**  30:1
  73:19
**consider**  30:9
  134:10
**considerations**
  99:24 102:11
  137:24
**considered**
  160:5,18 161:25
  163:25,25
**considering**  93:2
  164:6
**consistency**
  111:9 128:16
**consistent**  23:20
  24:8 46:4 47:20
  55:18,24 65:1
  88:24 90:21
  112:16 121:18
  123:7 126:11,22
  128:2 129:16
  149:8,15,23
  158:12 160:12
**consistently**
  152:19
**constitutional**
  47:4,5 101:7

**[consult - country]**

consult  55:5,8,16
  155:14
consultant  4:16
  55:3
consulting  35:9
  40:16 41:14,15
  64:23 128:25
  155:9,23 156:15
contact  36:3
contemporane...
  83:3
context  47:25
  53:14 66:3
  87:21 89:7,22
  90:4,15 91:5
  164:6
continuation
  82:13
continue  8:17
  122:19 138:13
continued  6:7,11
  79:13 119:8
  153:16
continues  83:6,8
  116:10 144:18
  145:7,16 148:17
  149:2
continuing  26:11
  26:13 27:17
  39:25 40:1 43:7
  44:6 69:10,10
  79:4 138:4
  147:21 149:12
  149:17 150:8
contraband  8:2
  20:12 38:11
  39:6 43:12,14
  44:3

control  7:20
  10:24 79:2 82:6
  82:9 85:8 147:2
conversation
  36:7 104:11
convicted  103:3
  103:6 159:19,20
  163:3
corey  1:4 126:11
  149:7
correct  8:6,22
  9:2,3,14,18,22
  9:23 10:11
  11:24 12:20
  17:18 20:15,18
  20:19 21:22,23
  22:1,16,17 23:10
  23:14,15 26:16
  27:21,22 30:19
  30:20,23 33:25
  46:22 50:17
  53:5 56:19,24,25
  57:3,7,14,15
  71:12 76:23,24
  80:4 87:3 92:18
  93:18 98:16
  99:13,17,18,21
  99:22 102:25
  103:15,20,23,24
  104:4 107:14,15
  109:11 117:15
  118:12,18
  123:14,15
  125:20 126:1,2
  127:16 131:12
  133:18 134:2,17
  134:18 137:8,22
  138:12 139:2,25

  140:1,17 142:7,9
  142:18,22
  151:14 152:5
  153:10 159:13
  159:14 160:6,23
  160:24 162:1,5
  167:14
correction  83:11
  129:10 138:7
correctional
  57:11,14 78:3
  88:10 99:16,20
  100:1,24,24
  101:1,22 102:8
  102:24 103:19
  103:22 104:3
  107:14 126:3
  128:3,17 129:4
  129:11,14
  130:11,14 131:5
  131:12 149:25
  159:12,14,21
  160:1,13 161:23
  162:15,25
  163:10,20
  164:24 165:3,10
  165:24 166:8
corrections  7:16
  18:22 19:1 24:7
  24:10 29:21
  30:5 32:6 33:24
  34:3,18,22 35:6
  35:8,14,18,24
  64:18 66:24
  67:13,24 68:4
  70:3,21 71:6,16
  72:7 73:10,25
  74:15 75:11,17

  75:25 76:15
  107:18 110:10
  114:1 119:18
  126:13,23 127:2
  127:4,25 128:13
  129:12,15,19
  130:7,10,25
  132:25 133:18
  133:22 149:1,9
  149:15,22
  150:13,20
  158:15 159:7,10
  159:23,25
  160:10 162:9
correctly  167:11
correspond
  144:10 145:9,13
corresponding
  151:2
corresponds
  148:5
couch  131:22
council  39:20
  44:8
counsel  9:10
  14:6 19:5,8,16
  20:11 22:22
  24:15 29:19
  47:1 143:24
  151:18 167:16
count  78:1
counted  125:20
  125:21
counter  22:9
country  42:13
  47:23 63:13
  64:24 152:24

[county - department]

**county** 20:2,14 41:23 43:1 159:16

**couple** 7:6 13:22 23:19 36:12 74:1 89:16 111:8 152:8

**course** 6:5,10 14:2 28:11,11 37:20,21 38:1,2 38:6,10,10,18 39:5,17 40:2,6,7 40:8,10 41:21 42:18,23,24,25 43:3,20 44:2,5 45:13 46:5,7,8 50:21 66:4 69:4 72:18,18 159:22 159:24 160:2

**courses** 39:24 46:17 47:17 49:8,9,15 50:2

**court** 1:1 20:13 42:10,11,15,16 44:25 91:14 135:12 158:11

**courts** 46:23 47:4

**cover** 42:12

**covered** 108:9

**covers** 34:9 136:19

**credit** 44:6

**credits** 40:1 43:8

**creeped** 134:15

**crime** 68:7 73:20

**criminal** 5:17 7:20 10:22

14:22,22 15:2 16:13,18 20:10 45:1 164:21 165:25

**curled** 112:18

**current** 151:20

**currently** 4:17 4:20 50:23

**curriculum** 3:9 36:24 37:10,20 38:6,10,18,23 39:5,9 40:6 42:2 42:2,18 43:3,21 44:2,4 64:20 67:13 68:3,3 70:2,4,8 73:13 73:17 74:20,22 75:5,6 156:9 157:23,25 158:3 160:4,8

**curriculums** 48:6 75:7

**custody** 97:13

**cut** 59:10 165:15

**cv** 51:20

**d**

**d** 3:1

**damage** 16:18

**dangerous** 98:25

**date** 37:25

**dates** 41:20

**david** 140:11

**davis** 2:9 3:4 33:17 34:25 68:22,25 76:2,7 89:4 90:12 106:24 137:10

143:19,20,22 144:12 149:3,18 150:11 166:18

**day** 9:4,4 13:19 13:19 14:3,3 38:1,1 39:13,17 40:12,13 42:19 42:21,23,24 44:5 167:20

**dc** 2:4

**deal** 103:5

**dealing** 94:24 114:2,4 159:18 159:19 164:13 164:14,19 165:13 166:9

**deals** 48:15

**dean** 29:24 78:9 79:10 81:13 82:17 124:7 151:23

**dean's** 125:1

**decision** 89:3 98:23 99:13,14 108:16 114:25 165:21

**decision's** 69:22

**decoy** 13:12 50:8 50:11 67:10 74:20

**decoying** 70:5,5 74:22

**dedicated** 45:18

**deescalating** 97:10

**defendant** 21:8 123:22 136:8 137:17,18 138:7

138:18,19,21 139:9,15 140:10 148:23 149:5 151:16

**defendant's** 20:11 29:18 34:24

**defendants** 1:8 2:12 135:18 136:13,14,17,19 136:25 137:2 151:23,25 166:19

**defensive** 49:12 154:16

**defiance** 115:1

**deficiencies** 8:22

**dep** 32:12,19

**department** 4:23 5:3,4 11:13,14 13:2 18:21,25 24:7,9 29:21 30:4 32:5 33:24 34:3,18,22 35:5 35:8,14,18,24 55:4,7,15 56:2 64:18 66:24 67:13,24 68:4 70:3,21 71:6,15 72:7 73:9,25 74:15 75:10,16 75:24 76:14 107:17 113:25 119:17 126:12 126:23 127:2,4 127:25 128:13 129:15,19 130:6 130:10,24

[department - directions]                                           Page 11

132:24 133:17
133:20,20,22
149:1,9,14,21
150:13,20
155:15 159:22
159:25
**depending**  47:3
47:22 106:23
134:3 152:23
**deploy**  69:23,23
108:17
**deployed**  14:4
14:20 15:14
16:7 29:3 82:23
105:14 106:16
**deploying**  14:8,9
105:25 127:10
128:5 150:2
**deployment**  6:13
66:21 68:1 79:5
79:5 80:3 81:17
106:20 129:21
140:13,21
**deployments**
14:17 107:8
129:18 154:19
**deploys**  124:16
**deponent**  167:8
167:10
**deposed**  20:25
**deposition**  1:14
30:10,18 31:3,6
31:16,21 32:9,16
32:17,22 33:4
34:12 44:23
71:12 86:8 93:1
93:10 103:17
130:21 141:12

166:22 167:13
**depositions**
127:8
**describe**  6:2
7:13 8:8 11:10
14:25 15:16
19:18 26:2
28:18 37:14
55:1,10 58:16
60:25 62:23
72:16 102:10
131:20 162:12
**described**  5:25
6:16 7:1 20:16
20:22 33:2
56:23 57:2 73:5
85:11 88:13
103:16 138:2
**describing**  8:5
26:14 46:16
88:16 94:1
138:11
**description**  3:6
**designated**  50:19
**detail**  8:9 25:22
26:14 27:7
55:11
**details**  58:17
60:9 126:20
**detainees**  103:3
159:18 163:2,12
163:14
**detection**  5:14
5:16 7:5 8:2
10:10,13,16,20
11:23 12:3,6,6,8
12:13 38:12
41:2 44:3,16

152:14,14
157:16
**detective**  62:12
**detector**  20:12
39:6 43:12,14
56:6 62:17 63:1
157:15
**determination**
74:18 92:17
**determine**  95:1
**develop**  8:15
42:2,2 54:8,15
157:11
**developed**  37:19
38:9,17,23 39:4
39:17 40:5
41:20 42:17
43:3,10,20 44:1
46:15 48:17
50:2 111:13
156:10
**developing**  48:5
54:18,22 78:18
156:14
**development**
49:8
**developments**
8:13
**device**  155:3
**differ**  46:2
**difference**  46:17
46:23 100:22
101:5,9,10,14,20
102:16 115:25
116:21 122:25
123:6,12 128:8
161:11 164:12
164:25

**differences**
46:19,21 69:15
100:6,8,12,19
101:22 102:7
104:1,2,3 116:16
164:5
**different**  5:24
41:25 46:18
74:7,10 90:11
102:14 107:12
111:8 117:1
127:22 128:18
134:10 138:1
152:11,17
162:17,19 163:2
163:8,11,24,24
164:18 165:7,9
166:9
**differentiate**
117:5
**differentiated**
117:2
**direct**  82:1 102:3
148:6,18 149:3
149:18 150:10
**directed**  77:16
81:1 82:18,22
84:20 105:16
118:25 146:6
147:10
**direction**  78:20
89:25 90:1
94:17 96:18,18
96:19,20 99:6
120:12 159:17
**directions**
152:19

[directly - earlier]                                                          Page 12

directly   81:15
  99:5 133:17
directs   82:5
disappears
  114:8
discipline   7:12
  7:19 8:6,13,18
  10:8,17 40:23,24
  40:25 45:6,10,19
  46:11 100:21
  101:19 102:6
  104:21 138:1,20
  139:10 145:15
  146:12 153:3
  158:19
disciplines   12:1
  55:21 65:5,5
  152:12,16,21,25
  157:17,17
disciplining
  139:17
discovery
  166:13
discrepancy
  130:6
discuss   74:4
  100:12 135:16
discussed   27:23
  41:16 44:22
  74:8 81:6 105:4
  105:7 108:13
  111:14 120:4
  124:2 128:22
  130:21 144:25
  150:25
discusses   68:4
  102:6

discussing   30:13
  40:24 98:11
  116:1 127:23
discussion   132:7
  143:6 144:5
disengagement
  94:6
dismissed
  137:12
dispute   109:21
distinct   12:1
  105:15
district   1:1,1
  19:24 20:3
division   1:2
  19:24
doc   31:11 103:7
doc's   160:3
doctrine   140:2
document   24:21
  57:23 59:1,13,16
  59:20 60:9,14
  61:4
documentation
  56:1
documented
  96:5
documenting
  29:20
documents
  13:22 22:14,18
  22:23,23 23:11
  26:13,17,19 29:8
  29:12,13,16 30:6
  30:21 31:8,12
  58:17,21 63:18
  64:17 69:2
  73:18,19 74:3

139:7
doe   136:13,17,19
  151:21
dog   5:16 6:6,11
  8:20 9:9,15
  11:18 14:8,9,21
  15:1,3,23 16:2,7
  16:8,10,14,15
  19:25 20:4,4,12
  23:20,22,24,25
  24:1,1,2,4,5 29:3
  29:6 38:11 39:6
  39:6 40:24,25
  42:20 43:12
  44:3 45:22
  47:18 50:8
  52:20 61:18
  62:9,12 63:6
  65:11 66:1,8,8,9
  66:11,13,14 67:9
  67:9 68:1 70:7
  74:5,9,12 75:2
  79:24 94:17
  95:14,20 96:6
  107:8,9 109:14
  109:16 111:4,11
  111:20 115:8,16
  128:20 152:15
  152:22,22,23
  153:16,24
  157:14,15
  162:11
dogs   6:14,21
  12:7 43:15,18
  45:16 56:6,6
  62:16 63:1,2
  66:17 72:14
  86:9,18 132:10

132:12 133:11
  135:4 152:14,14
  152:15,17,20,24
  153:3,6,12 157:7
  159:16
doing   46:9,10,11
  65:7 95:5
  104:12 135:7
  155:9 157:24
domestic   16:17
door   83:16 87:14
double   30:24
drive   1:17
drives   47:6
drug   7:4 9:8
  10:10,13,20
dual   152:19
duly   4:4 167:8
duration   31:22
  111:15 123:3
  147:18,24 148:3
duties   5:11
  13:19 14:3
duty   13:16
  135:19,24 136:9
  151:9,16 152:2

e

e   1:4 2:1,1 3:1,5
  4:13 167:2,2
earlier   6:17 9:13
  11:22 33:22
  37:24 40:24
  41:17 44:22
  46:16 50:15
  51:9,13 74:7
  99:15,19 103:16
  109:11 143:24

**[earlier - example]**                                                    Page 13

152:9 155:23
156:18 157:1
162:16
**east** 39:8
**eastern** 1:18
19:24 20:3
**easy** 110:5 122:3
**education** 40:1
43:7 44:6
**effect** 124:13
**effective** 77:11
79:9 80:21
146:1
**effort** 23:23
31:17 81:12
100:21 101:18
102:5 104:20
115:6 136:2
139:1 140:15
145:15 146:12
**eight** 38:2
**either** 8:14 15:7
30:10,15 51:13
65:24 66:12
108:18 124:9
132:9 154:3
155:14
**elaborate** 154:4
**electronically**
18:3 36:25 58:3
60:3
**eligible** 44:6
**employed** 70:20
**employees**
159:21
**employment**
11:12

**encounter**
100:23,23 101:6
101:6
**ends** 142:12
**energy** 49:9
155:6,7
**enforcement**
4:18,21 5:21
11:8,16,17 12:14
12:19 14:3 22:2
38:16 39:8,11,16
39:19,21 40:9
43:7 46:19 47:7
48:10,16,21
49:23 50:22
52:14 53:15,19
53:23,23 54:4,13
54:16 56:17,18
57:2 102:22
103:14 128:3,17
128:23 129:2,7,8
129:9 131:3
132:17 149:16
149:24 153:7
155:21,24 156:1
156:2,6,6 158:16
159:7,9 162:5,13
162:20 163:5
164:12 165:14
166:12
**engage** 76:20
**engaged** 76:1,16
76:22 77:23
91:10 104:24
105:19 106:9
109:1 119:23
**engagement**
108:24

**engaging** 53:6
**enhance** 8:20,23
**ensure** 82:2
135:3
**ensuring** 8:10
**entails** 5:17
**enter** 84:22
**entered** 87:3
93:2
**entering** 84:21
88:8 92:11,13
**enters** 90:25
91:22
**entire** 25:16
43:24 50:17
55:6 65:15
113:20 136:21
**entirety** 13:7
27:18
**entities** 57:1,2,6
**entity** 54:16
155:14
**entry** 16:5 37:15
38:4,9,17 39:4
39:15 40:5,15
41:12 42:17
43:2,10,20 44:1
**environment**
48:16 113:21
164:5,12 165:24
166:10
**environmental**
7:16 75:4
**environments**
164:13,17
**equally** 48:2
**escalating** 28:25
77:9 80:20

84:13 97:11,12
113:11 145:24
**escalation** 79:19
**escape** 95:20
**esq** 2:3,9
**establishment**
15:19
**estimate** 15:6,10
**estimating** 45:24
**et** 1:7 19:23 20:2
28:16,22 29:3
30:3 77:1,8,16
80:3 81:7 83:2,4
114:2 125:6
**evade** 16:14,20
73:24
**evaluate** 24:14
24:17 57:13
**evaluating** 110:1
123:13 162:14
**evasion** 68:9
**everybody** 81:22
86:11,20 136:20
**evidence** 5:18
7:22 11:3 144:1
160:5 161:25
**evolving** 29:1
77:10 80:20
98:7 145:25
**ex** 16:6
**examination** 4:6
143:21
**examined** 4:5
**example** 6:20
9:8 42:7 44:13
154:23 155:22
158:3 165:2,14
166:5

**[examples - file]**                                                    Page 14

**examples** 163:17
**exceeded** 61:16
  64:9 68:13
**exception** 81:22
  128:4 129:17,25
  130:2 149:25
**excessive** 108:4
  108:18 109:3,9
  109:15 110:3,17
  111:2,4,11 116:5
  117:7,10 146:18
**exclusively**
  45:22
**excuse** 76:4 85:6
  86:22 107:22
  142:5
**exercise** 136:1
  139:1 140:15
**exhausted** 29:4
**exhibit** 3:6 17:10
  17:14,21 18:1,9
  36:11,11,13,14
  36:15,24 37:3,6
  37:9 57:24 58:1
  58:11 59:17,23
  60:1,5,6 61:6
**exhibits** 17:18
  36:12,21,23
  57:17 59:14
**exists** 71:1
**expect** 15:4
  84:22
**expecting** 89:21
  112:3
**experience** 11:7
  11:11 37:13,16
  37:19 50:1 51:3
  54:18,22 65:1

99:10 102:22,24
  103:1,11,14,19
  103:21 104:1
  107:7 128:24,25
  152:15 153:1
  158:13 162:4,6
  162:13 166:12
**experiences**
  55:11 56:17,22
**expert** 3:8 18:2
  18:12,14,21 19:1
  19:4,16,20,22
  20:1,8,17,19
  21:2,7 33:23
  34:2,23 35:2
  109:24 140:6
**expertise** 162:4
**explain** 14:14,16
  60:23 87:9
  104:12 111:9
  115:25 134:5
  164:9
**explaining** 6:17
**explanation**
  104:14
**explosive** 42:20
  42:20 152:22
**explosives** 12:4
  41:1 45:11
**expound** 47:13
**expressed** 23:13
**expressing**
  110:24 140:20
**extensive** 48:9
**extent** 60:22

**f**

**f** 167:2
**face** 95:13,14
**faced** 104:22
  146:14
**facilities** 65:25
**facility** 57:11
  100:24,25 101:1
  162:25 163:10
  165:4 166:8
**facing** 89:1
**fact** 65:3 70:25
  79:14 88:12
  95:14 97:11
  119:16 122:2
**factor** 121:9
**factors** 73:20
  89:22 122:1,11
  154:10 165:19
**facts** 90:21 91:1
  112:21 144:10
  161:24 164:4,22
**fail** 24:10 138:7
  140:11
**failed** 77:13
  80:23 97:13
  105:10,12
  120:13,18
  121:15,19
  138:19 139:9
  146:3
**failing** 79:22
**failure** 136:3
  138:1
**fair** 151:11,25
**fairly** 47:20
  110:5

**faith** 23:23 31:17
  100:21 101:18
  102:5 104:20
  115:5,15 136:1
  139:1 140:15
  145:14 146:12
**falls** 147:18
**familiar** 44:24
**far** 57:5 108:9
  144:10 160:10
**farther** 113:19
**fast** 82:7 94:25
  98:1,20 99:11,11
  122:2,7
**federal** 56:17
  57:2,6 61:22
  158:10,20
  165:10
**fee** 34:7,9
**feel** 60:21 166:11
**fellow** 15:4
**field** 5:8 50:25
**fight** 15:19,22
  77:23 78:2,5,11
  78:20,20 79:4,14
  79:16,24 81:8,21
  82:10,14 83:6,14
  87:23,24 89:25
  96:8,13,25
  104:25 119:24
  120:16 124:3
**fighting** 78:8,12
  79:12,23 81:19
  82:25 124:8,22
**fights** 84:18
**figure** 33:18
**file** 17:17

**[files - full]**                                                              Page 15

**files** 29:17

**final** 3:7,10,12
18:2,12 58:2,14
60:2,7 111:15

**find** 100:17
130:6 144:14
160:8

**finding** 109:15

**fine** 33:17 61:10

**finish** 65:22 66:8

**finishing** 165:17

**fire** 82:17,22

**firearms** 154:25

**fired** 20:6

**fires** 78:9 81:14

**firm** 155:23

**first** 4:4 12:17
17:14 18:24
20:21 25:25
26:4 33:22 34:9
36:13,13 61:14
67:22 69:19
100:16 138:5
141:19 144:6

**fish** 55:7 56:2

**fist** 90:23 92:9

**fists** 89:24 94:8

**five** 143:14

**flag** 133:11

**fleck** 63:5

**floor** 95:8

**florida** 41:21,24
42:9,10,14,19
43:1 132:6,16

**focus** 8:10,12
28:6 47:9 49:3
60:18

**focused** 11:21
44:15,16 45:13
45:22 48:12
63:1 73:4 74:10
78:23 80:3
136:12,14

**folder** 17:19
36:21 57:18
59:14

**follow** 152:8

**followed** 42:23
42:24 106:8,15
146:14 147:2,7
147:13

**following** 29:15
92:7 105:13
120:19 121:19
146:9,23 147:7
150:22

**follows** 4:5

**footage** 91:9

**footnote** 31:19
31:20,21,24 32:1
32:3,7,9,11,13
32:15,17,19,21
142:6,12

**footnotes** 31:14
32:25 151:11

**force** 5:6,8 9:5,6
9:14,16,25 10:14
10:15 16:24
17:6 23:21 24:8
24:9 28:22,23,25
29:2 48:15 49:4
49:5,6 50:25
55:22 67:23
74:1,18 77:8,12
79:20,24 80:19

80:22 84:13
91:2 94:23 95:2
97:12 98:15,16
98:17,18,23
100:10 101:8
103:2 104:3,4
105:13 109:3,9
109:16 110:9,15
113:11 120:19
121:20 122:8
127:3,7 128:1,15
130:25 131:10
132:21 136:4
138:9 139:18
140:22 141:4,15
142:13 145:24
146:2 149:23
152:4 153:18,22
154:3,5,7,9,11
154:14 155:10
162:19,23,24

**forensic** 62:21
157:3

**foreseeability**
139:19 142:21

**foreseeable**
138:16,18 139:8
139:15,22 140:3
140:7

**form** 23:3 29:9
31:8,12 65:13
68:22 89:4
90:12 106:24
137:10 143:8

**formal** 52:15
53:9

**formalized**
54:17

**formed** 29:14
63:17 136:7

**former** 46:22

**forming** 22:15
22:19 26:18,20
30:22 61:20
160:5

**forms** 140:24

**forth** 128:12

**forward** 48:7
131:14

**found** 16:8 63:8
63:13 129:15
130:9 140:21
141:3,15 142:13
144:6 145:23
160:12

**foundation** 45:5

**four** 13:4 15:3
15:12,13 16:22
19:17 105:15
118:10 120:10

**fourth** 16:16
19:11,17

**frame** 83:19,20
83:20,20 92:21
94:20

**frameworks**
164:4

**free** 60:21

**friend** 15:24

**friends** 48:20

**front** 50:20
54:12

**full** 4:11 13:16
14:19 90:3 91:5
122:10 142:4
151:1

**[further - guidelines]**                                          Page 16

**further** 21:16 47:13 83:12,14 90:15 93:21,24 166:19,20
**futile** 29:4
**future** 135:9

**g**

**gain** 16:5
**gary** 19:22 20:22 21:20
**gathering** 119:20
**gears** 60:17
**general** 2:8 6:25 7:9,11,14,17 8:4 8:11,17,25 15:17 44:20,23 45:2,2 45:3,15,20 47:16 47:20 54:13 67:4,23 71:19 72:9,13,25 73:5 79:25 92:21 94:11,19 109:18 129:7 131:10,10 154:7
**general's** 29:19 133:21
**generalized** 45:7 158:18
**generally** 30:12 62:3 81:21 154:3 164:25
**generated** 29:24 29:25 30:2
**georgia** 156:10 156:12 158:4,5

**getting** 13:22 94:21 95:24 109:5 117:13 118:7,9 130:23 161:10
**girardeau** 39:1
**girlfriend's** 16:6
**give** 17:13 75:11 91:3 96:2 104:8 127:20 144:15 145:19 165:20
**given** 28:25 29:5 35:23 68:10,15 76:20,22 77:14 79:7,19 80:24 84:19 96:25 97:2 104:21 112:4 116:20 120:22,23,25 121:22,24 122:1 125:8 133:19,20 146:4,13 161:14 167:15
**gives** 124:16
**giving** 88:17 124:7 125:17 161:1
**glendale** 11:14 12:23 13:1,3 14:1
**go** 8:4 9:19 10:5 22:23 25:2,21 26:24,25 27:7,9 33:18 45:4,5 49:19 57:17 59:4 61:10 63:12 65:16,24 66:15 68:25

80:11,12,13 100:16,18 107:25 112:1 119:18 126:7 127:18 135:11 137:11 143:11 144:2 150:23 154:11 157:9
**goal** 62:2 63:3 156:19 157:20
**goes** 7:11 41:19 66:3 83:10 112:6,8 120:15 147:25
**going** 15:19 17:13 22:4,5 29:10 31:13 32:24 33:11 45:18 46:12 49:1 51:20 58:23 59:4 82:2 82:4 83:22 86:16 92:25 96:24 112:23 114:20 115:14 115:16 117:18 120:11,19 126:6 135:6 145:19,22 159:18 165:5,7,9 165:11
**good** 4:8 23:23 31:17 45:17 100:20 101:18 102:5 104:20 115:5,15 136:1 139:1 140:15 145:14 146:11 167:5

**governing** 129:3 155:20 156:2
**government** 81:13
**grabs** 111:25
**graduated** 49:5 154:8
**graham** 30:1 68:6 73:19
**granted** 21:9
**great** 37:6 44:17 108:13 110:4
**greater** 89:7
**grenade** 78:10 79:6 81:11,14 82:16,21 84:19 120:20 124:12
**ground** 79:2 81:24 85:10,23 86:11 94:21,22 95:24 96:22 105:11 112:2,6 113:22 120:14 120:17 121:16 161:9,9,11,18 164:5
**grounds** 21:10
**group** 41:6 62:15,16
**guardian** 35:9 40:16 41:14
**guess** 63:15 68:11,14 90:17 90:18 138:10
**guessing** 52:8
**guidance** 158:25
**guidelines** 62:17 67:23

**[guiding - identity]**                                                    Page 17

**guiding** 122:11
**gun** 124:7
**gunman** 78:6,9
**gunter** 29:17
**guy** 77:12,22
  78:7,12,21 79:4
  79:12,16,21
  81:23 82:4,12,19
  82:24 83:4,5,7,7
  83:10,12,13
  85:11,18,22
  94:10 96:20
  97:16,23 105:1,2
  105:2 113:2
  114:2 119:12,25
  124:4,9 125:7
**guy's** 77:11
**guys** 33:14

**h**

**h** 3:5
**half** 35:22 45:8,9
**halfway** 148:9
**hand** 92:9 97:5
  112:8,17 113:15
  114:10,18 115:7
  167:19
**handcuffing**
  154:16
**handgun** 130:4
**handled** 11:16
  28:22 107:13
  125:6
**handler** 6:3,4,25
  8:14,20 14:19
  24:4,5 30:2
  35:21 65:4,10
  66:1,3,7,9,11,13

69:5 74:17
84:21 94:19
103:19 107:8
**handlers** 15:5
  41:8,10 44:21,24
  61:23 63:7,9
  71:7,16 74:16
  75:11,17,25
  76:15 103:5
  129:20 132:10
  133:11 135:1,4
  153:12,14,21
**handling** 7:14,17
  8:17 30:3
**hands** 95:10,22
  115:1,3 153:24
  161:6,10
**happen** 157:5
**happened** 15:17
  89:8
**happening** 16:3
  82:7 83:23,24
  94:25 98:1,2,19
  99:10 113:21
  122:2,7 135:5
**happens** 112:7
**hard** 95:8
**harold** 140:11
**head** 87:15
  92:20 112:13
**heading** 26:9
  32:2,7,8,10
**heard** 94:19
**heeded** 78:9
**heeding** 79:22
**heights** 11:14
  13:1,3 14:1

**held** 51:7
**help** 109:24
  126:19
**helpful** 44:10
  60:22
**high** 37:14 66:12
**higher** 69:5
  134:8 156:21
  165:8
**hindsight** 83:19
  122:5
**hired** 55:3,8
**history** 16:13
  152:11 164:22
  165:25
**hit** 95:14
**hits** 35:20 36:4
  87:25
**hitting** 65:4
**hold** 5:2,5,8 50:3
  104:19 105:20
  106:1,9,16
  107:18,19 108:3
  111:1 112:10
  116:8,12 122:20
  126:10 136:1
  138:25 140:14
  146:11,17,21,25
  147:6,17 148:11
  149:7
**holding** 88:23
  90:21
**horn** 84:18
**hour** 6:4,10
  33:11 34:6,8,10
  34:13 35:22,22
  37:20 38:2,9,17
  39:4,9,13,17

40:6,8,12,13
41:20 42:18
43:3,11,13,16,17
43:20 44:1
45:13 46:5,7,8
46:17 62:6
63:10 72:17
**hours** 34:10
  45:12,18,21,21
  45:23 46:1,12
  48:11 61:7,24
  62:4,6 64:11
  69:6 135:7
**huge** 102:16
**human** 5:15 7:25
  12:4,9,9 14:5
  41:1 154:10,10
**humans** 10:25
  11:1,2,4 12:6
**hundreds** 14:17
  15:11
**hypothetical**
  88:18 90:4 91:4
**hypothetically**
  88:14,22 90:19

**i**

**idea** 57:8 109:4
**identical** 47:10
**identified** 35:2
**identify** 8:21
  23:16 24:19,21
  24:22,23 102:9
  117:4 145:17
**identifying**
  101:17,19,21
**identity** 151:25

**[ii - institute]**                                                                     Page 18

**ii**  1:15 3:2 4:2
**illinois**  1:17 4:23
  5:7 11:15 19:24
  20:10,14 39:5,11
  39:12 41:4,9,11
  41:18 48:22
  49:23 50:21,24
  156:6
**image**  84:4
  87:12,18
**imaged**  87:13
**images**  89:19
**immediacy**  68:7
  110:19
**immediate**  73:21
  119:21 121:5
**immediately**
  92:7 124:4
**immunity**  21:10
**impact**  78:10
  82:18,22 84:20
  100:8 105:16
**important**  42:13
**imprecise**  19:14
**improper**  132:12
  133:13 135:5
  136:10 140:12
  152:4 153:2
**improperly**
  132:11 139:16
**improve**  56:10
**inaccuracies**
  134:1
**inaccurate**
  133:24
**incarcerated**
  21:22

**incident**  16:4
  20:7 28:7 29:22
  29:23,25 30:2
  83:17 86:18
  90:20 133:6
  165:22
**incidents**  15:13
  15:16 94:23
**include**  10:22
  45:20 56:5
**included**  23:14
  55:20 110:24
**includes**  44:25
  65:3 154:17
  163:16
**including**  33:7
  137:1
**inconsistencies**
  127:17 129:13
  130:16
**inconsistent**
  127:10 128:11
**incorporate**
  143:25 144:23
  145:18 151:1,12
**incorporating**
  144:11
**indian**  43:21,22
  43:25
**indiana**  39:16,18
  39:19 40:3
  155:24 159:22
**indicate**  161:17
**indicated**  127:5
  167:7
**indicates**  161:7
**indication**  88:4
  96:25 97:2

  132:11 133:13
  150:21
**indicator**  132:9
**individual**  15:8
  15:9,12,14,21,23
  16:9,11,16,19
  78:24 110:11
  130:2 152:3
  153:3 165:12
  166:2
**individual's**
  161:9
**individually**
  25:24
**individuals**
  15:11 78:14
  114:12 166:4
**industry**  24:8
  26:6,10 27:12,16
  27:19 44:20
  45:3 55:18,25
  56:9 61:18,25
  62:4,15 65:2
  66:7,16 128:16
  129:16,23 130:8
  131:3,11 132:7
  132:19 134:9,20
  144:17 145:6
  150:18 156:16
  156:17 157:21
  158:6,13 159:4
  160:9 162:22
**industrywide**
  65:24
**ineffective**  82:19
**inflicted**  117:22
**infliction**  116:6
  146:22

**information**
  47:20 132:23
**initial**  3:7,10,12
  18:2,12 22:24
  23:7,7,9 33:6,8
  58:2,14 60:2,7
  111:15
**initially**  79:15
  94:13 104:25
**initiate**  96:24
**injured**  97:24,25
  113:1,2
**injury**  83:12
**inmate**  78:19
  79:1 81:19,24
  82:3,9 84:17,17
  85:9,13 86:13
  88:11 95:4
  120:24 121:23
  160:17 161:1,8
  161:13
**inmates**  77:17
  78:1 81:2,10
  86:10 90:2
  96:21 99:5,5
  105:8 113:21
  114:3 119:1,22
  120:8,8 146:7
  147:12 165:1
**inside**  78:2,3
  81:15,22 87:23
**instance**  14:14
  14:16 165:18
**instances**  56:13
  124:13
**institute**  49:6
  62:22 157:1,4

[institutes - johnson's]    Page 19

**institutes** 62:18
**institution** 129:5
**institutional**
  75:4
**instruct** 35:11
**instructing**
  134:25 161:17
**instruction** 38:2
  45:8 155:18
  156:22
**instructional**
  35:21 44:19
**instructions**
  160:25 161:14
**instructor** 13:12
  48:14,14 49:8,9
  49:10,11,12,12
  49:13,14,16,24
  154:6,16,18,21
  154:24,25 155:1
  155:2,2,4,5
  162:7,7
**instructs** 71:7,16
  72:7 75:11
**intend** 117:9
**intended** 147:2
**intending** 117:10
  117:11
**intent** 116:22,25
  117:2,24
**intentional**
  116:23
**intentionally**
  117:22
**interaction**
  21:25
**interested**
  167:17

**interior** 55:4,7
  55:15 56:2
**intermittent**
  13:9,10
**internal** 29:20
  29:22,23,25 30:2
**interpreting**
  46:24
**interruption**
  86:21 91:13
**intervene** 135:24
  136:3,4,9 151:9
  151:16 152:2
**introduce** 17:14
**introduced** 18:2
  36:25 58:2 60:2
  83:1
**introducing** 36:9
**introduction**
  25:10
**investigate**
  140:12
**investigation**
  16:23 17:5
  135:3 141:12
**investigations**
  17:2
**involve** 9:25
**involved** 14:18
  15:22 16:17
  20:4 21:22,24
  28:7 119:11
**issuance** 128:4
**issue** 73:21 78:7
  103:13 123:14
  129:21
**issues** 33:14
  40:23 42:5 43:9

  43:15 46:24
  47:5 49:3 78:15
  103:2,8
**items** 23:3

**j**

**jail** 159:17 163:7
  163:8
**jailers** 103:4
**jails** 103:5 163:7
**jefferson** 39:2
**jeffrey** 138:19
**jimmy** 138:19
**job** 7:2 9:5
**joe** 152:3
**john** 135:19
  136:13,17,19,25
  137:3,5,6 151:17
  151:19,21,22
**johnson** 1:4 2:3
  3:3 4:7 17:24
  18:4,6,7 23:6
  27:11 28:9
  29:13 31:14
  33:16,20 37:1
  44:17 58:4,24
  60:4,6 69:13
  71:25 76:6,11
  77:22 78:7,12,21
  79:3,11,15,21
  81:23 82:5,18,24
  83:6,11 84:2,5
  84:11,24,25 85:8
  86:8,17,22,24
  87:1,7,19 88:1
  88:13,25 89:10
  90:5,11,16,22
  91:9,13,14,18

  92:3,14 93:16
  94:7,15,18 95:9
  95:10,16,19 96:1
  96:7,12,16,24
  97:5,8,13,20
  99:6 104:19,24
  105:3,6,10,12,20
  105:22 106:1,10
  106:17 107:3
  108:3,22 109:2,4
  110:4 111:2,20
  111:22,25 112:1
  112:3,5,6,25
  113:5,6,14,17,17
  114:5,8,10,15,23
  114:25 115:2,6
  115:12 116:13
  117:12,23
  118:12,25,25
  119:9,15,18
  120:5,11,13,18
  121:5,11,14
  122:20 123:19
  124:4,9,14,17,22
  125:4,10,12,23
  126:11 131:24
  135:11,14 136:1
  137:15,22
  138:12,25
  140:15 143:10
  143:17 146:11
  146:17,21,25
  147:6,10,17
  148:12,20 149:7
  161:18 166:20
**johnson's** 31:25
  80:22 82:13
  83:7 91:23

**[johnson's - legal]**                                                    Page 20

93:20,25 95:13
97:19 112:13,17
112:18 113:15
114:20 115:15
122:21 125:16
146:2 148:13,15
**join** 82:4
**judgment** 21:9
**judiciously** 15:4
**july** 154:8
**jump** 18:18
**jumping** 95:12
**jurisdiction** 42:3
46:3,20,25 47:2
158:2
**jurisdictions**
46:18 47:23
**justification**
109:15
**jw** 30:1

**k**

**k** 1:7,18 4:13,13
**k9** 43:13
**kay** 2:3
**keep** 52:23
131:14 144:3
**kerr** 132:5,15
**kin** 167:16
**kind** 12:4 14:24
15:17 18:18,19
26:2 37:14
41:19 44:21
47:6 48:24
60:25 61:7,25
62:14,22 63:3,15
69:15 87:15,15
96:7 99:6

112:12 114:9
118:6,10 123:2,3
123:17 128:14
128:23 131:19
131:21 132:3,8
137:20 143:11
147:15 148:9
155:16 156:19
156:21 157:20
**kiser** 137:17,21
138:6,19 139:9
139:16
**kmiecik** 1:15 3:2
3:7,9,9,10,12 4:2
4:8,12,14 17:9
18:1 33:21
36:24,25 58:1
60:1 143:23
**kmiecik's** 3:7
18:1
**knife** 16:18
**know** 17:1,16,16
21:17 37:3 47:1
47:15 52:2,10
57:20 58:6
60:20 61:11
63:14 70:24
71:1 72:6 73:15
84:13 94:3
96:10 97:19,20
97:23,24 110:20
112:24,25 113:2
116:25 128:21
136:3 147:17
158:16 161:21
163:18 164:20
164:21 165:1,4

**knowing** 96:10
**knowledge**
161:21 162:4
166:15
**known** 112:22
130:3 165:24,25
165:25

**l**

**laid** 45:5 85:23
**language** 139:21
**large** 66:6
**launched** 81:11
84:19 105:14,16
120:21 121:21
124:12 125:1
154:22
**launcher** 125:2
154:20 162:9
**launches** 79:10
**law** 4:17,20 5:21
11:7,16 12:14,18
14:3 22:2 35:10
38:15 39:8,11,16
39:19,21 40:9,20
40:20,21,21
42:12 43:6
46:19 47:6
48:10,16,18,21
48:23 49:23
50:22 52:14
53:14,19,22,23
54:4,13,16 56:17
56:18 57:2
102:22 103:9,14
128:2,17,23
129:1,7,8,9
130:1 131:3

132:17 149:16
149:24 153:6
155:20,24 156:1
156:2,6,6 158:15
158:21 159:7,9
162:5,13,20
163:5 164:11
165:13 166:11
**lay** 85:10,13
124:8
**laying** 13:11,13
113:22
**layman's** 60:24
**lead** 41:13
107:12 108:20
117:21
**leads** 87:10
**leaned** 87:15
**learn** 8:14
**learning** 13:12
70:6 72:20
**leave** 114:13
115:22 123:10
**lecture** 6:7 35:23
72:19
**lectures** 6:13
**led** 85:24 109:8
138:22 139:11
**left** 14:1 28:24
112:8,17 113:15
114:10,18 115:7
135:15
**legal** 37:20 38:10
38:18 39:5 40:1
40:6,17 41:21
42:8,18 43:4,11
44:2 46:18
49:19 139:20

[legal - maintenance]                                                   Page 21

140:2 142:22
164:4
**legally** 140:6
**legislation**
158:25
**lend** 158:25
**length** 108:14,25
109:14,25 111:3
111:11,14 120:5
**lesson** 44:19
**lethal** 49:11
125:2 154:18,23
162:9,10
**level** 15:17 37:15
68:8 69:5 95:2
98:23 122:8
162:19 165:4
**levels** 98:18
165:8,8
**liability** 37:22
41:23 43:5 45:1
**lieutenant** 5:8
50:23 51:9
**life** 88:3
**limited** 151:19
164:22
**limits** 156:23
**line** 50:20 54:12
59:8 61:8
127:14 130:15
136:16
**liquor** 15:18
**list** 22:14 23:14
26:12 37:12
137:17 144:3
**listed** 22:20 23:1
23:2 25:10
26:18 30:7,22

37:15 58:21
63:19 67:12
73:17
**listing** 60:8
**lists** 25:3
**little** 19:14 40:11
47:13 55:11
102:2 126:20
134:5 154:4
163:16
**live** 10:25 11:1,2
11:4 12:6,9
**livenote** 1:20
**llc** 41:14
**llp** 2:3
**local** 15:18 47:23
155:15 163:7
**localized** 46:18
**locate** 16:7
**located** 16:14,19
**location** 42:6
86:10
**locations** 166:7
**locked** 87:19
88:1,10 92:6,14
**locking** 88:3
**long** 4:24 42:23
46:4 51:7
108:23 109:17
153:5,11 154:1
155:8,9
**longer** 110:11
115:6 122:21
128:21 137:6
148:12
**look** 13:23 22:4
28:6 29:8 42:4
51:20 61:25

62:3 63:23
64:24 65:12,25
68:23 69:1,9
70:7,14,16 72:22
74:24 77:21
84:14,15 85:3
95:21,22,24 98:1
99:9 100:20
104:9 113:20
115:17 120:25
121:8,25 122:4,9
122:14 124:2
130:1,5 132:1
134:11 143:7
156:19,21
157:12,13
**looked** 22:15
45:21 48:6
64:12 93:22
123:1,3 127:6
128:14 129:2,12
129:13 164:7
**looking** 12:8
13:24 14:21
22:22 25:7
28:16 42:8,9
46:14 61:19
64:16 70:1 72:9
87:16 89:24
90:1 92:5 94:2
95:1 98:2
102:14 107:5
128:10 133:8
141:8 145:4
156:25 158:5
162:21,24 163:3
163:14,21 164:1
164:11

**looks** 27:18
28:15 32:23
72:15
**lot** 15:20 32:24
64:23 66:14
124:1 158:18
159:15
**louisiana** 44:2,4
44:7
**low** 66:13
**lower** 132:22
148:9 149:4
150:17
**lowest** 156:20
**luxury** 83:21
122:6

m

**m** 4:13
**machine** 167:11
**madison** 20:2
21:8
**main** 110:19
147:4,14 148:8
149:4,19 157:12
**maintain** 23:24
31:18 100:21
101:18 102:5
104:20 136:2
139:1 140:16
142:25 145:15
146:12
**maintained** 8:11
**maintenance** 6:8
6:11 8:7,9,12,19
61:17 63:11,16
64:10 69:10

**[major - michael]**

**major** 35:24 62:8 100:22 101:14

**majority** 21:3 63:8 159:1

**making** 16:1 47:24 96:16 165:21

**malicious** 108:4 108:12,21 117:7 117:11 146:18 163:23

**manage** 122:21 148:13

**mandatory** 159:2

**manner** 24:4 77:16 81:1 108:12,21 116:24 117:11 117:12 118:25 126:11,21 146:6 147:11 149:7 163:23

**mansfield** 43:9

**manual** 71:1

**mark** 14:20

**marked** 17:17 18:8 36:20 57:17,24 58:11 59:14,17,23

**markings** 74:25

**massachusetts** 2:4

**massengill** 114:21

**matched** 116:9 147:1

**material** 68:11 68:16,17

**materials** 26:20 29:15 48:8 166:13

**matter** 34:15 79:14 95:14 139:12 141:13

**mauled** 138:23 139:11

**max** 101:3,3

**maximum** 77:24 81:10 101:2 166:2

**mccowan** 1:7 26:22 27:21 30:8,11,19 31:6 32:15,17,19,22 33:5 58:18 60:10 61:15 63:20 64:9 66:20,23 67:6,16 68:13,20 69:3,16 69:21 70:10,12 83:15,21,22 84:1 84:10,13 85:7 87:3,13 88:21,23 88:24 89:12 90:25 91:10,21 92:10,12,17 93:14,17 94:12 95:22 96:2,23 97:18,23,24 98:5 99:4,12 104:22 105:19 106:8,15 108:11,20 112:3 112:11,14,16,24 113:16,23 114:4

114:7,9,22,24 115:4,11,23 116:4,19 117:9 117:22 118:8,23 119:14,15 121:4 121:14 122:5 123:22 125:15 125:17 126:10 127:9 136:5,10 138:21 141:10 146:14 147:2,9 148:23 149:6

**mccowan's** 31:16,17,21 32:4 32:12 63:22 64:21,25 72:12 80:24 84:8 87:22 89:3 90:9 92:19,23 93:1 97:7 101:17 102:5 104:18 105:25 106:20 108:2,16 111:1 112:5 113:8,14 115:14,20 116:12 117:14 118:16 120:1 122:17 127:14 128:10 135:25 138:24 139:13 140:12,14 141:25 145:14 146:4,10,16,20 146:24 147:5,16 148:11,25

**mean** 8:9 25:16 59:10 164:15

**meaning** 46:10 66:22 99:22

**means** 90:18

**meant** 8:19 56:21

**measure** 132:4

**measurement** 134:12

**measuring** 63:16

**meet** 61:23 62:2 72:20 131:1

**meeting** 65:2 72:24

**meister** 20:9 21:12,21

**member** 21:25 41:3 85:2

**members** 35:14 41:9,10 105:4 119:19 121:12

**membership** 35:12

**memory** 51:24 154:13

**mention** 57:10

**mentioned** 7:3,6 8:3,24 9:20 10:9

**mentions** 113:7

**mentor** 63:4

**mesh** 66:9

**met** 61:16 63:10 63:20 64:9 68:13

**metal** 95:15

**methodology** 23:19

**michael** 1:15 3:2 4:2,12

[michigan - neither]                                                     Page 23

**michigan** 156:5
  156:5
**middle** 61:8
  127:19
**millimeter** 78:10
  79:6,11 81:11,14
  82:17,22 105:14
  105:16 120:20
  121:20 124:11
  125:1 154:20,23
**milliseconds**
  95:2
**mind** 100:22
  111:17 117:14
  117:19 118:8
**mine** 63:4
**minimum** 61:16
  61:24 62:4
  63:10 64:9
  72:25 131:2
**minute** 33:12
  143:14
**minutes** 33:16
  143:11
**misbehaving**
  132:9,10 133:11
  133:11,12 135:4
  135:4
**mischaracteriz...**
  71:24
**mismanagement**
  132:11
**mispronounced**
  12:24
**missed** 32:24
**missing** 14:23
  49:14 59:2 95:9

**missouri** 37:21
  37:23,24 38:7,19
  38:20,22 39:1,2
  156:3,4
**mix** 83:2
**mobile** 5:7 39:7
  39:8 50:24
**modalities** 154:3
**moment** 17:13
  57:16 83:23
  87:6,18 88:7
  89:9 91:12
  92:12,13 97:4
  104:6 111:17,18
  120:10 139:23
  145:19 161:14
  164:23
**moments** 95:5
**monday** 1:12
  122:3
**monitor** 54:15
**month** 51:19
  52:2,7 62:4
**morning** 4:8
  122:4
**motion** 96:16
**move** 8:23 13:23
  13:24 28:6
  76:25 80:6
  96:17 107:21
  123:16 126:6
**moved** 62:18
**moves** 150:4
**moving** 99:7
  120:7 131:14
  141:14
**mullins** 29:23
  78:4,6,13,22,25

  79:8 81:15,18,21
  81:23 82:1,8
  83:9 84:3,6,25
  84:25 85:6 87:2
  87:8,19 88:1,15
  89:1,11 90:11,24
  91:20,24 92:4,5
  92:7,8,14 93:9
  93:18 94:7,9
  96:19 97:17,25
  113:1,24 114:1,6
  120:2,6 124:6,16
  124:21
**multijurisdicti...**
  5:6
**multiple** 15:2
  79:7 84:4
  152:21 156:17
**multiplier** 9:6
**multipurpose**
  152:20
**munitions**
  162:10

**n**

**n** 2:1 3:1
**name** 4:11 12:24
  114:21
**narcotic** 12:3
  20:12 39:6
  42:20 43:12,14
  44:3,14,16 47:25
  62:11 152:14
  157:15,16
**narcotics** 5:15
  8:2 38:11 40:7
  40:25 45:11
  55:20 152:21

**narrow** 158:1
**narrowly** 158:1
**national** 55:5,15
  57:8 62:7,10,11
  62:18,21 157:1,4
  157:12,15,19
**nature** 7:9,11
  12:4 97:1
  119:25
**navigate** 28:12
  59:12,13
**navigated** 57:21
**navigating** 104:7
**near** 135:9
**nearby** 121:7
**nearly** 47:10
**necessarily** 86:6
  127:17 128:21
**necessary** 74:18
  77:10,18 79:23
  80:21 81:3 85:5
  98:6 119:2
  122:21 128:22
  146:1,8 147:12
  148:12 160:22
**need** 8:14 36:20
  44:24 49:17
  61:23 90:3 91:5
  91:6 131:21
  135:9 144:14
**needed** 13:13
  21:16 39:9 70:6
  98:23
**needs** 82:1 86:20
  93:21
**neither** 30:21
  57:5 124:8
  167:15

**[never - officer]** Page 24

**never** 19:6 21:15
  36:5 99:16,20
  107:13 109:2
  151:21
**new** 36:13
**noncompliance**
  113:10
**north** 2:9 19:23
  50:7 52:19 62:8
  153:15 157:14
**northern** 5:7
  19:23 50:24
**notary** 1:20
  167:4,23
**note** 83:17
**notice** 167:7
**nuances** 47:3,22
**number** 14:25
  22:6,7,9 23:10
  24:24 30:5 31:3
  31:4,5,6,19 39:7
  61:24 62:6
  64:10 132:2,3
**numbers** 133:23
  134:2,4 143:3,8
**numerous** 14:21
**nw** 2:4

**o**

**oag.state.va.us**
  2:11
**obedience** 7:15
  75:5
**object** 90:12
  106:24 137:10
**objection** 68:22
  76:2,7 89:4

**objective** 24:3
  68:5 116:24
  118:8,10,16
  121:9 122:1
  162:21 163:15
**objectively** 17:6
  24:3 99:14
  116:18 118:14
  118:23 122:12
  147:8
**objectives** 72:20
**observe** 157:8
**observed** 85:18
**observer** 157:5
**obvious** 100:6
  164:12
**obviously** 130:4
**oc** 49:13 78:10
  78:10 79:6
  81:11,14,17
  82:11,16,16,21
  84:19,20 105:14
  105:15 120:20
  120:22 121:21
  121:22 124:11
  124:20 154:22
  154:24 162:10
**occasions** 15:2
**occurred** 133:7
**occurring** 78:11
  79:18,25 83:14
  87:17 91:7
  121:2
**occurs** 162:14
**odor** 5:14 10:4,8
  10:16 11:22,25
  12:2,9,9 40:25
  56:6

**offender** 86:13
  95:4 164:19,20
**offenders** 14:22
  14:23 164:14
  165:6,24
**offense** 116:9
  119:9,10 121:2
**offenses** 119:17
**offer** 20:17
  126:8
**offering** 18:15
  23:17,19 24:13
  24:25 25:12,13
  28:19 33:3
  60:19 61:1
  63:25 107:16
  126:16,16
  127:21 137:7
**office** 2:8 29:20
  41:24 43:1
  133:21
**officer** 1:7 4:15
  4:18,21,25 5:5
  5:10,11,21 11:16
  26:21 27:20
  28:23 29:24,25
  30:3,8,10,11,18
  30:19 31:17
  32:4 33:5,5
  41:17 48:10
  50:16,18,19
  53:23 58:18
  60:10 61:15
  63:19,22 64:9,21
  64:25 65:14,20
  65:21 66:20,23
  67:5,16 68:12,20
  69:3,15,21 70:10

70:12 72:11
  73:7 77:13,14
  78:3,4,6,9,13,21
  78:25 79:8,10,17
  80:24,24 81:6,9
  81:13,15,18,21
  81:23 82:1,8,17
  83:1,9,15,21,22
  83:22 84:1,2,5,7
  84:10,12 85:6,6
  87:2,2,5,8,13,18
  87:22 88:1,3,4,5
  88:10,15,20,23
  88:24 89:1,3,11
  89:12 90:9,11,24
  90:25 91:10,19
  91:21,24 92:4,5
  92:6,8,10,12,14
  92:17,19,23,25
  93:8,14,17,18
  94:6,9,12 95:22
  96:1,9,19,22
  97:7,7,17,18,23
  97:24 98:3,5,20
  99:4,12,17
  101:17 102:5
  103:14 104:2,4
  104:18,22
  105:19,25 106:8
  106:15,19
  108:11,16,20
  110:9,12,21
  112:2,5,11,14,16
  112:20,24 113:1
  113:8,14,16,22
  113:23 114:1,1,4
  114:6,7,9,13,22
  115:4,11,13,14

**[officer - opinion]**                                                Page 25

115:19,20,22
116:4,12,19,23
117:9,13,22
118:8,16,23
119:14,15 120:1
120:2,6 121:3,14
122:5,17 123:22
124:5,6,15,21
125:1,7,15,17
126:9 127:9,14
128:10 135:25
136:5,10 137:18
138:21,24
139:13 140:13
141:10,25
145:14 146:3,4
146:10,13,16,20
146:24 147:2,5,9
147:16 148:10
148:23,25 149:5
156:4 160:25
161:5,12,15,22
163:17,22
164:18 165:10
165:11 166:9
**officer's**  105:11
  108:2 110:25
  117:18 120:14
  121:15 161:8
  165:21 166:4
**officers**  15:20,25
  21:9 35:13
  37:23 38:7,20
  39:25 40:9 41:4
  41:11 44:7
  70:24 71:1 72:8
  73:10,12,22
  79:20 98:25

99:4 103:7
121:6 136:8
138:8,22 139:17
156:11 158:4
159:12,14 160:1
162:23 163:4
164:25 165:3
**officers's**  116:22
**official**  167:19
**oh**  10:5,7 28:11
  29:11 51:21,25
  59:4,7 102:12
**okay**  4:14,17 5:2
  5:9,19,23 6:15
  8:3,8,24 9:19
  10:3,9,18 11:10
  12:16,21 13:17
  14:12,14 17:12
  19:10,18 22:5,11
  23:16 24:19
  25:25 26:17
  29:12 31:16
  33:16 34:14
  36:19,23 37:5,11
  48:4 51:18
  52:12 53:4
  54:14 57:19,22
  57:23 58:8
  59:22 60:8,12
  68:10 72:16
  73:2,15 76:17,19
  77:3 80:6,6 86:5
  90:6 91:19
  92:24 93:24
  96:2,2 100:15
  101:16 103:18
  106:11 107:16
  107:21 110:18

111:6,24 117:3
117:16 118:13
118:13,19
122:24 123:11
123:16,16
126:19 127:18
127:18,24 131:6
131:14,23 132:1
133:15 134:19
135:6,7,8,10
136:12,18
137:16 138:4,13
138:17 139:23
140:9 142:19
144:22 145:2,21
147:18,20,20
148:7,14,18,24
149:11 150:6,24
151:5,15 152:7
154:1 160:15,21
162:3 165:18
**once**  17:16 45:4
  45:7 69:22
  74:17 78:25
  82:8 110:11
  111:16 115:12
  115:16
**ones**  62:8
**ongoing**  29:7
  77:16 81:2
  119:1 146:7
  147:11
**onion**  77:24
  101:6 133:4,6
  150:17 165:2,6
**open**  17:10,23
  18:5 36:14,15
  37:4,5 51:23

58:5,7,8 59:19
59:21 61:6
**opened**  41:15
**opening**  61:3
**operate**  57:6
**operating**  30:4
  84:17 103:22
  127:3,5
**operational**  8:22
  13:19,19
**operative**  40:16
**opine**  137:14
**opined**  28:20
  108:13 127:24
  139:12
**opining**  123:14
  139:5 140:5
  142:20 164:1
**opinion**  20:20,24
  21:7,14 23:4,7,8
  23:9,17 24:24,25
  25:11,18,21,25
  26:4,19,21 27:1
  27:2,5,8 28:15
  28:18 29:9,14
  30:13 33:2
  60:19,25 61:14
  61:20 63:17
  64:8,8 65:13
  68:12,16,20 69:3
  69:12 70:19
  76:25 77:5,7,20
  80:2,5,7,18 81:5
  85:4,9,12,18
  86:3,6,12,15,16
  87:1 88:12 89:2
  90:2 91:1,23
  92:3 93:12

**[opinion - page]**

Page 26

96:15 98:10,11
98:14 104:9,13
104:15,18
105:18,23 106:7
106:21,22
107:12,22,24
108:2,15,17,23
109:8,25 110:16
110:23,25,25
111:3,5,14 116:1
116:3,4,11,11,17
116:23 117:6,9
117:16,17 118:1
118:4,6,14,15,20
118:22 119:16
119:23 122:12
122:14,17 123:1
123:1,6,17,19,25
126:7,9,15,16,21
127:12,19,21,22
128:9,9 130:23
131:1,7,15
133:14,25 134:6
134:11,17
135:17,18,22
136:5,8,12,16,18
136:21,24,25
137:4,7,16,19,23
138:5,6,9,10,14
138:15,17 140:5
140:9,10,21,25
141:4,8,14,16,22
142:3,10,11,15
142:17,18,20
143:2,3,9 144:6
144:8,19,22,24
145:2,9,18 146:9
146:10,16,19,24

147:5,8,15
148:10,19,20
149:5,20 150:12
150:19 151:8,15
151:18 152:1,6
160:16 161:2
165:20 166:16
**opinions** 22:16
22:19 23:12,19
24:13,18,20 25:3
25:3,4,6,9,11,13
25:15,19,22 28:5
30:7,23 31:7,11
32:12,14,16,18
32:20,22 33:1
60:18,23 64:1
107:16 116:2,14
116:17,21 118:7
118:11 123:2,6
136:15 144:2,4
145:14,21 148:5
151:1,7,11,12
**opp** 125:8
**opportunities**
41:8 125:5
**opportunity**
31:25 123:20
124:14,18,23
125:9,13,18,22
148:16,21
**opposed** 165:13
**option** 28:24,25
77:8 80:19
110:9 145:24
**options** 29:2
77:12 80:23
84:14 97:12
105:13 113:11

120:19 121:20
146:2
**order** 23:24 29:7
31:18 38:5
65:10 127:6
136:2 139:2
140:16 160:17
161:7,19
**ordering** 112:3
113:17
**orders** 105:11
112:4,5 120:14
121:15 124:7,10
124:21 125:2
127:6 161:14
**ordinance** 11:17
**orthogonal**
62:17
**outcome** 17:1,5
21:6 34:15
167:17
**outside** 53:8
155:11
**outstanding**
130:12
**overall** 8:21 25:6
25:8,18,21 32:11
32:13,16,18,20
32:21 64:4,4
65:11 90:2,8
91:1 107:5
128:14 131:1
133:1,5 136:24
143:7 150:14
**oversee** 50:25
**overseeing** 51:4
**oversight** 51:15
155:16

**overview** 127:20
**owner** 40:15
41:13

**p**

**p** 2:1,1
**p.m.** 166:22
**page** 3:2,6 22:4,6
22:7,8,10,10,13
22:23,25 24:24
25:2,5,7,20 26:5
26:11,13,25 27:9
27:11,17,18 28:5
28:10 29:13
31:2,5,20,20,22
31:24 32:2,3,7,8
32:14,15,18,19
32:21 37:12
61:7,8,15 77:2
80:13,16 86:5
100:18,20
104:10 107:23
108:1,6 111:21
116:3,10,11,18
117:6 122:16
123:18 127:20
131:16,24
135:17 136:24
137:23 138:4,14
141:20 142:5
144:7,14,16,18
144:19 145:3,7,7
145:9,16,16,23
146:19,22 147:4
147:14,21,22,24
147:25 148:3,6
148:10,15,17,19
148:24 149:2,4

[page - pertains]                                                    Page 27

149:12,16,17,19
149:20 150:4,8,9
150:11,23 151:8
152:1
**pages**  22:20
**pain**  116:6
  117:22 146:22
**palm**  41:23
  42:25 132:5,16
**paragraph**  28:21
**paragraphs**
  25:17
**park**  55:5,15
  57:8
**parking**  11:17
  15:20
**part**  8:25 22:15
  22:19 23:4,12
  35:12 53:22
  54:4 70:5 72:18
  85:17 86:15
  93:15,19,22
  98:13 105:18,23
  106:7 110:23
  111:2 112:23
  126:25 145:11
  152:2 153:14
  160:4,19
**participated**
  53:4
**participating**
  1:16 53:8
**particular**  6:16
  6:19 7:1,8 9:1
  21:13 23:25
  24:2,11 28:21,24
  47:6 48:24 66:1
  66:13 73:4

77:20 78:4,17
80:2,2 81:25
83:9 85:5,8
86:10 87:17
94:18 95:4,12,17
96:18 97:4,18
112:4 114:14,20
116:20 132:15
139:12 144:2
155:21 156:13
158:9,10 161:13
161:16 164:23
165:5,22 166:2,5
**particularly**
  53:11 73:6
**parts**  143:25
**party**  89:25
  167:16
**passed**  70:13
**passing**  63:5
  134:23
**passion**  48:18
**patrol**  5:16
  10:21,22 26:10
  27:12,15,19
  38:11 39:6 40:7
  40:24 41:6
  42:19 43:18
  44:3,13,13,15
  45:9,13,16,19,22
  46:10 48:2
  50:16,18 55:19
  55:20 56:5,5
  61:18 63:2
  103:23 107:8,9
  110:15 128:1,1
  129:23 131:11
  133:2 138:23

144:17 145:5
149:13,22,23
150:13,15,18
152:15,21,22,22
153:6 157:17
**pdf**  17:20
**peace**  37:23 38:7
  38:20 44:7
  156:3,11 158:4
**peaceful**  123:20
  148:21
**peacefully**  31:25
  124:14,18,23
  125:14,19
  148:16
**pennsylvania**
  1:22
**people**  14:23
  20:9 21:11,21
  41:9 113:24
**pepper**  49:13
  78:14,15 79:5
  82:20 124:16,17
  154:24 162:11
**perceive**  89:12
  112:22
**perceived**  89:11
  96:11
**percent**  63:9,14
  129:24 132:14
  132:18,22 133:1
  133:1,4,5,7
  134:9,16,19,22
  134:24 135:1
  150:14,14,16,19
**percentages**
  134:15

**perception**  72:14
  89:9,14 97:15,16
  108:15 115:11
  119:13,14
  121:14
**perfect**  17:12
  37:2 58:9
**performance**
  8:21
**period**  13:6
  115:9,13
**periods**  65:6
  92:2
**permitted**  68:19
**permitting**
  128:20
**person**  14:8,10
  15:23 21:22
  79:1 82:6 89:22
  89:23,24 90:1
  110:20 161:5
**personal**  35:7
  152:10
**personalities**
  66:10
**personality**
  66:12,14
**personally**  35:15
  71:8,9 72:1,2
**perspective**  66:3
  87:22 98:3
  113:15 115:18
  120:1
**pertained**  30:7
**pertaining**  56:18
  76:4 145:3
**pertains**  73:6
  144:7

**[phone - previous]**                                        Page 28

| | | | |
|---|---|---|---|
| **phone** 86:21 | 81:22 83:16 | 126:12,22 | **posts** 62:2 |
| **phrase** 100:2 | 84:2,22 86:19 | 127:11,25 | 156:19 157:21 |
| **physical** 16:11 | 87:3,6,14,16,23 | 128:12,15 129:1 | **potentially** |
| 77:23 78:20 | 87:25 88:9,25 | 129:13,16 | 98:24 145:13 |
| 81:8 82:10,13 | 90:25 91:11,22 | 130:12,13 149:1 | **power** 47:7 |
| 104:24 119:12 | 92:11,13 93:3 | 149:8,22 155:10 | 157:8 |
| 119:24 | 95:8 113:24 | 155:13 156:22 | **practice** 62:24 |
| **pick** 138:14 | 165:6,9 166:5 | 157:22 | 157:21 |
| **picture** 122:10 | **pod's** 101:2 | **policy** 17:8 32:6 | **practices** 157:9 |
| **place** 67:23 69:7 | **pods** 166:7 | 55:6,17,23 57:9 | 157:10 |
| 70:2,4 75:7 | **point** 31:5 48:2 | 57:10 67:22,25 | **praise** 7:15 |
| 167:7 | 51:13 60:21 | 73:25 74:1,2 | **pre** 129:21 |
| **places** 60:22 | 67:22 78:13 | 127:7 129:18,20 | **preceding** 25:17 |
| **plain** 139:21 | 79:10,17 81:17 | 130:7,19,25 | **predicate** 152:4 |
| **plaintiff** 1:5 2:6 | 81:20,25 82:22 | 149:14 156:15 | **prefer** 130:18 |
| 20:5 77:22 | 85:5 92:16 | 157:25 | **present** 37:19 |
| 123:19 126:11 | 94:18 95:11,17 | **polled** 63:6 | 41:3,12,16 48:12 |
| 139:8 148:20 | 96:15 97:1,4,25 | **poor** 106:5 | 159:25 |
| 149:7 | 100:15 101:12 | **porter** 2:3 | **presentation** |
| **plaintiff's** 20:25 | 102:18 110:19 | **portion** 148:9 | 43:11,18 47:10 |
| 21:2 139:24 | 112:4 114:15,21 | 150:7 | 47:11 |
| 143:24 151:18 | 114:24 124:15 | **portions** 72:19 | **presentations** |
| 166:21 | **pointed** 121:10 | 151:2 | 46:21 |
| **plaintiffs** 143:17 | **points** 21:3 | **posed** 138:24 | **presented** 38:13 |
| **play** 162:17 | 67:19,21 | **poses** 73:21 | 38:21 |
| 163:19 | **police** 4:15,23,24 | **position** 77:14 | **presenting** 42:4 |
| **pleading** 139:7 | 5:3,4,7 11:13,14 | 80:24 86:14 | 46:3 |
| **please** 4:10 | 13:2 20:4,6 | 95:23,25 96:9 | **presume** 118:5 |
| 17:14,15,25 | 21:25 26:6 | 98:4 112:2 | **pretrial** 103:2,6 |
| 29:11 31:1,15 | 41:17 43:23 | 146:4 | 159:18 163:2,12 |
| 47:14 51:21 | 50:7,24 52:19 | **positive** 79:24 | 163:13 |
| 52:4,5 55:1 | 62:9,10,10 63:6 | **possible** 128:5 | **pretty** 44:21 |
| 58:25 60:21 | 88:3 129:6 | 150:2 | 46:4,5 108:9 |
| 80:11 106:12 | 153:16 155:15 | **post** 38:8,21 | 161:19 |
| 107:25 131:19 | 157:14,18,19 | 39:13,21 44:7 | **prevent** 16:1,2 |
| **plus** 46:10 | 162:20 165:10 | 63:3 124:7 | 83:12,13 |
| **pod** 77:24 78:2,3 | **policies** 24:6 | 156:3,12 158:5 | **previous** 127:22 |
| 79:18 81:9,10,15 | 55:13 69:7 | | 143:6 |

**[previously - question's]**

**previously** 26:1 27:6 40:18 81:6

**primary** 46:16

**principles** 47:16 47:19 154:7

**prior** 8:11 11:6 11:12 12:12 25:14,23 29:2 77:12 80:22 81:6 86:17 123:21 126:1 128:9 137:19 141:8 142:24,25 146:2 148:22 151:12 166:6

**prison** 56:23 57:6 77:25 101:7 133:4,6 138:21 150:17 165:3,6 166:3

**prisoners** 103:3 138:22 139:11 159:20

**prisons** 133:2 150:15

**private** 66:4

**probably** 45:17 45:24,25 46:8,11 47:1 111:7 153:19

**probe** 68:15

**problem** 13:1 28:14 51:25 59:11 106:5,13

**procedure** 84:17 127:3,5

**procedures** 30:4 157:9

**process** 52:18 56:3 66:18

**production** 34:11

**professional** 1:19 37:13,16,18 50:8,11,11

**professor** 48:23

**proficiency** 60:11 65:7,8 70:9,18 72:23 74:25 141:10 142:1

**program** 44:12 44:14 53:6 66:6 66:11,25 70:20 70:22 72:15

**programs** 44:12 46:15 54:15,20 54:24

**promoted** 51:9 51:10,16 52:9

**prone** 85:10,13 160:17

**proper** 16:24 29:6 67:18 69:17 105:20 106:1 136:6 138:8 139:14

**properly** 24:4,5 138:20 139:10 140:12 150:21

**property** 16:18

**proportionate** 24:2

**protocols** 55:8

**prove** 79:9 82:19

**proved** 29:4 77:10 80:21 146:1

**provide** 155:19

**provided** 29:18 53:22 64:17 132:23 133:10 143:4,13 152:9 166:14

**provider** 39:16 155:25

**provides** 74:15

**providing** 128:6 150:2

**proximity** 92:8 94:8,9 105:9 120:6,7

**psychological** 154:13

**public** 1:21 22:1 167:5,23

**pull** 25:1 83:10

**pulled** 125:11

**purpose** 9:25

**purposes** 5:19 7:4,5,6 9:21 10:10 103:23

**pursuant** 17:7 61:17 73:13 93:10 125:2 167:6

**put** 38:6 40:8,18 41:7 44:4 48:7 60:14,14 63:3 66:2 69:8 70:8 70:15 72:12 77:6 87:21 94:5 95:10 113:17

115:7 132:18 158:3,7

**putting** 44:11 49:7,25 83:5 95:25 113:9 157:23,25

**q**

**qualified** 21:10

**quarter** 51:19

**quarterback** 122:4

**quarters** 122:15

**question** 6:22 7:7 9:11 14:7,12 19:13 23:5 31:10 34:20 44:9,11,17 47:12 53:20 56:20 64:5 65:18 67:2 67:4,10 71:4 72:3 73:3,8 75:14,21 76:10 76:18 84:12 85:14,20 86:2,4 86:7 89:12,17,20 91:3,4 92:1 95:21 96:8,22 101:25 102:12 106:6 109:6,13 109:19 110:4 112:19 114:16 126:5 131:19 136:22 137:1 142:16,24 143:1 145:22 152:18

**question's** 73:2 74:7

**[questioning - registered]**                                      Page 30

**questioning**
  74:10 143:18
**questions** 18:20
  24:14,16 104:13
  110:5 143:14
  151:17 152:8
**quick** 44:9,11
  58:23 135:9
**quickly** 94:22
**quote** 62:13

**r**

**r** 2:1 167:2
**range** 45:25
  46:12 52:11
  63:14 92:21
  94:11 132:23
  153:25
**rank** 5:2,5,8
**rap** 49:13 155:2
**rapidly** 29:1
  77:9 80:20 98:7
  145:25
**ratings** 74:25
**ratio** 132:14
  133:1,3,5,7
  150:20
**ratios** 131:23
  132:1,20 133:9
  133:10 134:8
  143:3,6 150:8,14
**reach** 68:20
  138:10
**reached** 61:2
  98:5
**reaching** 23:12
  150:7

**react** 83:22
  122:6
**read** 48:23 57:9
  85:16 91:15,17
  118:11 127:8
**reading** 48:18
**ready** 13:23
**real** 88:3
**realizing** 114:19
**really** 46:23 47:6
  61:21 70:17
  116:1,22 122:10
  123:5,5 135:2
  159:3,4
**realm** 12:8
**realtime** 107:9
  122:7
**reask** 19:13
**reason** 15:8,9
  41:25 43:17
  93:13 113:4
  133:24 134:19
  137:13 140:19
**reasonable** 17:7
  24:3 77:13,18
  80:23 81:3 84:9
  85:2 87:5,7,11
  88:6,9 89:13
  93:14 96:9,11
  97:7 98:3,4
  99:14 108:15
  112:20 114:13
  115:19,21
  116:18,24
  118:15,23 119:2
  119:14 121:3,13
  122:13 140:22
  141:4,16 146:3,8

  147:8,12
**reasonableness**
  68:5 73:14 89:2
  90:9 91:2 100:9
  103:12 108:14
  108:16 118:16
  123:4 162:22
  163:15
**reasonably**
  84:22 93:16
  130:3
**reasons** 138:9,11
**rebuttal** 23:8
  101:13
**recall** 17:4 23:15
  33:9 35:3,15,17
  36:1,5 52:25
  56:12 75:21,22
  76:18,20,21
  106:18 160:19
**received** 34:24
  52:14 53:11,14
  53:16,25 54:4,6
  54:10,14 69:21
  123:20 126:2
  130:10 148:20
**recess** 33:19
  135:13 143:16
**recollection** 93:6
**recommendati...**
  55:17,24 56:10
  56:14 57:12
**record** 4:10
  33:18 108:10,19
  115:24 117:20
  121:17 135:12
  167:14

**recorded** 167:11
**records** 64:21,22
  64:23 69:9
  125:3 130:20
  142:1,1,2
**recoveries** 11:3
**recovery** 5:18
  7:22
**red** 77:24 101:6
  133:3,6,10
  150:16 165:2,6
**redirected** 78:23
**reevaluate**
  134:17,18
**refer** 22:5,6,6
**reference** 134:23
**referencing**
  108:5,5
**referred** 91:17
**referring** 12:2,2
  22:10 64:3 67:1
  126:24
**reflects** 93:13,16
**refocuses** 82:9
**refresh** 36:22
  93:5
**regarding** 26:21
  52:16 67:17
  93:1 118:15
  127:25 141:16
  149:22 151:16
  155:10 160:16
  161:21
**regardless**
  151:24
**regimen** 63:11
**registered** 1:19

**[regularly - retained]**                                        Page 31

**regularly** 133:3
  150:16
**relate** 30:8 44:21
  56:23
**related** 6:13 7:25
  8:1 11:4 19:25
  20:5,11 24:7
  26:4 34:14 36:8
  40:21 42:5,10
  43:15 46:25
  48:19 53:11
  55:9 58:19 59:1
  60:10 61:20
  65:8,9 67:7 81:6
  103:2,9 128:15
  129:1 130:1,7
  137:4 139:18
  141:12 145:22
  153:22 158:8,22
  163:13
**relates** 49:20
  55:19 68:1
**relating** 50:12
  53:17 144:4
**relation** 130:13
  151:17
**relationship**
  34:21 35:7
**relationships**
  35:4
**relatively** 104:17
**release** 66:23
  67:6,9,18 69:17
  70:7 71:2,7,17
  72:8 73:7,10
  74:4,9,11,16
  75:12,18 76:1,5
  76:16,22 92:17

93:14 123:21
  148:22
**released** 137:13
**releases** 94:12
  111:20 115:8
**releasing** 67:8
**relied** 26:20
**relook** 71:18
**rely** 133:15
  156:14,16
**relying** 103:11
**remaining** 151:7
**remains** 5:16 8:1
  12:4 41:1
**remember** 15:13
  37:25 51:18
  52:1,25
**remote** 1:14
**render** 166:16
**rendered** 20:24
  21:14 24:17
**rendering** 24:20
**repeat** 6:23 31:9
  53:12 54:9,21
  56:20 65:18
  75:13 76:9
  101:25 105:21
  144:12 165:16
**rephrase** 126:4,4
**report** 3:8,11,13
  13:25 18:2,13,14
  18:19 20:20
  22:7,10,13,24
  23:13 24:23
  25:7,14,16,23
  26:1 27:7 28:3
  29:22,23,25 30:2
  30:22 33:6,8

34:7,11,11 58:2
  58:15 60:2,7,22
  77:7 87:22
  100:13 101:15
  103:25 104:8
  111:15 125:21
  135:17 143:25
  144:5 145:5,12
  147:24 149:19
  151:3,10,13
  160:5 162:1
**reporter** 1:19,20
  91:15 135:12
**reports** 29:20
  78:15 96:5
  125:3 161:17
**represent** 151:19
**representative**
  101:20
**representing** 2:6
  2:12
**require** 57:13
  65:14,21
**required** 116:25
  129:21
**requirement**
  61:22
**requiring** 128:4
  150:1
**residence** 1:16
  16:6
**residential**
  164:15
**resist** 16:20
**resistance** 68:8
  115:1
**resisted** 16:9

**resisting** 73:23
  96:13 110:14
  121:10
**resolve** 20:23
**resolved** 21:17
**resort** 24:1
  77:18 81:4
  116:13 118:6
  119:3 146:9
  147:7,13
**resources** 156:13
**respect** 9:8
  66:21
**responding**
  87:24
**response** 166:4
**responses** 111:8
**responsibilities**
  51:8 52:15
**responsibility**
  51:14
**responsible** 51:4
**rest** 30:6 151:13
**restore** 23:23
  31:18 100:21
  101:18 102:6
  104:20 136:2
  139:2 140:16
  145:15 146:12
**restraint** 105:12
  121:16 155:3,3
**restraints**
  120:15
**restrictions**
  158:7
**retained** 19:5,7
  19:15,19,21 20:1
  20:8,11,18 33:23

**[retained - see]**                                                          Page 32

34:17,23 55:16
**retainer**  34:9
**reverses**  79:16
**review**  29:15
  30:9 31:3 34:11
  55:16,23 71:11
  92:22,25 93:5
  112:15 115:24
  120:9 121:17
  128:23 141:25
  157:25
**reviewed**  22:15
  22:19,24 23:12
  30:17 33:4 56:7
  58:18,21 60:9
  63:18 64:17,22
  83:17 108:10,19
  117:21 125:3
  126:25 127:1,11
  131:2 144:1
  155:20 160:3
  161:24
**reviewing**  64:20
  71:14 83:18
  112:7 157:22
  164:2
**revising**  56:3
**rewards**  7:15
**richmond**  2:10
**rifle**  155:1,1
**right**  17:9 22:2
  28:10 30:14
  31:2 45:4 67:14
  74:3 79:19
  83:25 87:13
  89:9,22 95:15
  102:19 112:10
  112:10 118:11

124:6 125:24
127:1 135:15
145:11 166:18
**road**  67:3
**roanoke**  1:2
**robbery**  19:25
**robinson**  140:11
**robinson's**
  141:17
**rooted**  103:13
**round**  79:6
  105:14
**rounds**  79:11
  82:18,23 105:16
  120:22 124:25
**routinely**  65:25
**rule**  47:4 129:25
  129:25
**run**  35:9 78:19
**running**  78:24
  81:20 120:11
**ryan**  1:18

**s**

**s**  2:1 3:5
**sadistic**  108:4,12
  108:21 117:7,12
  146:18 163:23
**safety**  73:22
  110:12,21
  119:21 121:6
  164:18
**saginaw**  43:21
  43:22,24
**sat**  35:22
**saw**  87:10 96:10
  96:11

**saying**  22:9 59:9
  88:20,22 127:12
  135:22
**says**  37:19 61:9
  61:23 100:20
  116:8,18 122:17
  126:9 127:1
  134:22,23
  136:25 148:8
  149:4 150:12
**scenario**  28:25
**scene**  99:1
**scent**  11:4,25
  12:5,6,8,13
**schedule**  34:7
**scholer**  2:3
**science**  49:5,6
  154:9
**sciences**  62:21
  157:3
**scientific**  62:13
  62:16,25 156:25
**scottie**  29:23
**scroll**  23:18
  29:10 31:13
  58:23 145:20
**se**  158:20
**seal**  167:19
**search**  14:8 15:7
  16:7 35:11
  38:15 39:3,13,18
  40:3,11,22 42:5
  42:9 43:15,22,23
  44:5,23 46:24
  47:16,18,25
  48:13,19,20 49:3
  49:19,24 74:20
  102:22 153:18

153:22,23 158:8
**searched**  16:19
  105:6 120:3
**searches**  5:18
  7:23,24 10:25
  11:1,3 14:21
**searching**  15:10
**second**  4:13 6:11
  28:12 38:13
  69:20 82:11
  83:24 88:7
  91:10 94:3,4,4
  98:22 99:12
  104:8 142:4
  144:15
**seconds**  115:23
**section**  25:18,23
  26:2 101:17,19
  101:21 102:4,10
  104:7 111:16
  144:18,24 145:5
  147:23 148:2,14
  148:24 149:13
  150:7
**sections**  27:23
**security**  77:24
  81:10 101:2,3
  165:4,8,8 166:3
**see**  17:16 27:10
  27:11 36:23
  45:15 52:6,6,7
  57:23 59:2,2
  65:10 72:2,23
  75:1 78:18 84:2
  87:15,18 88:21
  89:8,18,18 91:6
  95:11 96:7
  102:4 112:16

**[see - sir]** Page 33

113:15 116:14
127:16,16
128:10 130:16
134:1,2 152:19
152:23 159:16
161:6
**seeing** 41:25
75:22 84:7,23,24
87:6,17 88:10
94:16,17 96:10
98:21 112:20
127:9
**seen** 18:8 37:6
58:10 59:22
65:1 71:8 88:2
**sees** 79:18 83:23
87:25 88:7,8
**seizure** 22:3
35:11 38:15
39:3,14,18 40:4
40:11,22 42:5,10
43:22,23 44:5,24
46:24 47:16,18
48:1,13,19,20
49:3,20,25
102:15,15,22
153:19,22 158:8
**seizures** 48:15
153:23
**seminar** 35:20
35:21,23 36:8
38:15 42:20
43:14
**send** 38:6
**sense** 12:11
61:12 72:9,25
139:20 142:22

**sensors** 157:7
**sent** 39:10
**separate** 12:1
105:15
**september** 1:12
167:20
**sergeant** 51:10
51:17 52:9
72:11 84:15,16
114:21 141:11
**series** 25:9
**serious** 119:9,10
121:2
**seriousness**
116:9 147:1
**service** 6:5 61:18
69:11
**services** 55:5,16
57:9
**set** 74:21,23
90:25 128:12
129:3 131:4
132:13 133:10
**seth** 29:24,24
**sets** 8:23 49:17
49:21 70:11
72:22,22,24 75:1
75:8
**setting** 13:14
48:16 56:23
57:14 99:21
100:2,3 101:3
103:22 107:14
159:10 161:23
162:15,20,20
164:24
**settings** 48:25
68:2 101:23

102:8,24 162:19
163:8
**settled** 21:4
**severity** 68:7
73:20
**shadow** 58:18
61:16 63:20
66:20,22,23 67:6
67:18 68:13,21
69:6,23,24 70:10
70:12,12 80:15
80:19 81:1 85:7
91:12 92:18
94:13 95:6,12
97:5 98:6 99:7
104:19 105:19
106:1,10,17
108:3,12 109:1
111:1,19,24
112:1,9,12
113:13 114:4,7,9
114:14,23
115:22 116:12
118:24 120:12
120:17 122:18
123:21 125:23
126:10 127:10
128:11 135:25
136:6,11 138:25
139:13 140:13
140:14 141:11
145:23 146:6,11
146:17,20,25
147:6,10,16
148:11,22 149:6
**shadow's** 26:22
31:23 60:10
111:16 147:25

148:4
**share** 17:10
36:11
**sheepdog** 35:9
40:16 41:13
**shepherd** 30:1
**sheriff** 159:17
**sheriff's** 41:24
43:1 163:7
**shoes** 84:8 96:23
97:7 115:20
**shorthand**
167:11
**shots** 20:6
**show** 26:1 27:6
**showing** 114:25
115:3 161:10
**shows** 114:18
132:25
**side** 4:16 15:25
83:5 113:23
129:2,6,10
163:20 166:21
**signature** 167:22
**similar** 127:22
154:19,22
**similarities**
100:6,8 102:7
**simply** 95:19
**sir** 17:11,18,19
18:6,17 26:16
28:10,17 59:15
59:18 61:5 80:5
80:17 100:17
101:11 108:7
109:12 111:23
116:15 118:18
131:25 135:20

**[sir - standards]** Page 34

141:21 160:20
**sit** 53:1 56:12
58:20 122:3
**sitting** 17:4
**situation** 10:1
16:17 29:2
77:10,21 78:18
80:21 97:9,10
98:8,12,24
139:14 145:25
**situations** 69:16
98:15,19,21
160:22
**six** 45:25 46:1
133:2 150:15
**skill** 8:23 49:17
49:20 70:11,16
72:21,22,24
74:21 75:1,8
**skills** 7:14,18
8:18,19 50:20
54:13 67:8 70:6
70:17
**slick** 95:8
**slips** 95:7
**sniff** 20:12
**sniffing** 9:8
**solid** 159:4
**somebody** 36:1
**somewhat** 60:24
123:18
**soon** 83:2,3 88:8
**sorry** 9:10 10:6
10:7 12:24
19:11 28:13
31:9 34:19
38:22 53:12
54:9,21 59:5,7

59:10 60:13
65:17 71:20
75:13 80:12
83:11 86:22
91:15 105:21
109:4 126:5
139:6 142:23
144:12 148:1
165:15
**sort** 9:5,13 57:13
144:5
**sorts** 9:6
**sounded** 59:9
**sources** 156:18
**south** 159:24,24
**speaking** 35:15
35:17 62:3
88:14,22 109:18
**speaks** 104:17
139:7
**specialize**
152:17
**specific** 6:18
7:12,18,21 8:6
8:13,18 24:25
40:23 41:19
42:3,6,9,14 43:9
45:6 47:22 49:2
49:20 60:18
61:24 65:6 73:3
75:8 115:9
129:1 136:15
137:4,19 152:24
153:24 158:2,19
**specifically** 6:19
6:20,25 7:7 15:3
26:3 41:9 55:12
59:1 61:1 63:8

67:25 72:6 73:3
73:15,18 75:3
77:6 87:9
102:13,17,18
103:25 104:5
106:18,20
107:10,19
112:11 113:7
120:9 126:23
129:20 134:22
135:23 136:16
137:2,5,17
155:24 157:24
161:12
**specifics** 7:23,24
7:25 8:1
**speed** 91:6 98:2
98:18 154:12,12
**spin** 96:6
**spinning** 96:16
**split** 44:12 83:24
88:7 98:22
99:12
**spoke** 36:5
**spray** 49:13
78:14 79:5,8
82:11,16,20
105:15 120:22
124:16,17,20
154:24 162:11
**spraying** 78:15
**stab** 113:7
**stabbed** 97:22
**staff** 77:17 81:3
85:2 93:10
105:3 119:2,19
119:22 121:12
133:12 146:7

147:12
**staley** 137:18,21
138:7,19 139:9
139:16
**staley's** 141:11
**stalking** 16:4
**stamped** 22:7
**stance** 89:23
95:18 96:8
**stand** 101:13
104:23 119:22
**standard** 1:18
27:20 46:6
65:20,23 68:5
73:14 84:16
101:7 102:15,16
116:24 129:23
132:19 134:21
156:4,20,21
162:21,22 163:1
163:2,6,11,14
**standards** 17:7
23:21 24:9 26:7
26:11 27:4,13,16
27:24,24 37:23
38:8,20 39:11,22
43:7 44:8,20
45:2,3,3,16 48:6
49:23 50:22
55:18,25 56:4,8
56:9 61:17,18,20
62:1,14,19,20,22
62:24 63:20
65:2,14 68:14
72:25 102:14,23
103:2,9 117:1
128:3,17,18
129:3,16 130:7

**[standards - summary]** Page 35

130:14 131:2,3,4
131:7,9,11
144:17 145:6
149:16,25 156:7
156:11,16,17
157:2,2,4,6,10
157:10,21 158:4
158:6,9,14,17,21
158:22,24 159:6
159:8 160:9,13
162:17 163:1,9
163:13
**standing** 94:7
124:6 167:5
**standpoint**
107:11 156:24
**stanley** 84:16
**stanley's** 72:11
84:15
**start** 9:19 25:5
26:12 28:7
29:13,14 44:20
61:6,11 65:21
66:1,7 67:2
78:19 91:14
104:10,12,14
110:16 113:9
115:12 124:5
131:21
**started** 6:3 52:18
52:20 53:2 59:9
61:7 62:15
153:14 154:15
**starting** 25:20
27:15 29:22
95:17 96:17
117:5 118:13
144:6 147:20

151:8
**starts** 25:2 26:6
26:25 27:3 77:1
82:17 94:15
95:6,16 96:6
107:23 114:6,22
122:15 131:15
135:17 138:6,15
**state** 4:10 11:15
20:10 38:21
39:18,24 41:8
42:10 43:8 47:3
47:4,6 48:21,22
61:22 77:24
100:25 101:7
102:17 103:7
117:14,19 118:8
129:20 133:4,6
150:17 151:11
155:15,16,21
158:10 159:1,21
163:10 165:2,6
**stated** 102:13
107:10 118:22
**statement** 77:20
85:19 121:18
**statements** 98:9
**states** 1:1 26:6
26:10 27:12,15
42:1 47:21 55:4
55:7,14 56:2
61:18 62:9 63:7
63:10 123:19
128:2 144:16
145:5 149:16,24
150:18 157:18
158:21,23 159:1

**statewide** 54:16
54:19,23
**static** 59:8
**statistics** 133:15
**status** 151:20
165:1
**statutory** 40:20
40:21
**stay** 36:3
**step** 64:6 94:15
95:16,17 113:19
135:2 136:23
**steps** 89:16
90:23,24
**stint** 13:8
**stolen** 20:5
**stop** 16:13 29:7
39:23 77:16
78:7,12,16 79:12
79:22,24 81:2,19
83:13,19 85:7
93:20,20 101:4
119:1 124:8,22
146:6 147:11
**stopped** 82:25
83:25
**street** 2:9 88:2
94:24 99:10
100:3,3,23 101:5
101:10,22 102:8
103:15 104:2
110:10 161:22
162:23 163:5,16
166:10
**strike** 99:24
108:24 126:3
**structure** 34:8
45:1

**study** 63:6
**sub** 146:14 147:3
147:13,21 149:9
150:4,23
**subgroup** 41:5
**subject** 16:12
128:6 150:3
**subjective**
117:14,18,24,24
**subjectively**
163:22
**subjects** 14:23
**submitted** 21:7
21:14
**substance** 12:3
63:23 64:1,3,4
64:12
**substituted**
151:21,22
**successfully** 40:2
**sufficiency** 26:21
130:24
**sufficient** 68:18
70:22 123:20
148:21 166:15
166:15
**sufficiently**
68:21
**suicidal** 14:23
**summary** 21:9
25:2,6,8,18,21
32:11,13,16,18
32:20,21 61:9
104:7 144:4,19
144:22 145:2,9
145:13,17,21
148:4 150:7
151:1,7,15

[summer - technical]

**summer** 52:11
**sundance** 1:17
**supervise** 24:10
  54:8,11 138:20
  139:10
**supervised**
  150:22
**supervising**
  139:17
**supervision** 38:3
  51:15 54:19,23
  132:12 167:12
**supervisor** 37:22
  41:22 42:21,24
  43:5,9
**supervisors**
  134:25
**supervisory**
  50:20 51:3
  54:12 133:12
**support** 25:15
  25:22 108:11
**supported** 62:6
  62:12
**supporting**
  55:25
**supreme** 42:16
**sure** 4:12 6:3,22
  6:24 7:14 9:10
  9:12 11:12
  15:10,18 17:21
  19:21 23:18
  24:21 25:1 26:4
  27:9 28:20
  31:11 37:17
  48:9 49:14
  51:22 53:13
  54:10 55:2,14

56:21 61:3,13
64:15 67:1,4
69:25 72:17
74:19 75:14
76:12 77:6 80:8
85:21 90:6
100:16 102:2
104:16 106:3,3
109:7 111:13
117:8 118:21
122:19 124:1
125:25 127:24
134:7 135:23
136:22 144:14
145:19 148:6
154:5 156:21
158:17 162:16
164:10
**surface** 95:8
**surrender** 31:25
  85:11,18 86:14
  95:23,25 96:2
  97:3,14 123:21
  124:15,18,23
  125:5,9,14,19,22
  128:7 148:16,21
  150:3
**surrendered**
  85:24 160:18
**surrenders** 83:5
**survey** 63:13
**suspect** 14:4,21
  15:2 16:5 19:25
  73:21,23 95:3
**suspected** 14:22
**suspects** 94:24
**sustain** 8:20

**swgdog** 62:15
**switch** 36:10
  60:17
**switching** 66:17
**sworn** 4:4 167:8
**system** 5:7 50:24
  57:6
**systems** 155:7

**t**

**t** 3:5 167:2,2
**table** 95:15
**tactical** 41:4,11
**tactics** 49:12
  154:17
**tailor** 42:14
  158:1
**tailored** 6:25 7:8
**take** 31:15 33:12
  52:4 58:23,25
  63:3 64:6 67:15
  70:15,16 89:16
  94:15 113:19,20
  122:9 136:23
  143:10,14
  157:20
**taken** 1:15 16:12
  33:19 62:22
  135:13 143:16
  167:6
**takes** 90:23
**talk** 49:16 70:4
  73:18 119:20
  163:13
**talked** 21:20
  66:25 101:11
  109:10 111:7
  119:8 157:1

165:19
**talking** 12:5 14:7
  14:9 23:6,7
  30:13 45:10,17
  69:14 77:19
  94:25 100:25
  101:1 111:17,18
  115:23 119:10
  119:11 131:23
  137:3,20 162:18
  163:6,7,8,9,10
**talks** 68:6
**targeted** 122:22
  148:13
**taser** 49:9 155:6
**task** 5:6
**taught** 38:1
  40:10,13 48:23
  159:24
**tdavis** 2:11
**teach** 35:10
  49:18 63:12
  136:3,4 163:4
**teaches** 48:21
  75:17,25 76:15
**teaching** 11:19
  75:7 103:1
**team** 50:23,25
  51:11 65:11
**team's** 8:21
**teams** 56:5 61:23
**technical** 38:12
  67:8 69:18,21
  70:6,16,17 72:21
  74:11,14,21,21
  74:23 106:19
  107:11

**technically**
  74:16
**technique**
  105:25 106:2,23
**techniques**
  106:16 107:18
  107:20
**technology**
  62:19 157:2
**tell**  148:4 167:8
**telling**  94:20
  113:16 161:5,8
  161:13
**temper**  82:12
**temporal**  63:21
  64:13 110:2
**tendencies**  166:6
**tendency**  166:1
**tense**  29:1 77:9
  80:20 98:7
  145:25
**tenure**  41:17
**term**  11:22
  142:20,22
  161:23
**terms**  60:24
  71:19 109:18
  117:8
**terry**  63:5
**test**  51:23,24
  65:10
**tested**  70:11 75:2
**testified**  4:5 9:12
  18:20,25 19:3,6
  33:21 50:15
  71:22 85:15,17
  85:22 86:8,25
  94:16,18 97:21

99:15,19 113:3
  115:5 133:16
  139:23 152:11
  154:2 155:10,22
  158:14 159:11
  160:3,15 162:16
**testifies**  84:16
  96:4 112:14
**testify**  4:3 20:20
  97:20
**testifying**  18:16
  33:23 156:18
**testimony**  3:2
  20:17 30:10
  71:18 72:10,11
  72:12 84:14,15
  87:4 91:17 93:1
  93:11 113:8
  125:16,17 126:1
  130:22 132:15
  141:12 150:25
  152:10 160:19
  161:16,20 167:6
  167:10,14
**testing**  65:7
**tests**  118:10
**texas**  43:4,6,8
  156:1
**texas's**  156:2
**thank**  4:8 12:10
  12:11 18:6 28:2
  28:4 33:1,10
  52:12 60:15
  99:23 131:13
  143:20 150:24
  152:7 166:18
**thereof**  167:17

**thing**  117:17
**things**  11:17
  49:17 66:15
  104:23 122:7
  124:1,3 129:6,10
  163:18,21
**think**  59:7 62:1
  65:17 71:3
  80:13 86:2 87:4
  88:6 89:13,16
  94:16 98:4
  100:2,5,7,18,22
  101:12,24
  104:17 105:4,7
  106:11 108:1
  114:12,19,21
  115:4 116:7
  117:8 119:13
  120:4 121:1,2,10
  121:16,25 122:9
  122:11 125:20
  139:6,6 150:6
  154:1
**thinking**  93:6,8
**third**  19:9 116:7
  121:8
**thought**  71:20
  76:17
**threat**  29:7 68:8
  73:22 77:17
  81:2 85:8 97:9
  110:12,20
  114:15,17,17
  115:2,6,11 119:1
  119:21 121:6
  138:24 146:7
  147:11

**threatening**
  119:19
**three**  19:12
  20:16 21:19
  38:1 46:9,12
  67:21 74:3
  79:11 82:17,21
  113:24 116:2
  120:8,10,10
  121:25 122:10
  122:15 124:13
  124:25 125:4
  163:23,25
**threshold**  87:6
  87:14,25 88:25
  91:11 110:17
  134:16,20
**tied**  34:15 84:3
  85:1
**tim**  34:25 143:13
**time**  1:18 4:9
  12:17 13:16
  14:19 16:2,9
  18:24 19:17
  28:24 29:3
  31:15 33:22
  35:16 46:10
  48:17 51:13
  52:4,23 58:25
  65:3,6,15 78:2,4
  78:17 79:14
  83:2,6,8,9,15
  84:1 87:2 90:24
  91:21,22 92:2,6
  92:7,10,13,21
  93:2,7 94:11,20
  95:12 97:4,18
  106:11,12 109:1

[time - turn]                                                                 Page 38

110:14 111:10
111:18,20 115:9
115:22 120:16
125:18 128:6
150:3 153:6
167:7
**times** 14:21 15:7
15:12 19:7,15
38:13 40:14
**timothy** 2:9
**today** 4:9 17:4
18:16 50:16
53:1 56:12
58:20 99:16
**tool** 10:15
**top** 22:25 29:16
31:20 37:18
79:16 82:19
83:7 123:18
131:16 138:5
150:11
**torso** 112:9,18
**total** 132:2,3,21
**totality** 29:5
64:17 69:2,9
70:14 77:14,21
80:25 84:24
94:3,5 97:6
104:21 107:6
108:8 109:10
110:8 115:18
120:15,20 121:1
122:1 124:3
134:12 146:4,13
164:2
**touching** 131:7
**town** 21:8

**township** 12:23
**tracking** 5:17
11:1 55:21
**tracks** 13:11,14
13:14
**traffic** 16:13
**trailing** 11:19
12:7
**trails** 13:14
**train** 54:8 65:15
71:23 73:12
107:7 138:7,20
139:10
**trained** 5:23 9:7
12:18 24:5
64:12 65:5
66:20,23 67:6,16
68:21 69:16
70:25 71:2
72:14 102:21
132:11 150:21
152:12,20 153:2
153:17 154:2
159:11
**trainer** 11:18
37:22 41:13,22
43:5 52:19
153:16
**trainers** 65:4
**training** 6:2,6,8
6:12,15,20,24
7:7,9,12,17,21
8:4,6,7,10,10,11
8:12,19,25 9:7,8
11:21 12:12,17
13:7,18 26:5,10
26:15,22 27:23
28:6 35:21

37:23 38:8,20
39:7,8,11,16,20
39:21 41:7,7
43:13 44:8,14
45:2,14,21,22
46:15 48:5,7,9
48:11,13 49:23
50:4,5,12,20,22
52:13,15,17,21
53:10,13,21,23
54:5,7,10,14,17
54:19,23 58:17
61:17,20 62:5
63:11,16,22,22
63:23 64:2,10,14
64:19,21,22,23
65:3,9,16,21,22
65:25 66:6,25
67:13 68:3,3,11
68:14,15,17,19
69:10,11,11,18
69:21 70:2,20,22
70:25 71:9 72:2
72:15 73:5,6,13
73:17 74:14,19
74:22 75:4
102:23 106:9,15
107:7,18 126:2
128:24 130:19
130:20 133:13
135:5 139:17
141:9,18,25
144:7,17 153:11
153:13,21
155:11,25 156:3
156:4,7,11,14
158:5,8 159:15
160:4,9 162:5

166:12
**trainings** 47:9
49:1 53:17,25
54:3 71:10 72:1
155:13
**trains** 72:8 73:10
**transcribed**
167:12
**transcript** 33:4
71:12,14
**transcription**
167:13
**transcripts**
30:18
**transpiring**
164:23
**trending** 42:13
**tribal** 43:23
**tribe** 43:21,25
**tricky** 72:5
**tried** 15:24,25
**trouble** 88:4
**true** 142:3
167:14
**truth** 167:9,9,10
**try** 42:14 47:17
81:12 144:3
**trying** 52:1 64:7
68:11,14 72:5
78:23 85:19
90:17,18 95:1,3
95:13,19 98:22
113:22 140:4
**tucked** 112:17
**tumultuous**
163:18
**turn** 26:5 67:15
89:15 96:17

**[turn - utilizing]**                                                          Page 39

143:18
**turning**  99:7
**twice**  42:22 69:5
**two**  12:1,22
  15:20 22:8
  29:17 31:7,11,12
  32:24 38:13
  39:13,17 40:13
  42:19,23,24 44:5
  67:19 90:23,23
  102:14 105:14
  120:22 121:22
  131:6,8 135:7
  162:25 163:8
**type**  6:16,19
  7:17 9:6,15
  11:23 20:6
  44:19 55:21
  96:8 155:3
  165:12
**types**  9:1

u

**unable**  112:16
**uncertain**  29:1
  77:9 80:20 98:7
  145:25
**uncommon**  66:7
  66:16
**underneath**
  112:9
**understand**  6:22
  9:11 24:12
  34:19 64:7
  65:17 67:2
  68:12 71:4 74:6
  75:14 85:19
  90:3,7,17 101:25

102:1,12 109:5
109:24 126:20
140:4 142:23
143:25
**understanding**
  21:1 35:1 48:18
  66:19,22 67:5,16
  69:20 72:13
  73:9 74:14 75:9
  75:15,23 76:13
  86:9,17,19
  106:12 109:19
  136:22 141:20
  165:12
**understood**  7:10
  8:16 11:5 12:10
  22:12 26:8
  27:14 50:9 51:2
  52:12 54:2
  56:21 64:15
  69:25 72:3 86:1
  127:12 134:14
**undertaken**
  53:10
**unfair**  89:17
**unfolding**  99:11
**unit**  38:3 39:7
  51:1,5,15 55:6
  55:20 130:13
  150:22
**united**  1:1 26:6
  26:10 27:12,15
  47:21 55:4,6,14
  56:2 61:17 62:9
  63:7,9 128:2
  144:16 145:5
  149:15,24
  150:17 157:18

**units**  54:8,11
**unknown**  78:19
  79:1 81:19,24
  82:3,9 114:11
  164:13,14,19
  166:10
**unleash**  116:19
**unnecessary**
  116:6 117:25
  146:21
**unquote**  62:13
**unreasonable**
  142:14
**unusual**  153:2
**update**  36:21
  40:17 42:21
  43:11
**updates**  8:13
  37:21 38:10,18
  39:5 40:6 41:21
  42:8,18 43:4
  44:2
**upper**  112:18
**upwards**  30:24
**urban**  164:16
**use**  6:13,17,19
  9:13,15 10:10,14
  10:19 11:23
  16:23 17:6
  23:21,24 24:1,8
  24:9 28:16,22
  29:6 48:15 49:4
  55:22 67:23
  68:1 74:1 77:1,8
  77:15 79:24
  80:15,18 81:1
  85:7 91:2 94:23
  98:6,15 100:9

103:1 104:4,18
108:2 109:3,9,16
111:1 116:12
117:10 118:24
122:17 127:3,7
128:1,15 130:25
131:10 134:13
134:24 135:25
136:4,6,11 138:8
138:8,25 139:13
140:14,22 141:3
141:15 142:13
142:20 145:23
146:5,10,17,20
146:24 147:5,9
147:16 148:11
149:23 152:4
153:18,22 154:5
154:7,11,14,17
155:10 157:20
158:7 159:12
160:14 161:23
162:18,23,24
163:24
**users**  49:18
**uses**  5:20,24 7:1
  7:8 16:22 132:7
  154:2
**utilize**  5:10,13
  5:14,20,23 6:18
  7:2,4
**utilized**  14:4
  15:7 16:2,10
  126:10 149:6
**utilizing**  6:6
  13:18 14:2
  16:18

**[v - witness]**                                                                Page 40

| v | | | |
|---|---|---|---|

**v** 1:6 20:9 29:17 29:17 30:1 68:6 73:19 132:5

**variations** 164:3

**variety** 152:16

**vast** 63:8

**vehicle** 20:13

**vendor** 66:5

**verbal** 82:15,20

**verbatim** 104:5

**version** 39:12,21 137:19

**versus** 19:22 20:2 21:11 40:12 45:9 67:10 128:9 132:2,16,21 165:10

**video** 29:17 83:19,25 87:10 89:18 92:20 93:13,15,15 94:15 95:11 112:8,15 120:9 121:18 127:8

**videoconference** 1:14 4:3

**videos** 83:16

**view** 91:5,8 108:25 112:7 127:13

**viewed** 108:19 127:8

**viewing** 91:8 94:14 96:9

**village** 4:22 11:15 41:18

**violent** 166:1,6

**virginia** 1:1 2:8 2:10 18:21,25 24:7 29:19,21 32:5 33:24 34:3 34:18,22 35:5,19 35:25 61:22 64:19 70:3,21 71:6,15 72:6 73:9 74:15 75:10,16,24 76:14 107:17 113:25 126:12 126:22 128:13 130:24 132:24 133:17 149:1,8 149:14,21 150:13,20

**virginia's** 67:12

**virtue** 68:16

**vision** 83:18

**vitae** 3:9 36:24 37:10

**voluntary** 159:3

**voting** 157:8

**vs** 21:21

| w | | | |
|---|---|---|---|

**w** 1:15 3:2 4:2,12

**walk** 37:11,13 48:4 77:4 114:6 117:3 118:19 123:24 131:20 135:21 139:4

**walker** 20:2 21:5 21:21

**walking** 88:14

**want** 14:6 27:9 28:9 33:12,17 52:8 75:14 90:6 125:25 135:2 136:21 143:23 144:2 161:20 165:16

**wanted** 18:19 80:1

**wanton** 116:6 146:22

**warden** 137:17 138:6,18

**warning** 79:12 82:11 120:24 121:24 125:17 128:4,19 129:22 130:17 150:1

**warnings** 78:7,8 78:16 79:7,21,22 81:13,18 82:15 84:19 120:21 121:21 124:17 125:8,19,21

**washes** 66:11

**washington** 2:4

**watch** 83:20

**waukesha** 38:12

**way** 34:15 42:1 61:9 62:23 65:24 72:5 105:18 112:12 118:11 122:16 143:4,9 161:2

**we've** 32:9 33:11 50:1 82:15,15,16 83:1 94:4 104:12 105:4,7

108:9 111:7 120:4 128:22 135:6 155:25

**weapon** 155:7

**weapons** 49:10 49:10,11 84:20 105:7 114:11 120:4 154:21 155:6,7

**website** 35:9,12 35:15 40:17,17

**week** 42:22

**weigh** 166:3

**welcome** 60:16

**went** 6:4,9 49:7 49:8 56:1 64:11 69:3 70:10 137:24

**west** 132:5,16

**western** 1:1

**whitley** 29:16

**whitten** 29:17

**wide** 158:6

**wife** 41:14

**wildlife** 55:7 56:3

**william** 140:10

**wisconsin** 20:3 38:11

**wish** 125:13

**withdraw** 76:7

**witness** 1:16 18:4 20:1,8,25 68:23 69:1 76:9 89:6 90:14 107:1 137:12 167:15,19

**[wooded - zoom]**

Page 41

**wooded**   164:16
**word**   139:20
**words**   23:22
**work**   4:22 7:20
  9:1,1 10:23
  12:13 34:10
  50:7 52:19 62:9
  79:13 153:9,16
  157:14 165:3
**worked**   11:13,18
  12:13,18,23 13:4
  99:20 103:5
  152:13
**working**   11:7
  13:25 62:16
  113:12 153:5
  161:22
**works**   112:11
**worth**   34:10
**wound**   21:2
**wrist**   111:25
  112:10 125:24
**writes**   62:14
**writing**   55:8,12
**written**   20:24

**x**

**x**   3:1,5

**y**

**yardstick**   63:16
  132:4,8 134:10
  134:12
**yeah**   13:4 28:11
  29:11 51:23
  52:4 65:19
  119:6 122:23
  133:12 135:8
  136:23 149:10

  150:10
**year**   14:20 37:25
  51:10,11,14
  52:22 53:5,9,15
  53:24 54:5
  154:8
**years**   5:1 12:22
  13:4 49:2 153:8

**z**

**zero**   124:13
**zoom**   1:14 2:3,9
  4:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.